# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 1:20-mj-03211-Becerra

**IN RE: CRIMINAL COMPLAINT**

_____/

### CRIMINAL COVER SHEET

1.  Did this matter originate from a matter pending in the Northern Region of the United States Attorney's Office prior to October 14, 2003? _____ Yes ___X___ No

2.  Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to September 1, 2007? _____ Yes ___X___ No

Respectfully submitted,

ARIANA FAJARDO ORSHAN
UNITED STATES ATTORNEY

By:  *Sean T. McLaughlin*
Sean T. McLaughlin
Assistant United States Attorney
Court ID No. A5501121
99 NE 4th Street, 8th Floor
Miami, FL 33132
Phone: (305) 961-9013

AO 91 (Rev. 08/09)  Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
Southern District of Florida

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| ALBERICO AHIAS CRESPO | ) | Case No.   1:20-mj-03211-Becerra |
| and JORGE DIAZ GUTIERREZ, | ) | |
| | ) | |
| _____ | ) | |
| *Defendant(s)* | | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ___September 2019 through July 2020___ in the county of ___Miami___ in the
___Southern___ District of ___Florida___ , the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. § 371 and 1001(a)(1)-(2) - Conspiracy to Commit an Offense Against the United States | CRESPO and DIAZ have conspired to commit an offense against the United States, that is, in a matter within the jurisdiction of the executive, legislative, and judicial branch of the Government of the United States, to knowingly and willfully falsify, conceal, and cover up by any trick, scheme, and device a material fact, and make a materially false, fictitious, and fraudulent statement and representation |
| 18 U.S.C. §§ 1512(b)(3) and 2 - Conspiracy to Commit & Attempted Witness Tampering | CRESPO and DIAZ have conspired and attempted to knowingly use corrupt persuasion, and engage in misleading conduct toward another person, with intent to hinder, delay, and prevent the communication to a law enforcement officer of the United States of information relating to the commission and possible commission of a Federal offense. |
| 18 U.S.C. § 1512(c)(2) and 2 - Conspiracy to Commit & Attempted Obstruction of Justice | CRESPO and DIAZ have conspired and attempted to corruptly otherwise obstruct, influence, and impede an official proceeding. |
| 21 U.S.C. § 846, 841(a)(1), and 841(b)(1)(C) - Conspiracy to Distribute and Possess with Intent to Distribute Schedule II Narcotics (Oxycodone) | CRESPO and DIAZ have knowing and willfully conspired to distribute and possess with the intent to distribute a Schedule II controlled substance, that is, a mixture and substance containing a detectable amount of Oxycodone. |

This criminal complaint is based on these facts:

SEE ATTACHED AFFIDAVIT OF FBI SA TIMOTHY P. LAWLER

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Special Agent Timothy P. Lawler, FBI
_____
*Printed name and title*

Sworn to before me and signed ~~in my presence.~~
via telephone

Date:  ___July 21, 2020___

_____
*Judge's signature*

City and state:  ___Miami, Florida___

Jacqueline Becerra, U.S. Magistrate Judge
_____
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Timothy P. Lawler, being first duly sworn, do hereby depose and state the following:

1.      I am a Special Agent with the Federal Bureau of Investigation ("FBI"), currently assigned to the Miami Field Office.  Since 1999, I have been a FBI Special Agent and for approximately twenty (20) years, have been assigned to a Public Corruption Squad in Miami, Florida (hereinafter "FBI-Miami PC Squad").  I have conducted numerous investigations, including public corruption and narcotics trafficking investigations.   I have also received formal and on-the-job training in criminal investigation procedures and criminal law, including violations of 18 U.S.C. §§ 371, 1001, 1503, and 1512 and 21 U.S.C. §§ 846 and 841.  I have also participated in various criminal investigations involving the above-described statutes.

2.      I submit this Affidavit based on information known to me personally from the investigation set forth below, as well as information obtained from others who have participated in the investigation of this and other related matters or have personal knowledge of the facts herein.   Specifically, this Affidavit is based upon: (a) court-authorized Title III wire and electronic intercepts; (b) my personal observations and knowledge; (c) my conversations with other law enforcement agents who have participated in this investigation and other, related investigations; (c) my review of judicial and grand jury records, search warrant results, phone records, and other recorded phone calls and meetings; and (d) witness interviews.  This Affidavit is being submitted in support of a criminal complaint against ALBERICO AHIAS CRESPO (hereinafter "CRESPO"), Special Agent with the Department Health and Human Services – Office of

1

Inspector General (hereinafter "HHS-OIG"), and JORGE DIAZ GUTIERREZ (hereinafter "DIAZ").   As such, it does not include all the information known to me as part of this investigation, but only information sufficient to establish probable cause for DIAZ and CRESPO for violations of 18 U.S.C. §§ 371, 1001, 1512(b)(3), 1512(c)(2)[1] and 21 U.S.C. §§ 846 and 841.

## FACTUAL BACKGROUND

3.      Since approximately 2018, FBI and HHS-OIG agents with the Southern District of Florida Health Care Fraud Strike Force (hereinafter "SDFL Health Care Fraud Strike Force"),[2] have engaged in an ongoing grand jury investigation targeting healthcare fraud and Oxycodone trafficking.   Through search warrant results, physical surveillance, confidential source recordings, witness interviews, and Title III intercepts, investigating agents identified DIAZ as a drug trafficker and patient recruiter,[3] including that DIAZ

---

[1]   Based on the law enforcement's investigation and the information set forth below, there is probable cause to establish that DIAZ and CRESPO knew of, or least foresaw, the federal criminal grand jury investigations and official proceedings relating to the GONZALEZ DTO investigation and knew that their actions were likely to affect them.   See United States v. Friske, 640 F.3d 1288, 1291-1292 (11th Cir. 2011) (describing the nexus requirements for Sections 1503, 1512(b)(1)-(2), and 1512(c)(2)). Section 1512(b)(3) does not contain an official proceeding nexus requirement.   See United States v. Ronda, 455 F.3d 1273, 1288 (11th Cir. 2006).   Section 1512(b)(3) "requires only 'the possible existence of a federal crime and a defendant's intention to thwart an inquiry into that crime.'"   Id. (quoting United States v. Veal, 153 F.3d 1233, 1250 (11th Cir. 1998)).

[2]   From 2006 to 2010, CRESPO served as a Special Agent with the Drug Enforcement Administration ("DEA").   Since approximately 2010, CRESPO has been a Special Agent with HHS-OIG and a member SDFL Health Care Fraud Strike Force.

[3]   For purposes of this Affidavit, patient recruiters are individuals that bring patients, often Medicare or Medicaid eligible, to health care clinics in order to unlawfully obtain patient medication prescriptions, typically Oxycodone, and distribute the pills for sizeable street-level profits.   In order to execute the scheme, recruiters often pay the patients a nominal cash amount for utilizing their personal and medical identifying information and typically pay kickback fees to the doctors, clinics, and pharmacies for

knew or foresaw that he (DIAZ) was under federal grand jury investigation. Based on interviews with agents with the SDFL Health Care Fraud Strike Force, confidential source recordings, and Title III intercepts, investigating agents learned that CRESPO knew that DIAZ was a patient recruiter, Oxycodone trafficker, and a target of the SDFL Health Care Fraud Strike Force's ongoing grand jury investigation.[4] The background to law enforcement's ongoing investigation is set forth below.

*SDFL Health Care Fraud Strike Force Investigation*
*Leading to Bosch & Dr. Gonzalez Indictments*

4.      During in and around March 2018, FBI and HHS-OIG health care agents on the SDFL Health Care Fraud Strike Force initiated a federal grand jury investigation, in the Southern District of Florida, into the drug trafficking organization ("DTO") operated by utilized by Dr. Rudolph Gonzalez-Garcia (hereinafter "Dr. Gonzalez") and others (hereinafter collectively "GONZALEZ DTO"), specifically at "West Medical Office, Inc." (hereinafter "West Medical") located at 3408 W. 84th Street, Hialeah, Florida.[5] The investigation focused on allegations that Dr. Gonzalez illegally dispensed Oxycodone, including that Dr. Gonzalez: a) issued Oxycodone prescriptions without conducting proper patient evaluations and determining medical necessity; b) endangered

---

issuing and filling the prescriptions. Patient recruiters may also receive kickback payments from clinics for bringing in Medicare and Medicaid-eligible patients. In order to limit law enforcement detection, patient recruiters may also utilize a network of sub-recruiters, or runners, while expanding their illegal operations across multiple doctors, clinics, and pharmacies.

