UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE No. 21-CR-20005-GAYLES

UNITED STATES OF AMERICA,

       *Plaintiff*,

v.

ALBERICO CRESPO,

       *Defendant.*

_____/

## MOTION TO SUPPRESS TITLE III WIRE COMMUNICATIONS AND REQUEST FOR *FRANKS* HEARING

COMES NOW the Defendant, **ALBERICO CRESPO**, by and through undersigned counsel, and pursuant to the Fourth Amendment of the United States Constitution and 18 U.S.C. § 2518(1)(a), hereby respectfully moves this Honorable Court for an entry of an Order suppressing from use as evidence any intercepted communications acquired in conjunction with the wiretap orders entered, its derivative, and for an evidentiary hearing herein.  In support thereof, the aggrieved defendant avers the following:

### I.
### INTRODUCTION

1.      **MR. CRESPO** is an aggrieved person within the meaning of Title 18 U.S.C. § 2510(11) and § 2518(10), in that he is a person who was a party to an intercepted wire communication and person to whom the interception was directed.

2.      Title III contains its own exclusionary rule, which states that an aggrieved person in any trial, hearing, or proceeding in or before any court may move to suppress the contents of any wire or oral communication intercepted or evidence derived therefrom,

on the ground that: "[(i)] the communication was unlawfully intercepted; (ii) the order of authorization or approval under which it was intercepted was insufficient on its face; or (iii) the interception was not made in conformity with the order of authorization or approval."

3.      In this case, the Title III intercepted wire communications should be suppressed because: a) the government did not establish the inadequacy of other investigatory procedures and the consequent necessity to utilize a wiretap, a prerequisite to the issuance of a wiretap pursuant to 18 U.S.C. § 2518(1)(c); and b) the applications failed to establish probable cause to support issuance of the intercept orders.

## II.
## HISTORY OF DEFENDANT

MR. CRESPO has dedicated his entire adult life to servicing the United States – oftentimes putting his own life at risk.  From 1993 through 1997, MR. CRESPO was military police for the United States Airforce.  During his time as military police he served as a linguist specialist and temporary duty to South and Central America for drug interdiction operations in support of the Colombian Government.  He also served temporary duty to the United States Central Command.  Thereafter, from 1997 through 2006, MR. CRESPO was a police officer with the City of Hialeah police department.  As a police officer for the Hialeah police department, MR. CRESPO worked patrol from 1997 through 2000, and was then promoted to detective.  As a detective, MR. CRESPO was assigned to the gang united, narcotics unit, and M.O.S.T. – a unit dedicated to tracking career criminals.

After almost ten (10) years of service to the City of Hialeah, MR. CRESPO became

a federal agent with the United State Drug Enforcement Administration (hereinafter "DEA"). During his time with the DEA, **MR. CRESPO** worked undercover targeting the most infamous drug cartels. **MR. CRESPO** also managed several high-level informants and was responsible for managing the safety, well-being, and immigration status of the family members of an informant whose identity was compromised. Suffice to state that during his time as a DEA agent **MR. CRESPO'S** life was threatened on numerous occasions.

From 2010, until the time of his arrest, **MR. CRESPO** served as a federal agent for the Office of Inspector General, United States Department of Health and Human Services (hereinafter "HHS"). **MR. CRESPO** served this country for almost thirty (30) years with pride – frequently putting his service to this country before his own health and safety. He has also served as a mentor and instructor to many individuals throughout his career. **MR. CRESPO** is a senior firearms instructor, senior defensive tactics instructor, and trainer to new and junior agents. It is against this backdrop – the lengthy history of **MR. CRESPO'S** dedication to serving this country – that the facts and circumstances included in the wiretap applications at issue herein should have been analyzed – rather than unverified, hyperbolic, and irrelevant half-truths and assumptions.

### III.
### RELEVANT FACTS WIRETAP APPLICATION, AFFIDAVIT AND ORDERS

This motion involves three (3) wiretap orders (hereinafter collectively referred to as the "Orders") pursuant to which the electronic communications involved in this case were intercepted by Government agents:

***April 16, 2020, Application, Affidavit, and Order:***

1.      On April 16, 2020, the Government sought and obtained an order authorizing the interception of electronic communications of Jorge Diaz Gutierrez, **MR. CRESPO**, Anais Lorenzo, Juan Carlos Rodriguez, "[a]nd other persons yet unknown" occurring over the "Target Telephone" (786) 542-3906 belonging to Diaz.

2.      According to this Application, the suspected offenses were as follows: (a) distribution of and possession with intent to distribute controlled substances, in violation of 21 U.S.C. § 841(a)(1); (b) the use of communications facilities in the commission of controlled substance offenses, in violation of 21 U.S.C § 843(b); (c) attempting and conspiring to commit the aforementioned crimes, in violation of 21 U.S.C. § 846; (d) influencing, obstructing, and impeding, and endeavoring to influence, obstruct, and impede influencing, obstructing, and impeding, and endeavoring to influence, obstruct, and impede, the due administration of justice, in violation of 18 U.S.C. § 1503; (e) conspiracy to influence, obstruct, and impede, and endeavor to influence, obstruct, and impede, the due administration of justice, in violation of 18 U.S.C. §§ 371 and 1503; (f) persuading, and engaging in misleading conduct toward another person with intent to influence, delay, and prevent the testimony of any person in an official proceeding, and hindering, delaying, and preventing the communication of information relating to the commission and possible commission of a federal offense to a law enforcement officer, and otherwise obstructing, influencing, and impeding any official proceeding, including attempts to commit these aforementioned crimes, in violation of 18 U.S.C. § 1512; and (g) aiding and abetting the commission all of the aforementioned crimes, in violation of 18 U.S.C. § 2.

Rabin & Lopez, P.A. • One Southeast Third Avenue, Suite 2600, Miami, FL 33131 • Tel: (305) 358-1064

3.      The Government in its Application submitted that based on probable cause the conversations would likely *provide evidence of the target subjects involvement in the Gonzalez DTO*.

4.      The application also stated that normal investigative procedures were tried and failed or appeared unlikely to succeed if tried or are too dangerous to employ.

