UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.   <u>21-20005-CR-GAYLES</u>

UNITED STATES OF AMERICA

v.

ALBERICO AHIAS CRESPO,
                    **Defendant.**
_____/

<u>GOVERNMENT OBJECTIONS TO REVISED
PRE-SENTENCE INVESTIGATION REPORT ("PSI")</u>

The United States of America, by and through the undersigned Assistant United States Attorney, hereby files the following Objections to Defendant Crespo's Revised Pre-Sentence Investigation Report ("PSI") (DE 306).   The Government again objects to the revised PSI's failure to fully include all of the information relating to the investigations and cases, including the Bosh Indictment (GX 43), for Dr. Rodolfo Gonzalez-Garcia (19-20055-CR-ALTMAN), Dr. Victor Hugo Espinosa (19-20100-CR-GAYLES), and Dr. Daniel Carpman (23-20175-CR-WILLIAMS) (PSI ¶ 4).   To the extent the revised PSI fails to include the Government's trial evidence regarding each of these doctors and clinics, including the Oxycodone illegally obtained and sold by co-defendant Diaz and his recruited patients, the Government also objects.

The Government again objects to the revised PSI, while properly cross referencing to U.S.S.G. § 2X3.1, incorrectly calculating Defendant Crepso's offense level for the "underlying offense" (conspiracy to distribute and possess with intent to distribute Oxycodone) (PSI ¶ 35). Pursuant to U.S.S.G. §§ 2X3.1 and 2D1.1(a)(5) and (c)(3), the Government's trial evidence and testimony overwhelmingly proved that the drug amount for the "underlying offense, that is, the conspiracy to distribute and possess with intent to distribute Oxycodone from November 2016

through July 2020, was at least 10,000 kilograms, but less than 30,000 kilograms of converted drug weight, which produces a drug offense level of 34.   Pursuant to U.S.S.G. §§ 2X3.1(a)(1), and the six-level reduction, Defendant Crespo's base offense level should be 28.

The revised PSI correctly adds two (2) additional points under § 3B1.3 for Defendant Crespo, a former HHS-OIG Special Agent, abusing of a position of public/private trust and using a special skill to significantly facilitate the commission and concealment of the offense (PSI ¶ 38). The revised PSI also correctly adds an additional two (2) points for obstruction of justice under § 3C1.1 (PSI ¶ 39).   However, this enhancement applies under two (2) separate and equally serious prongs: 1) Defendant Crespo's materially false PSI statements to U.S. Probation regarding his military service; and 2) Defendant Crespo repeated attempts, post-arrest, to intimidate and influence co-defendant Diaz from cooperating.

The Government objects to the revised PSI incorrectly awarding Defendant Crespo a two-level reduction under § 4C1.1 as a "zero-point offender" (PSI ¶ 41).   The Government's trial evidence, including Title III wiretap intercepts, overwhelmingly established that Defendant Crespo used "credible threats of violence in connection with the offense[s]" and also possessed a firearm or dangerous weapon "in connection with the offenses[s]."   U.S.S.G. §§ 4C1.1(a)(3) and (7). Section 4C1.1 does not apply to Defendant Crespo.

Defendant Crespo's total offense level should be 32.   With a category I criminal history (PSI ¶ 46), his advisory guideline range is 121-151 months' imprisonment.   Consistent with the 18 U.S.C. § 3553 factors, this Court should sentence Defendant Crespo, at the high end of the advisory guideline range, to 151 months' imprisonment.

## I.   **PROCEDURAL HISTORY**

On or about July 21, 2020, pursuant to a lengthy investigation, which included multiple

court-authorized Title III wire and electronic intercepts, Defendant Crespo, along with co-defendant Jorge Diaz Gutierrez (hereinafter "co-defendant Diaz"), was arrested, pursuant a 36-page criminal complaint (DE 3).  Defendant Crespo was initially charged with the following: conspiracy to conceal material information and provide materially false statements, in violation of 18 U.S.C. §§ 371 and 1001(a)(1)-(2); conspiracy to commit – and attempted - witness tampering, in violation of 18 U.S.C. § 1512(b)(3); conspiracy to commit – and attempted – obstruction of justice, in violation of 18 U.S.C. § 1512(c)(2); and conspiracy to distribute and possess with intent to distribute Oxycodone, in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(C) (id.).

On January 5, 2021, a federal grand jury sitting in Miami, FL, returned a sealed, multi-count indictment, in the above-captioned case number, against Defendant Crespo and co-defendants Diaz, Anais Lorenzo (hereinafter "co-defendant Lorenzo," and Yandre Trujillo Hernandez (hereinafter "co-defendant Trujillo") (DE 46).  Pursuant to the indictment, Defendant Crespo was charged with the following: conspiracy to distribute and possess with intent to distribute Oxycodone, in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(C) (Count 1); conspiracy to commit witness tampering, in violation of 18 U.S.C. §§ 1512(b)(3) and 1512(k) (Count 5); witness tampering, in violation of 18 U.S.C. § 1512(b)(3) (Counts 6-9); and conspiracy to obstruct justice, in violation of 18 U.S.C. § 1512(c)(2) and 1512(k) (Count 10) (id.).

Notably, the Count 1 Oxycodone trafficking conspiracy ran from November 2016 through July 21, 2020 (DE 46).  As set forth during the Government's trial evidence, the Count 1 conspiracy involved co-defendant Diaz's illegal activities with three (3) different physicians: 1) Dr. Rodolfo Gonzalez-Garcia ("Dr. Gonzalez"); 2) Dr. Victor Hugo Espinosa ("Dr. Espinosa"); and Dr. Daniel Carpman ("Dr. Carpman") (GXs 51A-D, 56A-D, 58A-D).[1]

---

[1]   GX refers to the Government's Trial Exhibits (DE 237).

As established by the Government's trial evidence and testimony, Diaz utilized Dr. Gonzalez from November 2016 through July 2018, until warned away by Defendant Crespo - due to an active federal law enforcement investigation as to Dr. Gonzalez, Diaz, and others.   Diaz immediately switched to Dr. Espinosa during August and September 2018.   Thereafter, co-defendant Diaz utilized Dr. Carpman from October 2018 up until his and Defendant Crespo's arrest on July 21, 2020 (GXs 10A-N, 51A-D, 56A-D, 58A-D).   The Government's trial evidence also overwhelmingly established that Defendant Crespo was aware of and unlawfully protected Diaz's historical and ongoing Oxycodone trafficking activities until their arrests on July 21, 2020.

