UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA,

    *Plaintiff,*

v.                                            CASE NO: 21-20005-CR-GAYLES

ALBERICO AHIAS CRESPO, et al.

    *Defendant.*
_____/

**DEFENDANT CRESPO'S OBJECTIONS TO REVISED PRESENTENCE REPORT**

Defendant, ALBERICO AHIAS CRESPO ("Mr. Crespo"), through undersigned counsel, hereby files his objections to [DE 306] Revised Presentence Report ("PSR").

**I. The PSR's First Draft**

On October 24, 2023, Probation filed in this case the PSR's first draft. [DE 292] That first draft reflected a Base Offense Level 24. [*Id*. at ¶¶ 33-34] Level 24 was determined by making Mr. Crespo responsible for all pills prescribed to the six patients named in the Indictment, which under the guideline's tables translated to **1,802 kilograms of converted drug weight**.[1] *Id*. In addition, Probation imposed a two-level aggravating enhancement for abusing a position of trust or use of special skill. This resulted in a Total Offense Level 26. [*Id*. at ¶ 42] But Probation correctly pointed out in the PSR, at ¶ 96, that Mr. Crespo qualified for a § 4C1.1 two-level reduction, which was to

---

[1] Per the sentencing guidelines, Oxycodone pills are converted to "kilograms of converted drug weight" using various tables and formulas. *See* DE 299 at 2-3 (Defendant Crespo's Objections to [Initial] Presentence Report, which explained the procedure). And once the total kilograms of converted drug weight is obtained, §§ 2D1.1(a)(5), (c)(5) and 2X3.1(a)(1) are used to arrive at the Base Offense Level. As relevant here, an offense involving 1,802 kilograms of converted drug weight yields a Base Offense Level of 24.

1

take effect November 1, 2023. Therefore, in the first draft of the PSR, Mr. Crespo would come out to a ***Total Offense Level 24*, and a *guidelines range of 51 to 63 months of imprisonment***.

Both Mr. Crespo and the Government objected to the PSR's first draft. Probation subsequently filed a revised PSR on January 9, 2024 [DE 306]. Mr. Crespo now files his objections to the Revised PSR.

## II. Mr. Crespo's Objections to the Revised (Final) PSR

Mr. Crespo objects to the following factual content and legal conclusions in the PSR:

### A. *Objections Not Affecting the Guidelines Range*

**¶ 9**: Paragraph 9 states that "Diaz and Lorenzo were in a relationship together and lived in an efficiency unit at the residence of SA Crespo …" This statement is inaccurate. Lorenzo at no time lived in the efficiency unit at the residence of SA Crespo. Thus, correction is required.

**¶ 10(a)**: Paragraph 10(a) asserts that SA Crespo "knew" of the planned arrest of [Dr.] Gonzalez. However, the evidence adduced at trial revealed that is not true. Instead, at trial an email was introduced stating that a doctor, who was not named, was going to be arrested on February 7, 2019. *See* Composite Exhibit 1 (the actual email introduced at trial). That email did not identify Dr. Gonzalez as the doctor who was going to be arrested. Nor was there evidence introduced at trial that anyone informed Mr. Crespo that Dr. Gonzalez was the doctor to be arrested. Given these points, this paragraph must be deleted or corrected.

**¶ 10(b)**: Likewise, Paragraph 10(b) must be deleted or corrected for the same reasons as ¶ 10(a). At trial an email was introduced stating that a search warrant was going to be executed at a medical office. *See* Composite Exhibit 1 (the actual email introduced at trial). That email did not identify Dr. Gonzalez's office as the medical office that was going to be searched. Nor was there testimony at trial that Mr. Crespo or other agents were informed that the medical offices to be

2

searched belonged to Dr. Gonzalez. Once again, given these points, this paragraph must be deleted or corrected.

¶ 13: This paragraph in the PSR states that "the initial patient interviews revealed that Diaz had been warned of these interviews, which led to Diaz telling the patients to be calm and that SA Crespo confirmed that law enforcement would not return to conduct additional interviews." The evidence adduced at trial refutes this assertion. In fact, Diaz testified at trial that he said these things to the patients to calm them and that way they would not sell their pills to someone else.

