1                     UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF FLORIDA
2                      CASE NO. 21-CR-20005-DPG-1

3

4    UNITED STATES OF AMERICA,              )    Pages 1-48
                                            )
5                    vs.                    )    Miami, Florida
                                            )
6    ALBERICO AHIAS CRESPO,                 )
                                            )    January 24, 2024
7                        Defendant.         )    1:44 P.M.

8                        TRANSCRIPT OF PROCEEDINGS
9              BEFORE THE HONORABLE DARRIN P. GAYLES
                      UNITED STATES DISTRICT JUDGE
10

11   APPEARANCES:

12   For the Government:        SEAN THOMAS MCLAUGHLIN
                                United States Attorney's Office
13                              99 NE 4th Street
                                Miami, Florida 33132
14
     For the Defendant:         JOSE M. QUINON
15                              Jose M. Quinon, P.A.
                                75 Valencia Avenue
16                              Suite 800
                                Coral Gables, Florida 33134
17

18

19

20

21

22   Reported By:               VERNITA ALLEN-WILLIAMS
     Vernita_Allen-Williams     Official Court Reporter
23   @flsd.uscourts.gov         United States District Court
     305.523.5048               400 North Miami Avenue
24                              Miami, Florida  33128

25

                STENOGRAPHICALLY RECORDED COMPUTER-AIDED TRANSCRIPT

01:44PM 1                    (Call to order of the Court at 1:44 P.M.)

01:44PM 2              THE COURTROOM DEPUTY:  Calling Case No. 21-CR-20005,

01:44PM 3      United States of America vs. Alberico Ahias Crespo.

01:44PM 4              Counsel, please state your appearance, starting with the

01:45PM 5      government.

01:45PM 6              MR. MCLAUGHLIN:  Good afternoon, Your Honor.  Sean

01:45PM 7      McLaughlin on behalf of the United States.  Also with me at

01:45PM 8      counsel table, my cocounsel, AUSA Chris Clark, and also the case

01:45PM 9      agent, FBI Special Agent Heidi Ford.

01:45PM 10             THE COURT:  All right.

01:45PM 11             MR. QUINON:  Jose Quinon on behalf of Alberico Crespo,

01:45PM 12     who is to my right here today.  Also to my right sitting at

01:45PM 13     counsel's table is my investigator/paralegal Jose Gonzalez.  Thank

01:45PM 14     you, sir.

01:45PM 15             THE COURT:  All right.  Good afternoon.  Sorry we're

01:45PM 16     starting a few minutes late.  We had a meeting and it got me

01:45PM 17     behind schedule.

01:45PM 18             Oh, and from probation.

01:45PM 19             MS. GALVEZ:  Good afternoon, Your Honor.  Stephanie

01:45PM 20     Galvez, U.S. Probation.

01:45PM 21             THE COURT:  All right.  Good afternoon.

01:45PM 22             All right.  We are here for Mr. Crespo's sentencing.  I

01:45PM 23     reviewed the presentence report, as well as the objections filed

01:45PM 24     by both sides in this case.

01:45PM 25             I guess to some degree some of the guidelines issues are

01:45PM  1   overlapping.  We'll take them one by one, starting with the

01:46PM  2   government.

01:46PM  3           MR. MCLAUGHLIN:  Your Honor, our first objection is to

01:46PM  4   the offense level.  In the government's opinion, and the case law

01:46PM  5   is very clear on that, in a plain text reading of the guideline is

01:46PM  6   very clear that the offense level should be a 34, which captures a

01:46PM  7   drug weight of between 10,000 and 30,000 kilograms of converted

01:46PM  8   drug weight.  I have laid out our position very clearly in my

01:46PM  9   opinion in our objections.  If the Court has any questions, I'm

01:46PM  10  happy to answer them.

01:46PM  11          But our opinion is, Judge, the guideline is very clear.

01:46PM  12  The offense level for an obstruction case is the guideline of the

01:46PM  13  underlying crime.  The underlying crime here is the conspiracy to

01:46PM  14  traffic in oxycodone from November of 2016 up until his arrest in

01:46PM  15  July of 2020.  That's it.  I think to hold him accountable as the

01:46PM  16  revised PSI does only for the Gonzalez era not only ignores the

01:46PM  17  facts, it ignores the law.

01:47PM  18          The Court sat here in trial.  For three weeks we

01:47PM  19  presented damning evidence, clear evidence, that not only did Mr.

01:47PM  20  Crespo know about Diaz's oxy trafficking during the Gonzalez era,

01:47PM  21  he knew about it thereafter and he reasonably should have known

01:47PM  22  about it.  I would draw the Court's attention to specifically the

01:47PM  23  events of July 17th where Crespo is specifically told by Diaz:  I

01:47PM  24  am engaged in oxycodone trafficking.  I have bought some pills

01:47PM  25  from one of my patients, Mercedes Perez.  And lo and behold, the

01:47PM 1    FBI has gone and talked to her and implicated me.  So the idea

01:47PM 2    that he doesn't know that Diaz is still oxy trafficking even after

01:47PM 3    the Gonzalez era just doesn't fly with the facts, Your Honor.

01:47PM 4        That's our position.  We have laid it out again in our

01:47PM 5    written response.  If the Court has any questions, I'm happy to

01:47PM 6    answer them.

01:47PM 7        THE COURT:  Okay.  And your response.  I understand you

01:47PM 8    have your own idea what the calculation should be.

01:48PM 9        MR. QUINON:  Judge, may I come up to the podium?

01:48PM 10       THE COURT:  Yes, sir.

01:48PM 11       MR. QUINON:  Thank you.

01:48PM 12       Judge, kind of an unusual case and circumstances.

01:48PM 13   Concerning the -- where we all end up in the PSI in this case,

01:48PM 14   it's unusual to have all of us end up at a different location, so

01:48PM 15   to speak, or a different conclusion.  That is to say, probation

01:48PM 16   ends up with their calculations; I ended up with different

01:48PM 17   calculations, and based upon objections that I filed, as you know;

01:48PM 18   and also the government ends up at a different level altogether.

01:48PM 19   So everybody ended up at a different level.

01:48PM 20       I think it is important to just go back and just give a

01:48PM 21   brief review of how we got here.  Okay.

01:48PM 22       The first thing that happened was probation filed the

01:48PM 23   initial draft of a PSI, which is normally the case.  And in doing

01:49PM 24   that, probation came up and concluded that the right way to

01:49PM 25   compute the guidelines in this case is to take the patients that

01:49PM 1    were named in the indictment, and actually patients that were the

01:49PM 2    core of this case.  Those were the patients who were visited by

01:49PM 3    the FBI agent, if you recall the testimony when we had the trial.

01:49PM 4    So there are six patients that were critical in connection with

01:49PM 5    the case, and really the whole trial revolved around, for the most

01:49PM 6    part, around those patients.  Okay.

01:49PM 7          And so probation came up with, based upon the evidence

01:49PM 8    that was given to probation by the government, not by the defense,

01:49PM 9    they gave them the reports, probation read all the reports, and

01:49PM 10   probation came up with the conclusion that the proper converted

01:49PM 11   drug weight under the guideline formulas was 1,802 kilograms.

01:49PM 12   Okay.  And based upon that, the base offense level, I believe, was

01:50PM 13   24, if I recall correctly.  Okay.  And came up with a total

01:50PM 14   offense level of 26, but recognized in paragraph 96 of the PSI

01:50PM 15   that Mr. Crespo was entitled to get that 4C1.1 reduction.

01:50PM 16          Anyways, the point being that at the end of the day the

01:50PM 17   first PSI probation concluded that the proper level here was

01:50PM 18   Level 24, which yielded 51 to 63 months of incarceration.  That

01:50PM 19   was probation's conclusions.

01:50PM 20          I filed my objections saying:  No, I think that's not the

01:50PM 21   way to compute the guidelines.  I object.  The reason that I

01:50PM 22   objected is because I brought up the fact that under the

01:50PM 23   guidelines when you have a conspiracy, it is not an individual

01:51PM 24   crime; it's a crime of joint criminal conduct.  And, therefore,

01:51PM 25   you have to go to a provision in the guidelines, which is

01:51PM   1    Section 1B1.3, to factor in the crossover in this case.

01:51PM   2         Under this section of the guidelines it tells you that

01:51PM   3    whenever you're going to attribute, as in this case, the amount of

01:51PM   4    drugs to determine punishment under the guidelines, there are

01:51PM   5    three things that you need to satisfy in order to hold the

01:51PM   6    defendant accountable to that.

01:51PM   7         Number one is that the joint criminal activity is within

01:51PM   8    the scope.  In other words, that what happened is within the scope

01:51PM   9    of the jointly undertaken criminal activity.  What that means is

01:51PM  10    the defendant gets punished not for the whole scope of the

01:52PM  11    conspiracy, and that's important.  That's where we part ways here.

01:52PM  12    I part ways with probation and the government here.  Okay.

01:52PM  13         If you read the commentary to this section, it tells you

01:52PM  14    that when you have joint criminal activity such as a conspiracy,

01:52PM  15    which is what we have here, okay, you don't attribute to the

01:52PM  16    defendant the entire scope of the conspiracy; you must attribute

01:52PM  17    only that conduct that is within the scope of the jointly

01:52PM  18    undertaken criminal activity.  That is to say, what the defendant

01:52PM  19    agreed to do within the scope of what he agreed to do within the

01:52PM  20    conspiracy is what he gets punished for, which is less typically

01:52PM  21    than the whole scope of the conspiracy.