[4] DIAZ is not cooperating with law enforcement or a known confidential source of information for CRESPO or any other law enforcement officer. FBI-Miami PC Squad investigators have not uncovered any evidence that CRESPO has prepared or authored any official report regarding his interactions with DIAZ as described in this Affidavit.

[5] West Medical was a pain management clinic that operated from approximately November 2016 to approximately August 2018.

3

patients' health by over-prescribing Oxycodone; c) caused the submission of fraudulent Medicare and Medicaid claims for medically unnecessary services; and d) solicited and received kickback payments.

5.      On or about May 1, 2018, in United States v. Bosch et al., 18-20352-CR-LENARD, a federal grand jury in Miami, Florida, returned an indictment charging four (4) defendants with conspiracy to unlawfully dispense Oxycodone and other controlled substances, in violation of 21 U.S.C. § 846 (hereinafter "Bosch Indictment"). The investigation which resulted in the Bosch Indictment was conducted by agents from the SDFL Heath Care Fraud Strike Force. Thereafter, three (3) of the four (4) defendants pleaded guilty and later received sentences ranging from 57-108 months imprisonment. One (1) defendant remains a fugitive. Pursuant to multiple witness interviews conducted by SDFL Heath Care Fraud Strike Force members relating to the Bosch Indictment, DIAZ was identified as a patient recruiter for the GONZALEZ DTO.

6.      On or about January 31, 2019, in United States v Gonzalez et al.; 19-20055-CR-ALTMAN, a federal grand jury in Miami, Florida, returned an indictment charging Dr. Gonzalez and four (4) other co-defendants with the following: conspiracy to pay and receive health care kickbacks, in violation of 18 U.S.C. § 371 and 42 U.S.C. § 1320a-7b(b)(1)-(2)(B); conspiracy to dispense controlled substance, in violation of 21 U.S.C. § 846; and dispensing a controlled substance, in violation of 21 U.S.C. 841(a) (hereinafter collectively "Dr. Gonzalez Indictment").[6] Thereafter, four (4) of the five (5)

---

[6] On or about February 7, 2019, pursuant to the Dr. Gonzalez Indictment, law enforcement executed sealed arrest warrants for each of the five (5) charged defendants. That same day, law enforcement executed a search warrant at West Medical. During the search warrant at West Medical, investigating agents seized voluminous patient medical files, that often included blank forms and forms without signatures and which were

defendants, including Dr. Gonzalez, pleaded guilty and later received sentences ranging from probation to 96 months imprisonment. One (1) defendant remains a fugitive. Pursuant to multiple witness interviews conducted by SDFL Heath Care Fraud Strike Force members relating to the Dr. Gonzalez Indictment, DIAZ was again identified as a patient recruiter for the GONZALEZ DTO. Additionally, based on these witness interviews, investigating agents learned that at least one (1) of the Dr. Gonzalez Indictment defendants had been tipped off about his pending arrest and that Dr. Gonzalez had bragged about having an inside source that provided him confidential, sensitive law enforcement information.

### *Initiation of Public Corruption Investigation*

7.     Beginning in and around March 2019, investigating agents met with and interviewed a confidential source of information ("SOI"). The SOI knew DIAZ for years and reported that DIAZ illegally bought and sold pills of Oxycodone and that CRESPO provided law enforcement protection for DIAZ's illegal narcotics trafficking activities. The SOI was also personally familiar with DIAZ's Oxycodone trafficking, including CRESPO's knowledge and protection of these activities.

8.     The SOI witnessed DIAZ sell Oxycodone pills to street level customers on various occasions, including how DIAZ utilized recruited patients to obtain Oxycodone from pharmacies. DIAZ told the SOI that he (DIAZ) had been recruiting patients and buying and selling patient Oxycodone prescriptions for years. DIAZ told the SOI not to

---

described to your Affiant by FBI and HHS-OIG health care agents as "standard fraudulent patient records." Investigating agents uncovered that West Medical utilized a color coding system to keep track of which patients belonged to a particular patient recruiter. Because the individual patient file for DIAZ was marked with a green tab, FBI and HHS-OIG health care agents believe that the other patient files seized at West Medical also marked with green tabs were recruited by DIAZ.

worry that CRESPO would alert DIAZ if DIAZ was being investigated.  DIAZ also informed the SOI that CRESPO knew DIAZ bought and sold Oxycodone pills because DIAZ and CRESPO had engaged in direct conversations about DIAZ's drug trafficking activities.  The SOI also witnessed DIAZ engage in drug trafficking directly in front of CRESPO.  DIAZ informed the SOI that CRESPO told DIAZ that if anyone ever wished "Santeria" on CRESPO, they "would pay for it with a bullet."[7]  The information provided by the SOI has since been corroborated by physical surveillance, court-authorized Title III intercepts, consensual recordings, and other investigative techniques.

9.       Beginning in and around April 2019, members of the FBI-Miami Public Corruption Squad (hereinafter "FBI-Miami PC Squad") started speaking with various SDFL Health Care Fraud Strike Force agents.  Pursuant to these conversations and subsequent review of HHS-OIG records, the FBI-Miami PC Squad learned that due to CRESPO's position on the SDFL Health Care Fraud Strike Force: a) no later than January 25, 2019, CRESPO knew of the planned February 7, 2019, arrests of Dr. Gonzalez Indictment defendants and also volunteered to participate; b) no later than January 28, 2019, CRESPO knew of the planned February 7, 2019, search warrant of West Medical and also volunteered to participate; c) CRESPO shared cubicle space with the HHS-OIG case agent leading the investigation into the GONZALEZ DTO; d) the status of the ongoing grand jury investigation and investigative targets and subjects, including DIAZ and others, were routinely and openly discussed in and around CRESPO and CRESPO's desk area; and e) as an acting supervisor, during March 2019, CRESPO

---

[7] Based on my law enforcement experience, and as subsequently corroborated by court-authorized Title III intercepts, when CRESPO told DIAZ that if anyone wished "Santeria" on CRESPO they "would "pay for it with a bullet," CRESPO warned that CRESPO would shoot anyone that reported his corrupt activities.

approved reports and documents in HHS-OIG's computer system regarding the GONZALEZ DTO investigation, specifically, four (4) FBI reports relating to the arrest and post-arrest statements of Dr. Gonzalez and two (2) other Dr. Gonzalez indictment defendants, and one (1) HHS-OIG Investigative Memorandum, which updated an earlier March 2018 version, detailing the GONZALEZ DTO investigation, including that recordings by confidential sources and cooperating witnesses were utilized.

10.     Beginning in April 2019, FBI-Miami PC Squad began utilizing a confidential human source (hereinafter "CHS").[8]  During the first phase of the GONZALEZ DTO investigation, during April-June 2018, the CHS at the direction of law enforcement, acted as a patient recruiter and was sent to conduct multiple, recorded purchases of Oxycodone from Dr. Gonzalez at West Medical.  During May 2018, while the CHS was waiting for another Oxycodone prescription at West Medical, DIAZ offered to buy the CHS's Oxycodone for $15 per pill and provided the CHS with his contact information.  The CHS ultimately established a relationship with DIAZ by representing that the CHS was involved in various criminal activities, including unlawfully obtaining and selling Oxycodone.  The information provided by the CHS has since been corroborated by physical surveillance, court-authorized Title III intercepts, consensual recordings, and other investigative techniques.

---

[8] The CHS assisted with the FBI-Miami PC Squad investigation as to DIAZ and CRESPO: a) to avoid prosecution in a separate SDFL Health Care Fraud Strike Force investigation; and b) for limited financial compensation.  The CHS previously worked with SDFL Health Care Fraud Strike Force investigators regarding the GONZALEZ DTO.  Because health care fraud agents discovered that the CHS was still recruiting patients for compensation, the CHS was closed for cause during the investigation which resulted in the Dr. Gonzalez Indictment.