5.      According to the Affidavit, Diaz, Lorenzo and Rodriguez were identified as drug traffickers and patient recruiters for the Gonzalez DTO, but "FBI and HHS-OIG health care agents temporarily postponed pursuing federal narcotics and health care fraud related charges" against them due to the FBI-Miami PC Squad's investigation targeting Diaz and MR. CRESPO.  "FBI and HHS-PIG agents intend to again continue their narcotics and health care fraud investigation regarding DIAZ, LORENZO, RODRIGUEZ, and others upon, and in conjunction with, FBI-Miami PC Squad investigators obtaining approval and initiating intercepts for wire and electronic communications over the TARGET TELEPHONE."

6.      There were no known previous phone calls between Diaz's phone, *i.e.*, the target phone, and Lorenzo and or Rodriguez, during the relevant period.

7.      During June 2019, law enforcement received information from a confidential source that an individual who resides in the Dominican Republic and knows MR. CRESPO stated the following: MR. CRESPO may still work with the DEA; MR. CRESPO'S family member is purportedly married to a high-level drug trafficker in the Dominican Republic[1]; and MR. CRESPO during October 2018, forewarned investigative targets in the Dominican

---

[1]      It is important to note that Mr. Crespo has top secret clearance, meaning that his entire family has been investigated by the office of professional management.

Rabin & Lopez, P.A. • One Southeast Third Avenue, Suite 2600, Miami, FL 33131 • Tel: (305) 358-1064

Republic of an upcoming arrest of airline employees involved in drug trafficking in or around Santo Domingo, Dominican Republic.  It is unclear whether the alleged confidential source or an individual known to the confidential source personally knew of the aforementioned information.  Furthermore, the affidavit does not explain why law enforcement discontinued (if it even continued) investigating this allegation.  However, the affidavit does disingenuously state, "[a]lthough no longer actively investigating this allegation, law enforcement did confirm that CRESPO previously traveled to the Dominican Republic."  Of course, **Mr. Crespo** travels to the Dominican Republic, he is Dominican, his father was buried in the Dominican Republic, and he still has relatives living in the Dominican Republic.

8.      There have been no prior applications seeking authorization to intercept wire, oral, or electronic communications involving any of the same persons, premises, or facilities, *i.e.*, they successfully arrested key members of the Gonzalez DTO, including but not limited to Dr. Gonzalez, without a wiretap

9.      The first phase of the Gonzalez DTO investigation focused on Dr. Gonzalez, Arlene Gonzalez (Dr. Gonzalez's wife), and others.  Investigating agents had planned a second phase targeting Diaz, Lorenzo and Rodriguez – the alleged drug traffickers and patient recruiters.  Based on opinion and belief, it seems *implausible* that the Government would first target the doctor, Dr. Gonzalez, of the Gonzalez DTO and then commence a second phase of investigation targeting the low-level pill pushers.  Furthermore, the fact that the Government had more than enough evidence to arrest Diaz (and the other targets) prior to its alleged commencement of its investigation into **Mr. Crespo** supports the conclusion that its investigation of the Gonzalez DTO has been closed.

10.     In May 2018 (*one year before the first Title III application*), Tania Sanchez (who was arrested pursuant to the Bosch Indictment), identified Dr. Gonzalez and his role in the Gonzalez DTO *and identified Diaz* as a patient recruiter and noted that Diaz typically paid $250 in kickbacks for each patient prescription.

11.     Beginning in June 2018, investigators interviewed Bosch who stated that he previously owned a cell phone store and commonly sold burner phones and SIM cards to patient recruiters that worked for Dr. Gonzalez, including Rodriguez.  Bosch also stated that Rodriguez had various sub-recruiters and runners working for him.

11.     During August 2018, Suyima Valdes, a former West Medical employee (clinic where Dr. Gonzalez worked) identified Diaz as a patient recruiter and stated that Diaz routinely visited West Medical and left with stacks of patient prescriptions.[2]

12.     Beginning in September of 2018, Abreu identified Diaz and Rodriguez as patient recruiters at West Medical.  She also identified Lorenzo as a patient at a separate health care clinic that engaged in the Oxycodone kickback scheme and where Abreu also recruited patients.

13.     In January of 2019, an Indictment was returned against Dr. Gonzalez, Arlene Gonzalez, Annie Suarez-Gonzalez ("Suarez"), Sucett Lopez ("Lopez"), and Fidel Marrero-Castellano, which charged them with conspiracy to pay and receive kickbacks,

---

[2]     The affidavit also states that Valdes stated that Dr. Gonzalez, during August 2018, called and told her that an unnamed individual, who often visited West Medical, disclosed to Dr. Gonzalez that a) someone was cooperating with the FBI against him; and b) Valdes and another West Medical employee had been approached by the FBI.  *It is important to note that this is not uncommon given that Bosch, Sanchez and Abreu were about to plead guilty and had been cooperating and Machado had just decided to plead guilty – could have been the information that caused Machado to decide to plead guilty.*

Rabin & Lopez, P.A. • One Southeast Third Avenue, Suite 2600, Miami, FL 33131 • Tel: (305) 358-1064

conspiracy to dispense a controlled substance, and dispensing a controlled substance. In other words, in January of 2019 the Gonzalez DTO, including but not limited to the *doctor illegally prescribing the controlled substances, i.e., the drugs that make up the drug trafficking organization*, were indicted.   By August of 2019, Dr. Gonzalez, Arlene Gonzalez, Annie Suarez-Gonzalez (the person that arranged the prescriptions for the patient recruiters like Diaz), and Fidel Marrero-Castellanos had all pled guilty.

14.     The investigation revealed that Dr. Gonzalez and his co-conspirators agreed to accept patients at West Medical recruited by Diaz, Lorenzo, Rodriguez, Abreu, Marrero, and other patient recruiters.   Dr. Gonzalez employed co-defendants Arlene Gonzalez, Suarez, and Lopez as office personnel and often left signed prescriptions for them to complete patient recruiters.

15.     On or about February 7, 2019, pursuant to the Dr. Gonzalez Indictment, law enforcement executed sealed arrest warrants for each of the five (5) charged defendants. Law enforcement also executed a search warrant at West Medical.  Patient medical files marked with blue tabs belonged to Marrero and Rodriguez.  Patient medical files marked with green belonged to Diaz and Lorenzo.