In case number 19-20055-CR-ALTMAN, Dr. Gonzalez pleaded guilty to conspiracy to engage in Oxycodone trafficking, from November 2016 through September 2018, and was sentenced to 96 months' imprisonment.   In case number 19-20100-CR-GAYLES, Dr. Espinosa pleaded guilty to conspiracy to engage in Oxycodone trafficking, from August 2017 through May 2018, and was initially sentenced to 60 months' imprisonment.    In case number 23-20175-CR-WILLIAMS, Dr. Carpman has been charged, among other crimes, with conspiracy to engage in Oxycodone trafficking, from September 2018 through March 2023, and is awaiting trial.   To the extent that the PSI fails to fully include all information related to all of these investigations and cases, including the Bosh Indictment (GX 43), the Government objects (PSI ¶ 4).

During July 2022, co-defendants Diaz, Lorenzo, and Trujillo all pleaded guilty to the charged Count 1 Oxycodone trafficking conspiracy.   All three (3) co-defendants agreed, in their written and signed factual proffers, that the Count 1 Oxycodone trafficking conspiracy operated from "no later than November 2016, and continuing through July 21, 2020" (DE 131, 133, 138). Co-defendant Diaz was sentenced to 76 months' imprisonment (DE 177).   Lorenzo was initially sentenced to 36 months' imprisonment (DE 179); however, after receiving a substantial assistance

reduction, she was sentenced to "time served" (DE 291).   Trujillo was sentenced to 70 months' imprisonment (DE 178).

On August 28, 2023, after a three-week trial, a jury found Defendant Crespo guilty of conspiracy to commit witness tampering, in violation of 18 U.S.C. §§ 1512(b)(3) and 1512(k) (Count 5); witness tampering, in violation of 18 U.S.C. § 1512(b)(3) (Counts 6-9); and conspiracy to obstruct justice, in violation of 18 U.S.C. § 1512(c)(2) and 1512(k) (Count 10) (DE 270, 275). The jury acquitted Defendant Crespo of the Count 1 Oxycodone trafficking conspiracy.   His sentencing is now set for 1:30 p.m. on January 24, 2024 (DE 307).

## II.   REVISED PSI OBJECTIONS

### A.   Incorrect Offense Level Computation

Based on Defendant Crespo's offense convictions, the revised PSI properly starts its analysis at "§ 2X3.1(a)(1) of the Guidelines Manual by way of § 2J1.2(c)(1)" (PSI ¶ 34).   Section 2J1.2(c)(1) directs that "[i]f the offense involved obstructing the investigation or prosecution of a criminal offense, apply § 2X3.1 (Accessory After the Fact) in respect to that criminal offense, if the resulting offense level is greater than that determined above."   U.S.S.G.   § 2J1.2(c)(1). "Because the conduct covered by [§ 2J1.2(c)(1)] is frequently part of an effort to avoid punishment for an offense that the defendant has committed or to assist another person to escape punishment for an offense, a cross reference to §2X3.1 (Accessory After the Fact) is provided.   Use of this cross reference will provide an enhanced offense level when the obstruction is in respect to a particularly serious offense, whether such offense was committed by the defendant or another person."   U.S.S.G. § 2J1.2 cmt. (background).

Utilizing § 2X3.1 remains proper because Defendant Crespo's offense convictions clearly "involved obstructing the investigation or prosecution of a criminal offense," that is, the entire

Count 1 Oxycodone trafficking conspiracy from November 2016 through July 21, 2020.   Count 1 and U.S.S.G. §§ 2D1.1 also result in a greater offense level than § 2J1.2.   Pursuant § 2X3.1, a defendant's base offense level is "6 levels lower than the offense level for the underlying offense…."   U.S.S.G. § 2X3.1(a)(1).   "[T]he definition of 'underlying offense' in § 2X3.1 … does not apply for cross-reference purposes."   United States v. McQueen, 86 F.3d 180, 183 (11th Cir. 1996).   The revised PSI fails to grasp that Defendant Crespo "is not entitled to select the least serious offense under investigation for purposes of applying the guidelines."   Id. at 184 (citing U.S.S.G. § 1B1.5 cmt. n.3 and noting "where cross-referencing required, and more than one offense applicable, the most serious offense is to be used").

Eleventh Circuit precedent is clear.   For purposes of Defendant Crespo's sentence and §§ 2J1.2 and 2X3.1(a)(1), "the base offense level for the obstructing defendant is six levels lower that the offense level for *the crime* the prosecution of which the defendant attempted to obstruct." United States v. Harrell, 524 F.3d 1223, 1227 (11th Cir. 2008) (*emphasis added*) (citing United States v. Pompey, 17 F.3d 351, 353 (11th Cir. 1994)).   Understandably, this approach "allows the sentencing court 'to weigh the severity of one's actions in obstructing justice based on the severity of the underlying offense that was the subject of the judicial proceeding sought to be obstructed, impeded or influenced.'"   Id. (quoting United States v. Brenson, 104 F.3d 1267, 1285 (11th Cir. 1997)).   "From this it follows that proof of the underlying offense is not material, because the point of the cross reference is to punish more severely (and to provide a greater disincentive for) … obstruction of [] prosecutions with respect to more serious crimes."   United States v. Arias, 253 F.3d 453, 459 (9th Cir. 2001) (quoting United States v. Keys, 67, F.3d 801, 813 (9th Cir. 1995) and reiterating that "[obstructive] conduct is itself more gravely wrongful if the proceeding in which it occurred had greater stakes").

Without question, Defendant Crespo's obstruction and witness tampering conduct occurred "in respect to" the entire Count 1 Oxycodone trafficking conspiracy.   U.S.S.G. § 2J1.2(c)(1); see also Harrell, 524 F.3d at 1228 ("For the obstruction of justice to be 'in respect to' the crimes urged by the government to be cross-referenced, the obstruction of justice must have had the potential to disrupt the government's investigation or prosecution of those crimes").   Thus, Defendant Crespo's "underlying offense" under § 2X3.1(a)(1), including for relevant conduct purposes, is the entire Count 1 Oxycodone trafficking conspiracy from November 2016 through July 21, 2020. See United States v. Johnson, 655 F.3d 594, 607 (7th Cir. 2011) (upholding district court's use of broader drug conspiracy offense level as "underlying offense" for § 2X3.1(a)(1) purposes); United States v. Gallimore, 491 F.3d 871, 876-877 (8th Cir. 2007) (same).