Mr. Crespo raised these same factual objections in his objections to the first draft of the PSR. [DE 299 at 1-2.] Probation, however, summarily rejected all the objections – that is, objections to ¶¶ 9, 10(a), 10(b), and 13 – declaring the following in an Addendum to the PSR: "According to 18 U.S.C. § 3661, 'no limitation shall be placed on the information concerning the …conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence.'" [DE 306-1 at 4.]

We respectfully disagree. While it is true that a wide variety of information may be included in a PSR, the inclusion of inaccurate or false information is not permitted. Otherwise, the defendant would be unfairly sentenced based on inaccurate or false facts, and that violates all fundamental notions of Due Process of law. Further, the inclusion of inaccurate or false testimony in the PSR would destroy its value as a tool to the courts and the bureau of prisons. So, it is important to correct mistakes or inaccuracies.

B. *Objections Affecting the Guidelines Range*

We object to the following PSR paragraphs, which do affect the guidelines:

¶ 35: This paragraph makes Mr. Crespo responsible for ***4,563 kilograms of converted drug weight***. This puts Mr. Crespo at Base Offense Level 26. This is quite different from the calculations

3
**JOSE M. QUIÑON, P.A.**
*75 Valencia Avenue, Suite 800, Coral Gables, FL 33134. Tel. (305) 858-5700. Fax (305) 358-7848. jquinon@quinonlaw.com*

appearing in the first draft of the PSR. In that first draft, Probation held Mr. Crespo responsible for ***1802 kilograms of converted drug weight***. Thus, the Revised PSR increased the converted drug weight by a walloping ***153.219%***. And elevated Mr. Crespo's Base Offense Level from a Level 24 to Level 26. In fact, the first PSR draft calculated Mr. Crespo's guidelines as ***Total Offense Level 24, with a recommended range of 51 to 63 months of imprisonment.*** While the Revised PSR's calculations placed Mr. Crespo at ***Total Offense Level 28, with a recommended range of 78 to 97 months of imprisonment.*** A significant (and painful) difference. We maintain that the guidelines calculations in both PSR versions were calculated incorrectly. We submit, for the reasons stated below, that the amount of converted drug weight properly attributable to Mr. Crespo is substantially less and his Base Offense Level and Total Offense Level likewise should be lower. Therefore, we object.

### *The Correct Guidelines Calculations*

The jury found Mr. Crespo not guilty of conspiracy to possess with intent to distribute Oxycodone. But found him guilty of the five counts charging him with obstruction of justice. The sentencing guideline for obstruction of justice offenses is § 2J1.2(c)(1). That provision, however, contains a cross reference that instructs to apply § 2X3.1 if the offense involves obstructing an investigation or prosecution of criminal offense and the resulting offense level is greater than the offense level under § 2J1.2. That cross reference applies here, so § 2X3.1 is the appropriate provision used to compute the guidelines in this case.

The application of § 2X3.1 focuses on the criminal offense that Mr. Crespo was convicted of obstructing; that is Count 1, conspiracy to possess with intent to distribute Oxycodone. This is the same count that the jury found him not guilty. Because the crime of conspiracy by its very nature involves "jointly undertaken criminal activity," § 1B1.3 of the guidelines comes into play

4

in calculating the guidelines. In this case, this is critically important because *"the scope of undertaken criminal activity' is not necessarily the same as the scope of the entire conspiracy, and hence relevant conduct is not necessarily the same for every participant."* [§ 1B1.3 cmt. n. 3(B) (emphasis added)]

Section 1B1.3, as relevant here, provides the following rules that must be applied in calculating the applicable guideline range:

> **§ 1B1.3. Relevant Conduct (Factors that Determine the Guideline Range)**
>
> (a)  CHAPTERS TWO (OFFENSE CONDUCT) AND THREE (ADJUSTMENTS). Unless otherwise specified, (i) the base offense level where the guideline specifies more than one base offense level, (ii) specific offense characteristics and ***(iii) cross references in Chapter Two,*** and (iv) adjustments in Chapter Three, **<u>shall</u>** be determined on the basis of the following:
>
> (1)  (A) all acts and omissions committed, aided, abetted, counseled, commanded induced, procured, or willfully caused by the defendant; and
>
> (B) in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all acts and omissions of others that were –
>
> *(i)  within the scope of the jointly undertaken criminal activity,*
>
> *(ii) in furtherance of that criminal activity,* **<u>AND</u>**
>
> *(iii) reasonably foreseeable in connection with that criminal activity;*
>
> that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense;
>
> (2)  solely with respect to offenses of a character for which § 3D1.2(d) would require grouping of multiple counts, all acts and omissions

> described in subdivisions (1)(A) and (1)(B) above that were part of the same course of conduct or common scheme or plan as the offense of conviction;
>
> (3)  all harm that resulted from the acts and omissions specified in subsections (a)(1) and (a)(2) above, and all harm that was the object of such acts and omissions; and
>
> (4)  any other information specified in the applicable guideline.