01:52PM  22         And when you read the commentary of this particular

01:52PM  23    section, it tells you precisely that, in those words:  That the

01:52PM  24    scope of the conspiracy and the scope of jointly undertaken

01:52PM  25    criminal activities are two different concepts.  And the court,

01:53PM  1    according to the guidelines, must make a finding to what was the

01:53PM  2    jointly undertaken criminal activity in this case.  Okay.  So

01:53PM  3    that's the first element of that section.

01:53PM  4          The second element is that the criminal activity has to

01:53PM  5    be undertaken by -- other than the defendant has to be in

01:53PM  6    furtherance of the conspiracy, in furtherance of the criminal

01:53PM  7    activity.

01:53PM  8          And the last thing, the third element is that it has to

01:53PM  9    be reasonably foreseeable in connection with that criminal

01:53PM  10   activity.

01:53PM  11         My main objection was on the first element of those three

01:53PM  12   things that the guidelines require.  If any of those three

01:53PM  13   elements is missing, then the defendant cannot be held accountable

01:53PM  14   in this case, as has been done.

01:53PM  15         So the issue here is then:  What is the jointly

01:54PM  16   undertaken criminal activity on the part of Mr. Crespo?  And my

01:54PM  17   position is that it is not the totality of the scope of

01:54PM  18   conspiracy.  Probation finds that it should be the scope of the

01:54PM  19   Gonzalez conspiracy.  Okay.  Initially they didn't come out to

01:54PM  20   that conclusion.  They came to that conclusion in the revised PSI,

01:54PM  21   the second one that we got.  Okay.  And so probation concluded,

01:54PM  22   once they read the government's objections that:  Okay.  We're

01:54PM  23   going to hold Mr. Crespo responsible for the totality of the

01:54PM  24   Gonzalez conspiracy.  Okay.  I objected to that.

01:54PM  25         The government also objected because the government said:

01:54PM  1  No, you've got to hold him accountable also for that part that

01:54PM  2  deals with Dr. Carpman, a different doctor, and also a Dr.

01:55PM  3  Espinosa, a doctor up in Boca Raton.  Okay.  And probation said:

01:55PM  4  No, it should only be Dr. Gonzalez.  And I'm saying it should be

01:55PM  5  only Dr. Gonzalez's conspiracy but not the entire scope of the

01:55PM  6  conspiracy; it should be only that part that Mr. Crespo agreed to

01:55PM  7  undertake criminal activity.

01:55PM  8        So that's the difference between all three parties here,

01:55PM  9  okay.  And this is one of those cases that, ironically, Mr.

01:55PM  10  Crespo's punishment is based upon the amount of oxycodone pills.

01:55PM  11  The higher the pills, the higher the accountable punishment under

01:55PM  12  the guidelines.  But what makes this ironic is that Mr. Crespo got

01:55PM  13  acquitted of Count 1.  As you know, Judge, the jury found him not

01:55PM  14  guilty of being involved in the trafficking aspect of Mr. Diaz,

01:56PM  15  the codefendant who testified.

01:56PM  16        So what is happening here is -- essentially is that now

01:56PM  17  Mr. Crespo gets acquitted of conduct in Count 1, and essentially

01:56PM  18  the way that this is working out if you listen to the government,

01:56PM  19  they want to punish him as if he had been found guilty of Count 1

01:56PM  20  essentially because of the number of pills that Mr. Diaz was

01:56PM  21  involved in.

01:56PM  22        Now, as I said before, the Court must make a finding of

01:56PM  23  the jointly undertaken criminal activity.  Mr. McLaughlin

01:56PM  24  mentioned this woman, Mercedes Perez, I mentioned her as well in

01:56PM  25  my pleadings.  And I pretty much put it out there that, yes, as to

01:56PM 1    the amount of pills that were dispensed to her, because Mr. Crespo

01:56PM 2    was communicating with Mr. Diaz about Mercedes Perez, and there

01:57PM 3    was conversation that could be, and obviously the jury took it to

01:57PM 4    mean, that there was obstruction there.  I can see where -- and I

01:57PM 5    put that in my pleadings -- I can see where that particular type

01:57PM 6    of conduct and pills could be taken into account.  And I used that

01:57PM 7    to come out to a Level 18 under my calculations.  Under the base

01:57PM 8    offense level and the total offense level, I came out to Level 18

01:57PM 9    in this case, which is 27 to 33 months.

01:57PM 10           Now, again, in assessing to what is Mr. Crespo going to

01:57PM 11   be held accountable, there are a couple of things that happened in

01:57PM 12   this unusual case during the trial that merit for us to review at

01:57PM 13   this point, particularly the Court, since you've got to make a

01:57PM 14   finding of what the undertaking by Mr. Crespo of what he

01:58PM 15   supposedly undertook from a criminal point of view as to joint

01:58PM 16   criminal activity in this case.

01:58PM 17           In this case we know that Mr. Crespo on October the 2nd

01:58PM 18   of 2019 calls Orlando, a coworker, to ask, and Orlando happened to

01:58PM 19   be -- Alvarez happened to be the lead agent in the case that

01:58PM 20   supposedly has been obstructed of Dr. Gonzalez.  And this lead

01:58PM 21   agent tells Mr. Crespo on October 2nd, when Mr. Crespo asked:  Are

01:58PM 22   you looking for this individual, Mr. Diaz, Jorge Diaz?  Is he

01:58PM 23   somebody you're looking for in connection with this investigation?

01:58PM 24   Orlando Alvarez said:  No.  The investigation is closed.  That is

01:58PM 25   October 2nd.

01:58PM  1    Now, that is important because Mr. Diaz kept selling

01:59PM  2  drugs or trafficking in oxycodone thereafter.  Mr. Crespo, with

01:59PM  3  all due respect, cannot be held accountable for obstructing an

01:59PM  4  investigation that in his mind doesn't exist.  Okay.  So that's a

01:59PM  5  factor that I wanted to bring up to the Court.

01:59PM  6    And also a second factor that I think is to be considered

01:59PM  7  by the Court is the fact that Mr. Diaz, the main witness for the

01:59PM  8  government, says in his testimony before the Court that it is only

01:59PM  9  essentially a few months before the arrest went down in this case.

01:59PM  10  Mr. Diaz and Mr. Crespo were arrested in this case July 21, 2020.

01:59PM  11  And Mr. Diaz testified that he moved into the house of Mr. Crespo

02:00PM  12  sometime at the very end of December of 2019 or early January.

02:00PM  13  And it is only a month after that, according to the codefendant's

02:00PM  14  testimony, that he tells Mr. Crespo that he, Mr. Diaz, was

02:00PM  15  involved in the trafficking or he was selling pills; he was

02:00PM  16  selling oxycodone pills.

02:00PM  17    So this is not a case where Mr. Crespo should be saddled

02:00PM  18  with all kinds of pills that he didn't sell, he didn't traffic.

02:00PM  19  We know he didn't profit because even the codefendant, the main

02:00PM  20  government witness, said he never got a penny out of this.  And we

02:00PM  21  also know that even the codefendant says he doesn't tell Diaz --

02:00PM  22  I'm sorry.  He doesn't tell Crespo until the very end that he was

02:00PM  23  selling these pills.

02:00PM  24    So that is what we have here.  And so I submit to you

02:00PM  25  that the proper level is as we have set forth in our pleadings,

02:01PM 1   which is a Level 18, which I believe comes to 27 to 33 months in

02:01PM 2   this case.

02:01PM 3          Now, that deals only with the base offense level that we

02:01PM 4   have been discussing.  There are other matters that are

02:01PM 5   objectionable.  You asked the government for their objections.  I

02:01PM 6   do have an objection to the two-level enhancement for obstruction

02:01PM 7   of justice.

02:01PM 8          THE COURT:  Well, we're going to get to that next.

02:01PM 9          MR. QUINON:  All right.  So I'm going to sit down, and

02:01PM 10  that's it for me for the time being.  Thank you, sir.

02:01PM 11         THE COURT:  All right.  So I will ask the government.

02:01PM 12         So the defendant was acquitted of the drug charge.  And,

02:01PM 13  look, I understand relevant conduct and that the standard here is

02:01PM 14  less than proof beyond a reasonable doubt, but how do you suggest

02:01PM 15  I should consider the acquittal in this determination?

02:02PM 16         MR. MCLAUGHLIN:  It's irrelevant, Your Honor, to speak

02:02PM 17  bluntly.

02:02PM 18         All due respect to Mr. Quinon, but his attempt to sort of

02:02PM 19  carve out accountability for this defendant just ignores the

02:02PM 20  truth.  And the truth is very simple, Your Honor.  This defendant

02:02PM 21  engaged in a long-running -- years-long obstruction conspiracy

02:02PM 22  with Jorge Diaz to protect his oxycodone trafficking.  And we have

02:02PM 23  proved that at our trial with all the exhibits -- with all due

02:02PM 24  respect to probation, they did not sit in on the trial --

02:02PM 25  overwhelming, and the basic facts tell you that.

1   So during that, as you heard Diaz testify at trial, that

2   of course Crespo warns him to get out of there, because of course

3   Crespo was on the strike force, the healthcare fraud strike force,

4   and they're investigating Gonzalez.

5   Why would Crespo need to warn Diaz to get out of there if

6   Crespo didn't know that Diaz was a drug trafficker?  Why would all

7   of the calls be happening on the day of the takedown in advance of

8   the search warrant?  Why would that happen?  Why did this happen,

9   Judge?  Because he knows he's a drug trafficker.  The attempts to

10  run his NCIC, reading up on reports, reporting back to Diaz.

11  They would talk six, seven times a day, Your Honor.  Is

12  it reasonably foreseeable for Crespo to believe that once he left

13  the Gonzalez office, he would continue trafficking?  Of course it

14  is.  Is it reasonable to assume when he invites him to move into

15  his house in late 2019 that he's still trafficking?  Of course it

16  is.  And, in fact, Diaz confirms to him that he still is.