11.     During September 2019, and continuing through December 2019, investigating agents utilized the CHS to conduct a series of controlled, consensually recorded calls between the CHS and DIAZ. Investigating agents developed a cover story for the CHS whereby law enforcement directed the CHS to pretend that the CHS had been recently approached by federal agents asking about the CHS's and DIAZ's involvement with the GONZALEZ DTO, including showing the CHS photographs of DIAZ and Oxycodone prescriptions from Dr. Gonzalez for the CHS and DIAZ. These recorded calls, including additional investigation, confirmed the close relationship between DIAZ and CRESPO, and revealed that DIAZ and CRESPO were conspiring to obstruct justice and provide materially false information to federal law enforcement.[9]

### *September 24, 2019*

12.     On or about September 24, 2019, at approximately 6:06 p.m., at the direction of law enforcement, the CHS engaged in a consensually recorded a telephone call with DIAZ (xxx-xxx-3906), which lasted approximately eight (8) minutes and 30 seconds. During the call, the CHS claimed that the CHS had been approached by HHS agents who asked about the CHS's and DIAZ's association with Dr. Gonzalez and their involvement in illegal drug activities. During the conversation, DIAZ stated: "No, no. If . . . . Look, listen. I'll fix this very quickly. Because my godson [CRESPO] . . . my godson who loves me as if I were . . . his son. I'm waiting for him to arrive from Greece . . . . It's possible he will arrive today. If he arrives today, I'm going to . . . I'm going to

---

[9] The quoted material from the CHS's controlled calls and Title III intercepts in this Affidavit emanate from rough draft Spanish-English translated transcripts completed by FBI language analysts. Interpretive remarks appear at places in parentheses. The interpretation of these calls is based on the context of the call and the training and experience in narcotics, health care fraud, and public corruption investigations of investigating agents.

call him to go by his house and talk to him."[10]  DIAZ also stated: "In his [CRESPO's]

office, the person handling the case . . . the person handling the case of this . . . of this

guy, are other agents that he knows."  DIAZ told the CHS: "I'm going to speak to

Alberico [CRESPO] today."  DIAZ also stated: "Forget it. Relax. I'm going to talk right

now with . . . with . . . well, with . . . I can tell you that he's [CRESPO] my godson

because I'm like a father to him. I'm going to talk to him now so he can find out."  DIAZ

went on to clarify: "Yes, they are federal. Yes, uh . . . . Hey, the one handling the case . .

. the one handling the case of this guy . . . of . . . . He had already spoken to me, my

godson. The one handling the case . . . of . . . of Gonzalez, are . . . yes, are . . . are three

federal agents, who work in his department."[11]

13.     On September 24, 2019, at approximately 6:16 pm, immediately after the

first controlled call between the CHS and DIAZ over (xxx-xxx-3906), pen register

analysis revealed that: a) DIAZ placed an unanswered call to CRESPO's personal cell

phone (xxx-xxx-3164); and b) at approximately 6:40 pm, CRESPO called DIAZ, which

lasted approximately two (2) minutes and 27 seconds.

14.     On September 24, 2019, following the 6:40 p.m. call between DIAZ and

CRESPO, pen register analysis revealed that, at approximately 6:52 p.m., DIAZ called

the CHS, which appeared to be unanswered. Thereafter, at approximately 6:53 p.m., the

CHS, at the direction of law enforcement, engaged in a controlled, recorded call with

---

[10]   Travel records checks revealed that CRESPO returned from Greece, to the
United States, that same day: September 24, 2019. Employment record checks further
indicated CRESPO returned to work on or about September 26, 2019.

[11]   FBI-Miami PC Squad investigators confirmed that are and have been, in fact,
three (3) case agents leading the GONZALEZ DTO investigation: one (1) FBI case
agent; one (1) HHS-OIG case agent; and one (1) HHS-OIG training agent.

DIAZ, which lasted approximately five (5) minutes and 17 seconds.   During the conversation, DIAZ told the CHS: "It is true, the truth is I did go to his [Dr. Gonzalez's] office, the same as many other people that went to his office - but the only relationship that I had with him was patient/doctor.   I don't, I don't have a close relationship or friendship with him, or anything like that."   DIAZ also stated: ". . . well I, I talked to this, with this guy [CRESPO], because as you know that is the fastest route and . . . as well, and I told him.   I told him, 'Listen, tomorrow, I need you to find out who wants to see me over there.   And I will gladly go wherever they ask me to go, uh, you know, what-whatever they want."   DIAZ also told the CHS: "Listen . . . the thing is that he [CRESPO] knows, when Rodolfo [Dr. Gonzalez] was busted he [CRESPO] said, 'I had nothing to do with this, dear father.   But, and you know this, the people are from my agency.'   So-so he can just find out, he will know who it [GONZALEZ DTO investigating agency] is.   And he [CRESPO] can tell me, 'Listen, this, this and that and he [GONZALEZ DTO investigating agent] will talk to you, or however that needs to talk.'"   Based on the timing and nature of the call between CRESPO and DIAZ described above in paragraph 13, including DIAZ's statements during the call described in this instant paragraph, Title III intercepts described below, and evidence uncovered during the GONZALEZ DTO investigation, there is probable cause to believe that CRESPO was concerned that the CHS was an informant, instructed DIAZ to lie about DIAZ's relationship and drug trafficking activities with Dr. Gonzalez, and that CRESPO and DIAZ conspired to obstruct justice and provide materially false information to federal law enforcement.

*October 2, 2019*

15.     On or about October 2, 2019, at approximately 9:09 a.m., pen register data showed that CRESPO (xxx-xxx-3164) placed a call to DIAZ (xxx-xxx-3906), which appeared to be unanswered.  Seconds later, the DIAZ called CRESPO, which lasted approximately 24 minutes.

16.     Thereafter, HHS-OIG conducted an analysis of user activity logs for their IRIS law enforcement database, specifically examining activity associated with CRESPO's user identification: "ALBERICOC."  In order to login into their agency database, HHS-OIG agents have their own and unique user name password.  During the SDFL Health Care Fraud Strike Force's GONZALEZ DTO investigation, the FBI and HHS-OIG both utilized specific and independent law enforcement databases to maintain documents, records, and evidence, including but not limited to, subject and witness identities and interviews, consensual recordings, charging documents, and operational plans for arrest and search warrants.  Additionally, it remained common practice for FBI and HHS-OIG agents assigned to the SDFL Health Care Fraud Strike Force to provide each other with copies of agency reports and documents to be entered into their respective databases.  Both databases have the ability to conduct queries for names, Social Security numbers, and phone numbers, including other sensitive investigative information.  These law enforcement databases also contain a pre-sign on banner acknowledging stating the user is only allowed to use the database for official use, is not allowed to query the system for personal interest, and may face civil and criminal penalties for unauthorized or improper use.

11

17.     As set forth below, HHS-OIG computer analysis for CRESPO's activity on October 2, 2019, during the 24-minute call (approximately 9:09 a.m. to 9:36 a.m.) between DIAZ and CRESPO set forth above in paragraph 15, revealed the following:

a.  At approximately 9:22 a.m., CRESPO commenced computer queries into the GONZALEZ DTO investigation.  CRESPO conducted a "quick search" for the term "Rodolfo Gonzalez," including specifying the OIG component of "Office of Investigations" and the region "Miami."

b.  At approximately 9:23 a.m., CRESPO viewed a FBI National Threat Operations Center tip line report.   This three-page report an anonymous complaint, during December 2018, regarding a doctor in Miami, Florida, that allegedly wrote illegal prescriptions and received cash-only payments from Dr. Gonzalez's prior patients.

c.  At approximately 9:25 a.m., CRESPO examined a .zip file, which contained various DEA and Florida Prescription Drug Monitoring Program ("PDMP") reports, covering the period of November 2016 through August 2018, regarding Dr. Gonzalez, his patients, and their prescriptions at West Medical.  These reports detailed, among other information, the following: all of Dr. Gonzalez's patients by order of quantity of prescriptions issued, which included DIAZ (2,190 pills/16 prescriptions); that, in total, Dr. Gonzalez prescribed approximately 1.3 million pills of Oxycodone, via 9,818 prescriptions; that the 1.3 million Oxycodone pills accounted for approximately 94% of all prescriptions that Dr. Gonzalez issued; and that, of the 1.3 million Oxycodone pills that Dr. Gonzalez prescribed, approximately 92% were 30mg tablets.

d.  At approximately 9:27 a.m., CRESPO conducted a Central Index Search with the specific search string "M18000319," which is HHS-OIG investigative file for the SDFL Health Care Fraud Strike Force investigation regarding GONZALEZ DTO investigation.

e.  At approximately 9:29 am, CRESPO viewed a FBI FD-302 documenting the arrest of Dr. Gonzalez. This FBI report detailed that Dr. Gonzalez, post-arrest, stated that he believed that his arrest was the result of prior activities at West Medical and that three (3) women and 10-12 Cuban males were responsible for the issues at the clinic. CRESPO also would have learned that Dr. Gonzalez executed a written Miranda waiver and agreed to be interviewed, but that Dr. Gonzalez's custodial interview was recorded and saved as evidence.

f.  After CRESPO viewed the Dr. Gonzalez arrest report, HHS-OIG computer analysis revealed that his IRIS session timed out and that he was re-directed by to the login screen.