16.     During March 2019, the Office of the State Attorney of Florida received an anonymous tip that Diaz, Lorenzo and other recruited patients to West Medical and East Medical, sold these patients' illegally obtained prescriptions, and laundered the proceeds by buying and selling used vehicles.  The anonymous tipster also provided the "target telephone" as Diaz's phone number, Lorenzo 1158 as Lorenzo's phone number; and seven (7) full names of recruited patients.  These patients file folders were tabbed in green.

17.     Beginning in March 2019, investigators interviewed Marrero on several occasions.   Marrero was a patient recruiter and sub-recruiter for Rodriguez at West Medical.   Marrero detailed his scheme with Rodriguez.   Marrero also identified Diaz as someone he saw at West Medical.   In order to uncover whether Marrero was cooperating, Rodriguez sent a female individual to Marrero's initial court hearings.

18.     In or around August 2018, Dr. Gonzalez called Suarez and told her to stay away from Valdes because she was cooperating.   Dr. Gonzalez also told Suarez that she would likely be contacted by law enforcement.   Dr. Gonzalez told Suarez he had a contact at the FBI.   Suarez was approached by law enforcement one (1) week later.

19.     During May of 2019, investigators interviewed Suarez.   Suarez often saw Diaz at West Medical and identified Diaz as a patient recruiter.   Suarez detailed Diaz's scheme with Dr. Gonzalez.

20.     Suarez noted an earlier incident at West Medical where Dr. Gonzalez, stating that patient recruiter Abreu was being investigated by the FBI, directed West Medical employees to stop providing her with Oxycodone prescriptions.   Per Suarez, approximately three (3) days after Dr. Gonzalez's directive Abreu was arrested.

21.     On or about March 2019, CS-2 voluntarily contacted FBI and HHS-OIG health care agents regarding concerns about Diaz and **Mr. Crespo**.   In a footnote, the affidavit states, "[o]n or about May 2018, CS-2 earlier reported similar information to the FBI, which was initially investigated by the FBI-Miami drug squad, which was not substantiated or forwarded to the FBI-Miami PC squad."   Notably, the affidavit does not state that in 2018 when CS-2 initially reported the information he stated that *he did not think* **Mr. Crespo** was corrupt.   Furthermore, the affidavit did not state that in 2018 CS-2

Rabin & Lopez, P.A. • One Southeast Third Avenue, Suite 2600, Miami, FL 33131 • Tel: (305) 358-1064

was determined to be unreliable and that his information was not based on factual basis.

A copy of this report is attached hereto and incorporated by reference herein as Exhibit

№ 1.

22.     On or about March 2019, CS-2 stated that Diaz illegally bought and sold

pills of Oxycodone and **MR. CRESPO** provided law enforcement protection for Diaz's illegal

narcotics protection.

23.     According to the Affidavit, due to **MR. CRESPO'S** position in the SDFL Health

Care Fraud Strike Force:

> a) no later than January 25, 2019, Crespo knew of the planned February 7, 2019 arrests of Dr. Gonzalez, Arlene Gonzalez, Suarez, Lopez, and Marrero, and also volunteered to participate; b) no later than January 28, 2019, Crespo knew of the planned February 7, 2019, search warrant of West Medical and also volunteered to participate; c) Crespo shared cubicle space with the HHS-OIG case agent leading the investigation into the Gonzalez DTO; d) the status of the investigation and investigative targets and subjects, including Dr. Gonzalez, Diaz, Lorenzo, Rodriguez and other were routinely and openly discussed in and around Crespo and his desk area; and e) as an acting supervisor, during March 2019, Crespo approved reports and documents in HHS-OIG's computer system regarding the Gonzalez DTO investigation, specifically, four (4) FBI reports relating to the arrest and post-arrest statements of Suarez, Arlene Gonzalez, and Dr. Gonzalez, and one (1) HHS-OIG Investigative Memorandum, which updated an earlier March 2018 version, detailing the Gonzalez DTO investigation, including that recordings by confidential sources and cooperating witnesses were utilized.

Importantly, the following facts were omitted from this paragraph of the Affidavit:

a)     The e-mail regarding the planned February 7, 2019, arrests of Dr. Gonzalez,

Arlene Gonzalez, Suarez, Lopez, and Marrero, and the search warrant of West Medical,

which **MR. CRESPO** volunteered to participate, *did not disclose the identity of the people*

*that were going to be arrested nor the name of the place that was going to be searched.*

Furthermore, the e-mail was sent to all of the HHS-OIG agents, and since **MR. CRESPO**

Rabin & Lopez, P.A. • One Southeast Third Avenue, Suite 2600, Miami, FL 33131 • Tel: (305) 358-1064

was not selected, he did not become aware of the identities of the individuals being arrested until *after* they had been arrested.  *See* Exhibits № 3 & 4.

24.     This affidavit also relies on information provided by two (2) confidential informants.  *See On Lee v. United States,* 343 U.S. 747, 757 (1952) ("The use of informers, accessories, accomplices, false friends, or any of the other betrayals which are 'dirty business' may raise serious questions of credibility.").

### **CS-1**

25.     As stated in the footnote, CS-1 was no longer working with SDFL Health Care Fraud Strike Force investigators regarding the Gonzalez DTO because health care fraud agents discovered that CS-1 was selling Oxycodone and Adderall, via a third-party, to Rodriguez and in exchange for $1-$150 per patient, CS-1 was referring patients to Rodriguez and others, CS-1 was closed for cause during the investigation which resulted in the Dr. Gonzalez Indictment.

26.     During the first phase of the Gonzalez DTO investigation, during April-June 2018, CS-1 acted as a patient recruiter and was sent to conduct multiple, recorded purchases of Oxycodone from Dr. Gonzalez at West Medical.  On or about May 30, 2018, while waiting for another Oxycodone prescription at West Medical, CS-1 was approached by Diaz.  *Diaz Offered to buy CS-1's Oxycodone for $15 per pill and provided CS-1 with his contact information in the event CS-1 decided to sell.*

27.     According to the Affidavit, CS-1 detailed Rodriguez's operation.  The Affidavit also states that a sub-recruiter for Rodriguez called CS-1 the day Marrero was arrested, February 7, 2019, and told CS-1 that Rodriguez had called Marrero the night before to warn Marrero that he would be arrested the following day.