The revised PSI cites to § 1B1.3 cmt. n.9 and reiterates that "the case of solicitation, misprision, or accessory after the fact, the conduct for which the defendant is accountable includes all conduct relevant to determining the offense level for the underlying offense that was known, or reasonably should have been known, by the defendant" (DE 306-1 at 1-2).   It incorrectly claims that the Government's trial evidence only shows Defendant Crespo's "knowledge with respect to the Dr. Gonzalez clinic investigation" (id. at 2).   The revised PSI further contends that "the existence of the other clinics and what others involved in the offense obtained and/or sold from these other clinics is not within the scope of [Defendant Crespo's] witness tampering or obstruction of Dr. Gonzalez's oxycodone trafficking investigation, neither is it in furtherance of or reasonably foreseeable in connection to the [Defendant Crespo's] witness tampering or obstruction of Dr. Gonzalez's oxycodone trafficking investigation, pursuant to § 1B1.3(a)(1)(B)" (id.).   The revised PSI is wrong on the facts and the law.

Pursuant to U.S.S.G. §§ 2D1.1(a)(5) and (c)(3), the drug amount for the entire Count 1

Oxycodone trafficking conspiracy is approximately 11,476 kg of converted drug weight, which results in a base offense level of 34.   The Government overwhelmingly established this total drug amount, at trial, through evidence and testimony identifying co-defendant Diaz's recruited patients and other co-conspirators, and the Oxycodone they unlawfully obtained and distributed, via the clinics operated by Dr. Gonzalez (GX 51C-D), Dr. Espinosa (GX 56C-D), and Dr. Carpman (GX 58C-D).   In addition to co-defendant Diaz (GX 19A-B), these individuals included the following: co-defendants Trujillo (GX 24A-B) and Lorenzo (GX 25A-B); and co-conspirators Carlos Pozo (GX 26A-B), Lucia Alvarez (GX 28A-B), Braulia Rego (GX 29A-B), Anibal Amara (GX 30A-B), Pedro Ruiz (GX 31A-B), Mercedes Perez (GX 32A-B), Marta Cardero (GX 33A-B), Braulio Sotolongo (GX 34A-B), Amanda Ponce (GX 35A-B), Gustavo Ponce (36A-B), Jose Garcia (GX 37A-B), Milka Lao (GX 38A-B), Alexis Ortega (GX 39A-B), Luis Paniagua (GX 40A-B), and Elisabeth Silio (GX 41A-B).

In determining Defendant Crespo's offense level, Sections 2J1.2(c)(1) and 2X3.1 control, not Section 1B1.3.   For purposes of the "underlying offense," § 2X3.1 directs courts to [a]pply the base offense level *plus any applicable specific offense characteristics that were known, or reasonably should have been known, by the defendant*."   U.S.S.G. § 2X3.1 cmt. n.1 (*emphasis added).*   Contrary to claims within the revised PSI, the Government is not required to prove that Defendant Crespo knew, or reasonably should have known, the length or drug amount involved the Count 1 conspiracy.   The Government is also not required to provide that Defendant Crespo knew, or should have known, about specific clinics or doctors.   "For drug offenses, drug quantity is not a specific offense characteristic."   United States v. Kimbrough, 536 F.3d 463, 476 (5th Cir. 2008); see also United States v. Small, 175 Fed. Appx. 765, 767 (7th Cir. 2006) (unpub. op.) (citing United States v. Girardi, 62 F.3d 943, 946 (7th Cir. 1995) and noting that "[w]hen the underlying

offense is drug-related, the quantity of drugs is not a specific offense characteristic about which the court inquires whether the accessory knew or should have known; rather, it is a factor used to determine the base offense level.")

"It goes without saying that Congress has elected to treat the trafficking of greater drug quantities as a more serious crime than the trafficking of lesser amounts.   Thus, the inclusion of drug quantity as a factor in the determination of the underlying offense level is consistent with the policy behind section 2X3.1 of 'punishing more severely those who act as accessories-after-the-fact to more serious crimes.'"   United States v. Cross, 371 F.3d 176, 182 (4th Cir. 2004) (quoting United States v. Godwin, 253 F.3d 784, 788 (4th Cir. 2001) and reiterating that under § 2X3.1, "the base offense level for a drug-related 'underlying offense' should include any increase based on the quantity of drugs involved, without regard to whether the defendant knew, or reasonably should have known, the amount involved.")

Even if this Court deems otherwise, the Government's trial evidence also overwhelmingly established that Defendant Crespo, as an HHS-OIG Special Agent assigned to the Southern District of Florida Healthcare Fraud Strike Force ("SDFL HCF Strike Force"), knew - or reasonably should have known - about the length and breadth of Count 1 Oxycodone trafficking conspiracy, including that it involved illegal Oxycodone trafficking conduct after the Dr. Gonzalez-era.   For starters, trial testimony from HHS-OIG SA Rolando Alvarez established that Defendant Crespo was well aware of the Dr. Gonzalez investigation, including co-defendant Diaz's role, well before it was actually charged via indictment.[2]   During February 2019, Defendant Crespo attended an "all

---

[2]   The Dr. Gonzalez Indictment charged Dr. Gonzalez and others with conspiracy to engage in Oxycodone trafficking from November 2016 through September 2018 (GX 49).   Dr. Gonzalez pleaded guilty to this same Oxycodone trafficking conspiracy and was sentenced to 96 months' imprisonment.

hands" SDFL HCF Strike Force briefing where the Defendant Gonzalez investigation and indictment were discussed in detail (GX 17C).   During March 2019, Defendant Crespo, as acting supervisor, downloaded and approved an HHS-OIG report detailing that the Strike Force's investigation focused on Dr. Gonzalez's illegal Oxycodone activity from 2015-2018 (GXs 10E, 17C).

Trial testimony from co-defendant Diaz established that, during 2017, Defendant Crespo threatened co-conspirator Pozo when Pozo initially attempted to provide information about Dr. Gonzalez and illegal Oxycodone activities at the clinic:

> Q.     And after Pozo was fired, did he attempt to approach law enforcement to complain about illegal activity at West Medical?
> A.     Yes.
> ….
> Q.     Mr. Diaz, how did you learn that Pozo tried to go to law enforcement to inform law enforcement about illegal activity at Dr. Gonzalez's clinic?
> A.     I found out through Alberico.
> Q.     What did Defendant Crespo tell you?
> A.     He said that Pozo spoke with me because he wanted to walk, quote, unquote, that is, to inform, and I told him -- and then I said, think about it very well because once I go through one door, I won't stop until I get through the last door. And Pozo stopped telling him anything as of that moment.
> Q.     Why did Defendant Crespo tell you this?
> A.     He knew that I was going to that clinic because he would also go visit that clinic, and I told him that I was going to the same clinic.
> Q.     You had this conversation with Defendant Crespo while you were still going to Dr. Gonzalez's clinic?
> A.     Yes.
> Q.     Now, at this point, were you worried that Pozo might try to inform on everybody with a different member of law enforcement?
> A.     Yes.
> Q.     Even after Pozo was fired from West Medical, did Pozo still get prescriptions from Dr. Gonzalez?
> A.     Yes.
> Q.     How did that happen?
> A.     The doctor would give them to him even free of charge and he told me I am going to keep on giving him the prescriptions to shut him up, tell him that everything is forgotten. I am going to give them to him free of charge.
>
> (DE 296 - Trial Transcript - August 18, 2023 - p. 31-33)