(emphasis added.) Because Mr. Crespo's case involves a Chapter Two cross reference, it is governed by § 1B1.3, and therefore the Court "shall" determine his Base Offense Level and Guideline Range in strict conformity with this section.

### The Application Notes provide a Roadmap to the Application of § 1B1.3 criteria

***First Element – "Within the Scope."*** § 1B1.3(a)(1)(B)(i) speaks to the scope of a defendant's accountability. In defining the scope of accountability, § 1B1.3 cmt. n. 3(B) warns that *"the scope of the 'jointly undertaken criminal activity' is not necessarily the same as the scope of the entire conspiracy." Id*. (emphasis added.) "In order to determine the defendant's accountability for the conduct of others under subsection (a)(1)(B), the court must **first** determine the scope of the criminal activity the particular defendant agreed to jointly undertake (*i.e.*, the scope of the specific conduct and objectives embraced by the defendant's agreement fairly inferred from the conduct of the defendant and others." *See United States v. Kuc*, 846 Fed. Appx. 860, 865–66 (11th Cir. 2021) (emphasis added). And the defendant's accountability is "limited" by the scope of his or her agreement. *Id*. So that "[a]cts of others that were not within the scope of the defendant's agreement, even if those acts were known or reasonably foreseeable to the defendant, are not relevant conduct under subsection (a)(1)(B)." *Id*. Lastly, the Application Notes state that a defendant cannot be held accountable or responsible for "conduct of members of a conspiracy prior to the defendant joining the conspiracy, *even if the defendant knows of that conduct*." *Id*. (emphasis added). To summarize,

the defendant's accountability is strictly "limited by the scope of his or her agreement to jointly undertake the particular criminal activity." *Id*.

**<u>Second Element – "in furtherance."</u>** This element is found in § 1B1.3(a)(1)(B)(ii), which requires the Court to determine if the conduct of others was in furtherance of the jointly undertaken activity.

**<u>Third Element – "reasonably foreseeable."</u>** § 1B1.3(a)(1)(B)(iii) requires the court to determine if the conduct of others that was within the scope of, and in furtherance of, the jointly undertaken criminal activity was reasonably foreseeable in connection with that criminal activity.

In conclusion, "The conduct of others that meets **all three criteria** set forth in subdivisions (i) through (iii) (i.e., 'withing the scope,' 'in furtherance,' and 'reasonably foreseeable') is relevant conduct under [§ 1.B1.3]." However, when the conduct of others *does not meet any one of the criteria set forth in subdivisions (i) through (iii)*, the conduct is not relevant conduct under this provision." § 1B.3 cmt. n. 3 (emphasis added).

### *Application of the § 1B1.3 Criteria to the Facts of this Case*

For starters, the *"within the scope"* criterion of § 1B1.3(a)(1)(B)(i) has not been met. And the failure to meet but one of the three criterions is enough to discount the PSR's ¶ 35 conclusion that puts Mr. Crespo at Base Offense Level 26. More to the point, the scope of the criminal activity Mr. Crespo agreed to jointly undertake with Jorge Diaz was not as extensive as attributed in the PSR. The PSR mistakenly held Mr. Crespo accountable for Oxycodone pills prescribed to <u>all</u> six patients mentioned in the Indictment <u>and</u> all of Mr. Diaz's related patients treated by Dr. Gonzalez. That expansive attribution of accountability is erroneous because there's no evidence that the jointly undertaken criminal activity extended to all those patients.