17  And then we get to January 17th where it's crystal clear

18  that Crespo knows again.  And he also knows that Diaz is a

19  trafficker because, as we showed at trial, there was the e-mail in

20  June that Crespo receives, he tells Diaz to run home.  He shows

21  that FBI e-mail to Diaz; they have a conversation.  Crespo says:

22  I'm not worried about you.  Continue on with the Uber, just

23  continue trafficking.

24  The 17th it's crystal clear where Diaz and Crespo are

25  talking about Diaz's trafficking that specific day.  And I would

02:04PM 1 direct your attention, Your Honor, to our response, which I'm

02:04PM 2 pulling verbatim from the trial where Crespo is telling Diaz:

02:04PM 3 I've been warning you for a year that Lorenzo and Pozo are going

02:04PM 4 to sell you out.  A year prior to 2020.

02:04PM 5 From the government's point of view, Your Honor, this

02:04PM 6 defendant has known about Diaz's oxycodone trafficking from the

02:04PM 7 word go.  Should he be held accountable for it?  Absolutely.  And

02:04PM 8 it is very clear in our response too.  There is a policy reason

02:04PM 9 for that:  The bigger -- the more serious crime you obstruct, the

02:04PM 10 bigger hit you get at sentencing, and I've laid out the cases for

02:04PM 11 that.

02:04PM 12 And he's not accountable for the entire drug conspiracy.

02:04PM 13 He gets a six-level reduction.  The defense knows that.

02:04PM 14 Do you have any other questions, Judge?

02:04PM 15 But it is a basic truth of what this case is about.  This

02:05PM 16 is about a corrupt agent who was protecting a drug trafficker

02:05PM 17 being investigated, by the way, by his colleagues that he worked

02:05PM 18 with every day for years; not a couple days, not a couple months,

02:05PM 19 for years.  Should he be accountable for the entire conspiracy?

02:05PM 20 Absolutely.

02:05PM 21 THE COURT:  All right.  Well, considering --

02:05PM 22 Well, first it's the government's objection.  I am going

02:05PM 23 to overrule the objection, and I guess I'll be overruling the

02:05PM 24 objection as well as to the defense calculation, as I find that

02:05PM 25 probation properly calculated the defendant's base offense level.

02:05PM 1        MR. MCLAUGHLIN:  Your Honor, if I may?

02:05PM 2        How is the Court not finding him accountable for --

02:05PM 3        THE COURT:  You're going to sit here and argue with me

02:05PM 4  when I'm making a finding?

02:05PM 5        MR. MCLAUGHLIN:  I'm just asking.

02:05PM 6        THE COURT:  You can object.  Have a seat.

02:05PM 7        I find that probation has made a reasonable determination

02:05PM 8  regarding the base offense level.  Of course the Court is

02:06PM 9  considering the base offense level based on conduct for which the

02:06PM 10  defendant was acquitted.  However, that does not end the

02:06PM 11  calculation.

02:06PM 12        I still consider his relevant conduct and his jointly

02:06PM 13  undertaken criminal activity, along with his co-conspirators,

02:06PM 14  understanding the standard is less than beyond a reasonable doubt,

02:06PM 15  which is the standard the jury considered.

02:06PM 16        The evidence is strongest with regard to the defendant's

02:06PM 17  knowledge regarding the criminal activity involving Dr.

02:06PM 18  Gonzalez's clinic.  While there may be some evidence to suggest

02:06PM 19  his knowledge regarding the other two doctors, Espinosa or

02:06PM 20  Carpman, under these circumstances I do find that probation made a

02:07PM 21  reasonable calculation; and therefore, I will overrule both

02:07PM 22  objections.

02:07PM 23        The next objection from the government.

02:07PM 24        MR. MCLAUGHLIN:  Your Honor, I think our next objection

02:07PM 25  -- and I apologize for interrupting -- is the zero point offender.

02:07PM   1    I think defense has other objections, but that's our last

02:07PM   2    objection.

02:07PM   3            THE COURT:  Any further argument on that?

02:07PM   4            MR. MCLAUGHLIN:  I don't see how on earth probation is

02:07PM   5    awarding zero to this offender, Your Honor.  We have a series of

02:07PM   6    very credible direct threats to kill possible cooperators.  I have

02:07PM   7    laid out in our response the law; you don't have to communicate

02:07PM   8    that directly to the person themselves.  Again, probation was not

02:07PM   9    at the trial, has not listened to the calls, the Court has.

02:07PM   10           It's very clear from the government that these were

02:08PM   11   threats, they were very credible threats, and for that reason he

02:08PM   12   is not a zero point offender, Your Honor.

02:08PM   13           THE COURT:  All right.  And your response.

02:08PM   14           MR. QUINON:  Your Honor, I need to remind counsel, who

02:08PM   15   was at trial and I certainly was and so was the Court, when his

02:08PM   16   own witness -- main witness in the case testified that he did not

02:08PM   17   believe that those threats that Mr. Crespo was going to hurt

02:08PM   18   anybody with those threats.

02:08PM   19           In addition to that, he testified that Mr. Crespo, he can

02:08PM   20   hear from the voice and the recordings in the courtroom that Mr.

02:08PM   21   Crespo was drunk on that night of July 17th of 2020.  That's the

02:08PM   22   testimony of the government's own witness.  He testified that Mr.

02:08PM   23   Crespo was drunk at the time, and that he didn't think that that

02:08PM   24   was something that he was going to act on.

02:08PM   25           Mr. Crespo never acted upon any of that.  What the man

02:08PM 1    was -- Mr. Crespo was, unfortunately, very drunk that night and

02:08PM 2    talked a lot of things that he really shouldn't have, you know.

02:09PM 3    And that happens sometimes when we drink excessively, as he did

02:09PM 4    that night.  And the testimony was from Agent Henry Luna, who

02:09PM 5    testified that there were a number of bottles of wine that were

02:09PM 6    consumed in a very short period of time.

02:09PM 7        There was no credible threat in this case; and therefore,

02:09PM 8    I think that -- that was the testimony that was here at trial.

02:09PM 9        THE COURT:  With regard to the zero point offender

02:09PM 10   objection, I am going to sustain that objection, as based on this

02:09PM 11   record and the totality of the evidence, I can't find that those

02:09PM 12   threats were not credible.  I don't think that it's appropriate,

02:09PM 13   even considering the 3553(a) factors, so I will sustain that

02:09PM 14   objection.

02:09PM 15       Any other objections from the government?

02:09PM 16       MR. MCLAUGHLIN:  No, not from the government, Your Honor.

02:10PM 17       THE COURT:  All right.

02:10PM 18       From the defense, your additional objections.

02:10PM 19       MR. QUINON:  Yes, sir.  We do object to the two-level

02:10PM 20   adjustment for obstruction of justice.  This was awarded because

02:10PM 21   of supposedly a contact with this individual who --

02:10PM 22       Just give me a second here, Judge.  Let me just get my

02:10PM 23   documentation.  I just want to make sure that I'm accurate.

02:11PM 24       So this was supposedly -- the evidence regarding this is

02:11PM 25   supposedly a statement made by Mr. Crespo to an individual named

02:11PM   1   Valodia Aguilera according to the assertions in this case, and

02:11PM   2   they were supposedly aimed to intimidate or to silence Mr. Diaz.

02:11PM   3   Okay.

02:11PM   4        The problem here is, A, those assertions weren't made.  I

02:11PM   5   made an objection to that effect, stating that our position is

02:11PM   6   that the statements were not made.

02:11PM   7        Second of all and importantly, the notification to Mr.

02:11PM   8   Crespo was never given that he's not supposed to have contact with

02:12PM   9   Mr. Valoria.  If the Court wishes, I have an e-mail here from

02:12PM  10   Mr. Seitles' office confirming that he never gave the list of no

02:12PM  11   contact.  It was a list that was made by the government and sent

02:12PM  12   to different individuals, including Mr. Seitles.  But Mr. Seitles

02:12PM  13   never -- as the attorney never gave the list to his client, Mr.

02:12PM  14   Crespo.  That's acknowledged by his office here.

02:12PM  15        I also have Mr. Crespo's fiancee or wife here today,

02:12PM  16   Samantha, who can testify that she was in contact with

02:12PM  17   Mr. Seitles' office at one point asking whether they had ever sent

02:12PM  18   that no contact list to Mr. Crespo, and the answer is no, they

02:13PM  19   never sent the list.  I would like to make this a part of the

02:13PM  20   record, an exhibit to today's sentencing hearing.  I gave a copy

02:13PM  21   to the government before we started today.  I have the fiancee

02:13PM  22   here who can testify to that under oath if the Court desires that.

02:13PM  23   But at this point I will move in this particular e-mail between --

02:13PM  24        (Door alarm sounding.)

02:13PM  25        -- with Mr. Seitles' office, Judge.

02:13PM  1        THE COURT:  So are you suggesting that there had to be a

02:13PM  2   communication from Mr. Seitles to the defendant for this witness

02:13PM  3   list to apply?

02:13PM  4        MR. QUINON:  Well, I basically raised four grounds why it

02:13PM  5   shouldn't apply.

02:13PM  6        One, the statement wasn't made.  We deny that.

02:13PM  7        Two, Mr. Crespo was never notified.

02:13PM  8        Three, if the government knew of this, which apparently

02:14PM  9   they said that they did, they never communicated that to me at the

02:14PM  10  time when this supposedly happened.  They never moved to revoke

02:14PM  11  Mr. Crespo's bond.  They never called me and said:  Hey, what's

02:14PM  12  going on with your guy?  He's not supposed to be contacting

02:14PM  13  witnesses.  Besides, Mr. Valoria never testified, was never a

02:14PM  14  witness here to my knowledge.  But I was never notified.  The

02:14PM  15  government never did anything with this information.