18.    On October 2, 2019, at approximately 9:36 am, investigating agents uncovered that CRESPO, using his government issued cell phone number xxx-xxx-1219, called the lead HHS-OIG case agent on the SDFL Health Care Fraud Strike Force's GONZALEZ DTO investigation. According to the HHS-OIG case agent, this call lasted approximately six (6) minutes and was not recorded. Investigating agents spoke with this HHS-OIG case agent and the lead FBI case agent on the GONZALEZ DTO investigation and learned the following: a) the HHS-OIG case agent and CRESPO worked in the same small cubicle area at their HHS-OIG office building; b) CRESPO's desk was located a few feet away from the lead HHS-OIG case agent; c) the GONZALEZ DTO

13

investigation and its targets and subjects, including DIAZ, were openly discussed by agents in their small workspace area; d) SDFL Health Care Fraud Strike Force agents often used another room with a white board that listed GONZALEZ DTO investigative details, targets, and subjects that CRESPO periodically saw; and e) during the course of the investigations leading up to the Bosch and Dr. Gonzalez Indictments, CRESPO also likely attended various meetings where agents openly discussed case details, targets, and subjects.

19.     Per the HHS-OIG case agent, during their call CRESPO explained that he had received an inquiry from "Jorge," who CRESPO identified as a "friend of a family-friend."  CRESPO explained that "Jorge" had received information that "two agents" were looking into "Jorge."  CRESPO also told the HHS-OIG case agent that he (CRESPO) looked in their agency's Investigative Reporting & Information System (IRIS) computer system and saw the name of the HHS-OIG case agent for the GONZALEZ DTO investigation.  CRESPO explained that "Jorge" was merely an elderly man that suffered from back pain and that "Jorge thought the doctor was legitimate."

20.     During the conversation with CRESPO, the lead HHS-OIG case agent attempted to remain casual and told CRESPO that the GONZALEZ DTO investigation was "closed."  The lead HHS-OIG case agent only told CRESPO that the investigation was "closed," because the agent had been instructed to temporarily pause the ongoing GONZALEZ DTO investigation until the FBI's public corruption investigation was more firmly in place.  Based on your Affiant's training and experience, including information uncovered from the SDFL Health Care Fraud Strike Force and FBI-Miami PC Squad investigations and subsequent Title III intercepts, CRESPO was surreptitiously referring

14

to DIAZ when he used the name "Jorge." Additionally, given CRESPO's knowledge of GONZALEZ DTO investigation and DIAZ's own drug trafficking activities, CRESPO provided materially false information to the HHS-OIG case agent and attempted to falsely exculpate DIAZ by claiming that "Jorge" was merely an elderly patient with back pain that thought Dr. Gonzalez ("the doctor") was legitimate.

21.     On October 2, 2019, at approximately 9:41 a.m., immediately after CRESPO's call to the lead HHS-OIG case agent, pen register data revealed that CRESPO (xxx-xxx-3164) called DIAZ, which lasted approximately two (2) minutes and 33 seconds.   Given the timing of the 24-minute call between DIAZ and CRESPO set forth above in paragraph 15, and the two (2) minute and 33 second call described above, including information uncovered from the SDFL Health Care Fraud Strike Force and FBI-Miami PC Squad investigations, there is probable cause to believe that CRESPO relayed sensitive law enforcement information to DIAZ, all in furtherance of their conspiracy to obstruct justice and provide materially false information to federal law enforcement.

### December 20, 2019

22.     On December 20, 2019, at approximately 10:56 a.m., at law enforcement direction, the CHS engaged in another controlled, recorded conversation with DIAZ, which lasted approximately five (5) minutes and 24 seconds.   The focus of this call involved the recent December 16, 2019, sentencings of Dr. Gonzalez and another co-defendant Gonzalez, pursuant to the Dr. Gonzalez Indictment.

23.     During this call, when the CHS asked if DIAZ saw the "news about-about Rodolfo [Dr. Gonzalez]," DIAZ stated: "they put him with El Chapo." The CHS mentioned that Dr. Gonzalez got "eight years and the wife got four months," and DIAZ

responded: "blood flowed . . . tongue wagging." When the CHS asked why DIAZ had not called the CHS since they last spoke, DIAZ stated: "I don't, I don't, I don't have a problem. Like I told you, I talked to the man [CRESPO]. . . . Dude, over there - he is the only one who sets appointments here in Miami and that is downtown, it is downtown. I told him [CRESPO], 'Ask all your co-workers over there if any of them need to talk to me. I have no problem.'" DIAZ also told the CHS: "And so then he [CRESPO] said to me, 'Okay,' he said, 'sounds good.' And then the next day he [CRESPO] told me, 'Listen, no one over here - no one wants anything to do with you. No one. Absolutely no one.'" DIAZ continued telling the CHS: "So then he [CRESPO] called, he called someone there and said, "Were you in the - in the Rodolfo thing [GONZALEZ DTO investigation]?" And he said, 'Yeah.' And the guy [GONZALEZ DTO investigating agent] said, 'Yeah, I'm about to close that thing already. Fuck it, it has a whole bunch of fucked up shit.'" Given the nature of this December 20, 2019, call, including information uncovered from the SDFL Health Care Fraud Strike Force and FBI-Miami PC Squad investigations, there is probable cause to believe that CRESPO relayed sensitive law enforcement information to DIAZ, all in furtherance of their conspiracy to obstruct justice and provide materially false information to federal law enforcement.

*DIAZ Surveillance & CRESPO's Residence*

24.   Beginning in and around June 2019, investigating agents conducted randomly targeted surveillance on DIAZ. On numerous occasions, DIAZ was observed going to various pain management clinics and pharmacies in Miami-Dade County, Florida, often accompanying other older patients. These clinics were also identified by SDFL Health Care Fraud Strike Force investigators as suspected pill mills. During early 2020, investigating agents observed DIAZ that was no longer living at his residence in

Miami Gardens, Florida. Instead, agents observed DIAZ living at an efficiency unit attached to CRESPO's personal residence in Hialeah, Florida. To date, DIAZ continues to live at this efficiency unit attached to CRESPO's personal residence

### *Court-Authorized Title III Intercepts over DIAZ's phone*

25.     Beginning in April 2020, investigating agents obtained court-authorization to conduct Title III intercepts over DIAZ's phone (xxx-xxx-3906). Agents obtained Title III court-authorization for three (3) different 30-day periods of interception: a) April 17, 2020, through May 16, 2020 (hereinafter "Title III Period #1"); b) June 1, 2020, through June 30, 2020 (hereinafter "Title III Period #2"); and c) July 7, 2020, through the present (hereinafter "Title III Period #3").

26.     These Title III intercepts revealed: a) DIAZ, while living at CRESPO's residence, actively engaging in Oxycodone trafficking, using various recruited patients (identified by initials as M.P., A.A., B.R., M.C., L.A., and P.R. among others)[12] and purchasers (identified by initials as Y.T., among others), via multiple pharmacies and at least one (1) new, identified medical clinic located in Miami, Florida; b) CRESPO's knowledge of DIAZ's past and present Oxycodone trafficking activities; c) CRESPO's active concealment of DIAZ's past and present Oxycodone trafficking activities from law enforcement detection; and d) CRESPO and DIAZ conspiring to obstruct justice and provide materially false information to federal law enforcement.