Rabin & Lopez, P.A. • One Southeast Third Avenue, Suite 2600, Miami, FL 33131 • Tel: (305) 358-1064

28.     During a recorded conversation between CS-1 and Diaz, wherein CS-1 pretended that he had been approached by HHS agents regarding the Gonzalez DTO, Diaz stated, "[n]o, no . . . . Look, listen.  I'll fix this very quickly.  Because my godson . . . my godson who loves me as if I were . . . his son.  I'm waiting for him to arrive from Greece . . . . It's possible he will arrive today.  If he arrives today, I'm going to . . . I'm going to call him to go by his house and talk to him."  Diaz also stated that his godson was "federal," and that "these people who caught him were federal."  Diaz also stated that the person handling the case are other agents that he (allegedly **MR. CRESPO**) knows.  Diaz went on to state that the three federal agents handling the case work in his department.  Thereafter, Diaz placed an unanswered call to **MR. CRESPO**.  **MR. CRESPO** allegedly returned the phone call, and the two (2) allegedly spoke for two (2) minutes and twenty-seven (27) seconds.

29.     During a second controlled call with CS-1, Diaz stated that he was just a patient.  Diaz also stated that, "Listen . . . the thing is that he knows, when Rodolfo was busted he said, 'I had nothing to do with this, dear father.  But, and you know this, the people are from my agency."  This statement allegedly made by **MR. CRESPO** proves that **MR. CRESPO** had not been providing Diaz with any information regarding the Bosch and or Gonzalez DTO, including but not limited to the arrest of Dr. Gonzalez and his co-defendants and the search warrant.  There would be no need for Diaz to call **MR. CRESPO** about an arrest and investigation that **MR. CRESPO** had already informed him about.

## CS-2

30.     CS-2 had been cooperating with CS-2 the FBI-Miami PC Squad investigation of **MR. CRESPO** and other target subjects since April 2019.  CS-2 is not a

paid informant and is allegedly cooperating as a "good Samaritan."  *Significantly,* the Government omitted the fact that CS-2 also indicated that he wanted to help his citizenship and would also like to be paid.  In fact, CS-2 stated, "[w]ould like help with his citizenship and would like to be paid but these are [allegedly] secondary to [] doing the right thing."  A copy of the FBI 302 report of CS-2's interview is attached hereto and incorporated by reference herein as Exhibit № 2.

31.     CS-2 stated that he knows Diaz and **MR. CRESPO** – and that the three (3) of them all practice the Santeria religion together.  CS-2 also stated that he was personally familiar with Diaz's Oxycodone trafficking activities, including **MR. CRESPO'S** knowledge and protection of these activities.  *CS-2 noted that him [sic] and Diaz used to be friends until they stopped talking due to a family disagreement.*

31.     CS-2 stated he witnessed Diaz selling Oxycodone pills to street level customers on various occasions and once traveled with Diaz to a pharmacy, where Diaz had elderly patients waiting.  CS-2 saw Diaz enter the pharmacy and obtain the patient's prescriptions.  Thereafter, Diaz returned outside, paid the patients a small fee, and kept all the pills.  CS-2 noticed that the pill bottles were issued by Dr. Gonzalez.

32.     Diaz allegedly confessed his scheme to CS-2.  Diaz also allegedly told CS-2 that **MR. CRESPO**, who Diaz referred to as "his friend" would alert him if Diaz was being investigated.  The affidavit omitted the fact that CS-2 explicitly stated, "[h]e is not sure whether [Diaz] is just bragging or is telling the truth."  *See* Exhibit № 1.  Moreover, CS-2 stated that he did not believe that **MR. CRESPO** was corrupt.  *See* Exhibit № 1.  Finally, the affidavit omits the fact that CS-2 stated the aforementioned in 2018 – not 2019. Diaz also informed CS-2 that **MR. CRESPO** knew Diaz bought and sold Oxycodone pills because

Rabin & Lopez, P.A. • One Southeast Third Avenue, Suite 2600, Miami, FL 33131 • Tel: (305) 358-1064

Diaz and **Mr. Crespo** had engaged in direct conversations about Diaz's drug trafficking activities.

33.     CS-2 also indicated that he allegedly witnessed Diaz and **Mr. Crespo** in a car together during a purported drug transaction.  It is important to note that nowhere in the discovery provided by the Government, to date, including the interview reports, does CS-2 state that he saw **Mr. Crespo** in the car with Diaz while Diaz was selling pills.  **Mr. Crespo** also told Diaz that if anyone ever wished "Santeria" on **Mr. Crespo** they would pay for it with a bullet.  Based on the Affiant's law enforcement experience he believes that when **Mr. Crespo** told Diaz that if anyone wished Santeria on him they would pay with a bullet, **Mr. Crespo** was warning Diaz that **Mr. Crespo** would shoot anyone that reported his corrupt activities.

34.     CS-2 also stated that **Mr. Crespo** is Diaz's "godson" within the Santeria context.

- - -

35.     **Mr. Crespo** did in fact disclose a relationship with Diaz, including the fact that he was probably communicating whatever conversation he had with the agent with Diaz since he was making Diaz available to communicate with the agent.

36.     Most of the information provided by the Government in support of a wiretap is based on assumptions.

37.     All of the documents and information searched by **Mr. Crespo** on October 2, 2019, during his 24-minute call between with Diaz was public information.  Moreover, there is no evidence that **Mr. Crespo** was providing the information to Diaz instead of

just verifying that what Diaz was telling him – that he is not involved in the Gonzalez DTO – was true.

38.     According to the information provided in the first affidavit, the Government certainly had enough evidence to arrest Lorenzo, Diaz and Rodriguez for their participation in the Gonzalez DTO but chose not to.   Furthermore, although the Government disingenuously tries to link MR. CRESPO to the leaks in its investigation of Bosch and the Gonzalez DTO – there is absolutely no link between those leaks and MR. CRESPO.   On the contrary, the leaks are probably attributed to individuals who had been actively cooperating with the Government (like CS-1 who while cooperating with the Government was selling narcotics to Rodriguez), or he had been arrested and received discovery – as they usually are.

**May 29, 2020, Application, Affidavit, and Order:**

> If a wiretap order authorizes electronic surveillance to continue after the first interception of a communication of the type sought, the application must contain 'a particular description of facts establishing probable cause to believe that additional communications of the same type will occur thereafter.'

*See United States v. Carrazana*, 921 F.2d 1557, 1565–66 (11th Cir. 1991) (citation omitted).