Defendant Crespo warned Diaz to leave Dr. Gonzalez's clinic to avoid law enforcement

detection:

> Q:    What was the month and year you stopped going to Dr. Gonzalez?
> A.    About July, July -- July 2018, like July 3rd.
> Q.    Prior to you leaving, did you ever learn that West Medical was under
>        investigation by law enforcement?
> A.    Yes.
> Q.    Did you have a conversation with Defendant Crespo about that?
> A.    Yes.
> Q.    What did he tell you?
> A.    Oh, that clinic, don't go there, leave there because that clinic is hot. Hot
>        means that it's in trouble.
> Q.    When he used the word "hot," what did you take that to mean?
> A.    I mean, when we use that expression, we mean to say that it's dangerous,
>        not convenient because -- well, it's dangerous that it's already under the
>        investigation, that the police is already looking at it.
> ….
> Q.    Handing the witness what's been admitted as, again, 50B1 through 50B13.
>        Mr. Diaz, prior to leaving West Medical, did you try to get all of your file
>        and your patients' files out of the clinic?
> A.    Yes.
> Q.    Why did you do that?
> A.    To save them from danger.
> Q.    When you say, "danger," what do you mean?
> A.    That they wouldn't turn up in the investigation.
> Q.    When you were doing that, were you worried that you might be arrested?
> A.    Yes.
> Q.    Why were you worried?
> A.    Well, first, I already knew that the clinic was under investigation, and that's
>        why I did it. Also, because an FBI agent was inquiring of my clients about
>        me so that's how I knew.
> (DE 296 - Trial Transcript - August 18, 2023 - p. 37-39)

After co-defendant Diaz fled from Dr. Gonzalez's clinic, at Defendant Crespo's urging,

Diaz's trial testimony also revealed that Defendant Crespo was keenly aware of the length and

breadth of Diaz's continuing Oxycodone trafficking activities and worked to protect them:

> Q.    When you first moved into Crespo's house, did you have a conversation
>        with him about your Oxycodone trafficking?[3]

---

[3]    At trial, the Government's evidence established the Diaz moved into Defendant
Crespo's residence during late 2019.

A.     Yes.

Q.     What did you guys talk about?

A.     It wasn't at the beginning. I had already been living there about a month, month or so.

Q.     What did you talk about?

A.     When I told him I wanted to rent there, I told him I can pay you up to a thousand dollars, and he said, "No, no, no man."  I started with 100, 200, 300 and when I reached 700 he said that was enough.

Q.     What did you talk about in terms of your Oxycodone trafficking?

A.     I told him then that I was selling my pills.

Q.     Did you tell him what doctors you were going to?

A.     Yes.

Q.     What did you tell him?

A.     The only doctor that he found out that I had been going to was Gonzalez.

Q.     But when you moved into his house were you going to Gonzalez?

A.     Well, when I moved into his house, I think I was already going to Carpman.

Q.     Did you talk about Carpman with Crespo?

A.     No.

Q.     You didn't talk about the doctor, but you did talk about your Oxycodone trafficking?

A.     Yes.

Q.     Why didn't you bring up Carpman?

A.     The truth is, I don't know, but I did tell him that I was trafficking.

Q.     What was Crespo' reaction to that?

A.     And he said, "Old man, calm down, calm down. Do your little thing."

Q.     Did he ever try to kick you out of the house?

A.     No, never.

(DE 296 - Trial Transcript - August 18, 2023 - p. 70-71)

…

Q.     Would you have conversations in person with Crespo about your Oxycodone trafficking?

A.     Yes.

(DE 296 - Trial Transcript - August 18, 2023 - p. 100)

…

Q.     Where was Anais threatening to go if you didn't give her money?

A.     To the police, yes.

Q.     Why were you talking with Crespo about this?

A.     Because I was sure that he would protect me from everything because really he had always done that.

(DE 296 - Trial Transcript - August 18, 2023 - p. 97)

…

Q.    How was Crespo very special with you?

A.    The entire time before all of this happened he was always looking after me, was inquiring about my health. He defended me. Like when he defended me with Anais, I told him about my problem about the pills and the FBI and everything, everything.

(DE 297 - Trial Transcript - August 22, 2023 - p. 103)

As noted above, the revised PSI's contends that "the existence of the other clinics and what others involved in the offense obtained and/or sold from these other clinics is not within the scope of [Defendant Crespo's] witness tampering or obstruction [convictions], neither is it in furtherance of or reasonably foreseeable in connection to the [Defendant Crespo's] witness tampering or obstruction [convictions]" (DE 306-1 at 2).  These claims have no factual or logical basis.  As elicited at trial, Defendant Crespo's witness tampering and obstruction of justice convictions directly pertained to co-defendant Diaz's historical <u>and</u> ongoing Oxycodone trafficking activities.

During May 2020, Defendant Crespo and Diaz repeatedly discussed their concerns regarding co-defendant Lorenzo's knowledge of Diaz's historical and ongoing Oxycodone trafficking activities - and Defendant Crespo's protection - and Lorenzo's threats to go to law enforcement (GXs 7-17, 7-18, 7-20, 7-21).  On May 8, 2020, utilizing Diaz's phone, Defendant Crespo directly threatened Lorenzo with violence for her attempts to extort Diaz from money in exchange for not informing the police:

The only cracked ass is yours! Call whoever you want! Don't threaten an old man anymore. Come to my house, knock on my door. You have it all recorded. Tell your husband to come and knock on my door. Don't leave it till later. Go on, sweetie, go on, knock on the door. Now, tell him, because I gave you my name, tell him to come. Fuck! Tell him to come! Who are you going to threaten? Stay off-stay off the meth, honey. Who are you threatening? You're crazy. I'm leaving it in a message and I gave you my address so you can knock on my door. Love you lots, you hear me?

(GX 7-17).[4]

---

[4]    At sidebar, even Defendant Crespo's counsel repeatedly referred to this call as "threatening" (DE 296 - Trial Transcript - August 18, 2023 - p. 70-71)

During her trial testimony, co-defendant Lorenzo stated that she remembered receiving this May 8, 2020, message from Defendant Crespo.   She further confirmed that it was in relation to her attempts to extort money from Diaz in exchange for not reporting his historical and ongoing Oxycodone activities to law enforcement (DE 296 - Trial Transcript - August 18, 2023 - p. 69-72).