There is no record evidence that Mr. Crespo's exchanges or discussions with Mr. Diaz amounted to "jointly undertaken criminal activity" as to the entire scope of the conspiracy in Count 1. In fact, the evidence at the trial revealed that Mr. Crespo did <u>not</u> discuss or take any action or have any understanding amounting to "jointly undertaken criminal activity" with Mr. Diaz related to pill trafficking with patients A.A., P.R., B.R., M.C., and L.A. Indeed, no evidence was adduced at the trial that Mr. Crespo even knew four of those five patients. Mr. Diaz did not testify that Mr. Crespo knew patients A.A., P.R., B.R, or MC – or that these patients were part of "jointly undertaken criminal activity."

Mr. Diaz testified Mr. Crespo knew patient L.A. because Crespo, while employed as a Hialeah police officer, had helped L.A. in protecting her mentally challenged son from neighborhood gang members. But Diaz did not testify – nor is there other evidence -- that Mr. Crespo knew of or facilitated Diaz's pill trafficking with L.A., or with any of the other four patients. Nor that there existed an agreement or understanding involving "jointly undertaken criminal activity." Moreover, Mr. Diaz's testimony at trial clearly established that Mr. Crespo did not receive even a single penny as part of a division of profits from trafficking in Oxycodone. It is important to bear in mind, while analyzing this issue, that the jury found Mr. Crespo <u>not guilty</u> of Count 1, the conspiracy to distribute and possess with intent to distribute a controlled substance. So that Mr. Crespo's jointly undertaken criminal activity was limited in scope, and it did not include Mr. Crespo engaging in criminal obstruction as to these five patients.

Out of the six mentioned in the Indictment, there is but only one patient, that perhaps could come close to an argument that Mr. Crespo should be held accountable for some (but not all) of

the pills prescribed to her.[2] That patient is M.P. This is the patient discussed between Mr. Diaz and Mr. Crespo in one of the telephone calls introduced as evidence at trial. All the Oxycodone pills prescribed to M.P. amounted to 87.03 grams. Converting the entire 87.03 grams to converted drug weight under the Sentencing Guidelines Drug Conversion Tables produces a Base Offense Level 20. Mr. Crespo would then receive a 2-level increase for abuse of a position of trust or use of a special skill. But he would receive a 2-level reduction because he meets the criteria for the newly enacted § 4C1.1. Accordingly, his Total Offense Level would be 20, with a guidelines range of 33-41 months. However, that is not the end of the analysis.

We know that Application Note § 1B1.3 cmt. 3(B), provides that Mr. Crespo cannot be held accountable for "conduct of members of a conspiracy prior to [him] joining the conspiracy, *even if [he] knows of that conduct.*" *Id*. (emphasis added). We also know that Mr. Diaz testified at trial that he told Mr. Crespo about his Oxycodone trafficking approximately a month after he moved into Crespo's garage/efficiency. That means that he told Mr. Crespo that he was trafficking in Oxycodone on or about the beginning of February 2020. Therefore, this is the point that Mr. Crespo would have arguably joined the conspiracy, and he arguably may be held accountable for the Oxycodone prescribed to M.P. after that date.

According to the PDMP introduced into evidence at trial, M.P. received six prescriptions from February 6 to July 16, 2020, for a total of 540 Oxycodone pills. *See* GX 58-C. This translates to 108.5 kilograms of converted drug weight and a Total Base Offense Level 18. To this Total Base Offense Level 18, we must add a 2-level increase for abuse of a position of trust or use of a special skill. But must also apply a 2-level reduction for the newly enacted § 4C1.1. All this yields

---

[2] This argument is not meant to be, nor should be taken or considered as, a waiver of Mr. Crespo's position that the evidence presented at trial was insufficient as a matter of law to find him guilty of those counts that he was found guilty.

a Total Offense Level 18. This is the correct level in this case, which has a range of 27-33 months of imprisonment.

In conclusion, the Total Offense Level in Mr. Crespo's case should be significantly lower than Level 28 in the PSR. Indeed, we know that the Total Offense Level must go down to at least Level 18.