02:14PM  16        And, four, this is rank hearsay from an individual, Mr.

02:14PM  17  Valoria.  There is a reason why he may want to do something like

02:14PM  18  this, if he did that, if he made the statement to the agents,

02:14PM  19  which we don't know, there is a reason for that.  Mr. Valoria, the

02:14PM  20  line sheets in the wire tap in this case, the Title 3 in this

02:14PM  21  case, shows that Mr. Valoria may have been doing some of that drug

02:15PM  22  business with Mr. Diaz; and he has a reason, therefore, to try to

02:15PM  23  please the agents in this case, Judge.

02:15PM  24        Judge, the bottom line is, it really is very, very thin

02:15PM  25  and, quite frankly, very unfair to take that type of statement

02:15PM  1   without this individual ever coming into court to give now an

02:15PM  2   adjustment -- an upward adjustment that will put this man in

02:15PM  3   prison for an additional period of time with this type of

02:15PM  4   evidence, with an individual of this character, who may have been

02:15PM  5   involved in the drug business himself and had a reason to try to

02:15PM  6   ingratiate himself with the agents in this case.

02:15PM  7            And so those are the four reasons.  And I think that,

02:15PM  8   quite frankly, you shouldn't really award such an adjustment in

02:15PM  9   this case, Judge.

02:15PM  10            THE COURT:  All right.  Give me a moment before I hear

02:15PM  11   from the government.

02:16PM  12            All right.  The government's response.

02:16PM  13            MR. MCLAUGHLIN:  Your Honor, as set forth in our first

02:16PM  14   sentencing exhibit, this list was communicated not only to Mr.

02:16PM  15   Seitles but to a series of people in probation.  It's irrelevant

02:16PM  16   from the government's point of view whether or not Mr. Seitles

02:16PM  17   communicates that, but it was provided to probation.  Logically we

02:16PM  18   would assume that that was communicated to the defendant from his

02:17PM  19   probation officer because it was provided to probation.

02:17PM  20            THE COURT:  This enhancement is solely based on the

02:17PM  21   contact with Mr. Aguilara?

02:17PM  22            MR. MCLAUGHLIN:  It's also with Mr. Diaz, because Mr.

02:17PM  23   Diaz was also on the no contact list.  So he's going through Mr.

02:17PM  24   Valoria to get to Diaz, so it's two parts to it.

02:17PM  25            MR. QUINON:  Well, the part of Mr. Diaz was discounted by

1 | probation.  That's why I only addressed Valoria, Your Honor.

2 | MR. MCLAUGHLIN:  And again we object to that discount;

3 | discounting by probation, but.

4 | THE COURT:  Okay.  Hold on for a second.

5 | There are two people allegedly contacted; Mr. Diaz and

6 | Mr. Aguillara.  And your argument was focused on Mr. Aguillara.

7 | MR. QUINON:  That's correct, because that's the one that

8 | probation used to enhance in this case.  Probation analyzed the

9 | Diaz situation and they decided that that was not sufficient to

10 | add or to take into account in trying to give Mr. Crespo this

11 | adjustment, so I only addressed Aguillara because that's the one

12 | that probation used.

13 | And again, Aguillara never has been a witness in this

14 | case and, again, not in court.  I mean if you're going to use him

15 | to give this man what amounts to a period of time in prison, at

16 | the very least we should have an opportunity to be able to

17 | cross-examine him.  Bring him to court, you know.  This is really

18 | almost like gossipy stuff.  If there's really any essence to this,

19 | it would have been used to violate the bond at the time when it

20 | happened, because they had been, in my opinion, and this is again

21 | conjecture again on my part, but they've been after Mr. Crespo,

22 | you know, from the very beginning.  If there was an opportunity to

23 | put him in, they would have put him in, bottom line.

24 | And I have never heard of this thing about Aguillara

25 | until we get to now, at the very end.

02:19PM  1     THE COURT:  All right.  Let me hear from the government.

02:19PM  2     MR. MCLAUGHLIN:  Your Honor, it is our position that Mr.

02:19PM  3  Crespo was not allowed to have contact with the codefendant Diaz

02:19PM  4  or Mr. Aguillara.  Like I noted in our response, although the bond

02:19PM  5  paperwork -- the box wasn't checked, it was very clear in the

02:19PM  6  joint motion that they were not allowed to have contact.  And the

02:19PM  7  evidence will show you that they're not allowed, because that's

02:19PM  8  why he reaches out to not only Diaz's son but also Valaria to pass

02:19PM  9  the message to Diaz to stop talking.

02:19PM  10     In terms of whether or not we sought to revoke his bond

02:19PM  11 is irrelevant for the determination of why Crespo is reaching out

02:19PM  12 to these people and saying what he's saying.  It's very clear why

02:19PM  13 he's reaching out to the son to deliver a message to Diaz, which

02:19PM  14 is to:  Keep your mouth shut.

02:19PM  15     It's very clear why he's reaching out to Valoria and

02:19PM  16 communicating to Valoria to keep his mouth shut.

02:20PM  17     And the timing of it is especially relevant from the

02:20PM  18 government's point of view because it comes at the time of

02:20PM  19 disclosures about Diaz's cooperation.  So from our point of view,

02:20PM  20 the only reason Crespo is reaching out to either of these people

02:20PM  21 is to silence Diaz, and that's why the enhancement applies.

02:20PM  22     One last thing, Your Honor.  In our objections there is

02:20PM  23 an alternative grounds to apply this enhancement; those are

02:20PM  24 Crespo's materially false statements regarding his military

02:20PM  25 service.  We have laid out the details of that.  So if the Court

02:20PM  1   does not want to apply it regarding the Valaria and Diaz's son

02:20PM  2   prong, it is very clear that he has obstructed justice regarding

02:20PM  3   his materially false statements regarding his military service as

02:20PM  4   to the other prong.

02:20PM  5            THE COURT:  Let's unpack these one by one.

02:20PM  6            So with regard to Mr. Valodia Aguilera, that person did

02:20PM  7   not testify; is that correct?

02:20PM  8            MR. MCLAUGHLIN:  That's correct, Your Honor.

02:20PM  9            THE COURT:  So I do agree with defense counsel; that for

02:20PM  10  me to make this finding, I have to hear some testimony.

02:21PM  11           Does the government have a witness?

02:21PM  12           MR. MCLAUGHLIN:  We do not, Judge.  We just have the 302.

02:21PM  13           THE COURT:  So I don't find that the contact with Valodia

02:21PM  14  Aguilera can be a basis for this enhancement.

02:21PM  15           So regarding your alternative argument regarding

02:21PM  16  statements about the defendant's military service or what you

02:21PM  17  allege to be false statements, let me hear from you on that issue.

02:21PM  18           MR. MCLAUGHLIN:  Your Honor, in our objections we have

02:21PM  19  laid out a series of materially false statements that Crespo made

02:21PM  20  regarding his service, regarding his alleged combat service.  I

02:21PM  21  would note to the Court in preparing our objection and for court

02:21PM  22  today, I have consulted with Air Force personnel who are currently

02:21PM  23  serving, and those that served at the time of Crespo's service.  I

02:21PM  24  myself served in the military, so I am very familiar with what a

02:22PM  25  DD214 is.  As I stated in our response, there is nothing to

1    suggest at all that Mr. Crespo is a military combat veteran, let

2    alone serving in the jungles of Peru, Brazil, and Colombia during

3    that time.  There is nothing in his DD214.  Certainly there would

4    be medals and awards to that effect.  We provided under seal his

5    DOD records.  There are no orders.  Again, there are no awards,

6    commendations, medals to that effect.

7         If you look at his resume, which he submits to DEA and, I

8    believe, HHOIG, which is part of our trial exhibits, there is no

9    mention of any combat experience, overseas combat experience.  All

10   he listed in his resume is that he was stationed at MacDill, he

11   guarded the parameter of the installation and some airplanes.

12        So the key from the government's point of view is why

13   he's doing this.  He's essentially doing this to get a variance

14   under 3553 or get a departure under the guidelines.  There is no

15   reason to lie about your military record, unless you're trying to

16   get sympathy from the Court.  Given those that have actually

17   served, Your Honor, faced combat, to have a former special agent

18   with years of experience, who is very familiar by the way with the

19   PSI process, his years as a special agent, he has participated in

20   the indictments of multiple defendants, the multiple sentencing of

21   defendants, he is very aware of what the PSI process is, what it

22   entails, to lie egregiously about his military service is

23   appalling, and he should be held accountable for it.

24        THE COURT:  All right.

25        MR. QUINON:  Judge, this is a particularly sensitive

02:23PM  1  matter, because it is offensive to hear the prosecutor get up in

02:23PM  2  court and do exactly what he just did.  To call the man a liar

02:23PM  3  when he served, it's particularly offensive.  Mr. Diaz -- I'm

02:23PM  4  sorry.

02:23PM  5      Mr. Crespo in this case will go under oath if you want

02:23PM  6  him now about what he served.  But I asked him:  What do you have

02:23PM  7  by way of anything at all from way back then?  Here is his Air

02:24PM  8  Force uniform at the time with his name tag.  Here is the medal

02:24PM  9  that Mr. McLaughlin just called Mr. Crespo a liar about.  This is

02:24PM  10  the uniform.  This is the medal that he's got.  Okay.

02:24PM  11      Here is kind of a jumpsuit that he still has -- Mr.