27.     PDMP analysis for this clinic described above in paragraph 25, for May 2019, through May 2020, detailed, among other information, the following: a) all of clinic's patients by order of quantity of prescriptions issued, which included DIAZ (1,170

---

[12] Pursuant to PDMP analysis, many of these same recruited patients were also former Oxycodone patients of Dr. Gonzalez.

pills/12 prescriptions), M.P. (1,251 pills/12 prescriptions), L.A. (1,290 pills/13 prescriptions), A.A. (1,285 pills/11 prescriptions), B.R. (1,230 pills/12 prescriptions), and M.C. (1,390 pills/13 prescriptions); b) that, in total, the clinic prescribed approximately 723,923 pills of Oxycodone and/or Oxycontin, via 6,893 prescriptions; c) that the 723,923 Oxycodone/Oxycontin pills accounted for approximately 91% of all prescriptions that the clinic issued; and d) that, of the 723,923 Oxycodone/Oxycontin pills that the clinic prescribed, approximately 89% were 30mg tablets. Pursuant to information provided by SDFL Health Care Fraud Strike Force investigators, the clinic's Oxycodone prescription statistics, like Dr. Gonzalez's in the GONZALEZ DTO investigation, appear to possess all the hallmarks of an illegal Oxycodone kickback scheme operation, including that 30mg tablets are the highest possible Oxycodone dosage amount and the most valuable, street-level quantity.

### *Title III Period #1*

28.     On April 20, 2020, at approximately 1:26 p.m., DIAZ had a conversation with an unidentified individual, first and last name unknown (hereinafter "FNU LNU-1"). DIAZ and FNU LNU-1 discussed trafficking Oxycodone in 180 pill quantities and used coded language as such as "coffee ready," "that R one," and "that G one," to discuss Oxycodone pills, their colors, and availability. FNU LNU-1 told DIAZ: "Hey, my friend has 180 of those little things." When DIAZ stated, "oh, he has 180 . . . is the coffee ready?," FNU-LNU-1 responded: "Let me call my friend, buddy." DIAZ asked: "Yeah, it's the same thing as last time, right?" UM1 replied: "Yeah, yeah . . . that R one, that G one, those."

29.     On April 20, 2020, at approximately 3:35 p.m., DIAZ received a call from another unidentified individual, first and last name unknown (hereinafter "FNU LNU-2").

During this call, DIAZ and FNU LNU discussed Oxycodone trafficking, used the code word "pullovers" in order to refer to the Oxycodone, and spoke regarding street prices for Oxycodone pills at $16 to $17 per pill. DIAZ told FNU LNU: "El Gordo wants to make a buck off every pullover [Oxycodone pill] but this guy who has the pullovers, uh, no, because it's just that . . . because El Gordo told him, 'Look, I'll buy them from you, they're good pullovers, name brand, at 16 bucks . . . and so then the guy's [like]: 'No, let me see if . . . see if I find someone who can pay 17 for the . . . the guy has like 80 pullovers [Oxycodone pills], good ones, name brand . . . so if I can't make a buck, then f*** it."

30.     On April 24, 2020, as part of an investigative ruse, the CHS was directed to contact DIAZ and state that the CHS had been approached by FBI agents inquiring about DIAZ and DIAZ's activities with Dr. Gonzalez, the CHS, and other patient recruiters. Toll records reveal that the CHS, at the direction of law enforcement, contacted DIAZ's phone approximately nine (9) times over the course of April 24, 2020, via seven (7) telephone calls and two (2) text messages.

31.     On April 24, 2020, at approximately 7:30 p.m., DIAZ called his voicemail and listened to the following voice messages left by the CHS, at the direction of law enforcement. Message #1: "Jorgito, it's [the CHS] call me back because I have to talk to you about something very important. Please call me." Message #2: "Jorgito, it's me, [the CHS]. I'm calling you, but I get the machine. I need to speak to you, it's um, important. Do me a favor, call me - call me back. Call me on this number, buddy."

32.     On April 24, 2020, at approximately 7:31 p.m., approximately one (1) minute after listening to the voice messages from the CHS, DIAZ called CRESPO (xxx-

xxx-3164).  DIAZ told CRESPO: "I was checking here because I got messages - nine messages from that fucking Negro [the CHS] . . . and they all say the same thing, 'I have to talk to you, it's important.'  I'm gonna fucking block him, right?"  CRESPO told DIAZ: "Yes, block him.  Don't even answer him."  When DIAZ replied "alright, okay, that's fine," CRESPO reiterated: "Don't even answer him . . . . Don't even answer him. Okay."

33.    On April 29, 2020, at approximately 12:05 p.m., DIAZ called the medical clinic described in paragraphs 26-27.  During this call, DIAZ discussed unlawfully obtaining multiple Oxycodone prescriptions from the clinic, and paying consultation fees, for multiple patients that DIAZ recruits, including M.P, B.R., A.A., and M.C., among others.  During the conversation, DIAZ told the clinic' receptionist: "[I'm calling] to pay for the consultations that I'm going to give you now . . . we're going to kill a few birds with one stone."  The receptionist replied: "You guys' appointment is for the first (May 1, 2020) . . . how many of you will there be?"  DIAZ replied: "Look, it's going to be . . . [A.A.] and [P.R.], they're different because they're paying with their card, I'm at [A.A.'s] house . . . Now I'm going to tell you mine, it's me, [B.R.] and . . . [M.C.] and I, I'm going to pay you with my card."  The receptionist stated "Let me put them, because I don't have them in the system . . . so he (the doctor) can send it today if you want it today . . . to the same pharmacy as last month, right?"  DIAZ replied: "We're still at the same pharmacy."

34.    During the same call, the receptionist inquired, "listen, but not [M.P.]?," and DIAZ responded: "I'm also going to do [M.P.] and I'm going to pay it from mine." Claudia stated: "I'm first going to charge you for [P.R.] and [A.A]. . . it will be $450 . . .

I'm going to need their card number." DIAZ provided a credit card number, which agents believe belonged to A.A, and told the receptionist: "Now [M.P.], [M.C.], [B.R.] Braulia, and I on my card." The receptionist replied: "$900 in total, ok?" DIAZ provided another credit card number and asked: "Do you think the doctor will call it in to the pharmacy today for me to get it on the first (May 1, 2020)?" The receptionist responded: "Yes, he's going to call it in."

35.     On May 14, 2020, at approximately 1:35 p.m., DIAZ received a call from FNU LNU. During this call, DIAZ and the FNU LNU and the FNU LNU used coded language and discussed the price for yellow-colored Oxycodone pills ("yellow pullover"). FNU LNU told DIAZ: "If he, if he it's the yellow one . . . if it's the yellow pullover . . . get it." DIAZ replied: "I know that the yellow one. The yellow one is very good, but how much?"

### Title III Period #2

36.     During June 2020, FBI agents attempted to interview certain of DIAZ's recruited patients: L.A. M.C, M.P., A.A, and B.R. The purpose of the interview was two-fold: 1) ask questions solely about the GONZALEZ DTO and to make sure that DIAZ and CRESPO realized that, at a minimum, the ongoing GONZALEZ DTO investigation remained active; and 2) uncover how and whether these investigative activities would be relayed to DIAZ and/or CRESPO.

37.     On June 3, 2020, at approximately 11:00 a.m., agents conducted a voluntary, non-custodial interview with L.A. at L.A.'s residence. L.A. stated that L.A. was prescribed Oxycodone by "Daniel" (the clinic doctor) and provided a business card for the clinic. L.A. stated that L.A. took Oxycodone on occasion, but had never sold or given away L.A.'s Oxycodone. L.A. stated that a friend named "Jorge Gutierrez"

21

(DIAZ) used to drive L.A. to medical appointments, but falsely claimed that L.A. had not seen DIAZ since L.A.'s previous doctor (Dr. Gonzalez) had been arrested.[13]  L.A. was shown a series of photographs of Dr. Gonzalez's former patients and claimed not to be familiar with any of them.

38.     On June 3, 2020, at approximately 12:09 p.m., and approximately ten (10) minutes after L.A.'s FBI interview described above, DIAZ received a call from an unknown male.  Thereafter, L.A. took over the line and told DIAZ: "Hey . . . where are you? . . . ah, well look, the FBI just snuck in." DIAZ stated: "Hold on, hold on.  I will go over there right now." L.A. responded: "I need you to come over here right now."