1.     Significantly, the wiretap recorded conversations made pursuant to the April affidavit did not provide any evidence of the target subjects involvement in the Gonzalez DTO, *i.e.*, the evidence the Government sought to discover pursuant to the wiretap application.   On the contrary, not a single conversation took place between Diaz and Rodriguez, and the Government determined that Lorenzo was living in the Florida Keys

Rabin & Lopez, P.A. • One Southeast Third Avenue, Suite 2600, Miami, FL 33131 • Tel: (305) 358-1064

and suffering from drug addiction. Thus, Rodriguez and Lorenzo were removed as target subjects. This is probably because, as the Government surely knew, the Gonzalez DTO was dismantled with the arrest of the doctor.

2.      Furthermore, the only alleged evidence obtained regarding **Mr. Crespo** was that Mr. Diaz called **Mr. Crespo** and asked him if he should block an individual who had left him nine (9) messages. **Mr. Crespo** said yes, block him.

3.      Without the affiant's creative coloring of conversations, there is simply nothing new to establish probable cause or necessity to continue tapping Diaz's phone as to the obstruction counts.

3.      Despite not acquiring any of the evidence it sought through the first affidavit, the Government requested reauthorization to investigate a new drug trafficking organization – the Carpman DTO. The Government could have used the same investigative techniques it used for the Gonzalez DTO to investigate the Carpman DTO.

***July 6, 2020, Application, Affidavit, and Order:***

1.      This affidavit claims that text messages regarding Ahias Holding Corp., **Mr. Crespo's** fiancés company, evidence **Mr. Crespo's** close relationship with Diaz. However, **Mr. Crespo** had already disclosed his close relationship with Diaz, which does not provide probable cause of a crime.

2.      Furthermore, the intercepted phone calls show that it was the target subjects who were selling pills with and to Diaz that were disclosing the FBI's investigation of them to Diaz – not **Mr. Crespo**. Additionally, the fact that Diaz, who does not know he is being recorded, tells his daughter that he told **Mr. Crespo**, "no, I have nothing to do with those people, I do know them, but I have nothing to do with those people," proves

---

Rabin & Lopez, P.A. • One Southeast Third Avenue, Suite 2600, Miami, FL 33131 • Tel: (305) 358-1064

that **Mr. Crespo** believed what he had previously told the agents – that Diaz was a family friend and elderly old man that takes pills for pain and is not involved in the Gonzalez DTO.

<div align="center">

**IV.**

**Memorandum of Law**
</div>

"Few threats to liberty exist which are greater than that posed by the use of eavesdropping devices." *See Berger v. State of N.Y.*, 388 U.S. 41, 62–63 (1967). As the *Supreme Court once stated,* "[t]he security of one's privacy against arbitrary intrusion by the police—which is at the core of the Fourth Amendment—is basic to a free society." *See Berger v. State of N.Y.*, 388 U.S. 41, 53 (1967) (quoting *Wolf v. People of State of Colorado*, 338 U.S. 25, 27 (1949). Thus, the fundamental principle behind the Federal wiretapping statute is the protection of the privacy rights of citizens from unwarranted invasion by Government intrusions. *See Berger*, 388 U.S. at 62 (citing *Lopez v. United States*, 373 U.S. 427, 441 (1963) ("[T]he fantastic advances in the field of electronic communication constitute a great danger to the privacy of the individual; indiscriminate use of such devices in law enforcement raises grave constitutional questions under the Fourth and Fifth Amendments.")). To protect an individual's fundamental right to privacy in conversation, Congress passed Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510-2521, to conform to the constitutional standards governing wiretaps prescribed by the Supreme Court in *Berger v. New York*, 388 U.S. 41 (1967) and *Katz v. Untied States*, 389 U.S. 347 (1967). Title III of the Omnibus Criminal Control and Safe Streets Act of 1968, establishes a *rigorous regime* that the government must follow to intercept the contents of any wire or oral communications.

### A.
### N<small>ECESSITY</small>

> Although the government need not pursue every alternative means of investigation, neither should it be able to ignore avenues of investigation that appear both fruitful and cost-effective. It is not unreasonable to expect the government to utilize those methods that appear to be potentially productive. We would flout the statutory intent that wiretaps be used only if necessary, were we to sanction a wiretap simply because the government pursued some "normal" investigative strategies that were unproductive, when more fruitful investigative methods were available. In effect, the government would be able to secure a wiretap in every case, even where a normal strategy would be likely to achieve the same result without resort to the serious intrusion that a wiretap necessarily entails.

*See United States v. Ippolito*, 774 F.2d 1482, 1486–87 (9th Cir. 1985)

Thus, to obtain an order authorizing a wiretap, a federal agent must set forth not only information about the suspected offense and the evidence sought, but also a detailed statement as to whether alternative investigative techniques have been tried or, if not, why those alternatives would be futile or unreasonably dangerous.   18 U.S.C. § 2518(1)(c) and 3(c).  In other words, *the government must establish necessity for the wiretap*, that is, that normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous.  *United States v. Giordano*, 416 U.S. 505, 515 (1974).  "These statutory requirements are designed to insure that wiretapping is neither 'routinely employed as the initial step in criminal investigation *nor resorted to in situations where traditional techniques would suffice to expose the crime.*'"  *United States v. Alonso*, 740 F.2d 862 (1984) (emphasis added). Electronic interceptions are not permitted if "traditional investigative techniques would suffice to expose the crime." *United States v. Kahn*, 415 U.S. 143, 153 & n. 12 (1974). "In a society which values privacy and the rights of the individual, wiretapping is to be

distinctly the exception and not the rule." *United States v. Hoffman*, 832 F.2d 1299, 1307 (1st Cir. 1987).

Consequently, the Supreme Court has stated that "Congress intended to require suppression where there is a failure to satisfy any of [the] statutory requirements of Title III." *Giordano*, 416 U.S. at 527.  The Congressional intent was to limit the interception of private citizen's private conversations to those situations clearly calling for the employment of this extraordinary investigative device.  *Id.*  Here, the first, second, and third Title III applications were insufficient to satisfy the necessity requirement of 18 U.S.C. § 2518(1)(c) and (3)(c).  *See United States v. Carrazana*, 921 F.2d 1557, 1565 (11th Cir. 1991) ("The affidavit must show with specificity why in *this particular investigation* ordinary means of investigation will fail.")