Beginning as early June 3, 2020, FBI agents began attempting to conduct interviews with certain of co-defendant Diaz's recruited patients.   During these interviews, FBI agents asked Diaz's recruited patients about past and ongoing Oxycodone prescriptions.   After the FBI agents departed, these same patients called Diaz and informed Diaz as to what occurred.   In turn, Diaz – as set forth in the Title III intercepts and during Diaz's trial testimony - called or spoke directly with Defendant Crespo about the FBI's active investigation (GXs 7-23, 7-24, 7-25, 7-27, 7-28, 7-31, 7-38, 7-39, 7-51, 7-53, 7-54).

On June 19, 2020, in response to an email from FBI SA Lawless regarding the FBI's ongoing investigation, Defendant Crespo notified Diaz of the email, told Diaz that he was not concerned about law enforcement detection, and instructed Diaz to continue on with his ongoing Oxycodone trafficking activities (GXs 7-35, 7-36, 7-37).   That same day, Diaz later relayed this conversation with Defendant Crespo to his daughter:

> So I went to the house to talk to him [CRESPO].   Listen, he's such a classy guy with me. I don't like to exaggerate, you understand me? Nothing. The guy [CRESPO] reached out—he reached out, got his cellphone, showed me and said, 'Look, I don't want you to have anything to do with these people.' I told him, 'No, I have nothing to do with those people. I do know them, but I have nothing to do with them.' He [CRESPO] said to me, 'Then, I'm not worried. Continue on—continue on—continue working the Uber (code for Oxy trafficking) the way you're doing. There's no problem.'
> (GX 7-37).

On June 26, 2020, Defendant Crespo received another email from FBI SA Lawless about the FBI's ongoing investigation.   This email specifically informed Defendant Crespo that: "We

are targeting patient recruiters (ie, co-defendant Diaz) who are facilitating illegal activities oxycodone distribution what we were doing so at Doctor Rodolfo Gonzalez-Garcia's clinic who are now doing the same with other doctors (ie, Dr. Carpman)."   This email, in no uncertain terms, alerted Defendant Crespo that the FBI's investigation targeted historical and current, ongoing conduct.   Defendant Crespo's convictions for conspiracy to engage in witness tampering and obstruction justice (September 2019-July 21, 2020), including his substantive witness tampering convictions (July 8, 17, and 20, 2020) also all involved dates that occurred after June 2020 (DE 46) – when Crespo clearly knew that the FBI's investigation pertained to co-defendant Diaz's historical <u>and</u> ongoing Oxycodone trafficking activities.   For the revised PSI to claim that Defendant Crespo's witness tampering and obstruction of justice convictions solely pertained Diaz's historical conduct at Dr. Gonzalez's clinic, from November 2016-July 2018, is simply incorrect.

On July 17, 2020, co-defendant Diaz specifically informed Defendant Crespo that he (Diaz), earlier that day, illegally obtained and sold Oxycodone from his recruited patient, Mercedes Perez.   Diaz also told Defendant Crespo that FBI agents later interviewed Perez, that same day, and that she told the agents about Diaz.   Immediately, Defendant Crespo repeatedly instructed Diaz to lie and obstruct the investigation, both in terms of ongoing and historical conduct (GXs 7-52 thru 7-65).   Defendant Crespo began lashing out and threatening assault and kill Lorenzo and co-conspirator Pozo due to his belief that they were informants and cooperating witnesses. Defendant Crespo's concern about both Lorenzo and Pozo clearly stemmed from his knowledge that they were intimately involved with co-defendant Diaz's Oxycodone trafficking activities from the very beginning and could provide the most damaging information against him and Diaz.

On July 17, 2020, Defendant Crespo also made the following additional, credible threats

when speaking with Diaz:

- GX 7-64 at p. 5 - "You're not listening to me.  Look old man, I grab Anais, I grab her in a canal, I'll stick her in—stick her in a bag, they'll never find her again."

- GX 7-65 at p. 1 - "Anais and Pozo sold you out…Pop, the both of us… are fucking going down, did you hear me? The both of us [UI]—"

- GX 7-65 at p. 2 - "I have been telling you for a year, that they are going to sell you out. You have not listened to me."

- GX 7-65 at p. 3 - "I don't understand why Anais. Anais deserves for me to go and shoot her!... You are not understanding me. I have killed people for less than that."

- GX 7-65 at p. 5-6 - "Listen to me, pop, if you call me to go get her, I'll stab her twice--her and that motherfucker, the other one. I'll kill them right there and then—…you do not know me, I'll make both of them bleed to death right there. Pop, I'm telling you. I'll grab them, I'll put them in—in a plastic bag, I'll put them in the Everglades. An alligator will eat them. This is the time when the male alligators eat."

- GX 7-65 at p. 9 - "Pop… the day, the day that I get to Pozo--you are not listening to me, I'll grab Pozo, listen to me, and I will grab Anais, listen to me. I know a lot about this. Both of them… they are going to pay for what they did to you and me. Pop, Anais, I'll… no, Pozo, I'm going to kill him. Pozo is nobody. Anais… I'm not going to kill her. I'm going to give her a beating, but a beating so she knows who is Alberico Ahias Crespo."

- GX 7-65 at p. 11 - "I'm tired of killing people. I don't want to kill anybody else. I do not enjoy that, but I'm going to tell you something, her, and all those crackheads. … Listen pop, I'll kill him for a pack of gum. …Pop… that faggot Pozo, I'll grab him, since he has AIDS, I'll stab him in the ass until he bleeds out. They sold you out, pop. They sold you out--"[5]

On July 20, 2020, during a recorded call with FBI SA Lawless, Defendant Crespo

continued to lie about Diaz's historical and ongoing Oxycodone trafficking activities and obstruct

---

[5]   At trial, FBI SA Slattery also testified that law enforcement took these July 17, 2020, threats seriously and actively monitored Defendant Crespo's movements through physical surveillance and Title III monitoring from July 17, 2020, until his July 21, 2020, arrest.

the investigation (GX 6).

Based on the foregoing, pursuant to §§ 2J1.2 and 2X3.1(a)(1), the "underlying offense" is the entire Count 1 Oxycodone trafficking conspiracy, not just the Dr. Gonzalez-era.   The drug amount for this conspiracy is approximately 11,476 kg of converted drug weight, which results in an offense level of 34.   With the six-point reduction under §2X3.1(a)(1), Defendant Crespo's base offense level is 28.

### B.      Properly Added Public Trust/Special Skill Enhancement

Under Section § 3B1.3, a two-level enhancement is warranted "[i]f the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense . . . ."   U.S.S.G. § 3B1.3.   The PSI properly awards Defendant Crespo with a two-point enhancement under U.S.S.G. § 3B1.3.