### *Probation's Mistaken Application of the § 1B1.3 Criteria to the Facts of this Case*

Probation in its [DE 306-1] Addendum to the Presentence Report sets forth the reasoning for elevating the kilograms of converted drug weight from 1,802 kilograms in the first draft of the PRS to 4,563 kilograms in the Revised PSR as follows:

> "According to § 1B1.3 comment.(n.9) [sic], 'in the case of **solicitation**, **misprision**, or **accessory after the fact**, the conduct for which the defendant is accountable includes all conduct relevant to determining the offense level for the underlying offense that was known, or reasonably should have been known, by the defendant.' The offense materials provided by the government, including those included as exhibits in the government's objection memorandum, show the defendant's knowledge with respect to the Dr. Gonzalez clinic investigation and the defendant should be accountable for <u>all</u> conduct relevant to that investigation that was known or reasonably should have been known, by the defendant." [DE 306-1 at 5]

[DE 306-1 at 5 ("<u>all</u>" is original emphasis, but other bold and underlined is added emphasis.)] Importantly, Mr. Crespo's case is not a case that fits the definition of "solicitation," "misprision," or "accessory after the fact." Instead, he was convicted of offenses involving *obstruction of justice or witness tampering*. Hence, this guideline comment utilized by Probation (and the government as well) has no application to Mr. Crespo's case.

Instead, as previously discussed, this case is governed by the criteria set forth in § 1B1.3(a)(1)(B)(i-iii). This provision, must be mandatorily applied in this case, sets a standard very different than that proposed by Probation. It does not contain any rule or prong that permits

ascribing responsibility or accountability for "all conduct relevant to determining the offense level for the underlying offense that was known, or reasonably should have been known, by the defendant." Instead, the criteria required by § 1B1.3(a)(1)(B)(i-iii) is totally different and "shall" be applied in cases involving "(iii) cross references in Chapter Two," which means cases such as Mr. Crespo's case. *See* 1B1.3(a). In sum, Probation has applied inapposite law and has therefore saddled Mr. Crespo with the entire scope of Dr. Gonzalez's conspiracy –mistakenly holding him accountable for all pills prescribed to all patients – even as to conduct and patients not embraced "(i) within the scope of the jointly undertaken criminal activity." § 1B1.3(a)(1)(B)(i).

In conclusion, we object and submit that ¶ 35 of the Revised PSR must reflect that the correct Base Offense Level is 24, and not 26, as concluded by Probation.

**¶32 and ¶39:** These paragraphs in the Revised PSR assign to Mr. Crespo a two-level enhancement for obstruction of justice. Probation did not include this enhancement in the first draft of the PSR. Rather, it made its surprising appearance after the government filed its objections. Mr. Crespo objects because (1) he did not make these statements to Valodia Aguilera aiming to "intimidate and silence Diaz." (2) Mr. Crespo did not receive a list notifying him that Mr. Aguilera was a witness included in a no-contact list, although it now appears that his then lawyer did. (3) the Aguilera statements constitute mere gossip known to the government during the pre-trial stage but never acted upon or brought to the attention of Mr. Crespo's lawyer or the Court. (4) Evidence exists to reasonably infer that Mr. Aguilera may have had criminal involvement with Mr. Diaz in the trafficking of Oxycodone. *See* Composite Exhibit "2" (wiretap line-sheets containing a telephonic discussion between Mr. Diaz and Mr. Aguilera about an individual named Pistolita ripping off Mr. Diaz during a drug deal involving 100 Oxycodone pills). The point being that Mr. Diaz felt comfortable to discuss his drug deals with Mr.Aguilera, something that drug dealers

would only discuss with someone trusted and involved in the same business. This is but another circumstance showing that Mr. Aguilera had a significant incentive to ingratiate himself with the agents and say something against Mr. Crespo to save himself from further scrutiny or possibly a criminal charge. In short, at the end of the day, this two-level enhancement is built upon nothing more than unreliable hearsay – lacking indicia of credibility – and thus should be rejected by the Court.

¶ 88 We object because, as previously explained above, the correct Total Offense Level is Level 18, and not Level 28 as it appears in the Revised PSR.

Respectfully submitted,

s/*Jose M. Quinon*
Jose M. Quinon

**JOSE M. QUINON, P.A.**
75 Valencia Avenue, Suite 800
Coral Gables, Florida 33134
Tel. (305) 858-5700
Cell (786) 348-3778
Email: jquinon@quinonlaw.com

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true copy of the foregoing Defendant Crespo's Objections to the Presentence Report was filed this January 17, 2024, via PACER, which will serve copy on all parties in this case.

s/*Jose M. Quinon*
Jose M. Quinon