02:24PM  12  Crespo has from the time that he served in Colombia with Grupo de

02:24PM  13  Combate 31, that's Combat Group 31, Colombia.  These are things

02:24PM  14  that he has, okay, from that time.  He will go under oath, I

02:24PM  15  mentioned that in my pleadings, if you want him to testify to that

02:24PM  16  he, in fact, was where he said he was to probation, and he did

02:24PM  17  serve in that capacity.

02:24PM  18      Now, to make sure that you understand that this is no

02:24PM  19  accident, it just so happens that he has a friend who also served

02:24PM  20  in the military who is here today, Gabriel Garcia, who I spoke to

02:25PM  21  a few minutes ago before we started court.  Mr. Garcia is a

02:25PM  22  retired U.S. Army captain who served in Kuwait, and he will tell

02:25PM  23  you that if you take a look at his military records, it will not

02:25PM  24  appear that he served in Kuwait.  If you want me to, I will call

02:25PM  25  Mr. Garcia at this time.

| | |
|---|---|
| 02:25PM | 1 |

THE COURT:  No, I don't think it's necessary.

MR. QUINON:  And he is a captain.  Again, a captain in the service.

THE COURT:  Gentlemen, it goes for both of you.  When I start talking, I want you to stop talking.

MR. QUINON:  I apologize.  I apologize.

THE COURT:  It's not necessary because I don't find that the enhancement would apply on this basis.  It doesn't affect the guidelines, although certainly both sides can argue whatever they want with regard to an appropriate sentence.  So with regard to your objection for adjustment, the adjustment for obstruction of justice, I will sustain that objection, and that enhancement will not apply.

What other objections do you have?

MR. QUINON:  I believe that those were the only objections that we had.

The base offense level, the total offense obviously, and the obstruction enhancement.  Judge, if I could have a second here.

MR. MCLAUGHLIN:  And, Your Honor, if I may.

Based on the Court's ruling --

THE COURT:  Hold that.  I want to make sure he's done with his objections, then I'm going to go to probation, and then I'm going to turn back to you.  Okay.

MR. QUINON:  Judge, I'm done.  Thank you.

02:26PM   1       THE COURT:  So for probation, if you can walk us back

02:26PM   2   through the guidelines calculations.  Okay.

02:26PM   3       MS. GALVEZ:  Okay.  So the base offense level remains a

02:27PM   4   26.  The defendant got a plus-2 for abuse of position of public

02:27PM   5   trust, 3B1.3, resulting in an adjusted offense level of 28, and an

02:27PM   6   advisory guideline range of 78 to 97 months.

02:27PM   7       THE COURT:  All right.  And that also the Court removed

02:27PM   8   the adjustment for obstruction of justice.

02:27PM   9       MR. QUINON:  Judge, after you're finished, I do have

02:27PM   10   something.

02:27PM   11       THE COURT:  You both are going to have plenty of time to

02:27PM   12   talk.

02:27PM   13       MR. QUINON:  No, no.  I apologize, but something just

02:27PM   14   occurred to me.

02:27PM   15       THE COURT:  Regarding the calculation?

02:27PM   16       MR. QUINON:  No, about 4C1.1.  I had not objected because

02:27PM   17   it was on my side of the table so to speak.  In other words, I

02:27PM   18   should have.  You took it away when the government objected to it,

02:27PM   19   and I should -- and I have an objection to that.

02:28PM   20       I had not objected formally before because I had no need

02:28PM   21   to object because it wasn't on the table, so to speak, to object.

02:28PM   22   It was on my side of the ledger, so to speak.  Do you get what I'm

02:28PM   23   saying?

02:28PM   24       THE COURT:  Yes.  So go ahead.

02:28PM   25       MR. QUINON:  All right.

02:28PM   1          I object on the grounds that the government is --

02:28PM   2   essentially the government is saying that this is based upon

02:28PM   3   credible threats.  But again, Judge, I think if I'm correct, and

02:28PM   4   you heard the trial, if I'm correct, their own witness said that

02:28PM   5   he did not believe that these were credible threats, and he said

02:28PM   6   he was not afraid of Mr. Crespo.

02:28PM   7          And again, he admitted that he knew Mr. Crespo.  And

02:28PM   8   based upon the voice of Mr. Crespo over those recordings, it was

02:28PM   9   patently obvious to him that Mr. Crespo was drunk when the

02:29PM  10   so-called threats were made.

02:29PM  11          In addition to that, we know that the agents -- an agent

02:29PM  12   that testified, they had the house of Mr. Crespo under

02:29PM  13   surveillance that night.  Mr. Crespo went to sleep, obviously.

02:29PM  14   Nothing happened.  Those were not -- there is nothing at all

02:29PM  15   indicating, I submit, that those were credible threats, okay.

02:29PM  16          And so I really ask you to really consider that.  It

02:29PM  17   makes a difference here.  And, you know, there has to be -- to be

02:29PM  18   credible, you have to take some action other than to talk while

02:29PM  19   you're drunk about:  I'm going to feed you.  And this was the kind

02:29PM  20   of threats that we're talking about:  I'm going to -- I'm going to

02:29PM  21   feed her to the alligators because I kill somebody every day.  I

02:29PM  22   am tired of killing people.  That's what he was saying on that

02:29PM  23   tape.  Think about that.

02:29PM  24          This is not a -- this is not a serial killer that I'm

02:30PM  25   sitting next to.  Okay?  But if you're going to find those

1    credible -- those threats credible, then you have to believe that

2    Mr. Crespo is a serial killer who is tired of killing people,

3    because that's what -- that's the garbage -- the alcohol-fueled

4    garbage that he was talking about that night.  And even the

5    government's main witness said:  I don't believe it, and I'm not

6    afraid of him; even though he came in here and unloaded on Mr.

7    Crespo, his so-called son and all that.  But he said as to that:

8    I don't believe it.

9        So, please, there has to be more credible than that.

10    That's just incredible threats.  Quite frankly, I even argued in

11    my closing argument to the jury, I used that to my advantage

12    actually in this case, in arguing to the jury that you couldn't

13    believe some of the evidence here because of what happened; the

14    fact that those were not credible, that Mr. Crespo wouldn't kill

15    people every day and feed them to the alligators.

16        So I ask you please to reconsider that and not to grant

17    that, Judge.  It's just -- it isn't warranted in this case.  It's

18    not a credible threat.

19        THE COURT:  All right.

20        Well, considering all of the evidence, including that the

21    jury did find the defendant guilty of the remaining counts, right,

22    beyond a reasonable doubt, I've ruled.  I don't see any reason to

23    revisit it.

24        So that calculation, my ruling will stay the same.

25        The calculation remains the same.  A total offense level

1   of 28, a criminal history category of I, placing the defendant's

2   advisory guideline range between 78 and 97 months.

3          What is the government's recommendation as to an

4   appropriate sentence?

5          MR. MCLAUGHLIN:  Your Honor, we recommend 97 months.  And

6   specifically under the 3553 factors, as we proved at trial, this

7   was a multi-year conspiracy to obstruct justice by a defendant,

8   who was working at the time with the healthcare fraud strike

9   force, charged with investigating and taking down the very

10  criminals and the very crimes that he was protecting.

11         This is not a case which -- I'm about to go to trial in

12  one where you have an undercover and a CI, you have a couple

13  recorded meetings over the course of a couple weeks or a couple

14  months and there's a takedown.  There is years, Your Honor; years

15  of conduct.

16         And it's especially galling given Mr. Crespo's position

17  on the strike force, and especially galling given what the opioid

18  crisis has done to this country, which the Court is very well

19  aware of.  And I think especially in terms of deterrence, a

20  sentence of 97 months is important, Your Honor.

21         The world is watching.  The country is watching.  The

22  community is watching.  What is this Court going to give an agent

23  who for years, sitting next to his colleagues day in and day out,

24  lying to them about what he knows about Diaz and his activities,

25  and actually invites him and has him live at his home, and is only

02:33PM   1   caught via a wire tap where you get to hear unvarnished, as the

02:33PM   2   Court did at trial, who this person is and what he's all about.

02:33PM   3   He's all about himself and what he can do to get ahead and who he

02:33PM   4   can protect.

02:33PM   5   Thankfully, Judge, we still live in a democracy right

02:33PM   6   now.  We are a country of laws, not men or women.  He does not --

02:33PM   7   he does not get to choose who he protects when and why.  It is a

02:33PM   8   violation of his oath, it is a violation of the oath that all of

02:33PM   9   us in law enforcement take.

02:33PM   10   And from our perspective, his conduct in this case is

02:33PM   11   galling to the extreme.  And it is for those reasons, Your Honor,

02:33PM   12   a sentence of 97 months is appropriate to send a message to

02:33PM   13   everyone in this community that such conduct will not be

02:33PM   14   tolerated.

02:33PM   15   I will say in terms of the other codefendants' sentences,

02:34PM   16   Diaz was given 76 months, so I don't think a sentence of 97 is

02:34PM   17   that much of a disparity, Judge, and especially given the conduct

02:34PM   18   and the violence he threatened against potential cooperators,

02:34PM   19   which is just galling and appalling.  From our point of view,

02:34PM   20   97 months is appropriate, Judge.

02:34PM   21   THE COURT:  All right.

02:34PM   22   I should note before you begin your presentation, I did

02:34PM   23   also review the character letters that were submitted at Docket

02:34PM   24   Entry 311, which contained several letters from family members,

02:34PM   25   friends, and a former law enforcement coworker.

02:34PM   1        MR. QUINON:  Yes, Your Honor.  Thank you.

02:34PM   2        Judge, I also -- we filed a motion for a downward

02:34PM   3   departure or in the alternative a variance as well, and I'd like

02:34PM   4   to address that as well.