39.     On June 4, 2020, at approximately 10:30 a.m., agents attempted to interview M.C. at M.C.'s residence; however, M.C. declined to speak with the agents. On June 4, 2020, at approximately 10:45 a.m., agents attempted to interview M.P. at M.P.'s residence; however, no one answered the door and agents left a business card.

40.     On June 4, 2020, at approximately 11:00 a.m., agents interviewed A.A. at A.A.'s residence.  A.A. falsely stated A.A. had never been prescribed any Oxycodone and that A.A. drove alone to medical appointments.[14]   A.A. was shown a series of photographs of Dr. GONZALEZ's former patients and claimed not to be familiar with any of them.

41.     On June 4, 2020, at approximately 11:49 a.m., and approximately five (5) minutes after A.A.'s FBI interview described above, DIAZ received a call from A.A..

---

[13]  Pursuant to physical surveillance and Title III intercepts between DIAZ and L.A., investigating agents observed DIAZ and L.A. meeting well after Dr. Gonzalez's 2019 arrest.

[14]  Pursuant to PDMP records, A.A. obtained Oxycodone prescriptions. Moreover, surveillance agents observed DIAZ drive A.A. to medical appointments.

During this call, A.A. told DIAZ: "You have to come here urgently. DIAZ responded: "Ah, no wait, I am on my way to, I know what it is, they went to [L.A.'s] the day before yesterday, ah, yesterday, today at [B.R.s] I am on my way to [B.R.s] house now and now you, I was gonna let you know." When A.A. stated "[t]hey are investigating something," DIAZ responded: "I know what it is, but well, you have nothing to worry about. I will talk to you now."

42.    On June 8, 2020, at approximately 8:08 p.m., DIAZ called B.R.. During the call, DIAZ and B.R. discussed setting aside a small amount of Oxycodone pills in order to make investigating agents believe, when they visited B.R. the next day, that B.R. used Oxycodone for medicinal purposes rather than providing her prescriptions to DIAZ. DIAZ confirmed that he consulted CRESPO ("Alberico") about B.R.'s pending FBI interview and CRESPO, who was - in fact - professionally acquainted with the agent who left his card at B.R.'s residence on June 4, 2020, reassured DIAZ that the agent would not follow up with B.R. after the interview. B.R. told DIAZ: "I already set 5 aside." DIAZ replied: ". . . tell [M.C.] to set 5 aside in case they go to her house." DIAZ stated that he spoke to "Alberico" [CRESPO] and CRESPO told him: "'Old man, no worries . . . that one isn't ever going back. I-I know him personally . . . .'" B.R. replied: "Yes, but he's [FBI agent] coming tomorrow at 10." DIAZ stated: "But that is for after tomorrow, and after that, he's [FBI agent] not going to go back again."

43.    On June 9, 2020, at approximately 10:00 a.m., agents interviewed B.R. at B.R.'s residence.  During the interview, B.R. also stated that B.R. was prescribed Oxycodone by the clinic described above in paragraphs 26-27. B.R. was shown a series

of photographs of Dr. Gonzalez's former patients and claimed to only recognize Sucette

Vinas Lopez, the fugitive in case number 19-20055-CR-ALTMAN.

44.     On June 9, 2020, at approximately 10:41 a.m., and approximately ten (10)

minutes after B.R.'s FBI interview described above, DIAZ received a call from B.R.

During the call, DIAZ and B.R. discussed B.R.'s interview with the FBI agents.  DIAZ

told B.R. that he again spoke with "Alberico" (CRESPO) and CRESPO stated that the

agents would not go back to see B.R.

45.     On June 12, 2020, at approximately 11:54 a.m., DIAZ received a call from

Y.T., once of DIAZ's Oxycodone bulk purchasers.  DIAZ and Y.T. discussed the current

status of the FBI's investigation and what DIAZ knew from his law enforcement contact.

DIAZ confirmed that he spoke to CRESPO ("el bacan"[15]) and that CRESPO stated that

FBI agents would not return to conduct any additional interviews.  DIAZ also confirmed

that CRESPO looked after and provided protection for DIAZ ("checking on your health

all these days" and "will continue to ask about you and stuff") and would alert and warn

DIAZ about law enforcement's investigation, all in furtherance of their conspiracy to

obstruct justice and provide materially false information to law enforcement.  During the

conversation, Y.T. asked DIAZ: "You haven't heard anything new, everything's good?"

DIAZ told Y.T. that everything was fine and that he (DIAZ) spoke to "el bacan"

[CRESPO], who told DIAZ that "'those people would go once and never return.'"  DIAZ

stated that he (DIAZ) asked if "el bacan" [CRESPO] was sure and "el bacan" [CRESPO]

---

[15] Per FBI linguists explained that "el bacan" is a superlative, Spanish slang term
for "the greatest," "the best," or "the big guy."  Agents believe than was DIAZ referred to
"el bacan," DIAZ meant CRESPO.

told DIAZ: "'[w]ell . . . I've been checking on your health all these days, right? . . . and I will continue to ask about you and stuff, worrying about you."

46.     On June 19, 2020, at approximately 12:20 p.m., FBI agents sent an email to various HHS health care fraud agents, including CRESPO, asking for Spanish speakers to support interviews for the GONZALEZ DTO investigation.  The email included an attachment containing list of former Dr. Gonzalez patients that needed to be interviewed. At approximately 1:51 p.m., CRESPO responded to the email and agreed to participate: "I can help if you need me."  As set forth below in paragraph 47, approximately ten (10) minutes after CRESPO agreed to participate in the FBI interviews of Dr. Gonzalez's former patients, CRESPO called DIAZ.

47.     On June 19, 2020, at approximately 2:01 p.m., DIAZ received a call from CRESPO.  During the call, CRESPO directed DIAZ to travel to their home immediately because CRESPO needed to warn DIAZ, in person, regarding the FBI's recent, planned activities in the GONZALEZ DTO investigation ("I have to talk to you about Gonzalez"). CRESPO told DIAZ: "Old man, hold on.  F***ing s***.  Old man, are you home or are you doing the stress test?"  DIAZ responded: "No, I'm at the appointment waiting to be called in to do the stress test."  CRESPO told DIAZ: "When you get home, come to see me because I have to talk to you regarding Gonzalez [the GONZALEZ DTO investigation] . . . . It's very important.  Come directly home.  Come to see me."

48.     On June 19, 2020, at approximately 5:24 p.m., DIAZ received a call from his daughter (hereinafter "A.D.").  During the call, DIAZ intimated that he met in-person with CRESPO and revealed that CRESPO disclosed to DIAZ the contents of the FBI email that CRESPO received earlier that day ("showed me his cell phone"), which

25

included a list of intended interview targets – including Milka Lao ("Milka") - in the GONZALEZ DTO investigation.   DIAZ told A.D.: "Yesterday, he [CRESPO] was talking with me, but listen he's very special with me.  He [CRESPO] asked me if I was going to do the catheterization . . . the stress test . . . and I responded 'yes.'  [He said] 'When you finish, come over because I need to speak with you.'  And I told him 'okay, I'll go now.'  Listen, he's such a classy guy with me and I don't like to make things up, nothing.  The guy [CRESPO] reached in and showed me his cellphone and said 'look, I don't want you to have anything to do with these people.'  I responded, 'no, I have nothing to do with those people, I do know them, but I have nothing to do with those people.'  He [CRESPO] said to me, 'then I'm calm now then.  Continue on working Uber the way you're doing.[16]  There's no problem.'  Listen, this guy is a real man.  I told him, 'look, from there I know a couple of people are actually saying in the street that I'm a snitch.'"  A.D. responded: "No!  Really?"  DIAZ asked: "Do you remember Milka, the blonde? . . . . Well Milka is one of them and she's on that list."

49.     On June 26, 2020, at approximately 9:41 a.m., DIAZ received a call from the clinic described above in paragraphs 26-27.  During the call, DIAZ spoke with an unidentified female office worker.  The officer worker asked DIAZ: "Jorgito, I am calling you because, look, I have an appointment for today for [M.C.] and [B.R.], [P.R.], and [A.A.] and they are not answering."  Thereafter, DIAZ and the officer worker discussed dates for these recruited patients' appointments, including DIAZ paying for A.A.

*Title III Period #3*

50.     On July 8, 2020, the lead FBI case agent on the GONZALEZ DTO investigation sent an email to members of the SDFL Health Care Fraud Strike Force,

---

[16] Both DIAZ and CRESPO know that DIAZ is not employed as an Uber driver.