A review of the affidavits and applications strongly suggest that the government had been extremely successful in infiltrating the alleged conspiracy – the Gonzalez DTO – without the need for a wiretap; it arrested Dr. Gonzalez.   Long before the government sought a wiretap application it was able to gather an enormous amount of information and evidence against the main players of the Gonzalez DTO and the owner of the target telephone, Diaz.   Law enforcement gathered this critical information using normal investigative tools.   Furthermore, the Government could have used the exact same techniques used to successfully dismantle the Gonzalez DTO to investigate the Carpman DTO.

Rabin & Lopez, P.A. • One Southeast Third Avenue, Suite 2600, Miami, FL 33131 • Tel: (305) 358-1064

**B.**

**PROBABLE CAUSE**

An application for a wiretap authorization must be supported by the same probable cause necessary for a search warrant. *United States v. Nixon*, 918 F.2d 895, 900 (11th Cir. 1990) (citing *United States v. Hyde*, 574 F.2d 856, 862 (5th Cir. 1978)). The issuing judge is to make a "practical, common-sense decision" about whether the "totality of the circumstances" indicate that there is probable cause that the sought-for evidence will be obtained. *Id.* (citing *Illinois v. Gates,* 462 U.S. 213, 238 (1983)).

The Government can establish probable cause for a wiretap with facts showing that (1) a crime is being, has been, or is about to be committed and (2) communications about the crime will be intercepted by the requested wiretap. *See* 18 U.S.C. § 2518(3)(a)–(b). "Pertinent here, the facts must be 'sufficiently close in time to the issuance [of the wiretap] ... that probable cause can be said to exist as of the time of [the wiretap] and not simply as of some time in the past.'" *See United States v. Grubbs*, 547 U.S. 90, 95 n.2, 126 S.Ct. 1494, 164 L.Ed.2d 195 (2006) (quoting with approval *United States v. Wagner*, 989 F.2d 69, 75 (2d Cir. 1993)); *see also United States v. Bervaldi*, 226 F.3d 1256, 1264–65 (11th Cir. 2000) (explaining that the staleness doctrine requires that probable cause exists when a wiretap is authorized). *See United States v. Goldstein*, 989 F.3d 1178, 1193 (11th Cir. 2021), *cert. denied sub nom. Bercoon v. United States*, 211 L. Ed. 2d 501 (2022). Furthermore, "The probable cause standard cannot be satisfied by relying upon suspicion, reasonable or not, or mere speculation." *United States v. $242,484, 389* F.3d 1149, 1178-79 (11th Cir. 2004); *United States v. Diaz-Garzia*, 808 F. Supp. 784, 790 (S.D. Fla. 1992) (probable cause is not satisfied by reasonable speculation).

As explained *supra*, the Government did not need a wiretap application to gather evidence of the Gonzalez DTO.  The Gonzalez DTO had already been dismantled (over a year before the first application for wiretap was submitted to the Court) and the Government had never intended to arrest Diaz, Lorenzo or Rodriguez.  The Government disingenuously used the Gonzalez DTO to establish probable cause for the wiretap (that was really directed at **Mr. Crespo**) because it knew that it did not have probable cause for the obstruction counts, *i.e.*, the counts related to **Mr. Crespo**.  *See United States v. Barnes*, 47 F.3d 963, 964–65 (8th Cir. 1995) (citations omitted) ("The danger inherent in disclosure without judicial approval is that the original application may have been a subterfuge, that is, the government, not having probable cause to obtain a wiretap for some crime, might obtain it by purporting to investigate a different crime. We have acknowledged the potential for this kind of abuse.  We have therefore held that a court, when faced with evidence of other crimes obtained in the course of a wiretap, may allow its disclosure only if it determines that: the original order was lawfully obtained, that it was sought in good faith and not as a subterfuge search, and that the communication was, in fact, incidentally intercepted during the course of a lawfully executed order.").

The Government's lack of probable cause is illustrated throughout the three (3) affidavits – but most significantly in the first two (2) affidavits.  In the first affidavit the Government claims that **Mr. Crespo** knew everything about the Gonzalez DTO investigation because, amongst other things, he shared cubicle space with the lead investigative agent and had access to a conference room where all the information related to the Gonzalez DTO was laid out.  If it is true, which we submit it is not, that **Mr. Crespo** knew everything about the Gonzalez DTO and was leaking information to Diaz, then there

Rabin & Lopez, P.A. • One Southeast Third Avenue, Suite 2600, Miami, FL 33131 • Tel: (305) 358-1064

was no need for him to call the lead agent on October 2, 2019, to find out whether Diaz was being investigated.   In other words, the Government cannot have it both ways – **MR. CRESPO** knows everything and has been leaking information and **MR. CRESPO** does not know if Diaz was a target of the investigation.  Before the initial wiretap there was *ample* evidence against Diaz that, if it were true that **MR. CRESPO** had access to everything, he would have absolutely known that Diaz was a target and that the investigation had not been closed.

The only probable cause that the Government provided against Diaz and the charges related to **MR. CRESPO** are that **MR. CRESPO** was duped by Diaz (his godfather) into believing that he was just an old man who was taking pain pills and driving elderly individuals to their medical appointments, *i.e.*, exactly what Diaz told his daughter when he did not know he was being recorded.

<div align="center">

**C.**
**FRANKS**

</div>

Finally, it is respectfully submitted that the Affidavits submitted in support of the various Title III applications contain intentional or reckless falsehoods and omissions that were material to a finding of probable cause and necessity and consequently would respectfully request a *Franks* hearing with regard to these matters.

> To challenge the veracity of an affidavit in support of a wiretap order under *Franks*, a defendant must make 'a substantial preliminary showing' that (1) 'a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit,' and (2) 'the allegedly false statement is necessary to the finding of probable cause.'

*See Franks v. Delaware*, 438 U.S. 154, 155-56 (1978).