"'Public or private trust' refers to a position of public or private trust characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference)."   U.S.S.G. § 3B1.3 cm1. n.1.   "While it may be said that all police officers occupy positions of trust because of the nature of their job duties and their position in society, the inquiry does not end there.   Police officers are not afforded the same trust with regard to all matters; with respect to certain matters, police officers may occupy positions of special trust."   United States v. Pedersen, 3 F.3d 1468, 1471 (11th Cir. 1993).

Given Defendant Crespo's offense conduct, and the Government's trial evidence and testimony, the revised PSI is correct (PSI ¶ 38).   Defendant Crespo clearly utilized and abused his position as an HHS-OIG Special Agent on the SDFL HCF Strike Force to "in a manner that significantly facilitated the commission or concealment of [his and others' crimes]."   U.S.S.G. § 3B1.3.   Defendant Crespo utilized his position on the Strike Force to actively monitor and warn

co-defendant Diaz as to any related investigative activity, engage in unauthorized access and disclosure of investigative case file materials and information, and corruptly lie to and mislead other Strike Force agents and supervisors.   The revised PSI properly awards Defendant Crespo with a two-point enhancement under U.S.S.G. § 3B1.3 and his offense level increases to 30.

### C.   Properly Added Obstruction Enhancement

The revised PSI also correctly adds an additional two (2) points for obstruction of justice (PSI ¶ 39).   However, this enhancement applies for both: 1) Defendant Crespo's materially false statements to U.S. Probation during his PSI interview; and 2) Defendant Crespo's post-arrest attempts to intimidate and unlawfully influence co-defendant Diaz.   The revised PSI applies the latter.   However, it simply ignores the former and states: "the defendant's fiancée, Samantha Martinez, verified the defendant's background information, which included the defendant's military experience" (DE 306-1 at 2-4).

Under § 3C1.1, a two-level enhancement is applicable "[i]f (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense."   U.S.S.G. § 3C1.1   "[P]roviding materially false information to a probation officer in respect to a presentence or other investigation for the court" qualifies as "covered conduct" under § 3C1.1.   U.S.S.G. § 3C1.1 cmt. n.4(H).[6]   "[T]hreatening, intimidating, or otherwise unlawfully influencing a co-defendant, witness, or juror, directly or indirectly, or attempting to do so" also qualifies as "covered conduct" under § 3C1.1.   U.S.S.G.

---

[6]   "'Material' evidence, fact, statement, or information, as used in this section, means evidence, fact, statement, or information that, if believed, would tend to influence or affect the issue under determination."   U.S.S.G. § 3C1.1 cmt. n.6.

§ 3C1.1 cmt. n.4(A).

*Materially False Statements to U.S. Probation Regarding Military Service*

As set forth in paragraph 72 of the revised PSI, Defendant Crespo still claims that "his service in the Air Force included his participation in a drug interdiction mission. He was stationed in Leticia, Colombia, Tabatinga, Brazil, and Ocho Rios, Peru, where he experienced combat against the Revolutionary Armed Forces of Colombia (FARC) guerrilla group."   In paragraph 62 of the revised PSI, Defendant Crespo also again references his "experience in combat."

The Governments maintains that these claims are materially false.   The revised PSI argues that Defendant Crespo's materially false claims regarding his military service do no "suggest that the defendant should receive leniency and/or a downward variance pursuant to 18 U.S.C. § 3553(a)(1) factors" (DE 306-1 at 3).   This assertion completely ignores Defendant Crespo's history, background, and familiarity with the PSI process as a prior, federal law enforcement officer with the SFDL HCF Strike Force.   His materially false claims regarding his military service were not made by mistake or oversight.   They were clearly made in order to sway this Court toward leniency and a downward variance/departure when considering 18 U.S.C. § 3553(a)(1) (Defendant Crespo's history and characteristics) and U.S.S.G § 5H1.11 ("Military service may be relevant in determining whether a departure is warranted, if the military service, individually or in combination with other offender characteristics, is present to an unusual degree and distinguishes the case from the typical cases covered by the guidelines.").

As part of its trial evidence, the Government admitted Defendant Crespo's HHS-OIG employment records, which contained Defendant Crespo's DD Form 214 and resume (GX 13D). Additionally, the Government obtained and provided Defendant Crespo's <u>entire</u> military service

record to U.S. Probation and defense counsel.[7]   A DD Form 214 is a form documenting a military servicemember's separation from active duty, and contains dates of service, any commendations or medals received, the reason for separation and the type of discharge.   Defendant Crespo's DD Form 214 indicates that he entered active duty with the U.S. Air Force on August 24, 1993, and separated from active duty on March 4, 1997 (GX 13D at 11).   The DD Form 214 also notes that Defendant Crespo spent approximately 14 weeks in basic military training and apprentice law enforcement training through the end of 1993 (id.).

As set forth in the revised PSI, Defendant Crespo noted that he "lived in South Florida until he moved to Tampa, Florida, in 1993, where he resided until 1997, while he served in the military" (PSI ¶ 54).   Defendant Crespo's DD Form 214 further notes that he separated from active duty on March 4, 1997, at MacDill Air Force Base in Tampa, FL (GX 13D at 11).   There is no credible evidence establishing that Defendant Crespo was ever stationed, or ever served, anywhere other than MacDill Air Force Base in Tampa, FL, from early 1994 through March 1997.[8]

While Defendant Crespo materially and falsely claims that "his service in the Air Force included his participation in a drug interdiction mission" and that he was "stationed in Leticia, Colombia, Tabatinga, Brazil, and Ocho Rios, Peru, where he experienced combat against the Revolutionary Armed Forces of Colombia (FARC) guerrilla group," his Form DD 214 and military service record provide no such support.   Common sense dictates that had Defendant Crespo - in fact - served and engaged in combat missions outside the United States, his Form DD 214 and

---

[7]   The Government will submit these documents to the Court under seal.