02:34PM   5        THE COURT:  Okay.

02:34PM   6        MR. QUINON:  And so in relation to what the proper

02:35PM   7   sentence should be, that's how I will argue it.  Okay.

02:35PM   8        And so very important, this is one of those cases that

02:35PM   9   you heard the evidence and you had the benefit of seeing Mr. Diaz

02:35PM  10   testify and also Ms. Lorenzo in this case.  Mr. Diaz, according to

02:35PM  11   Anais Lorenzo, the other codefendant who testified, is an

02:35PM  12   accomplished manipulator according to her.  Remember that.

02:35PM  13        Ms. Lorenzo was at one time -- when she met Mr. Diaz, she

02:35PM  14   was employed at Jackson Memorial Hospital as a medical technician,

02:35PM  15   had a good job, worked like the rest of us; a working stiff who

02:35PM  16   works from 9:00 to 5:00 every day and had a normal life, until she

02:36PM  17   got involved with Mr. Diaz, who she sees as, again, her word,

02:36PM  18   master manipulator.  That's what she called him during the course

02:36PM  19   of the trial.

02:36PM  20        And that man got her involved essentially in drugs; and

02:36PM  21   eventually not only got her involved in drugs, she became a rabid

02:36PM  22   drug addict.  But also he had her be his right-hand person in the

02:36PM  23   drug distribution.  Ms. Lorenzo at one time took the place of this

02:36PM  24   individual Pozo, who was the right-hand man of Mr. Diaz in his

02:36PM  25   business.

02:36PM 1    So Mr. Diaz, who is a master manipulator, for years --

02:36PM 2 the first three years or so, two years or so, I asked him on

02:36PM 3 cross-examination whether he had any conversations with Mr. Crespo

02:36PM 4 other than religion.  And the answer was no, during those early

02:37PM 5 years of his relation with Mr. Crespo, it was all about religion.

02:37PM 6    This Santeria religion to me anyways, I'm not a believer

02:37PM 7 in it and so I can say this, I just find it a troubling religion

02:37PM 8 that makes people believe that you can talk to your loved ones,

02:37PM 9 even though they passed away, and ask them counseling in your

02:37PM 10 everyday life problems.  It's kind of a -- to me, that's kind of a

02:37PM 11 scary religion; but for whatever, Mr. Crespo was a devotee of the

02:37PM 12 religion.  And Mr. Diaz happened to be a high priest of the

02:37PM 13 religion, which means that he had a lot of credibility and a lot

02:37PM 14 of respect and reverence coming to him from Mr. Crespo.  In fact,

02:37PM 15 Mr. Crespo used to call him father.  If you recall, that's the

02:37PM 16 testimony in this case.

02:37PM 17    And Mr. Diaz saw an opportunity to use Mr. Crespo, who

02:38PM 18 was a federal agent, to his advantage and did.  Now, very clear

02:38PM 19 Mr. Diaz testified that even though he -- Mr. Diaz was involved in

02:38PM 20 the trafficking or selling of this oxycodone, he never, ever was

02:38PM 21 in a situation where Mr. Crespo was with him engaged in that

02:38PM 22 activity, or that he gave a single penny to Mr. Crespo because of

02:38PM 23 Mr. Crespo helping him or being involved with him in the drug

02:38PM 24 business, not at all.  Mr. Crespo was not at all involved in that,

02:38PM 25 and that's why the jury found him not guilty in this case.

1    Now, the guidelines in this case, again, the thinking,

2 the rationale behind the guidelines is the higher you are in the

3 hierarchy of drugs, the more the punishment; the more pills, the

4 higher the punishment.  But Mr. Crespo didn't sell any pills, even

5 though -- and this --

6    Bear this in mind, Judge, in the criminal complaint, they

7 had a witness named Sotolongo, who said that he, Sotolongo, has

8 seen Mr. Crespo with Mr. Diaz selling drugs.  Mr. Diaz,

9 fortunately, at least as to this that, told the truth.  He said

10 that's not true.

11    But when Mr. Crespo got arrested in this case, the

12 government arrested him with the idea that they had a witness in

13 their camp who was going to say that Mr. Crespo was out in the

14 street selling drugs, which is absolutely not true.  That's part

15 of the reason why we went to trial.  And Mr. Diaz gave it up in

16 this trial and said:  That's not true.  Mr. Crespo was not ever in

17 my presence whenever I did my business of drugs, and I didn't give

18 him a penny of whatever profit I made.

19    And the evidence that we heard at trial concerning the

20 profit of Mr. Diaz was absolutely daunting.  He was making about

21 $14,000 a month he said at times, but not a penny to Mr. Crespo.

22 And under the guidelines, Judge, again, 5K2.0, if this case falls

23 outside of the normal case and the guidelines, something that was

24 not contemplated by the commission, then the Court can give a

25 downward departure.

02:40PM 1      This is one of those cases. The only reason why you get

02:40PM 2 involved in trafficking in drugs is to make money. Nobody else --

02:40PM 3 nobody goes into business -- in the drug business other than to

02:41PM 4 make money. Mr. Crespo didn't make any money. He was not in the

02:41PM 5 drug business, but yet his punishment has gone up and up because

02:41PM 6 pills were distributed to people that he did not know.

02:41PM 7      During the trial the government had a chart with a number

02:41PM 8 of people, and the overwhelming majority of them were not known to

02:41PM 9 Mr. Crespo. Mr. Crespo didn't know most of those people, and now

02:41PM 10 he's going to get punished for that; for the distribution of pills

02:41PM 11 to people he didn't know, deals that he didn't make, profit that

02:41PM 12 he didn't make. And so I submit to you that this is a case that

02:41PM 13 is ripe for a downward departure under that basis.

02:41PM 14      There is an additional basis for a downward departure,

02:42PM 15 and that is Section 5H1.11 of the guidelines, which again allows

02:42PM 16 for that type of departure to someone who served our country in

02:42PM 17 the military, and Mr. Crespo did that. He did that honorably for

02:42PM 18 four years. And when he was serving, he did serve overseas. He

02:42PM 19 has not lied to probation, on the contrary. And he served in the

02:42PM 20 places that he told probation that he did serve.

02:42PM 21      I attached to my pleadings an article that at around the

02:42PM 22 time that Mr. Crespo was serving overseas there were skirmishes

02:42PM 23 and our armed forces were in South America serving to prevent drug

02:43PM 24 trafficking, and they were, indeed, battling in the jungles with

02:43PM 25 the individuals who were there; the FARC and the other militants

02:43PM   1   who were in the jungle.  The article is there.  It is documented.

02:43PM   2   This is not something that I made up.  I went into the Internet, I

02:43PM   3   got it, I put it there.

02:43PM   4          So Mr. Crespo is deserving as well of a downward

02:43PM   5   departure because he honorably served us, he served our country;

02:43PM   6   not to mention that for many years he served as a federal agent,

02:43PM   7   as a police officer for over 20 years; 27 years.

02:43PM   8          In addition to that and alternatively, the Court can

02:43PM   9   grant him a variance.  When you take a look at his history, he

02:44PM   10  doesn't even have a ticket, never had any prior contact with the

02:44PM   11  criminal justice system at all.  First time here.

02:44PM   12         Always the history of this man has been public service

02:44PM   13  since he was young.  He served in the military, he served as a

02:44PM   14  Hialeah police officer, he served the DEA, he served with HHS,

02:44PM   15  he's always been a public servant.  And when you consider what

02:44PM   16  you're going to do with this case and how you're going to punish

02:44PM   17  him, he's been punished.  He suffered tremendously so far.  We

02:44PM   18  know that he has gone from what was then a prestigious, honorable

02:44PM   19  position to a point in his life where he is publicly humiliated.

02:44PM   20         He has become a pariah within his community; the people

02:45PM   21  that he has known for all these years.  He has lost his career;

02:45PM   22  something that he has devoted more than half of his life to in

02:45PM   23  this case.  He's lost his savings.  He's had to pay lawyers like

02:45PM   24  me to come in and to represent him in court.  Bond, all the other

02:45PM   25  issues, not working for years because he was suspended without pay

02:45PM  1    waiting.  He served over 12 months of home confinement in this

02:45PM  2    case when you put it all together.

02:45PM  3        He suffers from PTSD.  It's documented.  He's gotten

02:45PM  4    treatment for that.  Now he doesn't even have health insurance,

02:45PM  5    and he will not have health insurance when he gets out as well

02:45PM  6    because once you're a convicted felon, which he is now, he can

02:46PM  7    kiss goodbye the idea that he is going to have a decent job where

02:46PM  8    he's going to have the benefit of healthcare.  And so he's going

02:46PM  9    to have to suffer through his PTSD however he can, but he won't

02:46PM  10   have the healthcare to attend to that.

02:46PM  11       And most of all he's lost the ability to do something

02:46PM  12   that is very valuable to all of us, and that is to be able to in

02:46PM  13   the morning as we shave or we look ourselves in the mirror to feel

02:46PM  14   satisfied with ourselves.  To be able to look at ourselves in the

02:46PM  15   mirror to say:  Hey, you're a good guy.  You're doing your damn

02:46PM  16   best, and you're okay.  He's lost that.  And now he is going to

02:46PM  17   also serve time in a prison system; something that was

02:46PM  18   unfathomable, that was unimaginable to him.

02:47PM  19       So, yeah, it's been something of a harsh journey for him,

02:47PM  20   but at trial you saw the character, the goodness in him too.  I

02:47PM  21   don't want you to judge him basically based upon what the

02:47PM  22   prosecutor has highlighted; what amounts to a very short period of

02:47PM  23   his life.  I think he showed a lot of character here.