26

including CRESPO, canvassing for volunteers in the near future in order to help interview individuals associated with the ongoing GONZALEZ DTO investigation. The email stated:

> We are back on track to do a sweep of interviews scheduled to take place **Friday, July 17, 2020.** The last couple of weeks I've gone out and done some interviews and was able to narrow down our list a bit and shifted focus to a few patient recruiters along with a handful of beneficiaries. As a result I've narrowed down the email chain to those who have responded to me who are willing to assist.
>
> I was cleared by our management to hold a briefing at our offsite on **Tuesday, July 14, 2020 at 1pm** where you will be assigned a bene or patient recruiter to interview. Additionally, you will be provided an interview package that will have a list of questions to ask and pictures to show the individual you are going to interview. Please hold any questions regarding this until the briefing as any additional information will be provided then.

Thereafter, at approximately 10:14 a.m., CRESPO responded, via email: "Confirmed."

51.    On July 9, 2020, at approximately 4:15 p.m., DIAZ received a call from his former girlfriend, A.L.[17] During the call, A.L. told DIAZ: "Call Pistolita, that he has 100 blue ones [Oxycodone pills]." DIAZ replied: "Oh, he has one 100 ones?"

52,    On July 9, 2020, at approximately 4:19 p.m., DIAZ received a call from an unknown male that referred to himself as "Pistolita." During the call, DIAZ and Pistolita discussed DIAZ obtaining 100 pills of Oxycodone at $16 per pill. Pistolita stated: "I have 100 of them. I am giving them to you at sixteen, at sixteen a pill [$16/pill]. I am . . . Yes, at sixteen a pill. They are giving them to me at fifteen [$15/pill]. To speak clearly, they are giving them to me at fifteen." Pistolita added: "If you can give me fifteen fifty [$1550], so I can pay for the room, I will make fifty [$50] . . . ." DIAZ replied: "I'll give you . . . I'll give you sixteen [$1600]. Relax."

---

[17] During the GONZALEZ DTO investigation, A.L. was also identified as a patient recruiter at West Medical.

53.     On July 10, 2020, at approximately 12:28 p.m., DIAZ called "Pistolita." During the call, DIAZ advised "Pistolita" that the Oxycodone that DIAZ recently bought from Pistolita was fake. DIAZ stated: ". . . it's not the real one and I'll tell you why . . . you run these through a system, through some lights, through a machine and it pulls out the components . . . those pills are put into something like when they're going to pull out your DNA . . . and what it does is, those are, those, those are infrared rays . . . . Because remember that I'm talking about 200,000 to 300,000 [pills] moving through here, you get me? . . . My connection called me today and told me, 'hey, you know those aren't real."

54.     On July 14, 2020, consistent with the email described above in paragraph 50, the lead FBI case agent on the GONZALEZ DTO investigation briefed members of the SDFL Health Care Fraud Strike Force. Despite earlier agreeing to attend and participate in the briefing, CRESPO did not show up. Thereafter, the lead FBI case agent emailed a written briefing package to all assisting agents, including CRESPO. The briefing package reiterated that the GONZALEZ DTO investigation was part of an ongoing grand jury investigation and included DIAZ's photograph and additional information relating to DIAZ and other patient recruiters in the GONZALEZ DTO.

55.     On July 17, 2020, at approximately 11:00 a.m., investigating agents interviewed L.A. at L.A.'s residence. L.A. did not have L.A.'s most recent Oxycodone medication and claimed to have accidently thrown it away. L.A. provided agents with an empty Oxycodone medication bottle from April 2020. Although L.A. earlier told agents that L.A. did not speak with DIAZ anymore, FBI agents reviewed the call log on L.A.'s cell phone and noted multiple, recent phone calls to and from DIAZ. L.A. falsely denied selling Oxycodone to DIAZ or anyone else and knowing if DIAZ bought and sold

Oxycodone medication.  L.A. stated that DIAZ lived in an efficiency of someone else's residence, but when L.A. was shown a photograph of DIAZ, L.A. falsely denied knowing the individual depicted in the photograph.

56.     On July 17, 2020, at approximately 12:44 p.m., DIAZ received a call from L.A., who was another telephone number for L.A.'s spouse.  During the call, L.A. advised DIAZ that FBI agents had interviewed L.A.  Per L.A., agents claimed that L.A. sold Oxycodone pills to DIAZ ("because I sell my pills to you), and L.A. stated ". . . and I tell them no and no and no, and that I know you because you have taken me to the doctor."  L.A. told DIAZ: "I am letting you know, just in case, do you understand?"  DIAZ informed L.A. that people who had already been arrested were providing information against them.

57.     On July 17, 2020, at approximately 1:00 p.m., DIAZ called "Goyo," L.A.'s spouse.  DIAZ told "Goyo" that it was a good thing that L.A. had called DIAZ from Goyo's telephone.  DIAZ stated: ". . . they probably put pressure on [L.A.] so that [L.A.] would immediately call . . . because they [federal law enforcement] are probably intercepting [L.A.'s] telephone."

58.     On July 17, 2020, at approximately 1:30 p.m., investigating agents interviewed M.P. at M.P.'s residence.  M.P. showed agents Oxycodone medication that was prescribed to M.P. on July 16, 2020, and filled on July 17, 2020.  The prescription bottle that M.P. provided contained only one (1) Oxycodone pill despite the bottle indicating that 90 pills were dispensed that day.  M.P. admitted to providing M.P.'s Oxycodone medication to DIAZ earlier that day.   M.P. purportedly loaned the Oxycodone to DIAZ because DIAZ recently received fake Oxycodone medication and

needed M.P.'s prescription.  M.P. claimed that M.P. only gave DIAZ Oxycodone this month and had not done so in the past.  M.P. stated that DIAZ used to take M.P. to medical appointments to obtain Oxycodone.  M.P. identified DIAZ via photograph and provided the FBI agents with DIAZ's telephone number.  M.P. also stated that DIAZ lived in an efficiency of someone else's residence.

59.     On July 17, 2020, at approximately 4:27 p.m., DIAZ received a call from CRESPO.  During the call, DIAZ and CRESPO discussed DIAZ's Oxycodone trafficking with M.P., M.P.'s interview with law enforcement, and including how to best obstruct the investigation moving forward when agents interviewed DIAZ.  DIAZ told CRESPO: "I bought some pullovers [Oxycodone] from her [M.P.] today and then, they [the investigating agents] asked her today and she [M.P.] said that -that she did not have them - that she did not have them because she had lent them to me. And so then the man [investigating agent] told her [M.P.], 'No, so you . . .' and she said, 'No, no, I never...what happens is that they didn't give him [DIAZ] the right ones and I lent them to him but . . . .'"  CRESPO responded: "yeah, that's, that's, that's a mistake... that's a mistake, you hear?  She [M.P.] put you in a bad spot there."  CRESPO continued: "because that puts you in the spotlight. No, no.  If you had called me, I would have told you clearly, don't give her any f***ing thing.  'She's a liar, she didn't lend me anything. Look at my pills here, what are you talking about?'  No, old man.  You made a mistake there, I wouldn't have fucking given her anything, I would have told her, 'No, that's not true . . .'"  CRESPO also provided DIAZ with instructions to destroy and tamper with evidence and how to provide materially false information when DIAZ was likely interviewed by investigating agents.  CRESPO stated: "right now, you take those

30

[Oxycodone] pills and split them into fours, you understand me? You take the cutter with you, and you cut them up there. You cut them into fours and tell him [lead FBI agent on GONZALEZ DTO investigation], 'Look, I take a little piece every couple of hours, to be able to bear the pain because of the humidity, it's worse now in the summer' . . . this and that."

60.    On July 17, 2020, at approximately 4:38 p.m., DIAZ called CRESPO. During the call, CRESPO continued to provide instructions to DIAZ on how to lie to investigating agents and obstruct the investigation. CRESPO stated: "Hey, you tell him [lead FBI agent on GONZALEZ DTO investigation], straight up, 'A person called me and she doesn't know it, she said that I have lent her pills. No, no, no, no, that she lent me pills . . . wait, wait, wait, wait, wait . . . you have asked a couple of people. I don't sell pills to anyone. I have to meet with you.'" CRESPO further added: "that's what's up. Do me a favor, cut the [Oxycodone] pills up. Cut them into fours."