Rabin & Lopez, P.A. • One Southeast Third Avenue, Suite 2600, Miami, FL 33131 • Tel: (305) 358-1064

| | Intentional/Reckless falsehoods and Omissions | Facts |
|---|---|---|
| 1. | The Target subjects of the first application for wiretap are Diaz, Crespo, Lorenzo and Rodriguez. The Target telephone is Diaz's telephone. | The Target of the Title III Application was Mr. Crespo – not Diaz, Lorenzo or Rodrguez. The Government had enough to arrest Diaz. |
| 2. | April 2022 Title III Application:<br><br>FBI and HHS-OIG health care agents have temporarily postponed pursuing federal narcotics and health care fraud-related charges against DIAZ due to the FBI-Miami PC Squad's investigation targeting CRESPO, a federal law enforcement official, and DIAZ.<br><br>FBI and HHS-OIG agents intend to again continue their narcotics and health care fraud investigation regarding DIAZ, LORENZO, RODRIGUEZ, and others upon, and in conjunction with, FBI-Miami PC Squad investigator obtaining approval and initiating intercepts for wire and electronic communications over the TARGET TELEPHONE. | The Investigation into the Gonzalez DTO was closed. Special Agent Rolando Alvarez said the truth – the investigation into the Gonzalez DTO had been closed. The fact that the Government has to repeat several times that the investigation had not been closed and drafted a memo months after Agent Alvarez told **MR. CRESPO** supports the conclusion that the investigation was closed, and the Government is trying to cover-up the fact. The fact that the doctor of the Gonzalez DTO was arrested also supports the conclusion that the investigation was closed- the Government does not arrest the main doctor of a conspiracy – dismantle and operation – and then go after the low-level participants. Illustrative is also the fact that the Government never arrested Rodriguez. |
| 3. | ¶ 32 April 2022 Title III Application: "Beginning in and around April 2019, members of the FBI-Miami PC Squad started speaking with various SDFL Health Care Fraud Strike Force agents. Pursuant to these conversations and subsequent review of HHS-OIG records, the FBI-Miami PC Squad learned that due to CRESPO's position on the SDFL Health Care Fraud Strike Force: a) no later than January 25, 2019, CRESPO knew of the planned February 7, 2019, arrests of Dr. Gonzalez, Arlene Gonzalez, | **MR. CRESPO** did not know Mr. Gonzalez was going to be arrested. The January 25, 2019, e-mail to all the HHS agents asking for assistance in the arrest did not identify the name of the person being arrested. The e-mail simply stated, "Are you available for an arrest Feb 7? Will be a Doctor in Weston…" A copy of the email is attached hereto and incorporated by reference herein as Exhibit № 3. |

| | | |
|---|---|---|
| | Suarez, Lopez, and Marrero, and also volunteered to participate;" | |
| 4. | ¶ 32 April 2022 Title III Application: "b) no later than January 28, 2019, CRESPO knew of the planned February 7, 2019, search warrant of West Medical and also volunteered to participate;" | The search warrant e-mail did not identify the name of the clinic that was going to be searched. The email simply stated, "[p]lease I need 6 additional agents to assist in a search warrant on Thursday Feb. 7. The target is a small clinic office in Hialeah located 10 minutes from our office." A copy of the email is attached hereto and incorporated by reference herein as Exhibit № 4. |
| 5. | April 2022 Title III Application Footnote 10: "During June 2019, law enforcement received information, via a confidential source located outside the State of Florida, that an individual, who resides in the Dominican Republic, knows CRESPO and that: a) CRESPO may still with/work for DEA; b) CRESPO's family member is purportedly married to a high-level drug trafficker in the Dominican Republic; and c) CRESPO, during October 2018, forewarned investigative targets in the Dominican Republic of an upcoming arrest of airline employees involved in drug trafficking in and around Santo Domingo, Dominican Republic. Although no longer actively investigating this allegation, law enforcement did confirm that CRESPO has previously traveled to the Dominican Republic." | **MR. CRESPO** is from the Dominican Republic, of course he visits the Dominical Republic. Moreover, the Footnote states nothing about why law enforcement is not investigating this allegation. |
| 6. | ¶ 83 April 2022 Title III Application: "Additionally, CRESPO has not disclosed to his HHS-OIG or SDFL Health Care Fraud Strike Force superiors and colleagues, or issued any law enforcement reports regarding, his contacts and relationship with | **MR. CRESPO** did disclose his relationship with Diaz to HHS-OIG agents on several occasions. On October 2, 2019, **MR. CRESPO** called the lead investigative agent of the Gonzalez DTO and explained that he had received an inquiry from "Jorge" who is a family friend and who received information that he was being investigated. |

Rabin & Lopez, P.A. • One Southeast Third Avenue, Suite 2600, Miami, FL 33131 • Tel: (305) 358-1064

|   | | |
|---|---|---|
|   | DIAZ." | **MR. CRESPO** also revealed his relationship with Diaz to another HHS-OIG agent to assist him (**MR. CRESPO**) in investigating Medicare fraud using Diaz's Medicare number. |
| 7. | "Suarez noted an earlier incident at West Medical where Dr. Gonzalez, stating that patient recruiter Abreu was being investigated by the FBI, directed West Medical employees to stop providing her with Oxycodone prescriptions. Per Suarez, approximately three (3) days after Dr. Gonzalez's directive Abreu was arrested." | As detailed in Ms. Abreu's factual pfoccer, the Government's Motion to reduce Ms. Abreu's sentence, and Ms. Abreu's response to same, Ms. Abreu did not work for Dr. Gonzalez during this period. A copy of the aforementioned pleadings is attached hereto and incorporated by reference herein as Exhibit № 5. |
| 8. | Footnote 17<br>April 2022 Title III Application:<br><br>"[O]n or about May 2018, CS-2 earlier reported similar information to the FBI, which was initially investigated by the FBI-Miami drug squad, which was not substantiated or forwarded to the FBI-Miami PC squad." | On or about May 2018, CS-2 reported similar information about Diaz. As to Mr. Crespo CS-2 stated, "[h]e is not sure whether [Diaz] is just bragging or is telling the truth." *See* Exhibit № 1. Moreover, CS-2 stated that he did not believe that **MR. CRESPO** was corrupt. *See* Exhibit № 1. |
| 9. | ¶¶ 38 and 39 April 2022 Title III Application:<br><br>CS-2 had been cooperating with CS-2 the FBI-Miami PC Squad investigation of **MR. CRESPO** and other target subjects since April 2019. CS-2 is not a paid informant and is allegedly cooperating as a "good Samaritan."<br><br>CS-2 "[i]s believe by law enforcement to be reliable." | The Government omitted the fact that CS-2 explicitly stated, "[w]ould like help with his citizenship and would like to be paid but these are [allegedly] secondary to [] doing the right thing." *See* Exhibit № 2.<br><br>Moreover, in May of 2018, CS-2 was deemed to be unreliable and that his information was not based on facts. *See* Exhibit № 1. |
| 10 | ¶ 40 April 2022 Title III Application:<br><br>"CS-2 knew CRESPO and that CRESPO was an HHSOIG | In or around April of 2018, CS-2 stated that **MR. CRESPO** was a DEA agent. *See* Exhibit № 1. Furthermore, CS-2 stated that he did not know if Diaz was just bragging or telling the truth regarding **MR.** |