[8]   The Government fails to comprehend how or why the revised PSI relies on Defendant Crespo's fiancée, Samantha Martinez, as a credible source - in any way - regarding his military service.   She has no firsthand knowledge of these matters and given her relationship with Crespo and Diaz and involvement in the charged crimes (especially on July 17, 2020), is not a reliable source of information.

military record would certainly reflect such service.   Moreover, Defendant Crespo's Form DD 214 and military record would indicate any one or more of the following decorations, medals, badges, citations, or campaign ribbons: 1) Combat Readiness Medal, <u>see</u> <u>https://www.afpc.af.mil/Fact-Sheets/Display/Article/421935/combat-readiness-medal/</u>; 2) Air and Space Outstanding Unit Award, <u>see</u> <u>https://www.afpc.af.mil/Fact-Sheets/Display/Article/421951/air-and-space-outstanding-unit-award/</u>; 3) Armed Forces Expeditionary Medal, <u>see</u> <u>https://www.afpc.af.mil/Fact-Sheets/Display/Article/421915/armed-forces-expeditionary-medal/</u>; and/or 4) Joint Meritorious Unit Award, <u>see</u> <u>https://www.afpc.af.mil/Fact-Sheets/Display/Article/421866/joint-meritorious-unit-award/</u>.   To the contrary, his DD Form 214 simply includes the "Air Force Training Ribbon, National Defense Service Medal, Small Arms Expert Marksmanship Ribbon with device, [and] Air Force Good Conduct Medal" (GX 13D at 11).   These awards denote fairly standard military service for a well-behaved, U.S.-based enlisted Air Force servicemember during the mid-1990s - certainly not arduous overseas duty in "Leticia, Colombia, Tabatinga, Brazil, and Ocho Rios, Peru," and "combat" against armed guerilla fighters.   His military service record also provides no evidence of any overseas duty or combat.

Moreover, had Defendant Crespo - in fact - served and engaged in combat missions outside the United States, he would have certainly included this information on his resume to HHS-OIG (GX 13D at 4-5).   Defendant Crespo's resume reveals no such military service.   Instead, it notes that he was merely stationed in "Tampa, Florida," as "Air Force Security Police," and was "[r]esponsible for conducting Law Enforcement patrol duties within Military Installations[,] [a]ccountable for enforcing Military/Civilian Laws under Military and Federal Guidelines[,] [p]roviding force protection for Air Force aircrews[,] and [i]mplement[ing] policing and security

activities, as well as resource protection for Military resources."   Defendant Crespo merits a § 3C1.1 two-level enhancement for his materially false claims regarding his military service and his offense level should increase to 32.

### *Post-Arrest Attempts to Intimidate and Unlawfully Influence Co-Defendant Diaz*

The revised PSI correct awards a § 3C1.1 two-level enhancement for his post-arrest attempts to intimidate and unlawfully influence co-defendant Diaz from cooperating.   Additional law enforcement investigation revealed that – after his July 2020 arrest and no-contact prohibition with co-defendant Diaz[9] and Valodia Aguilera – Defendant Crespo repeatedly attempted to intimidate and silence Diaz (SX #1-5).[10]

Diaz's trial testimony detailed his fear and awe of Defendant Crespo:

Q.      Mr. Diaz, when we last broke before the break, we were discussing why it
        took you so long to cooperate.   Do you remember that?
A.      For the same reason that I just mentioned that there was too much, too much
        friendship between the two of us.   We had too many things in common. I
        knew his character and I knew he could think that I was snitching on him. I
        was afraid. He had a lot of power.
Q.      When you said you were afraid, why were you afraid?
A.      Because, nothing, I mean, he had power. There was no problem. When he
        would talk to me, it was -- I really would get scared.
Q.      What power did he have?
A.      Well, imagine that, he was a federal agent. He would go get people. One
        time he told me he went to Spain to get someone.
(DE 295 - Trial Transcript - August 17, 2023 - p. 151)

…

---

[9]   Contrary to claims in the revised PSI (DE 306-1 at 4), Defendant Crespo and co-defendant Diaz were expressly prohibited have any contact with each other (DE 10, 11, 12, 13, 14).  U.S. Magistrate Judge Becerra also signed an order granting the parties agreed bond for Defendant Crespo, which specifically included a no-contact prohibition with his co-defendant (Diaz) (DE 12, 13, 14).   However, the specific bond documents, likely due to a clerical error, failed to check off this special condition (DE 15, 16).

[10]   SX refers to the Government's Sentencing Exhibits, which were attached the Government's earlier filing (DE 300).

Q.      When you use the term "my godson," who are you referring to?

A.      Alberico.

Q.      If you think Pedro Alvarez is an informant, why are you mentioning Crespo?

A.      Because I saw in him -- I saw the authority, power.

Q.      Can you repeat that, I'm sorry? I didn't hear the interpreter.

…

Q.      You saw in who?

A.      Alberico.

(DE 296 - Trial Transcript - August 18, 2023 - p. 57)

Diaz's son informed investigating agents that, not long after Defendant Crespo and Diaz were arrested during July 2020, Defendant Crespo texted Diaz's son, provided a phone number, and instructed that Diaz need to call Defendant Crespo at the number provided (SX #2).   Diaz's son also became concerned how Defendant Crespo could even obtain the son's phone number (id.) Given Defendant Crespo's position as a former HHS-OIG Special Agent, and Diaz's intimate knowledge of their illegal activities together, the only purpose in contacting Diaz's son was to attempt to threaten, intimidate, or otherwise unlawfully influence Diaz from cooperating.

Defendant Crespo did not stop with Diaz's son.   In further violation of his no-contact order, Defendant Crespo also contacted their mutual friend Valodia Aguilera (SX #1, #3).   Per Aguilera, Defendant Crespo called him on two (2) occasions.   The first time, Defendant Crespo directed Aguilera to tell Diaz to "stop talking" and that Diaz was telling "lies" (id.).   The second time, which occurred around November 2022, Defendant Crespo again directed Aguilera to tell Diaz to "stop talking" and relayed that what Diaz told investigators was "harmful" to Defendant Crespo, including certain details (id.).   This second approach with Aguilera was especially galling because, during October 2022, the Government disclosed to Defendant Crespo's defense team that Diaz was - in fact - cooperating and detailed Diaz's recent cooperation (SX #4, #5). Understandably, Defendant Crespo's defense team likely immediately shared this news with their client.   In response, Defendant Crespo contacted Aguilera in order to intimidate and silence Diaz.

Page **23** of **28**

Although Defendant Crespo was convicted of witness tampering and obstruction offenses and § 2X3.1 applies to his offense level, a two-level enhancement under § 3C1.1 remains applicable "if a significant further obstruction occurred during the investigation, prosecution, or sentencing of the obstruction offense itself." U.S.S.G. § 3C1.1 cmt. n.7. Defendant Crespo's conduct with Diaz' son and Aguilera were clearly significant attempts to threaten, intimidate, or otherwise unlawfully influence Diaz from cooperating. Defendant Crespo merits a § 3C1.1 two-level enhancement and his offense level should increase to 32.