02:47PM  24       You heard Orlando Alvarez, the lead in this investigation

02:47PM  25   that brought Mr. Crespo here, testify that Mr. Crespo volunteered

02:47PM   1   to go to Puerto Rico.  He's not Puerto Rican.  He volunteered

02:47PM   2   without pay after Hurricane Maria, a Category 5 hurricane that

02:47PM   3   destroyed that little beautiful island of Puerto Rico, and he did

02:47PM   4   it without getting paid, and went to an area that was infested

02:48PM   5   with mosquitoes, no electricity, nothing going, no food, and he

02:48PM   6   stayed there over a month helping people.  And even Rolley Alvarez

02:48PM   7   who came in and testified said:  Hey, I'm thankful that he did

02:48PM   8   that.  That, I'm very grateful that he did that.

02:48PM   9       And then he also showed character when Henry Luna, an

02:48PM   10   agent that worked with him in HHS, Henry is a gay man who was

02:48PM   11   being bullied by three FBI agents at the job, and nobody really

02:48PM   12   stood up for Henry.  And Henry was a really decent human being and

02:48PM   13   came in and testified in this case and told us about what

02:48PM   14   happened.  Like Henry said, nobody stood up for Henry except Mr.

02:48PM   15   Crespo.  He told the agents -- the FBI agents who were bullying

02:49PM   16   Henry:  You better stop, or I'm going to kick your butt basically

02:49PM   17   in different language.  And Henry has always been very thankful

02:49PM   18   that his friend, Mr. Crespo, had the character and the caring to

02:49PM   19   stand up to people at the job, FBI agents who were bullying Henry.

02:49PM   20       And Henry explained that to this day Al Crespo is one of

02:49PM   21   his dearest friends and he is very grateful to him.  And when

02:49PM   22   Henry was going through his divorce, Henry has two little girls,

02:49PM   23   he would bring them over to Crespo's house.  And that shows again

02:49PM   24   the kind of character.  Not too many people stand up for other

02:49PM   25   people when they're being bullied.  No, you're always thinking

02:49PM   1   about your own self; what's good for you.

02:49PM   2        It wasn't good for Crespo to confront three FBI agents

02:50PM   3   who are part of the same task force that he works.  That's not the

02:50PM   4   way to get promoted.  That's not the way to get kudos from the

02:50PM   5   gang so to speak, but it was the right thing to do.  I think that

02:50PM   6   speaks very highly about him.  It speaks very highly about his

02:50PM   7   character.  And I think that those are the things in life that at

02:50PM   8   a time like today, a time of need, it's like a savings account

02:50PM   9   that you should be allowed to withdraw from that savings account

02:50PM   10  of all the good things and all the good character that you have

02:50PM   11  accumulated through life.

02:50PM   12       And, therefore, I think that you should give him a

02:50PM   13  reduction under either a downward departure or a variance.

02:50PM   14       And you asked what the recommendation is from our

02:50PM   15  position, I submit to you, Your Honor, that a sentence of

02:51PM   16  18 months in prison is more -- is sufficient in this case.  It is

02:51PM   17  not -- more is not warranted.  He's gone through a lot.  He's been

02:51PM   18  on this ride for years now waiting for his trial because we had

02:51PM   19  the pandemic in between.

02:51PM   20       Again, he served 12 months home confinement, has been

02:51PM   21  absolutely devastated by what happened and all those things, and I

02:51PM   22  submit to you that a sentence of 18 months in prison should be

02:51PM   23  sufficient but not greater than necessary in this case.  Thank

02:51PM   24  you.

02:51PM   25       THE COURT:  Mr. Crespo, is there anything you want to say

02:51PM 1    before I impose your sentence?

02:51PM 2          You should stay there.  That's fine.  Just pull the

02:51PM 3    microphone close.

02:51PM 4          DEFENDANT CRESPO:  If I may, Your Honor, first -- first

02:52PM 5    of all, Your Honor, under the eyes of God I'd like to apologize to

02:52PM 6    the beautiful people of the United States that allowed me to serve

02:52PM 7    all of my life, and I'll explain a little bit more about that.

02:52PM 8          I'd like to apologize to the United States government.

02:52PM 9    I'd like to apologize to some of my coworkers that are sitting

02:52PM 10   back there, and I saw them today and I shook their hand and I was

02:52PM 11   allowed to hug them, and I appreciated that from them, because

02:52PM 12   they were kind to me.  Thank you.  I appreciate it.

02:52PM 13         I'd like to apologize to my family, Your Honor, that I

02:52PM 14   have put through this terrible ordeal.  And particularly I'd like

02:53PM 15   to apologize to my wife, who has had to deal with a sick man, Your

02:53PM 16   Honor.  See, I came to this country as a young boy.  I lost my

02:53PM 17   father to alcoholism shortly after.  I hated alcohol; couldn't

02:53PM 18   smell it, couldn't see it.  And I needed to know how could I say

02:53PM 19   thank you to the United States, and the only way I could was to

02:53PM 20   serve.

02:53PM 21         See, it may not be important to people; but from the age

02:53PM 22   of 16, the only thing I've ever done is serve.  And I'll tell you

02:54PM 23   why I still hold my red beret.  Some people that are from New York

02:54PM 24   will know the Guardian Angels.  There's people back there that

02:54PM 25   know what I'm talking about, people who worked with me, because

1    they had -- this is a community service group.  So when -- in high

2    school when kids were out partying and hanging out, the Guardian

3    Angels had a chapter in Miami.  I was the vice president of the

4    chapter.  I was the second in command.  Every Friday night, every

5    Saturday night, and every Sunday midday we would patrol Miami

6    Beach, because at the time there were terrible injustices and hate

7    crimes that were happening to individuals in the LGBT community at

8    the time, so we did that type of community service work.

9          And from 16 to 18, that's what I did.  I wasn't out

10   partying, I wasn't doing any of that.  I was going to high school,

11   I was wrestling, and then I changed my red beret for my black one

12   for the Air Force.

13         I sit here and, you know, I am -- I am hurt that my

14   service has been called into question in that manner, because I

15   got to tell you, Your Honor, I'm a broken man and I'm no victim

16   but I'm a broken man from 30 years of service, because I've seen

17   the worst in humanity.  And unfortunately through this process --

18         I was drunk, I was blacking out.  There were things that

19   were happening to me that I couldn't explain it to you.

20         And, Your Honor, even through all my service --

21         And while in the government I got my master's degree in

22   psychology for licensure, and I became a master's level

23   psychologist or a licensed psychotherapist so I can help people

24   like myself.

25         Your Honor, for many years I had no will to live because

02:56PM  1    the only thing I knew how to do was serve others.  I would never

02:56PM  2    harm myself or harm anybody else.  I'm a deeply religious man, and

02:56PM  3    I said that to Ms. Galvez during my PSI.

02:56PM  4          Your Honor, I hope you can give me a second opportunity,

02:56PM  5    because I'm going to start again, but I'm going to go back to

02:56PM  6    helping people.  I've made my mind up on that.  I'm going to try

02:56PM  7    to see how I can go back, and I'm going to try to help veterans

02:56PM  8    just like I used to.  I had this psychology practice that was just

02:56PM  9    discussed.

02:56PM  10         Your Honor, I've got to be honest with you:  I'm a

02:56PM  11   terrible businessman.  I was mostly pulling money out of my pocket

02:56PM  12   because veterans would come see me and I was certified in

02:57PM  13   hypnotherapy, and I would do hypnosis to help people like me.  I

02:57PM  14   suffer from PTSD, I suffer from clinical depression, I suffer from

02:57PM  15   nightmares, tremors.  My wife could tell you what she suffers

02:57PM  16   through sometimes, me waking up fighting and the things that I've

02:57PM  17   seen and I've been through.

02:57PM  18         I'm alive under the grace of God, because I've been

02:57PM  19   through so many things.  I -- I couldn't -- and just because I

02:57PM  20   didn't put on a paper all the bad things that have ever happened

02:57PM  21   to me, Your Honor, I want to forget them.  Every day I want to

02:57PM  22   forget them.  I don't want to think about when I went through

02:57PM  23   treatment and when I even went through the PSI, having to talk

02:57PM  24   about those things, Your Honor, they put me in a dark place.

02:57PM  25         It was kind of like when I got arrested, they put me in

02:57PM    1    solitary confinement for almost four days and nobody would give me

02:57PM    2    medication.  I was having convulsions, I was coming in and out of

02:58PM    3    tremors, cold sweat laying on the floor screaming for help, so

02:58PM    4    that's how I know that, you know.

02:58PM    5            I have a great friend who is back here who is the Army

02:58PM    6    captain who fought in Iraq, and him and I talk all the time of how

02:58PM    7    we deal with the demons.  And they just don't go away, but it was

02:58PM    8    not just my military service.  I saw some ugly things at the PD,

02:58PM    9    in DEA.  I mean, just the things I've been through.

02:58PM   10            I am an idiot.  I am an idiot, sir, and I wish I could

02:58PM   11    have a do-over because I didn't ask for help.  And I believed in

02:58PM   12    somebody that -- in a manner that I shouldn't.  I know better and

02:58PM   13    I should have acted better.  I let everybody down, most of them,

02:58PM   14    and I'm sorry.

02:59PM   15            But I've lost everything, I've lost my pensions, I lost

02:59PM   16    my life savings, I have nothing.  I have to start from scratch.

02:59PM   17    I'm living out of the kindness of my fiancee, sir.  Even my

02:59PM   18    medication, I've had to find a Good Rx card, and I have to find

02:59PM   19    coupons when it's prescribed to me.  I have to bring coupons to

02:59PM   20    try to get my medication, Your Honor.