61.    On July 17, 2020, at approximately 4:40 p.m., DIAZ called CRESPO. During the call, CRESPO again provided instructions to DIAZ on how to lie to investigating agents and obstruct the investigation, including how to prevent investigating agents from learning that CRESPO and DIAZ lived at the same residence. CRESPO instructed DIAZ to say: "'I don't receive people at my house. I'm an elderly person, I have emphysema, I have everything, I can't allow if someone has COVID. We have to meet someplace.'"

62.    On July 17, 2020, at approximately 5:41 p.m., DIAZ called CRESPO. DIAZ and CRESPO again discussed how to prevent investigating agents from learning that CRESPO and DIAZ lived at the same residence and nature of their relationship.

31

DIAZ stated: "and the other thing is you are my landlord. I, my only relationship with you is paying you my rent, that's it." CRESPO replied: "take it easy. Don"t you, don't you worry about that. You leave that to me."

63.    On July 17, 2020, at approximately 6:08 p.m., DIAZ called CRESPO. During the call CRESPO provided DIAZ with additional instructions for handling any interview with investigation agents. CRESPO instructed DIAZ to say: "my pills are with me . . . someone told me that someone lent me their pill . . . my pills are with me. Where are you so I can go see you right now?'" CRESPO also instructed DIAZ to call the lead FBI case agent on the GONZALEZ DTO investigation.

64.    On July 17, 2020, at approximately 6:14 p.m., DIAZ called the lead FBI case agent on the GONZALEZ DTO investigation.  This same agent also interviewed L.A. and M.P. that same day.  DIAZ left voice message stating: "My name is Jorge Diaz, you know, I hear from somebody you know, that I do something bad uh, and I don't do nothing.  My pills is with me, you know, I can show you, you know, anytime you want, please can you call me back to xxx-xxx-3906. Thank you."

65.    On July 17, 2020, at approximately 6:15 p.m., DIAZ called CRESPO. CRESPO and DIAZ discussed how to best lie to investigating agents and obstruct the investigation. CRESPO stated: "when they pull your phone records they're going to see my phone . . . I'm going to call the cat [the lead FBI case agent on the GONZALEZ DTO investigation] now.  I'm gonna tell him, 'Listen, buddy, uh . . . a person close to the family called me saying this and this and this happened.  What happened?  Because he wants to talk to you now.  He told me this and this. I don't know what's going on, what is

the problem?  He says he wants to talk to you right now because he hasn't done anything wrong.'"

66.    On July 17, 2020, at approximately 7:04 p.m., CRESPO called DIAZ. CRESPO and told DIAZ: "this is going to bite me in the ass, you hear me?  I'm gonna suffer.  I have to suffer this . . . although you may not believe it, I will not abandon you. You're gonna end my life and yours . . . old man, you killed us both.  You killed us both because you live where I live.  And I am not going to sell you out. . . . .  It seems like you don't know me.  I am more man than I am police . . . old man, the world is going to fall on us, but it's going to fall on us together.  Maybe we'll make it out, make it out.  Hey, I called the American guy [the lead FBI case agent on the GONZALEZ DTO investigation] and he didn't answer me."

67.    On July 17, 2020, at approximately 7:14 pm, CRESPO called DIAZ. CRESPO told DIAZ that DIAZ could up spending 3 years in jail easily and also discussed killing and assaulting those who may have cooperated against DIAZ.  CRESPO also stated: "Old man, we're both gonna end up in jail.  You're not understanding.  Both of us.  Because old man, I'm not gonna sell you out."  CRESPO continued: "I don't understand why [A.L.] . . . [A.L.] deserves for me to go and pump some lead into her . . . You're not understanding me, I have killed people for less."  CRESPO told DIAZ: "Look, old man, if you would have called me to go pick her [A.L.] up, I would have stabbed her twice - her and that son of a bitch - I would have killed both of them right there.  You don't know me, I would have let them both bleed out right there.  Old man, I'm telling you, I'd get them, put them in plastic bags, I'll stick them in the Everglades, a

33

crocodile will eat them. This is the season for male crocodiles to eat. Old man, you're going to end your life and you're going to end my life for no reason."

68.    During the same call, CRESPO warned: "The day, the day-the day I get ahold of Pozo,[18] you're not listening to me, I'll snag Pozo, listen to me, and I'll snag [A.L.] - listen to me - I know a lot about this . . . they will both pay us back for this, for you and me. Old man, [A.L.], I'm going to - no, Pozo, I'm gonna kill him because Pozo is nothing. [A.L.], I'm not gonna kill her, I'm gonna give her such a beating, but such a beating, and she will know who ALBERICO AHIAS CRESPO is. They're gonna take her up in a helicopter. Old man, you can't imagine, but now, me abandon you? . . . I'll have to suck up whatever I have to suck up but old man, in this, you haven't listened to your son." CRESPO continued: "So you why I'm not asking you, 'hey, buddy, call [A.L.] right now, ask her where she's at?' [Because] if I find them, I'll be stabbing all of them . . . Old man, I'm tired of killing people, I don't want to kill anyone. That doesn't bring me joy. But I'll tell you something, her and all of those crackheads - look, old man, I'd kill them for a pack of gum . . . . Old man, that f****t, I'd get Pozo - since he has AIDS - I'd stab him in the ass till he bleeds out. They screwed you, old man."

68.    On July 20, 2020, at approximately 12:54 pm, DIAZ called CRESPO. CRESPO asked if the guy [the lead FBI case agent on the GONZALEZ DTO investigation] called DIAZ. DIAZ said no. CRESPO then said that he received a text and would talk to the agent at 1:00 p.m. in order to see what the agent says.

---

[18] During this call, when CRESPO referred to "Pozo," he meant "Pistolita," – the individual recommended by A.L. and who had recently sold DIAZ $1,600 worth of fake Oxycodone pills.

69.     On July 20, 2020, at approximately 1:00 p.m., the lead FBI case agent on the GONZALEZ DTO investigation conducted a consensually monitored, recorded phone call with CRESPO.  During the call, CRESPO provided materially false information and continued to obstruct law enforcement's ongoing investigation. CRESPO claimed that he (CRESPO) had received a phone call from DIAZ, a family friend, on Friday while CREPSO was eating dinner.  Per CRESPO, DIAZ told CRESPO that DIAZ was being implicated in Oxycodone distribution by people who are lying. CRESPO stated that DIAZ fell off a roof and hurt his back and takes Oxycodone because of this.  CRESPO stated DIAZ was a good person and that if DIAZ was involved in Oxycodone distribution, CRESPO would arrest DIAZ himself.  CRESPO did not believe DIAZ was involved in anything like that and had never heard or seen DIAZ do anything like that because CRESPO would never be involved with someone like that and would arrest him on the spot.  CRESPO later agreed to meet with FBI agents on July 21, 2020, in order to discuss the matter further.

## CONCLUSION

70.     Based on the above-described information and facts, your Affiant submits that there is probable cause to believe that CRESPO and DIAZ have: conspired to commit an offense against the United States, that is, in a matter within the jurisdiction of the executive, legislative, and judicial branch of the Government of the United States, to knowingly and willfully falsify, conceal, and cover up by any trick, scheme, and device a material fact, and make a materially false, fictitious, and fraudulent statement and representation, in violation of 18 U.S.C. §§ 371 and 1001(a)(1)-(2); conspired and attempted to knowingly use corrupt persuasion, and engage in misleading conduct toward another person, with intent to hinder, delay, and prevent the communication to a law

35

enforcement officer of the United States of information relating to the commission and possible commission of a Federal offense, in violation of 18 U.S.C. §§ 1512(b)(3) and 2; conspired and attempted to corruptly otherwise obstruct, influence, and impede an official proceeding, in violation of 18 U.S.C. §§ 1512(c)(2) and 2; and knowingly and willfully conspired to distribute and possess with the intent to distribute a Schedule II controlled substance, that is, a mixture and substance containing a detectable amount of Oxycodone, in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(C).

FURTHER YOUR AFFIANT SAYETH NAUGHT.

Timothy Lawler, Special Agent
Federal Bureau of Investigation

SWORN TO AND SUBSCRIBED
before me this __21__ day of July 2020.

JACQUELINE BECERRA
UNITED STATES MAGISTRATE JUDGE