Rabin & Lopez, P.A. • One Southeast Third Avenue, Suite 2600, Miami, FL 33131 • Tel: (305) 358-1064

| | | |
|---|---|---|
| | agent. CS-2 was personally familiar with DIAZ's Oxycodone trafficking activities, including CRESPO's knowledge and protection of these activities." | **CRESPO** allegedly letting Diaz "'[k]now whether he is being investigated or not" and also stated that he did not believe **MR. CRESPO** was corrupt.  *See* Exhibit № 1. There is nothing regarding this alleged fact in CS-2's March 22, 2019, FBI 302 report.  *See* Exhibit № 2. |
| 11. | ¶ 42 April 2022 Title III Application:  "When CS-2 told DIAZ that DIAZ was going to get in trouble, DIAZ told CS-2 not to worry because CRESPO, who DIAZ referred to as 'his friend,' would alert DIAZ if he was being investigated. DIAZ also informed CS-2 that CRESPO knew DIAZ bought and sold Oxycodone pills because DIAZ and CRESPO had engaged in direct conversations about DIAZ's drug trafficking activities." | CS-2 stated that he did not know if Diaz was just bragging or telling the truth regarding **MR. CRESPO** allegedly letting Diaz "'[k]now whether he is being investigated or not" and also stated that he did not believe **MR. CRESPO** was corrupt. *See* Exhibit № 1.  There is nothing regarding this alleged fact in CS-2's March 22, 2019, FBI 302 report.  *See* Exhibit № 2. |
| 12 | ¶ 43 April 2022 Title III Application:  "CS-2 told investigators that during another occasion, CS-2 witnessed DIAZ and CRESPO in a vehicle together. CS-2 was not in the vehicle with DIAZ and CRESPO, but could clearly see them from CS-2's outside vantage point. Per CS-2, another car pulled up next to them and DIAZ sold drugs to an unidentified person. Thereafter, CS-2 approached DIAZ and asked why DIAZ allowed CRESPO, a law enforcement officer, to watch him sell drugs. DIAZ told CS-2 'not to worry about CRESPO,' because CRESPO was DIAZ's friend and that 'CRESPO will | CS-2 stated that he did not know if Diaz was just bragging or telling the truth regarding **MR. CRESPO** allegedly letting Diaz "'[k]now whether he is being investigated or not" and also stated that he did not believe **MR. CRESPO** was corrupt. *See* Exhibit № 1.  There is nothing regarding this alleged fact in CS-2's March 22, 2019, FBI 302 report.  *See* Exhibit № 2.  It is also important to note that nowhere in the discovery provided by the Government, to date, including the interview reports, does CS-2 state that he saw Mr. Crespo in the car with Diaz while Diaz was selling pills.  *See* Exhibits № 1 & 2. |

Rabin & Lopez, P.A. • One Southeast Third Avenue, Suite 2600, Miami, FL 33131 • Tel: (305) 358-1064

| | look the other way.' DIAZ informed CS-2 that CRESPO told DIAZ that if anyone ever wished 'Santeria' on CRESPO, they 'would pay for it with a bullet.' | |
|---|---|---|

Based on the discovery received, much of the information provided by CS-2 regarding **MR. CRESPO** was reported in or around May of 2018 – not March of 2019, as the Government makes it seem.  *See* Exhibits № 1 & 2.  The Government's reckless and intentional misrepresentations regarding one if its key witnesses, CS-2, in and of itself, merits a *Franks* hearing.

## V.
## CONCLUSION

When the Government submitted its first application for wiretap it knew that the investigation against the Gonzalez DTO had been closed, the Gonzalez DTO had been dismantled, and it did not intend to arrest Diaz, Lorenzo, and Rodriguez (despite having ample evidence to present to the Grand Jury for Indictment).  However, the Government knew that it did not have sufficient probable cause for a wiretap application against the true target of its investigation, **MR. CRESPO**.  Therefore, in order to secure a favorable order, the Government made it seem as if it were still investigating the Gonzalez DTO and intentionally included several half-truths, omissions, and falsehoods about **MR. CRESPO**, which solely served to inflame the reader.  Moreover, the Government did not need a wiretap to investigate the Gonzalez DTO, which it knew had already been dismantled, nor the Carpman DTO.  The Government's improper and unlawful tactics to secure a wiretap of **MR. CRESPO** supports the suppression of all three (3) wiretap

Rabin & Lopez, P.A. • One Southeast Third Avenue, Suite 2600, Miami, FL 33131 • Tel: (305) 358-1064

applications, as well as the evidence derived therefrom.[3]

WHEREFORE, the Defendant, **ALBERICO CRESPO** pray that this Honorable Court will grant the relief sought herein.

<div style="margin-left:40%">

Respectfully submitted,
**RABIN & LOPEZ, P.A.**
One Southeast Third Avenue
Suite 2600
Miami, FL  33131
Tel: 305•358•1064
Email: sjr@miamilawyer.com

*s/ Samuel J. Rabin, Jr.*

SAMUEL J. RABIN, JR.
Florida Bar № 273831

*s/ Andrea C. Lopez*

ANDREA C. LOPEZ
Florida Bar № 109512

</div>

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 10th day of October 2022, a true and correct copy of the foregoing Motion to Suppress Title III Wire Communications and Request for Franks Hearing was furnished via the CM/ECF system to all parties designated to receive the electronic filings in this cause.

<div style="margin-left:40%">

*s/ Samuel J. Rabin, Jr.*

SAMUEL J. RABIN, JR.

</div>

---

[3]     Because the second and third wiretap applications also lacked necessity, relied on many of the misrepresentations contained in the first wiretap application and was based on derivative information from the initial defective wiretap application, any and all evidence resulting therefrom must also be suppressed.