### D. Improperly Added Zero-Point Offender Reduction

The revised PSI incorrectly awards Defendant Crespo a two-level reduction under § 4C1.1 as a "zero-point offender" (PSI ¶ 41). To receive a two-level reduction under § 4C1.1, Defendant Crespo bears the burden of establishing that meets "all of the criteria" in §§ 4C1.1(a)(1)-(10). As noted in detail above, the Government's trial evidence, including Title III wiretap intercepts, overwhelmingly established that Defendant Crespo used "credible threats of violence in connection with the offense[s]." He also possessed a firearm or other dangerous weapon "in connection with the offenses[s]." U.S.S.G. §§ 4C1.1(a)(3) and (7).

Section 4C1.1(a)(3) tracks the safety-valve language in U.S.S.G. § 5C1.2(a)(2) and does not define use of "credible threats of violence in connection with the offense." Nonetheless, basic common sense dictates that Defendant Crespo does not qualify as a zero-point offender. "To be eligible for safety-valve [or zero-point offender] relief, the defendant must not have used 'violence or credible threats of violence' while 'attempting to avoid detection or responsibility' for the offense of conviction." United States v. Sandoval-Sianuqui, 632 F.3d 438, 443 (8th Cir. 2011) (noting that "[i]f a defendant [] threatens a cooperating witness for the purpose of obstructing or impeding the investigation, prosecution, or sentencing of his offense of conviction, it follows that

the defendant has used [] credible threats of violence for the purpose of attempting to avoid detection or responsibility for the offense of conviction."). Additionally, "a threat need not be communicated to the person to whom it is directed to disqualify a defendant from application of the safety valve [or zero-point offender] provision." United States v. Cyrus, 238 Fed. Appx. 929, 932 (4th Cir. 2007) (unpub. op.) (citing United States v. Spring, 305 F.3d 276 (4th Cir. 2002) and affirming district court's denial of safety valve to defendant's indirect threat regarding probation officer).

Defendant Crespo's direct threats to Lorenzo on May 8, 2020, and subsequent indirect threats against Lorenzo and Pozo were all "credible threats of violence." Because Defendant Crespo's credible threats targeted potential witnesses against him and co-defendant Diaz, they were all made "in connection with" his offense convictions, that is, "while 'attempting to avoid detection or responsibility' for the offense of conviction." Sandoval-Sianuqui, 632 F.3d at 443.

Alternatively, Defendant Crespo also does not qualify for zero-point offender relief because he possessed a firearm or other dangerous weapon in connection with his offenses. See U.S.S.G. § 4C1.1(a)(7). During the charged offenses and the entirety of Diaz's Oxycodone trafficking activities, Defendant Crespo was gun-carrying federal law enforcement officer and firearms instructor. He also maintained a State of Florida concealed weapon permit. When Defendant Crespo was arrested on July 21, 2020, while attempting to meet with FBI SA Lawless and continue obstructing the FBI's investigation (GX 6), he also possessed a loaded firearm and numerous knives (SX #6).

Defendant Crespo clearly does not qualify as a "zero-point offender" under § 4C1.1,

## III.   **FINAL GUIDELINE RANGE & TOTAL SENTENCE**

Defendant Crespo's total offense level is 32. Because Defendant Crespo utilized credible

threats of violence in connection with his offenses and as a federal law enforcement officer, possessed a firearm and other dangerous weapons in connection with his offenses, he does not merit any zero-point offender reduction under U.S.S.G. § 4C1.1.   With a category I criminal history (PSI ¶ 45), his advisory guideline range is 121-151 months' imprisonment.   Consistent with the 18 U.S.C. § 3553 factors, this Court should sentence Defendant Crespo to 151 months' imprisonment.

A sentence of 151 months' imprisonment is approximately twice the sentence for co-defendant Diaz and entirely reasonable (DE 177).   The societal devastation that the opioid epidemic has wrought upon this country (and this District) is well known.   It has been documented through countless films, television shows, books, articles, and other formats.

The opioid epidemic was also certainly known to Defendant Crespo, a former HHS-OIG Special Agent assigned to the SFDL HCF Strike Force and state and federal law enforcement official since 1997.   Instead of upholding and safeguarding very the laws that he was entrusted to protect, he repeatedly and unabashedly dishonored and violated them – all while hiding behind his badge and own ego and arrogance.   Defendant Crespo's offense conduct is a disgrace and an insult to the countless men and women who honorably serve - and have honorably served - in state, local, and federal law enforcement.

As revealed through the Government's trial evidence and testimony, Defendant Crespo – while a member of the SFDL HCF Strike Force - knowingly and corruptly obstructed official federal proceedings and tampered with multiple witness, all to protect a wide-reaching Oxycodone trafficking organization that involved three (3) different doctors.   From November 2016 through July 2020, Government's trial evidence and testimony revealed that Diaz and his co-defendants and co-conspirators unlawfully trafficked tens of thousands of 30mg Oxycodone pills, with a total

street value of well over $1 million - all with Defendant Crespo's knowledge, approval, and protection (GXs 51, 56D, 58D).   Defendant Crespo consistently lied to, and materially omitted information from, his Strike Colleagues and supervisors regarding Diaz's historical and ongoing Oxycodone trafficking activities.   He also repeatedly threatened extreme violence and retribution against possible cooperators.

The nature and circumstances of Defendant Crespo's crimes warrant a 151-month sentence.   <u>See</u> 18 U.S.C. § 3553(a)(1).   Because Defendant Crespo's crimes were "more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence."   <u>United States v. Kalu</u>, 485 Fed. Appx. 366, 374 (11th Cir. 2012) (unpub. op.) (quoting <u>United States v. Martin</u>, 455 F.3d 1227, 1240 (11th Cir. 2006)).   As to the kinds of sentences available and the need to avoid unwarranted sentencing disparities, a 151-month sentence comports with the advisory guidelines and 20-year statutory maximum penalties. <u>See</u> 18 U.S.C. § 3553(a)(4)-(6).   Consistent with 18 U.S.C. § 3553(a)(2)(A)-(C), given the above, a 151-month sentence will also promote respect for the law, protect the public, reflect the seriousness of Defendant Crespo's crimes, and provide a just punishment.

Respectfully submitted,

MARKENZY LAPOINTE
UNITED STATES ATTORNEY

BY:    <u>*s/ Sean T. McLaughlin*</u>
SEAN T. MCLAUGHLIN
ASSISTANT UNITED STATES ATTORNEY
Court ID No. A5501121
11200 NW 20th Street, Suite 101
Miami, FL 33172
(305) 715-7642/7654
Email: Sean.McLaughlin@usdoj.gov

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on January 16, 2024, I electronically filed the foregoing document with the Clerk of the Court and counsel of record using CM/ECF.

*s/ Sean T. McLaughlin*
SEAN T. McLAUGHLIN
Assistant United States Attorney