02:59PM   21            Alcohol, I started drinking alcohol in the jungles of

02:59PM   22    South America because that's how you calm down.  That's what you

02:59PM   23    did in the military, because I never drank alcohol before that;

02:59PM   24    never during high school.  I never did that.  Service led me down

02:59PM   25    that path because that's what you did.  That's what you do in the

02:59PM 1  military, and it just went on worse from there.

02:59PM 2       So I want you to know that the person you heard on that

02:59PM 3  fateful night, who was drunk, dark, and really didn't have the

02:59PM 4  will to live, is not the person that I am.  I am not a terrible

03:00PM 5  person.  I know at times I felt the government has been unfair to

03:00PM 6  me, been unfair.  I wasn't the easiest guy to get along with, but

03:00PM 7  it was out of fear, Your Honor, and I realize that.

03:00PM 8       I was rough, I was hard.  But I'll tell you every day,

03:00PM 9  every day I gave a hundred percent.  I worked every single day of

03:00PM 10 the week.  My boss, who is the big boss here in Florida now, is

03:00PM 11 back there.  He used to yell at me because I was working

03:00PM 12 Saturdays, Sundays.  This is what I did.  This is who I was.

03:00PM 13      And, Your Honor, I accept the responsibility of my

03:00PM 14 mistakes.  But I swear to you, Your Honor, I never had any

03:00PM 15 intention to violate the code, and I'm sorry that I did, because I

03:01PM 16 didn't even benefit from it.  The total opposite.  I've been

03:01PM 17 punished worse than everybody else because I've lost everything I

03:01PM 18 had.  And I'm just riddled with debt and all kinds of issues, so I

03:01PM 19 hope you can find some clemency and leniency for this old

03:01PM 20 broken-down civil servant.  Thank you, Your Honor.

03:01PM 21      THE COURT:  All right.  Thank you, sir.

03:01PM 22      I've considered the statements of the parties, the

03:01PM 23 presentence report, which contains the advisory guidelines and the

03:01PM 24 statutory factors set forth in Title 18, United States Code,

03:01PM 25 Section 3553(a).

03:01PM  1      It is the finding of the Court that the defendant is not

03:01PM  2  able to pay a fine.

03:01PM  3      Obviously, this was an unusual case, and Mr. Crespo

03:01PM  4  seemed to have led a law-abiding life until this situation arose.

03:02PM  5  He was a public servant until he was not.

03:02PM  6      And the thing that struck me during the trial was, I was

03:02PM  7  just wondering:  How does someone like this fall under the

03:02PM  8  influence of Mr. Diaz?  For the life of me, you know, I still to

03:02PM  9  this day don't understand it; and why Mr. Crespo would risk it at

03:02PM  10  all, literally, to help that man.

03:02PM  11      I think about, of course, the crimes for which the

03:02PM  12  defendant was convicted, the seriousness of those crimes.  And it,

03:02PM  13  quite frankly, was, Mr. Crespo, your actions were a betrayal of

03:02PM  14  the public's trust, a betrayal of the trust of your fellow law

03:03PM  15  enforcement officers.  And it wasn't passive, it wasn't isolated;

03:03PM  16  it happened over a pretty significant period of time.  And, of

03:03PM  17  course, someone --

03:03PM  18      I mean it wasn't just your actions, the potential

03:03PM  19  jeopardizing or hindering the investigation, it could also

03:03PM  20  potentially endanger other law enforcement officers, because there

03:03PM  21  are people that had information about these investigations and the

03:03PM  22  intent of law enforcement who should not have had that

03:03PM  23  information.  Of course, balance the fact, of course, that you

03:03PM  24  have no prior criminal history.

03:04PM  25      The government from their pleading sought something in

03:04PM 1    the range of 151 months, and the defense is seeking something much

03:04PM 2    less than that.

03:04PM 3         But having considered everything, I do find that a

03:04PM 4    sentence at the high end of the guideline range is appropriate and

03:04PM 5    in line with what I was thinking is sufficient but not greater

03:04PM 6    than necessary, in any event.

03:04PM 7         So it is the judgment of the Court that the defendant,

03:04PM 8    Alberico Ahias Crespo, is committed to the Bureau of Prisons for a

03:04PM 9    term of 97 months as to Counts 5 and 7 through 10.  All such terms

03:04PM 10   shall run concurrent with one another.

03:04PM 11        Upon his release from imprisonment, the defendant shall

03:04PM 12   be placed on supervised release for a term of three years as to

03:04PM 13   each of those counts, which shall run concurrent with one another.

03:05PM 14        Within 72 hours of the defendant's release, he shall

03:05PM 15   report in person to the probation office in the district where he

03:05PM 16   is released.

03:05PM 17        While on supervised release, the defendant shall comply

03:05PM 18   with the mandatory and standard conditions of supervised release,

03:05PM 19   as referenced in Part F of the presentence report -- the revised

03:05PM 20   report.

03:05PM 21        The defendant shall also comply with the following

03:05PM 22   special conditions:  a permissible search, mental health

03:05PM 23   treatment, substance abuse treatment, the association restriction,

03:05PM 24   and he shall pay a special assessment in the amount of $500, which

03:05PM 25   shall be paid immediately to the United States, which reflects a

03:05PM  1    hundred dollars for each count of conviction.  Those special

03:05PM  2    conditions are also noted in Part F of the report.

03:05PM  3         In sum, the defendant's total sentence is:  97 months of

03:06PM  4    imprisonment, to be followed by three years of supervised release,

03:06PM  5    with the mandatory, standard, and special conditions that I

03:06PM  6    previously mentioned, including a $500 special assessment.

03:06PM  7         Forfeiture of the defendant's right, title, and interest

03:06PM  8    in certain property is hereby ordered consistent with the

03:06PM  9    indictment.

03:06PM  10        If the government is seeking forfeiture, you shall submit

03:06PM  11   a proposed order within three days of this proceeding.

03:06PM  12        Now that sentence has been imposed, does the defendant or

03:06PM  13   counsel object to the Court's findings of fact or the manner in

03:06PM  14   which sentence was pronounced?

03:06PM  15        MR. QUINON:  Yes, Your Honor, we do.

03:06PM  16        I will restate the objections that I wrote in the

03:06PM  17   pleadings that were filed, as well as the objections that I have

03:06PM  18   raised here today.

03:06PM  19        And I would add that the findings as to the joint

03:07PM  20   criminal activity were insufficient by the Court.  So those would

03:07PM  21   be my objections at this point as to the sentence imposed.

03:07PM  22        THE COURT:  All right.  Your objections are noted.

03:07PM  23        Mr. Crespo, you have the right to appeal your sentence

03:07PM  24   imposed.  Any notice of appeal must be filed within 14 days of

03:07PM  25   entry of the formal judgment.

| | | |
|---|---|---|
| 03:07PM | 1 | If you are unable to pay the cost of an appeal, you may |
| 03:07PM | 2 | apply for leave to appeal in forma pauperis, meaning at no cost to |
| 03:07PM | 3 | you. |
| 03:07PM | 4 | Are there recommendations? |
| 03:07PM | 5 | MR. QUINON:  Yes.  I would ask the Court to recommend the |
| 03:07PM | 6 | RDAP program. |
| 03:07PM | 7 | THE COURT:  I will make that recommendation. |
| 03:07PM | 8 | MR. QUINON:  And I would ask the Court to recommend that |
| 03:07PM | 9 | Mr. Crespo serve his sentence as close as possible to an |
| 03:07PM | 10 | institution here in South Florida, Your Honor. |
| 03:07PM | 11 | THE COURT:  All right.  I will make that recommendation |
| 03:07PM | 12 | as well. |
| 03:07PM | 13 | MR. QUINON:  That's it, Judge.  Thank you. |
| 03:07PM | 14 | THE COURT:  All right.  The defendant shall be |
| 03:07PM | 15 | surrendered here in court by the court security officers. |
| 03:08PM | 16 | Is there anything else today on behalf of the government? |
| 03:08PM | 17 | MR. MCLAUGHLIN:  Not for the government, Your Honor. |
| 03:08PM | 18 | THE COURT:  All right. |
| 03:08PM | 19 | Anything else on behalf of Mr. Crespo? |
| 03:08PM | 20 | MR. QUINON:  No, sir. |
| 03:08PM | 21 | THE COURT:  All right.  If you want me to excuse the |
| 03:08PM | 22 | audience while that happens, I will do that; or if you want that |
| 03:08PM | 23 | to happen in open court, I will allow that to happen.  I'm asking |
| 03:08PM | 24 | you, counsel. |
| 03:08PM | 25 | MR. QUINON:  Me? |

03:08PM 1   THE COURT:  Yes.  I don't know if his family and friends

03:08PM 2   want to be here, or if the defendant wants them there for this

03:08PM 3   part.

03:08PM 4   DEFENDANT CRESPO:  Can I say bye to my family, Your

03:08PM 5   Honor?

03:08PM 6   THE COURT:  Well, orally, I'm going to defer to the

03:08PM 7   marshals that there are to be no physical contact.  All right.

03:08PM 8   So you will have a moment to say goodbye.

03:09PM 9   All right.  We're in recess.

03:09PM 10   (Proceedings adjourned at 3:09 P.M.)

11   C E R T I F I C A T E

12   I, VERNITA ALLEN-WILLIAMS, do hereby certify that

13   the foregoing is a complete, true, and accurate transcript of

14   the proceedings had in the above-entitled case before the

15   Honorable DARRIN P. GAYLES, one of the judges of said Court,

16   at Miami, Florida, on January 24, 2024.

17

18   /s/Vernita Allen-Williams
     Official Court Reporter
19   United States District Court
     Southern District of Florida
20

21

22

23

24

25