```
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF FLORIDA
 2                           MIAMI DIVISION
                      CASE NO. 21-CR-20005-DPG
 3

 4    UNITED STATES OF AMERICA,          Miami, Florida

 5              Plaintiff,               August 24, 2023

 6    vs.                                9:36 a.m. to 7:17 p.m.

 7    ALBERICO AHIAS CRESPO,             Volume 12

 8              Defendant.               Pages 1 to 284
      _____

 9

10                          JURY TRIAL
                BEFORE THE HONORABLE DARRIN P. GAYLES
11                 UNITED STATES DISTRICT JUDGE

12    APPEARANCES:

13    FOR THE GOVERNMENT:     CHRISTOPHER CLARK, ESQ.
                              SEAN McLAUGHLIN, ESQ.
14                            ASSISTANT UNITED STATES ATTORNEY
                              UNITED STATES ATTORNEY'S OFFICE
15                            99 Northeast Fourth Street
                              Miami, Florida 33132
16

17    FOR THE DEFENDANT:      JOSE QUINON, ESQ.
                              JOSE M. QUINON, P.A.
18                            75 Valencia Avenue
                              Suite 800
19                            Coral Gables, Florida 33134

20
      STENOGRAPHICALLY REPORTED BY:
21
                              PATRICIA DIAZ, FCRR, RPR, FPR
22                            Official Court Reporter
                              United States District Court
23                            400 North Miami Avenue
                              11th Floor
24                            Miami, Florida 33128
                              (305) 523-5178
25
```

1                               I N D E X

2    WITNESSES FOR THE GOVERNMENT:                          PAGE

3       Jesus Barranco
                                                            4
4       CONTINUED CROSS-EXAMINATION BY MR. QUINON
        REDIRECT EXAMINATION BY MR. CLARK                   9
5

6    GOVERNMENT RESTS                                       22
     MOTION FOR JUDGMENT OF ACQUITTAL                       23
7

     WITNESSES FOR THE DEFENDANT:                           PAGE
8

        Henry Luna
9
        DIRECT EXAMINATION BY MR. QUINON                    32
10       CROSS-EXAMINATION BY MR. CLARK                      48
        REDIRECT EXAMINATION BY MR. QUINON                  71
11

        Victoria Buono (Recording played)                   79
12

     DEFENSE RESTS                                          86
13   CHARGE CONFERENCE                                      90
     JURY INSTRUCTIONS                                      123
14   GOVERNMENT CLOSING STATEMENT BY MR. MCLAUGHLIN         141
     DEFENDANT'S CLOSING STATEMENT BY MR. QUINON            187
15   GOVERNMENT'S REBUTTAL CLOSING STATEMENT MR. MCLAUGHLIN 232
     FINAL CLOSING INSTRUCTIONS                             243

16

17

18                          DEFENSE EXHIBITS

19    NO.                              RECEIVED      ADMITTED

20    2A-2B                                             85

21

22

23

24

25

```
 1              (Call to the Order of the Court.)

 2              THE COURT:  Please be seated.

 3              COURTROOM DEPUTY:  Calling case 22-CR-20005.  United

 4   States of America versus Alberico Ahias Crespo.

 5              Counsel, state your appearances, starting with the

 6   government.

 7              MR. MCLAUGHLIN:  Good morning, Your Honor.  Sean

 8   McLaughlin on behalf of the United States.  Also with me at

 9   counsel table is AUSA Chris Clark and the cage agent FBI

10   Special Agent Sean Slattery.

11              THE COURT:  All right.

12              MR. QUINON:  Good morning, Your Honor.  Jose Quinon on

13   behalf of Alberico Crespo, who is present in court, my

14   investigator/paralegal just stepped out to see if our witnesses

15   are out there.

16              THE COURT:  Good morning.

17              We were waiting for the jurors.

18              I know traffic this morning was really bad, but we have

19   everyone now.

20              Are we ready to resume?

21              MR. MCLAUGHLIN:  We are.

22              THE COURT:  All right.  Bring them in.

23              (The jury entered the courtroom at 9:38 a.m.)

24              THE COURT:  We are missing someone.

25              Please be seated.
```

```
 1              We are missing a juror.

 2              A JUROR:  He is here.

 3              COURT SECURITY OFFICER:  He is not outside.  He is not

 4     inside.

 5              Let me go outside.

 6              He is here.

 7              THE COURT:  Oh, okay.

 8              Now, you can proceed.

 9              Agent Barranco is still on the stand.

10              (The witness, Jesus Barranco, retook the stand.)

11                         CONTINUED CROSS-EXAMINATION

12     BY MR. QUINON:

13     Q.  Good morning, Agent Barranco.

14     A.  Good morning.

15     Q.  I just have a couple more questions and I am done here this

16     morning.

17              You testified yesterday when Mr. Clark questioned you about

18     the fact of how the grand jury works.

19              Correct?

20     A.  Yes.

21     Q.  Do you remember that?

22              And essentially -- and you also testified that in your

23     career -- how many years have you been now an agent?

24     A.  Eighteen years now.

25     Q.  Right, never had a no true bill, in other words, the grand
```

1   jury always indicted.

2       Correct?

3   A.   Yes, in most cases, yes.

4   Q.   Well, in all the ones that you've done?

5   A.   In all the cases that I am aware of, yes.

6   Q.   So just so the jury understands, a grand jury is different

7   than a trial jury.

8       Correct?

9   A.   It is, yes.

10   Q.   Because in a grand jury, it's a situation where only the

11   prosecutor appears to interact with the people who are the

12   jurors.

13       Correct?

14   A.   Correct.

15   Q.   A defense lawyer, such as myself on behalf of a client who

16   the grand jury is entertaining whether or not to indict, is not

17   allowed in that room.  Correct?

18   A.   Correct.

19   Q.   So, essentially, it's a situation where the grand jurors

20   are guided by a prosecutor.

21       Correct?

22   A.   The evidence is presented by a prosecutor.

23   Q.   And the prosecutor instructs the jury on the law as well.

24       Correct?

25   A.   Yes.

1    Q.   So it's a one-sided presentation as opposed to here where I

2    have an opportunity to question you.

3         Correct?

4    A.   Correct.

5    Q.   Now, you also when -- yesterday, when Mr. Clark questioned

6    you, there was some testimony about what happens if one of the

7    agents in the -- in your agency, for example, happens to have

8    some social connection or relationship with somebody, it is

9    something that typically could be brought up to the -- to your

10   attention as a supervisor.

11        Correct?

12   A.   Yes, it's possible.

13   Q.   All right.  If it is, it's something that is handled

14   administratively.

15        Correct?

16   A.   Depending on the circumstances.

17   Q.   Well, I mean, if the fact is that you learn that one of the

18   agents, you know, has too close of a relationship with somebody

19   and you learn of that, one of the things that is discussed

20   possibly is recuse himself from having anything to do with that

21   case.

22        Correct?

23   A.   If there is a personal connection with a witness, they

24   would have to recuse themselves, yes.

25   Q.   Right.  And that is true of somebody who is working

1    actively on the case.  Correct?

2    A.  Yes.

3    Q.  All right.  So those are matters that are administratively

4    in nature.  Correct?

5    A.  Yes.

6    Q.  Now, do you all have a standard operating manual procedure?

7    A.  We do.

8    Q.  You have that?

9    A.  We have one, yes.

10   Q.  And what does -- do you know what it says about whether or

11   not I can use the IRIS system in order to check on somebody who

12   wants to know, let's say, a defense lawyer calls one of your

13   agents, which happens, and I say, "Listen, I'm representing

14   somebody.  I want to know is there anything that is pending?

15   Do you want him," or anything of that sort.

16       Is the agent that I call, who may not be the one handling

17   the case because I don't know who is handling the case, would

18   this agent be able to go and check to say, "Hey, yes, there is

19   a case pending and you need to get ahold of this agent"?

20       Is there anything in the SOP that prevents the agent from

21   doing that?

22   A.  Well, you wouldn't be able to give out information if you

23   don't have an investigative -- if you are not an assigned

24   investigator or connection to the case, or a reason to give out

25   the information.

1      If a defense attorney were to call you, I don't believe

2   that we would be giving out information necessarily.

3      They would be directed to contact the case agent on that

4   case.

5   Q.  That's what I mean.  You find out who the case agent is and

6   you say, "Hey, that's the case agent," correct, "so you deal

7   with him"?

8   A.  Yes, that would be the extent of the information that would

9   be shared with that defense attorney, right.

10  Q.  And for the agent that one is talking to, that I would be

11  talking to, he would need to find out who the case agent is.

12     Correct?

13  A.  Yes.

14  Q.  Now, last question.  Like I said, I have very few questions

15  this morning, last area I am going to question you about.

16     Mr. Crespo, essentially, you have different types of

17  agents.  Some agents like to work in groups and work well with

18  others.  Other agents are more to themselves, correct, in their

19  work?

20  A.  Correct.

21  Q.  Mr. Crespo would fall into the category, he is pretty much

22  a guy that likes to work by himself.  Correct?

23  A.  He was very selective about the people he worked with.

24  Q.  Correct.  And sometimes, not only was he selective about

25  the people that he worked with, but sometimes he didn't work

1    well with other people, particularly agents from other

2    agencies.

3        Correct?

4    A.   There is always the possibility of personalities not

5    getting along.

6            MR. QUINON:  Okay.  That's all I have, thank you.

7            THE COURT:  Okay.  Any redirect?

8            MR. CLARK:  Yes, please, Your Honor.

9            Good morning, ladies and gentlemen.

10           A JUROR:  Good morning.

11                       REDIRECT EXAMINATION

12   BY MR. CLARK:

13   Q.   Agent Barranco, upon the conclusion of court yesterday, the

14   defense counsel began asking you about the defendant's

15   temperament.

16       Do you recall those questions?

17   A.   Yes.

18   Q.   During the time you supervised Agent Crespo, were there any

19   issues he had as far as temper displayed toward other agents or

20   prosecutors?

21   A.   During the time I supervised him, there was one occasion

22   where he had a dispute with another -- an agent from another

23   agency.

24   Q.   And it was a serious enough dispute for it to come to your

25   attention as a supervisor?

1    A.   Yes.

2    Q.   And would you consider the defendant to have a temper?

3    A.   Yes.  I mean, I would consider him to be someone that's

4    quick to anger.

5    Q.   You were also asked yesterday about the ongoing

6    investigation as a follow-up to the initial indictment of West

7    Medical and Rodolfo Gonzalez and the four other employees

8    there.

9         Do you recall those questions?

10   A.   Yes.

11   Q.   And you had stated yesterday during direct examination as

12   well as cross-examination, that the case, the investigation was

13   continuing.  Do you recall that?

14   A.   Yes, that's correct.

15   Q.   And to what extent was the case continuing after the return

16   of the indictment on January 31, 2019, and the ensuing arrest

17   of Gonzalez and the three employees at West Medical on

18   February 7th of 2019?

19   A.   So, there were plans to work additional subjects that were

20   part of the conspiracy in the case, but because these

21   allegations came forward, there was a pause in the

22   investigation for a time to look into these matters.

23        So the investigation, the healthcare fraud, the Medicare

24   fraud part of the investigation, rather than continue, was

25   paused.

1   Q.   And the fact that there was an ongoing investigation was

2   reflected in the memo, the initial investigative memo that was

3   prepared by Rolando Alvarez on March 4th of 2018.   Was it not?

4   A.   Correct.

5   Q.   We saw that memo yesterday.   And what further investigation

6   did Agent Alvarez describe?

7   A.   There was further interviews and investigation that was

8   ongoing that was described in the memo.   The memo is done once

9   a year by every agent to update what's going on in the case and

10  that was the memo that he completed on that.

11  Q.   Specifically, what did Agent Alvarez describe as future

12  targets of investigation with respect to West Medical?

13  A.   There were potential future targets of individuals that

14  were involved in the purchase and sale of controlled substances

15  and purchasing controlled substances from patients.

16  Q.   Including beneficiaries?

17  A.   To include Medicare beneficiaries.

18  Q.   Including the patient brokers?

19  A.   Yes, the patient brokers that I am speaking of, they are

20  the ones that buy and sell the prescriptions and the

21  medication.

22  Q.   In fact, Jorge Diaz was identified as an individual who was

23  linked with Dr. Gonzalez and West Medical, was he not?

24  A.   Yes, correct.

25  Q.   And Yandre Trujillo was connected to West Medical through

1   Jorge Diaz?

2   A.   Yes.   There were a number of individuals like them that

3   were potential targets.

4   Q.   Including Anais Lorenzo, the girlfriend of Jorge Diaz?

5   A.   Yes, correct.

6   Q.   When Agent Alvarez and Agent Lawless encountered Rene

7   Sotolongo, that was after the indictment and arrest of West

8   Medical, was it not?

9   A.   Yes.

10  Q.   And that information was conveyed to you on March 19th of

11  2019?

12  A.   Correct.

13  Q.   In furtherance of the ongoing Phase 2 of the West Medical

14  investigation?

15  A.   Yes.

16  Q.   Now, COVID didn't begin in 2019, did it?

17  A.   No, it began in 2020.

18  Q.   In fact, it was March of 2020 when the courts shut down?

19  A.   Correct.

20  Q.   And as we all know, the first couple months of COVID,

21  generally, everything was shut down.

22      People weren't going out to restaurants and gyms and going

23  to work, for the most part?

24  A.   Correct.

25  Q.   Except for essential employees?

1    A.   That's correct.

2    Q.   Were you designated as an essential employee?

3    A.   Yes, federal agents are designated as essential employees.

4    Q.   Did you and all your HHS-OIG agents, as well as the FBI

5    agents, just shut down law enforcement on account of COVID?

6    A.   No.

7    Q.   How did you continue your duties during that period of

8    time?

9    A.   We continued our duties using every precaution available,

10   with masks.  We had -- we got fitted for N95 masks, so that we

11   can continue doing our jobs.

12        We went out in the community only when we had to do

13   essential interviews.  We tried to limit contact, like doing

14   interviews on the phone, but we continued doing our jobs and

15   investigating our cases.

16        In addition, there were agents from our office that were

17   deployed to assist with patients that were held on cruise ships

18   that were being quarantined.

19        So we were very much involved in doing our work still

20   during the pandemic.

21   Q.   As time passed and we became more accustomed and

22   knowledgeable about the COVID pandemic, the rules were relaxed

23   more and more, were they not?

24   A.   Yes, that's correct.

25   Q.   And come June and July of 2020, it was part of your routine

1  duties to go out and interview potential witnesses and targets

2  of investigations?

3          MR. QUINON:  Objection.  Leading.

4          THE COURT:  Sustained.

5  BY MR. CLARK:

6  Q.  How did you and fellow agents follow up with your ongoing

7  investigations in the face of COVID?

8  A.  So, we were given guidance by the department on when we

9  were supposed to resume normal activity and it was done in

10  phases.  We didn't just all return to full 100 percent

11  activities, it was done in phases, but because we are essential

12  employees and we are federal employees, we were out in the

13  community doing things that other employees that work in the

14  office were not doing.

15  Q.  When Charlie Lawless had sent out the request for

16  assistance to conduct bene interviews in June of 2020, what, if

17  any, resistance was there from your agency as far as having

18  your agents participate in those interviews?

19  A.  There wasn't any resistance.  We would normally do those

20  interviews.

21  Q.  What prevented the participation of your HHS agents in

22  interviewing those benes in March of 2020?

23  A.  Their hesitation was the concern that Agent Crespo raised

24  about these patients being COVID-19 positive.

25  Q.  But for the fact that Agent Crespo had disclosed to you

1    that he had a source on the street, an old man who said that

2    your benes or the benes who were going to be interviewed had

3    COVID, what would have happened?

4    A.   We would have gone forward and participated.

5            MR. QUINON:  Objection.

6            THE COURT:  What is the basis?

7            MR. QUINON:  Speculative.

8            THE COURT:  Overruled.

9    BY MR. CLARK:

10   Q.   You may answer.

11   A.   We would have participated in those interviews with the

12   FBI.

13   Q.   So Agent Crespo effectively thwarted your ongoing

14   investigation by telling you about these COVID beneficiaries?

15           MR. QUINON:  Objection.  Leading.

16           THE COURT:  Sustained.

17   BY MR. CLARK:

18   Q.   What, if any, impact did Agent Crespo's disclosure to you

19   have on the ongoing investigation into those persons affiliated

20   with Dr. Gonzalez's clinic, then later with Dr. Carpman's

21   clinic?

22   A.   It prevented us from participating in an investigative

23   activity and doing interviews.

24   Q.   When Agent Crespo had presented this information to you,

25   did you just accept it on face value?

1   A.   No.

2   Q.   And to what extent did you try to push back and find out

3   exactly where he was getting this information?

4   A.   I requested the source from Crespo multiple times wanting

5   to know who the person was, how valid, how credible that source

6   might be, but he didn't provide the information.

7   Q.   As a supervisor, you could have issued him an order, could

8   you not, to say, "Disclose this source or else"?

9   A.   Yes.

10   Q.   Why did you not?

11   A.   I felt that we did not want to turn this into sort of a

12   disciplinary action.  I wanted to convey the information to my

13   superiors for them to weigh in on what should be done.

14   Q.   What, if any, influence on your decision not to press the

15   defendant about the identity of the informant did the overall

16   concern about your -- if this were true, that your agents may

17   have been exposed to COVID?

18   A.   There was a general concern about COVID because of the

19   circumstances of the pandemic, so the agency may overreact to

20   something like this, for a concern like this, but also in the

21   back of my mind there was allegations that were being

22   investigated.

23   Q.   So you didn't want to interfere with anything that the

24   public corruption side of the house was doing with respect to

25   Agent Crespo?

1    A.   Correct.   That was a factor in my thinking.

2    Q.   Now, defense counsel on cross-examine has suggested that

3    because supposedly the CI was once a DEA informant for the

4    defendant, that you could never disclose his identity.

5         Do you recall those questions?

6    A.   Yes.

7    Q.   Now, in your familiarity with confidential informants,

8    confidential sources, do they retain their confidential status

9    indefinitely?

10   A.   No, they don't.

11   Q.   How likely is it that a DEA source from ten years ago would

12   still be acting as an informant in 2020?

13             MR. QUINON:   Objection, Your Honor.

14             THE COURT:   I'm sorry.   Basis?

15             MR. QUINON:   Again, speculative.

16             He is asking him about a DEA agent, another agency.

17             THE COURT:   Overruled.

18   BY MR. CLARK:

19   Q.   You may answer.

20   A.   It would be very unusual for someone to maintain that

21   status of informant for that length of time.

22   Q.   Now, returning to the memorandum, the first investigative

23   memo that was prepared by Agent Alvarez, who was the reviewing

24   official as reflected in that report?

25   A.   I review a large volume of these reports and I was on leave

1    at the time.  When I checked the record in IRIS, the record

2    reflected that I approved the document but I had designated

3    Crespo to fill in for me and review documents and approve

4    documents, so there is a possibility that he may have reviewed

5    it on my behalf.

6    Q.  Do you know whether or not that it's the actual person,

7    whether it's the ASAC or the acting ASAC, whose name would

8    appear on the bottom of that report if they, in fact, approved

9    it?

10   A.  I am not certain of that.

11   Q.  That would require somebody from IT to state for certainty?

12   A.  Correct.  The record reflected that my name was on as the

13   approving official for the document, but because I delegated my

14   approval to Agent Crespo, we would have to check with IT to see

15   how that would reflect in the actual document.

16   Q.  Do you have any reason to believe that you did not approve

17   that report and that Agent Crespo had done so?

18   A.  Because I was on leave, it's possible that Agent Crespo

19   might have reviewed the document.

20   Q.  Did he ever tell you he reviewed the Gonzalez report?

21   A.  No.

22   Q.  Did -- and you can approve these reports remotely.  You

23   don't have to be in the office in order to access the IRIS

24   database.  Correct?

25   A.  I am able to review the reports and approve them remotely

1   from my laptop, yes.

2   Q.  You very well could have done that on April 4th, was that

3   the date?

4   A.  March 4th, yes.  It's possible.

5   Q.  Now, when accessing IRIS in order to review reports and

6   approve reports, can you describe the process?

7      What are you actually doing?  What are you seeing?

8   A.  So, an agent will write a report.  They will submit it into

9   the IRIS system, which is our case management system, and then

10  the supervisor at that time will go in there to pull the report

11  up, read it, and make sure it's correct, and then they have the

12  ability to approve it.  Then once it's approved, the report

13  goes into the case file.

14     It won't be populated into the evidence and into the case

15  file until the supervisor approves it.

16  Q.  That's all done within the IRIS database system?

17  A.  Correct.

18  Q.  There is no need to download a report merely to approve it?

19  A.  Correct.  You would be viewing the report within the system

20  itself.  You wouldn't be copying it onto your computer.

21     MR. CLARK:  If we can please turn on the monitors,

22  Judge, and refer to Government's Exhibit 17C.

23  BY MR. CLARK:

24  Q.  Agent Barranco, you have before you a printout and if you

25  look at the very bottom reference, this is the Gonzalez memo.

1     Do you see here -- and this is from the defendant's work

2   computer.

3     Do you see a reference to the fact that this had been

4   downloaded to Alberico Crespo's computer?

5   A.  I see the download.  I just can't identify the memo itself.

6   It says, "Word document."

7        MR. CLARK:  Can we pull up the memo?

8   BY MR. CLARK:

9   Q.  Is that the Alvarez memo referring to the Gonzalez

10  investigation?

11  A.  Yes, it is.

12  Q.  Based on this, what did the defendant do with the Gonzalez

13  report?

14  A.  It appears that he downloaded it.

15  Q.  Was there any necessity for him, as your acting special

16  agent in charge, to have downloaded it to his work computer?

17        MR. QUINON:  Objection, Your Honor.

18        THE COURT:  Basis?

19        MR. QUINON:  He wouldn't know what's in the mind of the

20  person who needs or doesn't need to download that report.

21        THE COURT:  Overruled.

22  BY MR. CLARK:

23  Q.  You may answer.

24  A.  There wouldn't have been a need to download it onto your

25  computer to review it.

1      You can review it and approve it.

2   Q.  What, if anything, did the defendant ever tell you about

3   having downloaded this Gonzalez report?

4   A.  I was not informed.

5   Q.  Had you known that he had a relationship with Jorge Diaz at

6   the time who was actively involved in Oxycodone distribution,

7   would you have permitted him to be your acting special agent in

8   charge while you are absent?

9   A.  No, absolutely not.

10  Q.  In fact, on March 19th when allegations surfaced about his

11  involvement with Diaz, did you and other members of the

12  administration at HHS take pains to prevent him from ever

13  acting as an acting special agent in charge?

14  A.  Yes, we did.  After the allegations came to light, he was

15  not allowed to act on my behalf anymore and there was a

16  segregation of documents that, you know, the documents weren't

17  being submitted to the case log anymore so that he wouldn't be

18  able to access them.

19  Q.  When conducting interviews of potential witnesses or

20  targets, do agents ever do these by themselves, on their own,

21  one-on-one?

22  A.  It's rare.  Most often they have another agent with them

23  when they do the interviews.

24  Q.  Why is that?

25  A.  For safety and to corroborate what the witness is saying.

1   Q.   So it's not just one person's word?

2   A.   Correct.

3   Q.   That's standard procedure with all agents in your agency?

4   A.   That's standard procedure for us, yes.

5   Q.   And with the defendant while he was acting as an agent?

6   A.   Yes.

7           MR. CLARK:  I have no additional questions, Your Honor.

8           THE COURT:  All right.  You may step down.

9           (Witness excused.)

10          THE COURT:  Any further evidence from the government?

11          MR. CLARK:  No, Your Honor, at this time the government

12   rests.

13          THE COURT:  Ladies and gentlemen, now that the

14   government has rested, I need to talk to the attorneys about

15   scheduling.

16          We are going to take just a short break.

17          We will send you back to the jury room and you get some

18   coffee and then we will bring you back in shortly.

19          COURT SECURITY OFFICER:  All rise.

20          (The jury exited the courtroom at 10:03 a.m.)

21          THE COURT:  All right.  Please be seated.  Are there

22   any motions at this time?

23          MR. QUINON:  Yes, Your Honor, if I could just have a

24   second.

25          THE COURT:  Okay.

1          MR. QUINON:  We are going to renew all of our motions

2     that have been made pretrial, as well as motions that have been

3     made during the course of the trial, and also as to the counts,

4     if I may just have a second, so I can get the copy of the

5     indictment here.

6          As to Count 1, Your Honor, which is the conspiracy --

7     hold on, the controlled substance conspiracy, we move for a

8     judgment of acquittal in that there is insufficient evidence

9     that Mr. Crespo joined the conspiracy in this case.

10          As the evidence has shown, Mr. Diaz testified that he

11     was the one whose business this was, the distribution of the

12     substance, the Oxycodone and that he kept all the profits, that

13     he never gave any money to Mr. Crespo from whatever he was

14     doing, Mr. Diaz was doing, in the sale.

15          That was Mr. Diaz's testimony.

16          And there was no evidence that Mr. Crespo was present

17     as well, something that came up during the course of the trial

18     but we have now shown that not to be the case, so there is no

19     evidence that Mr. Crespo was present and that he witnessed any

20     distribution of drugs, of Oxycodone or sale of any Oxycodone,

21     and there is just no evidence at all that he joined knowingly

22     the conspiracy in this case to possess with intent to

23     distribute Oxycodone.

24          So, as to all the elements of this offense, it is our

25     position that the government's proof has failed to -- is

1    insufficient and fails to prove that Mr. Crespo intentionally

2    or knowingly joined a conspiracy of two or more people for the

3    unlawful object to distribute and to possess Oxycodone.  That's

4    as to Count 1.

5         Count 5 is the conspiracy to witness tampering and,

6    again, as to this particular count, no evidence -- the evidence

7    is insufficient to show that Mr. Crespo knowingly joined,

8    knowingly and willfully joined this particular conspiracy to

9    tamper with witnesses.

10        Our theory of the case is different, but that's not for

11   us to argue at this point, and I understand that but the

12   evidence is insufficient in itself that has been presented,

13   even taken in favor of the Government to show that Mr. Crespo

14   knowingly joined a conspiracy to witness tamper in the case.

15        Particularly, that the evidence does not show that he

16   acted with the corrupt purpose, as the law will be defined to

17   the jury and the law is in this district.

18        Likewise, it's our contention that the evidence is

19   insufficient to show that Mr. Crespo engaged in misleading

20   conduct or that he did knowingly as to any material false

21   statement.

22        In sum, our position is that the evidence is

23   insufficient to prove him -- to make this case go to the jury

24   at this point.

25        Counts 7, 8 and 9 are counts of witness tampering, and,

1    again, we move for a judgment of acquittal on those counts

2    because the government has failed to produce enough evidence to

3    go to the jury on the issue of whether Mr. Crespo knowingly,

4    corruptly persuaded another person, or knowingly engaged in

5    misleading conduct toward another person.

6           Furthermore, it is also our position that the evidence

7    is insufficient to show the criminal intent required for this

8    matter to -- for this case to go to the jury.

9           That is to say, there is an insufficiency of criminal

10   intent to hinder, delay, prevent the communication of

11   information to a law enforcement officer of the United States.

12   And as was the case with the conspiracy to witness tamper in

13   this case as well, in the substantive witness tampering count,

14   7, 8, and 9, the evidence is insufficient to show that

15   Mr. Crespo acted to corruptly persuade or to corrupt another

16   person in the manner that is required by the law as well as

17   that there is insufficient evidence that he engaged in that

18   misleading conduct in this case as the law requires.

19          Again, in sum, our position is that the evidence is

20   insufficient to go to the jury at this point, even taken in the

21   best light in favor of the Government.

22          Lastly, Count 10, our position is that the evidence is

23   insufficient that Mr. Crespo knowingly joined, and willfully

24   joined the conspiracy or the plan in this case, and that's one

25   of the elements of the offense.

1              In addition, the evidence has failed to prove the fact

2      of an official proceeding, that is to say that there was an

3      official proceeding, such as a federal grand jury at the time,

4      or that Mr. Crespo was able to foresee or knew of a grand jury

5      proceeding which are elements of the offense in this case.

6              So, again, the evidence is insufficient to show that

7      he, Mr. Crespo, joined the conspiracy or that he -- or that

8      there has been evidence presented by the government

9      sufficiently to satisfy the official proceeding element of this

10     particular offense.

11             Consequently, like the other counts, it is our position

12     that there has been a failure of evidence, and the evidence is

13     insufficient to let the case go to the jury at this point.

14             THE COURT:  I'm sorry, just a moment.

15             I'm sorry, did that conclude your argument?

16             MR. QUINON:  Yes, sir.

17             THE COURT:  Who is going to respond for the government?

18             MR. MCLAUGHLIN:  Certainly, Your Honor.

19             As to Count 1, it's crystal clear there was an

20     Oxycodone trafficking conspiracy.  We have proved that every

21     which way to Sunday, through the wiretap calls, the testimony

22     of Diaz, the testimony of Lorenzo, through the testimony of

23     Special Agent Alvarez and through the testimony of Special

24     Agent Lawless.

25             The next element is --

1          THE COURT:  I'm sorry, can you pull the microphone a

2    little closer to you?

3          MR. MCLAUGHLIN:  I'm sorry, the next question is, did

4    Crespo know about it and did he willfully join it?

5          Well, of course he did.  When he is tipping off Diaz

6    about that West Medical is under investigation, he has joined

7    the conspiracy, knowingly and willfully.

8          When they are having constant communications about the

9    status of the investigation, he has joined the conspiracy.

10          When they are having constant phone calls around the

11    time of squad meetings, the search warrant, the arrest warrant,

12    he has willfully joined the conspiracy.

13          When he is downloading reports and sharing it with

14    Diaz, he has willfully joined the conspiracy.

15          That's just 2019.  We go to 2020, when you see in the

16    wiretap calls, when he is directing Diaz to block any and all

17    calls from Pedro Alvarez, which he knows and Diaz knows is a

18    CI, he has willfully joined the conspiracy.

19          When he is threatening Anais Lorenzo that she is

20    threatening to go to the police about Diaz, and him, he has

21    willfully joined the conspiracy.

22          When he is tipping off Diaz about the e-mail on June

23    19th from Charles Lawless, come home, I have to talk to you

24    about the Gonzalez, showing him on -- showing Diaz on the phone

25    what is in that e-mail, he has willfully joined the conspiracy.

1          And Diaz in the wiretap calls tell you that he is

2     directing Diaz to continue on with his drug trafficking,

3     continue on with the Uber.  He has willfully joined the

4     conspiracy, Your Honor.

5          Taking aside all of that evidence, on July 17th when he

6     gets the call from Diaz and Diaz tells him, "Hey, I bought some

7     Oxycodone from Mercedes Perez," and he directs Diaz, "Go

8     back to Mercedes Perez" -- and then Diaz tells him, "She has

9     informed on me, we are in trouble," and Diaz tells him, "I have

10    gone back there and I gave her some pills to make it look like

11    when the agents come the next day that she didn't sell the

12    pills," Diaz directs him, "Go back to her house, get those

13    pills, come home, cut them all up, and when the agents call

14    you, lie, lie, lie, lie, lie."

15         THE COURT:  You said Diaz directed him.  Is that what

16    you meant?

17         MR. MCLAUGHLIN:  When Crespo directs Diaz to do that,

18    I'm sorry, and when he directs him to lie repeatedly, he has

19    willfully joined the conspiracy.

20         I can continue on, Your Honor, but I think it's crystal

21    clear he has knowingly and willfully joined the conspiracy.

22         As to Count 5, this is a conspiracy created and

23    orchestrated by the defendant.  In terms of his willful and

24    knowing participation, he is the one on June 8th who was lying

25    to Agent Barranco about this purported CI that these benes have

1    COVID.  We have proved that.

2          On July 17th, that is, the other person there is

3    Special Agent Lawless, and the focus of that conduct is the

4    wiretap calls on July 17th where Crespo is repeatedly and in

5    explicit detail telling Diaz, what to say to Lawless, how to

6    lie, how to tamper with evidence and how to obstruct the

7    investigation.

8          Count 9, is July 20th.  That is the call with Lawless.

9    There are at least 15 different lies in that.

10          I can go through them in detail, if the Court wants,

11    but it's very clear we have proved that, and in terms of Count

12    10, both Count 5 and Count 10 overlap to a certain degree, but

13    what Mr. Quinon raised was the issue of the grand jury

14    proceeding, all the government has to prove, Your Honor, is

15    that a grand jury proceeding was reasonably foreseeable to

16    Agent Crespo as a federal agent on the Strike Force.

17          It is crystal clear we have proved that it was

18    reasonably foreseeable, and we know specifically in the wiretap

19    calls on July 17th when he is telling Diaz, "Listen, they are

20    going to pull my records," he is basically confessing to the

21    crime there, which is the only way you can pull call records is

22    a grand jury subpoena.

23          So, Your Honor, I think it's crystal clear we have met

24    the elements of every count in this case.

25          If the Court has any questions, I'm more than happy to

1   answer them.

2          THE COURT:  So in Count 7, that relates to the date,

3   July 8, 2020?

4          MR. MCLAUGHLIN:  Correct, that is the --

5          THE COURT:  What evidence was there July 8th?

6          MR. MCLAUGHLIN:  That is the Barranco -- the attempt to

7   shut down the investigation by claiming to have this purported

8   CI when he is having that conversation with Agent Barranco.

9          And the other person for that count is Agent Barranco.

10  In Counts 8 and 9, the other person is Special Agent Lawless.

11         THE COURT:  All right.  Anything else in reply?

12         MR. QUINON:  No, Your Honor.

13         THE COURT:  All right.  Considering the evidence in the

14  light most favorable to the Government, as I must at this

15  stage, I find that there is sufficient evidence to proceed.

16         I am mindful for Count 1, the conspiracy to distribute

17  charge, I am mindful of defendant's arguments about Mr. Diaz's

18  testimony that the defendant was not present and that he

19  received no financial benefit.

20         MR. MCLAUGHLIN:  Your Honor, I could address that

21  point.

22         THE COURT:  Let me finish my statement.

23         MR. MCLAUGHLIN:  I'm sorry, Your Honor.

24         THE COURT:  But given the totality of the evidence, I

25  find that there is sufficient evidence to proceed so the motion

1    is denied as to all counts.

2           You are going to be calling a witness?

3           MR. QUINON:  Yes, Your Honor, here is what we plan and

4    we have discussed it with the prosecutor.

5           I am going to call a witness, Henry Luna, who is an

6    agent who worked with Mr. Crespo, and then there is a witness,

7    as I mentioned to you before, another agent that I had planned

8    to call, one who is pregnant, and has a note from the doctor.

9           We have agreed that we can just play the tape of her

10   interview when she was interviewed by the agent for the

11   investigation, but I have agreed to play that particular tape

12   and admit the transcript of that tape and that's it.

13          We will rest after that.

14          THE COURT:  Okay.

15          MR. MCLAUGHLIN:  Your Honor, just so you know, that

16   tape is about 30 minutes.  It's not like a ten-minute

17   interview.

18          It's fairly lengthy.  So I just want to let the Court

19   know it's going to take about 30-some minutes to play that

20   tape.

21          THE COURT:  But you are going to play that recording

22   first or are you going to call the live witness first?

23          MR. QUINON:  I am going to call Mr. Luna first.

24          THE COURT:  All right.  Then are we ready to proceed?

25          MR. QUINON:  Yes.

1          THE COURT:  All right.  Then let's bring in the jury,

2     please.

3          (The jury entered the courtroom at 10:21 a.m.)

4          THE COURT:  All right.  Please be seated.

5          All right.  Thank you for your patience, ladies and

6     gentlemen.

7          Are you ready to proceed?

8          MR. QUINON:  Yes, sir.  The defense will call Agent

9     Henry Luna.

10          THE COURT:  Okay.  All right.  Before you have a seat,

11     please raise your right hand and he will administer the oath.

12          (The witness, Henry Luna, was duly sworn.)

13          THE COURT:  All right.  Please have a seat.  Make sure

14     you pull the microphone close to you.

15                          DIRECT EXAMINATION

16     BY MR. QUINON:

17     Q.  Good morning, sir.

18     A.  Good morning.

19     Q.  Would you be kind enough to tell us your name and who are

20     you employed by?

21     A.  My name is Henry Luna.  I am a federal agent with the

22     Department of Health and Human Services.

23     Q.  Okay.  So how old are you?

24     A.  Forty.

25     Q.  How long have you worked for HHS-OIG?

1   A.   I started working there in January 2011.

2   Q.   Would you tell the ladies and gentlemen of the jury what

3   you do there as an agent?

4   A.   As an agent, I investigate crimes committed against the

5   Medicare program.  I also can do child support cases and

6   unaccompanied minor cases.

7   Q.   And do you work -- how many agents in your team?

8   A.   It varies over time.  It could be between like eight and

9   ten.

10   Q.   Okay.  And, again, when did you start, what year?

11   A.   2011.

12   Q.   While you worked there, did you get to meet another agent

13   by the name of Alberico Crespo?

14   A.   Yes.

15   Q.   When, roughly, is it that you met Agent Crespo?

16   A.   As soon as I started working there.

17   Q.   He was already working there when you started?

18   A.   Yes.

19   Q.   Okay.  Did you ever work any cases with him?

20   A.   No.

21   Q.   All right.  So how is it that you got to know him if you

22   didn't work cases with him?  How did that come about?

23   A.   It's a small office and also, like, he used to teach

24   firearms, control tactics.

25   Q.   Did he teach you firearms?

1   A.   Yes.

2   Q.   Also, did you have contact with him on occasion whenever

3   there was social or work gatherings, I should say, by the

4   agency, did you have contact with Crespo at that time?

5   A.   Yes.

6   Q.   During the course of the years as you worked there since

7   2011, did your friendship with Mr. Crespo kind of increase and

8   blossom?

9   A.   Yes.

10   Q.   Tell us a little bit about that.  How did that come about?

11   A.   I am actually not sure but, like, we just, like, as he was

12   providing training and different type of trainings, I got

13   interested so we started chatting a little more, and then it

14   got to the point that we were hanging out outside of work, but

15   I am not sure when that started.

16   Q.   Okay.  Would that have been a gradual thing since 2011, you

17   got to meet him, you got to know him, and you got closer as the

18   years went by?

19   A.   Yes.

20   Q.   Did there come a time -- now, when the pandemic came, did

21   that relationship become even closer?

22   A.   Yes.

23   Q.   Tell us about that.  Why was that?

24   A.   Again, like, I am not sure but, like, it got to the point

25   that we were talking pretty much every day, every other day.

1   We were hanging out because, like, as you all know, you

2   couldn't go and meet people so we felt safe with each other so

3   we would hang out.  I would hang out with him and Samantha.

4   Q.  Samantha being his wife?

5   A.  Yes.

6   Q.  And you would visit their home?

7   A.  Yes.

8   Q.  And they would visit your home?

9   A.  Yes.

10  Q.  So, let me ask you, during the pandemic, you mentioned that

11  it was different because you couldn't go places.  Did also the

12  pandemic affect your job, how you did your job?

13  A.  Yes, it was different.  We started to do a lot of stuff

14  online, over the phone.

15  Q.  Were there any measures taken by HHS-OIG to protect the

16  agents from getting infected with the virus?

17  A.  Yes, we were provided, like, equipment, masks, and

18  different items to protect us in the event that we had to go

19  somewhere and actually have contact with somebody.

20  Q.  Okay.  During that time, were you going out on interviews?

21  A.  For the most part, no.

22  Q.  Why not?

23  A.  We tried to do everything we could online so we were not --

24  people were not comfortable, like, receiving people at their

25  house so we would not try to go to their house unless we had

1   to.

2   Q.   So that if you were going to interview somebody during the

3   pandemic, it was thought that you were not going to be well

4   received for fear of getting COVID?

5   A.   Correct.

6   Q.   So how would you do it, online basically?

7   A.   Yes.

8   Q.   Telephone?

9   A.   Yes.

10  Q.   All right.  Now, you mentioned that you would go over to

11  Crespo's house and he would go over your house.

12       How often was this?

13       During a typical week, what would happen?  Just give us an

14  idea since we weren't there.

15  A.   I would say at least maybe once a week or twice a week.

16  It varied depending on what we had going on with work or if I

17  had my children with me or not.

18  Q.   And you would bring your kids with you over to Crespo's

19  house at the time?

20  A.   No, I didn't want to take the kids out of the house, but

21  they will go to my house if I had the kids.  That was not an

22  issue.

23  Q.   And "they" being Samantha and Crespo would go to your house

24  when the children were with you at that time?

25  A.   Yes.

1   Q.   What kind of activities -- what did you do?  When you met

2   with Crespo and Samantha, how would you guys spend time?

3   A.   We would cook or we would go somewhere to eat and have

4   drinks and hang out.

5   Q.   All right.  Now, during the pandemic and the fact that you

6   were getting together with him and Samantha, going over their

7   house, and there came time that you went over the house and

8   there was some drinking, you would drink at that time?

9   A.   Yes.

10   Q.   By "drinking," I am talking about alcoholic beverages, all

11   of you would engage in that?

12   A.   Yes.

13   Q.   All right.  And you had seen Crespo drink in those

14   occasions, had you not?

15   A.   Correct.

16   Q.   And you would drink also.  Correct?

17   A.   Yes.

18   Q.   Samantha would drink as much as you guys, or less or what?

19   A.   No, way less.

20   Q.   Now, did you have a relationship that you trusted Al, not

21   only in your work but socially?

22        MR. CLARK:  Your Honor, object to the overall leading

23   nature of the questions.

24        THE COURT:  Well, as to that question, overruled.

25   BY MR. QUINON:

1   Q.   You can answer the question.

2   A.   Yes.

3   Q.   During the time that he was with you, did you become aware

4   of an individual that was renting or living there in the house

5   that Crespo and Samantha lived in?

6   A.   Yes.

7   Q.   Who did you learn that individual to be?

8   A.   Don Jorge.

9   Q.   Okay.  He was referred to as Don Jorge?

10   A.   Uh-huh, yes.

11   Q.   And when Al spoke to Don Jorge, did you ever hear Al refer

12   to him as *padre*?

13   A.   Sometimes.

14   Q.   Just for the record, *padre* means father.  Correct?

15   A.   Yes.

16   Q.   Now, what was -- did you have any interaction with this

17   individual, Don Jorge?

18   A.   Very casual, just like, hello, how are you, no more than

19   that.

20   Q.   Was Don Jorge really a part of -- whenever you went over,

21   was he a part of a gathering at all?

22   A.   No.  He would come and say hi, but then he would go back to

23   his room.

24   Q.   Now, during the time that you were working during the

25   pandemic, if you needed to go to the office where you were

1   working, the HHS-OIG, could you just show up at the office or

2   did you have to notify or do anything before you went?

3   A.   We were instructed that we had to tell our supervisors.

4   Q.   You would have to tell the supervisor what?

5   A.   Basically ask if we could go to the office because if we

6   have to go, like, for any reason we would have to sort of ask

7   for permission, hey, can I go to the office, and once we were

8   in the office we had to sign a log saying, yes, I was here from

9   this time to this time.

10  Q.   At the time you were in the office, were you -- if there

11  were other agents in there, how would you be able to interact

12  with the other agents?

13       In other words, were there requirements of keeping distance

14  between agents?

15  A.   Yes, and wear a mask.

16  Q.   All right.  Now, did there come a time in July of 2020 on a

17  Friday, July 17th, do you recall that on July 17, 2020, on a

18  Friday, you, Crespo, and Samantha met at some establishment to

19  have some drinks and to eat some lunch?

20  A.   Yes.

21  Q.   Prior to going to that place, do you remember what the

22  restaurant's name was, the establishment's name was?

23  A.   Cooper's Hawk, I think.

24  Q.   Do you remember what city or municipality that was located

25  at?

 1  A.   In Doral.

 2  Q.   Prior to going there that day, which was a Friday, did you

 3  all have any type of gathering or meeting at work?

 4  A.   Yes.

 5  Q.   Tell us about that.  What happened that day?

 6  A.   We had what they call an all-hands meeting so everybody had

 7  to attend, but it was online.

 8  Q.   Okay.  How long did that meeting take place?

 9  A.   I don't remember when it started, but I think it was over

10  with by 12:30.

11  Q.   All right.  Do you recall, more or less, what time you got

12  to the -- to this Cooper's Hawk establishment?

13  A.   Around 1 p.m., maybe.

14  Q.   All right.  Were you the first to get there or was Al,

15  Mr. Crespo, there already with Samantha, or did you get there

16  first?

17  A.   No, I got there and I waited for them in my car.

18  Q.   All right.  What happened then at Cooper's Hawk?  Can you

19  tell us what took place?

20  A.   We went inside and we got a table.  We ate and drank there.

21  We drank wine.

22  Q.   And when you say that you went in and got a table, what

23  kind of place is this?  Tell us so that we have an idea.  How

24  big of a place is it and, you know, so that we have an idea of

25  the establishment.

1      Where were you seated, that kind of a thing?

2   A.   It was big.   It has -- it's still there.   I think it has an

3   inside area and outside area.

4      We sat outside.

5   Q.   Okay.   Who was sitting -- did you get a table?

6   A.   Yes, the three of us got a table.

7   Q.   Did you order liquor?

8   A.   Yes.

9   Q.   And eventually, was food ordered as well?

10  A.   Yes.

11  Q.   So that we have an idea when we say -- when you say we

12  ordered liquor, tell us about how much liquor was ordered and

13  how it was consumed?

14  A.   Well, at that place, when you go in that place, you can get

15  bottles of wine.   I think if you have a membership, you are

16  allowed a certain amount of bottles.   I am not sure how many

17  bottles we drank that day but we were drinking wine.

18  Q.   And do you recall it was multiple bottles of wine?

19  A.   Yes.

20  Q.   Was Samantha drinking as well?

21  A.   She was but not as much as we were.

22  Q.   All right.   Was Al Crespo drinking that day?

23  A.   Yes.

24  Q.   Are we talking, in terms of bottles, would five bottles or

25  thereabouts ring a bell with you?

```
 1              MR. CLARK:  Objection.  Leading.
 2              THE COURT:  Sustained.  If you will rephrase your
 3    question.
 4    BY MR. QUINON:
 5    Q.  All right.  Roughly, give us an estimate how many bottles.
 6    A.  I don't remember how many but I would guess it was more
 7    than, between five and six, maybe.
 8    Q.  All right.  Was it enough wine, shall we say, where -- did
 9    you notice that Mr. Crespo was intoxicated?
10    A.  Yes.
11    Q.  What was your -- what did you notice about him that led you
12    to believe that he was intoxicated?
13    A.  He always likes to talk but when he is drinking he talks
14    even more and he likes to call people on the phone and so --
15    so, he started calling people and talking and I started to
16    talking to Samantha and we were talking -- initially, we were
17    talking about their wedding because they were planning their
18    wedding, so we sort of like tune him out and I am not sure what
19    he was talking about, like who he was calling, but he was
20    calling people and we were just talking about the wedding
21    stuff.
22    Q.  Okay.  This went on for how long, this situation where he
23    was on the phone talking and you were speaking to Samantha?
24    A.  I am not sure.  We were there for a little bit, maybe like
25    a couple of hours.  I'm not sure.
```

1  Q.  While you were talking to Samantha again, what, again, were

2  you talking to her about?

3  A.  Their wedding planning.

4  Q.  So you really are not paying too much attention to what he

5  was talking on the phone, what Crespo was talking on the phone?

6  A.  No.

7  Q.  All this time, we are talking about a few hours that you

8  were there.

9      In the meantime, drinking is taking place.

10     Correct?

11 A.  Yes.

12 Q.  Do you recall, roughly, what time you were leaving the

13 establishment?

14 A.  No, I don't remember actually.  I think we were there for

15 at least a couple of hours but I don't remember.

16 Q.  Okay.  Did you -- during the time that you were there that

17 you were drinking, did you feel yourself that you were having

18 too much liquor and you needed to stop?

19 A.  Yes.

20 Q.  How did you do that?  Tell me how you felt and what you

21 did.

22 A.  I felt like I was getting drunk, so I decided to like slow

23 down and I started drinking water because I had to drive back

24 to my house and I didn't want to drive intoxicated.

25 Q.  All right.  So you were able to slow down at that time and

1    just do whatever for a while?

2    A.  Yes.

3    Q.  Now, when I asked you before whether Crespo was drinking

4    and he was intoxicated, was he drunk?

5    A.  Yes.

6         MR. CLARK:  Objection, Your Honor.  Beyond the scope of

7    the witness's knowledge.

8         THE COURT:  Sustained to the form of the question.

9    BY MR. QUINON:

10   Q.  Tell us what you saw and what you thought about his

11   drinking?

12   A.  Well, we were drinking, again, I don't know how many

13   bottles but, like I said, when he is drunk, then he talks even

14   more than normal and then he starts calling people.  So, I

15   mean, that was kind of like the indication that he was drunk.

16   Q.  And you have been with him before when he is drinking on

17   other occasions?

18   A.  Yes.

19   Q.  So you can tell when -- how he reacts when he is drinking?

20   A.  Yes.

21   Q.  Now, at work, although you didn't work cases with him, did

22   you have a good working relationship with Al at work?

23   A.  Yes.

24   Q.  Were you able to notice him interacting with other agents

25   at the time during the time that he worked there?

1  A.  Yes.

2  Q.  Did there come a time that an agent for the FBI made some

3  derogatory comments about you being gay, that Al came out to

4  your defense while you were working there?

5  A.  Well, I wasn't present for that but he told me and another

6  agent told me, too, and then Al talked to these -- I think it

7  was more than one.  He talked to them and sort of like put them

8  in their place.

9  Q.  And the whole thing was that you were gay and they were

10  kind of making comments about you?

11  A.  Yes.

12  Q.  And Al is known to be -- let me ask the question

13  differently.

14      Based upon what you have seen of Al, is he the type of

15  person that if he sees something that he feels is not

16  appropriate to keep quiet or will he say his piece?

17  A.  No, he will make everybody known that something is not

18  right and he will voice his concerns.

19  Q.  All right.  During this time of the pandemic, that you were

20  going over to his house and he was coming over to your house

21  and you guys were -- that's the time you got closer to him?

22  A.  Yes.

23  Q.  You were going through a divorce from your husband at that

24  time?

25  A.  Yes.

1    Q.   And you mentioned children.

2         You have children?

3    A.   Yes, I have two daughters.

4    Q.   How old are the girls?

5    A.   Nine and four.

6    Q.   Okay.  Was it known at work of your -- the fact that you

7    were gay, was that known to the agents at least from HHS?

8    A.   Yes.

9    Q.   And the individuals who made those comments were FBI

10   agents?

11   A.   Yes.

12   Q.   By the way, even though you got closer to Al during the

13   pandemic and you had a relationship with him close, did Al at

14   work any time come to you and tell you that he was religiously

15   devoted to Santeria?  Did he ever do that?

16   A.   No.

17   Q.   To your knowledge, was that something he talked about at

18   work?

19   A.   No.

20   Q.   Now, during the course of this matter after Al was

21   arrested, were you interviewed by the FBI agents who were

22   working the case?

23   A.   Yes.

24   Q.   And how many times were you interviewed?

25   A.   Twice.

1   Q.   During that time, were you questioned about the drinking

2   that took place?

3   A.   I think so.

4   Q.   Did you ever express an opinion about the fact that you

5   were there present and that Al was drunk that day?

6        Did you ever say that?

7   A.   Yes.

8   Q.   And did you talk about the fact that Al, around that time,

9   was sad?

10  A.   Yes.

11  Q.   Why was he sad?  What did you say?  What was the reason?

12  A.   He was very upset because his godmother had passed, a

13  cousin of his had passed because of COVID, and his daughter,

14  she is leaving.  Everybody in the house has COVID so he was

15  upset that maybe she would get it and something would happen to

16  her and all of that happened like within two weeks, I think,

17  one after the other.

18  Q.   Okay.  So you explained to the agents that you were aware

19  of the circumstances that Al was going through, the family with

20  COVID, and one of them had passed away.

21       You explained all of that?

22  A.   Yes.

23  Q.   And you mentioned that this was -- this would have been

24  within two weeks or so.  You mentioned that just now?

25  A.   If I recall correctly, I think it was within two weeks.

1   Q.   So we established that you were drinking on July 17th, so

2   it would have been a couple of weeks back from July 17th.

3   Correct?

4   A.   Correct.

5          MR. QUINON:  If I can just have a second, Judge.

6          THE COURT:  Sure.

7          MR. QUINON:  That's all have I for now, Judge.

8          THE COURT:  All right.  Cross.

9          MR. CLARK:  Yes, please, Your Honor.

10                     CROSS-EXAMINATION

11   BY MR. CLARK:

12   Q.   Agent Luna, when you began back at HHS-OIG in 2011, what

13   had you done before that?

14   A.   I was a federal agent with the IRS.

15   Q.   IRS?

16   A.   IRS.

17   Q.   Were you a criminal investigative agent with the IRS?

18   A.   Yes.

19   Q.   Nevertheless, despite the fact that you had previous law

20   enforcement experience, when you began with HHS, you went

21   through training, did you not?

22   A.   Through the training that the agency has, yes.

23   Q.   And you were educated about all sorts of things involving

24   investigative work as well as the federal criminal justice

25   system.  Correct?

1    A.   Yes.

2    Q.   And you were educated about grand jury proceedings, were

3    you not?

4    A.   Yes.

5    Q.   And you were trained about the protocols, the dos and

6    don'ts as an agent, particularly an agent working with HHS-OIG?

7    A.   Yes.

8    Q.   You were instructed about the proper way to access NCIS and

9    DAVID information?

10   A.   Yes.

11   Q.   And these are things that you practiced on a day-to-day

12   basis, were they not?

13   A.   Yes.

14   Q.   By virtue of being a criminal investigative agent, you

15   necessarily investigated cases, went to the grand jury, were

16   involved in your investigations and consulted with other agents

17   about their investigations?

18   A.   Yes.

19   Q.   You were drawn to Agent Crespo because he was more

20   experienced than you?

21   A.   I guess.

22   Q.   You were aware of the fact that the defendant had worked as

23   a Hialeah Police Department officer?

24   A.   Yes.

25   Q.   And necessarily, as a police officer in Hialeah, he had

1   experience on the street, did he not?

2   A.  Yes.

3   Q.  So he has some street savvy.

4       He knew how to deal with people who are involved in various

5   crimes, financial as well as violent type of offenses?

6   A.  I think so.

7   Q.  And not only that, he worked for the DEA, too, did he not?

8   A.  Yes.

9   Q.  And as a member of the DEA, he was investigating federal

10  narcotics offenses?

11  A.  Yes.

12  Q.  And he would share his exploits with you and other agents

13  about the cases he had and the experiences he had with both

14  Hialeah Police Department as well as with the DEA?

15  A.  Yes.

16  Q.  So he was a very seasoned agent by the time he came on to

17  HHS?

18  A.  Yes.

19  Q.  And he continued to work cases with HHS?

20  A.  Yes.

21  Q.  He was very familiar with protocols at HHS, the dos and

22  don'ts?

23  A.  Yes.

24  Q.  He was very familiar with how to conduct himself with

25  respect to interviews of witnesses and targets of

1   investigation?

2   A.   Yes.

3   Q.   He was very well-versed in how to present matters to the

4   grand jury?

5   A.   Yes.

6   Q.   And certainly, he was aware of the necessity to

7   confidentiality when it comes to investigative work?

8   A.   I would think so.

9   Q.   As well as grand jury investigations?

10  A.   Yes.

11  Q.   So it's not like he was some rookie or somebody that was

12  ignorant.  He was somebody who was steeped in how to be a

13  police officer and a federal agent?

14  A.   Yes, sir.

15  Q.   And not only did he have all that case knowledge, but he

16  also had practical physical skills that were valued by HHS-OIG?

17  A.   Yes.

18  Q.   He was very proficient in firearms?

19  A.   Yes.

20  Q.   As a matter of fact, he was a firearms instructor?

21  A.   Correct.

22  Q.   He would teach other agents, including people like

23  yourself, who had previous law enforcement experience about how

24  to handle firearms?

25  A.   Correct.

1  Q.  As part of his duties, he, just like you, carried a firearm

2  during the day when you were on duty.

3     Correct?

4  A.  Yes.

5  Q.  And even off duty, agents carry firearms, do they not?

6  A.  Sometimes.  It depends on the agent.

7  Q.  And in addition to carrying firearms, Defendant Crespo

8  carried a knife, did he not?

9  A.  Yes.

10  Q.  And he was proficient in the use of a knife?

11  A.  I think so, yes.

12  Q.  And he was educated and trained in martial arts?

13  A.  I never saw him training, but I think he was.

14  Q.  So, certainly, he was a person who was skilled and could

15  handle himself physically when it comes to defending himself or

16  others?

17  A.  Correct.

18  Q.  Added to that is that, based on your experience with him,

19  he was quick to anger, was he not?

20  A.  I mean, I don't -- I wouldn't say quick to anger but, you

21  know, like he would just -- if he didn't like something, he

22  would voice his -- you know, he will say something, but I

23  wouldn't say quick to anger.

24  Q.  Not only would he say things to people, you believed that

25  he was prone to violence?

1  A.   Not prone to violence but -- because he was so well

2  trained, I would assume like he would know how to respond, you

3  know, in any situation.

4  Q.   Let's fast forward, Agent Luna.

5       When you had learned that Al Crespo was arrested by the

6  federal agents, your first thought was that he must have

7  punched out or assaulted a beneficiary, a target of

8  investigation?

9  A.   Well, I knew that he was going to go to interviews that

10 Monday so I thought, well, maybe something went south and he

11 had to do something, he punched somebody, like, because, like,

12 I never thought that he will be arrested for anything, you

13 know.

14 Q.   But if he was arrested, you assumed it was because of

15 violent nature, that he went too far and hurt somebody?

16 A.   I mean, not that went too far.

17      I didn't know what type of interviews he was going to do

18 that day.

19      I knew he was going to do interviews but I thought that

20 maybe, you know, something didn't go right and he had to react.

21 Q.   Sir, you recall being interviewed on July 20, 2020, shortly

22 after the defendant's arrest.  Correct?

23 A.   Yes.

24 Q.   And do you recall having told Jennifer Spalding with your

25 agency, I believe she is attached to internal affairs.

1      Is that correct?

2   A.  Yes.

3   Q.  On page 12, do you recall having told her -- and this is

4   12 days after his arrest.  Correct?

5   A.  Yes.

6   Q.  At that time you told her that when Al was arrested, you

7   knew that he was doing interviews and that you believed

8   something got out of control and he punched somebody.

9      Isn't that correct?

10  A.  Yes.

11  Q.  Now, your relationship with the defendant grew over the

12  course of time?

13  A.  Yes.

14  Q.  And you knew him when he was married to his former wife,

15  Irene?

16  A.  Yes.

17  Q.  He was divorced from Irene and very quickly assumed a

18  relationship with Samantha?

19  A.  Yes.

20  Q.  You, yourself, were going through marital difficulties with

21  your husband, were you not?

22  A.  Not at the moment.

23  Q.  So, at that time when you would get together with the

24  defendant and with Samantha, you would sometimes be accompanied

25  by your husband Brian?

```
 1    A.   Very few times.

 2    Q.   Mostly it was just the three of you?

 3    A.   Yes.

 4    Q.   You, Samantha and the defendant?

 5    A.   Correct.

 6    Q.   And the time that you two spent together intensified during

 7    COVID?

 8    A.   What was that again?

 9    Q.   The time that you three spent together intensified or

10    became -- it increased during COVID?

11    A.   Correct, yes.

12    Q.   Because no longer were you going to the office?

13    A.   Yes.

14    Q.   That started in March of 2020?

15    A.   Yes.

16    Q.   Were you still with Brian at that time, or had you

17    separated?

18    A.   No, around February we separated.

19    Q.   So shortly after that is when you were separated and spent

20    more time with the defendant and with Samantha?

21    A.   Yes.

22    Q.   And when you were together, you would drink?

23    A.   Yes.

24    Q.   And you don't consider yourself to be an excessive drinker,

25    do you?
```

```
 1   A.   No.
 2   Q.   And you don't consider the defendant to be an excessive
 3   drinker, do you?
 4   A.   No.
 5   Q.   You don't believe he has an alcohol problem?
 6   A.   I don't think so.  I mean, over the pandemic I think we
 7   drank way more than what we normally would drink.
 8   Q.   Way more, but did that border on alcoholism?
 9   A.   No, I mean, the thought was that everybody was just like --
10   we didn't know when all of this was going to end, you know, the
11   pandemic, so, we thought, this is going to end soon so we just
12   sort of like, just trying to push through this.
13        You know, it was horrible being in quarantine and we didn't
14   know what to do so --
15   Q.   You didn't consider yourself a problem drinker?
16   A.   No.
17   Q.   You didn't consider the defendant to be a problem drinker?
18   A.   No.
19   Q.   And you would get together and you would drink whiskey on
20   occasion?
21   A.   Yes.
22   Q.   You would drink wine?
23   A.   Yes.
24   Q.   And you would spend time together, you would spend hours
25   together at his house drinking.  Correct?
```

1   A.   Yes.

2   Q.   There was nothing extraordinary about the times you spent

3   together.  You could handle the liquor that you drank, could

4   you not?

5   A.   There were a couple of times that I couldn't and I would

6   take an Uber home or I would just spend the night at their

7   house.

8   Q.   And the defendant, likewise, he handled his liquor.  He was

9   an experienced drinker?

10  A.   I would think so, can yes.

11  Q.   You never saw him black out?

12  A.   Not that I can remember.

13  Q.   You never saw him falling down drunk?

14  A.   No.

15  Q.   So you just considered him to be a normal drinker like

16  yourself?

17  A.   Yes.

18  Q.   Now, things didn't cease entirely for you and the defendant

19  being agents doing active work with HHS just because of COVID?

20  A.   What was that again?

21  Q.   You still worked as agents, you just didn't take vacation

22  for the next several months while there was a lockdown?

23  A.   No, we were -- yes, correct, I was still working.

24  Q.   And agents were still going out on the street conducting

25  interviews, were they not?

1   A.   Sometimes, if it was -- it was very important that it was

2   in person, yes.

3   Q.   You, as an experienced agent, know that you are not going

4   to interview a target of investigation or a significant witness

5   over the telephone.

6        Correct?

7   A.   No.

8   Q.   You were going to go out with a second agent to corroborate

9   what that witness tells you in person?

10  A.   Yes.

11  Q.   And HHS agents were doing so despite the fact that COVID

12  existed in 2020?

13  A.   I wasn't doing it unless I had to.  I don't know other

14  people, but I wasn't doing it.

15  Q.   At that time, were you part of the task force?

16  A.   Maybe not.  I don't remember.

17  Q.   So you weren't as active as the task force agents having to

18  go on the streets making cases while COVID was prevalent?

19  A.   No, I was doing civil cases and I was doing unaccompanied

20  minor cases.

21  Q.   And that's a lot easier to do at home over the telephone

22  and computer, is it not?

23  A.   Sometimes.

24  Q.   Criminal cases require you to be out there interviewing

25  witnesses, acquiring evidence?

1    A.   Yes.

2    Q.   And there were accommodations made for the agents to go out

3    there and do their work.

4         Correct?

5    A.   Yes.

6    Q.   Perhaps, rather than meeting a witness, a beneficiary, a

7    target in their home, you would meet outside their home in the

8    open air?

9    A.   Yes.

10    Q.   You would maintain social distancing?

11    A.   Yes.

12    Q.   You would wear a mask?

13    A.   Yes.

14    Q.   So just because there was COVID doesn't mean that HHS was

15    not doing their job?

16    A.   No, we were still working.

17    Q.   And COVID didn't keep you and the defendant from going to

18    Cooper's Hawk on July 17, 2020, did it?

19    A.   No, we sat outside.

20    Q.   And you certainly weren't wearing masks when you were

21    sitting and eating at Cooper's Hawk, were you?

22    A.   No, I think that they organized people, like whomever you

23    went there with, you would be sort of, like, segregated.  The

24    tables were not right next to each other.

25    Q.   You stated on direct examination that you arrived at

1   Cooper's Hawk at 1 p.m.

2       Is that right?

3   A.   Around that time.  I don't recall the exact time.

4        MR. CLARK:  Let me see Defense Exhibit 1, please.

5   BY MR. CLARK:

6   Q.   Sir, as a matter of fact, it wasn't 1 o'clock when you

7   arrived there, was it?  It was around more like 1:30, two

8   o'clock when you and the defendant and Samantha arrived at

9   Cooper's Hawk?

10  A.   I guess.

11  Q.   Is that correct, sir?

12  A.   I guess.  I don't remember the exact time.

13  Q.   Well, you said 1 o'clock to the defense counsel during your

14  direct examination.

15  A.   Yes, around 1 o'clock.

16  Q.   Let me show you what's been admitted in evidence,

17  Defendant's Exhibit 1B.

18       Sir, this is the bill from Cooper's Hawk for your party,

19  and it reflects that the check was open at 2:08 p.m. on

20  July 17, 2020.

21       Is that correct?

22  A.   Yes, that's the time it shows there.

23  Q.   And it also reflects that the check was closed at

24  6:40 p.m.?

25  A.   Correct.

1    Q.   So you, the defendant, and Samantha spent a little over

2    four hours at Cooper's Hawk.   Is that correct?

3    A.   Yes.

4    Q.   During that time you shared drinks.   Correct?

5    A.   Yes.

6    Q.   Not liquor, not heavy liquor like whiskey?

7    A.   It was wine.

8    Q.   Wine.   And much like those social occasions that you shared

9    with the defendant and with Samantha at the residences, the

10   three of you were engaged in your typical joint activity?

11   A.   Yes.

12   Q.   You were just drinking wine, eating food, talking?

13   A.   Yes.

14   Q.   And it was common whenever you would get together with the

15   defendant, even on a social occasion, he would be on the phone?

16   A.   Yes.

17   Q.   And he did that often in your presence.   He would get on

18   the phone with some unknown person and carry on?

19   A.   Correct.

20   Q.   In fact, during those four or so hours when you were at the

21   restaurant, he was on the phone some ten times with an

22   individual?

23   A.   Yes, he was on the phone.

24   Q.   And these weren't particularly lengthy calls but they were

25   frequent calls, some ten calls while the three of you were

1   together?

2   A.   I don't know how many calls but I guess.

3   Q.   He was frequently interrupted?

4   A.   He was on the phone a lot, yeah, a lot.

5   Q.   But that wasn't unusual?

6   A.   Correct.

7   Q.   In fact, you weren't even aware of who he was speaking

8   with?

9   A.   Correct.

10  Q.   And as far as you were concerned, there was nothing unusual

11  at all about his demeanor that day?

12  A.   Correct.

13  Q.   And the most that you could say is that he was a little sad

14  because of the passing of one of his family members recently?

15  A.   Correct.

16  Q.   And he was preoccupied about an air-conditioning unit that

17  had broken at his home that he and Samantha had to go and

18  repair?

19  A.   Yes.

20  Q.   Other than that, you did not consider his behavior to be

21  unusual?

22  A.   No.

23  Q.   And he was coherent, meaning he was rational, he followed

24  the conversation, did he not?

25  A.   I think so.

1   Q.   He wasn't falling down drunk, was he?

2   A.   No.

3   Q.   He wasn't stumbling, was he?

4   A.   Not that I remember.

5   Q.   During the period of time you were together, you said you

6   felt intoxicated but you were able to remedy that by drinking

7   water and eating some more food?

8   A.   Correct.

9   Q.   As time passed, at 6:40 p.m. when you departed, you felt

10  comfortable driving home on the Palmetto?

11  A.   Yes.

12  Q.   You mentioned that they were members of this Cooper's Hawk

13  wine-of-the-month club?

14  A.   Al and Samantha, I think they have a membership there, yes.

15  Q.   And that membership entitles the members, the defendant and

16  Samantha, to purchase bottles of wine.  Correct?

17  A.   Yes.

18  Q.   And to take bottles of wine home?

19  A.   I think so.  I don't know.  I am not familiar with all

20  the -- with what's included in the membership.

21  Q.   Now, you said on direct examination that you, Samantha and

22  the defendant consumed five or six bottles of wine.

23       Do you recall having said that?

24  A.   I think it was, like, five, I'm not sure.

25  Q.   You said that, don't you recall having said that on direct

1   examination?

2   A.   Yes, around five.

3   Q.   If you, in fact, had consumed multiple bottles of wine,

4   would you think you would be able to drive home that day?

5   A.   Probably not.

6   Q.   And that figure, five or six, today is the first time you

7   ever said that you, the defendant and Samantha consumed five or

8   six bottles of wine on July 17, 2020?

9   A.   I guess, yes.

10  Q.   Getting back to your interview on July 30th of 2019 {sic},

11  again, 13 days after you were at Cooper's Hawk, you gave a

12  formal interview to members of your Internal Affairs bureau?

13  A.   Yes.

14  Q.   You were very interested in being accurate in the

15  information you conveyed to Internal Affairs?

16  A.   Yes.

17  Q.   And on page 32 of that document, you stated, "I don't know

18  how many bottles of wine we had there."

19  A.   Correct.

20  Q.   Isn't that true?

21  A.   Yes, I said around five and I don't --

22  Q.   No, you didn't say that, sir.  Would you like to see the

23  statement?

24  A.   No, now I said around five, but I don't remember.

25  Q.   But 13 days after this incident to IA, you didn't say five

1   or six bottles, did you?

2        Would you like to see it?

3   A.  I don't remember.

4        MR. QUINON:  What page are you referring to?

5        MR. CLARK:  Page 32.

6   BY MR. CLARK:

7   Q.  Now, sir, you did not tell Agent Spalding that you, the

8   defendant and Samantha, drank five or six bottles of wine, did

9   you?

10  A.  Not at that time.

11  Q.  But your memory is better now, how many years later, three

12  years later?

13  A.  At the moment that's what I remembered and that's why I

14  said that I didn't know how many.  Now I estimated like five

15  but I don't actually remember how many.

16  Q.  Now, Samantha very well may have taken some bottles of wine

17  with her from Cooper's Hawk.  Correct?

18  A.  That I don't remember.

19  Q.  You wouldn't rule it out, would you?

20  A.  Sure, it's possible.

21  Q.  If we may see the Exhibit, 12C.  This is a pole camera

22  depicting the defendant and Samantha arriving home shortly

23  after leaving Cooper's Hawk.

24       (Government's Exhibit 12C was played in open court.)

25  BY MR. CLARK:

1   Q.   Do you recognize any of the cars depicted in the video?

2   A.   Yes.

3   Q.   Which car do you recognize?

4   A.   That is Samantha's car.

5   Q.   Where are they pulling up to?

6   A.   It looks like their house.

7   Q.   That's the house where you visit the defendant and Samantha

8   and share wine?

9   A.   Yes.

10   Q.   And you will shortly see Samantha emerge from the car and

11   go to the front door.

12       Samantha was carrying a black bag emerging from her car and

13   going home.

14       Correct?

15   A.   Say that again.

16   Q.   Samantha, as we see, is carrying a black bag as she enters

17   her front door?

18           MR. QUINON:   Objection, Your Honor.

19           THE COURT:   Basis?

20           MR. QUINON:   That's not what is shown on the video.

21   She came out of the door.

22           THE COURT:   Well, overruled, you can deal with that on

23   your redirect.

24   BY MR. CLARK:

25   Q.   Do you see a parcel in Samantha's hands?

1   A.   Yes, it looks like she has a bag.

2   Q.   And that very well could contain bottles of wine that she

3   had taken from Cooper's Hawk as a member of the

4   wine-of-the-month club, as people typically do who go to that

5   particular restaurant.

6        Correct?

7   A.   I am not aware how that membership works, like if you are

8   allowed to take the bottles or you have to drink them there.   I

9   don't know.

10  Q.   Is that the only time you accompanied them to Cooper's

11  Hawk?

12  A.   Yes.

13  Q.   You are not a member, are you?

14  A.   No.

15  Q.   Now, concerning Don Jorge, did you first meet him at a

16  restaurant in Hialeah?

17  A.   Yes.

18  Q.   You were having lunch with the defendant?

19  A.   Yes.

20  Q.   Was it just the two of you or were there other people

21  present?

22  A.   Just us.

23  Q.   And out of the blue, a man comes up to your table?

24  A.   I think he called, I think Al called Don Jorge and told him

25  we were there.

```
 1   Q.   He asked him to come over and meet you?

 2   A.   I think so.

 3   Q.   When he came, the defendant introduced him as Don Jorge?

 4   A.   I think he said padre, like in Spanish, padre.

 5   Q.   And they enjoyed a very close, warm, familial relationship,

 6   did they not?

 7   A.   Yes.

 8   Q.   Based upon how they interacted, you believed him to be the

 9   defendant's father?

10   A.   I thought he could have been, yes.

11   Q.   And you continued to see Don Jorge over the passage of

12   time?

13   A.   Yes.

14   Q.   And you learned that Don Jorge occupied the efficiency

15   apartment at the defendant's home?

16   A.   Yes.

17   Q.   And Don Jorge often would come and join you and Samantha

18   and the defendant?

19   A.   He would come and say hi and then leave.

20   Q.   And you saw him some dozen times just come and go from the

21   defendant's home?

22   A.   I don't know how many times but, I guess, yeah.

23   Q.   Now, sir, you mentioned previously that you were trained in

24   how to properly use NCIC information?

25   A.   Some people are trained to actually run the system and some
```

1   others, they just get their reports.  Not everyone has access

2   to NCIC.

3   Q.  And the purpose of NCIC is to assist agents like yourself

4   in order to run certain individuals who are suspected to be

5   involved in criminal activity that relates to your job?

6   A.  Yes.

7   Q.  And you can find, by accessing that NCIC personal

8   identifying information.  Correct?

9   A.  Yes.

10   Q.  You can find out their address?

11   A.  Yes.

12   Q.  You can find out their arrest record?

13   A.  Any charges, yes.

14   Q.  You can find out the existence of any pending warrants for

15   their arrest?

16   A.  Yes.

17   Q.  And you were instructed that the only time that you could

18   run a criminal records check of an individual is if it's

19   investigative-related?

20   A.  Correct.

21   Q.  You just don't casually run an NCIC of your neighbors?

22   A.  Correct.

23   Q.  Of your friends?

24   A.  Correct.

25   Q.  Of your family?

1   A.   Correct.

2   Q.   That would be improper to do so?

3   A.   Yes.

4   Q.   Likewise, as an HHS-OIG, you were not permitted to

5   associate with people involved in criminal activity outside of

6   your investigative work?

7   A.   Correct.

8   Q.   And not only are you prohibited from doing that work-wise,

9   but personally, would you, as an agent, knowingly associate

10  with somebody involved in criminal activity, including drug

11  trafficking?

12  A.   No.

13  Q.   Would you allow an individual like that in your own home?

14  A.   No.

15  Q.   If you became aware that somebody you know was actively

16  involved in criminal activity, what would you do?

17  A.   Report it.

18  Q.   Report it to the authorities so that they could investigate

19  somebody who was involved in crime?

20  A.   Correct.

21  Q.   If that criminal activity was something that your own

22  agency was investigating, would you feel an even greater need

23  to report that to your office?

24  A.   Yes.

25  Q.   And even if it was a friend or family member, would it be

1    incumbent upon you, as an agent, to notify your supervisor that

2    you know that this individual was involved in crime?

3    A.   Yes.

4    Q.   And you expect that your agency would recuse you from that

5    case, keep you separate from that, so that there would be no

6    question of impropriety, that you were unfairly influencing the

7    investigation in order to protect somebody close to you?

8    A.   Correct.

9          MR. CLARK:  I have no further questions, Your Honor.

10          THE COURT:  All right.  Any redirect?

11          MR. QUINON:  Yes, Your Honor.

12          Mr. McLaughlin, can you play 12C, please?

13                     REDIRECT EXAMINATION

14   BY MR. QUINON:

15   Q.   I am going to show you this exhibit, this video that was

16   played during the cross-examination by Mr. Clark.

17          MR. QUINON:  Can you play it from the beginning,

18   please?

19          (Government's Exhibit 12C was played in open court.)

20   BY MR. QUINON:

21   Q.   All right.  Do you see the car?

22   A.   Yes.

23   Q.   That's Samantha's car?

24   A.   Yes.

25   Q.   Let's observe and see if you see her going into the house.

1      Do you see her get off the car here?

2   A.   Yes.

3   Q.   Do you see her there going into the house?

4   A.   Yes.

5   Q.   So, it appears there that she went into the house.

6   Correct?

7   A.   Yes.

8   Q.   Now, there is some time that she is inside the house.  She

9   doesn't come out.  She hasn't come out yet.

10      Correct?

11  A.   Yes.

12  Q.   Now, she seems to be coming out of the house now.  Correct?

13  A.   Yes, she opened the door and came out.

14      MR. QUINON:  Okay.  Stop it there, please.

15      Can you go back and stop when she came out of the

16  house, Mr. McLaughlin, please?

17      MR. MCLAUGHLIN:  Do you know what time on the clock

18  that is?

19      MR. QUINON:  A few seconds more.

20      MR. MCLAUGHLIN:  Just tell me when you want me to stop

21  it.

22      MR. QUINON:  Go ahead.

23      MR. MCLAUGHLIN:  It's still playing.

24      MR. QUINON:  Stop it and go back.  I want to see her

25  coming out of the house to see what is in her hand when she

1    comes out of the house.

2          (Government's Exhibit 12C was played in open court.)

3    BY MR. QUINON:

4    Q.  Okay, we are doing it over again.

5         Here comes the car.

6         Do you see where the car is parked there.  Right?

7    A.  Yes.

8    Q.  Let's observe when Samantha gets out of the car.

9         Did you see her get out of the car?

10   A.  Yes.

11   Q.  Do you see her walking into the house at this point?

12   A.  Yes.

13        MR. QUINON:  All right.  When she comes out of the

14   house, she is holding something, can you stop it?

15        MR. MCLAUGHLIN:  Just yell when you want me to stop.

16   That's easier --

17        MR. QUINON:  All right.  As she is coming out.  Get

18   ready to stop in a second.

19        Here we go.  Stop it right there.

20        All right.  You stopped it.

21   BY MR. QUINON:

22   Q.  There, do you see her there?

23   A.  Yes.

24   Q.  And there seems to be something on the right hand.

25   Correct?

1   A.   Yes.

2   Q.   Can you tell what that is?

3   A.   It looks like a bag.

4   Q.   It seems to be a woman's purse?

5   A.   I can't tell what it is.  Maybe it's a bag but, a purse,

6   but I can't tell if it's a purse or just a regular bag.

7   Q.   All right.  But that's when she comes out of the house.

8   Correct?

9   A.   Yes.

10   Q.   Not when she is going into the house.  Correct?

11   A.   Yes.

12          MR. QUINON:  All right.  You can take it out.

13   BY MR. QUINON:

14   Q.   You recall a few minutes ago that Mr. Clark questioned you

15   and asked you about a statement that you had given to the

16   investigator for the agency, HHS-OIG, on July 30th.

17          Do you recall those questions he asked you?

18   A.   Yes.

19   Q.   One of the questions he asked you at page 32 was you didn't

20   say at that time how many bottles of wine.

21          Correct?

22   A.   Correct.

23   Q.   But you did say, correct me if I am wrong, "I don't know

24   how many bottles of wine we had and we just kept opening

25   bottles."

1      You did tell her that, that you just kept opening bottles.

2      Correct?

3   A.   Correct.

4   Q.   That part Mr. Clark didn't ask you about, did he?

5   A.   No.

6   Q.   Now, Mr. Clark also asked you and intimated that Al is, in

7   his words, prone to violence.

8      Do you recall those questions?

9   A.   Yes.

10  Q.   And you told him that's not what you had seen.  What you

11  had seen is that he will respond if somebody comes at him.

12     Correct?

13  A.   Correct.

14  Q.   And he will respond, as he did, defending you when people

15  were making comments about you.  Correct?

16  A.   Yes.

17  Q.   Now, you went to this place, Cooper's Hawk to drink and you

18  sat outside?

19  A.   Yes.

20  Q.   At that time, other people were frequenting the

21  establishment also?

22  A.   Yes.

23  Q.   How distant were the tables at that place?

24  A.   I think everything was supposed to be six feet apart so

25  whatever, you know, whomever you went there with, you will sit

1    with those people but like everybody else was six feet apart.

2    Q.   This was outside of the -- they were serving outside of

3    the -- outside the building.

4         Right?

5    A.   Yes.

6    Q.   In the open air?

7    A.   Yes.

8    Q.   Mr. Clark went over with you that you didn't get there at

9    1 p.m., you got -- you went into the establishment and the

10   check was open at 2:08 p.m., according to what he showed you,

11   the document, correct?

12   A.   Correct.

13   Q.   But you had gotten there earlier.  Correct?

14   A.   Yes.

15   Q.   And you had waited for Al and Samantha.  Correct?

16   A.   Yes.

17   Q.   During the time that you were there, and you responded, so

18   far as you were able to recall and so far as you recall,

19   Samantha didn't take any bottles home that you recall.

20        Correct?

21   A.   Not that I remember.

22   Q.   And Mr. Clark questioned you and his word that Al was a

23   little sad, certainly was sad enough for you to know that he

24   was down in the dumps.

25        Correct?

1   A.   Yes.

2   Q.   Now, Mr. Clark questioned you whether you felt comfortable

3   driving home.

4        Do you remember that?

5   A.   Yes.

6   Q.   But was Samantha drinking heavily that day?

7   A.   No.

8   Q.   And to your understanding, who was supposed to drive home?

9   A.   Well, Al wanted to drive but she told him that he wasn't

10  okay to drive, that she was going to drive.

11  Q.   So, Samantha persuaded him, "Don't drive, you are too drunk

12  to drive, I'll drive"?

13  A.   Correct.

14  Q.   By the time, the time you met Don Jorge at this restaurant

15  in Hialeah, Mr. Clark questioned you, it was apparent to you,

16  was it not, that Crespo treated this individual with respect

17  and called him *padre*?

18  A.   Yes.

19  Q.   So it appeared to be a relationship of respect?

20  A.   Yes.

21  Q.   Now, if there are any issues of an agent not abiding by the

22  protocol of your agency, HHS-OIG, the agency has administrative

23  ways of disciplining an agent, does it not?

24  A.   Yes.

25  Q.   And so if an agent doesn't use properly NCIC or any other

1   facility that is available to an agent, he or she could be

2   disciplined administratively.  Correct?

3        MR. CLARK:  Objection as to relevance.

4        THE COURT:  Overruled.

5   BY MR. QUINON:

6   Q.  You can answer the question.

7   A.  Yes, a person could be -- there could be some type of

8   punishment.

9   Q.  And up to getting fired.  You can fire an agent --

10  A.  Yes.

11  Q.  -- depending on the interaction involved?

12  A.  Correct.

13        MR. QUINON:  I believe that's all I have, Judge.

14        If I could just have a second.

15        THE COURT:  Okay.

16        MR. QUINON:  That's all I have, Judge.

17        THE COURT:  All right.  You may step down.

18        (Witness excused.)

19        THE COURT:  Your next witness?

20        MR. QUINON:  Judge, this is the -- we are going to play

21  that tape that we discussed in the transcript that we are going

22  to admit into evidence.

23        THE COURT:  All right.  Ladies and gentlemen, the next

24  witness will appear by way of a statement that was previously

25  provided which will be played by defense counsel.

 1          MR. QUINON:  Yes.  We will play it as soon as they come

 2    back, Judge.  Mr. McLaughlin is teeing it up right now.

 3          THE COURT:  Before you play it, I should note, ladies

 4    and gentlemen, you should consider this witness's recorded

 5    statement as you would the testimony of any other witness.

 6          Are we ready?

 7          MR. QUINON:  Yes, I can play it.

 8          (Audio played in open court of Victoria Buono.)

 9          THE COURT:  I'm sorry, we need to pause it.

10          COURT SECURITY OFFICER:  Restroom.

11          THE COURT:  All right.  Why don't we take five minutes?

12          COURT SECURITY OFFICER:  All rise.

13          (The jury exited the courtroom at 11:46 a.m.)

14          THE COURT:  All right.  Please be seated.  Let's take a

15    short bathroom break.

16          (Brief recess.)

17          MR. QUINON:  Two things.

18          Mr. McLaughlin has never played a tape like this.

19          We would like for the Court to let the jurors know that

20    the reason why we are doing this is because this particular

21    witness had a medical emergency and, obviously, she is not

22    going to be here so we agreed that this would be a way to

23    present her testimony.

24          I should have thought about this and brought it to your

25    attention before, but I did not, and I apologize for that.

1          THE COURT:  All right.

2          MR. QUINON:  And the other things is, I just found out,

3    I did not know that Mr. McLaughlin who is very good with this

4    Trial Director has the ability to show the transcript -- oh,

5    okay.

6          In other words, he can have the transcript showing

7    while the audio is playing, which would be good because they

8    can see it and they can follow it in the transcript.

9          THE COURT:  Okay.

10         MR. QUINON:  We would -- what I'd like to do is to do

11   that, in other words, play the tape and have them look at the

12   transcript and they can follow the transcript because I can

13   see, looking at them, that it's very difficult to just sit

14   there and kind of follow it without a transcript.

15         THE COURT:  Okay.  Picking up where we are?

16         MR. QUINON:  I'd like to really do it from the

17   beginning to be fair to them.  I know it would add about ten

18   minutes, but it's really worth it because this is an unusual

19   setting and an unusual way of doing it.  I just want to make

20   sure that they get it right, that we do it the right way,

21   Judge, so I would like for you to make that accommodation, just

22   start from the beginning with the transcript.

23         THE COURT:  All right.

24         MR. MCLAUGHLIN:  I defer to the Court, Your Honor.

25   Whatever the Court wants, I can do.

1          THE COURT:  All right.  We will -- I will tell them

2     why.

3          Well, first, does the government object to me telling

4     them why?

5          MR. MCLAUGHLIN:  No, Your Honor, I think that's

6     appropriate.  I have no problem with that.

7          THE COURT:  We will start from the beginning.

8          I have a Judges' meeting --

9          MR. MCLAUGHLIN:  It's 35 minutes, Your Honor.  That's

10    the total.

11         THE COURT:  I have a Judges' meeting that starts at

12    noon that I'm supposed to lead.

13         We will just play it now when they come back.

14         Okay.

15         MR. QUINON:  All right.  Thank you, sir.

16         Judge, eventually I am going to mark the recording 1A

17    and the transcript -- I'm sorry, 1B and the transcript is going

18    to be 2B, and I will do that in the presence of the jury then.

19         THE COURT:  Okay.

20         (Brief recess.)

21         THE COURT:  All right.  We are back on the record.

22    Note the presence of the defendant and the attorneys.

23         So I was thinking, I was trying to avoid unnecessary

24    breaks and also balance the trial, but if we are going to have

25    to take a break anyway for motions and/or jury instructions,

1   so, why don't -- and because I have my meeting, why don't we

2   just take our lunch break now, we will just tell the jury to go

3   to lunch now, come back at one o'clock, and then we will play

4   the tape from the beginning.

5          MR. QUINON:  That's fine, Judge.

6          THE COURT:  Fine with the government?

7          All right.  So we will resume back at one o'clock.

8          COURT SECURITY OFFICER:  All rise.

9          THE COURT:  Oh, just, how much time are you all

10  anticipating for closings?

11         MR. MCLAUGHLIN:  Given the amount of evidence, Your

12  Honor, I'd prefer two hours, like a 90 and a 30, but at least

13  90 minutes, 60 to 30.  There is a lot of material.  This has

14  been a long trial and I don't want to rush and speak too fast.

15         MR. QUINON:  I don't need that much time but I will

16  take whatever time he is going to get, you know, I would like

17  to have time.

18         THE COURT:  I will give it some thought over the break,

19  and just so you all know, I always read the instructions first

20  before the argument.

21         MR. QUINON:  Judge, when do you anticipate we will get

22  our copy of the instructions?

23         THE COURT:  We need to do a charge conference.

24         I did go through the instructions.  They are mostly

25  standard.  I mean, I looked at the objections as well.

1          So, when you say a copy, I mean, I am assuming you have

2    a copy of your own proposed instructions as well as the

3    government's?

4          MR. QUINON:  No, no, I do, what I meant is the final

5    ones, the Court's.

6          THE COURT:  Well, presumably after the tape when I hear

7    the motions, we will have a charge conference.  Then we will --

8    we will get the printed copy to you as quickly as possible.

9    Some of the objections it looks like the government may have

10   adopted because I couldn't find some of the things that you

11   mentioned.

12         MR. QUINON:  What happened was they filed initially a

13   version of their jury instructions.  I filed objections.  They

14   remedied some of them, some of them, most of them, actually,

15   but not all of them.  So they, in a second version, they filed

16   second proposed instructions, and I filed objections to the

17   second proposed objections {sic}, so there are objections to --

18   that are pending that need to be resolved.

19         THE COURT:  Well, no, I understand that, but I

20   didn't -- of course, you are going to get the final

21   instructions before closing, but are you saying you need them

22   any particular amount of time before you close?

23         MR. QUINON:  No, I mean, as long as I can have them,

24   you know, like --

25         MR. MCLAUGHLIN:  Your Honor, in terms of mine, just so

1    the Court knows, I am using a PowerPoint, if there are any

2    changes I would like to know so I can make the change in my

3    PowerPoint, but that shouldn't take very long.

4         THE COURT:  Well, I can't promise you you will have

5    time to put it on the PowerPoint, but you will have a final

6    version.

7         All right.  See you at one.

8         (Lunch recess.)

9         THE COURT:  All right.  We are back on the record.

10   Note the presence of the attorneys and the defendant.

11        Are we ready?

12        MR. QUINON:  We are.

13        MR. MCLAUGHLIN:  Yes.

14        THE COURT:  All right.  Thank you.

15        (The jury entered the courtroom at 1:13 p.m.)

16        THE COURT:  All right.  Please be seated.

17        Welcome back, ladies and gentlemen.  We are ready to

18   resume with the trial.

19        There are a couple of preliminary things.  I told you

20   before that you were going to hear the testimony, the statement

21   by one of the witnesses and that you should consider that

22   statement as you would -- as evidence as you would any other

23   witness.

24        The parties did ask that I explain to you that this

25   witness is not present to testify in court because of a medical

1    emergency.

2            That's why she is not here.

3            Also, we've had a couple of technological glitches

4    during the trial.

5            There is a transcript of the statement that the parties

6    wanted played for you.  They have now been able to fix that so

7    we will start the statement from the beginning.

8            I think we were ten minutes in.

9            They will play it for you with the video so you will be

10   able to see the transcript on your screen.

11           All right.  Are we ready?

12           MR. MCLAUGHLIN:  Yes, Your Honor.

13           (Defendant's Exhibits 2A and B were played in open

14   court.)

15           THE COURT:  Does that conclude the recording?

16           MR. QUINON:  Yes, Your Honor.

17           We would move into evidence this recording as

18   Defendant's Exhibit 2A as well as the transcript, which is

19   Defendant's Exhibit 2B as in boy.

20           THE COURT:  All right.  Is there any objection?

21           MR. MCLAUGHLIN:  No objection, Your Honor.

22           THE COURT:  All right.  It will be admitted.

23           (Defendant's Exhibits 2A-2B were admitted in evidence.)

24           THE COURT:  Anything else by way of evidence?

25           MR. QUINON:  No, Your Honor, we are going to rest at

1  this point on behalf of Mr. Crespo.

2       THE COURT:  Any further evidence from the government?

3       MR. MCLAUGHLIN:  No, Your Honor.

4       THE COURT:  All right.  Ladies and gentlemen, now that

5  both sides have rested, the next thing for me and the attorneys

6  to do is to go over the law in which you will be instructed.

7  That does take us a little while so that we can make copies.

8       Why don't we recess now and have you prepare to come

9  back at 2:30.

10      You don't have to stay in the jury room.  You can move

11 about but just come back at 2:30.

12      I will give you the instructions on the law.  Then the

13 attorneys will give their closing arguments and then I will

14 instruct you to begin your deliberations, so don't discuss the

15 case at all until I tell you to do so.

16      So, relax and we will see you back here in around

17 40 minutes.

18      COURT SECURITY OFFICER:  All rise.

19      (The jury exited the courtroom at 1:52 p.m.)

20      THE COURT:  Please be seated.  Are there any motions at

21 this time?

22      MR. MCLAUGHLIN:  Your Honor, if I may, in light of the

23 defendant's decision not to testify, I ask the Court to

24 colloquy the defendant about his right to testify and his

25 choice.

1          THE COURT:  All right.  Any objection to me doing that?

2          MR. QUINON:  No, Your Honor.

3          Let me just tell him what the process is.

4          THE COURT:  Sure.

5          MR. QUINON:  That's fine, Your Honor.

6          THE COURT:  Mr. Crespo, please raise your right hand to

7   be sworn.

8          (The defendant, Alberico Ahias Crespo, was duly sworn.)

9          THE COURT:  Please be seated.

10          Pull the microphone close to you.

11          Mr. Crespo, you are aware that your attorney has rested

12   your case?

13          THE DEFENDANT:  Yes, sir.

14          THE COURT:  By resting, that presumes you are not going

15   to be testifying.

16          Is that correct?

17          THE DEFENDANT:  Yes, Your Honor.

18          THE COURT:  Now, like any other defendant in a criminal

19   case, you have the absolute right to testify.  You also have

20   the absolute right not to testify.  That is a decision left to

21   you alone for consultation with your attorney.

22          Do you understand that?

23          THE DEFENDANT:  Yes, sir.

24          THE COURT:  Your attorney, Mr. Quinon, is very

25   experienced, as I am sure you know that, and he can provide you

1    with his best advice on how to proceed but the ultimate

2    decision on whether to testify or not is yours alone to make.

3           Do you understand that?

4           THE DEFENDANT:  Yes, sir.

5           THE COURT:  Have you had enough time to speak with your

6    attorney about whether or not you should testify?

7           THE DEFENDANT:  Yes, Your Honor.

8           THE COURT:  Has he answered any or all of your

9    questions regarding that issue?

10          THE DEFENDANT:  Yes, Your Honor.

11          THE COURT:  Do you need any additional time to speak to

12   your attorney about whether or not you should testify?

13          THE DEFENDANT:  No, Your Honor.

14          THE COURT:  So, after speaking to your lawyer -- first,

15   let me say, even though both sides have rested in front of the

16   jury, it's not too late if you want to testify.

17          Do you understand that?

18          THE DEFENDANT:  Yes, Your Honor.

19          THE COURT:  So, having spoken to your attorney, is it

20   your desire to testify or not testify in the trial?

21          THE DEFENDANT:  I will not be testifying, Your Honor.

22          THE COURT:  Okay.

23          Now, Mr. Quinon, any motions?

24          MR. QUINON:  Before I do that, I just want to put on

25   the record that I have told Mr. Crespo that it is entirely his

1    decision and no matter what I may have, at any time during our

2    conversations expressed one way or another, it's always his

3    decision to decide whether or not to testify.

4        THE COURT:  Okay.

5        MR. QUINON:  So, yes, at this time I am going to renew

6    all our pretrial motions and all the motions made during the

7    course of the trial and I will make the objections of

8    insufficiency of evidence that I made at the close of the

9    government's case under Rule 29.

10       I will incorporate those objections at this point and,

11   really, they are objections of insufficiency as to Counts 1, 5,

12   7, 8 and 9 and 10, which are the counts that Mr. Crespo is

13   charged in this case.  As to all the counts, I previously made

14   arguments of insufficiency of the evidence and I would repeat

15   them at this point now that all the evidence has been in and

16   ask for a judgment of acquittal.

17       THE COURT:  All right.  Any response from the

18   government?

19       MR. MCLAUGHLIN:  We adopt the same arguments we made,

20   Your Honor, at the close --

21       THE COURT:  Can you speak into the microphone.

22       MR. MCLAUGHLIN:  I'm sorry.  We adopt the same

23   arguments we need made at the close of the government's case,

24   Your Honor.  I don't think the defense has put forth any

25   evidence that negates the burden here.

1          THE COURT:  All right.  The motion is denied.  Although

2     the standard is a bit different at this stage now that all the

3     evidence is closed, I do still find there is sufficient

4     evidence to proceed to the jury.

5          We will proceed with our charge conference.  As I told

6     the parties before, I will first work off the government's

7     proposed instructions considering the defense objections and

8     then I will consider the defendant's proposed instructions that

9     are not already covered.

10          Does each side have a copy of the instructions in front

11     of you?

12          MR. MCLAUGHLIN:  Yes, Your Honor, I do.

13          THE COURT:  You have your copy?

14          MR. QUINON:  Yes, Judge, I am just looking for the ones

15     that I proposed.

16          Yes, I have my proposed and I have the government's as

17     well.

18          THE COURT:  All right.  I am operating off the

19     government's updated proposed instructions, which is found at

20     Docket Entry 258.  Is that the latest version?

21          MR. MCLAUGHLIN:  That's correct, Your Honor.

22     Permission to remain seated during the charge conference?

23          THE COURT:  Yes, you can both remain seated.

24          The first instruction, proposed instruction one,

25     Court's instructions to the jury, is there any objection from

1    the government?

2            MR. QUINON:  No objection.

3            THE COURT:  From the defense?

4            MR. QUINON:  No, Your Honor, as that's the standard, we

5    did not object.

6            THE COURT:  All right.  The second instruction, duty to

7    follow instruction and presumption of innocence when a

8    defendant does not testify, is there an objection from the

9    government?

10           MR. MCLAUGHLIN:  No objection, Your Honor.

11           THE COURT:  From the defense?

12           MR. MCLAUGHLIN:  No objection.

13           THE COURT:  Instruction 3, definition of reasonable

14   doubt, is there an instruction {sic} from the government?

15           MR. MCLAUGHLIN:  No objection, Your Honor.

16           THE COURT:  From the defense?

17           MR. QUINON:  No objection.

18           THE COURT:  I will note, the footnotes and the

19   headings, "Proposed instructions" with the given numbers, those

20   will all be deleted.

21           Instruction 4, consideration of the evidence, direct

22   and circumstantial, argument of counsel, comments from the

23   Court.

24           Is there an objection from the government?

25           MR. MCLAUGHLIN:  No objection.

1          THE COURT:  From the defense?

2          MR. QUINON:  No, Your Honor.

3          THE COURT:  Instruction 5, credibility of witnesses.

4          Is there an objection from the government?

5          MR. MCLAUGHLIN:  No objection.

6          THE COURT:  From the defense?

7          MR. QUINON:  No, Your Honor.

8          THE COURT:  Proposed instruction 6, impeachment of

9    witnesses because of inconsistent statements or felony

10   conviction.

11          Do we have felony convictions?

12          MR. MCLAUGHLIN:  We do, Your Honor, for both

13   Ms. Lorenzo and Mr. Diaz.

14          THE COURT:  Okay.  Any objection to this instruction

15   from the government?

16          MR. MCLAUGHLIN:  No objection, Your Honor.

17          THE COURT:  From the defense?

18          MR. QUINON:  No, Your Honor.

19          THE COURT:  Instruction -- proposed instruction 7,

20   testimony of police or codefendant with plea and cooperation

21   agreement and use of addictive drugs.

22          Is there an objection from the government?

23          MR. MCLAUGHLIN:  No objection.

24          THE COURT:  For the defense?

25          MR. QUINON:  No objection.

1          THE COURT:  Proposed instruction 8, expert witness.

2          Is there an objection from the government?

3          MR. MCLAUGHLIN:  No objection.

4          THE COURT:  From the defense?

5          MR. QUINON:  No objection.

6          THE COURT:  Proposed instruction 9, on or about a

7     particular date, knowingly, willfully.  I believe there is an

8     objection to this one.

9          MR. QUINON:  Yes, Your Honor, this is not the standard.

10    We have a pattern jury instruction in this district that we use

11    all the time which is 9.1A but counsel modified it and I do

12    object to the modification that he added and I filed written

13    objections laying out the reasons and, essentially, it

14    highlights what I expect, part of what I expect the government

15    will be arguing during their closing arguments, and this brings

16    the Court into the area of commenting on some of the evidence,

17    and the reason I say that is because there are three numbers

18    that, different areas that are included in the addition that

19    counsel made, but I could suggest other areas that the jury

20    should be focused on, such as that there was information

21    related to the client that the investigation was closed, to

22    focus on the lack of evidence.

23          In other words, once you go down the road of

24    highlighting some evidence, it's really going down a slippery

25    slope.

1          So I say the proper instruction that we always use here

2    in this district, particularly when it comes to knowingly and

3    willfully, is just the standard.

4          We don't modify it.

5          THE COURT:  All right.  So your objection is to the

6    last paragraph, the third paragraph?

7          MR. QUINON:  Yes, sir, where it begins, "In

8    determining," from here on now, I do object to that.  That's

9    not part of the pattern.

10         THE COURT:  Why is the government asking for this?

11         MR. MCLAUGHLIN:  Your Honor, I cite to an Eleventh

12    Circuit case, which is United States versus Umbach, it's a 2017

13    case, and it's a 1512 case, which specifically cites, with

14    approval, a jury instruction given in that case and I really

15    had two choices.

16         One, I could have put that language in both Counts 5,

17    Counts 7, 8, 9 and Count 10, and then repeated it each time.  I

18    decided to move it here in proposed instruction 9 so it's in

19    one place.

20         I think it's appropriate to give in the context of 1512

21    but instead of repeating it repeatedly, I put it here.

22         That's the government's position, Your Honor.

23         THE COURT:  I am going to sustain the objection.  I

24    will strike that.  I will just use the standard language, which

25    is the first two paragraphs.

1           The next objection, paragraph ten, conjunctively

2    charged counts.

3           Is there an objection from the government?

4           MR. MCLAUGHLIN:  No objection, Your Honor.

5           THE COURT:  From the defense?

6           MR. QUINON:  No, Your Honor.

7           THE COURT:  Instruction 10, introduction to offense

8    instructions.

9           Is there an objection from the government?

10          MR. MCLAUGHLIN:  No objection.

11          THE COURT:  From the defense?

12          MR. QUINON:  No objection, Your Honor.

13          THE COURT:  Instruction 11, controlled substances,

14   conspiracy.

15          I am assuming no objection from the government.

16          MR. MCLAUGHLIN:  No objection.

17          MR. QUINON:  The only suggestion that I have, and it's

18   more along the lines of a suggestion, is that this particular

19   instruction does not include the elements of an 841.

20          In other words, the jury has been asked to find guilty

21   or not guilty on the conspiracy, but it doesn't tell them what

22   the elements are of an 841, which is important for the jury to

23   be able to reach a decision.

24          THE COURT:  So you want me to add the instruction for

25   841?

 1          MR. QUINON:  Just the elements, Judge, right before --

 2   right on page 13, where you start with, "The defendant can be

 3   found guilty," you know.

 4          THE COURT:  What is the government's position as far as

 5   adding the elements of the controlled substances violation?

 6          MR. MCLAUGHLIN:  I think it's confusing and it's

 7   unnecessary, Your Honor.  The elements of an 846 charge are the

 8   two that are cited here.

 9          I don't think the Court needs to go into any detail

10   about what it is to distribute or possess with the intent to

11   distribute Oxycodone.  That's why we submitted what we

12   submitted, Your Honor.

13          We would keep it as-is.

14          THE COURT:  So the --

15          MR. QUINON:  Judge, as an example, on the conspiracy to

16   commit witness tampering, you can see that in the proposed

17   instruction 13, the government sets forth the elements of

18   witness tampering so the jury has the benefit in determining

19   whether the client is guilty or not guilty of conspiracy for

20   witness tampering.  They will know the elements of what witness

21   tampering is because it's included in the subsequent

22   instruction, which is the standard for witness tampering

23   instruction, which is page 13.

24          THE COURT:  I will note that typically the parties

25   agree to add the element of the substantive offense following

1    the conspiracy.

2          Do you have that language in your proposed

3    instructions?

4          MR. QUINON:  I didn't do it, Judge, I apologize.  I

5    caught it last night.  I went over them again and I realized

6    that it was an oversight on my part because you did not have an

7    substantive 841 and this is the reason why it escaped me, but

8    typically you do have to put it in there because they have to

9    have an idea of what it is --

10         THE COURT:  What instruction number is that?

11         MR. QUINON:  It's in the 100s but I don't know what

12   number it would be.

13         THE COURT:  In Count 1, the defendant is charged with

14   conspiracy to distribute and possess with intent to distribute

15   a controlled substance, and in instruction 098 in the pattern

16   instructions, that is for 21 U.S.C. Section 841(a)(1), it says,

17   "It's a federal crime for anyone to possess a controlled

18   substance with the intent to distribute it.  The substance, in

19   this case, Oxycodone, is a controlled substance.  The defendant

20   can be found guilty of this crime only if the following facts

21   are proved beyond a reasonable doubt.

22         "One, the defendant knowingly possessed the substance,

23   the defendant intended to distribute the substance, and three,

24   the weight of the substance defendant possessed was more than

25   whatever the threshold amount is."

1           And then it says, "Two, intended to distribute is to

2    plan to deliver possession of a controlled substance to someone

3    else, even if nothing of value is exchanged."

4           Then it goes on to say, "The defendant has been charged

5    with distributing or possessing and intending to distribute at

6    least the threshold amount of the substance but you may find

7    the defendant guilty of the crime even if the amount of the

8    controlled substance for which he should be held responsible is

9    less than the threshold.

10          "So, if you find that -- if you find the defendant

11   guilty, you must also unanimously agree on the weight of the

12   substance and the defendant possessed it and specify the amount

13   in the verdict form."

14          That's part of the instruction.  I think it's missing a

15   bracket.

16          In any event, you want me to list the three elements

17   and the description or the definition of intent to distribute?

18          MR. QUINON:  Yes, sir.

19          THE COURT:  What's the government's position on that?

20          MR. MCLAUGHLIN:  This is the problem, Your Honor.  He

21   is not charged with a substantive offense.  If you listen to

22   the elements, it's the defendant possessed with intention --

23   the defendant did this, the defendant did this.  That's not how

24   conspiracy law works.

25          The elements of an 846 is that two or more people, it

1    doesn't have to be the defendant, have to agree in some way to

2    engage in Oxy trafficking.  All the defendant has to do is know

3    about the plan and willfully join in it.

4         So if you actually lay out the 841 elements that the

5    defendant has to possess, has to distribute, it's confusing the

6    issue and, in fact, there is no evidence that the defendant

7    possessed and distributed narcotics, it was all done by other

8    co-conspirators.  All the government has to prove in Count 1 is

9    that he knew of the conspiracy and he willfully joined in it on

10   one occasion.

11        So, to me, Your Honor, putting the elements of an 841

12   tries to conflate the two crimes.  If the Court wants to

13   include an instruction about what intent to distribute means or

14   what possession means, that's fine, but I think the 841

15   elements, as the Court read out where it says, the defendant

16   has to do this, the defendant has to do that, confuse the

17   issues in terms of an 846 conspiracy.

18        MR. QUINON:  The 841 is already mentioned in the

19   instruction that the government has submitted for the

20   conspiracy.  It says on the second sentence, "Title 21, United

21   States Code, 841(a)(1) makes it a crime for anyone to knowingly

22   distribute Oxycodone and/or normally possess Oxycodone with

23   intent to distribute it," but it doesn't instruct the jury, it

24   doesn't educate the jury as to what elements constitute that

25   crime.  It just mentions the crime.  And that's the point.

1          The point is that the jury has to find in this case in

2    order to find Mr. Crespo guilty that they were conspiring to

3    violate 841, which is knowingly distributing Oxycodone.  And so

4    you've got to define it.

5          I mean, it's not -- in all the cases that I have tried,

6    basically, you got to include it.  You have to have the

7    elements so the jury knows what the conspiracy is.

8          THE COURT:  Well, in most of those cases, though, there

9    is also the substantive charge, though.

10         It's not usually just the conspiracy alone.

11         MR. QUINON:  Normally you are right, Judge, normally

12   you have a conspiracy that is paired with a substantive, but

13   there are situations where, like we are presented with right

14   now, it's just a conspiracy and I have confronted that as well.

15         THE COURT:  So, I mean, again, the elements are, "The

16   defendant knowingly possessed the substance; two, the defendant

17   intended to distribute the substance," and the third element

18   deals with the weight, but in the instruction, the second

19   sentence says, "Title 21, United States Code, Section 841(a)

20   makes it a crime for anyone to knowingly distribute Oxycodone

21   and/or knowingly possess Oxycodone with intent to distribute

22   it."

23         Other than weight, what's missing?

24         The third element, my clerk has just explained me, the

25   updated instructions may not even include that last part, so,

1    the first -- so it would be just the two elements that he

2    knowingly possessed the substance and he intended to distribute

3    it, and it does indicate both in sentence two and in the first

4    element for the conspiracy, it notes the object was to

5    distribute Oxycodone and/or possess with the intent to

6    distribute it.

7            So, it seems to be covered.  Normally, I mean,

8    generally, I made the observation they normally are together

9    but in this case the instruction seems to cover it.

10           Any other issue?

11           MR. QUINON:  No, that's the objection that I have as to

12   this one, Judge.

13           THE COURT:  All right.  As I find that it talks about

14   possession and intent already in the instruction, I will

15   overrule the objection.

16           Any other objections regarding the instruction?

17           MR. QUINON:  No, that's the only objection I had as to

18   that instruction.

19           THE COURT:  Okay, the next instruction, proposed

20   instruction number 12, conspiracy to commit witness tampering.

21   I think the objection was similar regarding this, but I will

22   let you speak for yourself.

23           MR. QUINON:  On this one, it was a little bit

24   different, Judge.

25           I submitted instructions and I worked out of the -- as

1    I mentioned before, only two circuits have pattern instructions

2    that cover the offenses in this witness tampering, the third

3    and the seventh, and this definition that was used here of

4    corruptly persuade, which appears on page 17, witness

5    tampering, I think, you know, waters down the adjective

6    "corruptly."

7           THE COURT:  Just so I can narrow it down, for this

8    instruction, do you have any objections to any of the language

9    on the first page, which is page 16?

10          MR. QUINON:  I don't see that now, Judge, no.

11          THE COURT:  Well, you know, they say speak now or

12   forever hold your peace.

13          MR. QUINON:  I don't think so, Judge, no.

14          THE COURT:  Okay.  So the language on the second page

15   that you object to is what?

16          MR. QUINON:  The definition of corruptly persuade on

17   page 17, I submit to the Court that a definition that is more

18   complete, and we believe correct, is the one that I submitted

19   in my proposed instruction appears on page three of my proposed

20   instruction.

21          THE COURT:  From where did you get this language?

22          MR. QUINON:  It had to be either -- all the language

23   entirely came out of the Third and Seventh Circuit.

24          I didn't use any other language other than those two

25   pattern instructions that were issued by those two circuits.

1          THE COURT:  The government writes, "See third pattern,"

2     so which of you is using the Third Circuit's pattern

3     instruction, because the language is a little different?

4          MR. MCLAUGHLIN:  Mine would have come from the Third,

5     Your Honor, so I am guessing his comes from the Seventh.

6     That's what I'm guessing.

7          THE COURT:  Did you say yours came from the Third or

8     the Seventh?

9          MR. QUINON:  I used both, Judge, and I can't tell which

10    one I used for that specific language, but I used both the

11    Third and the Seventh, but I think counsel for the language

12    that we are discussing on the government, I think he cites --

13    yeah, you cited to the third.  I probably used the Seventh

14    then, Judge.

15         MR. MCLAUGHLIN:  You kind of combo both, it looks like,

16    because you used some of the Third language.  I think you do a

17    combo.

18         MR. QUINON:  Yours came straight out of the Third the

19    way it is?

20         MR. MCLAUGHLIN:  I don't have any heartburn about that.

21         MR. QUINON:  Judge, I don't think the government has

22    any objection if we use the one that I submitted.

23         THE COURT:  Is that correct?

24         MR. MCLAUGHLIN:  Yeah, I think he takes some -- he

25    takes pretty much all of mine, then adds some from the Seventh

1   and it seems as we are in the Eleventh Circuit and we are kind

2   of flying in unknown waters, it's better to take from two

3   circuits than one.

4           THE COURT:  So, this would be the last paragraph of

5   page three of the defense proposed instructions.  Is that

6   correct?

7           MR. MCLAUGHLIN:  That's correct, Judge.

8           THE COURT:  Do you object to also the misleading

9   conduct definition?

10          MR. QUINON:  My suggestion on misleading conduct was

11  just to, when it says, "Means, Number 1, knowingly making a

12  false statement," I put in a suggestion that it should be, "A

13  material false statement," in other words, add the word

14  "material."

15          THE COURT:  Your instruction does not have that word?

16          MR. QUINON:  I know.  I realize that.

17          THE COURT:  What is the government's position about

18  adding the word "materially"?

19          MR. MCLAUGHLIN:  Just so I am clear, Your Honor, is the

20  defense suggestion that part one of misleading conduct should

21  read, "Knowingly making a materially false statement"?

22          THE COURT:  That's what I heard.  Is that correct?

23          MR. QUINON:  Yes, it has to be a material statement, it

24  can't be just any statement.

25          MR. MCLAUGHLIN:  My proposal comes right from the

1    statute.  I think we are going to have to define materiality if

2    we use that.  That's fine, but I think that opens up that issue

3    in terms of we are going to have to add in what materiality is.

4         What I was going to say, Your Honor, in terms of my

5    proposed, the government is not going to rely on prongs 3 and

6    4.  There isn't any sample, specimen, map, photograph, boundary

7    mark, so for the ease of convenience, the government recommends

8    that those be stricken, and then there is essentially three

9    prongs of misleading conduct.

10        MR. QUINON:  So you are eliminating three and four?

11        MR. MCLAUGHLIN:  Because I quote verbatim, Your Honor,

12   from the statute, but the prongs 3 and 4 really don't apply.

13        THE COURT:  Aren't there five?

14        MR. MCLAUGHLIN:  Correct.  We would keep one, two, and

15   five.

16        THE COURT:  So, I guess, starting with eliminating

17   three and four under misleading conduct, is there an objection

18   to deleting that?

19        MR. QUINON:  No, Your Honor, no objection.  One more

20   thing about this.

21        THE COURT:  Hold on.  I have to do one thing at a time.

22        MR. QUINON:  Sorry.

23        THE COURT:  So, I will delete three and four, and what

24   was Number 5 will become Number 3.

25        Now, as to the first prong or the first part of

1    misleading conduct -- now, the second prong mentions

2    intentionally concealing a material fact.  So the "material"

3    word is used as far as it's used there.

4         MR. QUINON:  Right, it's used in the concealment but

5    it's not used in the full statement, and I think it should be

6    added there.

7         MR. MCLAUGHLIN:  The government's counterargument to

8    that is if Congress intended to use "material false statement,"

9    it would be there, Your Honor.

10        That said, Your Honor, if the Court wants to add

11   "materially false statement" to make move this along, that's

12   fine.  We would just recommend that the Court instruct the jury

13   on materiality, which is going to be in the bank fraud, wire

14   fraud instructions, and I will get the number for the Court

15   right now.

16        We are looking it up.

17        THE COURT:  Okay.  Well, I was looking for where -- we

18   are defining misleading conduct and I am trying to figure out

19   where that term is used in the instruction.

20        MR. MCLAUGHLIN:  Page 17, Your Honor.

21        THE COURT:  I don't have my computer to do a word

22   search, but we are defining a term but I don't see where the

23   term was used before.

24        MR. MCLAUGHLIN:  In the statute, Your Honor?

25        THE COURT:  Oh, never mind.  It's at the top.  All

1    right.  I will add the word "material" such that it will read,

2    "Misleading conduct means knowingly making a materially false

3    statement."

4         Well, giving this further thought, I don't find that

5    adding "materially" is warranted here.  The first one involves

6    making a false statement.  The second one is dealing with the

7    omission and the third involves a trick, scheme or device with

8    the intent to mislead.

9         The statute doesn't require the materiality portion but

10   there is still the requirement that there be the intent to

11   hinder, delay or prevent the communication, that misleading

12   statement.

13        So, I don't find it to be necessary.  So, I am not

14   going to add the "material."

15        MR. QUINON:  One more matter, the very last paragraph

16   on that same page, which we -- page four, I don't know where

17   the government got this.  The government is not required to

18   prove -- well, actually, that's not in the government.  That's

19   fine.

20        MR. MCLAUGHLIN:  That was a mistake.

21        MR. QUINON:  No problem.

22        You denied that, okay, that's fine.

23        THE COURT:  I am sorry, I didn't hear the last part of

24   what you said.

25        MR. QUINON:  I said we are ready to go.  I will just

1    preserve my objection to you not giving the material --

2    including the "material" word.  That's fine.

3            Thank you.

4            THE COURT:  Do you have the defense language for

5    corruptly persuading?

6            All right.  The next instruction, witness tampering,

7    proposed instruction 13, is there an objection?

8            MR. MCLAUGHLIN:  Your Honor, if the Court uses the same

9    changes we just discussed through 13, there is no objection at

10   all from the government.

11           THE COURT:  Okay.  So, the corruptly persuade would be

12   changed to use the defense language and for misleading conduct

13   we would delete three and four, and five would become three.

14           Is that correct?

15           MR. MCLAUGHLIN:  That's correct, Your Honor.

16           THE COURT:  Any objection to those changes?

17           MR. QUINON:  No, sir.

18           THE COURT:  Any objections from the defense to that

19   instruction with those changes?

20           MR. QUINON:  This is 13?

21           THE COURT:  Yes, the substantive witness tampering

22   instruction.

23           MR. QUINON:  One second here, I am reading my own notes

24   here.

25           No, the only request I will make is that, again, on

1    page 20 that it be added "material" but you already denied that

2    so I will preserve that objection presuming that you are going

3    to be consistent with your ruling, Your Honor.

4         THE COURT:  Yes, I will deny that request for this

5    instruction as well.

6         MR. QUINON:  So that was my only objection.

7         THE COURT:  Okay.  The next instruction, conspiracy to

8    obstruct justice, that's proposed instruction 14.

9         MR. QUINON:  Yeah, the only objection on that is not on

10   the first page, no objection as to the language on the first

11   page.

12        On the second page, I do object to that sentence at the

13   very top of the page that begins, "The existence of an

14   agreement may be proved by inferences of the conduct."  That

15   language is already covered in the instructions.

16        Basically, that's circumstantial evidence and that's

17   covered under pattern number four, which you intend to give and

18   to which we did not object.

19        THE COURT:  All right.  Is this standard language, that

20   sentence?

21        MR. MCLAUGHLIN:  It may -- I think I deleted it from

22   all the others and forgot to delete it from the final one, Your

23   Honor.  So the government has no heartburn deleting that one

24   sentence out.

25        THE COURT:  So I will delete that sentence.  "The

1   existence of an agreement may be proved by inferences from the

2   conduct of the alleged participants or from circumstantial

3   evidence of the scheme."  That will be deleted.

4           Any other objection to that instruction?

5           MR. QUINON:  No, Your Honor.

6           THE COURT:  Proposed instruction, 15, aiding and

7   abetting, is there an objection from the government?

8           MR. MCLAUGHLIN:  No objection, Your Honor.

9           THE COURT:  From the defense?

10          MR. QUINON:  No objection.

11          THE COURT:  The Pinkerton instruction, the government

12  is requesting this, there is an objection?

13          MR. QUINON:  Yes, Your Honor, there is an objection to

14  it.

15          MR. MCLAUGHLIN:  I will say, we can withdraw that, Your

16  Honor.

17          THE COURT:  All right.  That will be removed.

18          Instruction 17, note-taking, is there an objection from

19  the government?

20          MR. MCLAUGHLIN:  No objection.

21          THE COURT:  From the defense?

22          MR. QUINON:  No, Your Honor.

23          THE COURT:  Caution, single defendant, multiple counts,

24  that's Number 18.

25          Is there an objection from the government?

1          MR. QUINON:  No objection, Your Honor.

2          THE COURT:  None from the defense.

3          Proposed instruction, Number 19, duty to deliberate.

4          Is there an objection from the government?

5          MR. MCLAUGHLIN:  No objection.

6          THE COURT:  From the defense?

7          MR. QUINON:  No objection.

8          THE COURT:  And then proposed instruction 20, verdict.

9          Is there an objection from the government?

10         MR. MCLAUGHLIN:  No objection.

11         THE COURT:  From the defense?

12         MR. QUINON:  No objection, Your Honor.

13         THE COURT:  Are there any additional -- well, that

14  takes care of the government's proposed instructions.

15         Are there additional instructions being requested by

16  the defense?

17         MR. QUINON:  Yes, Judge.

18         I had submitted one before as our proposed instruction

19  Number 4, which is good faith defense.

20         THE COURT:  Aren't those usually in fraud cases?

21         MR. QUINON:  We see it in those cases as well, yes.

22         THE COURT:  What's the government's position regarding

23  the good faith defense instruction?

24         MR. MCLAUGHLIN:  The government is mindful that we can

25  get in trouble when we start fighting with the defense about

1   their proposed instructions, but I just don't see where the

2   facts justify a good faith instruction given the charged crimes

3   here.  There isn't a good faith defense to narcotics

4   conspiracy.  There isn't a good faith defense to witness

5   tampering and obstruction.

6          As the Court noted, those are really defenses that come

7   up in tax cases and fraud cases so.

8          I know defense counsel submitted, I think it was last

9   night, an instruction that is somewhat similar to this

10  regarding policy violations and things of that nature and I

11  read that and didn't have much of an issue with it, but in

12  terms of good faith, I am not certain I just don't see where

13  that type of the defense is justified by either the defense's

14  theory of the case or the facts of this case.

15         THE COURT:  Okay.  So, do you want to provide some

16  explanation?

17         MR. QUINON:  Yeah.

18         Our theory is that he did not act with intent to

19  obstruct and that he acted essentially with intent to assist or

20  help this individual, Diaz, but not with the intent to obstruct

21  in this particular case, and that he, Diaz, was his religious

22  guide and that in that sense, there was a relationship but

23  there was no intent to obstruct, and, therefore, acting in good

24  faith would be a defense.

25         The jury would have to find, that, in fact, he had no

1   intent to obstruct and that he acted in good faith when he

2   interacted with Mr. Diaz.

3          Again, if there is any issue at all, as I understand

4   the law, then, you know, if there is any factual basis, even

5   though -- even if the Court may not agree with it, it should be

6   given in the case.

7          In other words, because the instruction even says that

8   even if the defendant perception may not be correct and you are

9   acting in good faith, it's still a defense.

10         THE COURT:  Even the cases you cite don't deal with

11   this kind of case.

12         One of the cases you cite it mentions a tax law

13   violation, the standard, and looking at S17, the two good faith

14   examples in the patterns are -- suggest cases that require an

15   intent to defraud or a good faith reliance upon advice of

16   counsel.

17         This language you use about a defendant -- well, first

18   of all, where does this instruction come from?

19         MR. QUINON:  It comes from Richard Klugh, who is an

20   appellate lawyer.  That's where it comes from, this one.  I

21   asked him to put it together for me and he did.

22         THE COURT:  This sentence, "The defendant acts in good

23   faith where he or she believes that the conduct or statements

24   at issue fall within the scope of the permissible exercise of

25   their discretion," what does that mean, "the permissible

1    exercise of discretion"?

2         MR. QUINON:  That if he acts within what he believes to

3    be the reasonable exercise of his discretion, in other words,

4    with the scope of what is given to him of his discretion, and

5    it then continues, "Even if that exercise in discretion is

6    mistaken, it still can be good faith," that's what the

7    instruction says.

8         THE COURT:  But what evidence is there that he was

9    operating within the permissible scope of his discretion?

10        I mean, even the defense witness said that there is

11   certain activity that wouldn't be permissible.

12        MR. QUINON:  Well, that's for the jury to find out

13   whether or not.  I mean, that's the jury's finding in this

14   case, in other words, whether or not he was traveling under

15   what he believed to be the exercise of his discretion, the fact

16   that that witness who testified said no to his, that's a whole

17   different matter.  That's the state of mind of that witness

18   that testified, not of the defendant in this case and so --

19        THE COURT:  All right.  I don't find any evidentiary

20   basis to give this instruction so I will not give it.

21        MR. QUINON:  All right.

22        Lastly, Judge, I submitted an instruction last night,

23   which I sent copy to your staff by way of Word as well, which

24   is Docket Entry 266.

25        THE COURT:  This relevance of civil or employment rules

1   and regulations?

2        MR. QUINON:  Yes, we have had evidence, including today

3   about, you know, regulations and things of that sort that are

4   really administrative matters, civil matters and so I think the

5   jury needs to be instructed and you, yourself, earlier in the

6   trial said that at the end, we were going to address this issue

7   as to an instruction.

8        THE COURT:  What's the government's position?

9        MR. QUINON:  I think we would not have a problem with

10  it but I would recommend we add a couple of words to it.

11       So, when Crespo is ignoring standards and violating

12  policies, it's clearly evidence of his subjective intent to

13  commit the charged crimes.  That's the government's theory.

14       The way the instruction reads -- and the jury should be

15  able to consider that.  I agree with the defense that, standing

16  alone, these are not crimes and the jury should be instructed

17  to that regard.

18       So I would amend the instruction to say in the second

19  sentence, "I caution you that a violation of these civil

20  statutes, rules, regulations, ethical standards or standards of

21  care" --

22       THE COURT:  I'm sorry, I lost you in there.

23       MR. MCLAUGHLIN:  It's the second sentence which reads,

24  "I caution you that a violation of these civil statutes, rules,

25  regulations, ethical standards or standards of care, standing

1    alone, are not a crime -- standing alone is not a crime."

2         THE COURT:  Okay.

3         MR. QUINON:  Standing -- what was it?

4         MR. MCLAUGHLIN:  I'm sorry.  "Standing alone is not a

5    crime."

6         THE COURT:  Let's take the sentences one at a time.  In

7    the first sentence you write, "During this trial you have heard

8    testimony regarding governmental or employment rules and

9    regulations" -- is "and opinions" necessary?

10        MR. QUINON:  Not really, Judge.

11        THE COURT:  Okay.  So I will delete those two words.

12   The first sentence would be, "During this trial you have heard

13   testimony regarding governmental or employment rules and

14   regulations regarding ethical standards and standards of action

15   for certain employees of government agencies."

16        MR. MCLAUGHLIN:  Your Honor, if I may.

17        THE COURT:  Yes.

18        MR. MCLAUGHLIN:  I would have it read, "You have heard

19   testimony regarding governmental or employment policies and

20   procedures."  I think that's an easier, cleaner way to say it

21   regarding ethical standards and standards of conduct for

22   certain government employees of government agencies.

23        THE COURT:  Do you have a problem with "policies and

24   procedures"?

25        MR. QUINON:  I would add "regulations, policies and

1    procedures."

2         THE COURT:  Did the witnesses mention the word

3    "regulation" or "regulations"?

4         MR. MCLAUGHLIN:  No, Your Honor.

5         MR. QUINON:  I don't recall that.

6         THE COURT:  Okay.  Then we will go with policies and

7    procedures.

8         Let me read this sentence.  "During the trial, you have

9    heard testimony regarding governmental or employment policies

10   and procedures regarding ethical standards and standards of

11   action for certain employees of governmental agencies."

12        Is the government fine with that sentence?

13        MR. MCLAUGHLIN:  No objection, Your Honor.

14        THE COURT:  And the defense?

15        MR. QUINON:  No objection, Judge.

16        THE COURT:  All right.  The next sentence, the

17   government suggested that I modify the second sentence -- well,

18   we don't make reference to civil statutes earlier so I am

19   assuming the government is requesting that I say, "I caution

20   you that a violation of these policies and procedures" --

21        MR. MCLAUGHLIN:  That's correct, Your Honor.

22        THE COURT:  -- "is not a crime."

23        MR. MCLAUGHLIN:  Standing alone is not a crime.

24        THE COURT:  What's your position about that for the

25   defense?

        1          MR. QUINON:  May I ask the government, is that -- and

        2    then you are okay with the rest of the instruction?

        3          THE COURT:  Well, let's deal with this sentence.

        4          Do you have a problem with adding "standing alone"?

        5          MR. QUINON:  It depends.  If he says it's okay with the

        6    rest.

        7          MR. MCLAUGHLIN:  I think we need to take it sentence by

        8    sentence.

        9          MR. QUINON:  Then, yes, I object.

       10          THE COURT:  Well, I think "standing alone" is fine

       11    under the circumstances.  That's an accurate statement, so I

       12    will add those two words as well.

       13          Now the next sentence, "This is not a civil case," any

       14    objection to that?

       15          MR. MCLAUGHLIN:  No objection from the government.

       16          THE COURT:  Any objection from the -- I am assuming no

       17    objection from the defense from that statement?

       18          MR. QUINON:  No, Your Honor.

       19          THE COURT:  The next sentence, "The defendant is not on

       20    trial for civil violations or even administrative violations."

       21          Does the government object to that sentence?

       22          MR. MCLAUGHLIN:  I think I would make it cleaner, Your

       23    Honor, to say, "The defendant is not on trial for violating

       24    policies and procedures."

       25          THE COURT:  Is there an objection to that?

1          MR. QUINON:  No objection.

2          THE COURT:  Okay.  So it will read, "The defendant is

3    not on trial for violating policies and procedures."

4          Therefore, is the last sentence necessary, which is,

5    "The defendant cannot be convicted of a crime merely for

6    breaching civil statutes, rules, regulations, conduct,

7    standards and standards of care applicable to this conduct"?

8          MR. MCLAUGHLIN:  If the Court wants to strike it, the

9    government has no objection to that.  I don't think it's

10   necessary, Your Honor.

11         MR. QUINON:  I would rather just leave it in there just

12   to, you know, bring home the point that that's not -- you know,

13   once and for all that that's not really what's at stake in this

14   case in light of the fact that we have had this problem

15   reappear, not only once, but a number of times during the

16   trial, including Your Honor having instructed them at one point

17   early on.

18         THE COURT:  I am going to strike the last sentence.  I

19   think it's redundant.  I already say that a violation of

20   policies and procedures is not a crime, not standing alone and,

21   that this isn't a civil case and that he is not on trial for

22   violating these policies and procedures.

23         So I think that's enough.

24         Now, where do you want me to put this?

25         MR. QUINON:  I guess after the offenses instructions.

1          THE COURT:  Okay.  I will put it after the instruction

2    on conspiracy to --

3          MR. QUINON:  Count 10, right after Count 10.

4          THE COURT:  -- obstruct justice.

5          Okay.  Well -- or it should follow aiding and abetting?

6          MR. QUINON:  That's fine also.  If you feel that's

7    better, I am okay with that.

8          THE COURT:  I will put it after aiding and abetting.

9          MR. QUINON:  Okay.

10          THE COURT:  The verdict form seems to be

11    straightforward.

12          Any objection from the government?

13          MR. MCLAUGHLIN:  No objection.

14          THE COURT:  From the defense?

15          MR. QUINON:  No, Your Honor.

16          THE COURT:  All right.  We will get those final copies

17    prepared and printed for you.

18          Again -- well, we will have that for you within a few

19    minutes.

20          How soon are you ready to give your closing?

21          MR. MCLAUGHLIN:  If I can have, once we get the

22    instructions, Your Honor, ten minutes to review it and use the

23    restroom, I am ready to go.

24          THE COURT:  All right.  So why don't you plan on coming

25    back in 15 minutes.  The instructions will be on your desk by

1    then and then we will get started.

2            So, how much time, giving it some more thought, how

3    much time do you really need?

4            MR. MCLAUGHLIN:  Ninety minutes, Your Honor, 60 and 30

5    if that's okay.

6            THE COURT:  You are fine with 90 minutes?

7            MR. QUINON:  I will take 90 if he takes 90.

8            THE COURT:  I will give each side 90 minutes.

9            What time alerts would you like?

10           MR. MCLAUGHLIN:  At the hour mark.  I guess whatever I

11   have left over, I can use for rebuttal.

12           THE COURT:  So just give you an alert at the hour mark?

13           MR. MCLAUGHLIN:  Yes.

14           THE COURT:  Do you want time alerts, Mr. Quinon?

15           MR. QUINON:  Yeah, 15 minutes.

16           THE COURT:  All right.  I will read the instructions up

17   through the verdict instruction and then I will give that after

18   you both close.

19           All right.  Let's take a 15-minute recess.

20           COURT SECURITY OFFICER:  All rise.

21           (Recess taken.)

22           THE COURT:  All right.  We are back on the record.  I

23   note the presence of the attorneys as well as the defendant.

24           Have you had a chance to review the instructions,

25   government?

1          MR. MCLAUGHLIN:  We have, Your Honor.

2          THE COURT:  Everything is fine?

3          MR. MCLAUGHLIN:  Everything is fine.

4          THE COURT:  Mr. Quinon, everything fine with the

5   instructions?

6          MR. QUINON:  Yes, except for the objections I

7   previously made and I also reviewed again this addition that

8   the government suggested about standing alone language on the

9   objection that I submitted last night, my Docket Entry 266.

10         I am not sure that I am at all convinced or settled

11  with what standing alone means.

12         It's a kind of vague language on that instruction, the

13  one that you put after aiding and abetting.

14         I saw it now and it just kind of hit me, what does that

15  mean?  So I do object to it.

16         THE COURT:  Okay.  Your objection is noted.  We will

17  bring them in.

18         As I told you, I will read the instructions and then we

19  will proceed with the government's closings.

20         COURT SECURITY OFFICER:  All rise for the jury.

21         (The jury entered the courtroom at 3:15 p.m.)

22         THE COURT:  All right.  Everyone, please be seated.

23         All right.  Welcome back, ladies and gentlemen.  We are

24  passing out a copy of the Court's instructions on the law.

25         Each of you should have your own copy.

1          And I apologize for the delay, but sometimes it takes a

2     while to not only finalize the instructions on the law, but

3     also to make all these copies for you, but we are now prepared

4     to proceed.

5          I will read the instructions except for the very last

6     instruction to you.

7          Then you will have the closing arguments from the

8     attorneys and then I will give you the final instruction.

9          You have a copy so that you can follow along with me as

10    I read the instructions.  Those are your copies so if you

11    choose to make notes on your copy, you are welcome to do that

12    but I will give you my original copy for your use during your

13    deliberations.

14         So those instructions are as follows.

15         Members of the jury -- oh, there are also contractions

16    in here.  I will usually just give the words so instead of

17    "it's," I will say "it is."

18         Members of the jury:

19         It is my duty to instruct you on the rules of law that

20    you must use in deciding this case.  After I have completed

21    these instructions, you will go to the jury room and begin your

22    discussions-what we call deliberations -- or what we call your

23    deliberations.

24         You must decide whether the government has proved the

25    specific facts necessary to find the defendant guilty beyond a

1   reasonable doubt.  Your decision must be based only on the

2   evidence presented during the trial.  You must not be

3   influenced in any way by either sympathy for or prejudice

4   against a defendant or the government.

5        You must follow the law as I explain it-even if you do

6   not agree with the law-and you must follow all of my

7   instructions as a whole.  You must not single out or disregard

8   any of the Court's instructions on the law.

9        The indictment or formal charge against a defendant is

10  not evidence of guilt.  The law presumes every defendant is

11  innocent.  The defendant does not have to prove his innocence

12  or produce any evidence at all.  The defendant does not have to

13  testify, and if the defendant chose not to testify, you cannot

14  consider that in any way while making your decision.  The

15  government must prove the guilt of the defendant beyond a

16  reasonable doubt.  If it fails to do so, you must find the

17  defendant not guilty.

18       The government's burden of proof is heavy, but it does

19  not have to prove a defendant's guilt beyond all upon doubt.

20  The government's proof only has to exclude any reasonable doubt

21  concerning the defendant's guilt.

22       A reasonable doubt is a real doubt, based on your

23  reason and common sense after you have carefully and

24  impartially considered all the evidence in the case.

25       Proof beyond a reasonable doubt is proof so convincing

1    that you would be willing to rely and act on it without

2    hesitation in the most important of your own affairs.  If you

3    are convinced that the defendant has been proved guilty beyond

4    a reasonable doubt, say so.  If you are not convinced, say so.

5          As I said before, you must consider only the evidence

6    that I have admitted in the case.  Evidence includes the

7    testimony of witnesses and the exhibits admitted.  But,

8    anything the lawyers say is not evidence and is not binding on

9    you.  You should not assume from anything I have said that I

10   have any opinion about any factual issue in this case.  Except

11   for my instructions to you on the law, you should disregard

12   anything I may have said during the trial in arriving at your

13   own decision about the facts.

14         Your own recollection and interpretation of the

15   evidence is what matters.  In considering the evidence you may

16   use reasoning and common sense to make deductions and reach

17   conclusions.  You should not be concerned about whether the

18   evidence is direct or circumstantial.

19         "Direct evidence" is the testimony of a person who

20   asserts that he or she has actual knowledge of a fact, such as

21   an eyewitness.

22         "Circumstantial evidence" is proof of a chain of facts

23   and circumstances -- excuse me.

24         "Circumstantial evidence is proof of a chain of facts

25   and circumstances that tend to prove or disprove a fact.  There

1   is no legal difference in the weight you may give to either

2   direct or circumstantial evidence.

3           When I say you must consider all the evidence, I do not

4   mean that you must accept all the evidence as true or accurate.

5   You should decide whether you believe what each witness had to

6   say, and how important that testimony was.  In making that

7   decision, you may believe or disbelieve any witness, in whole

8   or in part.  The number of witnesses testifying concerning a

9   particular point does not necessarily matter.

10          To decide whether you believe any witness, I suggest

11  that you ask yourself a few questions:

12          Did the witness impress you as one who was telling the

13  truth?

14          Did the witness have any particular reason not to tell

15  the truth?

16          Did the witness have a personal interest in the outcome

17  of the case?

18          Did the witness seem to have a good memory?

19          Did the witness have the opportunity and ability to

20  accurately observe the things he or she testified about?

21          Did the witness appear to understand the questions

22  clearly and answer them directly?

23          Did the witness's testimony differ from other testimony

24  or other evidence?

25          You should also ask yourself whether there was evidence

1   that a witness testified falsely about an important fact.  And

2   ask whether there was evidence that at some other time a

3   witness said or did something, or did not say or do something,

4   that was different from the testimony the witness gave during

5   this trial.

6        To decide whether you believe a witness, you may

7   consider the fact that the witness has been convicted of a

8   felony or a crime involving dishonesty or a false statement.

9        But keep in mind that a simple mistake does not mean a

10  witness was not telling the truth as he or she remembers it.

11  People naturally tend to forget some things or remember them

12  inaccurately.  So, if a witness misstated something, you must

13  decide whether it was because of an innocent lapse in memory or

14  an intentional deception.  The significance of your decision

15  may depend on whether the misstatement is about an important

16  fact or about an unimportant detail.

17       You must consider some witness's testimony with more

18  caution than others.

19       For example, a witness may testify about events that

20  occurred during a time when the witness was using addictive

21  drugs, and so the witness may have an impaired memory of those

22  events.

23       Also, in this case, the government has made plea and

24  cooperation agreements with some witnesses in exchange for his

25  and/or her testimony.  Such plea bargaining, as it's called,

1    provides for the possibility of a lesser sentence than the

2    witness would normally face.  Plea bargaining is lawful and

3    proper, and the rules of this court expressly provide for it.

4          But a witness who hopes to gain more favorable

5    treatment in his and her own case may have a reason to make a

6    false statement in order to strike a good bargain with the

7    government.  So while a witness of that kind may be entirely

8    truthful when testifying, you should consider that testimony

9    with more caution than the testimony of other witnesses.  And

10   the fact that a witness has pleaded guilty to an offense is not

11   evidence of guilt of any other person.

12         When scientific, technical or other specialized

13   knowledge might be helpful, a person who has special training

14   or experience in that field is allowed to state an opinion

15   about the matter.

16         But that does not mean you must accept the witness's

17   opinion.  As with any other witness's testimony, you must

18   decide for yourself whether to rely upon the opinion.

19         You will see that the indictment charges that a crime

20   was committed on or about a certain date.  The government does

21   not have to prove that the crime occurred on an exact date.

22   The government only has to prove beyond a reasonable doubt that

23   the crime was committed on a date reasonably close to the date

24   alleged.

25         The word "knowingly" means that an act was done

1    voluntarily and intentionally and not because of a mistake or

2    by accident.  The word "willfully" means that the act was

3    committed voluntarily and purposely, with the intent to do

4    something that the law forbids; that is, with the bad purpose

5    to disobey or disregard the law.  While a person must have

6    acted with the intent to do something the law forbids before

7    you can find that the person acted willfully, the person need

8    not be aware of the specific law or rule that his or her

9    conduct may be violating.

10          Where a statute specifies multiple alternative ways in

11   which an offense may be committed, the indictment may allege

12   the multiple ways in the conjunctive; that is, by using the

13   word "and."

14          If only one of the alternatives is proved beyond a

15   reasonable doubt, that is sufficient for conviction, so long as

16   you agree unanimously as to that alternative.

17          The indictment charges six separate crimes called

18   counts, against the defendant.  Each count has a number.  You

19   will be given a copy of the indictment to refer to during your

20   deliberations.

21          Count 1 charges that the defendant knowingly and

22   willfully conspired to distribute and possess with the intent

23   to distribute Oxycodone, a Schedule II controlled substance.

24          Count 5 charges that the defendant knowingly and

25   willfully conspired to commit witness tampering.

1          Count 7, 8, and 9 each charge that the defendant

2    committed a substantive offense.  Count 7, 8, and 9 charge that

3    the defendant corruptly and knowingly committed witness

4    tampering.  I will explain the law governing these substantive

5    offenses in a moment.

6          Count 10 charges that the defendant knowingly and

7    willfully conspired to obstruct justice.

8          But first note that the defendant is not charged in

9    Counts 1, 5, and 10 with committing a substantive offense-the

10    defendant is charged with conspiring to commit those offenses.

11    I will also give you specific instructions on conspiracy.

12          Count 1 of the indictment charges the defendant with a

13    violation of Title 21, United States Code, Section 846.  Title

14    21, United States Code, Section 841(a)(1) makes it a crime for

15    anyone to knowingly distribute Oxycodone and/or knowingly

16    possess Oxycodone with intent to distribute it.  It is a

17    separate federal crime for anyone to conspire to knowingly

18    distribute Oxycodone and/or knowingly possess with intent to

19    distribute Oxycodone.

20          A "conspiracy" is an agreement by two or more persons

21    to commit an unlawful act.  In other words, it is a kind of

22    partnership for criminal purposes.  Every member of the

23    conspiracy becomes the agent or partner of every other member.

24    The government does not have to prove that all of the people

25    named in the indictment were members of the plan, or that those

1    who were members made any kind of formal agreement.  The heart

2    of a conspiracy is the making of the unlawful plan itself, so

3    the government does not have to prove that the conspirators

4    succeeded in it carrying out the plan.

5         The defendant can be found guilty of this crime only if

6    the following facts are proved beyond a reasonable doubt:

7         One, two or more people in some way agreed to try to

8    accomplish a shared and unlawful plan, the object of which was

9    to distribute Oxycodone and/or possess with the intent to

10   distribute Oxycodone; and, two, the defendant knew the unlawful

11   purpose of the plan and willfully joined in it.

12        A person may be a conspirator even without knowing all

13   the details of the unlawful plan, or the names and identities

14   of all the other alleged conspirators.  If the defendant played

15   only a minor part in the plan, but had a general understanding

16   of the unlawful purpose of the plan-and willfully joined in the

17   plan on at least one occasion-that is sufficient for you to

18   find the defendant guilty.

19        But simply being present at the scene of an event or

20   merely associating with certain people and discussing common

21   goals and interests does not establish proof of a conspiracy.

22   Also, a person who does not know about a conspiracy but happens

23   to act in a way that advances some purpose of one does not

24   automatically become a conspirator.

25        In Count 5, the defendant is charged with violating

1   Title 18, United States Code, Sections 1512(b)(3) and (k),

2   which makes it a federal crime for anyone to conspire to

3   knowingly use corrupt persuasion, or engage in misleading

4   conduct toward another person, with the intent to hinder,

5   delay, or prevent the communication to a law enforcement

6   officer of the United States of information.  It's missing a

7   period there.

8           The defendant can be found guilty of this crime only if

9   all of the following acts are proved beyond a reasonable doubt:

10          One, two or more people in some way agreed to try to

11  accomplish a shared and unlawful plan to knowingly use corrupt

12  persuasion or engage in misleading conduct toward another

13  person, with the intent to hinder, delay or prevent the

14  communication to a law enforcement officer of the United States

15  of information relating to the commission or possible

16  commission of a federal offense; and, two, the defendant knew

17  the unlawful purpose of the plan and willfully joined in it.

18          A "conspiracy" is an agreement by two or more persons

19  to commit an unlawful act.  In other words, it is a kind of

20  partnership for criminal purposes.  Every member of the

21  conspiracy becomes the agent or partner of every other member.

22  The government does not have to prove that all of the people

23  named in the indictment were members of the plan, or that those

24  who were members made any kind of formal agreement.  The heart

25  of a conspiracy is the making of the unlawful plan itself, so

1    the government does not have to prove that the conspirators

2    succeeded in carrying out the plan.

3         A person may be a conspirator even without knowing all

4    the details of the unlawful plan, or the names and identities

5    of all the other alleged conspirators.

6         If the defendant played only a minor part in the plan

7    but had a general understanding of the unlawful purpose of the

8    plan-and willfully joined in the plan on at least one

9    occasion-that is sufficient for you to find the defendant

10   guilty.  But simply being present at the scene of an event or

11   merely associated with certain people and discussing common

12   goals and interests does not establish proof of a conspiracy.

13   Also, a person who does not know about a conspiracy but happens

14   to act in a way that advances some purpose of one, does not

15   automatically become a conspirator.

16        To "corruptly persuade" means to act with corrupt

17   intention and to use wrongful means to persuade another person

18   to break the law and, thus, to corrupt another person into

19   violating a known legal duty in relation to a federal criminal

20   offense, to accomplish an unlawful end or unlawful result, or

21   to accomplish some otherwise lawful end or lawful result in an

22   unlawful manner.

23        Corruptly persuade does not include conduct which would

24   be misleading conduct but for a lack of a state of mind.

25        "Misleading conduct" means:

1        One, knowingly making a false statement;

2        Two, intentionally omitting information from a

3   statement and, thereby, causing a portion of such statement to

4   be misleading, or intentionally concealing a merely fact, and

5   thereby creating a false impression by such statement;

6        Or three, knowingly using a trick, scheme or device

7   with intent to mislead.

8        "Another person" must be a third party, not a

9   conspirator to that same crime.

10        "Law enforcement officer of the United States" means an

11   officer or employee of the federal government, or a person

12   authorized to act for or on behalf of the federal government or

13   serving the federal government as an adviser or consultant

14   authorized under law to engage in or supervise the prevention,

15   detection, investigation, or prosecution of an offense.

16        In Counts 7, 8 and 9, the defendant is charged with

17   violating Title 18, United States Code, Section 1512(b)(3),

18   which makes it a federal crime for anyone to knowingly use

19   corrupt persuasion, or engage in misleading conduct toward

20   another person, with the intent to hinder, delay, or prevent

21   the communication to a law enforcement officer of the United

22   States of information.

23        The defendant can be found guilty of this crime only if

24   all the following facts are proved beyond a reasonable doubt:

25        One, the defendant knowingly corruptly persuaded

1    another person, or knowingly engaged in misleading conduct

2    toward another person;

3         Two, the defendant acted with intent to hinder, delay,

4    or prevent the communication of information to a law

5    enforcement officer of the United States;

6         Three, there was a reasonable likelihood that the

7    information would have been provided to a law enforcement

8    officer of the United States; and

9         Four, the information related to the commission or

10   possible commission of a federal offense.

11        To "corruptly persuade" means to act with corrupt

12   intention and to use wrongful means to persuade another person

13   to break the law and, thus, to corrupt another person into

14   violating a known legal duty in relation to a federal criminal

15   offense, to accomplish an unlawful end or unlawful result, or

16   to accomplish some otherwise lawful end or lawful result in an

17   unlawful manner.  Corruptly persuade does not include conduct

18   which would be misleading conduct but for a lack of a state of

19   mind.

20        "Misleading conduct" means:

21        One, knowingly making a false statement;

22        Two, intentionally omitting information from a

23   statement and, thereby, causing a portion of such statement to

24   be misleading, or intentionally concealing a material fact, and

25   thereby creating a false impression by such statement;

1          Or three, knowingly using a trick, scheme, or device

2     with intent to mislead.

3          "Another person" must be a third party, not a

4     conspirator to that same crime.

5          "Law enforcement officer of the United States" means an

6     officer or employee of the federal government, or a person

7     authorized to act for or on behalf of the federal government or

8     serving the federal government as an advisor or consultant,

9     authorized under law to engage in or supervise the prevention,

10    detection, investigation or prosecution of an offense.

11         In Count 10, the defendant is charged with violating

12    Title 18, United States Code, Sections 1512(c)(2) and (k),

13    which makes it a federal crime for anyone to conspire to

14    knowingly and corruptly obstruct, influence, or impede an

15    official proceeding.

16         The defendant can be found guilty of this crime only if

17    all the following facts are proved beyond a reasonable doubt:

18         One, two or more people in some way agreed to try to

19    accomplish a shared and unlawful plan to corruptly otherwise

20    obstruct, influence, or impede an official proceeding; and,

21    two, the defendant knew the unlawful purpose of the plan and

22    willfully joined in it.

23         A "conspiracy" is an agreement by two or more persons

24    to admit an unlawful act.  In other words, it is a kind of

25    partnership for criminal purposes.  Every member of the

1   conspiracy becomes the agent or partner of every other member.

2   The government does not have to prove that all of the people

3   named in the indictment were members of the plan, or that those

4   who were members made any kind of formal agreement.  The heart

5   of a conspiracy is the making of the unlawful plan itself, so

6   the government does not have to prove that the conspirators

7   succeeded in carrying out the plan.

8        A person may be a conspirator even without knowing all

9   the details of the unlawful plan or the names and identities of

10  all the other alleged conspirators.  If the defendant played

11  only a minor part in the plan but had a general understanding

12  of the unlawful purpose of the plan-and willfully joined in the

13  plan on at least one occasion-that is sufficient for you to

14  find the defendant guilty.  But simply being present at the

15  scene of an event or merely associating with certain people and

16  discussing common goals and interests does not establish proof

17  of a conspiracy.  Also, a person who does not know about a

18  conspiracy but happens to act in a way that advances some

19  purpose of one does not automatically become a conspirator.

20       A person acts corruptly if he or she acts with an

21  improper purpose and engages in conduct knowingly and

22  dishonestly with the specific intent to subvert, impede, or

23  obstruct an official proceeding.

24       The term "official proceeding" means a proceeding

25  before a federal grand jury.  The government is not required to

1    prove that a federal grand jury proceeding was pending or about

2    to be instituted at the time of the offense.

3          However, the government must prove that the defendant

4    at least foresaw or knew of a federal grand jury proceeding,

5    and that his actions were likely to affect it.

6          It is possible to prove the defendant guilty of a crime

7    even without evidence that the defendant personally performed

8    every act charged.

9          Ordinarily -- I'm sorry.

10          Ordinarily, any act a person can do may be done by

11    directing another person, or agent, or it may be done by acting

12    with or under the direction of others.

13          A defendant aids and abets a person if the defendant

14    intentionally joins with the person to commit a crime.

15          A defendant is criminally responsible for the acts of

16    another person if the defendant aids and abets the other

17    person.  A defendant is also responsible if the defendant

18    willfully directs or authorizes the acts of an agent, employee,

19    or other associate.

20          But finding that a defendant is criminally responsible

21    for the acts of another person requires proof that the

22    defendant intentionally associated with or participated in the

23    crime-not just proof that the defendant was simply present at

24    the scene of a crime or knew about it.

25          In other words, you must find beyond a reasonable doubt

1   that the defendant was a willful participant and not merely a

2   knowing spectator.

3           During this trial, you have heard testimony regarding

4   government or employment policies and procedures regarding

5   ethical standards and standards of action for certain employees

6   of government agencies.  I caution you that a violation of

7   these policies and procedures, standing alone, is not a crime.

8   This is not a civil case.  The defendant is not on trial for

9   violating policies and procedures.

10          You have been permitted to take notes during the trial.

11  Most of you-perhaps all of you-have taken advantage of that

12  opportunity.

13          You must use your notes only as a memory aid during

14  deliberations.  You must not give your notes priority over your

15  independent recollection of the evidence, and you must not

16  allow yourself to be unduly influenced by the notes of other

17  jurors.

18          I emphasize that notes are not entitled to any greater

19  weight than your memories or impressions about the testimony.

20          Each count of the indictment charges a separate crime.

21  You must consider each crime and the evidence relating to it

22  separately.

23          I caution you that the defendant is on trial only for

24  the specific crimes charged in the indictment.  You are here to

25  determine from the evidence in this case whether the defendant

1    is guilty or not guilty of those specific crimes.

2            You must also never consider punishment in any way to

3    decide whether the defendant is guilty.  If you find the

4    defendant guilty, the punishment is for the judge alone to

5    decide later.

6            Your verdict, whether guilty or not guilty, must be

7    unanimous-in other words, you must all agree.  Your

8    deliberations are secret, and you will never have to explain

9    your verdict to anyone.  Each of you must decide the case for

10   yourself, but only after fully considering the evidence with

11   the other jurors.  So you must discuss the case with one

12   another and try to reach an agreement.  While you are

13   discussing the case, do not hesitate to reexamine your own

14   opinion and change your mind if you become convinced that you

15   were wrong.  But do not give up your honest beliefs just

16   because others think differently or because you simply want to

17   get the case over with.

18           Remember that, in a very real way, you are

19   judges-judges of the facts.  Your only interest is to seek the

20   truth from the evidence in the case.

21           Now, that concludes the instructions for now.  I will

22   give you the final instruction after the lawyers have given

23   their closing arguments.

24           You will first hear from the government.  By procedure,

25   the government always goes first, followed by the defense, and

1    the government is entitled to divide their closing arguments

2    between an initial argument and a rebuttal argument after the

3    defense has spoken.

4         We will hear from the government and then we will

5    probably take a short bathroom break, and then hear from the

6    defense.

7         All right.  Is the government ready to proceed?

8         MR. MCLAUGHLIN:  Thank you, Your Honor.

9         Ladies and gentlemen of the jury, opposing counsel, may

10   it please the Court.

11        Ego, arrogance, and corruption, just like I told you

12   three weeks ago in opening statement, this case is about ego,

13   arrogance and corruption of just one person, the defendant,

14   Defendant Crespo.

15        Now, over the last three weeks, the government's

16   evidence, the government's testimony, as I promised you in

17   opening statement, has been detailed.  It has been thorough and

18   it has been damning and we have overwhelmingly and beyond all

19   reasonable doubt proved the defendant's guilt of every single

20   count in this case, all six.

21        Now Count 1 charges the defendant with a conspiracy to

22   distribute and possess with the intent to distribute Oxycodone.

23   You have heard from the Court regarding instructions.  You will

24   get your own copy in the back room, but I want to go through

25   some of the elements before we go through the facts because I

1    think it will help and guide you.

2         The first element is that two or more people, in some

3    way, agreed to try to accomplish a shared and unlawful plan,

4    the object of which was to distribute Oxycodone and/or possess

5    with the intent to distribute Oxycodone.

6         We have proven that every which way to Sunday, ladies

7    and gentlemen.  Through the wiretap calls, through the

8    testimony of Jorge Diaz, through the testimony of Anais

9    Lorenzo, through the testimony of Special Agent Lawless who

10   investigated West Medical, through the testimony of Special

11   Agent Rolando Alvarez who also investigated West Medical.

12   There was no doubt that there was a drug trafficking conspiracy

13   regarding Oxycodone.

14        It started in November of 2016 with Jorge Diaz and all

15   of his patients as they went to West Medical, as they continued

16   to go to Dr. Espinosa in Boca Raton, and all the way at the end

17   of this case when they were at Dr. Carpman's clinic here in

18   Miami, Florida.

19        There is no doubt that there is a drug trafficking

20   agreement in this case.

21        The main question that you have to decide is did

22   Defendant Crespo know about it and did he willfully join in it?

23        And as we go through the facts here, we have proven

24   that beyond all doubt.

25        The second count that Defendant Crespo is charged with

1    is Count 5.  Again, that's another conspiracy.  The first

2    element is that two or more people, in some way, agreed to try

3    to accomplish a shared and unlawful plan to knowingly use

4    corrupt persuasion, or engage in misleading conduct toward

5    another person, with the intent to hinder, delay, or prevent

6    the communication to a law enforcement officer of the United

7    States of information relating to the commission or possible

8    commission of a federal offense.

9           The conspiracy here is the conspiracy between Defendant

10   Crespo and Jorge Diaz.  It starts in September of '19, when the

11   first calls come in with the confidential informant, Pedro

12   Alvarez, and it ends with their arrest on July 21, 2020.

13          The second element is did Defendant Crespo know about

14   the unlawful purpose of this plan and did he willfully join in

15   it?

16          As we go through the evidence in closing arguments, and

17   as you have seen over three weeks, Defendant Crespo created

18   this conspiracy.  He directed it.  He was the sole leader in

19   charge of it.

20          Jorge Diaz was just his co-conspirator.

21          Counts 7, 8 and 9 are substantive offenses.  Those are

22   not conspiracy counts.

23          The elements of those are as follows:

24          One, that Defendant Crespo knowingly corruptly

25   persuaded another person or knowingly engaged in misleading

1    conduct toward another person.

2          Two, that Defendant Crespo acted with the intent to

3    hinder, delay, or prevent the communication of information to a

4    law enforcement officer of the United States;

5          Three, there was a reasonable likelihood that the

6    information would have been provided to a law enforcement

7    officer of the United States; and

8          Four, the information related to the commission or

9    possible commission of a federal offense.

10         Those are charged in three counts.

11         Count 7 charges the date of July 8, 2020.  The conduct

12   at issue there is Defendant Crespo's lies about having an

13   informant that somehow knew that all of the beneficiaries that

14   were going to be interviewed on July 17th had COVID.  That's a

15   ridiculous fabrication.  That is the basis for Count 7.

16         Count 8 are the wiretap calls on July 17th between Diaz

17   and Crespo, specifically Crespo giving detailed instructions to

18   Jorge Diaz on how to lie to Special Agent Charlie Lawless, and

19   you see that in the calls when Diaz picks up the phone and

20   calls Lawless and, just as directed by Defendant Crespo says,

21   "Hi, my name is Jorge Diaz, I did nothing wrong, I don't know

22   why is anyone is wanting to talk to me."

23         All of that is a fabrication, all of that is a lie,

24   that is all done with the intent to tamper.

25         Lastly, Count 9 is the phone call with Special Agent

1   Lawless that Defendant Crespo has.  There is at least 15 to 16

2   separate lies in that conversation.  I will walk you through

3   them.  All of that is done with the intent to tamper.

4        Those are the three counts of Count 7, 8 and 9.

5        Count 10 is the conspiracy to obstruct justice, and

6   there is a lot of overlap between the conspiracy to engage in

7   witness tampering and the conspiracy to obstruct justice, and I

8   will walk you through the elements of Count 10 now.

9        One, is that two or more people, in some way, tried to

10  accomplish a shared and unlawful plan to corruptly and

11  otherwise obstruct, influence, or impede an official

12  proceeding.

13       The official proceeding here, ladies and gentlemen, is

14  a grand jury proceeding.  We don't have to prove that one was

15  in place but we have to prove that one was foreseen by the

16  defendant.  He was a federal agent, former DEA agent, was a

17  Strike Force agent, the idea that a Strike Force investigation

18  doesn't include a federal grand jury is ridiculous.  Of course

19  he knew that, and of course he foresaw it.

20       The second element is that he knew the unlawful purpose

21  of this plan and willfully joined in it.

22       Just that like the witness tampering conspiracy, he is

23  the creator and the director of this conspiracy along with

24  Jorge Diaz.

25       The Court, in its opening instructions, talked to you

1    about reasonable doubt.

2         I think it's important for us to go through that very

3    quickly.

4         Here, again, we have the burden of proof in this case.

5    It's one that we embrace and one that we carry and, ladies and

6    gentlemen, we have met our burden in this case.

7         As the Court instructs, our burden of proof is heavy,

8    but we don't have to prove the defendant's guilt beyond all

9    possible doubt.  The government's proof only has to exclude any

10   reasonable doubt and we have proven the defendant's guilt here,

11   ladies and gentlemen, beyond all reasonable doubt.

12        And the Court also instructed you about the type of

13   evidence you can consider and the importance of using your

14   reasoning and your common sense.

15        All of you have lived life.  You have experienced

16   things.  You bring all of that to the table here as jurors.

17   Use it.  Use your reasoning.  Use your common sense.

18        You have listened to wiretap tapes, they are crystal

19   clear what they say.  Use your reasoning and your common sense.

20        There are two types of evidence that you can consider.

21   One is direct evidence.  Some of the direct evidence we have

22   had in this case are the wiretap calls.  You hear the words

23   come out of the defendant's mouth.  That is direct evidence.

24        Other types of evidence you can consider is indirect

25   evidence or circumstantial evidence, and I think the Judge

1    instructed you when we were being selected about what is

2    circumstantial evidence.  Circumstantial evidence is

3    essentially this:  You are at home, you see clouds in the sky,

4    it's thundering out, you go inside and about an hour later you

5    come outside and there are puddles of water in your front yard.

6    Well, that's circumstantial evidence, the puddles, that it

7    rained.  You didn't have to see it directly rain, but the

8    puddles themselves are the circumstantial evidence.

9          As the Court has instructed you, direct evidence and

10   circumstantial evidence have the same power in this case.

11         After we have done that, I want to through the timeline

12   of events, ladies and gentlemen, and walk you through the

13   elements and how each of the facts fit each of the crimes.

14         So, our case begins in 2015 and 2016.  As you heard

15   from the testimony from Jorge Diaz, also from Anais Lorenzo,

16   Defendant Crespo meets Jorge Diaz about this time.  They

17   quickly become friends.

18         At the time, Defendant Crespo is an HHS-OIG agent on

19   the Strike Force.  He has been there since at least 2010.

20   Prior to that, he has experience, four years of experience with

21   the DEA, and before joining the DEA, he was a member of the

22   Hialeah Police Department.

23         So, as our conspiracy starts, it's very important to

24   consider the level of experience that Defendant Crespo has.  As

25   he says himself, this is not his first rodeo.  He's very

1    experienced in recognizing what drug traffickers are, how they

2    operate, the lifestyles they live, the types of phones they

3    use.  He has been around the block.

4         And when they meet, Jorge Diaz is basically a drug

5    dealer.  He has no legitimate income.  He is making about $900

6    a month in social security.  He is living with a woman who is

7    20 to 30 years younger than he is.  And he is using not only a

8    regular phone, but a drug phone.

9         That's the start of their relationship.

10        And as we proved through our summary evidence regarding

11   each of the doctors and the PDMP records, Diaz and his

12   recruited patients are at West Medical with Dr. Gonzalez no

13   later than November of 2016.

14        As we head into 2018 in the story here, Diaz and

15   Crespo, as both Anais Lorenzo and Jorge Diaz testified -- and

16   you can hear the nature of their relationship in the phone

17   calls.

18        They call each other, son, father, I love you, I love

19   you.

20        They are now close, intimate friends in 2017, 2018.

21   They are regularly visiting each other's houses.  They are on

22   the phone constantly, four to five times a day, and Jorge Diaz

23   is talking to Crespo not only on a regular phone but also a

24   drug phone, giant red flag.

25        During this time, Crespo meets Carlos Pozo.  He meets

1    Anais Lorenzo.  He meets beneficiaries Anibal Amaro, Pedro

2    Ruiz, Lucia Alvarez, and around this time the investigation

3    into West Medical and Dr. Gonzalez starts.

4         And you heard Special Agent Luna testify himself today

5    that the HHS-OIG was a small office, and you heard Special

6    Agent Alvarez testify that his neighbor at the HHS-OIG was

7    Defendant Crespo.

8         Special Agent Alvarez testified that they talked about

9    the West Medical investigation at the office.  He felt no need

10   to keep it secret.  He talked about that that Jorge Diaz was a

11   target.

12        Again, there is no evidence in this case, and logic and

13   common sense will tell you that Defendant Crespo did not go to

14   work with a blindfold on and earmuffs.

15        As you heard from both Special Agent Lawless and also

16   Special Agent Alvarez that Jorge Diaz is one of multiple

17   targets in this investigation.  And again, he has openly

18   discussed at both the Strike Force office and the HHS-OIG

19   office.

20        As we move forward into 2017 and 2008, the PDMP records

21   and our summary exhibit for Dr. Gonzalez show you that, now, of

22   course, Anais Lorenzo has joined the conspiracy.  She is now a

23   patient at Dr. Gonzalez's office at West Medical, and around

24   that same time as testified to by Jorge Diaz, is that Carlos

25   Pozo is fired from the clinic and attempts to provide

1   information of illegal activity to Defendant Crespo.

2       We have submitted, in our exhibits, you can look at

3   them when you go back there, Pozo is fired in the fall of 2017.

4   There are bank records that are in evidence for West Medical,

5   and you see actually he is getting a paycheck and then suddenly

6   it stops roughly in October or November of 2017.  So that's

7   roughly the time frame when that happens.

8       In response, as Jorge Diaz testified, that Crespo

9   essentially declines to investigate it, threatens and

10  intimidates Pozo to keep his mouth shut and, of course, Crespo

11  tells Diaz all of this and also tips off Diaz, of course, that

12  the clinic is under federal investigation.

13      Here we are again, still in 2017, 2018.  You heard

14  Special Agents Lawless and Alvarez testified to you that the

15  Strike Force identified Diaz as a patient recruiter and, again,

16  a patient recruiter is someone that gets people from different

17  communities and takes them to the clinic and buys their pills

18  and then resells them.

19      He is identified as a patient recruiter as early as

20  May 2018 on video.

21      Upon getting news, of course, that he is part of the

22  investigation and that the clinic is under investigation, Diaz

23  attempts to gets patient files out of the clinic.

24      He testified to that, and by July of 2018, he and his

25  patients have fled West Medical and are now Oxy trafficking

1    with Dr. Espinosa up in Boca Raton.

2         The reason that they fled, ladies and gentlemen, I

3    submit to you is because of the corrupt acts of Defendant

4    Crespo tipping them off about the investigation.

5         Then as we head into the fall of 2018, Diaz, and Pozo,

6    who used to be very close, very tight, you heard Jorge Diaz

7    testify to you that Carlos Pozo was like his right-hand man.

8    Like Crespo was at the house every day, on the phone all the

9    time.  Pozo would drive the patients.  He would pick them up

10   from the clinic, he would take them to the pharmacies, he would

11   make payments.

12        They end their relationship over a disagreement about

13   money.

14        In Pozo's place, as Ms. Lorenzo testified, she takes

15   over.  She now begins helping out driving patients to the

16   clinic, driving patients to the pharmacy, paying them and

17   things of that nature.

18        Then as we are into the fall of 2017, now Diaz and his

19   whole true crew are at Dr. Carpman's clinic, and about the same

20   time, the Strike Force agents begin working towards a grand

21   jury indictment in the case, and as both Special Agents Lawless

22   and Alvarez told you, they wanted to include Diaz in that

23   indictment, but it was decided that Diaz would be omitted and

24   then put on a second round.  That's what's really going on here

25   in the fall of 2018.

1          In October of 2018, Special Agent Lawless testified

2     that the Strike Force agents receive the DEA letter which

3     includes information about Diaz, Lorenzo, Trujillo and

4     Dr. Gonzalez and, of course, within days of that, Crespo

5     decides to break his lease at his side business right next to

6     Dr. Gonzalez's in West Medical offices in Hialeah.

7          Still within 2017 and 2018, the state of play is

8     basically this, ladies and gentlemen:

9          Diaz is an Oxycodone trafficker.  He has no job.  His

10    only regular source of income is social security.  He is making

11    12 to 16 thousand dollars a month trafficking Oxycodone.  He is

12    using regular and drug phones with Crespo and, as he testified

13    to, he is worried about getting charged, he is worried about

14    getting arrested and he is talking only to one person about

15    that, Defendant Crespo, and they are talking on the phone four

16    to five times a day.  That is the state of play 2017, 2018.

17         During this time, of course, Crespo is very well aware

18    of the West Medical investigation in his office.

19         Again, this is not a case where Diaz and Dr. Gonzalez

20    are being investigated by the Miami-Dade Police Department,

21    some entity that he has no affiliation with or in some building

22    that he doesn't go to.

23         He is being investigated by the very people he sees

24    every single day at the very buildings he goes to every single

25    day.

1          He is hiding the nature of his relationship from his

2    coworkers and his supervisors, and he is hiding what he knows

3    about Diaz's Oxycodone trafficking from his colleagues and his

4    supervisors.

5          Again, that is the state of play in 2017, 2018.

6          As we head into December, as we showed you through our

7    summary, there is a squad meeting with HHS-OIG Strike Force,

8    it's about six weeks before the Dr. Gonzalez indictment, and,

9    of course, between 10:19 a.m. and 7 p.m., there are 19 phone

10   contacts between Crespo and Diaz.

11         Special Agent Slattery testified that he had reviewed

12   call records for both Diaz and Crespo on the days before that

13   and the days after, and there was nowhere near the amount of

14   activity in that compressed time period.

15         I submit to you the evidence shows that those calls are

16   all about that squad meeting, all about what is happening in

17   the Dr. Gonzalez investigation and whether or not Diaz is going

18   to be charged.  That's why they are having those phone calls.

19         As we head into 2019, again, the state of play has not

20   changed.  Diaz is an Oxy trafficker, Crespo is a corrupt agent,

21   plain and simple.

22         As we see through the phone records and e-mail records,

23   suddenly there is an e-mail that goes out from Special Agent

24   Alvarez saying at 11:26, saying, "Hey, I need folks to help

25   with arrests on February 7th."

1          And within 19 minutes, 19 minutes, Crespo calls Diaz.

2     I submit to you the only reason that phone call is made is to

3     tell Diaz what's going on in the investigation.

4          At 2:47, they have another conversation, and then while

5     he is on the phone with Diaz, he confirms his availability for

6     the arrests, while he is on the phone with Diaz.

7          January 28, 2019, there is an HHS-OIG e-mail at 8:16

8     a.m. notifying Crespo of a search warrant in the West Medical/

9     Gonzalez case for February 7, 2019.

10         Within 19 minutes, he tries to call Diaz.  I submit to

11    you, the only reason he makes that phone call is to warn Diaz

12    and to talk to Diaz about what is going on.

13         Of course, you see at 8:53, he confirms his

14    availability.

15         I would submit to you, defense counsel, through their

16    questioning, tried to create the impression that Crespo was a

17    team player, always wanted to help people out, always wanted to

18    volunteer.

19         He is volunteering for these arrests and he is

20    volunteering for these search warrants because he wants to be

21    close to the action.  The more he is close to the action, the

22    more information he can give to Diaz.  That's why he is

23    volunteering, ladies and gentlemen.

24         January 31st, the indictment is returned.  It is under

25    seal.  At 8:51 a.m., of course, Crespo is trying to call Diaz.

1          At 3:06, he tries to call him again, and, at six

2     o'clock they have a 13-minute conversation.

3          Again, I submit to you, the focus and the reason for

4     these calls is this indictment, and whether or not Diaz is in

5     it and what are they going to do about it.

6          February 2019, again, the state of play is exactly the

7     same.  Diaz is a drug dealer; Crespo is a corrupt agent.

8          As we head into February 2019, there is an all-hands

9     meeting that day.  There is an all-hands e-mail at 10:57.  That

10    meeting is going to be on February 6th and, of course, at

11    one o'clock, Crespo calls Diaz and they have a 17-minute

12    conversation.

13         I think it's important, ladies and gentlemen, for you

14    to remember, these are happening during working hours.

15         This is not happening on a Saturday.  This is not

16    happening on a Sunday.  This is a corrupt agent on the phone,

17    on his personal phone, by the way, calling a drug dealer,

18    telling him what is going on in his office about him.

19         On the 7th, the arrests start at 6:15 a.m.  Crespo is

20    going to know this, he is an experienced agent, even though

21    he's not participating, and of course, starting at 8:29 a.m.,

22    at 9 a.m., Crespo calls Diaz and there is a 54-minute

23    conversation.

24         As you can see, ladies and gentlemen, it's always

25    Crespo calling Diaz.

1          It's not Diaz pinging Crespo for information.  Crespo

2     is calling him, giving him information, tipping him off,

3     keeping him out of trouble.

4          Then, of course, between 5:42 and 6:21, there are three

5     more attempts.

6          As we head to March of 2019, the state of play is

7     exactly the same.  On March 4th, Crespo, of course, has not

8     told anyone within his chain of command about his relationship

9     with Diaz.

10         He downloads the report about the investigation from

11    Special Agent Alvarez, as ASAC Barranco testified, there is no

12    legitimate reason for him downloading that at all and, of

13    course, at 12:37, he calls Diaz and has a 17-minute

14    conversation.

15         I submit to you, ladies and gentlemen, the whole

16    purpose of that phone call, the entire purpose of that

17    conversation, is the contents of that report.

18         And, of course, on March 22nd, Special Agents Lawless

19    and Alvarez schedule an interview with Ruben Sotolongo for

20    March 22, 2019.  On that day, Crespo picks up the phone, again,

21    and has a 50-minute conversation with Diaz.  While he is on the

22    phone with Diaz, requests and gets his criminal history report.

23         I submit to you, again, the only reason he is doing

24    that is to find out if Diaz has a warrant for his arrest and

25    what the status of the investigation is and how much trouble

1    Diaz is in and how he can help him.

2          On that day, Special Agents Alvarez and Lawless

3    interview Ruben Sotolongo, and based on the information they

4    get, they immediately contact their respective supervisors at

5    HHS-OIG and at the FBI.  Their plan is to do a Round 2

6    indictment, which would include Diaz, are put on hold and the

7    public corruption investigation begins.

8          And between April and September of 2019, nothing

9    changes.

10          As you see through the PDMP summaries that we have

11    done, Diaz is Oxycodone trafficking at Carpman's clinic.  He is

12    making 12 to 16 grand a week.

13          He is talking to Crespo daily on his drug phones, on

14    his regular phones.  He is worried about where he is in the

15    investigation.  He is talking to Crespo four to five times a

16    day, and Crespo is a corrupt agent.

17          Now, on September 24, 2019, as you saw through the

18    calls and the transcripts, it's in the book, the public

19    corruption unit decided to use Pedro Alvarez as a confidential

20    informant.

21          They utilized him because -- why he did is he had a

22    prior relationship with Diaz.  They were both patient

23    recruiters at the clinic, and they make the first call.

24          As we went through that call, Diaz clearly learns that

25    there are agents out there looking for him.  What's

1    interesting, is out of the gate, Diaz is worried that Pedro

2    Alvarez is a confidential informant, out of the gate, and he

3    testified to it.

4         And what that really tells you is that who has he been

5    talking about, hey, this guy could be an informant.  This guy

6    could be an informant.  You got to be on the lookout.

7         He is talking to Defendant Crespo about it.

8         But Diaz slips up in these early calls and he begins to

9    reveal on tape the nature of his corrupt relationship with

10   Crespo.

11        You see here he tells Pedro Alvarez, "Listen, I will

12   fix this quickly because my godson," clearly referring to

13   Crespo, my godson who loves me like I was his son, I am waiting

14   for him to arrive from Greece.  It is possible that he arrives

15   today.  If he arrives today, I am going to call him in order to

16   go to his house and talk to him because he is a federal agent."

17        And after that call ends, while it is still going you

18   see other quotes from Diaz which reveal the nature of their

19   corrupt relationship.

20        Diaz reveals that he knows exactly who the agents are

21   that investigated the Gonzalez case, how many there were.  He

22   uses Crespo's first name in the call.

23        After that call happens, and as you saw through our

24   summary charts, is Diaz hangs up the phone and then he calls

25   Crespo in Greece.  That's how scared, that's how worried he is.

1        Crespo calls him back at 6:40 and they have a two

2   minute and 27 minute {sic} conversation, and I submit to you,

3   ladies and gentlemen, the entire purpose of that conversation

4   was to discuss what's going on.

5        From their perspective, the Gonzalez investigation had

6   been dormant since February and suddenly there is someone

7   calling saying there are agents out looking for Diaz.  They are

8   very concerned.

9        So they are discussing who are the possible witnesses

10   against Diaz, who could be an informant, who is not, and how

11   are they best going to protect Diaz, at all costs, from being

12   caught by law enforcement.

13        That's what they are talking about in this two minute

14   and 27 second call, while, again, Crespo is in Greece.

15        In the wiretap, it's actually -- Crespo confesses to

16   that, I have the quote here.

17        On July 17, 2020, at 7:14 p.m., he tells Diaz, "I have

18   been telling you for a year that they" Anais Lorenzo and Carlos

19   Pozo, "are going to sell you out."

20        What does that tell you?  Of course, they have been

21   talking about who could be an informant, who could be a witness

22   against Diaz for over a year.

23        That same day after, speaking with Crespo, as Diaz

24   testified himself, I asked him, "Why did you pick up the phone

25   and call this guy back that you thought was an informant," and

1  he says he did it because he needed to do damage control

2  because, of course, he mentioned Crespo's name.  They have a

3  five-minute call.

4       Diaz is clearly worried that Alvarez is a CI and you

5  see in this call, Crespo's influence in how to handle this.

6       So basically, it starts off saying, "I don't have any

7  influence, I've got nothing to hide," but nonetheless, at the

8  end of the call, he slips up and, again, starts talking about

9  Crespo.

10       As we go into October 2019, the state of play with Diaz

11  and Crespo, again, unchanged.  Diaz is a drug dealer; Crespo is

12  a corrupt agent.

13       Then we see on October 2nd, Crespo and Diaz have a 24-

14  minute phone conversation, starting at 9:09 a.m., and while

15  Crespo was on the phone with Diaz, logs into the IRIS case file

16  system and starts searching, and the only reason he is doing

17  that is he is looking for investigative updates about Diaz.

18       There is no reason for him to be in that case file.

19       There is no reason for him to be looking at the

20  Dr. Gonzalez investigation whatsoever.  The only reason he is

21  doing it is to cover up for his best friend, drug dealer Jorge

22  Diaz.

23       Among other items he views, of course, is a report of

24  Dr. Gonzalez's postarrest statements.

25       And immediately after doing that, he picks up the phone

1   and calls Special Agent Rolando Alvarez who testified about

2   that, using his government phone.

3           During that call, Crespo deliberately conceals his true

4   relationship with Diaz, including his prior and ongoing

5   knowledge about Diaz's drug dealing activities.  He just says,

6   "I have a friend named Jorge who said someone is looking out

7   for him."

8           Again, this is a federal agent talking to another

9   federal agent from the same agency on the same Strike Force

10  that investigate the same crimes.

11          Again, he omits Diaz's last name when discussing his

12  reason for calling, and he, of course, deliberately omits any

13  reference to calls from CI Pedro Alvarez and Diaz.

14          Lastly, in that call, Crespo learns that, hey, even

15  though on the HHS-OIG side things are shut down or closed out,

16  there might be other agencies investigating, including DEA.

17          So, the notion that Crespo believed that the

18  investigation was closed, just doesn't square with the facts.

19          And we see, of course, that as soon as Crespo gets off

20  the phone with Special Agent Alvarez, on his government phone,

21  he switches back over to his personal phone and, of course,

22  calls Jorge Diaz and they have a two minute and 33 minute {sic}

23  conversation.  I submit to you, the entire purpose of that call

24  and the entire purpose of that conversation is to discuss what

25  Rolando knows and what's going on.

1          As we head into November and December, again, the state

2     of play is exactly the same.  Diaz is still a drug dealer.  He

3     is Oxy trafficking out of Carpman's office, making loads of

4     money, talking to Crespo on his drug phone, on his work phone.

5     He is worried about getting arrested, but he's got Crespo in

6     his back pocket and Crespo is a corrupt agent.

7          But in December of 2019, as you heard through the

8     testimony of Jorge Diaz and, of course, also you see in Diaz's

9     own bank records, Crespo has Diaz move into his own home,

10    knowing he is a drug dealer.

11         He affords him total freedom of movement throughout the

12    house, permits him to engage in Oxy trafficking on the phone

13    out of his house.

14         Again, Crespo knows Diaz is a drug dealer when he moves

15    in, there is no doubt about it, ladies and gentlemen, and

16    accepts drug trafficking proceeds as rent.

17         On the 20th, there is one last call between Pedro

18    Alvarez and Diaz.  It's very clear in that call that Diaz and

19    Crespo are still worried that Alvarez is a CI and are doing

20    everything they can to cover their tracks.

21         There is a moments, though, at the end where Diaz lets

22    his guard down and starts talking about Crespo.

23         And we head into January through April of 2020, the

24    state of play is still the same.  Diaz is a drug trafficker;

25    Crespo is a corrupt agent.

1          In April of 2020, that's when the court-authorized

2    wiretap investigation by the FBI public corruption squad

3    begins.

4          Crespo and Diaz are living together at Crespo's

5    residence, and Diaz is Oxy trafficking out of Crespo's

6    residence, and when I say that, he is making the phone calls to

7    the benes, he is leaving his car there, he is driving to their

8    house, picking them up, taking them to the clinic, going to the

9    pharmacy.

10         And as we see by April of 2020, there is a call on the

11   wiretap where it's very clear that Diaz is using drug

12   trafficking proceeds to pay rent.

13         We know that because through the PDMP records on April

14   24th, Mercedes Perez got her prescription filled.

15         Diaz testified that he immediately went and got it,

16   bought it from her and sold it, and then picks up the phone can

17   calls Crespo and says, "I've got your rent money."

18         As Diaz testified, rent wasn't due until the beginning

19   of the month, so why on earth would Diaz be calling Crespo on

20   April 24th saying, "I've got your rent money?"  It's drug

21   money.  It's very simple.  And also, Crespo clearly would know

22   that Diaz gets social security and social security comes at the

23   beginning of the month, not at the end.

24         That same day, Crespo is still providing protection

25   and, of course, Diaz gets all these calls again from CI Pedro

1    Alvarez.

2         Who does he turn to?  His best friend and corrupt

3    agent/friend Crespo and Crespo directs him, "Yes, block him,

4    don't even respond.  Block him."

5         We are in May of 2020.  The wiretap investigation

6    continues.

7         Crespo and Diaz are still living together.

8         Again, Diaz is Oxycodone trafficking out of Defendant

9    Crespo's residence.  Picking up patients, taking them to

10   pharmacies, meeting with them, buying pills.  It's apparent and

11   obvious over the wiretap what is going on, but we see in May

12   of 2020, specifically May 8th, the beginning of it, is that

13   Crespo and Diaz are very worried about Anais Lorenzo.  She

14   testified to it and so did Jorge Diaz.

15        During this time, Anais Lorenzo starts threatening

16   Jorge Diaz in this way:  "Listen, if you don't give me money,

17   I'm going to go to the cops," and she knows everything.  She

18   knows about Diaz's Oxycodone trafficking.  She knows about

19   Diaz's corrupt relationship with Crespo.  She has a lot to hang

20   over Diaz if he doesn't give her money.

21        They are clearly scared out of their minds about it,

22   and it becomes very obvious that they are when Crespo, using

23   Diaz's phone, decides to leave a voicemail for Anais Lorenzo,

24   basically telling her, come to my house and I'll beat the crap

25   out of you, don't threaten an old man anymore.  Don't threaten

1    Diaz anymore.

2           You heard the call.  I played it two or three times.

3           On May 10th, Crespo and Diaz continue talking about

4    what they are worried about.  You see here, of course, Crespo

5    wants to assault Lorenzo and Diaz talks about how Lorenzo

6    clearly knew his business, which was Oxy trafficking, and that

7    Diaz assures Crespo that, listen, if she informs on me, I can

8    inform on her.  I can inform on what her dad does.

9           Again, this is a federal agent talking to a drug

10   dealer.  They live together.  This is what is going on.

11          May 12th, they are still talking about it.

12          Crespo himself summarizes the entire conundrum that

13   they have, which is basically, hey, you have to get away from

14   Anais, she's a danger, she's a threat to me, she's a threat to

15   you, what she's basically trying to do is say, "Hey, you've got

16   to give me 1,000 bucks a month because I know what you are up

17   to."

18          What is Diaz up to?  He is a Oxy trafficker, he's a

19   drug dealer.

20          As we head into June, again, the investigation with our

21   wiretap continues.  They are still living together, and Diaz is

22   still an Oxy trafficker.

23          And as you saw through the wiretap calls, in early

24   June, the FBI goes out and start interviewing Diaz's patients,

25   including Lucia Alvarez, Anibal Amaro, Pedro Ruiz, Braulio

1    Rego, Marta Cardero and Mercedes Perez, and as you saw through

2    the wiretap calls, of course, all these patients lie, but they

3    immediately report back to Diaz what's happening and, of

4    course, Diaz immediately reports that to Crespo and relays it

5    back to the patients.

6         Crespo assures Diaz that these agents won't come back

7    and just continue what you are doing.

8         Of course, Diaz fearing that his patients might leave,

9    relays this back to them.  And it's all on the wiretap.

10        And as we get to June 18th, of course, there is the

11   message which really lays out Crespo's state of mind and his

12   mentality, "I have no interest in anything LEO-related.  I just

13   became part of a culture I loath of cops.  I'm on the road,

14   retired on active duty.  I am done.  I have five years left.

15   The last 18 months of the five I will go to work one day a

16   week.  I hope I can disable out somehow.  I want out."

17        And on June 19th, if Crespo had any questions or doubts

18   at that point, it becomes very clear that the Dr. Gonzalez

19   ongoing investigation regarding patient recruiters and others

20   has kicked back up.  Of course, he gets an e-mail from Special

21   Agent Lawless saying, "Hey, we are going to start doing these

22   interviews," and he attaches a list of people that they want to

23   interview, and that e-mail happens at 12:20.

24        And, of course, at 1:50, Crespo confirms his

25   availability and then immediately calls Diaz.

1          Why does he call him?

2          Because suddenly, things are real again.

3          He tells them, "When you get home, come see me because

4     I have to talk to you regarding Gonzalez.  It's very important.

5     Come directly home.  Come see me."

6          Why does he say that?  Because he knows Diaz is a drug

7     dealer.  He knows Diaz was a drug dealer at Dr. Gonzalez's

8     clinic, and he knows that the FBI is reigniting their

9     investigation and Diaz is in trouble, and Diaz does.  And as

10    you see through the video, Crespo gets home at 2:07.  Diaz gets

11    home at 2:15, and they have a conversation about everything at

12    the residence.  Diaz told you that, logic and common sense

13    tells you that.  And basically that conversation amounted to

14    Crespo taking his work phone, showing Diaz, a drug dealer, an

15    FBI e-mail, showing him the list of people that they want to

16    interview and asking him questions about it.

17         We know exactly what they talked about because Diaz

18    tells his daughter later that evening, and in that

19    conversation, Diaz tells his daughter that Crespo pulled out

20    his phone, showed him the list of beneficiaries, asked him if

21    he knew anything about them and tells him, "I don't want you to

22    have anything to do with them."

23         And then Diaz says, "I don't have anything to do with

24    them.  I know them."

25         And Crespo says, "Then I am not worried.  Continue on

1    working the Uber you are doing," which is hey, all good.  The

2    FBI is looking at these other people, you don't know them,

3    continue on doing what you were doing with the Oxy trafficking.

4    You are good to go.

5         As we head into July of 2020, they are still living

6    together and Diaz is still Oxy trafficking.

7         On July 8th, here is the e-mail from, kind of setting

8    in stone what's going to happen regarding the interviews.

9         Again, the first e-mail goes out on June 19th and

10   there's a list of beneficiaries but there is no date certain of

11   when this interview is going to happen, it's just, we want to

12   do these interviews, here are the people we want to target.

13        This e-mail narrows it done and basically says, hey, we

14   are going to do this operation on July 17th, and there is going

15   to be a briefing at the offsite on July 14th.

16        At 10:14, which is within 20-some-odd minutes, Crespo

17   confirms his availability and beginning at noon that day,

18   through the wiretap that we played for you, Diaz starts getting

19   calls from Braulia Rego and other people worried about that

20   there is a black SUV in front of their apartment and they are

21   worried that the FB is looking at them, and of course, Diaz

22   testified about that and said, "Listen, I was supposed to go

23   pick up their pills that day but I couldn't because everyone

24   was worried."  And they were talking both on the regular phone,

25   which was subject to the wiretap, and the drug phone, which was

1   not, and of course, you see, and we played for you the call

2   where, of course, Diaz tells all of this to Crespo and says,

3   "Listen, I need to talk to you about something.  It's

4   nothing -- it's something I saw about our friend that I showed

5   you in my phone," clearly talking about Charles Lawless.

6         I showed you what the contents of Diaz's phone, he had

7   a picture of Charles Lawless and, clearly, this calls confirms

8   that they talked about it.

9         And then in that same breath, Diaz then starts talking

10  about how he cannot chip in for the new truck that Crespo wants

11  to get because he doesn't have any money because of the whole

12  mess that happened earlier in June, which is when, of course,

13  the FBI interviewed all of his patients, and that slowed down

14  business, again, highlighting Crespo's knowledge about the drug

15  trafficking conspiracy.

16        And on that day, Crespo clearly is worried about the

17  ongoing surveillance of the FBI, Diaz and his patients.

18        He has noticed that the FBI has been out interviewing

19  Diaz's patients repeatedly, again, Lucia Alvarez, Anibal Amaro

20  twice, Marta Cardero, Braulia Rego.  Things are getting

21  incredibly hot with Diaz at this point.  He decides to pick up

22  the phone and call his supervisor.

23        He tries to call him at 5:15 p.m., and then he gets a

24  call back at 6:13 and ASAC Barranco testified today and

25  yesterday about the contents of that call, and the whole

1    purpose of that call was basically Crespo trying to shut things

2    down.

3          Crespo is not a young agent.  He knows how the

4    government works.  He knows that this time COVID is a very real

5    thing and he knows that the government, of anyone out there, is

6    going to take the conservative, cautious approach when you have

7    COVID in play.

8          So he introduces this fraudulent scheme that he has a

9    former DEA CI that told him, out of nowhere, that patients that

10   the FBI was planning to interview on July 17th.

11         Now, take that statement in isolation.

12         The only patients that were identified as potential

13   people to be interviewed were sent in an e-mail in June that

14   Charlie Lawless sent.  It's the same e-mail where Crespo took

15   out his phone and showed Diaz in June.

16         He tells Barranco that, "Hey, my former DEA CI is a man

17   on the street, says all these people that we are going to

18   interview have COVID."

19         Not surprisingly, ASAC Barranco begins to push back on

20   that and Crespo, again, corruptly refuses to explain how or why

21   this purported CI would, A, know the people that the FBI were

22   going to interview, know where they live and know that they had

23   COVID.  Again, their names were only disclosed in an e-mail in

24   June.

25         Also, Crespo refuses to explain how the CI would

1    possibly know that each of these individuals, there's like 14

2    individuals, all living in separate residences in different

3    places, he would know that each one of them had COVID, and then

4    he, lastly, when asked, refuses to even disclose the name or

5    the identity of this purported CI.

6            I submit to you, ladies and gentlemen, that the entire

7    former DEA CI is a complete and utter fabrication, a corrupt

8    fabrication by this defendant to shut down the investigation.

9            And as we head into July 14th and 15th, he thinks he is

10   successful.  He thinks it's going to work and that's why he

11   skips the briefing.

12           He is the only agent that doesn't go to the briefing.

13           On the 15th, he learns that, of course, it's partially

14   successful.  HHS-OIG has decided to pull back all of their

15   people from this interview operation, but nonetheless, the FBI

16   says, "We are going to continue and we are going to go continue

17   on Friday, July 17, 2020.

18           It's very clear in Crespo's mind at this point he

19   thinks, hey, if HHS-OIG pulls out, probably the FBI will pull

20   out.  Nothing is going to come of this.  We're good to go.  I

21   am going to go have fun with my girlfriend and wife and my

22   friend at Cooper's Hawk on a Friday.  I'm not worried about

23   anything.

24           That's how we head into July 17th.  As we see through

25   the wiretap calls, starting at 11, Diaz buys Mercedes Perez's

1   Oxycodone prescription.  It's in the calls.  He promptly,

2   immediately, turns around and sells those to Yandre Trujillo.

3   That's the guy he would sell these pills to, mostly.  It was

4   mostly Yandre Trujillo but he said sometimes he would sell them

5   to Omar and some other folks, but it was mostly Yandre

6   Trujillo.

7          And what also Diaz told you is that, "Listen, I didn't

8   sit around when I got a patient's prescription and keep it at

9   home for days, I literally would go with the patient to the

10  pharmacy, buy it and turn around and sell it within hours," and

11  that's what happens on this day.

12         At 12:44, Diaz gets a phone call from Lucia Alvarez,

13  "Hey, the FBI is at my house again, what in the world is going

14  on?"

15         And, of course, Diaz, using his drug phone, turns

16  around and calls both Braulia Rego and Marta Cardero, because

17  they were neighbors.  You call one, you call the other one and

18  at 12:55 in the wiretap, as you see through the transcripts,

19  Diaz calls Crespo, and they later meet at Crespo's house to

20  discuss what's going on with Lucia Alvarez.  It makes sense

21  from Diaz's point of view.

22         These people were interviewed in early June.  Crespo is

23  telling them, "Hey, they are not going to come back."  Yet,

24  here we are, it's July 17th, and suddenly the FBI is back

25  again.  What the heck is going on?

1       At 2:28 p.m., Diaz learns over his drug phone this time

2    that Mercedes Perez has now been interviewed by the FBI.  In

3    response, he takes the initiative to travel to her house and

4    provide him the Pistolita pills that he thought were real, but

5    weren't, to her in order to deceive the FBI when they were

6    scheduled to go back the next day, because remember what

7    happened was the FBI went to Mercedes Perez's house and they

8    said, "Hey, listen -- "

9       THE COURT REPORTER:  I'm sorry.

10      MR. MCLAUGHLIN:  They go to her house, they know from

11   the PDMP records that she gets an Oxy prescription that day and

12   they ask her, "Where are your pills," and she goes -- she

13   doesn't say, "I sold them to Jorge Diaz."  She says I lent them

14   to him, but for the first time she actually interjects Diaz's

15   name into the conversation.

16      Diaz learns this and they basically tell Mercedes,

17   "Listen, we are going to come back tomorrow and if that's true,

18   you better have your pills back."

19      So, Diaz, upon learning this drives there and takes his

20   Pistolita pills back to her in the anticipation that the FBI

21   when they return on the 18th, the next day, will be able to see

22   this and everything will be okay.

23      And we see at 4:27, this is when it all starts.  Diaz

24   tells Crespo that he is very worried because as far as why is

25   he worried.  He's worried that Mercedes Perez has mentioned his

1    name in relation to the illegal distribution of Oxycodone to

2    the FBI.  Then he tells Crespo and Crespo then tells him,

3    "Listen, nobody is listening to your phone or mine either.  I'm

4    telling you, I know what that is.  There is no such thing,"

5    which is basically, again, a federal agent telling a drug

6    dealer, "Don't worry, you don't have to speak in code or

7    cryptically, no one is tapping our phones, speak freely," and

8    Diaz basically lays out what happened.  He says, "Listen, I saw

9    a lady over there, Mercedes, and I went to buy some pullovers,"

10   and as you heard from Diaz and as you see repeatedly in the

11   wiretap transcript, pullovers is code for Oxycodone.  And he

12   basically says, "Listen, I went over there, I bought her pills

13   and the FBI showed up and then she told them that somehow she

14   lent them to me."

15          And what is striking about this conversation is at no

16   point do you see in that call, in that transcript, when Diaz

17   says Mercedes, you never hear Crespo go, "Mercedes?  Mercedes

18   who?  Who are you talking about?  What is going on here?"

19   Nothing.  Never.  He knows exactly who it is.

20          And Diaz uses the terms "pullovers," you don't hear

21   Crespo say, "Pullovers?  What is a pullover?  What are you

22   talking about?"

23          Diaz himself testified, pullovers were regular drug

24   lingo.

25          Everyone knows what they mean.

1          Crespo knows what he means.  He knows exactly what he

2     is being told by Diaz.  Diaz is basically saying, "Listen, I

3     did some Oxy trafficking earlier today with Mercedes, now the

4     FBI is talking to her.  I am very worried.  What are we going

5     to do to fix it," and basically Crespo starts saying, "Listen,

6     I looked into this, but I think somebody snitched on you."

7          Of course, Crespo, as they continue to talk, Crespo

8     tells Diaz, "Listen, this is a mistake that she brought you up.

9     She threw you under the bus.  Let's see what happens tomorrow

10    but that was a catastrophic mistake."  At no point does Crespo

11    tell him, "Hey, listen, probably you should come into the FBI

12    and tell the truth and let them know what has been going on."

13         There is none of that.  It's, "We've got a massive

14    problem and we need to fix it," and, of course, Crespo tells

15    Diaz exactly why he is in trouble because she brought up Diaz's

16    name, it's a red flag, and then Crespo basically says to Diaz,

17    "Listen, she shouldn't have said anything."

18         This is, again, a federal agent talking to a drug

19    dealer, "My advice to you as the agent, to you, the drug

20    dealer, is to not say anything."

21         Corruption, plain and simple.  And basically directs

22    Diaz, "Listen, we have got to destroy her, throw her under the

23    bus, do everything we can to protect you, Diaz and me, Crespo."

24         In that same call now Crespo starts giving him specific

25    instructions in terms of how to obstruct the investigation, how

1    to tamper with evidence.  Tells him, "Listen, you go back over

2    to Mercedes's house, you pick up your pills," basically

3    instructing him to go commit another crime, "take them home,

4    cut them up, and when the FBI talks to you, you lie your face

5    up."  That's what is going on in this call.

6         What's remarkable about it, it's not Diaz asking

7    questions, suggesting what to do, right out of the gate, Crespo

8    is telling him exactly what to do, and it's because he is a

9    Strike Force agent.  He has been an agent for 27, 28 years and

10   as he says himself, he knows his game.  He knows this game.

11        During the same call, again, this was at 4:27, there

12   was a lot of questioning from the defense, and trying to

13   insinuate that somehow Crespo was intoxicated on July 17th.

14        This call is happening at 4:27 in the afternoon, 4:27,

15   it's not happening at eleven o'clock at night, it's not

16   happening at midnight, it's not happening at 9:30.  It's at

17   4:27, and the basics of the conspiracy are baked in here.  You

18   tamper with evidence, you cut up those pills and when the FBI

19   comes to talk to you, you lie your face off.  You trash

20   Mercedes Perez, you call her a liar.  You said that you did

21   nothing wrong.

22        It's all here and it's very early in the evening.

23        And, of course, Diaz ends the conversation by saying,

24   "Thank you, thank you, you are an amazing guy."

25        At 4:38, they have another call.  Crespo, at this point

1    now is directing Diaz to call Special Agent Lawless.  "He is

2    not going to see you at this time."  And he tells him exactly

3    what to say.  He says, "Tell him this, someone called me that

4    she doesn't know.  She said that I lent her pills.  No, no, no,

5    that she lent me pills.  Wait, I don't sell pills to anyone I

6    have" --

7         Well, this is all clearly a lie.  Crespo knows it's a

8    lie.  Mr. Diaz also testified.  Clearly, Crespo knew Diaz was a

9    drug dealer in Gonzalez era, 2017, 2018.  Diaz testified

10   himself like, "Listen, when I moved in there, we even had more

11   detailed conversations of exactly what I do for money, again,

12   which is Oxy trafficking."

13        So when he is telling Diaz, "Tell Special Agent Lawless

14   that I don't sell pills to anyone, I have to meet with you,"

15   it's a complete lie and fabrication.  Again, this is a federal

16   agent, federal agent on the very same Strike Force as Special

17   Agent Lawless.

18        As we are still on the calls at 4:38, again, this is

19   very early in the evening.  According to the receipt, they are

20   at Cooper's Hawk.

21        Again, this is at 4:30.  He tells him this, this

22   reiterates what is going on, "Disprove Mercedes Perez, throw

23   her under the bus, and then again, cut up the pills, cut them

24   in four, cut all of them."

25        Now, 4:40, now they have a conversation about, "Well,

1    what happens if the FBI wants to meet at my home?"

2         Clearly, that's a problem for Crespo because he has a

3    drug dealer living in his house, and the very agents that he

4    works with and sees and knows every day would learn that he has

5    a drug dealer living in his house.  Crespo provides him

6    guidance in terms of what to do, "Don't meet at my house, make

7    sure you meet out in public."

8         Of course, right after that call, Diaz switches to his

9    drug phone and calls Mercedes Perez, and, as directed by Diaz,

10   drives back to his house, gets those pills, comes back to the

11   Crespo residence and cuts them all up into fours, right there,

12   Government's Exhibit 20.

13        At 5:41, Crespo and Diaz have another phone call where

14   Diaz is kind of worried, "Listen, what if they ask about

15   relationship or where I live," and of course, Crespo assures

16   him, "Don't you worry about that, I don't have a problem, you

17   don't have a problem.  I am going to deal with whatever I have

18   to deal with."

19        At 5:45, again, Crespo is directing Diaz to make a

20   phone call to Lawless to lie.  Again, let's move forward on

21   what we have to do, they are in this together.  It is a

22   conspiracy, ladies and gentlemen.

23        Diaz, "I will do whatever you tell me to do."

24        Who is leading this?  Who is directing this conspiracy?

25   Defendant Crespo is.

1          Of course, Crespo essentially confesses their crimes

2    here.

3          "Remember, you have not behaved well, we are outside of

4    the law.  We are outside of the law."

5          A federal agent, we, you and me, Jorge Diaz, are

6    outside of the law.

7          Again, this is a call at 5:45 p.m.  Again, this is not

8    happening at midnight, two in the morning, three in the morning

9    after a long night out at the bar.  It's 5:45 in the evening.

10          Now we go to 6:06.  Of course, at Crespo's direction,

11    Diaz does as told, calls Special Agent Lawless in hopes that

12    Lawless will call him back and Diaz can tell him the phony

13    story that Crespo told him to tell.

14          After this call, of course, Diaz immediately reports

15    back to Crespo about what's going on and Crespo, again,

16    dictates exactly how to lie to Charlie Lawless.

17          This is at 6:08.  He tells him, "Listen, when he calls

18    you, be clear, quote, they told me that someone lent me my

19    pills.  No, no, no, my pills are with me.  Where can I go see

20    you?  Do you understand?"

21          Again, this is all a fabrication.  It's all a lie.  And

22    again, these are the same lies are talked about two hours

23    earlier at four o'clock, 4:30.

24          Again, tells Diaz to tell Lawless, "I will go see you

25    right now, my pills are with me.  This is what I learned.  This

1    is bullshit.  I have done nothing wrong."

2          And, of course, Crespo tells Diaz, "As soon as you hang

3    up, call him again and leave a message."

4          THE COURT:  I'm sorry, Counselor, I am giving you the

5    alert.

6          MR. MCLAUGHLIN:  Thank you.  "I did nothing wrong."

7          Crespo assures him that he is going to defend him and,

8    of course, as directed by Lawless, Diaz does exactly that,

9    leaves a voicemail, "Charlie, my name is Jorge Diaz.  I hear

10   from somebody that I do something bad.  I did nothing wrong.

11   My pills are with me.  I can show you, call me back."

12         And, of course, throughout the rest of the night we

13   have played those calls repeatedly.  The plan gets more and

14   more specific.  Crespo gets more and more angry.

15         There are statements such as, "We are fucked.  We are

16   going to jail.  I am going down with you."

17         Crespo at this point is convinced that Anais Lorenzo

18   and Carlos Pozo are the snitches or the informants in this

19   case.

20         Why does he think that?  Well, one, Carlos Pozo came to

21   him in 2017 to inform on Dr. Gonzalez.  So, of course, that's

22   why in the throes of July 17th, he wants to kill him and he

23   wants to assault him.

24         Why does he want to kill and assault Anais Lorenzo?

25   The calls in May of 2020 tell you that.  She was threatening

1    Diaz to go to the cops if he didn't pay her a thousand dollars.

2    Those are the reasons why those two names come up at that time.

3              If we can go to the ELMO, Your Honor.

4              Actually, if we can go back to the computer, I'm sorry.

5              As we head into July 18th and 19th, Diaz is in the

6    Keys.  The plan is in place.  "When the FBI calls, you lie your

7    face off."

8              You saw the video where they are talking about what's

9    going on on the Monday and, of course, on the Monday Special

10   Agent Crespo has his phone call with Special Agent Lawless and

11   in that call Crespo just lies his face off, refers to Diaz as a

12   friend of the family, which is clearly not true.  Diaz is

13   Crespo's friend.

14             He talks about how he has no idea why anyone was

15   looking for Diaz.  He talks about how, of course, if Crespo had

16   any -- knew about any illegal activity from Diaz, he would have

17   nothing to do with him, have him arrested himself.  All that is

18   false and fraudulent and, of course, which leads us to July

19   21st, when everyone is arrested and, of course, when Diaz is

20   arrested, he is arrested trying to show the FBI the very cut-up

21   Pistolita pills that Defendant Crespo directed him to cut up

22   and telling the very false story that Defendant Crespo told him

23   to tell.

24             That's our story here.

25             Now, in Count 1, ladies and gentlemen, if we can go to

1    the screens, Your Honor.

2         Again, the first element, two or more people have to

3    agree to engage in Oxy trafficking.  Again, we have proved that

4    every which way to Sunday through Diaz's testimony, through

5    Lorenzo's testimony, through the PDMP records.  There was an

6    Oxy trafficking conspiracy which began in November of 2016 and

7    continued all the way up to the defendant's arrest.

8         The issue is, did Crespo know about it and did he

9    willfully join in it?

10        Of course he did.

11        He knew about it as early as 2017 when he is learning

12   from Pozo that there is illegal activity at Gonzalez's and

13   threatening him, intimidating him.

14        He is tipping off Diaz about West Medical being under

15   investigation.  He knows about the conspiracy and when he

16   starts tipping off Diaz, he has joined the conspiracy and he is

17   in this conspiracy with Diaz providing protection all the way

18   through his arrest.

19        He is joined in the conspiracy when he is looking for

20   the NCIC for Diaz.

21        He has joined the conspiracy when he is calling Diaz at

22   the time of search warrants and arrest warrants.

23        He is in the conspiracy, ladies and gentlemen, when he

24   is having Diaz move into his house, accepting drug money.

25        He is definitely in the conspiracy on June 19th, when

1    he is providing Diaz with Lawless's e-mail and the names of the

2    people that are going to be interviewed.

3            He is in the conspiracy on July 17th, when he is

4    telling Diaz to cut up his pills, go get them from Mercedes

5    Perez and lie to the FBI, and he is still in the conspiracy

6    when he is lying on the phone to Charlie Lawless repeatedly

7    about what he knows about Diaz and his relationship with Diaz.

8            There is no doubt that Crespo knows about the purpose

9    of the conspiracy and that he has willfully joined in it.

10           Again, he doesn't have to be a drug dealer to be in a

11   conspiracy.  He doesn't have to be on the street corner selling

12   the pills.  He doesn't have to be the guy recruiting it.  All

13   he has to do is know about it and join in it and, as an agent,

14   his most valuable tool to all of his conspirator is his

15   information on the inside, and he provides it.

16           He helps Diaz for years tipping him off about

17   information, who is under investigation, how to avoid arrest,

18   how to lie to the FBI, and how not to get caught.

19           He is in the conspiracy, ladies and gentlemen.

20           Witness tampering, the most important prong of this,

21   ladies and gentlemen, is the misleading conduct toward another

22   person.  When he is lying to ASAC Barranco about his phony CI,

23   he is only doing it to shut down the investigations so people

24   cannot provide information about a federal crime to a federal

25   agent.

1          Again, all of the agents in this are federal.  All of

2     the crimes are federal.  That's why he is doing it.  He is not

3     concerned about COVID.  He is not concerned about the health

4     and safety of his co-workers, he only cares about Jorge Diaz

5     and himself, and that's why he makes up that story and he knows

6     it might work because everyone at that time is paranoid about

7     COVID.

8          On the 17th when he is telling Diaz, "Call Lawless, lie

9     your face off.  Tell him that you did nothing wrong.  Tell them

10    that Mercedes Perez is a liar."

11         The only reason he is doing that is to prevent Lawless

12    from learning the truth and telling other people on the Strike

13    Force.

14         When he has his conversation with Charlie Lawless on

15    the 20th where he lies about his relationship with Diaz, what

16    he knows about Diaz, and everything else, the only reason he is

17    doing that is to prevent Lawless from providing truthful

18    information about a federal crime to other members on the

19    Strike Force.

20         It's very simple.

21         Count 7, 8 and 9, again, these are the specific counts

22    on specific days.

23         Count 7 is the Barranco DEA CI story.

24         Count 8 is the July 18th direction of Diaz to lie to

25    Lawless on the phone, and then Count 9 is the recorded phone

1    call on July 20th and, lastly, we have an obstruction

2    conspiracy in Count 10, which overlaps with the witness

3    tampering conspiracy.

4          The main element in Count 10 is that we have to prove

5    that Crespo foresaw a grand jury proceeding, which I submit to

6    you as a federal agent for almost two decades, a Strike Force

7    agent for over a decade, he knew exactly when Charlie Lawless

8    reignited the Gonzalez/West Medical investigation that there

9    was going to be a grand jury proceeding.  He actually says that

10   in those phone calls when he tells Diaz, "Listen, when they

11   figure it out, they are going to pull the call records."

12         He knows, as a federal agent, that the only way to pull

13   call records is with a federal grand jury subpoena.  Remember

14   when he warns him, "They are going to see my phone number.

15   Don't you worry about it, I will make up a story."  Again, that

16   shows his corrupt intent, his state of mind.

17         Without question, ladies and gentlemen, we have proved

18   Count 10 beyond a reasonable doubt.

19         I ask you, when you go back and have a chance to settle

20   down, read that transcript book again, you might be sick of

21   these calls, you might be sick of it, it's all in there.  The

22   entire story is in there.

23         Look at our summaries.  They are all in there.  And

24   look through the lens of a corrupt agent providing protection

25   for a drug dealer.  It's a simple story, it's a straightforward

1  story.  We have proved his guilt of every single count in this

2  case.

3        Thank you very much.

4        THE COURT:  All right.  Ladies and gentlemen, why don't

5  we just take a short break before we begin with the defense

6  argument.

7        Now, from my estimate, completing the arguments today

8  and giving it to you to begin your deliberations would probably

9  get us somewhere between 6:30 and 7.  So, I am going to leave

10  the decision to you.

11        We can break earlier than that, if you wish, around six

12  or 6:30, and then come back.  So, if we finish all the

13  arguments tonight, then if you come back, you just do your

14  deliberations, you don't come into court, you just wait until

15  all the jurors are there and you begin your deliberations and

16  you can come whenever you want.

17        If we break up the arguments such that we have to

18  continue it in the morning, then we reconvene in the morning,

19  hear the rest of the arguments.

20        If you want to finish all the arguments tonight and you

21  want me to order you some pizza or something, I am happy to do

22  that, but I will let you tell Rehan what you want to do during

23  the break.

24        Let's take five minutes and we will come back.

25        COURT SECURITY OFFICER:  All rise.

 1             (The jury exited the courtroom at 4:59 p.m.)

 2             MR. QUINON:  Can I have a little bit more than the five

 3    minutes that I need to get organized?

 4             THE COURT:  All right.  Just a few more minutes than

 5    that.

 6             For the government, you have 21 minutes left.

 7             MR. MCLAUGHLIN:  Thank you, Your Honor.

 8             (Brief recess.)

 9             THE COURT:  Please be seated.  Note the presence of the

10    attorneys and the defendant.

11             Are you ready?

12             MR. QUINON:  Yes, Your Honor.

13             THE COURT:  Can we check if the jury is ready?

14             (The jury entered the courtroom at 5:14 p.m.)

15             THE COURT:  Please be seated.  All right.

16             For the defendant.

17             MR. QUINON:  May it please the Court, counsel, ladies

18    and gentlemen of the jury.  Good afternoon.

19             A JUROR:  Good afternoon.

20             MR. QUINON:  First, before I start, I want to thank you

21    for participating in this trial.  It's always a great sacrifice

22    that is made by the members of the community to give up their

23    time and their lives to come here and sit and put away your

24    obligations to your jobs and your families, and I just want to

25    tell you that we appreciate that.

1          This is a very helpful thing and important thing that

2    you do and so before I begin, I want to thank you for that

3    because I won't have the opportunity to do it at the end.

4          Now, as judges, you have a tremendous amount of power.

5    You will be deciding guilt or not guilty in a case, and that is

6    a tremendous amount of power because a lot of times in our

7    lives we sit and we wonder, you know, do I make a difference,

8    does it matter what I think and, yet, this is the only thing

9    that we do where each and every one of you is a judge and as to

10   who to believe and what to believe in this case, you are the

11   supreme judges.

12         Judge Gayles is the judge of the law and he gives us

13   the law and makes the rulings during the case but insofar as

14   who is telling the truth or who to believe, you are above any

15   judge in the system.  So, that is a tremendous amount of power,

16   a tremendous obligation also.

17         So, as judges, your job will be to find out what is the

18   law and you apply the facts as you heard, who you believe and

19   what do you believe to the law.

20         It is a difficult job in that sometimes the

21   instructions and the law is not something that you are used to

22   because you don't deal with this type of material or type of

23   language or terms on an everyday basis.

24         We have all tried to make it as easy as we can for you

25   with the instructions but you need to go over them carefully

1    because you need to know what the law requires.

2           Now, those are the rules of the road and those are very

3    important when you serve on a jury.

4           This is, as you know, a criminal case.  In a criminal

5    case, one of the things that we always need to keep in mind,

6    particularly as you sit as jurors in a case, is what is the

7    standard by which I judge an individual in this case,

8    Mr. Crespo, and this is a standard that applies to everybody in

9    our country.  This is our system of laws that we are very proud

10   of that requires the government to prove this case beyond and

11   to the exclusion of a reasonable doubt.  That is the highest

12   burden in the law.

13          Other countries have different burdens.  Other

14   countries don't have juries but we are very proud of our

15   tradition that for over 200 years we have jurors and we have a

16   standard.  We require the government to meet a level of proof

17   that is extremely high.

18          So, let me first start by discussing with you what it

19   is that that standard is and how high it is.

20          This is part of your jury instructions and you will

21   have it with your package and it's an instruction that the

22   Court is going to give you about the definition of reasonable

23   doubt.

24          The government must prove each and every element, not

25   just every count, each and every element of the offense, and

1    the offenses are divided into elements, beyond a reasonable

2    doubt, and if you have any doubt about that, that they have not

3    proven the case to that level, it is your obligation as

4    citizens, as members of the jury, to return a verdict of not

5    guilty.

6         So, it is important to understand this definition of

7    reasonable doubt, so I want to spend a little bit of time going

8    over it with you.  Again, you will see that it tells you that

9    the government has the burden of proof that is heavy, but it

10   doesn't have to prove guilt beyond all possible doubt.

11        That's how it starts and that the government must

12   exclude reasonable doubt.

13        Now, the part that I want to read to you, that I want

14   to discuss with you down here is what is the level of this

15   proof?  How high is that proof?  How difficult is that proof?

16        The instruction, the law tells you that proof of --

17   proof beyond a reasonable doubt is proof so convincing that you

18   will be willing to rely and act without hesitation, very

19   important, without hesitation in the most important of your own

20   affairs.

21        So, the level of proof to convict somebody of a crime

22   in this case has to be so that you can say, without hesitation,

23   that the case has been proven beyond a reasonable doubt and how

24   do you measure that?  As you would things that are the most

25   important things in your own life.

1          So, let's talk about that.  What is one of the most

2    important things in our lives?  Our health, obviously, our

3    jobs, our family, those are things that are important.

4          So, when you sit down and you judge a case and ask

5    yourself, what are the most important affairs, what is the most

6    important things in our lives and how can this case be proven

7    beyond hesitation, I suggest to you to think of it along these

8    lines:

9          One of the most important things in life is our

10   families and so, let's say that you have a relative of yours,

11   it could be a brother, could be your sister, your father, your

12   son, somebody in the hospital, and this happens, sometimes we

13   are called upon to make a decision.  Your relative, your loved

14   one is in bad shape and the doctor tells you that he or she may

15   not make it and sometimes you are the head of the family and

16   you need to make that decision.

17         Do I unplug my relative?  The doctor will tell you,

18   this person, your loved one, may not make it.  Do you want to

19   keep resuscitating this person tied up to this machine or

20   should we unplug your loved one, your son, your daughter, your

21   sister?  Now that is a tough situation but that is one of the

22   most important things in our lives, and I bring that up

23   because, in this case, somebody's life is also at stake here.

24   Important things are at stake here.

25         In the case of your relative, you don't pull that plug,

1   you don't say, "Yes, I pull the plug, the person can pass

2   away," you don't do that unless you are very, very certain, no

3   different than here.  You don't pull the plug.  You don't make

4   that decision unless you are very sure, and unless, very

5   important, you can do it without hesitation.

6        If at any point there is any issue that makes you

7   hesitate, then the case has not been proven beyond a reasonable

8   doubt.  And this goes as to every count and as to every element

9   of the offense.

10       So, as you can see, this is a very high and very

11  difficult burden for the government, and you are the judges and

12  we depend on you to follow the law and that is one of the most

13  sacred, revered and important concepts that we have that makes

14  us as a country proud that this is our justice system and that

15  we can be fair and that we can follow along.

16       A case like this is going to test you because

17  Mr. Crespo, far from perfect, he made lots of mistakes here and

18  I am going to go over that, but that doesn't mean he is guilty

19  of the crimes he is charged with.

20       So, your job, again, is to remember that that is the

21  standard by which you must measure every aspect and every

22  element of this case, no different than construction guys as

23  you walk downtown and you see them in their construction sites,

24  they have their measuring tapes.

25       Well, here, their measuring tape is the standard of

1    beyond a reasonable doubt.

2         So, I wanted to start by discussing with you that

3    concept because that runs through everything that is said in

4    this court.  Okay.

5         Another instruction that you will have that I want to

6    go over with you that it kind of gets lost sometime because

7    it's written, and it's a little word name.  This little word

8    here, "willfully" has a big, big meaning in the law.

9         You remember when we started this case and I did my

10   opening statement, I was clear and I told you that in criminal

11   law you only penalize when you do things with criminal intent.

12   I told you that at the beginning because I knew when we get to

13   this point, that was going to be the issue, whether or not, Mr.

14   Crespo, when he did what he did, he had the required criminal

15   intent.  That is going to be the issue, okay.

16        And so I told you that from the very outset.  I said,

17   "Look, in this case when we get to the end what matters is

18   going to be whether there was criminal intent," and this little

19   word is very important because the instructions will tell you

20   that the government must prove the commission of the crimes

21   knowingly, that he acted knowingly and that he acted willfully.

22        Now, let's talk about willfully.  What does it mean?

23        The word "willfully" means that the act was committed

24   voluntarily and purposely with the intent to do something the

25   law forbids; that is, with bad purpose to disobey or disregard

1    the law.

2              So, you may do something that could look bad, it's a

3    mistake, but it is not necessarily violating the law and that

4    is a fine line and that is something that we are going to

5    discuss because it applies in this case.

6              I think it was a great Justice of the U.S. Supreme

7    Court that a dog knows the difference between somebody who

8    kicks him intentionally and somebody who stumbles over the dog.

9    So there is a line there and we are going to discuss it, but I

10   want you to, when you go back and you have your instructions,

11   please, remember, that the case and the elements here, the

12   government must prove that Mr. Crespo acted willfully; that is

13   to say, that he committed the acts voluntarily, purposely, with

14   the intent to do something the law permits.  In other words, he

15   is acting against the law, he knows that, with a bad purpose to

16   disobey and disregard the law, and unless the government proves

17   that beyond a reasonable doubt, he must be found not guilty and

18   we rely upon you to follow those instructions.

19             I'm sorry that I am taking a little time about the law

20   but it's important because, as judges, you must follow the law

21   and so this is important.  We must go over the law because you

22   are going to use it in this case.

23             Another one of the issues that you, as judges, will do

24   is, how do you judge people?  How do you judge credibility?

25   How do you tell how much weight do I give to testimony?  Do I

1  believe him, don't I believe him?

2       Well, there are some instructions here about that, so

3  let's go over some of them at this point and you will have them

4  in your package.

5       But this one is testimony of accomplice or codefendant

6  with plea and cooperation agreement and use of addictive drugs.

7       Okay.  The law, in its wisdom, is telling you that not

8  all witnesses come into this courtroom with the same

9  credibility.  In other words, to be judged the same way and

10  this law is telling you, the law in its wisdom is telling you,

11  that when you judge people who testify who come to these cases,

12  some of them you have to be particularly careful with because

13  they have an incentive, they have a reason to lie.

14       And this is that instruction.  This instruction tells

15  you that the government has made plea or cooperation

16  agreements, and you see that here in this part of the

17  instruction, and you have had those witnesses here.

18       You had Mr. Diaz, Jorge Diaz, and you had Anais

19  Lorenzo, okay?  And I am particularly focused on this guy,

20  Diaz, because I submit to you that Anais Lorenzo has got his

21  number when she said that Jorge Diaz is a manipulator and she

22  is right about that.

23       And knowing that, coming from a government witness who

24  lived with a guy for years, she is telling you, "Hey, this guy

25  is a manipulator," you got to be on guard about what he is

1   telling you in this case, and a lot of the stuff that was

2   talked about here, is not on those tapes.

3        A lot of the things that he talked about that, Crespo

4   told me this and Crespo told me that.  No, no, no, not all of

5   that was on the tapes and there is some stuff that we will

6   discuss in a few minutes, but the thing that I want to impress

7   upon you is that he comes here and you want to be on guard with

8   this guy because Anais Lorenzo, who lived with the guy for

9   years, who has now, if anything, has no reason to come down on

10  the guy, is telling you, hey, I broke away from this guy.  He

11  basically -- she doesn't want to be with this guy.  He is a

12  manipulator.  Now I see him for what he is, and Jorge Diaz, he

13  is not going to change overnight.

14       He was, he is, and he will be a manipulator.  That's

15  the nature of that animal.

16       But you are judging and the law is telling you, okay,

17  when an individual comes into this court with a plea or a

18  cooperation agreement, you have to be more on guard.

19       This is like you are out on the street, you are driving

20  and you see the stop sign.

21       What does it tell you?

22       Stop.  And that's what this instruction is telling you.

23  When you see that kind of witness, it's telling you, hey, stop.

24  This witness is not a normal person.  This is not a normal

25  witness.  That is what that instruction is telling you.

1          So it tells you down here in this paragraph, "But a

2     witness who hopes to gain more favorable treatment in his or

3     her own case may have a reason to make a false statement in

4     order to strike a bargain with the government."

5          So while a witness of that kind may be entirely

6     truthful when testifying, you should consider that testimony

7     with more caution than the testimony of other witnesses, right

8     here.

9          When it comes to an individual like Mr. Diaz, the law,

10     in its wisdom, is telling you you need to consider his

11     testimony with more caution than other witnesses, and there is

12     good reason for that.

13          When you assess anything with this individual Diaz,

14     keep that in mind because that is important, and as judges, you

15     must apply that standard as reflected in the instructions that

16     have been given to you and that will be given to you.

17          In addition to that, there is another instruction

18     concerning credibility of witnesses, how do we -- what are some

19     of the things that should be looked at, and there are a number

20     of them.  I don't mean to emphasize one or two over the other

21     but I am just bringing out to your attention some of them.

22          So, one of the things that you need to ask is, as you

23     look at an individual like Diaz, did he impress you as an

24     individual who is telling the truth, and does he have a

25     personal interest in the outcome of this case.

1    Now, you know that he has an interest in this case

2    because you know that he plead guilty, got a reduction for

3    pleading guilty.

4    When you plead guilty, you get a reduction,

5    automatically, much -- you get a lesser sentence than if you go

6    to trial and get found guilty.

7    He knows that, but what he knows in this case is that

8    he got a sentence of 76 months, six years and four months, but

9    he knew that that was not his sentence and, basically, in my

10   cross-examination I got him to admit that.

11   He knew that when he got a sentence of 76 months, he

12   had the opportunity to come back and lessen that blow of

13   76 months.  That guy, Diaz, doesn't want to do 76 months.

14   Nobody does, in prison.  But particularly a person of

15   that nature.  He will do anything, and I mean anything, not to

16   do 76 months, and he knew that the only way to do that is to

17   get the assistance, the help of the Government.

18   And he is a manipulator, Mr. Diaz.  He knows what the

19   government wants in this case.  And he was embellishing,

20   Mr. Diaz, and at times outright lying in his testimony.

21   And he kept saying, no, and at any stage, in every

22   stage always, throw the mantra, the chosen phrase, "No, I felt

23   comfortable because Crespo told me that they are only going to

24   go there once for an interview, that the agents were not going

25   to go back for a second interview, and I felt very comfortable

1    because Crespo was an FBI agent."

2         That was Diaz.  Of course, Crespo is not an FBI agent

3    but, besides that, more important, none of that is on the

4    tapes.  What Mr. Diaz was doing, Mr. Diaz was manipulating his

5    patients.  He calls them his customers.  Mr. Diaz was

6    manipulating them because he was using -- he was using Crespo,

7    telling the patients, "Relax, I have a godson who is a federal

8    agent, nothing is going to happen here.  The agents came to

9    your house, don't worry about it, they are not coming back.

10   Crespo, my godson, told me that they are only coming one time.

11   They don't come back again."

12        But he was saying that because he was manipulating his

13   patients because he didn't want to lose the patients.  Those

14   patients, as they are called, beneficiaries or benes, were

15   selling their pills and if they thought that Diaz was being

16   investigated, they would cut all their connections to Diaz and

17   they would sell their pills to somebody else.

18        So it was important to Diaz to be able to manipulate

19   the patients and in order to manipulate the patients, he needed

20   some tool to manipulate the patients and that tool was Crespo

21   and he kept doing that time and time again.

22        That's an example of Diaz manipulating people.

23        I think that Anais Lorenzo gave you different instances

24   where she was manipulated by Diaz.  She was not a drug addict

25   when she started going out with him in 2011.  She was not into

1   Santeria, that religion, in 2011.  She testified to that under

2   oath here before you.

3          Mr. Diaz now takes the stand, essentially, and says,

4   no, no, no, no -- I asked him, "Was Anais into Santeria when

5   she met you and started going out with you?

6          "Oh, yes, she was."

7          That's not Anais Lorenzo's testimony.  She was not.

8   This man is a charlatan.  This man is a con artist, and he took

9   that woman, who is 30 years younger than him and had her

10  wrapped around his finger through his Santeria religion.  And

11  that is a religion that I spent some time going over with

12  Mr. Diaz.  And I think we all learned some stuff about it.  I

13  don't pretend that I am an expert in Santeria by far, but we

14  learned something about it, and, quite frankly, disturbing

15  things, that part of what you believe in the real religion is

16  that you can talk to dead people, and that you can change

17  events.

18         Also, we learned from Anais that you can place curses,

19  and she was terrified that this old man would put a curse on

20  her, a Santeria curse.

21         Now, if you don't believe in Santeria, there is no

22  problem.  Hey, you want to put a curse on me, knock yourself

23  out, buddy.  You can do whatever you want with your dolls,

24  stick your pins, do whatever the hell you want, I am not afraid

25  of that, but if you believe, if you believe, then you got a

1    problem.

2           And you saw where Anais said, Anais Lorenzo testified

3    here, that she was afraid when she was fighting at the end,

4    when she wanted nothing more to do with this creep, that she

5    was afraid that he was going to put a curse on her.

6           Now, why is that important and why did I go into

7    Santeria into both of them?

8           Because that has played a role in this case in really

9    allowing an individual like Diaz to possess the minds of

10   others, and he did that.

11          And he got into the mind of this fellow right here,

12   Crespo.  He did.  He did.  And how did he do it?  Through the

13   religion.  You heard from Anais, which I submit to you is a

14   much more reliable source of information about Crespo's meeting

15   Diaz and how he came into the religion.

16          Crespo came to Diaz because Crespo did, was dabbling in

17   Santeria, no question about it.  But Diaz became a figure that

18   was bigger than life to Crespo, not because Diaz is such a

19   fascinating person or important person or he is interesting.

20   No, it had everything to do with the religion.  You saw a

21   little taste of that when I asked him, you know, "Tell me a

22   little bit about Santeria, who is this saint, what is that

23   other saint, and what did you do?"

24          I asked him about that because I wanted to get him out

25   of his little box and tell us what are the tools that he uses

1   to possess people's minds.  And you can do that.  You can

2   basically own people.

3        That's why you have cults, people who follow -- people

4   who will follow you all over and do things that are incredible,

5   if you believe in a cult.  They possess your mind and this is a

6   religion where you can do that kind of a thing.

7        In fact, Mr. Diaz testified that some of the Babalaos,

8   the high priests of their religion, charge too much, he said.

9   But, yet, Mr. Diaz was telling you that he charges himself

10  $2,500 if you want to be a saint.  In that religion, maybe

11  2,000, up to 3,000, and that he, Diaz, kept himself very busy

12  because he was always making people saints, aside from the fact

13  that he was doing consultations, I guess to help people who had

14  problems.  But people paid him money.  Think about this.

15  People tell {sic} him money because he has the ability to talk

16  to ghosts or to spirits and to change events and to do those

17  kind of things.

18        It may be nonsense to most of us, but not to the people

19  who are going to see him and who are paying money.

20        Crespo was one of those people that went to see him,

21  and what did Anais Lorenzo tell you on the stand?  I didn't

22  call her.  I never met this woman before, I never seen her.

23        The government calls her, that's the government's

24  witness.  She tells you that when Crespo went there,

25  immediately, it was like kept going to the house all the time,

1   kept calling, and it was all about religion and Anais Lorenzo

2   told you that.

3           That was the relationship that was cultivated by

4   Mr. Diaz, not for weeks, not for months, for years.  He is a

5   very smart manipulator.

6           Why do I say that?  If you remember, to give you an

7   example how he manipulated Anais.  He got together with Anais

8   Lorenzo in 2011.  He didn't get her into his drug business,

9   into his peddling of pills right away.  That girl who was 30-

10  some-years younger than him had a good job.  She was working.

11  She was a normal person working nine to five in Jackson

12  Memorial Hospital.

13          So what happened?  2011, she is fine.  2011, 2012, she

14  is fine.  2013, 2014, through the years he is gaining her

15  confidence.  He is grabbing her mind until what happens?  I

16  believe it was 2017, she finally succumbs to his -- what he

17  really wanted.  She became a stooge.  She became a tool for

18  Mr. Diaz.

19          She now became, what, a patient of Dr. Gonzalez and

20  what did that mean?  What did that mean at that time to the

21  manipulator, to Mr. Diaz?

22          Do you know what it meant?  Money in his pocket.

23          He had another individual now that he really

24  manipulated that he really owned living with him, that he could

25  get her to go to the doctor, get pills, give me the pills, I

1    sell the pills, I keep the money, you keep doing this, and he

2    even went, because once he owned her, when he, Diaz, had an

3    argument with this guy Pozo, who never came in, by the way, he

4    has never been a witness here, but when Diaz had an argument

5    with Pozo, Diaz had such a hold with Anais Lorenzo, that he

6    told Anais, "From now on, you take Pozo's place, you will drive

7    the patients to the doctor.  You will drive the patients to the

8    pharmacy, and this girl, who at one time -- again, she was a

9    normal person.  She didn't believe in Santeria, she was normal.

10         At that point, she was far from normal.

11         She got hooked on what, first Oxycodone because that's

12   what Diaz was doing.

13         Now, Diaz will tell you, as he did, "No, I didn't know

14   anything about it.  I mean, she was stealing two of those pills

15   from every bottle and that's how she got hooked."

16         I submit to you, that's not the case.  And, again, this

17   fellow is a manipulator.

18         After she got hooked on Oxycodone, it was over for that

19   young lady, unfortunately.

20         She then went to even a worse, worse drug,

21   methamphetamine, ice, that is probably one of the worst, most

22   addictive destroying type of drug, and that drug took over that

23   poor girl and, quite frankly, life is over once that drug takes

24   over you.

25         It destroyed her family with her kids, her relationship

1    with the kids, the relationship with her mother.

2         It destroyed everything in that girl's life, until what

3    happens?

4         She ends up in prison now and she has been,

5    fortunately, clean for 18 months, but she told you, clean only

6    because she is in custody.  Because I asked her, "When you went

7    to rehab, you went there because you wanted to get better?"

8         She said, "No, man, I was waiting to get out."

9         But that's not because she is a bad person.  It's

10   because she was possessed by drugs, and the guy who manipulated

11   her, who put her in that position, was this creep, Diaz.

12        And it took him years but what's what he did with her.

13        Now, he did -- when he met Crespo, again, he met him

14   and it took him years to kind of use him.  Crespo was an agent,

15   true, but Diaz was peddling drugs, peddling pills, but he

16   wasn't telling anybody about that.

17        I asked him that on cross-examination, "You kept it

18   very close to your vest, didn't you?

19        "Yes.

20        "And you did that, sir, because you didn't want to get

21   caught.  Correct?

22        "Yes.

23        "So that is something that you would do but you were

24   leading a double life."

25        Do you recall that cross-examination because I spent

1    some time on that, and he had to admit that for a long time

2    Mr. Diaz was leading a double life.

3          Yes, it's true that Crespo was going to him for

4    religious services and belief in this guy, in this creep, and

5    as years went by, that relationship, true, became tighter

6    because Mr. Manipulator was taking over.

7          And so an advantage in the relationship with Crespo,

8    and he went on for years.  And he, what did he do?

9          He wanted to use Crespo as a way of telling his

10   patients, "Not to worry, everything is cool.  I got protection.

11   I got a federal agent."

12         But, you know what, not a single patient, not one, not

13   a beneficiary, not a bene, has come into this courtroom and

14   said that, in fact, they had any conversations with this man,

15   with Crespo, not one.

16         I mean, you must have thought about that as you sat

17   here.

18         You saw the pictures of so many of them, the prosecutor

19   mentioned there were 14, not a single one came in here to say

20   that they had anything to do with Mr. Crespo about Oxycodone.

21         Now, one of them knew Mr. Crespo, Lucia Alvarez,

22   through her son Nanny who Crespo helped Lucia Alvarez because

23   Nanny was being bullied by gang members when Crespo was a

24   police officer in Hialeah.

25         But it is no accident that not a single bene, not a

1    single one of those patients, as many as there were, can come

2    in here and say that they had anything to do with illegal

3    activity with Mr. Crespo, not one, and that is an important

4    fact in this case.

5          By the way, neither did Mr. Pozo come in and say that

6    he confessed to Al Crespo that he, Pozo, had information about

7    Dr. Gonzalez' clinic was doing illegal things.  We don't have

8    that.

9          What is the evidence of that, that Pozo told Crespo,

10   that he, Pozo, possessed evidence of illegal trafficking of

11   Oxycodone in Dr. Gonzalez's clinic?

12         The only evidence you have is when you heard from

13   Mr. Diaz, the manipulator.

14         And the prosecutor mentioned the word "corrupt."  If

15   there is any corrupt source here of information, it's that man,

16   Diaz, and that is what they bring to you to make that important

17   conclusion here.

18         So, I tell you that as jurors, you got to have your

19   light bulb on, insofar as who is testifying and whether you are

20   buying what they are saying.  That source of information,

21   Mr. Diaz, is a poisonous tree.  Remember that.

22         In fact, I cross-examined him and I showed him one of

23   the exhibits, Government Exhibit 7-37, it's the transcript, and

24   it's a transcript that the prosecutor has mentioned before and

25   used with Diaz, and I went back on cross and showed it to him

 1    and it was page five of that transcript where Mr. Diaz, on

 2    June 19 of 2020 -- and let me set the background for this

 3    conversation between -- this is a conversation between Diaz and

 4    his daughter Ashley.  And that's important.  He is now talking

 5    to his daughter so he can be more open and more honest because

 6    he is not going to do the same thing to his own daughter Ashley

 7    in terms of manipulation and using her as he is going to do

 8    with Crespo or Anais Lorenzo.

 9         What happened was, Diaz -- I'm sorry, Crespo, in

10    June 19th of 2020, gets an e-mail.

11         Now, he is working as an agent at HHS-OIG, an FBI agent

12    from the Strike Force, Charles Lawless who testifies in this

13    case, sends out an e-mail that says, "We are going to do

14    interviews of beneficiaries, and we are looking for

15    particularly Spanish-speaking agents because the beneficiaries

16    speaks Spanish."

17         So, he sends out an e-mail and the e-mail has a number

18    of people, over ten, I believe, about ten.

19         One of them, Number 7, is an interesting one, Milka

20    Lao, and I will get back into that in a minute.

21         So, Charles Lawless, from the FBI sends out that

22    e-mail.  Crespo gets the e-mail but Crespo then calls on the

23    phone, and we heard the conversation.  It's recorded.  He calls

24    Diaz and says, "Old man, I need for you to come over to my

25    house, I need you to come over to the house, I need to talk to

1    you about Gonzalez."

2             This is about Dr. Gonzalez, on the tape.

3             Diaz, at the time, is having some type of work on his

4    heart, some type of medical procedure, but he takes a pause of

5    his medical procedure and he says, "Okay, I'm coming over."

6    And comes over and speaks to -- Diaz comes over and speaks to

7    Crespo.  This is June 19th of 2020.

8             After that conversation, Diaz is talking to his

9    daughter Ashley, on the phone and he is telling her what

10   occurred when he met with Crespo.  And this conversation goes

11   here and he tells her that Crespo is a classy guy with him, see

12   this part right here, and that Crespo had shared with him,

13   showed him a cell phone, he said, and asked him, "Do you know

14   any of these people?"  And Diaz said, "No, I have nothing to do

15   with those people.  I do know them, but I have nothing to do

16   with them."

17            In other words, I know who they are, some of those

18   people, but I don't do anything with them, meaning I don't do

19   anything illegal with any of those people, okay?  And that is

20   important.  That is important.

21            Why is that?  Because one of the individuals in there

22   is Milka Lao, and how do we know that?

23            Because he tells that to Ashley.  So he tells Ashley

24   that one of the things that he noticed is that there was Milka

25   Lao.

1          Now, why is that important?

2          Clearly, it shows that Mr. Diaz, the manipulator, was

3     manipulating Mr. Crespo because he is telling Crespo, Crespo is

4     going there.  This is his father or religious -- in the

5     religion, a person that he really cared about.

6          By the way, this is June 19, 2020.  Crespo at that time

7     and Diaz, for that matter, are of the belief that there is no

8     investigation going on when this happened on June 19th of 2020.

9          Why do I say that?  Because on October the 2nd -- I'm

10    sorry, this conversation was June 19, 2020.  On October the 2nd

11    of 2019, months before, Rolando Alvarez, the agent who came in

12    and testified here, the agent who is an agent for HHS-OIG, who

13    was the lead agent, one of the lead agents in the Dr. Gonzalez

14    case, told Crespo when Crespo called him, "Are you an agent in

15    that case?

16          "Yes."  Rolando told him, "Yes, I am."

17          And Rolando told Crespo on October the 2nd of 2019 that

18    the investigation of Dr. Gonzalez was over.  Dr. Gonzalez, at

19    that time, had been convicted and had been sentenced.

20    Dr. Gonzalez had plead guilty, was sentenced by that time and

21    Rolando, the agent, Alvarez, told Crespo, "The investigation of

22    Dr. Gonzalez is closed."

23          And Crespo had told Rolando Alvarez, the DEA agent

24    that, "This is about a person that I know.  I need to know, are

25    you handling this investigation?

1          "No, the investigation is closed."

2          Crespo had told Diaz, "The investigation is closed.

3   You are not under investigation.  There is no investigation."

4          The person who is doing the investigation here is

5   Rolando Alvarez, he said the investigation is closed, there is

6   no investigation.

7          So, so far as Crespo and, for that matter, Diaz, the

8   investigation was no investigation at all as of October the 2nd

9   of 2019.

10         So now we roll the clock to this conversation here that

11   we have been talking about.  This is different.

12         This is not 2019.  This is 2020.  This conversation

13   takes place about nine months later, this one that I have here

14   on the ELMO that you are looking at.  And here, Crespo is still

15   of the mind, first, there is no investigation going on.

16         Secondly, Diaz has nothing to do with the trafficking

17   in Oxycodone and what he wants to do is to make sure that he is

18   not involved, that Diaz is not involved in Oxycodone.

19         So, he says, "Do you know any of these people," just to

20   make sure, listen, is this guy, at that time point is living in

21   the efficiency in Crespo's house.  So Crespo wants to make sure

22   Diaz is not involved in Oxycodone sales or trafficking or

23   whatever you want to call it and says to the guy, "Do you know

24   any of these people," and Diaz says, "No, I am not involved

25   with any of them," meaning I am not doing anything illegal.  I

1   have not done anything illegal with any of them, and that was a

2   lie.

3          Mr. Diaz was involved in the Oxycodone business with

4   Milka Lao.  Milka Lao, and you saw the evidence that was

5   presented by the government, Milka Lao was, herself, getting

6   pills from Dr. Gonzalez and selling her pills.  Milka Lao's

7   husband was also a patient of Dr. Gonzalez and getting pills.

8   Milka Lao's mother was also getting pills and selling them from

9   Dr. Gonzalez.

10          And the man that was behind Milka Lao is none other

11   than Mr. Diaz, because Mr. Diaz has admitted that he told Milka

12   Lao to go to a doctor in Boca, Dr. Espinosa, and we know that

13   she did because the government presented evidence of Milka Lao

14   getting pills from Boca.

15          And the government had the pictures of Milka Lao's

16   husband getting pills in Boca.  And we know further, that it

17   was Mr. Diaz who then recommends to Milka Lao that she should

18   go where, to the clinic of Dr. Carpman.  And how do we know

19   that Diaz did that, because the clinic of Dr. Carpman -- this

20   Dr. Carpman had a clinic with this fellow, Yandre Trujillo, who

21   was the person that Diaz was selling the pills to.

22          So Diaz had all kinds of information about Dr. Carpman

23   and what Dr. Carpman was doing and he told Milka Lao to go

24   ahead and go to that clinic.

25          So, the point here is very simple.

1          Mr. Diaz was in business with Milka Lao and when

2    confronted with the question, "Do you know anybody here that

3    you are" -- meaning, are you doing anything illegal with

4    anybody here?  The answer was no by Mr. Diaz, a lie.

5          Now, why would Mr. Diaz -- if Crespo is a corrupt agent

6    and Crespo knows in June 20th of -- I'm sorry, June 19th of

7    2020, that Diaz is indeed a drug dealer, as the government has

8    proposed, if he knows that, why is he asking Diaz, "Are you

9    doing anything illegal with anybody here?"

10         What is this?

11         If he knew, if Crespo knew that.  He didn't know that.

12   Crespo didn't know at that time.

13         And, what do we know?  We know that -- how do we know

14   that, because Diaz is confessing that to his own daughter.  He

15   told Crespo, "I know those people, but I don't do anything with

16   them," meaning I don't do anything illegal with them.  But you

17   know that that was not true and that that is a lie because you

18   have seen evidence here that Lao was getting medicine from

19   three doctors, and she was doing business with Mr. Diaz.

20         So, that conversation between Mr. Diaz and his daughter

21   is important.  It demonstrates that he, Mr. Diaz, was

22   manipulating this man, Mr. Crespo for his advantage, and that's

23   what you can expect from somebody like Diaz, because that's who

24   he is.

25         He is a con man who is going to do whatever needs to be

1    done to get his way, and, yes, Crespo was a very useful stooge,

2    a very useful individual that he could use and he could

3    manipulate because, you know what, he knew that he had the

4    trust of Crespo through what, through the religion, through the

5    religion.

6           I mean, you saw him when I asked Mr. Diaz, you know,

7    "Hey, that sounds pretty good talking to spirits, can I do it?

8           "Oh, you can do it, if you get the right training

9    because, you know, this part of the brain goes back here, and

10   this is the one that speaks to the ghost," and all of that.

11   This is the kind of stuff that you are going to get from an

12   individual like that.

13          But the point is that if you submit yourself to an

14   individual like that and you begin to trust them and you begin

15   to go into their world, you get to be owned by them to some

16   degree and they begin to use you.

17          Now, why is that important?

18          It's important because in this case, it is true, it is

19   true that Crespo said some things on those tapes that, yes,

20   they are problematic, and they concern me and I need to discuss

21   it with you and I am discussing them with you but you need to

22   understand the background.  You need to understand what is

23   going on in terms of the religion and the role that it plays in

24   this thing.  And why is that important?

25          Because Crespo is not doing what he is doing with the

1    intent, with corrupt intent, which is required by law to break

2    the law, and that is important because if he doesn't act with

3    corrupt intent, then he cannot be found guilty.

4         Now, how do you know that, and it's hard.  You can't

5    get into his mind, into Crespo's mind, but there is a window

6    here that allows you to do that, and that is the following

7    window.

8         I asked this individual, Diaz, "You get into drugs

9    because why?  What is the reason that anybody, what's the only

10   reason that you get into being a trafficker in Oxycodone?

11   What's the only reason that you become a drug dealer," to use

12   the words of a prosecutor, To make what, money, money.

13        That, my friends is the sweet ingredient that attracts

14   people, greedy people, to do crimes and to do bad things,

15   money.

16        That is what drugs are all about, and you don't get to

17   do drugs and you don't get to traffic in drugs, unless you are

18   going to make money.

19        You have to be insane, particularly if you had been a

20   federal agent or you had been in law enforcement for 27 years,

21   you are not going to throw that out the window and get into

22   drugs unless you want to make money.

23        I mean, there have been agents, yes, that's true, that

24   have gotten involved in bad things, but they normally people

25   money {sic}.  Because that is really what motivates people.

1    There is always a motive.  There is always a reason why you get
2    involved in crime.
3         So, I asked Diaz, "You are making 14, $16,000 a month.
4    Tell me, how much of that are you cutting this man in?  How
5    much are you giving to Crespo of your 14 or $16,000 a month?
6         "Zero."
7         Think about that.
8         That is truly something that you need to ponder upon,
9    that you need to really consider here.
10        I asked Mr. Diaz, "Did you -- besides giving him money,
11   that sale of business, you were in the Oxycodone business,
12   Mr. Diaz?
13        "Yes."
14        He was not and Mr. Diaz had to admit that, not because
15   he wanted to.
16        You have to understand, look, this case is -- when you
17   come into a federal case, and you can tell by my -- just by
18   looking at me, my age, I have been around courts a long time.
19        When you battle that table there, that's the federal
20   agents, you got yourself the FBI, you got yourself the IRS, you
21   got yourself the HHS, I mean three letters going back and down.
22   They have all kind of agents.
23        You have seen it in this case.  They went ahead and
24   they had, what, they had surveillance on an airplane, right
25   follow people with an airplane.  They put a camera on a pole,

1    on a telephone pole for months outside of this man's house and

2    the one thing they didn't say, they didn't bring into court but

3    you know that happened because you know the resources that they

4    have, is that they scoured, they went all over this man's

5    financials looking to see where is the money because he's got

6    to be involved in this for the money.  Right?

7           Zero money.  Zero money.

8           And now the government tells you, "Well, wait a minute,

9    he had to know because Diaz is only getting social security,

10   and look, here are the bank records for Diaz, see, he gets $915

11   every month, social security."

12          Crespo had to know.  He is a trained agent.  He is not

13   a newbie, baloney.

14          I guess they learned from the first time, and you, too,

15   because you didn't do the investigation, I didn't do the

16   investigation but we both learned at the same time here that

17   that is not true.

18          Diaz wasn't just making $915 a month from social

19   security.  He had the best source of money that he didn't have

20   to declare.

21          He is a Santeria.  He is a Palero.  He is charging

22   25,000 -- I'm sorry, $2,500 for saint, people that he is

23   bamboozling into believing that he has these supernatural

24   powers, and he charges them 2,500 bucks.  And he said, "I am

25   always busy, I am always doing saints."

1          So, he is always busy and he is always making $2,500.

2          And you know what, he certainly is not declaring it,

3     and he certainly wasn't charged for any type of federal

4     offense, tax violation for not declaring it.

5          But it is nonsense to come here and to say that that

6     was his sole course of income.  That is not true and the

7     evidence here, according to this individual, Mr. Diaz, he,

8     himself, had to admit what he was doing.

9          Of course, he was a little bit bitching about the fact

10     that he wasn't charging as much as others who abused the

11     religion, the religion.  And, of course, he got caught into a

12     kind of inexplicable position, you are this high priest and you

13     have this thing about religion, but you are engaged in an

14     activity.  Is that allowed by your religion, Mr. Diaz?

15          No.

16          Next, an instruction that will be given to you about

17     this issue of policies and procedures, and we heard on a number

18     of occasions that Al Crespo did not follow certain policies and

19     procedures.  We've heard testimony to that effect, and this is

20     an important instruction because it tells you that violation --

21     right here, "I caution you that violation of these policies and

22     procedures, standing alone, is not a crime."  This is not a

23     civil case.

24          Mr. Crespo is not here on trial for violation of any

25     procedure or policies.  Those things can be dealt with

1    administratively.

2         I asked that question of Henry Luna when I called him

3    as a witness, and I believe I asked Barranco a little bit about

4    it as well.  The agents can handle that internally.  If

5    somebody breaks any policy or procedure of an agency, you fire

6    his butt, get him out.  And if in this case, Crespo did not

7    follow their procedures and did not follow their policies, you

8    fire them.  In fact, quite frankly, in this case, his career as

9    a law enforcement officer is done.  No matter what happens in

10   this case, he is done, he is fired, he is gone, but that's for

11   somebody else.  That's not for you.  You are here to determine

12   this, which is a criminal case.

13        So, again, I wanted to discuss that instruction because

14   it is important that you understand that.

15        Now, Mr. McLaughlin, the prosecutor, mentioned to you

16   that Crespo in this case always volunteered because he wanted

17   to be in the inside so he can tip off Diaz.

18        That's not true.  You were here.  Ever since he joined

19   HHS-OIG, he has been a hard worker.  He is a good agent, not a

20   single -- there were three agents, from HHS-OIG who came in to

21   testify, three, and all of them told you the same thing.

22        This guy, Crespo, was a good agent, productive, always

23   volunteering.

24        You need somebody, I'm in.  It is not a coincidence

25   that he was volunteering for this thing.  That's what he did.

1    That's who he is.  That's what he has done his entire career.

2           But, yet, you can twist it a little bit to say, "Look,

3    he was doing that because he wanted to be on the inside, that's

4    why he was volunteering for everything."

5           No, he volunteered for everything all the time.

6           Take a look at the recording, that you heard the

7    recording.  Unfortunately, she couldn't be here, Victor Buono,

8    another agent, and I mentioned three, but really it's four,

9    Victoria is an agent, she was somebody that came into the

10   agency and she was mentored by, and she says that on the tape,

11   mentored by Al Crespo.

12          What did she say, the guy was a hard-working agent, a

13   good agent.  And what else is there in that transcript, in that

14   tape that you heard from Victoria Buono?  Okay.

15          Victoria Buono attended the July 14th debriefing and

16   she was assigned to be partners with Crespo and she contacted

17   Crespo and Crespo told her, "Sure, we will do the debriefings.

18   We will go and interview this bene," and Crespo agreed to do

19   that.

20          But, obviously, she knew that Crespo was legitimately

21   concerned about COVID.  It wasn't a phony baloney thing made up

22   like the prosecutor said what happened on July 8th with

23   Barranco, and I will get to Barranco's testimony in a minute.

24   It wasn't a phony baloney thing.

25          How do you know that?  Because Victoria Buono, an agent

1    in that agency, tells you that Crespo was worried about COVID.

2    He was willing to do the interviews, not a matter of cancelling

3    the interview.  He was willing to do it, but he wanted to do it

4    from the car, he wanted to do it from the car so he wouldn't be

5    exposing himself to COVID.  Why is that?  Why?  Because COVID

6    hit him hard.

7         Members of his family passed away from that disease.

8    His little daughter who was ten years old, got COVID, the whole

9    family of the little daughter got COVID.

10        So when -- and that's a count in this case, Count 8, is

11   the conversation -- I'm sorry, Count 7, the conversation

12   between Crespo and Agent Barranco is a count, and you have

13   heard what the counts here are.

14        When I questioned Mr. Diaz, right?  Every single one of

15   those counts, Mr. Diaz told you he was exposed to 20 years

16   maximum in prison.  Right?

17        This is serious stuff here.  Serious stuff.

18        So that's a 20-year conversation where they were

19   discussing now.  What do we know about that?

20        Al Crespo tells his supervisor, Barranco, that he heard

21   from an old source that he had, an old man, a source that he

22   had from DEA days, and Crespo had worked with DEA before, that

23   benes had COVID, and Barranco, of course, he is your company

24   man, and if you work for one of these agencies and if you work

25   for a big company, you have to worry about your job because if

1  somebody gets into trouble, you always want to take the side of

2  the company.

3       It's not the case as the prosecutor described here that

4  Crespo told Barranco, yes, every one of those benes got COVID

5  in this address and that address, nothing like that.

6       This is normal conversation between an agent, who is

7  reporting to his supervisor, hey, and he was concerned.

8       Crespo went there because he was concerned himself

9  about not getting COVID as well as the agents who worked with

10 him.

11      He said, "Hey, I heard from this individual, who was an

12 informant when I was in DEA, who told me that there is COVID

13 out there and that some of these benes may have COVID."  Okay.

14      And Barranco then gets into a little bit into a

15 different mode.

16      Barranco begins to dig at who is this informant.  He

17 wants the name, basically, the identity, the revelation of who

18 is the confidential informant, and if you know anything about

19 law enforcement, and I cross-examined him on that, confidential

20 means confidential when you know an informant.

21      Why, because that informant's life is on the line.

22 It's up to you to protect them.  You are the law enforcement

23 who needs to protect them because when you are an informant,

24 particularly on drug cases, you can lose your life.

25      So, what happens is Barranco at that time, on July 8,

1    2020, when this conversation takes place, and, again, this is a

2    count in the indictment, when that conversation takes place,

3    Barranco knows that there is an investigation going on and that

4    it deals with Crespo.

5         So he is digging and he is suspicious simply because he

6    has that in the back of his mind but, in reality, what Al is

7    telling him is the truth.  We are July 8, 2020, in the middle

8    of the pandemic, when, as we all know, people were in the

9    hospital, people were dying.  He has family members who passed

10   away from COVID.  The daughter was suffering from COVID at that

11   time.  He is depressed at that time.  How do we know that?

12        Henry Luna testified that he was depressed because of

13   the COVID situation with his family, and so he, depressed,

14   concerned about himself, concerned about his fellow agents,

15   heard that from an individual from DEA days that there is COVID

16   out there, possibly with some of the people that may be

17   interviewed, and tells that to his supervisor, very normal.

18   And why do I say "very normal"?  Is this me just saying that?

19        No, you heard in that recording with Buono, Victoria

20   Buono says it.  They asked her.  One of the agents here asked

21   her, "Well, didn't you find that strange that he is saying

22   about that he has got this informant DEA saying that?"

23        She said, "No, not at all."  It's right there.  You can

24   listen to the tape.  You will see the transcript.  You will

25   have it with you.

1          She said, "Not at all.  Al knows everybody.  He is the

2     go-to guy in our agency.  Al knows people in the street.  I am

3     not surprised at all.  That's not crazy," to use her word,

4     that's what she said.  "That's not crazy at all.  That's Al."

5          Now, Barranco gave it a different interpretation but

6     what's the difference, Barranco is thinking of an investigation

7     that is going on, Buono is not.  Victoria Buono saw it for what

8     it was.

9          This man was concerned about COVID, was concerned about

10    his family, saw what was happening.  The office was working at

11    a percentage, maybe half of the operational way because of

12    COVID, and he relayed that information.  That's all he did.

13         Now, Barranco wanted to know the name of the informant.

14    In law enforcement, you don't do that.

15         THE COURT:  Fourteen minutes.

16         MR. QUINON:  Thank you, sir.

17         How do we know that you don't do that in law

18    enforcement?  Again, not because I tell you, because I

19    cross-examined Rolando Alvarez, the government's witness, I

20    cross-examined him and I said, "Let me ask you, if your

21    supervisor" -- and the supervisor of Rolando Alvarez is none

22    other than who, Barranco, the same guy who testified here.  I

23    asked him, "If your supervisor asked you to give him the name

24    of an informant, would you do that?"

25         Rolando Alvarez said, "No, I won't do that."

1          I asked him then, "Why not?

2          "Because I would need the permission of the agency who

3     he is informing for."

4          So, what Barranco was saying that arouses his suspicion

5     is nonsense, because he knows or should know, I should say,

6     that you don't ask about the identity of an informant,

7     particularly a DEA informant, that is with another agency

8     dealing with other issues.

9          Again, please, I urge you, when you go back, if you

10    have any doubt about when you get to this Count 8, take a look

11    at Buono's transcript, listen to their conversation, and you

12    will see and she says, "I was not at all surprised, because Al

13    knows everybody.  He is a street guy.  He was a street cop in

14    Hialeah for many years.  He had sources."

15         Now, Count 1, and I am going to shortcut this thing

16    because I am running out of time and I just want to make sure

17    that I get within my time.

18         I apologize to you and you have to understand, this is

19    important.

20         You know, this man's life is here.  You will decide on

21    it and he deserves every moment that we give him.

22         It's important.

23         Count 1, again, conspiracy to possess with intent to

24    distribute Oxycodone.  In a case where the evidence is this man

25    did not receive, did not ask for any money and did not receive

1    any money, he is not involved with that.

2           He is not guilty of Count 1.  He is not even close.  He

3    is not involved in the Oxycodone business with this other

4    fellow, with Mr. Diaz, and to be involved in drugs, again, and

5    I hate to repeat it but it's important, you only do it for

6    money.  And there is no evidence that Al acted with criminal

7    intent to in any way involve himself or to get himself involved

8    in any conspiracy having to deal with drugs.

9           And, when you go back and you take a look at the

10   instructions on this Count 1, here is the little word.

11   Remember the little word that I told you was so important and

12   so big, "willfully joined the conspiracy."

13          You don't just join the conspiracy.  You have to

14   willfully join the conspiracy, which meant what, we read the

15   definition of "willfully" before, right, that you are doing it

16   with the purpose to violate the law, and there is no reason why

17   Al Crespo would have been purposefully to violate the law in a

18   conspiracy to dealing drugs when he is not making drugs, he is

19   not selling drugs, he had nothing to do with drugs.  Has

20   absolutely no reason, no rhyme for that.

21          And that little word "willfully" is important and it is

22   there and you must find beyond a reasonable doubt to find him

23   guilty that he willfully joined, not that he joined, that he

24   willfully joined.

25          It's a little word with a big meaning, and there is no

1   evidence of that.

2          That's Count 1.

3          By the way, Count 1, while we are at it, let me just

4   point something out for you.

5          The fact that Al knew Mr. Diaz and that he was present

6   in some of the events or associated with certain people, or

7   even discussed common goals or interest, does not establish a

8   conspiracy.  Very important.

9          The same concept goes to Count 5, conspiracy to commit

10  witness tampering.  Again, very important, "willfully."  I

11  won't repeat it.  It's late.  I am running out of time so I

12  want to go over that.

13         "Willfully," again, that is the high burden that the

14  government has in this case, and I submit to you, they have not

15  met that burden, and when it comes to that conspiracy of

16  witness tampering, there is a definition of corruptly persuade,

17  here we go, and has to be done with a corrupt intention.

18         Again, as I told you in the beginning, in my opening

19  statement, in criminal law you penalize the criminal intent

20  when you do it consciously in an effort to violate the law, to

21  break the law, and there is no evidence that Al Crespo acted

22  with that intent in this case.

23         Same thing with the substantive counts, which are

24  Counts 7 and, 8 and 9.  These are the counts that have you with

25  you and you will have with you back there when you deliberate.

1            Once again, importantly, you see here, it's Counts 7, 8

2     and 9, importantly, it's not just persuading.  It's corrupt.

3     You have to act with that intent, corruption, corrupt intent,

4     and, again, no evidence of that.  And the same thing I read to

5     you before or I pointed out before, to corruptly persuade, you

6     have to do things with criminal intent, corrupt intent in

7     criminal cases and you don't have that in this case.

8            Lastly, Count 10, conspiracy to obstruct justice.  And,

9     again, it has the same language as we saw before that is simply

10    being present at the scene of an event or merely associated

11    with certain people and discussing common goals and interest

12    does not establish proof of a conspiracy, so the fact that he

13    was, because of the religion, tight or close to Mr. Diaz, does

14    not mean that that is a conspiracy because in this case,

15    Count 10, you need to find what, specific intent, not just

16    intent, specific intent.

17           Again, criminal mindset to violate the law, and very

18    important in this Count 10, you talk about an official

19    proceeding is an element of this particular offense, a

20    component of this, and it means what, an official proceeding

21    means a proceeding before a federal grand jury.

22           And what do we know about that?  We know that as of

23    October 2nd of 2019, Rolando Alvarez told Crespo that there was

24    no investigation, that he, as the lead agent, that was the end

25    of the investigation, and there is no more talk in any of those

1  tapes, in anything at all in the case, about a federal grand

2  jury.

3       You know what happened, take a look at the conversation

4  then that happens in July 20 of 2021, the day before Crespo

5  gets arrested, there is a conversation between Charles Lawless

6  and Crespo, and it is Charles Lawless the day before he arrests

7  Crespo, that brings up, "Oh, I may go before a grand jury," he

8  mentions a grand jury, the day before the arrest.  That's the

9  only time that it's mentioned in the case about a grand jury,

10  right here.

11       So, Count 10, with all due respect, the government has

12  failed to put proof, certainly, any proof beyond a reasonable

13  doubt.

14       Count 10, I submit to you, clearly should be not guilty

15  as the other counts.

16       Now, let me address a couple of other issues and I have

17  to wrap up.

18       Diaz, who has a high stake in this case because as

19  Crespo is found guilty, in his mind he is going to get a much

20  bigger reduction.

21       He says, "You know what, Crespo tipped me off about

22  Dr. Gonzalez, who is under investigation and Dr. Gonzalez was

23  going to get arrested.  I learned of that through Crespo."

24       That is what Diaz testified to.  But that is not what

25  Anais Lorenzo testified to.  Anais Lorenzo said, she testified,

1    if you recall, it's part of the record in this case, that Diaz

2    learned that Dr. Gonzalez was under investigation and that he

3    was going to get arrested because a woman who worked at the

4    clinic by the name of Sucett, who was a secretary there, was

5    the one who was tipping off Diaz that the clinic was under

6    investigation.

7          So, the source of Diaz -- Diaz had people working in

8    that clinic and the employees in the clinic, some of them were

9    already cooperating with the government.  That's who tipped off

10   Diaz but now it's convenient for Diaz to say, "No, no, no, I

11   learned from Crespo," so he can get a bigger and better

12   reduction.

13         I will wrap up by saying to you that one of the things

14   you learn in the case is that Crespo is a good-hearted person

15   and you learn that very early in the case when Rolando Alvarez

16   came in to testify and he shared with you, Rolando is from

17   Puerto Rico, had his family in Puerto Rico and they had this

18   hurricane, Maria, that absolutely destroyed the island and

19   Rolando wanted to go back there and help his family, make sure

20   that they were alive and make sure that he could help the

21   family, and he did what any one of us would want to do, help

22   the family and tell other people that he worked with what he

23   was going to do, and some of the agents there, four of them,

24   Rolando and three more, showed a tremendous amount of what

25   goodness and what good people they are, and one of them

1    happened to be this man right here.

2         He went to the island and give of himself and spent a

3    month in an island that didn't have electricity, an island that

4    didn't have food, an island that you had no AC, nothing,

5    mosquitoes, basically, hardship.

6         What did he gain out of it, nothing.

7         He took out of his own vacation days, his own sick days

8    to be there.  And he didn't have any reason to be there.

9    Rolando did, because his family was there.

10        Mr. Crespo didn't.

11        THE COURT:  Time.

12        MR. QUINON:  It's time already, Your Honor?

13        THE COURT:  Yes.

14        MR. QUINON:  You heard that, and you heard that he

15   stuck up for when they were trying to bully Henry Luna because

16   he was gay.

17        I leave you with that, my time is up.  I thank you and

18   I ask you to please give this man the attention that he gets

19   and hold the government to their burden and I hope that you

20   will return a verdict of not guilty as to each and every count.

21        Thank you.

22        THE COURT:  All right.  For the government.

23        MR. MCLAUGHLIN:  Your Honor, can I have a five-minute

24   restroom break?

25        THE COURT:  Okay.  All right.  We will recess just for

1    five minutes.  Then we will wrap up the argument.  We should

2    get out of here shortly after seven.

3              (The jury exited the courtroom at 6:47 p.m.)

4              THE COURT:  All right.  Please be seated.

5              Are you all set?

6              MR. MCLAUGHLIN:  I am ready, Your Honor.

7              THE COURT:  For the record, I do note the presence of

8    everyone, including the defendant.

9              (The jury entered the courtroom at 6:52 p.m.)

10             THE COURT:  Please be seated.  For the government.

11             MR. MCLAUGHLIN:  Thank you, Your Honor.

12             Ladies and gentlemen, the best way to look at this case

13   and to view the government's evidence of this testimony is

14   through the prism of Crespo's mentality and you see that

15   through numerous wiretap calls, the testimony of Anais Lorenzo,

16   the testimony of Jorge Diaz is the mentality, the corrupt

17   mentality that Crespo had that there were two systems of the

18   criminal justice system here, especially in South Florida.

19             There was one for him and Diaz where they could do

20   whatever they want, go wherever they want, say whatever they

21   want and there were no consequences, and one for everybody

22   else.

23             That's it.

24             It's very simple.

25             I want to start with the whole idea raised by the

1    defense that Defendant Crespo had no idea that Diaz was in

2    Oxycodone trafficking, had no idea it had gone on forever, that

3    Crespo never tipped him off.  That is nonsense, ladies and

4    gentlemen, and the way you know it is nonsense is on July 17th,

5    who does Crespo want to kill?  He wants to kill two people, he

6    wants to kill Anais Lorenzo and he wants to kill Carlos Pozo.

7         Pozo doesn't come up in any conversation on the wire at

8    all, until suddenly when the walls are crumbling down on

9    July 17th, Crespo brings him up.  Diaz never brings up Pozo,

10   it's Crespo.  Why?

11        Because what Diaz tells you has a factual foundation to

12   when it.  During 2017, when Pozo was fired from West Medical,

13   he goes to Crespo, who he knows is a federal agent, and wants

14   to inform of illegal activity there.  Right away, Crespo knows

15   that Pozo is a threat, and Pozo is Diaz's right-hand man.

16        So when the world is crumbling down on July 17th, and

17   they are trying to figure out who the snitch is, he is the one

18   who brings up Pozo, no one else and he knows Pozo is a threat

19   because Pozo tried to inform before.

20        What does that tell you, is that he has known for years

21   that Diaz is a drug dealer.

22        In fact, if you actually go to the transcript, he

23   admits it.  It's another confession.

24        Again, every witness is different and, again, follow

25   the instructions, the wiretap is nearly unassailable in this

1   case and it's his own words telling you what he thinks, what he

2   feels, and what his corrupt intent is and what his illegal

3   intent is.

4       This is transcript 7-65, the second page, again, this

5   is Crespo bringing up Pozo.

6       "You know, Pozo sold you out.  Anais sold you out."

7       And then right down here, "I have been telling you for

8   a year, a year that they are going to sell you out."

9       Well, if Diaz isn't a drug dealer and Crespo doesn't

10  know he is a drug dealer why are they having conversations

11  about Pozo and Anais selling him out?  Of course, he is a drug

12  dealer and he has known for a year or longer that Pozo is

13  potentially a threat and Anais Lorenzo is now a threat.

14      Here is another example of exactly how long -- proving

15  how long Crespo has known that Diaz is a drug dealer.

16      This is April 24, 2020, this is transcript 7-14, and

17  this is a call from Diaz to Crespo when Pedro, the CI, is

18  calling again, in April.  This is seven months later from

19  September.

20      And basically Diaz says, "Listen, this guy is calling

21  him."  He calls him, "This fucking black man," which they

22  clearly know who they are talking about because they have

23  talked about Pedro Alvarez being a CI and Pedro Alvarez being a

24  threat.  Why is he a threat to Diaz, because he was a patient

25  recruiter at West Medical.  Clearly Crespo knows that.

1          And what do they talk about, "What I am going to do?"

2          Crespo, "Block him, block him, don't respond.  Block

3     him."

4          Think of the illogical scenario that is.  This is a

5     federal agent telling someone block the calls of a confidential

6     informant.  Again, a federal agent instructing a drug dealer to

7     block calls of a confidential informant.

8          The only reason he does that is because he knows Diaz

9     is a drug dealer.

10          That is the only reason.

11          In terms of defense counsel's comments about Count 1

12     and the narcotics conspiracy, the government does not have to

13     prove why Crespo was involved in the conspiracy.  We don't have

14     to prove that he is laundering mounds of cash, why he did those

15     things.

16          People commit crimes for a variety of reasons,

17     stupidity, ego, arrogance, lots of reasons.

18          Why is not part of the elements, but what I can tell

19     you is, this is transcript 7-12, this is Diaz, "I have

20     Samantha's money that's from the PPE from China they were

21     selling.  I have your rent."

22          It's April 24th.  It's not the beginning of the month.

23     It's not when he has the social security check come in.  This

24     is drug money, he's taking it and he knows exactly where this

25     money is coming from.

1        Again, why is Anais Lorenzo a threat?  Why does Crespo

2    was to kill her and stab her and take her out to the Everglades

3    and cut her up so the alligators can eat her, because she has

4    been threatening Diaz.

5        Here he is on May 8th, screaming at Anais Lorenzo,

6    threatening to keep her mouth shut, and if she doesn't, there

7    will be consequences.

8        Again, you only leave this voicemail if you know that

9    the threats against your drug dealer best friend, who is living

10   at your house, are very serious and can threaten you and your

11   drug dealer best friend.

12       Defense counsel made the point, how do we judge people?

13       Well, I submit to you, ladies and gentlemen, judge this

14   defendant on the facts of this case, judge this defendant on

15   what he says in these wiretap calls, and judge this defendant

16   on his conduct, before the wiretap.

17       Again, the government's evidence is very clear and

18   convincing and beyond a reasonable doubt that Crespo has known

19   Diaz is a drug dealer for a very long time.

20       You have the Pozo issue.  You have Diaz's testimony

21   that he was tipped off about the investigation, that's why he

22   fled West Medical, and it makes sense when you look at the

23   timing of the calls, as we get into 2019 before the indictment.

24       There is no reason for them to be calling each other

25   before a search warrant, before an arrest, the day of a squad

1   meeting, the day of a Strike Force meeting, unless they are

2   constantly talking about what's going on in the investigation.

3        The only reason he would be interested in what is going

4   on in that investigation is if they were worried about Diaz

5   being a target.  Why would you worry about Diaz being a target?

6        Because he is a drug dealer.

7        Think about -- take a step back and think about that

8   call with Pedro Alvarez in September.  Pedro Alvarez calls Diaz

9   and he says, "Listen, there are these agents interviewing me

10  and they are asking about you, I don't know, but they are

11  asking about you."

12       Of course, Diaz says, "I will talk to Crespo, he works

13  there.  He knows all the agents, we will be fine."

14       If Crespo doesn't know that Diaz is a drug dealer,

15  image how that call between Diaz and Crespo right after would

16  play out.

17       The call comes in, Crespo answers the phone, if he is

18  not an corrupt agent, "Who is asking about you?  Why are agents

19  asking about you?  Why is -- who is Dr. Gonzalez/West Medical?

20  What is going on?  What is -- this is crazy."

21       But that's not what happens.

22       It's just month after month, week after week, day after

23  day, of obstruction and covering up and protection.

24       Why, because he knows he is a drug dealer.

25       That is why.

1          Defense counsel made a comment about decisions that you

2     have to make as jurors.

3          Look at the decisions that Crespo makes for years.  He

4     chooses not to go to his colleagues and say, "I know Jorge

5     Diaz.  I know he is a drug dealer."

6          He makes a decision, for years, not to go to his

7     supervisor and say, "I know Jorge Diaz, I know he is a drug

8     dealer."

9          It's day after day, week after week, year after year of

10    decision after decision after decision where there is a fork in

11    the road.  He can go left and be a righteous, upstanding agent

12    and follow the law, or he can go right and cover up and protect

13    and obstruct.  He goes right every single time, right up until

14    the moment he is arrested.

15         Look at that call with Charlie Lawless.  That's really

16    his Alamo, his Waterloo, his last chance to come clean, and

17    what does he do?

18         He is on the phone with a federal -- fellow federal

19    agent and lies repeatedly to him.  Tells this whole story, "I

20    know Diaz was calling but I didn't know why he was calling me.

21    I didn't know anything about that.  If I knew he was a drug

22    dealer I would turn into Hialeah Police, I would pinch him

23    right there," and then he brags about, "Listen, if the agents

24    come to you and you have to worry about getting a lawyer, then

25    you have some huge problem.  If someone comes and talks to me,

1    I am going to say, 'Hey, what's up?'"

2         It's all projection.  It's all ego.  It's all bluster

3    because he is protecting himself and he is protecting Diaz.

4    It's all a charade, and it's all reflected in the counts.

5         The entire conspiracy to tamper.

6         Let's focus on Barranco.  The government has the burden

7    on this case.  They don't have to put on any evidence, they

8    don't have to call a single witness, but they did.

9         Do you think, ladies and gentlemen, using your

10   reasoning and your common sense, if this DEA source was a real

11   person, actually existed, he would have been here?  He doesn't

12   exist.  It's a fabrication.

13        The whole idea that Crespo was concerned about COVID,

14   nonsense.  He is so concerned about COVID he is out with Henry

15   Luna and Samantha drinking wine at Cooper's Hawk on a Friday.

16        That's garbage.  The entire reason that story is

17   fabricated is to shut down the investigation.  It almost

18   worked.  He got HHS to stand down.  It almost worked.  It's the

19   entire reason he does it.

20        He doesn't reveal the source of this DEA CI because the

21   DEA CI doesn't exist.

22        You heard Barranco testify, "Every time I asked him a

23   question, 'Well, how does your source know this?  How does your

24   source know these people,'" he wouldn't say anything.

25        Why, because it's all a fabrication.

1          Again, on the 17th, when he is directing Diaz on the

2   wiretap, look, it's in your book.  "Call him, throw her under

3   the bus, say you did nothing wrong.  I don't sell pills to

4   anyone."

5          It's all part of the witness tampering conspiracy and

6   that's all being directed by him.

7          Again, the calls with Lawless with lie after lie after

8   lie, that's Count 9.  It's all part of the defendant's corrupt

9   plan to shut down and obstruct.  That's all he does.

10          There is no good agent here, ladies and gentlemen.

11          Good agents don't obstruct investigations.  Good agents

12   don't lie to their colleagues.  They don't lie to the

13   supervisors.

14          The whole idea that he is a good, hard-working agent,

15   garbage, nonsense.

16          In terms of the final count and the instructions,

17   really, I want to talk to you a little bit about the witness

18   tampering count.

19          Defense counsel tried to talk to you about "corruptly

20   persuade" and that prong, that's not what the government is

21   relying on here.

22          We are relying on the "knowingly engaged in misleading

23   conduct" prong.  That's where you find him guilty.

24          He can be guilty of it in two ways, he can either

25   corruptly persuade or knowingly engage in misleading conduct

1    toward another person.

2          Again, July 8th, it's Barranco.  July 17th, it's

3    Lawless, and on July 20th, it's Lawless, the other person.

4          What is misleading conduct?  Knowingly making a false

5    statement, omitting key information in a statement, or using a

6    trick, scheme or device with intent to mislead.

7          The fabricated DEA CI, prong three, there is your

8    trick, scheme or device or mislead.

9          Having Diaz call Lawless on the 17th saying, "I am

10   Jorge Diaz, someone said some story about me lending pills.  I

11   did nothing wrong."

12         That's him aiding and abetting and directing Diaz to

13   knowingly make a false statement.

14         Everyone knows, Diaz knows he is a drug dealer; Crespo

15   knows he is a drug dealer.

16         That's a false statement.

17         Then Crespo, himself, when he is talking to Lawless on

18   the 20th, it's on the transcript book, go back and read it,

19   there are at least 15 different lies, I don't have time to go

20   through every single one of them, but he is making false

21   statements and he is omitting key information from Charlie

22   Lawless, time and time and time again.

23         Why is that?  Because he doesn't want Charlie Lawless

24   to know the truth because he knows if Charlie Lawless knows the

25   truth, he tells another agents and there it goes.

1          Lastly, Count 10, a person acts corruptly if they act

2     with an improper purpose or engage in conduct knowingly and

3     dishonestly with a specific intent to subvert, impede, or

4     obstruct.

5          Every single thing Crespo has done in that charged

6     conspiracy, September of '19 through July of '20, is with that

7     purpose.

8          You don't ask people to lie.  You don't lie yourself to

9     agents.  You don't make up stories to your colleagues and

10     supervisors unless you are acting corruptly, plain and simple.

11          Lastly, the whole idea that Crespo had no idea or could

12     foresee that a grand jury proceeding was going to happen is

13     ridiculous.

14          The e-mails are in evidence.  You will see in the

15     e-mails, Charlie Lawless tells him, "We have a grand jury

16     investigation ongoing."

17          He knows in the call himself, on July 17th, and he

18     tells Diaz this.  Again, the wiretap says it all, it's his own

19     words, it's confession after confession after confession.

20          This is transcript 7-62.  He is telling Diaz, they are

21     worried at this point.  "They are going to give him your phone

22     number.  They are going to pull the call records."

23          Again, how do you pull call records?  Three or four

24     different agents told you that.  That's through a federal grand

25     jury subpoena.  So he knows that there is going to be a grand

1    jury subpoena, there is going to be a grand jury proceeding.

2          He not only foresee it, he knows it.

3          Lastly, when you are directing your drug dealer best

4    friend to lie to the agents, when you yourself are lying to

5    agents, of course those actions are going to impact that.

6          Ladies and gentlemen, I thank you for your time.  It's

7    very late.

8          I just urge you, go back there, look at the transcript

9    book.  If you want to play -- all the calls are in evidence.

10   You can play them again, all the summaries that we showed you

11   are in evidence.  Take a look at them.  Use your reason, use

12   your judgment, use your common sense, he is guilty of every

13   count charged in this case.  He is guilty beyond all reasonable

14   doubt.

15         Thank you.

16         THE COURT:  All right.  Ladies and gentlemen, when you

17   get to the jury room, choose one of your members to act as a

18   foreperson.  The foreperson will direct your deliberations and

19   speak for you in court.

20         A verdict form has been prepared for your convenience.

21   It says, "United States District Court, Southern District of

22   Florida," it bears a case number and what we call the style of

23   the case, United States of America, versus Alberico Ahias

24   Crespo, verdict, and then there is a question for each count.

25         Number one, we, the jury, unanimously find the

1    defendant, Alberico Ahias Crespo, as to Count 1 of the

2    indictment.  Your options are guilty or not guilty and you

3    check the appropriate line, based on your unanimous verdict and

4    you go through the same exercise for Counts, 5, 7, 8, and then

5    on the second page, Counts 9 and 10, and then it reads, "So say

6    we all, signed and dated at the United States Courthouse,

7    Miami, Florida," the date is blank and there is a place for the

8    foreperson to sign and print his or her name.

9         So, again, you will take the verdict form with you to

10   the jury room.  When you have all agreed on a verdict, your

11   foreperson must fill in the form, sign it, date it and carry

12   it.  Then you will return to the courtroom.

13        If you wish to communicate with me at any time, please

14   write down with me your message or question and give it to the

15   marshal.  The marshal will bring it to me and I will respond as

16   promptly as possible, either in writing or by talking to you in

17   the courtroom.

18        But I caution you not to tell me how many jurors have

19   voted one way or the other at that time.

20        So, with that said, I am going to give you the original

21   copy of the instructions as well as the verdict form.

22        The parties will prepare all the exhibits that were

23   admitted, that were admitted into evidence.  You will also

24   receive a copy of the indictment for your use.

25        Now, one of you, there are 13 of you, and a trial in

1    federal court consists of 12.

2            Michelle Pierre Louis, you are our alternate.

3            Where is Ms. Pierre Louis.

4            So, I have a certificate for you and Rehan will give

5    you whatever you need for work.

6            Now, Ms. Pierre Louis, I am going to ask that you not

7    speak to anyone about the trial until the jury has reached a

8    verdict because if something happens, someone falls ill or has

9    some issue, we would have to bring you back in to deliberate.

10            So, Rehan will let you know once the jury has reached a

11    verdict but we are going to let you step out first so that you

12    can get your belongings and thank you very much for your

13    service.

14            (The alternate juror exited the courtroom.)

15            THE COURT:  Ladies and gentlemen, now it's already

16    after seven.  So, tomorrow you can decide how much or as little

17    work you want to do now at this point.  If you want to go home,

18    you can do that.  If you want to select a foreperson first,

19    that's fine as well.

20            Tomorrow morning you can return at whatever time you

21    wish, whether it's earlier than 9:30, which is when we have

22    been starting or a little later, but you will report directly

23    back here tomorrow morning and you will begin your -- well,

24    if -- resume if you begin your deliberations tonight.

25            We will provide food for you tomorrow so you will just

1    talk to Rehan about what you want tomorrow and he will make

2    sure we provide food for you.

3         All the items that were introduced into evidence will

4    be provided for you either a physical -- the physical documents

5    or the electronic documents will be on a computer, a clean

6    computer for you to pull them up yourselves.

7         Your books with the transcripts, you can take that in

8    with you now so that you can use that as well.  Or, if you

9    don't want to carry that right now, Rehan and the CSO will

10   bring it in for you.

11        So, you are now free to begin your deliberations and

12   whenever you are ready to go tonight, just let Rehan know and

13   you are not going to come back in here.  You just leave and

14   then you will report back at the time you tell him you want to

15   report back tomorrow.

16        Okay.  Thank you very much.

17        (The jury exited the courtroom to begin deliberations

18   at 7:15 p.m.)

19        THE COURT:  All right.  Please be seated.  First, were

20   there any objections to the instructions as read?

21        MR. MCLAUGHLIN:  No, Your Honor.

22        MR. QUINON:  None, Your Honor.

23        THE COURT:  All right.  If you will confer regarding

24   the exhibits, how do you have this?  Is it a clean laptop, do

25   you have?

1        MR. MCLAUGHLIN:  The way the office does it now is we

2   are given tablets.  So I have loaded all of our exhibits on

3   there.

4        I just need to do one last double-check against the

5   exhibit list with defense counsel so they are in agreement that

6   these were, in fact, the exhibits that went in.  Then what I

7   need to do is take the defense's exhibits, which are

8   electronic, and load them on there as a defense exhibit and we

9   will be there.

10       It shouldn't take too long.

11       I just need ten minutes.

12       THE COURT:  Sure, that's fine.

13       And if you haven't all written down your cell phone

14   numbers yet, make sure you write that down for Rehan and once

15   we hear from the jury what time they are going to return.

16       Obviously, you are close.

17       How far away is your office?

18       MR. QUINON:  I am in Coral Gables.  I am about

19   30 minutes away.

20       THE COURT:  All right.  Let's find out what time.  Did

21   they say what time?

22       COURTROOM DEPUTY:  Ten o'clock tomorrow.

23       THE COURT:  So, they will resume.

24       Are they going to leave now?

25       COURTROOM DEPUTY:  They are leaving as we speak.

 1          THE COURT:  They are leaving now.  We will give them a

 2    chance to depart and that gives you more time to work on the

 3    exhibits.

 4          MR. QUINON:  Judge, do you want me here?

 5          THE COURT:  I don't think you need to be there in the

 6    morning but I'd say around lunchtime you should probably make

 7    your way here.

 8          MR. QUINON:  Shall do.

 9          THE COURT:  All right.  We are in recess.

10          (The proceedings were adjourned at 7:17 p.m., to be

11    continued in Volume 13.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              C E R T I F I C A T E

 2

 3          I hereby certify that the foregoing is an

 4    accurate transcription of the proceedings in the

 5    above-entitled matter.

 6

 7

 8    April 1, 2024          /s/Patricia Diaz
      DATE                   PATRICIA DIAZ, RPR, FPR, FCRR
 9                           Official Court Reporter
                             United States District Court
10                           400 North Miami Avenue, Eleventh Floor
                             Miami, Florida 33128
11                           (305) 523-5178

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

## $

**$16,000** [2] - 216:3, 216:5
**$2,500** [3] - 202:10, 217:22, 218:1
**$900** [1] - 148:5
**$915** [1] - 217:10, 217:18

## '

**'19** [2] - 143:10, 242:6
**'20** [1] - 242:6
**'Hey** [1] - 239:1
**'Well** [1] - 239:23

## /

**/s/Patricia** [1] - 249:8

## 0

**098** [1] - 97:15

## 1

**1** [30] - 1:8, 23:6, 24:4, 26:19, 30:16, 40:13, 60:1, 60:4, 60:6, 60:13, 60:15, 76:9, 89:11, 97:13, 99:8, 104:11, 129:21, 130:9, 130:12, 141:21, 181:25, 225:15, 225:23, 226:2, 226:10, 227:2, 227:3, 235:11, 244:1, 249:8
**1,000** [1] - 165:16
**10** [23] - 25:22, 29:12, 89:12, 94:17, 95:7, 120:3, 130:6, 130:9, 136:11, 145:5, 145:8, 185:2, 185:4, 185:18, 228:8, 228:15, 228:18, 229:11, 229:14, 242:1, 244:5
**100** [1] - 14:10
**100s** [1] - 97:11
**10:03** [1] - 22:20
**10:14** [1] - 168:16
**10:19** [1] - 153:9
**10:21** [1] - 32:3
**10:57** [1] - 155:9
**10th** [1] - 165:3
**11** [2] - 95:13, 171:25
**11:26** [1] - 153:24
**11:46** [1] - 79:13
**11th** [1] - 1:23
**12** [7] - 1:7, 54:3, 54:4, 101:20, 152:11, 157:12, 245:1
**123** [1] - 2:13
**12:20** [1] - 166:23
**12:30** [1] - 40:10
**12:37** [1] - 156:13
**12:44** [1] - 172:12
**12:55** [1] - 172:18
**12C** [5] - 65:21, 65:24, 71:12, 71:19, 73:2
**12th** [1] - 165:11
**13** [10] - 64:11, 64:25, 96:2, 96:17, 96:23, 108:7, 108:9, 108:20, 244:25, 248:11
**13-minute** [1] - 155:2
**14** [5] - 109:8, 171:1, 206:19, 216:3, 216:5
**141** [1] - 2:14
**14th** [3] - 168:15, 171:9, 220:15
**15** [6] - 29:9, 110:6, 120:25, 121:15, 145:1, 241:19
**15-minute** [1] - 121:19
**1512** [2] - 94:13, 94:20
**1512(b)(3** [2] - 132:1, 134:17
**1512(c)(2** [1] - 136:12
**15th** [2] - 171:9, 171:13
**16** [4] - 102:9, 145:1, 152:11, 157:12
**17** [10] - 39:17, 59:18, 60:20, 64:8, 102:4, 102:17, 106:20, 110:18, 159:17, 171:17
**17-minute** [2] - 155:11, 156:13
**17C** [1] - 19:22
**17th** [24] - 28:5, 29:2, 29:4, 29:19, 39:17, 48:1, 48:2, 144:14, 144:16, 168:14, 170:10, 171:24, 172:24, 176:13, 180:22, 183:3, 184:8, 233:4, 233:9, 233:16, 240:1, 241:2, 241:9, 242:17
**18** [6] - 110:24,

132:1, 134:17, 136:12, 166:15, 205:5
**187** [1] - 2:14
**18th** [4] - 166:10, 173:21, 181:5, 184:24
**19** [8] - 111:3, 153:9, 154:1, 154:10, 208:2, 210:6, 210:10
**19th** [11] - 12:10, 21:10, 27:23, 166:17, 168:9, 181:5, 182:25, 208:10, 209:7, 210:8, 213:6
**1:13** [1] - 84:15
**1:30** [1] - 60:7
**1:50** [1] - 166:24
**1:52** [1] - 86:19
**1A** [1] - 81:16
**1B** [2] - 60:17, 81:17

## 2

**2** [2] - 12:13, 157:5
**2,000** [1] - 202:11
**2,500** [1] - 217:24
**20** [7] - 53:21, 109:1, 111:8, 148:7, 178:12, 221:15, 229:4
**20-some-odd** [1] - 168:16
**20-year** [1] - 221:18
**200** [1] - 189:15
**2008** [1] - 149:20
**2010** [1] - 147:19
**2011** [10] - 33:1, 33:11, 34:7, 34:16, 48:12, 199:25, 200:1, 203:8, 203:13
**2012** [1] - 203:13
**2013** [1] - 203:14
**2014** [1] - 203:14
**2015** [1] - 147:14
**2016** [4] - 142:14, 147:14, 148:13, 182:6
**2017** [15] - 94:12, 148:20, 149:20, 150:3, 150:6, 150:13, 151:18, 152:7, 152:16, 153:5, 177:9, 180:21, 182:11, 203:16, 233:12
**2018** [11] - 11:3, 148:14, 148:20, 150:13, 150:20, 150:24, 151:5, 151:25, 152:1, 152:7, 152:16, 153:5, 177:9
**2019** [2] - 10:16, 10:18, 12:11, 12:16, 27:15, 64:10, 153:19,

154:7, 154:9, 155:6, 155:8, 156:6, 156:20, 157:8, 157:17, 160:10, 162:7, 210:11, 210:17, 211:9, 211:12, 228:23, 236:23
**2020** [38] - 12:17, 12:18, 13:25, 14:16, 14:22, 17:12, 27:15, 30:3, 39:16, 39:17, 53:21, 55:14, 58:12, 59:18, 60:20, 64:8, 143:12, 144:11, 159:17, 162:23, 163:1, 163:10, 164:5, 164:12, 168:5, 171:17, 180:25, 208:2, 208:10, 209:7, 210:6, 210:8, 210:10, 211:12, 213:7, 223:1, 223:7, 234:16
**2021** [2] - 229:4
**2023** [1] - 1:5
**2024** [1] - 249:8
**20th** [7] - 29:8, 162:17, 184:15, 185:1, 213:6, 241:3, 241:18
**21** [7] - 97:16, 99:20, 100:19, 130:13, 130:14, 143:12, 187:6
**21-CR-20005-DPG** [1] - 1:2
**21st** [1] - 181:19
**22** [2] - 2:6, 156:20
**22-CR-20005** [1] - 3:3
**22nd** [1] - 156:18
**23** [1] - 2:6
**232** [1] - 2:15
**24** [2] - 1:5, 157:17, 160:13, 234:16
**243** [1] - 2:15
**24th** [3] - 163:14, 163:20, 235:22
**25,000** [1] - 217:22
**258** [1] - 90:20
**266** [2] - 114:24, 122:9
**27** [4] - 159:2, 159:14, 176:9, 215:20
**28** [2] - 154:7, 176:9
**29** [1] - 89:9
**2:07** [1] - 167:10
**2:08** [2] - 60:19, 76:10
**2:15** [1] - 167:11
**2:28** [1] - 173:1
**2:30** [2] - 86:9, 86:11

**2:47** [1] - 154:4
**2A** [2] - 85:13, 85:18
**2A-2B** [2] - 2:20, 85:23
**2B** [2] - 81:18, 85:19
**2nd** [6] - 160:13, 210:9, 210:10, 210:17, 211:8, 228:23

## 3

**3** [4] - 91:13, 105:5, 105:12, 105:24
**3,000** [1] - 202:11
**30** [8] - 31:16, 82:12, 82:13, 121:4, 148:7, 200:9, 203:9, 247:19
**30-some** [1] - 31:19
**305** [1] - 1:24, 249:11
**30th** [2] - 64:10, 74:16
**31** [1] - 10:16
**31st** [1] - 154:24
**32** [4] - 2:9, 64:17, 65:5, 74:19
**33** [1] - 161:22
**33128** [2] - 1:24, 249:10
**33132** [1] - 1:15
**33134** [1] - 1:19
**35** [1] - 81:9
**3:06** [1] - 155:1
**3:15** [1] - 122:21

## 4

**4** [5] - 2:3, 91:21, 105:6, 105:12, 111:19
**40** [1] - 86:17
**400** [2] - 1:23, 249:10
**48** [1] - 2:10
**4:27** [5] - 173:23, 176:11, 176:14, 176:17
**4:30** [2] - 177:21, 179:23
**4:38** [2] - 176:25, 177:18
**4:40** [1] - 177:25
**4:59** [1] - 187:1
**4th** [4] - 11:3, 19:2, 19:4, 156:7

## 5

**5** [13] - 24:5, 28:22, 29:12, 89:11, 92:3, 94:16, 105:24, 129:24, 130:9, 131:25, 143:1, 227:9,

**8**

**8** [23] - 24:25, 25:14, 30:3, 30:10, 89:12, 93:1, 94:17, 130:1, 130:2, 134:16, 143:21, 144:11, 144:16, 145:4, 184:21, 184:24, 221:10, 222:25, 223:7, 225:10, 227:24, 228:1, 244:4
**800** [1] - 1:18
**841** [9] - 95:19, 95:22, 95:25, 97:7, 99:4, 99:11, 99:14, 99:18, 100:3
**841(a** [1] - 100:19
**841(a)(1** [3] - 97:16, 99:21, 130:14
**846** [4] - 96:7, 98:25, 99:17, 130:13
**85** [1] - 2:20
**86** [1] - 2:12
**8:16** [1] - 154:7
**8:29** [1] - 155:21
**8:51** [1] - 154:25
**8:53** [1] - 154:13
**8th** [7] - 28:24, 30:5, 164:12, 168:7, 220:22, 236:5, 241:2

**9**

**9** [22] - 2:4, 24:25, 25:14, 29:8, 30:10, 89:12, 93:6, 94:17, 94:18, 130:1, 130:2, 134:16, 143:21, 144:25, 145:4, 155:22, 184:21, 184:25, 227:24, 228:2, 240:8, 244:5
**9.1A** [1] - 93:11
**90** [7] - 2:13, 82:12, 82:13, 121:6, 121:7, 121:8
**99** [1] - 1:15
**9:09** [1] - 160:14
**9:30** [2] - 176:16, 245:21
**9:36** [1] - 1:6
**9:38** [1] - 3:23

**244:4**
**50-minute** [1] - 156:21
**523-5178** [2] - 1:24, 249:11
**54-minute** [1] - 155:22
**5:14** [1] - 187:14
**5:15** [1] - 169:23
**5:41** [1] - 178:13
**5:42** [1] - 156:4
**5:45** [3] - 178:19, 179:7, 179:9

**6**

**6** [1] - 92:8
**60** [2] - 82:13, 121:4
**6:06** [1] - 179:10
**6:08** [1] - 179:17
**6:13** [1] - 169:24
**6:15** [1] - 155:19
**6:21** [1] - 156:4
**6:30** [2] - 186:9, 186:12
**6:40** [3] - 60:24, 63:9, 159:1
**6:47** [1] - 232:3
**6:52** [1] - 232:9
**6th** [1] - 155:10

**7**

**7** [23] - 24:25, 25:14, 30:2, 89:12, 92:19, 94:17, 130:1, 130:2, 134:16, 143:21, 144:11, 144:15, 145:4, 153:9, 154:9, 184:21, 184:23, 186:9, 208:19, 221:11, 227:24, 228:1, 244:4
**7-12** [1] - 235:19
**7-14** [1] - 234:16
**7-37** [1] - 207:23
**7-62** [1] - 242:20
**7-65** [1] - 234:4
**71** [1] - 2:10
**75** [1] - 1:18
**76** [5] - 198:8, 198:11, 198:13, 198:16
**79** [1] - 2:11
**7:14** [1] - 159:17
**7:15** [1] - 246:18
**7:17** [2] - 1:6, 248:10
**7th** [3] - 10:18, 153:25, 155:19

**A**

**a.m** [12] - 1:6, 3:23, 22:20, 32:3, 79:13, 153:9, 154:8, 154:25, 155:19, 155:21,

155:22, 160:14
**abets** [2] - 138:13, 138:16
**abetting** [5] - 110:7, 120:5, 120:8, 122:13, 241:12
**abiding** [1] - 77:21
**ability** [4] - 19:12, 80:4, 126:19, 202:15
**able** [17] - 7:18, 7:22, 18:25, 21:18, 26:4, 39:11, 43:25, 44:24, 63:6, 64:4, 76:18, 85:6, 85:10, 95:23, 115:15, 173:21, 199:18
**above-entitled** [1] - 249:5
**absent** [1] - 21:8
**absolute** [2] - 87:19, 87:20
**absolutely** [3] - 21:9, 226:20, 230:18
**abused** [1] - 218:10
**AC** [1] - 231:4
**accept** [3] - 15:25, 126:4, 128:16
**accepting** [1] - 182:24
**accepts** [1] - 162:16
**access** [4] - 18:23, 21:18, 49:8, 69:1
**accessing** [2] - 19:5, 69:7
**accident** [2] - 129:2, 206:25
**accommodation** [1] - 80:21
**accommodations** [1] - 59:2
**accompanied** [2] - 54:24, 67:10
**accomplice** [1] - 195:5
**accomplish** [10] - 131:8, 132:11, 133:20, 133:21, 135:15, 135:16, 136:19, 142:3, 143:3, 145:10
**according** [3] - 76:10, 177:19, 218:7
**account** [1] - 13:5
**accurate** [4] - 64:14, 118:11, 126:4, 249:4
**accurately** [1] - 126:20
**accustomed** [1] - 13:21
**acquiring** [1] - 58:25

**acquittal** [3] - 23:8, 25:1, 89:16
**ACQUITTAL** [1] - 2:6
**act** [23] - 21:15, 112:18, 125:1, 128:25, 129:2, 130:21, 131:23, 132:19, 133:14, 133:16, 134:12, 135:11, 136:7, 136:24, 137:18, 138:8, 138:10, 190:18, 193:23, 215:2, 228:3, 242:1, 243:17
**acted** [13] - 24:16, 25:15, 112:19, 113:1, 129:6, 129:7, 135:3, 144:2, 193:21, 194:12, 226:6, 227:21
**acting** [12] - 17:12, 18:7, 20:15, 21:7, 21:13, 22:5, 112:23, 113:9, 138:11, 194:15, 242:10
**action** [6] - 16:12, 116:14, 117:11, 139:5, 154:21
**actions** [2] - 138:5, 243:5
**active** [3] - 57:19, 58:17, 166:14
**actively** [3] - 7:1, 21:6, 70:15
**activities** [3] - 14:11, 37:1, 161:5
**activity** [16] - 14:9, 15:23, 61:10, 69:5, 70:5, 70:10, 70:16, 70:21, 114:11, 150:1, 153:14, 181:16, 182:12, 207:3, 218:14, 233:14
**acts** [11] - 113:22, 114:2, 132:9, 137:20, 138:15, 138:18, 138:21, 151:3, 194:13, 242:1
**actual** [3] - 18:6, 18:15, 125:20
**add** [11] - 80:17, 95:24, 96:25, 104:13, 105:3, 106:10, 107:1, 107:14, 115:10, 116:25, 118:12
**added** [4] - 52:18, 93:12, 106:6, 109:1
**addict** [1] - 199:24
**addictive** [4] - 92:21, 127:20, 195:6, 204:22

**adding** [4] - 96:5, 104:18, 107:5, 118:4
**addition** [6] - 13:16, 26:1, 52:7, 93:18, 122:7, 197:17
**additional** [5] - 10:19, 22:7, 88:11, 111:13, 111:15
**address** [6] - 30:20, 69:10, 115:6, 222:5, 229:16
**adds** [1] - 103:25
**adjective** [1] - 102:5
**adjourned** [1] - 248:10
**administer** [1] - 32:11
**administration** [1] - 21:12
**administrative** [3] - 77:22, 115:4, 118:20
**administratively** [4] - 6:14, 7:3, 78:2, 219:1
**admit** [7] - 31:12, 78:22, 136:24, 198:10, 206:1, 216:14, 218:8
**admits** [1] - 233:23
**admitted** [8] - 60:16, 85:22, 85:23, 125:6, 125:7, 212:11, 244:23
**ADMITTED** [1] - 2:19
**adopt** [2] - 89:19, 89:22
**adopted** [1] - 83:10
**advances** [3] - 131:23, 133:14, 137:18
**advantage** [3] - 139:11, 206:7, 213:22
**advice** [3] - 88:1, 113:15, 175:19
**adviser** [1] - 134:13
**advisor** [1] - 136:8
**affairs** [4] - 53:25, 125:2, 190:20, 191:5
**Affairs** [2] - 64:12, 64:15
**affect** [2] - 35:12, 138:5
**affiliated** [1] - 15:19
**affiliation** [1] - 152:21
**affords** [1] - 162:11
**afraid** [3] - 200:24, 201:3, 201:5
**afternoon** [3] - 176:14, 187:18, 187:19
**age** [1] - 216:18

3

**agencies** [7] - 9:2, 116:15, 116:22, 117:11, 139:6, 161:16, 221:24

**agency** [21] - 6:7, 9:23, 14:17, 16:19, 17:16, 22:3, 34:4, 48:22, 53:25, 70:22, 71:4, 74:16, 77:22, 161:9, 219:5, 220:10, 221:1, 224:2, 225:2, 225:7

**agent** [119] - 3:9, 4:23, 7:16, 7:18, 7:19, 7:20, 8:3, 8:5, 8:6, 8:10, 8:11, 9:22, 11:9, 17:16, 19:8, 20:16, 21:7, 21:13, 21:22, 22:5, 29:16, 31:6, 31:7, 31:10, 32:21, 33:3, 33:4, 33:12, 45:2, 45:6, 48:12, 48:14, 48:17, 49:6, 49:14, 50:16, 51:13, 52:6, 58:3, 58:8, 70:9, 71:1, 77:21, 77:23, 77:25, 78:1, 78:9, 130:23, 132:21, 137:1, 138:11, 138:18, 145:16, 145:17, 147:18, 153:20, 155:7, 155:16, 155:20, 157:16, 158:16, 160:12, 161:8, 161:9, 162:6, 162:25, 165:9, 170:3, 171:12, 174:5, 175:18, 175:19, 176:9, 177:16, 179:5, 183:13, 183:25, 185:6, 185:7, 185:12, 185:24, 199:1, 199:2, 199:8, 205:14, 206:11, 208:11, 210:11, 210:12, 210:13, 210:14, 210:21, 210:23, 213:5, 215:20, 217:12, 219:19, 219:22, 220:8, 220:9, 220:12, 220:13, 220:25, 222:6, 228:24, 233:13, 235:5, 235:6, 237:18, 238:11, 238:19, 240:10, 240:14

**Agent** [56] - 3:10, 4:9, 4:13, 9:13, 9:18, 11:6, 11:11, 12:6, 14:23, 14:25, 15:13, 15:18, 15:24, 16:25, 17:23, 18:14, 18:17, 18:18, 19:24, 26:23, 26:24, 28:25, 29:3, 29:16, 30:8, 30:9, 30:10, 32:8, 33:15, 49:19, 53:4, 65:7, 142:9, 142:11, 144:18, 144:25, 149:4, 149:6, 149:8, 149:15, 149:16, 152:1, 153:11, 153:23, 156:11, 161:14, 161:20, 166:21, 177:1, 177:13, 177:17, 179:11, 181:10, 221:12

**agent/friend** [1] - 164:3

**agents** [74] - 6:7, 6:18, 7:13, 8:17, 8:18, 9:1, 9:19, 13:3, 13:4, 13:5, 13:16, 14:6, 14:18, 14:21, 16:16, 21:20, 22:3, 28:11, 28:13, 33:7, 35:16, 39:11, 39:12, 39:14, 44:24, 46:7, 46:10, 46:21, 47:18, 49:16, 50:12, 51:22, 52:5, 53:6, 57:19, 57:21, 57:24, 58:11, 58:17, 59:2, 69:3, 151:20, 152:2, 157:25, 158:20, 159:7, 166:6, 178:3, 184:1, 198:24, 199:8, 208:15, 210:13, 215:23, 216:20, 216:22, 219:4, 219:20, 222:9, 223:14, 223:20, 230:23, 237:9, 237:13, 237:18, 238:23, 240:11, 241:25, 242:9, 242:24, 243:4, 243:5

**Agents** [4] - 150:14, 151:21, 156:18, 157:2

**ago** [3] - 17:11, 74:14, 141:12

**agree** [9] - 96:25, 98:11, 99:1, 113:5, 115:15, 124:6, 129:16, 140:7, 182:3

**agreed** [10] - 31:9, 31:11, 79:22, 131:7, 132:10, 136:18, 142:3, 143:2, 220:18, 244:10

**agreement** [14] -

17:23, 18:14, 18:17, 92:21, 109:14, 110:1, 130:20, 131:1, 132:18, 132:24, 136:23, 137:4, 140:12, 142:20, 195:6, 196:18, 247:5

**agreements** [2] - 127:24, 195:16

**ahead** [3] - 72:22, 212:24, 216:23

**Ahias** [4] - 3:4, 87:8, 243:23, 244:1

**AHIAS** [1] - 1:7

**ahold** [1] - 7:19

**aid** [1] - 139:13

**aiding** [5] - 110:6, 120:5, 120:8, 122:13, 241:12

**aids** [2] - 138:13, 138:16

**air** [3] - 59:8, 62:16, 76:6

**air-conditioning** [1] - 62:16

**airplane** [2] - 216:24, 216:25

**AI** [37] - 37:20, 38:11, 40:14, 41:22, 44:22, 45:3, 45:6, 45:12, 45:14, 46:12, 46:13, 46:20, 47:5, 47:8, 47:19, 53:5, 54:6, 63:14, 67:24, 75:6, 76:15, 76:22, 77:9, 207:6, 218:18, 220:11, 221:20, 223:6, 224:1, 224:2, 224:4, 225:12, 226:6, 226:17, 227:5, 227:21

**Alamo** [1] - 238:16

**Alberico** [7] - 3:4, 3:13, 20:4, 33:13, 87:8, 243:23, 244:1

**ALBERICO** [1] - 1:7

**alcohol** [1] - 56:5

**alcoholic** [1] - 37:10

**alcoholism** [1] - 56:8

**alert** [2] - 121:12, 180:5

**alerts** [2] - 121:9, 121:14

**alive** [1] - 230:20

**all-hands** [3] - 40:6, 155:8, 155:9

**allegations** [4] - 10:21, 16:21, 21:10, 21:14

**allege** [1] - 129:11

**alleged** [5] - 110:2, 128:24, 131:14,

133:5, 137:10

**alligators** [1] - 236:3

**allow** [2] - 70:13, 139:16

**allowed** [6] - 5:17, 21:15, 41:16, 67:8, 128:14, 218:14

**allowing** [1] - 201:9

**allows** [1] - 215:6

**almost** [3] - 185:6, 239:17, 239:18

**alone** [16] - 87:21, 88:2, 100:10, 115:16, 116:1, 116:4, 117:23, 118:4, 118:10, 119:20, 122:8, 122:11, 139:7, 140:4, 218:22

**alternate** [2] - 245:2, 245:14

**alternative** [2] - 129:10, 129:16

**alternatives** [1] - 129:14

**Alvarez** [49] - 11:3, 11:6, 11:11, 12:6, 17:23, 20:9, 26:23, 27:17, 142:11, 143:12, 149:2, 149:6, 149:8, 149:16, 150:14, 151:22, 153:24, 156:11, 156:19, 157:2, 157:19, 158:2, 158:11, 160:4, 161:1, 161:13, 161:20, 162:18, 162:19, 164:1, 165:25, 169:19, 172:12, 172:20, 206:21, 206:22, 210:11, 210:21, 210:23, 211:5, 224:19, 224:21, 224:25, 228:23, 230:15, 234:23, 237:8

**Amaro** [3] - 149:1, 165:25, 169:19

**amazing** [1] - 176:24

**amend** [1] - 115:18

**America** [2] - 3:4, 243:23

**AMERICA** [1] - 1:4

**amount** [12] - 41:16, 82:11, 83:22, 97:25, 98:6, 98:7, 98:12, 153:13, 188:4, 188:6, 188:15, 230:24

**amounted** [1] - 167:13

**Anais** [40] - 12:4, 27:19, 142:8, 147:15, 148:15, 149:1, 149:22, 159:18, 164:13, 164:15, 164:23, 165:14, 180:17, 180:24, 195:18, 195:20, 196:8, 199:23, 200:4, 200:7, 200:18, 201:2, 201:13, 202:21, 203:1, 203:7, 204:5, 204:6, 208:8, 229:25, 232:15, 233:6, 234:6, 234:11, 234:13, 236:1, 236:5

**anger** [4] - 10:4, 52:19, 52:20, 52:23

**angry** [1] - 180:14

**Anibal** [3] - 149:1, 165:25, 169:19

**animal** [1] - 196:15

**answer** [8] - 15:10, 17:19, 20:23, 30:1, 38:1, 78:6, 126:22, 213:4

**answered** [1] - 88:8

**answers** [1] - 237:17

**anticipate** [1] - 82:21

**anticipating** [1] - 82:10

**anticipation** [1] - 173:20

**anyway** [1] - 81:25

**apart** [2] - 75:24, 76:1

**apartment** [2] - 68:15, 168:20

**apologize** [4] - 79:25, 97:4, 123:1, 225:18

**apparent** [2] - 77:15, 164:10

**appear** [3] - 18:8, 78:24, 126:21

**APPEARANCES** [1] - 1:12

**appearances** [1] - 3:5

**appeared** [1] - 77:19

**appellate** [1] - 113:20

**applicable** [1] - 119:7

**applies** [2] - 189:8, 194:5

**apply** [3] - 105:12, 188:18, 197:15

**appreciate** [1] - 187:25

**approach** [1] - 170:6
**appropriate** [4] -
45:16, 81:6, 94:20,
244:3
**approval** [2] - 18:14,
94:14
**approve** [8] - 18:3,
18:16, 18:22, 18:25,
19:6, 19:12, 19:18,
21:1
**approved** [3] - 18:2,
18:8, 19:12
**approves** [1] - 19:15
**approving** [1] -
18:13
**April** [11] - 19:2,
157:8, 162:23, 163:1,
163:10, 163:13,
163:20, 234:16,
234:18, 235:22, 249:8
**area** [4] - 8:15, 41:3,
93:16
**areas** [2] - 93:18,
93:19
**argue** [1] - 24:11
**arguing** [1] - 93:15
**argument** [9] -
26:15, 82:20, 91:22,
141:2, 186:6, 204:3,
204:4, 232:1
**arguments** [15] -
30:17, 86:13, 89:14,
89:19, 89:23, 93:15,
123:7, 140:23, 141:1,
143:16, 186:7,
186:13, 186:17,
186:19, 186:20
**arouses** [1] - 225:4
**arrest** [15] - 10:16,
12:7, 27:11, 53:22,
54:4, 69:12, 69:15,
143:12, 156:24,
182:7, 182:18,
182:22, 183:17,
229:8, 236:25
**arrested** [15] - 46:21,
53:5, 53:12, 53:14,
54:6, 152:14, 162:5,
181:17, 181:19,
181:20, 229:5,
229:23, 230:3, 238:14
**arrests** [5] - 153:25,
154:6, 154:19,
155:19, 229:6
**arrive** [1] - 158:14
**arrived** [3] - 59:25,
60:7, 60:8
**arrives** [2] - 158:14,
158:15
**arriving** [2] - 65:22,

125:12
**arrogance** [3] -
141:11, 141:13,
235:17
**artist** [1] - 200:8
**arts** [1] - 52:12
**as-is** [1] - 96:13
**ASAC** [6] - 18:7,
156:11, 169:24,
170:19, 183:22
**Ashley** [5] - 208:4,
208:6, 209:9, 209:23
**aside** [2] - 28:5,
202:12
**aspect** [1] - 192:21
**assault** [3] - 165:5,
180:23, 180:24
**assaulted** [1] - 53:7
**asserts** [1] - 125:20
**assess** [1] - 197:13
**assigned** [2] - 7:23,
220:16
**assist** [3] - 13:17,
69:3, 112:19
**assistance** [2] -
14:16, 198:17
**ASSISTANT** [1] -
1:14
**associate** [3] - 70:5,
70:9, 138:19
**associated** [4] -
133:11, 138:22,
227:6, 228:10
**associating** [1] -
131:20, 137:15
**assume** [2] - 53:2,
125:9
**assumed** [2] - 53:14,
54:17
**assuming** [4] - 83:1,
95:15, 117:19, 118:16
**assures** [4] - 165:7,
166:6, 178:15, 180:7
**ate** [1] - 40:20
**attached** [1] - 53:25
**attaches** [1] - 166:22
**attempt** [1] - 30:6
**attempts** [3] -
149:25, 150:23, 156:5
**attend** [1] - 40:7
**attended** [1] - 220:15
**attention** [6] - 6:10,
9:25, 43:4, 79:25,
197:21, 231:18
**ATTORNEY** [1] -
1:14
**attorney** [8] - 8:1,
8:9, 87:11, 87:21,
87:24, 88:6, 88:12,
88:19

**ATTORNEY'S** [1] -
1:14
**attorneys** [8] - 22:14,
81:22, 84:10, 86:5,
86:13, 121:23, 123:8,
187:10
**attracts** [1] - 215:13
**audio** [2] - 79:8, 80:7
**August** [1] - 1:5
**AUSA** [1] - 3:9
**authorities** [1] -
70:18
**authorized** [5] -
134:12, 134:14,
136:7, 136:9, 163:1
**authorizes** [1] -
138:18
**automatically** [4] -
131:24, 133:15,
137:19, 198:5
**availability** [4] -
154:5, 154:14,
166:25, 168:17
**available** [2] - 13:9,
78:1
**Avenue** [3] - 1:18,
1:23, 249:10
**avoid** [2] - 81:23,
183:17
**aware** [11] - 5:5,
38:3, 47:18, 49:22,
51:6, 62:7, 67:7,
70:15, 87:11, 129:8,
152:17

---

# B

**Babalaos** [1] - 202:7
**background** [2] -
208:2, 214:22
**bad** [10] - 3:18,
129:4, 180:10,
191:14, 193:25,
194:2, 194:15, 205:9,
215:14, 215:24
**bag** [6] - 66:12,
66:16, 67:1, 74:3,
74:5, 74:6
**baked** [1] - 176:17
**balance** [1] - 81:24
**baloney** [3] - 217:13,
220:21, 220:24
**bamboozling** [1] -
217:23
**bank** [4] - 106:13,
150:4, 162:9, 217:10
**bar** [1] - 179:9
**bargain** [2] - 128:6,
197:4
**bargaining** [2] -

127:25, 128:2
**Barranco** [34] - 2:3,
4:9, 4:10, 4:13, 9:13,
19:24, 28:25, 30:6,
30:8, 30:9, 156:11,
169:24, 170:16,
170:19, 183:22,
184:23, 219:3,
220:23, 221:12,
221:20, 221:23,
222:4, 222:14,
222:16, 222:25,
223:3, 224:5, 224:6,
224:13, 224:22,
225:4, 239:6, 239:22,
241:2
**Barranco's** [1] -
220:23
**based** [8] - 20:12,
45:14, 52:18, 68:8,
124:1, 124:22, 157:3,
244:3
**basics** [1] - 176:17
**basis** [9] - 15:6,
17:14, 20:18, 49:12,
66:19, 113:4, 114:20,
144:15, 188:23
**bathroom** [2] -
79:15, 141:5
**battle** [1] - 216:19
**bears** [1] - 243:22
**beat** [1] - 164:24
**became** [9] - 13:21,
55:10, 70:15, 166:13,
201:17, 203:17,
203:19, 206:5
**become** [10] - 34:21,
38:3, 105:24, 108:13,
131:24, 133:15,
137:19, 140:14,
147:17, 215:11
**becomes** [5] -
130:23, 132:21,
137:1, 164:22, 166:18
**BEFORE** [1] - 1:10
**began** [5] - 9:14,
12:17, 48:12, 48:20,
182:6
**begin** [15] - 12:16,
86:14, 123:21,
151:20, 186:5, 186:8,
186:15, 188:2,
214:14, 214:16,
245:23, 245:24,
246:11, 246:17
**beginning** [13] -
71:17, 80:17, 80:22,
81:7, 82:4, 85:7,
163:18, 163:23,
164:12, 168:17,

193:12, 227:18,
235:22
**begins** [9] - 94:7,
109:13, 147:14,
151:15, 157:7, 158:8,
163:3, 170:19, 222:16
**behalf** [8] - 3:8, 3:13,
5:15, 18:5, 21:15,
86:1, 134:12, 136:7
**behaved** [1] - 179:3
**behavior** [1] - 62:20
**behind** [1] - 212:10
**belief** [2] - 206:4,
210:7
**beliefs** [1] - 140:15
**believes** [2] - 113:23,
114:2
**bell** [1] - 41:25
**belongings** [1] -
245:12
**bene** [4] - 14:16,
206:13, 206:25,
220:18
**beneficiaries** [10] -
11:16, 11:17, 15:14,
144:13, 149:1,
167:20, 168:10,
199:14, 208:14,
208:15
**beneficiary** [3] -
53:7, 59:6, 206:13
**benefit** [2] - 30:19,
96:18
**benes** [9] - 14:22,
15:2, 28:25, 163:7,
199:14, 221:23,
222:4, 222:13
**best** [10] - 25:21,
88:1, 159:11, 160:21,
164:2, 217:19,
232:12, 236:9,
236:11, 243:3
**better** [6] - 65:11,
104:2, 120:7, 173:18,
205:7, 230:11
**between** [21] - 33:8,
39:14, 42:7, 141:2,
143:9, 144:16, 145:6,
153:9, 153:10, 156:4,
157:8, 162:17, 186:9,
194:7, 208:3, 213:20,
221:12, 222:6, 229:5,
237:15
**beverages** [1] -
37:10
**beyond** [32] - 44:6,
97:21, 123:25,
124:15, 124:19,
124:25, 125:3,
128:22, 129:14,

131:6, 132:9, 134:24, 136:17, 138:25, 141:18, 142:24, 146:8, 146:11, 185:18, 189:10, 190:1, 190:10, 190:17, 190:23, 191:7, 192:7, 193:1, 194:17, 226:22, 229:12, 236:18, 243:13

**big** [7] - 40:24, 41:2, 193:8, 221:25, 226:12, 226:25

**bigger** [3] - 201:18, 229:20, 230:11

**bill** [2] - 4:25, 60:18

**binding** [1] - 125:8

**bit** [12] - 34:10, 42:24, 90:2, 101:23, 187:2, 190:7, 201:22, 218:9, 219:3, 220:2, 222:14, 240:17

**bitching** [1] - 218:9

**black** [5] - 57:11, 66:12, 66:16, 168:20, 234:21

**blank** [1] - 244:7

**blindfold** [1] - 149:14

**block** [9] - 27:16, 148:3, 164:3, 164:4, 235:2, 235:5, 235:7

**blossom** [1] - 34:8

**blow** [1] - 198:12

**blue** [1] - 67:23

**bluster** [1] - 239:2

**Boca** [3] - 142:16, 151:1, 212:12, 212:14, 212:16

**book** [5] - 157:18, 185:20, 240:2, 241:18, 243:9

**books** [1] - 246:7

**border** [1] - 56:8

**bottle** [1] - 204:15

**bottles** [24] - 41:15, 41:16, 41:17, 41:18, 41:24, 42:5, 44:13, 63:16, 63:18, 63:22, 64:3, 64:8, 64:18, 65:1, 65:8, 65:16, 67:2, 67:8, 74:20, 74:24, 74:25, 75:1, 76:19

**bottom** [2] - 18:8, 19:25

**bought** [3] - 28:6, 163:16, 174:12

**boundary** [1] - 105:6

**box** [1] - 201:25

**boy** [1] - 85:19

**bracket** [1] - 98:15

**brags** [1] - 238:23

**brain** [1] - 214:9

**Braulia** [3] - 168:19, 169:20, 172:16

**Braulio** [1] - 165:25

**breaching** [1] - 119:6

**break** [16] - 22:16, 79:15, 81:25, 82:2, 82:18, 133:18, 135:13, 141:5, 152:5, 186:5, 186:11, 186:17, 186:23, 215:1, 227:21, 231:24

**breaks** [2] - 81:24, 219:5

**breath** [1] - 169:9

**Brian** [2] - 54:25, 55:16

**Brief** [1] - 79:16

**brief** [2] - 81:20, 187:8

**briefing** [3] - 168:15, 171:11, 171:12

**bring** [3] - 3:22, 22:18, 32:1, 36:18, 119:12, 122:17, 146:16, 191:22, 207:16, 217:2, 244:15, 245:9, 246:10

**bringing** [2] - 197:21, 234:5

**brings** [5] - 93:15, 229:7, 233:9, 233:18

**broke** [1] - 196:10

**broken** [1] - 62:17

**brokers** [2] - 11:18, 11:19

**brother** [1] - 191:11

**brought** [4] - 6:9, 79:24, 175:8, 175:15

**bucks** [2] - 165:16, 217:24

**buddy** [1] - 200:23

**building** [2] - 76:3, 152:21

**buildings** [1] - 152:24

**bulb** [1] - 207:19

**bullied** [1] - 206:23

**bullshit** [1] - 180:1

**bully** [1] - 231:15

**Buono** [10] - 2:11, 79:8, 220:7, 220:14, 220:15, 220:25, 223:19, 223:20, 224:7

**Buono's** [1] - 215:11

**burden** [12] - 89:25, 124:18, 146:4, 146:6,

146:7, 189:12, 190:9, 192:11, 227:13, 227:15, 231:19, 239:6

**burdens** [1] - 189:13

**bureau** [1] - 64:12

**bus** [4] - 175:9, 175:23, 177:23, 240:3

**business** [11] - 23:11, 152:5, 165:6, 169:14, 203:8, 212:3, 213:1, 213:19, 216:11, 226:3

**busy** [3] - 202:11, 217:25, 218:1

**butt** [1] - 219:6

**buy** [3] - 11:20, 172:10, 174:9

**buying** [2] - 164:10, 207:20

**buys** [2] - 150:17, 171:25

**BY** [32] - 1:20, 2:4, 2:4, 2:9, 2:10, 2:10, 2:14, 2:14, 4:12, 9:12, 14:5, 15:9, 15:17, 17:18, 19:23, 20:8, 20:22, 32:16, 37:25, 42:4, 44:9, 48:11, 60:5, 65:6, 65:25, 66:24, 71:14, 71:20, 73:3, 73:21, 74:13, 78:5

---

## C

**cage** [1] - 3:9

**camera** [2] - 65:21, 216:25

**cancelling** [1] - 221:2

**cannot** [5] - 119:5, 124:13, 169:10, 183:24, 215:3

**car** [15] - 40:17, 66:3, 66:4, 66:10, 66:12, 71:21, 71:23, 72:1, 73:5, 73:6, 73:8, 73:9, 163:7, 221:4

**Cardero** [3] - 166:1, 169:20, 172:16

**care** [4] - 111:14, 115:21, 115:25, 119:7

**cared** [1] - 210:5

**career** [3] - 4:23, 219:8, 220:1

**careful** [1] - 195:12

**carefully** [2] - 124:23, 188:25

**cares** [1] - 184:4

**Carlos** [7] - 148:25,

149:24, 151:7, 159:18, 180:18, 180:20, 233:6

**Carpman** [5] - 212:18, 212:19, 212:20, 212:22, 212:23

**Carpman's** [5] - 15:20, 142:17, 151:19, 157:11, 162:3

**carried** [2] - 52:1, 52:8

**carry** [5] - 52:5, 61:18, 146:5, 244:11, 246:9

**carrying** [6] - 52:7, 66:12, 66:16, 131:4, 133:2, 137:7

**cars** [1] - 66:1

**CASE** [1] - 1:2

**case** [157] - 3:3, 6:21, 7:1, 7:17, 7:19, 7:24, 8:3, 8:4, 8:5, 8:6, 8:11, 10:12, 10:15, 10:20, 11:9, 19:9, 19:13, 19:14, 21:17, 23:9, 23:18, 23:22, 24:10, 24:14, 24:23, 25:8, 25:12, 25:13, 25:18, 25:24, 26:5, 26:13, 29:24, 46:22, 51:15, 71:5, 86:15, 87:12, 87:19, 89:9, 89:13, 89:23, 94:12, 94:13, 94:14, 97:19, 100:1, 101:9, 112:14, 112:21, 113:6, 113:11, 114:14, 114:18, 118:13, 119:14, 119:21, 123:20, 124:24, 125:6, 125:10, 126:17, 127:23, 128:5, 139:8, 139:25, 140:9, 140:11, 140:13, 140:17, 140:20, 141:12, 141:20, 142:17, 142:20, 146:4, 146:6, 146:22, 147:10, 147:14, 149:12, 151:21, 152:19, 154:9, 158:21, 160:15, 160:18, 180:19, 186:2, 188:5, 188:10, 188:13, 189:4, 189:5, 189:6, 189:7, 189:10, 190:3, 190:22, 190:23, 191:4, 191:6, 191:23,

191:25, 192:7, 192:16, 192:22, 193:9, 193:17, 194:5, 194:11, 194:22, 196:1, 197:3, 197:25, 198:1, 198:7, 198:19, 201:8, 204:16, 207:4, 208:13, 210:14, 210:15, 214:18, 216:16, 216:17, 216:23, 218:23, 219:6, 219:8, 219:10, 219:12, 219:16, 221:10, 222:3, 225:24, 227:14, 227:22, 228:7, 228:14, 229:1, 229:9, 229:18, 230:1, 230:14, 230:15, 232:12, 234:1, 236:14, 239:7, 243:13, 243:22, 243:23

**cases** [27] - 5:3, 5:5, 13:15, 33:5, 33:6, 33:19, 33:22, 44:21, 49:15, 50:13, 50:19, 58:18, 58:19, 58:20, 58:24, 100:5, 100:8, 111:20, 111:21, 112:7, 113:10, 113:12, 113:14, 195:11, 222:24, 228:7

**cash** [1] - 235:14

**casual** [1] - 38:18

**casually** [1] - 69:21

**catastrophic** [1] - 175:10

**category** [1] - 8:21

**caught** [5] - 97:5, 159:12, 183:18, 205:21, 218:11

**causing** [2] - 134:3, 135:23

**caution** [12] - 110:23, 115:19, 115:24, 117:19, 127:18, 128:9, 139:6, 139:23, 197:7, 197:11, 218:21, 244:18

**cautious** [1] - 170:6

**cease** [1] - 57:18

**cell** [2] - 209:13, 247:13

**certain** [19] - 18:10, 29:12, 41:16, 69:4, 112:12, 114:11, 116:15, 116:22, 117:11, 128:20,

131:20, 133:11,
137:15, 139:5,
168:10, 192:2,
218:18, 227:6, 228:11
**certainly** [8] - 26:18,
51:6, 52:14, 59:20,
76:23, 218:2, 218:3,
229:12
**certainty** [1] - 18:11
**certificate** [1] - 245:4
**certify** [1] - 249:3
**chain** [3] - 125:22,
125:24, 156:8
**chance** [4] - 121:24,
185:19, 238:16, 248:2
**change** [5] - 84:2,
140:14, 196:13,
200:16, 202:16
**changed** [2] -
108:12, 153:20
**changes** [5] - 84:2,
108:9, 108:16,
108:19, 157:9
**charade** [1] - 239:4
**CHARGE** [1] - 2:13
**charge** [15] - 20:16,
21:8, 21:13, 30:17,
82:23, 83:7, 90:5,
90:22, 96:7, 100:9,
124:9, 130:1, 130:2,
143:19, 202:8
**charged** [22] - 89:13,
95:2, 97:13, 98:4,
98:21, 112:2, 115:13,
130:8, 130:10,
131:25, 134:16,
136:11, 138:8,
139:24, 142:25,
144:10, 152:13,
153:18, 192:19,
218:3, 242:5, 243:13
**charges** [12] - 69:13,
128:19, 129:17,
129:21, 129:24,
130:6, 130:12,
139:20, 141:21,
144:11, 202:9, 217:24
**charging** [2] -
217:21, 218:10
**charlatan** [1] - 200:8
**Charles** [7] - 27:23,
169:5, 169:7, 208:12,
208:21, 229:5, 229:6
**Charlie** [13] - 14:15,
144:18, 170:14,
179:16, 180:9, 183:6,
184:14, 185:7,
238:15, 241:21,
241:23, 241:24,
242:15

**charts** [1] - 158:24
**chatting** [1] - 34:13
**check** [11] - 7:11,
7:18, 18:14, 60:19,
60:23, 69:18, 76:10,
187:13, 235:23,
244:3, 247:4
**checked** [1] - 18:1
**child** [1] - 33:5
**children** [4] - 36:17,
36:24, 46:1, 46:2
**China** [1] - 235:20
**chip** [1] - 169:10
**choice** [1] - 86:25
**choices** [1] - 94:15
**choose** [2] - 123:11,
243:17
**chooses** [1] - 238:4
**chose** [1] - 124:13
**chosen** [1] - 198:22
**Chris** [1] - 3:9
**CHRISTOPHER** [1] -
1:13
**CI** [21] - 17:3, 27:18,
28:25, 30:8, 160:4,
161:13, 162:19,
163:25, 170:9,
170:16, 170:21,
170:25, 171:5, 171:7,
183:22, 184:23,
234:17, 234:23,
239:20, 239:21, 241:7
**Circuit** [3] - 94:12,
102:23, 104:1
**Circuit's** [1] - 103:2
**circuits** [3] - 102:1,
102:25, 104:3
**circumstances** [6] -
6:16, 16:19, 47:19,
118:11, 125:23,
125:25
**circumstantial** [13] -
91:22, 109:16, 110:2,
125:18, 125:22,
125:24, 126:2,
146:25, 147:2, 147:6,
147:8, 147:10
**cite** [3] - 94:11,
113:10, 113:12
**cited** [2] - 96:8,
103:13
**cites** [2] - 94:13,
103:12
**citizens** [1] - 190:4
**city** [1] - 39:24
**civil** [12] - 58:19,
114:25, 115:4,
115:19, 115:24,
117:18, 118:13,
118:20, 119:6,

119:21, 139:8, 218:23
**claiming** [1] - 30:7
**CLARK** [29] - 1:13,
2:4, 2:10, 9:8, 9:12,
14:5, 15:9, 15:17,
17:18, 19:21, 19:23,
20:7, 20:8, 20:22,
22:7, 22:11, 37:22,
42:1, 44:6, 48:9,
48:11, 60:4, 60:5,
65:5, 65:6, 65:25,
66:24, 71:9, 78:3
**Clark** [11] - 3:9, 4:17,
6:5, 71:16, 74:14,
75:4, 75:6, 76:8,
76:22, 77:2, 77:15
**classy** [1] - 209:11
**clean** [5] - 205:5,
238:16, 246:5, 246:24
**cleaner** [2] - 116:20,
118:22
**clear** [14] - 26:19,
28:21, 29:11, 29:17,
29:23, 104:19,
146:19, 162:18,
163:11, 166:18,
171:18, 179:18,
193:10, 236:17
**clearly** [19] - 115:12,
126:22, 157:24,
158:12, 160:4,
163:21, 164:21,
165:6, 165:9, 169:7,
169:16, 177:7, 177:8,
178:2, 181:12, 210:2,
229:14, 234:22,
234:25
**clerk** [1] - 100:24
**client** [3] - 5:15,
93:21, 96:19
**clinic** [25] - 15:20,
15:21, 142:17,
149:25, 150:12,
150:17, 150:22,
150:23, 151:10,
151:16, 151:19,
157:11, 157:23,
163:8, 167:8, 207:7,
207:11, 212:18,
212:19, 212:20,
212:24, 230:4, 230:5,
230:8
**clock** [2] - 72:17,
211:10
**close** [20] - 6:18,
32:14, 46:13, 68:5,
71:7, 83:22, 87:10,
89:8, 89:20, 89:23,
121:18, 128:23,
148:20, 151:6,

154:21, 205:18,
226:2, 228:13, 247:16
**closed** [9] - 60:23,
90:3, 93:21, 161:15,
161:18, 210:22,
211:1, 211:2, 211:5
**closer** [5] - 27:2,
34:17, 34:21, 45:21,
46:12
**closing** [8] - 83:21,
86:13, 93:15, 120:20,
123:7, 140:23, 141:1,
143:16
**CLOSING** [4] - 2:14,
2:14, 2:15, 2:15
**closings** [2] - 82:10,
122:19
**clouds** [1] - 147:3
**club** [2] - 63:13, 67:4
**co** [3] - 99:8, 143:20,
184:4
**co-conspirator** [1] -
143:20
**co-conspirators** [1] -
99:8
**co-workers** [1] -
184:4
**code** [2] - 174:6,
174:11
**Code** [7] - 99:21,
100:19, 130:13,
130:14, 132:1,
134:17, 136:12
**codefendant** [2] -
92:20, 195:5
**coffee** [1] - 22:18
**coherent** [1] - 62:23
**coincidence** [1] -
219:24
**colleagues** [4] -
153:3, 238:4, 240:12,
242:9
**colloquy** [1] - 86:24
**combo** [2] - 103:15,
103:17
**comfortable** [5] -
35:24, 63:10, 77:2,
198:23, 198:25
**coming** [10] - 45:20,
72:12, 72:25, 73:17,
120:24, 195:23,
199:9, 199:10, 209:5,
235:25
**command** [1] - 156:8
**comment** [1] - 238:1
**commenting** [1] -
93:16
**comments** [6] - 45:3,
45:10, 46:9, 75:15,
91:22, 235:11

**commission** [9] -
132:15, 132:16,
135:9, 135:10, 143:7,
143:8, 144:8, 144:9,
193:20
**commit** [11] - 96:16,
101:20, 115:13,
129:25, 130:10,
130:21, 132:19,
138:14, 176:3, 227:9,
235:16
**committed** [9] - 33:4,
128:20, 128:23,
129:3, 129:11, 130:2,
130:3, 193:23, 194:13
**committing** [1] -
130:9
**common** [15] -
61:14, 124:23,
125:16, 131:20,
133:11, 137:16,
146:14, 146:17,
146:19, 149:13,
167:12, 227:7,
228:11, 239:10,
243:12
**communicate** [1] -
244:13
**communication** [8] -
25:10, 107:11, 132:5,
132:14, 134:21,
135:4, 143:6, 144:3
**communications** [1] -
27:8
**communities** [1] -
150:17
**community** [3] -
13:12, 14:13, 187:22
**company** [3] -
221:23, 221:25, 222:2
**complete** [3] -
102:18, 171:7, 177:15
**completed** [2] -
11:10, 123:20
**completing** [1] -
186:7
**component** [1] -
228:20
**compressed** [1] -
153:14
**computer** [10] -
19:20, 20:2, 20:4,
20:16, 20:25, 58:22,
106:21, 181:4, 246:5,
246:6
**con** [2] - 200:8,
213:25
**concealing** [3] -
106:2, 134:4, 135:24
**concealment** [1] -

106:4
  conceals [1] - 161:3
  concept [2] - 193:3,
227:9
  concepts [1] -
192:13
  concern [5] - 14:23,
16:16, 16:18, 16:20,
214:20
  concerned [14] -
62:10, 125:17, 159:8,
184:3, 220:21, 222:7,
222:8, 223:14, 224:9,
239:13, 239:14
  concerning [4] -
67:15, 124:21, 126:8,
197:18
  concerns [1] - 45:18
  conclude [2] - 26:15,
85:15
  concludes [1] -
140:21
  conclusion [2] -
9:13, 207:17
  conclusions [1] -
125:17
  conditioning [1] -
62:16
  conduct [42] - 14:16,
24:20, 25:5, 25:18,
29:3, 50:24, 104:9,
104:10, 104:20,
105:9, 105:17, 106:1,
106:18, 107:2,
108:12, 109:14,
110:2, 113:23,
116:21, 119:6, 119:7,
129:9, 132:4, 132:12,
133:23, 133:24,
133:25, 134:19,
135:1, 135:17,
135:18, 135:20,
137:21, 143:4, 144:1,
144:11, 183:21,
236:16, 240:23,
240:25, 241:4, 242:2
  conducting [2] -
21:19, 57:24
  confer [1] - 246:23
  CONFERENCE [1] -
2:13
  conference [4] -
82:23, 83:7, 90:5,
90:22
  confessed [1] -
207:6
  confesses [2] -
159:15, 179:1
  confessing [2] -
29:20, 213:14

  confession [4] -
233:23, 242:19
  confidence [1] -
203:15
  confidential [11] -
17:7, 17:8, 143:11,
157:19, 158:2,
222:18, 222:19,
222:20, 235:5, 235:7
  confidentiality [1] -
51:7
  confirms [1] - 154:5,
154:13, 166:24,
168:17, 169:7
  conflate [1] - 99:12
  confronted [2] -
100:14, 213:2
  confuse [1] - 99:16
  confusing [2] - 96:6,
99:5
  Congress [1] - 106:8
  conjunctive [1] -
129:12
  conjunctively [1] -
95:1
  connected [1] -
11:25
  connection [3] - 6:8,
6:23, 7:24
  connections [1] -
199:16
  consciously [1] -
227:20
  consequences [2] -
232:21, 236:7
  consequently [1] -
26:11
  conservative [1] -
170:6
  consider [26] - 10:2,
10:3, 55:24, 56:2,
56:15, 56:17, 62:20,
79:4, 84:21, 90:8,
115:15, 124:14,
125:5, 126:3, 127:7,
127:17, 128:8,
139:21, 140:2,
144:13, 146:20,
146:24, 147:24,
197:6, 197:10, 216:9
  consideration [1] -
91:21
  considered [2] -
57:15, 124:24
  considering [4] -
30:13, 90:7, 125:15,
140:10
  consistent [1] -
109:3
  consists [1] - 245:1

  conspiracy [110] -
10:20, 23:6, 23:7,
23:9, 23:22, 24:2,
24:5, 24:8, 24:14,
25:12, 25:24, 26:7,
26:20, 27:7, 27:9,
27:12, 27:14, 27:18,
27:21, 27:25, 28:4,
28:19, 28:21, 28:22,
30:16, 95:14, 95:21,
96:15, 96:19, 97:1,
97:14, 98:24, 99:9,
99:17, 99:20, 100:7,
100:10, 100:12,
100:14, 101:4,
101:20, 109:7, 112:4,
120:2, 130:11,
130:20, 130:23,
131:2, 131:21,
131:22, 132:18,
132:21, 132:25,
133:12, 133:13,
136:23, 137:1, 137:5,
137:17, 137:18,
141:21, 142:12,
143:1, 143:9, 143:18,
143:22, 145:5, 145:6,
145:7, 145:22,
145:23, 147:23,
149:22, 169:15,
176:17, 178:22,
178:24, 182:6,
182:15, 182:16,
182:17, 182:19,
182:21, 182:23,
182:25, 183:3, 183:5,
183:9, 183:11,
183:19, 185:2, 185:3,
225:23, 226:8,
226:12, 226:13,
226:14, 226:18,
227:8, 227:9, 227:15,
228:8, 228:12,
228:14, 235:12,
235:13, 239:5, 240:5,
242:6
  conspirator [10] -
131:12, 131:24,
133:3, 133:15, 134:9,
136:4, 137:8, 137:19,
143:20, 183:14
  conspirators [7] -
99:8, 131:3, 131:14,
133:1, 133:5, 137:6,
137:10
  conspire [3] -
130:17, 132:2, 136:13
  conspired [3] -
129:22, 129:25, 130:7
  conspiring [2] -

100:2, 130:10
  constant [2] - 27:8,
27:10
  constantly [2] -
148:22, 237:2
  constitute [1] - 99:24
  construction [2] -
192:22, 192:23
  consultant [2] -
134:13, 136:8
  consultation [1] -
87:21
  consultations [1] -
202:13
  consulted [1] - 49:16
  consumed [4] -
41:13, 63:22, 64:3,
64:7
  contact [6] - 8:3,
13:13, 34:2, 34:4,
35:19, 157:4
  contacted [1] -
220:16
  contacts [1] - 153:10
  contain [1] - 67:2
  contention [1] -
24:18
  contents [3] -
156:17, 169:6, 169:25
  context [1] - 94:20
  continue [14] -
10:24, 13:7, 13:11,
28:2, 28:3, 28:20,
165:3, 166:7, 167:25,
168:3, 171:16, 175:7,
186:18
  CONTINUED [2] -
2:4, 4:11
  continued [7] - 13:9,
13:14, 50:19, 68:11,
142:15, 182:7, 248:11
  continues [3] -
114:5, 164:6, 165:21
  continuing [2] -
10:13, 10:15
  contractions [1] -
123:15
  control [3] - 33:24,
54:8, 160:1
  controlled [11] -
11:14, 11:15, 23:7,
95:13, 96:5, 97:15,
97:17, 97:19, 98:2,
98:8, 129:23
  conundrum [1] -
165:12
  convenience [2] -
105:7, 243:20
  convenient [1] -
230:10

  conversation [42] -
30:8, 62:24, 145:2,
154:4, 155:2, 155:12,
155:23, 156:14,
156:17, 156:21,
159:2, 159:3, 160:14,
161:23, 161:24,
167:11, 167:13,
167:19, 173:15,
174:15, 176:23,
177:25, 184:14,
208:3, 208:23, 209:8,
209:10, 210:10,
211:10, 211:12,
213:20, 221:11,
221:18, 222:6, 223:1,
223:2, 225:11, 229:3,
229:5, 233:7
  conversations [4] -
89:2, 177:11, 206:14,
234:10
  convey [1] - 16:12
  conveyed [2] -
12:10, 64:15
  convict [1] - 190:21
  convicted [3] -
119:5, 127:7, 210:19
  conviction [2] -
92:10, 129:15
  convictions [1] -
92:11
  convinced [5] -
122:10, 125:3, 125:4,
140:14, 180:17
  convincing [3] -
124:25, 190:17,
236:18
  cook [1] - 37:3
  cool [1] - 206:10
  Cooper's [19] -
39:23, 40:12, 40:18,
59:18, 59:21, 60:1,
60:9, 60:18, 61:2,
63:12, 64:11, 65:17,
65:23, 67:3, 67:10,
75:17, 171:22,
177:20, 239:15
  cooperating [1] -
230:9
  cooperation [5] -
92:20, 127:24, 195:6,
195:15, 196:18
  cop [1] - 225:13
  copies [4] - 86:7,
120:16, 123:3, 123:10
  cops [3] - 164:17,
166:13, 181:1
  copy [17] - 23:4,
82:22, 83:1, 83:2,
83:8, 90:10, 90:13,

8

114:23, 122:24,
122:25, 123:9,
123:11, 123:12,
129:19, 141:24,
244:21, 244:24
  **copying** [1] - 19:20
**Coral** [2] - 1:19,
247:18
  **corner** [1] - 183:11
  **correct** [122] - 4:19,
5:2, 5:8, 5:13, 5:14,
5:17, 5:18, 5:21, 5:24,
6:3, 6:4, 6:11, 6:15,
6:22, 7:1, 7:4, 8:6,
8:12, 8:18, 8:20, 8:22,
8:24, 9:3, 10:14, 11:4,
11:24, 12:5, 12:12,
12:19, 12:24, 13:1,
13:24, 17:1, 18:12,
18:24, 19:11, 19:17,
19:19, 22:2, 30:4,
36:5, 37:15, 37:16,
38:14, 43:10, 48:3,
48:4, 48:25, 51:21,
51:25, 52:3, 52:17,
53:22, 54:1, 54:4,
54:9, 55:5, 55:11,
56:25, 57:23, 58:6,
59:4, 60:11, 60:21,
60:25, 61:2, 61:4,
61:19, 62:6, 62:9,
62:12, 62:15, 63:8,
63:16, 64:19, 65:17,
66:14, 67:6, 69:8,
69:20, 69:22, 69:24,
70:1, 70:7, 70:20,
71:8, 72:6, 72:10,
72:12, 73:25, 74:8,
74:10, 74:21, 74:22,
74:23, 75:2, 75:3,
75:12, 75:13, 75:15,
76:11, 76:12, 76:13,
76:15, 76:20, 76:25,
77:13, 78:2, 78:12,
87:16, 90:21, 102:18,
103:23, 104:6, 104:7,
104:22, 105:14,
108:14, 108:15,
113:8, 117:21, 205:21
  **correctly** [1] - 47:25
  **corroborate** [2] -
21:25, 58:8
  **corrupt** [38] - 24:16,
25:15, 132:3, 132:11,
133:16, 133:18,
134:19, 135:11,
135:13, 143:4, 151:3,
153:20, 155:7,
155:16, 157:16,
158:9, 158:19,

160:12, 162:6,
162:25, 164:2,
164:19, 171:7,
185:16, 185:24,
207:14, 207:15,
213:5, 215:1, 215:3,
227:17, 228:2, 228:3,
228:6, 232:16, 234:2,
237:18, 240:8
  **corruption** [8] -
16:24, 141:11,
141:13, 157:7,
157:19, 163:2,
175:21, 228:3
  **corruptly** [25] - 25:4,
25:15, 102:4, 102:6,
102:16, 108:5,
108:11, 130:3,
133:16, 133:23,
134:25, 135:11,
135:17, 136:14,
136:19, 137:20,
143:24, 145:10,
170:20, 227:16,
228:5, 240:19,
240:25, 242:1, 242:10
  **costs** [1] - 159:11
  **counsel** [19] - 3:5,
3:9, 9:14, 17:2, 60:13,
78:25, 91:22, 93:11,
93:19, 103:11, 112:8,
113:16, 141:9,
154:15, 187:17,
236:12, 238:1,
240:19, 247:5
  **counsel's** [1] -
235:11
  **Counselor** [1] -
180:4
  **Count** [60] - 23:6,
24:4, 24:5, 25:22,
26:19, 28:22, 29:8,
29:11, 29:12, 30:2,
30:16, 94:17, 97:13,
99:8, 120:3, 129:21,
129:24, 130:1, 130:2,
130:6, 130:12,
131:25, 136:11,
141:21, 143:1,
144:11, 144:15,
144:16, 144:25,
145:4, 145:8, 181:25,
184:21, 184:23,
184:24, 184:25,
185:2, 185:4, 185:18,
221:10, 221:11,
225:10, 225:15,
225:23, 226:2,
226:10, 227:2, 227:3,
227:9, 228:8, 228:15,

228:18, 229:11,
229:14, 235:11,
240:8, 242:1, 244:1
  **count** [20] - 24:6,
25:13, 29:24, 30:9,
129:18, 139:20,
141:20, 142:25,
145:5, 186:1, 189:25,
192:8, 221:10,
221:12, 223:2,
231:20, 240:16,
240:18, 243:13,
243:24
  **counterargument**
[1] - 106:7
  **countries** [2] -
189:13, 189:14
  **country** [2] - 189:9,
192:14
  **Counts** [11] - 30:10,
89:11, 94:16, 94:17,
130:9, 134:16,
143:21, 227:24,
228:1, 244:4, 244:5
  **counts** [21] - 23:3,
24:25, 25:1, 26:11,
31:1, 89:12, 89:13,
95:2, 110:23, 129:18,
143:22, 144:10,
145:4, 184:21,
221:13, 221:15,
227:23, 227:24,
229:15, 239:4
  **couple** [10] - 4:15,
12:20, 42:25, 43:15,
48:2, 57:5, 84:19,
85:3, 115:10, 229:16
  **course** [71] - 23:3,
23:17, 27:5, 34:6,
46:20, 54:12, 83:20,
89:7, 145:18, 145:19,
149:22, 150:10,
150:11, 150:21,
152:4, 152:17, 153:9,
154:13, 154:25,
155:10, 155:21,
156:4, 156:7, 156:13,
156:18, 159:20,
160:2, 160:23,
161:12, 161:19,
161:21, 162:8,
163:25, 165:4, 166:2,
166:4, 166:8, 166:10,
166:20, 166:24,
168:21, 169:1, 169:2,
169:12, 171:13,
172:15, 175:7,
175:14, 176:23,
178:8, 178:15, 179:1,
179:10, 179:14,

180:2, 180:8, 180:12,
180:21, 181:9,
181:15, 181:18,
181:19, 182:10,
199:2, 218:6, 218:9,
218:11, 221:23,
234:11, 237:12, 243:5
  **court** [16] - 3:13,
9:13, 65:24, 71:19,
73:2, 79:8, 84:25,
85:14, 128:3, 163:1,
186:14, 193:4,
196:17, 217:2,
243:19, 245:1
  **Court** [36] - 1:22,
1:22, 3:1, 29:10,
29:25, 31:18, 79:19,
80:24, 80:25, 84:1,
86:23, 91:23, 93:16,
96:9, 99:12, 99:15,
102:17, 106:10,
106:12, 106:14,
108:8, 112:6, 113:5,
119:8, 141:10,
141:23, 145:25,
146:7, 146:12, 147:9,
187:17, 189:22,
194:7, 243:21, 249:9,
249:9
  **COURT** [255] - 1:1,
3:2, 3:11, 3:16, 3:22,
3:24, 4:3, 4:7, 9:7,
14:4, 15:6, 15:8,
15:16, 17:14, 17:17,
20:18, 20:21, 22:8,
22:10, 22:13, 22:19,
22:21, 22:25, 26:14,
26:17, 27:1, 28:15,
30:2, 30:5, 30:11,
30:13, 30:22, 30:24,
31:14, 31:21, 31:24,
32:1, 32:4, 32:10,
32:13, 37:24, 42:2,
44:8, 48:6, 48:8,
66:19, 66:22, 71:10,
78:4, 78:15, 78:17,
78:19, 78:23, 79:3,
79:9, 79:10, 79:11,
79:12, 79:14, 80:1,
80:9, 80:15, 80:23,
81:1, 81:7, 81:11,
81:19, 81:21, 82:6,
82:8, 82:9, 82:18,
82:23, 83:6, 83:19,
84:4, 84:9, 84:14,
84:16, 85:15, 85:20,
85:22, 85:24, 86:2,
86:4, 86:18, 86:20,
87:1, 87:4, 87:6, 87:9,
87:14, 87:18, 87:24,
88:5, 88:8, 88:11,

88:14, 88:19, 88:22,
89:4, 89:17, 89:21,
90:1, 90:13, 90:18,
90:23, 91:3, 91:6,
91:11, 91:13, 91:16,
91:18, 92:1, 92:3,
92:6, 92:8, 92:14,
92:17, 92:19, 92:24,
93:1, 93:4, 93:6, 94:5,
94:10, 94:23, 95:5,
95:7, 95:11, 95:13,
95:24, 96:4, 96:14,
96:24, 97:10, 97:13,
98:19, 100:8, 100:15,
101:13, 101:19,
102:7, 102:11,
102:14, 102:21,
103:1, 103:7, 103:23,
104:4, 104:8, 104:15,
104:17, 104:22,
105:13, 105:16,
105:21, 105:23,
106:17, 106:21,
106:25, 107:23,
108:4, 108:11,
108:16, 108:18,
108:21, 109:4, 109:7,
109:19, 109:25,
110:6, 110:9, 110:11,
110:17, 110:21,
110:23, 111:2, 111:6,
111:8, 111:11,
111:13, 111:20,
111:22, 112:15,
113:10, 113:22,
114:8, 114:19,
114:25, 115:8,
115:22, 116:2, 116:6,
116:11, 116:17,
116:23, 117:2, 117:6,
117:14, 117:16,
117:22, 117:24,
118:3, 118:10,
118:16, 118:19,
118:25, 119:2,
119:18, 120:1, 120:4,
120:8, 120:10,
120:14, 120:16,
120:24, 121:6, 121:8,
121:12, 121:14,
121:16, 121:20,
121:22, 122:2, 122:4,
122:16, 122:20,
122:22, 173:9, 180:4,
186:4, 186:25, 187:4,
187:9, 187:13,
187:15, 224:15,
231:11, 231:13,
231:22, 231:25,
232:4, 232:7, 232:10,
243:16, 245:15,

246:19, 246:23, 247:12, 247:20, 247:23, 248:1, 248:5, 248:9

**Court's** [4] - 83:5, 90:25, 122:24, 124:8

**court-authorized** [1] - 163:1

**Courthouse** [1] - 244:6

**COURTROOM** [3] - 3:3, 247:22, 247:25

**courtroom** [17] - 3:23, 22:20, 32:3, 79:13, 84:15, 86:19, 122:21, 187:1, 187:14, 195:8, 206:13, 232:3, 232:9, 244:12, 244:17, 245:14, 246:17

**courts** [2] - 12:18, 216:18

**cousin** [1] - 47:13

**cover** [5] - 101:9, 102:2, 160:21, 162:20, 238:12

**covered** [4] - 90:9, 101:7, 109:15, 109:17

**covering** [1] - 237:23

**COVID** [48] - 12:16, 12:20, 13:5, 13:22, 14:7, 15:3, 15:14, 16:17, 16:18, 29:1, 36:4, 47:13, 47:14, 47:20, 55:7, 55:10, 57:19, 58:11, 58:18, 59:14, 59:17, 144:14, 170:4, 170:7, 170:18, 170:23, 171:3, 184:3, 184:7, 220:21, 221:1, 221:5, 221:8, 221:9, 221:23, 222:4, 222:9, 222:12, 222:13, 223:10, 223:13, 223:15, 224:9, 224:12, 239:13, 239:14

**COVID-19** [1] - 14:24

**coworkers** [1] - 153:2

**crap** [1] - 164:24

**crazy** [3] - 224:3, 224:4, 237:20

**create** [1] - 154:16

**created** [2] - 28:22, 143:17

**creating** [2] - 134:5, 135:25

**creator** [1] - 145:23

**credibility** [4] - 92:3,

194:24, 195:9, 197:18

**credible** [1] - 16:5

**creep** [3] - 201:4, 205:11, 206:4

**CRESPO** [1] - 1:7

**Crespo** [331] - 3:4, 3:13, 8:16, 8:21, 9:18, 14:23, 14:25, 15:13, 15:24, 16:4, 16:25, 18:3, 18:14, 18:17, 18:18, 23:9, 23:13, 23:16, 23:19, 24:1, 24:7, 24:13, 24:19, 25:3, 25:15, 25:23, 26:4, 26:7, 27:4, 28:17, 29:4, 29:16, 31:6, 33:13, 33:15, 34:4, 34:7, 36:23, 37:2, 37:13, 38:5, 39:18, 40:15, 41:22, 42:9, 43:5, 44:3, 49:19, 52:7, 53:5, 77:16, 86:1, 87:6, 87:8, 87:11, 88:25, 89:12, 100:2, 115:11, 141:14, 142:22, 142:25, 143:10, 143:13, 143:17, 143:24, 144:2, 144:17, 144:20, 145:1, 147:16, 147:18, 147:24, 148:15, 148:23, 148:25, 149:7, 149:13, 150:1, 150:8, 150:10, 151:4, 151:8, 152:4, 152:12, 152:15, 152:17, 153:10, 153:12, 153:20, 154:1, 154:8, 154:16, 154:25, 155:7, 155:11, 155:19, 155:22, 155:25, 156:1, 156:7, 156:20, 157:13, 157:15, 157:16, 158:7, 158:10, 158:13, 158:25, 159:1, 159:14, 159:15, 159:23, 160:9, 160:11, 160:13, 160:15, 161:3, 161:14, 161:17, 161:19, 162:4, 162:5, 162:6, 162:9, 162:14, 162:19, 162:22, 162:25, 163:4, 163:17, 163:19, 163:21, 163:24, 164:3, 164:7, 164:13,

164:19, 164:22, 165:3, 165:4, 165:7, 165:12, 166:4, 166:6, 166:17, 166:24, 167:10, 167:14, 167:19, 167:25, 168:16, 169:2, 169:10, 169:16, 170:1, 170:3, 170:14, 170:20, 170:25, 172:19, 172:22, 173:24, 174:2, 174:17, 174:21, 175:1, 175:5, 175:7, 175:10, 175:14, 175:16, 175:23, 175:24, 176:7, 176:13, 176:25, 177:7, 177:8, 178:2, 178:5, 178:11, 178:13, 178:15, 178:19, 178:25, 179:1, 179:13, 179:15, 180:2, 180:7, 180:14, 180:17, 181:10, 181:11, 181:15, 181:21, 181:22, 182:8, 183:8, 185:5, 189:8, 192:17, 193:14, 194:12, 196:3, 196:4, 198:23, 199:1, 199:2, 199:6, 199:20, 201:12, 201:16, 201:18, 202:20, 202:24, 205:13, 205:14, 206:3, 206:7, 206:9, 206:15, 206:20, 206:21, 206:22, 206:23, 207:3, 207:6, 207:9, 208:8, 208:9, 208:22, 209:7, 209:10, 209:11, 209:12, 210:3, 210:6, 210:14, 210:17, 210:21, 210:23, 211:2, 211:7, 211:14, 211:21, 213:5, 213:6, 213:11, 213:12, 213:15, 213:22, 214:1, 214:4, 214:19, 214:25, 216:5, 217:12, 218:18, 218:24, 219:6, 219:16, 219:22, 220:11, 220:16, 220:17, 220:18, 220:20, 221:1, 221:12, 221:20, 221:22, 222:4, 222:8, 223:4,

226:17, 227:21, 228:23, 229:4, 229:6, 229:7, 229:19, 229:21, 229:23, 230:11, 230:14, 231:10, 232:17, 233:1, 233:3, 233:5, 233:9, 233:10, 233:13, 233:14, 234:5, 234:9, 234:15, 234:17, 234:25, 235:2, 235:13, 236:1, 236:18, 237:12, 237:14, 237:15, 237:17, 238:3, 239:13, 241:14, 241:17, 242:5, 242:11, 243:24, 244:1

**Crespo's** [21] - 15:18, 20:4, 36:11, 36:18, 144:12, 158:22, 160:2, 160:5, 163:4, 163:5, 164:9, 166:11, 169:14, 171:18, 172:19, 179:10, 181:13, 201:14, 211:21, 215:5, 232:14

**crew** [1] - 151:19

**crime** [45] - 29:21, 70:19, 71:2, 97:17, 97:20, 98:7, 99:21, 99:25, 100:20, 116:1, 116:5, 117:22, 117:23, 119:5, 119:20, 127:8, 128:19, 128:21, 128:23, 130:14, 130:17, 131:5, 132:2, 132:8, 134:9, 134:18, 134:23, 136:4, 136:13, 136:16, 138:6, 138:14, 138:23, 138:24, 139:7, 139:20, 139:21, 176:3, 183:24, 184:18, 190:21, 216:2, 218:22

**crime-not** [1] - 138:23

**crimes** [17] - 33:4, 50:5, 99:12, 112:2, 115:13, 115:16, 129:17, 139:24, 140:1, 147:13, 161:10, 179:1, 184:2, 192:19, 193:20, 215:14, 235:16

**criminal** [33] - 25:7, 25:9, 48:17, 48:24,

49:14, 58:24, 69:5, 69:18, 70:5, 70:10, 70:16, 70:21, 87:18, 130:22, 132:20, 133:19, 135:14, 136:25, 156:22, 189:4, 193:10, 193:11, 193:14, 193:18, 219:12, 226:6, 227:19, 228:6, 228:7, 228:17, 232:18

**criminally** [2] - 138:15, 138:20

**cross** [12] - 10:12, 17:2, 48:8, 71:16, 198:10, 205:17, 205:25, 207:22, 207:25, 222:19, 224:19, 224:20

**CROSS** [4] - 2:4, 2:10, 4:11, 48:10

**cross-examination** [5] - 10:12, 71:16, 198:10, 205:17, 205:25

**CROSS-EXAMINATION** [4] - 2:4, 2:10, 4:11, 48:10

**cross-examine** [1] - 17:2

**cross-examined** [4] - 207:22, 222:19, 224:19, 224:20

**cruise** [1] - 13:17

**crumbling** [2] - 233:8, 233:16

**cryptically** [1] - 174:7

**crystal** [5] - 26:19, 28:20, 29:17, 29:23, 146:18

**CSO** [1] - 246:9

**cult** [1] - 202:5

**cultivated** [1] - 203:3

**cults** [1] - 202:3

**culture** [1] - 166:13

**curse** [4] - 200:19, 200:20, 200:22, 201:5

**curses** [1] - 200:18

**custody** [1] - 205:6

**customers** [1] - 199:5

**cut** [11] - 28:13, 176:4, 176:18, 177:23, 177:24, 181:20, 181:21, 183:4, 199:16, 236:3

**cut-up** [1] - 181:20

**cuts** [1] - 178:11

**cutting** [1] - 216:4

# D

**dabbling** [1] - 201:16
**dad** [1] - 165:8
**Dade** [1] - 152:20
**daily** [1] - 157:13
**damage** [1] - 160:1
**damning** [1] - 141:18
**danger** [1] - 165:14
**DARRIN** [1] - 1:10
**database** [2] - 18:24, 19:16
**DATE** [1] - 249:8
**date** [11] - 19:3, 30:2, 93:7, 128:20, 128:21, 128:23, 144:11, 168:10, 244:7, 244:11
**dated** [1] - 244:6
**daughter** [13] - 47:13, 167:18, 167:19, 191:20, 208:4, 208:5, 208:6, 209:9, 213:14, 213:20, 221:8, 221:9, 223:10
**daughters** [1] - 46:3
**DAVID** [1] - 49:9
**day-to-day** [1] - 49:11
**days** [12] - 54:4, 64:11, 64:25, 152:4, 153:12, 153:13, 172:9, 184:22, 221:22, 223:15, 231:7
**DEA** [26] - 17:3, 17:11, 17:16, 50:7, 50:9, 50:14, 145:16, 147:21, 152:2, 161:16, 170:9, 170:16, 171:7, 184:23, 210:23, 221:22, 222:12, 223:15, 223:22, 225:7, 239:10, 239:20, 239:21, 241:7
**dead** [1] - 200:16
**deal** [9] - 8:6, 50:4, 66:22, 113:10, 118:3, 178:17, 178:18, 188:22, 226:8
**dealer** [42] - 148:5, 155:7, 155:17, 160:11, 160:21, 162:2, 162:10, 162:14, 165:10, 165:19, 167:7, 167:14, 174:6, 175:19, 175:20, 177:9, 178:3, 178:5, 183:10, 185:25,

213:7, 215:11, 233:21, 234:9, 234:10, 234:12, 234:15, 235:6, 235:9, 236:9, 236:11, 236:19, 237:6, 237:14, 237:24, 238:5, 238:8, 238:22, 241:14, 241:15, 243:3
**dealing** [4] - 107:6, 161:5, 225:8, 226:18
**deals** [2] - 100:18, 223:4
**dealt** [1] - 218:25
**debriefing** [1] - 220:15
**debriefings** [1] - 220:17
**decade** [1] - 185:7
**decades** [1] - 185:6
**deceive** [1] - 173:5
**December** [3] - 153:6, 162:1, 162:7
**deception** [1] - 127:14
**decide** [13] - 89:3, 123:24, 126:5, 126:10, 127:6, 127:13, 128:18, 140:3, 140:5, 140:9, 142:21, 225:20, 245:16
**decided** [5] - 43:22, 94:18, 151:23, 157:19, 171:14
**decides** [3] - 152:5, 164:23, 169:21
**deciding** [2] - 123:20, 188:5
**decision** [20] - 16:14, 86:23, 87:20, 88:2, 89:1, 89:3, 95:23, 124:1, 124:14, 125:13, 126:7, 127:14, 186:10, 191:13, 191:16, 192:4, 238:6, 238:10
**decisions** [2] - 238:1, 238:3
**declare** [1] - 217:20
**declaring** [2] - 218:2, 218:4
**declines** [1] - 150:9
**deductions** [1] - 125:16
**defend** [1] - 180:7
**Defendant** [26] - 52:7, 141:14, 142:22, 142:25, 143:9, 143:13, 143:17,

143:24, 144:2, 144:12, 144:20, 145:1, 147:16, 147:18, 147:24, 149:7, 149:13, 150:1, 151:3, 152:15, 158:7, 164:8, 178:25, 181:21, 181:22, 233:1
**defendant** [135] - 1:8, 10:2, 16:15, 17:4, 20:12, 21:2, 22:5, 28:23, 30:18, 49:22, 54:11, 54:24, 55:4, 55:20, 56:2, 56:17, 57:8, 57:18, 59:17, 60:8, 61:1, 61:9, 61:15, 63:15, 63:22, 64:7, 65:8, 65:22, 66:7, 67:18, 68:3, 68:18, 81:22, 84:10, 86:24, 87:8, 87:18, 91:8, 96:2, 97:13, 97:19, 97:22, 97:23, 97:24, 98:4, 98:7, 98:10, 98:12, 98:22, 98:23, 99:1, 99:2, 99:5, 99:6, 99:15, 99:16, 100:16, 110:23, 113:8, 113:17, 113:22, 114:18, 118:19, 118:23, 119:2, 119:5, 121:23, 123:25, 124:4, 124:9, 124:10, 124:11, 124:12, 124:13, 124:15, 124:17, 125:3, 129:18, 129:21, 129:24, 130:1, 130:3, 130:6, 130:8, 130:10, 130:12, 131:5, 131:10, 131:14, 131:18, 131:25, 132:8, 132:16, 133:6, 133:9, 134:16, 134:23, 134:25, 135:3, 136:11, 136:16, 136:21, 137:10, 137:14, 138:3, 138:6, 138:7, 138:13, 138:15, 138:16, 138:17, 138:20, 138:22, 138:23, 139:1, 139:8, 139:23, 139:25, 140:3, 140:4, 141:13, 141:21, 145:16, 171:8, 187:10, 187:16, 232:8, 236:14, 236:15, 244:1
**DEFENDANT** [11] -

143:24, 144:2, 144:12, 144:20, 145:1, 147:16, 147:18, 147:24, 149:7, 149:13, 150:1, 151:3, 152:15, 158:7, 164:8, 178:25, 181:21, 181:22, 233:1
**Defendant's** [5] - 60:17, 85:13, 85:18, 85:19, 85:23
**DEFENDANT'S** [1] - 2:14
**defendant's** [17] - 9:14, 20:1, 30:17, 53:22, 68:9, 68:15, 68:21, 86:23, 90:8, 124:19, 124:21, 141:19, 146:8, 146:10, 146:23, 182:7, 240:8
**defending** [2] - 52:15, 75:14
**DEFENSE** [2] - 2:12, 2:18
**Defense** [1] - 60:4
**defense** [61] - 5:15, 7:12, 8:1, 8:9, 9:14, 17:2, 32:8, 45:4, 60:13, 78:25, 89:24, 90:7, 91:3, 91:11, 91:16, 92:1, 92:6, 92:17, 92:24, 93:4, 95:5, 95:11, 104:5, 104:20, 108:4, 108:12, 108:18, 110:9, 110:21, 111:2, 111:6, 111:11, 111:16, 111:19, 111:23, 111:25, 112:3, 112:4, 112:8, 112:13, 112:24, 113:9, 114:10, 115:15, 117:14, 117:25, 118:17, 120:14, 140:25, 141:3, 141:6, 154:15, 176:12, 186:5, 233:1, 235:11, 236:12, 238:1, 240:19, 247:5, 247:8
**defense's** [2] - 112:13, 247:7
**defenses** [1] - 112:6
**defer** [1] - 80:24
**define** [2] - 100:4, 105:1
**defined** [1] - 24:16
**defining** [2] - 106:18, 106:22
**definitely** [1] - 182:25
**definition** [10] - 91:13, 98:17, 102:3,

1:17, 2:7, 87:13, 87:17, 87:23, 88:4, 88:7, 88:10, 88:13, 88:18, 88:21
**Defendant's** [5] - 60:17, 85:13, 85:18, 85:19, 85:23
**DEFENDANT'S** [1] - 2:14
**defendant's** [17] - 9:14, 20:1, 30:17, 53:22, 68:9, 68:15, 68:21, 86:23, 90:8, 124:19, 124:21, 141:19, 146:8, 146:10, 146:23, 182:7, 240:8
**defending** [2] - 52:15, 75:14
**DEFENSE** [2] - 2:12, 2:18
**Defense** [1] - 60:4
**defense** [61] - 5:15, 7:12, 8:1, 8:9, 9:14, 17:2, 32:8, 45:4, 60:13, 78:25, 89:24, 90:7, 91:3, 91:11, 91:16, 92:1, 92:6, 92:17, 92:24, 93:4, 95:5, 95:11, 104:5, 104:20, 108:4, 108:12, 108:18, 110:9, 110:21, 111:2, 111:6, 111:11, 111:16, 111:19, 111:23, 111:25, 112:3, 112:4, 112:8, 112:13, 112:24, 113:9, 114:10, 115:15, 117:14, 117:25, 118:17, 120:14, 140:25, 141:3, 141:6, 154:15, 176:12, 186:5, 233:1, 235:11, 236:12, 238:1, 240:19, 247:5, 247:8
**defense's** [2] - 112:13, 247:7
**defenses** [1] - 112:6
**defer** [1] - 80:24
**define** [2] - 100:4, 105:1
**defined** [1] - 24:16
**defining** [2] - 106:18, 106:22
**definitely** [1] - 182:25
**definition** [10] - 91:13, 98:17, 102:3,

102:16, 102:17, 104:9, 189:22, 190:6, 226:15, 227:16
**defraud** [1] - 113:15
**degree** [2] - 29:12, 214:16
**delay** [9] - 25:10, 107:11, 123:1, 132:5, 132:13, 134:20, 135:3, 143:5, 144:3
**delegated** [1] - 18:13
**delete** [5] - 105:23, 108:13, 109:22, 109:25, 116:11
**deleted** [3] - 91:20, 109:21, 110:3
**deleting** [1] - 105:18, 109:23
**deliberate** [3] - 111:3, 227:25, 245:9
**deliberately** [2] - 161:3, 161:12
**deliberations** [14] - 86:14, 123:13, 123:22, 123:23, 129:20, 139:14, 140:8, 186:8, 186:14, 186:15, 243:18, 245:24, 246:11, 246:17
**deliver** [1] - 98:2
**demeanor** [1] - 62:11
**demonstrates** [1] - 213:21
**denied** [4] - 31:1, 90:1, 107:22, 109:1
**deny** [1] - 109:4
**depart** [1] - 248:2
**departed** [1] - 63:9
**department** [1] - 14:8
**Department** [5] - 32:22, 49:23, 50:14, 147:22, 152:20
**depicted** [1] - 66:1
**depicting** [1] - 65:22
**deployed** [1] - 13:17
**depressed** [2] - 223:11, 223:12, 223:13
**DEPUTY** [3] - 3:3, 247:22, 247:25
**derogatory** [1] - 45:3
**describe** [3] - 11:6, 11:11, 19:6
**described** [2] - 11:8, 222:3
**description** [1] - 98:17
**deserves** [1] -

225:21
**designated** [3] - 13:2, 13:3, 18:2
**desire** [1] - 88:20
**desk** [1] - 120:25
**despite** [2] - 48:19, 58:11
**destroy** [1] - 175:22
**destroyed** [3] - 204:25, 205:2, 230:18
**destroying** [1] - 204:22
**detail** [4] - 29:5, 29:10, 96:9, 127:16
**detailed** [3] - 141:17, 144:17, 177:11
**details** [3] - 131:13, 133:4, 137:9
**detection** [2] - 134:15, 136:10
**determine** [2] - 139:25, 219:11
**determining** [2] - 94:8, 96:18
**device** [5] - 107:7, 134:6, 136:1, 241:6, 241:8
**devoted** [1] - 46:15
**Diaz** [365] - 11:22, 12:1, 12:4, 21:5, 21:11, 23:10, 23:14, 26:22, 27:5, 27:14, 27:16, 27:17, 27:20, 27:22, 27:24, 28:1, 28:2, 28:6, 28:7, 28:8, 28:9, 28:12, 28:15, 28:17, 29:5, 29:19, 92:13, 112:20, 112:21, 113:2, 142:8, 142:14, 143:10, 143:20, 144:16, 144:18, 144:19, 144:21, 145:24, 147:15, 147:16, 148:4, 148:11, 148:14, 148:15, 148:22, 149:10, 149:16, 149:24, 150:8, 150:11, 150:15, 150:22, 151:5, 151:6, 151:18, 151:22, 151:23, 152:3, 152:9, 152:19, 153:10, 153:12, 153:17, 153:20, 154:1, 154:3, 154:5, 154:6, 154:10, 154:11, 154:12, 154:22, 154:25, 155:4, 155:7, 155:11,

155:22, 155:25, 156:1, 156:9, 156:13, 156:21, 156:22, 156:24, 157:1, 157:6, 157:11, 157:22, 157:24, 158:1, 158:8, 158:18, 158:20, 158:24, 159:7, 159:10, 159:11, 159:17, 159:22, 159:23, 160:4, 160:10, 160:11, 160:13, 160:15, 160:17, 160:22, 161:4, 161:13, 161:22, 162:8, 162:9, 162:14, 162:18, 162:21, 162:24, 163:4, 163:5, 163:11, 163:15, 163:18, 163:19, 163:22, 163:25, 164:7, 164:8, 164:13, 164:14, 164:16, 164:20, 165:1, 165:3, 165:5, 165:7, 165:18, 165:21, 166:3, 166:4, 166:6, 166:8, 166:25, 167:6, 167:7, 167:9, 167:10, 167:12, 167:14, 167:17, 167:19, 167:23, 168:6, 168:18, 168:21, 169:2, 169:9, 169:17, 169:21, 170:15, 171:25, 172:7, 172:12, 172:15, 172:19, 173:1, 173:13, 173:16, 173:19, 173:23, 174:8, 174:10, 174:16, 174:20, 174:23, 175:2, 175:8, 175:15, 175:16, 175:22, 175:23, 176:6, 176:23, 177:1, 177:8, 177:13, 178:8, 178:9, 178:13, 178:14, 178:19, 178:23, 179:5, 179:11, 179:12, 179:14, 179:24, 180:2, 180:8, 180:9, 181:1, 181:5, 181:11, 181:12, 181:15, 181:16, 181:19, 182:14, 182:16, 182:17, 182:20, 182:21, 182:24, 183:1, 183:4, 183:7, 183:16, 184:4,

184:8, 184:15, 184:16, 184:24, 185:10, 195:18, 195:20, 195:21, 196:12, 197:9, 197:13, 197:23, 198:13, 198:18, 198:20, 199:2, 199:4, 199:5, 199:15, 199:16, 199:18, 199:22, 199:24, 200:3, 200:12, 201:9, 201:15, 201:16, 201:17, 201:18, 202:7, 202:9, 202:11, 203:4, 203:18, 203:21, 204:2, 204:4, 204:5, 204:12, 204:13, 205:11, 205:15, 206:2, 207:13, 207:16, 207:21, 207:25, 208:1, 208:3, 208:9, 208:24, 209:3, 209:6, 209:8, 209:14, 210:2, 210:7, 211:2, 211:7, 211:16, 211:18, 211:22, 211:24, 212:3, 212:11, 212:17, 212:19, 212:21, 212:22, 213:1, 213:4, 213:5, 213:7, 213:8, 213:14, 213:19, 213:20, 213:21, 213:23, 214:6, 215:8, 216:3, 216:10, 216:12, 216:14, 217:9, 217:10, 217:18, 218:7, 218:14, 219:17, 221:14, 221:15, 226:4, 227:5, 228:13, 229:18, 229:24, 230:1, 230:5, 230:7, 230:10, 232:16, 232:19, 233:1, 233:9, 233:11, 233:21, 234:9, 234:15, 234:17, 234:20, 234:24, 235:8, 235:19, 236:4, 236:19, 237:4, 237:5, 237:8, 237:12, 237:14, 237:15, 238:5, 238:7, 238:20, 239:3, 240:1, 241:9, 241:10, 241:12, 241:14, 242:18, 242:20, 249:8
**diaz** [2] - 162:2, 177:9

**DIAZ** [2] - 1:21, 249:8
**Diaz's** [18] - 23:15, 30:17, 153:3, 161:5, 161:11, 162:8, 164:18, 164:19, 164:23, 165:24, 169:6, 169:19, 172:21, 173:14, 175:15, 182:4, 233:15, 236:20
**dictates** [1] - 179:16
**differ** [1] - 126:23
**difference** [4] - 126:1, 188:7, 194:7, 224:6
**different** [26] - 5:6, 8:16, 24:10, 29:9, 34:12, 35:11, 35:13, 35:18, 90:2, 93:18, 101:24, 103:3, 114:17, 127:4, 150:16, 171:2, 189:13, 192:3, 192:22, 199:23, 211:11, 222:15, 224:5, 233:24, 241:19, 242:24
**differently** [2] - 45:13, 140:16
**difficult** [4] - 80:13, 188:20, 190:15, 192:11
**difficulties** [1] - 54:20
**dig** [1] - 222:16
**digging** [1] - 223:5
**direct** [14] - 10:11, 59:25, 60:14, 63:21, 63:25, 91:21, 125:18, 125:19, 126:2, 146:21, 146:23, 147:9, 243:18
**DIRECT** [2] - 2:9, 32:15
**directed** [8] - 8:3, 28:15, 143:18, 144:20, 178:9, 180:8, 181:21, 240:6
**directing** [9] - 27:16, 28:2, 138:11, 177:1, 178:19, 178:24, 240:1, 241:12, 243:3
**direction** [3] - 138:12, 179:10, 184:24
**directly** [4] - 126:22, 147:7, 167:5, 245:22
**Director** [1] - 80:4
**director** [1] - 145:23

**directs** [7] - 28:7, 28:12, 28:17, 28:18, 138:18, 164:3, 175:21
**disable** [1] - 166:16
**disagreement** [1] - 151:12
**disbelieve** [1] - 126:7
**disciplinary** [1] - 16:12
**disciplined** [1] - 78:2
**disciplining** [1] - 77:23
**disclose** [3] - 16:8, 17:4, 171:4
**disclosed** [2] - 14:25, 170:23
**disclosure** [1] - 15:18
**discretion** [7] - 113:25, 114:1, 114:3, 114:4, 114:5, 114:9, 114:15
**discuss** [11] - 86:14, 140:11, 159:4, 161:24, 172:20, 190:14, 194:5, 194:9, 196:6, 214:20, 219:13
**discussed** [6] - 6:19, 31:4, 78:21, 108:9, 149:18, 227:7
**discussing** [12] - 103:12, 131:20, 133:11, 137:16, 140:13, 159:9, 161:11, 189:18, 193:2, 214:21, 221:19, 228:11
**discussions** [1] - 123:22
**discussions-what** [1] - 123:22
**disease** [1] - 221:7
**dishonestly** [2] - 137:22, 242:3
**dishonesty** [1] - 127:8
**disobey** [3] - 129:5, 193:25, 194:16
**displayed** [1] - 9:19
**disprove** [2] - 125:25, 177:22
**dispute** [2] - 9:22, 9:24
**disregard** [5] - 124:7, 125:11, 129:5, 193:25, 194:16
**distance** [1] - 39:13
**distancing** [1] - 59:10

**distant** [1] - 75:23
**distribute** [35] - 23:23, 24:3, 30:16, 96:10, 96:11, 97:14, 97:18, 97:23, 98:1, 98:5, 98:17, 99:5, 99:13, 99:22, 99:23, 100:17, 100:20, 100:21, 101:2, 101:5, 101:6, 129:22, 129:23, 130:15, 130:16, 130:18, 130:19, 131:9, 131:10, 141:22, 142:4, 142:5, 225:24
**distributed** [1] - 99:7
**distributing** [2] - 98:5, 100:3
**distribution** [4] - 21:6, 23:11, 23:20, 174:1
**DISTRICT** [3] - 1:1, 1:1, 1:11
**district** [3] - 24:17, 93:10, 94:2
**District** [4] - 1:22, 243:21, 249:9
**disturbing** [1] - 200:14
**divide** [1] - 141:1
**divided** [1] - 190:1
**DIVISION** [1] - 1:2
**divorce** [1] - 45:23
**divorced** [1] - 54:17
**Docket** [3] - 90:20, 114:24, 122:9
**doctor** [6] - 31:8, 191:14, 191:17, 203:25, 204:7, 212:12
**doctors** [2] - 148:11, 213:19
**document** [7] - 18:2, 18:13, 18:15, 18:19, 20:6, 64:17, 76:11
**documents** [6] - 18:3, 18:4, 21:16, 246:4, 246:5
**dog** [2] - 194:7, 194:8
**dollars** [2] - 152:11, 181:1
**dolls** [1] - 200:23
**Don** [12] - 38:8, 38:9, 38:11, 38:17, 38:20, 67:15, 67:24, 68:3, 68:11, 68:14, 68:17, 77:14
**don'ts** [2] - 49:6, 50:22
**done** [28] - 4:15, 5:4,

11:8, 14:9, 14:11, 16:13, 18:17, 19:2, 19:16, 48:13, 99:7, 128:25, 138:10, 138:11, 144:24, 145:3, 147:11, 157:11, 166:14, 168:13, 180:1, 212:1, 214:1, 219:9, 219:10, 220:1, 227:17, 242:5
**door** [4] - 66:11, 66:17, 66:21, 72:13
**Doral** [1] - 40:1
**dormant** [1] - 159:6
**dos** [2] - 49:5, 50:21
**double** [3] - 205:24, 206:2, 247:4
**double-check** [1] - 247:4
**doubt** [45] - 91:14, 97:21, 124:1, 124:16, 124:19, 124:20, 124:22, 124:25, 125:4, 128:22, 129:15, 131:6, 132:9, 134:24, 136:17, 138:25, 141:19, 142:12, 142:19, 142:24, 146:1, 146:9, 146:10, 146:11, 162:15, 183:8, 185:18, 189:11, 189:23, 190:2, 190:7, 190:10, 190:12, 190:17, 190:23, 192:8, 193:1, 194:17, 225:10, 226:22, 229:13, 236:18, 243:14
**doubts** [1] - 166:17
**down** [37] - 12:18, 12:21, 13:5, 22:8, 30:7, 43:23, 43:25, 57:13, 63:1, 76:24, 78:17, 93:23, 93:24, 102:5, 102:7, 161:15, 162:22, 169:13, 170:2, 171:8, 180:16, 183:23, 185:20, 190:14, 191:4, 196:9, 197:1, 216:21, 233:8, 233:16, 234:7, 239:17, 239:18, 240:9, 244:14, 247:13, 247:14
**download** [4] - 19:18, 20:5, 20:20, 20:24
**downloaded** [4] - 20:4, 20:14, 20:16,

21:3
**downloading** [2] - 27:13, 156:12
**downloads** [1] - 156:10
**downtown** [1] - 192:23
**dozen** [1] - 68:20
**Dr** [43] - 11:23, 15:20, 142:16, 142:17, 148:12, 149:3, 149:21, 149:23, 151:1, 151:19, 152:4, 152:6, 152:19, 153:8, 153:17, 160:20, 160:24, 166:18, 167:7, 180:21, 203:19, 207:7, 207:11, 209:2, 210:13, 210:18, 210:20, 210:22, 212:6, 212:7, 212:9, 212:12, 212:18, 212:19, 212:20, 212:22, 212:23, 229:22, 230:2, 237:19
**drank** [6] - 40:20, 40:21, 41:17, 56:7, 57:3, 65:8
**drawn** [1] - 49:19
**drink** [10] - 37:8, 37:13, 37:16, 37:18, 55:22, 56:7, 56:19, 56:22, 67:8, 75:17
**drinker** [6] - 55:24, 56:3, 56:15, 56:17, 57:9, 57:15
**drinking** [21] - 37:8, 37:10, 41:17, 41:20, 41:22, 42:13, 43:9, 43:17, 43:23, 44:3, 44:11, 44:12, 44:16, 44:19, 47:1, 48:1, 56:25, 61:12, 63:6, 77:6, 239:15
**drinks** [3] - 37:4, 39:19, 61:4
**drive** [13] - 43:23, 43:24, 64:4, 77:8, 77:9, 77:10, 77:11, 77:12, 151:9, 204:6, 204:7
**drives** [2] - 173:19, 178:10
**driving** [6] - 63:10, 77:3, 151:15, 151:16, 163:7, 196:19
**drug** [72] - 28:2, 70:10, 142:12,

142:19, 148:1, 148:4, 148:8, 148:24, 152:12, 155:7, 155:17, 157:13, 160:11, 160:21, 161:5, 162:2, 162:4, 162:10, 162:14, 162:16, 162:24, 163:11, 163:20, 165:9, 165:19, 167:6, 167:7, 167:14, 168:25, 169:14, 172:15, 173:1, 174:5, 174:23, 175:18, 175:19, 177:9, 178:3, 178:5, 178:9, 182:24, 183:10, 185:25, 199:24, 203:8, 204:20, 204:22, 204:23, 213:7, 215:11, 222:24, 233:21, 234:9, 234:10, 234:11, 234:15, 235:6, 235:9, 235:24, 236:9, 236:11, 236:19, 237:6, 237:14, 237:24, 238:5, 238:7, 238:21, 241:14, 241:15, 243:3
**drugs** [17] - 23:20, 92:21, 127:21, 195:6, 205:10, 205:15, 215:8, 215:16, 215:17, 215:22, 226:4, 226:8, 226:18, 226:19
**drunk** [8] - 43:22, 44:4, 44:13, 44:15, 47:5, 57:13, 63:1, 77:11
**due** [2] - 163:18, 229:11
**duly** [2] - 32:12, 87:8
**dumps** [1] - 76:24
**during** [58] - 9:18, 9:21, 10:11, 13:7, 13:20, 23:3, 23:17, 34:6, 35:10, 35:20, 36:2, 36:13, 37:5, 38:3, 38:24, 43:16, 44:25, 45:19, 46:12, 46:20, 47:1, 52:2, 55:6, 55:10, 60:13, 61:4, 61:20, 63:5, 71:16, 76:17, 85:4, 89:1, 89:6, 90:22, 93:15, 116:7, 116:12, 117:8, 119:15, 123:12, 124:2,

125:12, 127:4, 127:20, 129:19, 139:3, 139:10, 139:13, 148:25, 152:17, 155:14, 161:3, 164:15, 176:11, 186:22, 188:13, 233:12
**duties** [4] - 13:7, 13:9, 14:1, 52:1
**duty** [8] - 52:2, 52:5, 91:6, 111:3, 123:19, 133:19, 135:14, 166:14
**dying** [1] - 223:9

**E**

**e-mail** [22] - 27:22, 27:25, 153:22, 153:23, 154:7, 155:9, 166:20, 166:23, 167:15, 168:7, 168:9, 168:13, 170:13, 170:14, 170:23, 183:1, 208:10, 208:13, 208:17, 208:22
**e-mails** [2] - 242:14, 242:15
**early** [9] - 119:17, 150:19, 158:8, 165:23, 172:22, 176:22, 177:19, 182:11, 230:15
**earmuffs** [1] - 149:14
**earth** [1] - 163:19
**ease** [1] - 105:7
**easier** [3] - 58:21, 73:16, 116:20
**easy** [1] - 188:24
**eat** [3] - 37:3, 39:19, 236:3
**eating** [3] - 59:21, 61:12, 63:7
**educate** [1] - 99:24
**educated** [3] - 48:23, 49:2, 52:12
**effect** [1] - 218:19
**effectively** [1] - 15:13
**efficiency** [2] - 68:14, 211:21
**effort** [1] - 227:20
**ego** [4] - 141:11, 141:12, 235:17, 239:2
**eight** [1] - 33:8
**eighteen** [1] - 4:24
**either** [8] - 102:22, 112:13, 124:3, 126:1,

174:3, 240:24,
244:16, 246:4
**electricity** [1] - 231:3
**electronic** [2] -
246:5, 247:8
**element** [17] - 26:9,
26:25, 96:25, 100:17,
100:24, 101:4, 142:2,
143:2, 143:13,
145:20, 182:2, 185:4,
189:24, 189:25,
192:8, 192:22, 228:19
**elements** [28] -
23:24, 25:25, 26:5,
29:24, 95:19, 95:22,
96:1, 96:5, 96:7,
96:17, 96:20, 98:16,
98:22, 98:25, 99:4,
99:11, 99:15, 99:24,
100:7, 100:15, 101:1,
141:25, 143:23,
145:8, 147:13, 190:1,
194:11, 235:18
**eleven** [1] - 176:15
**Eleventh** [3] - 94:11,
104:1, 249:10
**eliminating** [2] -
105:10, 105:16
**ELMO** [2] - 181:3,
211:14
**embellishing** [1] -
198:19
**embrace** [1] - 146:5
**emerge** [1] - 66:10
**emergency** [2] -
79:21, 85:1
**emerging** [1] - 66:12
**emphasize** [2] -
139:18, 197:20
**employed** [1] - 32:20
**employee** [4] - 13:2,
134:11, 136:6, 138:18
**employees** [12] -
10:7, 10:17, 12:25,
13:3, 14:12, 14:13,
116:15, 116:22,
117:11, 139:5, 230:8
**employment** [6] -
114:25, 116:8,
116:13, 116:19,
117:9, 139:4
**encountered** [1] -
12:6
**end** [16] - 56:10,
56:11, 115:6, 133:20,
133:21, 135:15,
135:16, 142:16,
151:12, 160:8,
162:21, 163:23,
188:3, 193:17, 201:3,

228:24
**ends** [4] - 143:12,
158:17, 176:23, 205:4
**enforcement** [21] -
13:5, 25:11, 48:20,
51:23, 132:5, 132:14,
134:10, 134:21,
135:5, 135:7, 136:5,
143:6, 144:4, 144:6,
159:12, 215:20,
219:9, 222:19,
222:22, 224:14,
224:18
**engage** [13] - 37:11,
99:2, 132:3, 132:12,
134:14, 134:19,
136:9, 143:4, 145:6,
162:12, 182:3,
240:25, 242:2
**engaged** [8] - 24:19,
25:4, 25:17, 61:10,
135:1, 143:25,
218:13, 240:22
**engages** [1] - 137:21
**enjoyed** [1] - 68:5
**ensuing** [1] - 10:16
**entered** [6] - 3:23,
32:3, 84:15, 122:21,
187:14, 232:9
**enters** [1] - 66:16
**entertaining** [1] -
5:16
**entire** [11] - 156:16,
159:3, 161:23,
161:24, 165:12,
171:6, 185:22, 220:1,
239:5, 239:16, 239:19
**entirely** [5] - 57:18,
88:25, 102:23, 128:7,
197:5
**entitled** [3] - 139:18,
141:1, 249:5
**entitles** [1] - 63:15
**entity** [1] - 152:21
**Entry** [3] - 90:20,
114:24, 122:9
**equipment** [1] -
35:17
**era** [1] - 177:9
**escaped** [1] - 97:7
**especially** [1] -
232:18
**Espinosa** [3] -
142:16, 151:1, 212:12
**ESQ** [3] - 1:13, 1:13,
1:17
**essential** [5] - 12:25,
13:2, 13:3, 13:13,
14:11
**essentially** [10] -

4:22, 5:19, 8:16,
93:13, 105:8, 112:19,
147:3, 150:9, 179:1,
200:3
**establish** [5] -
131:21, 133:12,
137:16, 227:7, 228:12
**established** [1] -
48:1
**establishment** [6] -
39:18, 40:12, 40:25,
43:13, 75:21, 76:9
**establishment's** [1] -
39:22
**estimate** [2] - 42:5,
186:7
**estimated** [1] - 65:14
**ethical** [6] - 115:20,
115:25, 116:14,
116:21, 117:10, 139:5
**evening** [4] - 167:18,
176:22, 177:19, 179:9
**event** [6] - 35:18,
98:16, 131:19,
133:10, 137:15,
228:10
**events** [6] - 127:19,
127:22, 147:12,
200:17, 202:16, 227:6
**eventually** [2] - 41:9,
81:16
**Everglades** [1] -
236:2
**everyday** [1] -
188:23
**evidence** [125] -
5:22, 19:14, 22:10,
23:8, 23:10, 23:16,
23:19, 23:21, 24:6,
24:12, 24:15, 24:18,
24:22, 25:2, 25:6,
25:14, 25:17, 25:19,
25:22, 26:1, 26:6,
26:8, 26:12, 28:5,
29:6, 30:5, 30:13,
30:15, 30:24, 30:25,
58:25, 60:16, 78:22,
82:11, 84:22, 85:17,
85:23, 85:24, 86:2,
89:8, 89:14, 89:15,
89:25, 90:3, 90:4,
91:21, 93:16, 93:22,
93:24, 99:6, 109:16,
110:3, 114:8, 115:2,
115:12, 124:2,
124:10, 124:12,
124:24, 125:5, 125:6,
125:8, 125:15,
125:18, 125:19,
125:22, 125:24,

126:2, 126:3, 126:4,
126:24, 126:25,
127:2, 128:11, 138:7,
139:15, 139:21,
139:25, 140:10,
140:20, 141:16,
143:16, 146:13,
146:20, 146:21,
146:23, 146:24,
146:25, 147:2, 147:6,
147:8, 147:9, 147:10,
148:10, 149:12,
150:4, 153:15, 176:1,
176:18, 207:9,
207:10, 207:12,
212:4, 212:13,
213:18, 218:7,
225:24, 226:6, 227:1,
227:21, 228:4,
232:13, 236:17,
239:7, 242:14, 243:9,
243:11, 244:23, 246:3
**evidentiary** [1] -
114:19
**exact** [3] - 60:3,
60:12, 128:21
**exactly** [17] - 16:3,
155:6, 156:7, 158:20,
162:2, 167:17,
174:19, 175:1,
175:15, 176:8, 177:2,
177:11, 179:16,
180:8, 185:7, 234:14,
235:24
**EXAMINATION** [10] -
2:4, 2:4, 2:9, 2:10,
2:10, 4:11, 9:11,
32:15, 48:10, 71:13
**examination** [10] -
10:11, 10:12, 59:25,
60:14, 63:21, 64:1,
71:16, 198:10,
205:17, 205:25
**examine** [1] - 17:2
**examined** [4] -
207:22, 222:19,
224:19, 224:20
**example** [6] - 6:7,
96:15, 127:19,
199:22, 203:7, 234:14
**examples** [1] -
113:14
**except** [4] - 12:25,
122:6, 123:5, 125:10
**excessive** [2] -
55:24, 56:2
**exchange** [1] -
127:24
**exchanged** [1] - 98:3
**exclude** [3] - 124:20,

146:9, 190:12
**exclusion** [1] -
189:11
**excuse** [1] - 125:23
**excused** [2] - 22:9,
78:18
**exercise** [6] -
113:24, 114:1, 114:3,
114:5, 114:15, 244:4
**Exhibit** [11] - 19:22,
60:4, 60:17, 65:21,
65:24, 71:19, 73:2,
85:18, 85:19, 178:12,
207:23
**exhibit** [4] - 71:15,
149:21, 247:5, 247:8
**EXHIBITS** [1] - 2:18
**Exhibits** [2] - 85:13,
85:23
**exhibits** [9] - 125:7,
150:2, 207:23,
244:22, 246:24,
247:2, 247:6, 247:7,
248:3
**exist** [2] - 239:12,
239:21
**existed** [2] - 58:12,
239:11
**existence** [3] -
69:14, 109:13, 110:1
**exited** [7] - 22:20,
79:13, 86:19, 187:1,
232:3, 245:14, 246:17
**expect** [4] - 71:4,
93:14, 213:23
**experience** [8] -
48:20, 50:1, 51:23,
52:18, 128:14,
147:20, 147:24
**experienced** [7] -
49:20, 57:9, 58:3,
87:25, 146:15, 148:1,
155:20
**experiences** [1] -
50:13
**expert** [2] - 93:1,
200:13
**explain** [6] - 84:24,
124:5, 130:4, 140:8,
170:20, 170:25
**explained** [3] -
47:18, 47:21, 100:24
**explanation** [1] -
112:16
**explicit** [1] - 29:5
**exploits** [1] - 50:12
**exposed** [2] - 16:17,
221:15
**exposing** [1] - 221:5
**express** [1] - 47:4

**expressed** [1] - 89:2
**expressly** [1] - 128:3
**extent** [3] - 8:8, 10:15, 16:2
**extraordinary** [1] - 57:2
**extremely** [1] - 189:17
**eyewitness** [1] - 125:21

# F

**fabricated** [2] - 239:17, 241:7
**fabrication** [8] - 144:15, 144:23, 171:7, 171:8, 177:15, 179:21, 239:12, 239:25
**face** [8] - 14:7, 15:25, 128:2, 176:4, 176:19, 181:7, 181:11, 184:9
**facility** [1] - 78:1
**fact** [46] - 4:18, 6:17, 11:1, 11:22, 12:18, 14:25, 18:8, 20:3, 21:10, 26:1, 37:5, 46:6, 47:4, 47:8, 48:19, 49:22, 51:20, 58:11, 60:6, 61:20, 62:7, 64:3, 99:6, 106:2, 112:25, 114:15, 119:14, 125:20, 125:25, 127:1, 127:7, 127:16, 128:10, 134:4, 135:24, 202:7, 202:12, 206:14, 207:4, 207:22, 218:9, 219:8, 227:5, 228:12, 233:22, 247:6
**factor** [1] - 17:1
**facts** [17] - 97:20, 112:2, 112:14, 123:25, 125:13, 125:22, 125:24, 131:6, 134:24, 136:17, 140:19, 141:25, 142:23, 147:13, 161:18, 188:18, 236:14
**factual** [3] - 113:4, 125:10, 233:11
**failed** [4] - 23:25, 25:2, 26:1, 229:12
**fails** [2] - 24:1, 124:16
**failure** [1] - 26:12
**fair** [2] - 80:17,

192:15
**fairly** [1] - 31:18
**faith** [13] - 111:19, 111:23, 112:2, 112:3, 112:4, 112:12, 112:24, 113:1, 113:9, 113:13, 113:15, 113:23, 114:6
**fall** [6] - 8:21, 113:24, 150:3, 151:5, 151:18, 151:25
**falling** [2] - 57:13, 63:1
**falls** [1] - 245:8
**false** [21] - 24:20, 104:12, 104:13, 104:21, 106:8, 106:11, 107:2, 107:6, 127:8, 128:6, 134:1, 134:5, 135:21, 135:25, 181:18, 181:22, 197:3, 241:4, 241:13, 241:16, 241:20
**falsely** [1] - 127:1
**familial** [1] - 68:5
**familiar** [3] - 50:21, 50:24, 63:19
**familiarity** [1] - 17:7
**families** [2] - 187:24, 191:10
**family** [18] - 47:19, 62:14, 69:25, 70:25, 181:12, 191:3, 191:15, 204:25, 221:7, 221:9, 223:9, 223:13, 224:10, 230:17, 230:19, 230:21, 230:22, 231:9
**far** [15] - 9:19, 14:17, 53:15, 53:16, 62:10, 76:18, 96:4, 106:3, 173:24, 192:17, 200:13, 204:10, 211:7, 247:17
**fascinating** [1] - 201:19
**fast** [2] - 53:4, 82:14
**father** [5] - 38:14, 68:9, 148:18, 191:11, 210:4
**favor** [2] - 24:13, 25:21
**favorable** [3] - 30:14, 128:4, 197:2
**FB** [1] - 168:21
**FBI** [41] - 3:9, 13:4, 15:12, 45:2, 46:9, 46:21, 157:5, 163:2, 165:24, 167:8,

167:15, 168:2, 169:13, 169:17, 169:18, 170:10, 170:21, 171:15, 171:19, 172:13, 172:24, 173:2, 173:5, 173:7, 173:20, 174:2, 174:13, 175:4, 175:11, 176:4, 176:18, 178:1, 181:6, 181:20, 183:5, 183:18, 199:1, 199:2, 208:11, 208:21, 216:20
**FCRR** [2] - 1:21, 249:8
**fear** [1] - 36:4
**fearing** [1] - 166:8
**February** [8] - 10:18, 55:18, 153:25, 154:9, 155:6, 155:8, 155:10, 159:6
**federal** [65] - 13:3, 14:12, 26:3, 29:16, 32:21, 48:14, 48:24, 50:9, 51:13, 53:6, 97:17, 130:17, 132:2, 132:16, 133:19, 134:11, 134:12, 134:13, 134:18, 135:10, 135:14, 136:6, 136:7, 136:8, 136:13, 137:25, 138:1, 138:4, 143:8, 144:9, 145:16, 145:18, 150:12, 158:16, 161:8, 161:9, 165:9, 174:5, 175:18, 177:15, 177:16, 179:5, 183:24, 184:1, 184:2, 184:18, 185:6, 185:12, 185:13, 199:7, 206:11, 215:20, 216:17, 216:19, 218:3, 228:21, 229:1, 233:13, 235:5, 235:6, 238:18, 242:24, 245:1
**feet** [2] - 75:24, 76:1
**fellow** [7] - 14:6, 201:11, 204:17, 212:20, 223:14, 226:4, 238:18
**felony** [3] - 92:9, 92:11, 127:8
**felt** [10] - 16:11, 35:2, 43:20, 43:22, 63:6, 63:9, 77:2, 149:9, 198:22, 198:25
**few** [9] - 8:14, 43:7,

55:1, 72:19, 74:14, 120:18, 126:11, 187:4, 196:6
**field** [1] - 128:14
**fighting** [2] - 111:25, 201:3
**figure** [5] - 64:6, 106:18, 185:11, 201:17, 233:17
**file** [4] - 19:13, 19:15, 160:15, 160:18
**filed** [5] - 83:12, 83:13, 83:15, 83:16, 93:12
**files** [1] - 150:23
**fill** [2] - 18:3, 244:11
**filled** [1] - 163:14
**final** [8] - 83:4, 83:20, 84:5, 109:22, 120:16, 123:8, 140:22, 240:16
**FINAL** [1] - 2:15
**finalize** [1] - 123:2
**finally** [1] - 203:16
**financial** [2] - 30:19, 50:5
**financials** [1] - 217:5
**fine** [22] - 82:5, 82:6, 87:5, 99:14, 105:2, 106:12, 107:19, 107:22, 108:2, 117:12, 118:10, 120:6, 121:6, 122:2, 122:3, 122:4, 194:4, 203:13, 203:14, 237:13, 245:19, 247:12
**finger** [1] - 200:10
**finish** [3] - 30:22, 186:12, 186:20
**fire** [3] - 78:9, 219:5, 219:8
**firearm** [1] - 52:1
**firearms** [7] - 33:24, 33:25, 51:18, 51:20, 51:24, 52:5, 52:7
**fired** [5] - 78:9, 149:25, 150:3, 219:10, 233:12
**first** [47] - 12:20, 17:22, 31:22, 31:23, 40:14, 40:16, 53:6, 64:6, 67:15, 81:3, 82:19, 88:14, 90:6, 90:24, 94:25, 101:1, 101:3, 102:9, 105:25, 107:5, 109:10, 113:17, 116:7, 116:12, 130:8, 140:24, 140:25,

142:2, 143:1, 143:11, 147:25, 157:23, 158:22, 168:9, 173:14, 182:2, 187:20, 189:18, 204:11, 211:15, 217:14, 245:11, 245:18, 246:19
**fit** [1] - 147:13
**fitted** [1] - 13:10
**five** [28] - 41:24, 42:7, 63:22, 63:24, 64:2, 64:6, 64:7, 64:21, 64:24, 64:25, 65:8, 65:14, 79:11, 105:13, 105:15, 108:13, 148:22, 152:16, 157:15, 160:3, 166:14, 166:15, 186:24, 187:2, 203:11, 208:1, 231:23, 232:1
**five-minute** [2] - 160:3, 231:23
**fix** [4] - 85:6, 158:12, 175:5, 175:14
**flag** [2] - 148:24, 175:16
**fled** [3] - 150:25, 151:2, 236:22
**Floor** [2] - 1:23, 249:10
**FLORIDA** [1] - 1:1
**Florida** [9] - 1:4, 1:15, 1:19, 1:24, 142:18, 232:18, 243:22, 244:7, 249:10
**flying** [1] - 104:2
**focus** [4] - 29:3, 93:22, 155:3, 239:6
**focused** [2] - 93:20, 195:19
**folks** [2] - 153:24, 172:5
**follow** [2] - 10:6, 14:6, 80:8, 80:12, 80:14, 91:7, 120:5, 123:9, 124:5, 124:6, 192:12, 192:15, 194:18, 194:20, 202:3, 202:4, 216:25, 218:18, 219:7, 233:24, 238:12
**follow-up** [1] - 10:6
**followed** [2] - 62:23, 140:25
**following** [7] - 96:25, 97:20, 131:6, 132:9, 134:24, 136:17, 215:6
**follows** [2] - 123:14,

143:23
**food** [6] - 41:9, 61:12, 63:7, 231:4, 245:25, 246:2
**footnotes** [1] - 91:18
**FOR** [5] - 1:13, 1:17, 2:2, 2:6, 2:7
**forbids** [3] - 129:4, 129:6, 193:25
**Force** [17] - 29:16, 145:17, 147:19, 149:18, 150:15, 151:20, 152:2, 153:7, 161:9, 176:9, 177:16, 184:13, 184:19, 185:6, 208:12, 237:1
**force** [2] - 58:15, 58:17
**foregoing** [1] - 249:3
**foreperson** [5] - 243:18, 244:8, 244:11, 245:18
**foresaw** [3] - 138:4, 145:19, 185:5
**foresee** [3] - 26:4, 242:12, 243:2
**foreseeable** [2] - 29:15, 29:18
**foreseen** [1] - 145:15
**forever** [2] - 102:12, 233:2
**forget** [1] - 127:11
**forgot** [1] - 109:22
**fork** [1] - 238:10
**form** [7] - 44:8, 98:13, 120:10, 243:20, 244:9, 244:11, 244:21
**formal** [5] - 64:12, 124:9, 131:1, 132:24, 137:4
**former** [5] - 54:14, 145:16, 170:9, 170:16, 171:7
**forth** [2] - 89:24, 96:17
**fortunately** [1] - 205:5
**forty** [1] - 32:24
**forward** [5] - 10:21, 15:4, 53:4, 149:20, 178:20
**foundation** [1] - 233:11
**four** [22] - 10:7, 46:5, 61:2, 61:20, 105:10, 105:17, 105:23, 107:16, 108:13, 109:17, 135:9, 144:8, 147:20, 148:22,

152:15, 157:15, 177:24, 179:23, 198:8, 220:8, 230:23, 242:23
**fours** [1] - 178:11
**fourteen** [1] - 224:15
**Fourth** [1] - 1:15
**FPR** [2] - 1:21, 249:8
**frame** [1] - 150:7
**frankly** [3] - 200:14, 204:23, 219:8
**fraud** [6] - 10:23, 10:24, 106:13, 106:14, 111:20, 112:7
**fraudulent** [2] - 170:8, 181:18
**free** [1] - 246:11
**freedom** [1] - 162:11
**freely** [1] - 174:7
**frequent** [1] - 61:25
**frequenting** [1] - 75:20
**frequently** [1] - 62:3
**Friday** [6] - 39:17, 39:18, 40:2, 171:17, 171:22, 239:15
**friend** [11] - 70:25, 160:21, 161:6, 164:2, 169:4, 171:22, 181:12, 181:13, 236:9, 236:11, 243:4
**friends** [4] - 69:23, 147:17, 148:20, 215:13
**friendship** [1] - 34:7
**front** [6] - 66:11, 66:17, 88:15, 90:10, 147:5, 168:20
**fucked** [1] - 180:15
**fucking** [1] - 234:21
**full** [2] - 14:10, 106:5
**fully** [1] - 140:10
**fun** [1] - 171:21
**furtherance** [1] - 12:13
**furthermore** [1] - 25:6
**future** [2] - 11:11, 11:13

## G

**Gables** [2] - 1:19, 247:18
**gain** [1] - 128:4, 197:2, 231:6
**gaining** [1] - 203:14
**game** [2] - 176:10
**gang** [1] - 206:23
**garbage** [2] - 239:16,

240:15
**gate** [3] - 158:1, 158:2, 176:7
**gathering** [2] - 38:21, 40:3
**gatherings** [1] - 34:3
**gay** [4] - 45:3, 45:9, 46:7, 231:16
**GAYLES** [1] - 1:10
**Gayles** [1] - 188:12
**general** [4] - 16:18, 131:15, 133:7, 137:11
**generally** [2] - 12:21, 101:8
**gentlemen** [40] - 9:9, 22:13, 32:6, 33:2, 78:23, 79:4, 84:17, 86:4, 122:23, 141:9, 142:7, 145:13, 146:6, 146:11, 147:12, 151:2, 152:8, 154:23, 155:13, 155:24, 156:15, 159:3, 162:15, 171:6, 178:22, 181:25, 182:23, 183:19, 183:21, 185:17, 186:4, 187:18, 232:12, 233:4, 236:13, 239:9, 240:10, 243:6, 243:16, 245:15
**ghost** [1] - 214:10
**ghosts** [1] - 202:16
**giant** [1] - 148:24
**girl** [3] - 203:9, 204:8, 204:23
**girl's** [1] - 205:2
**girlfriend** [2] - 12:4, 171:21
**girls** [1] - 46:4
**given** [15] - 14:8, 30:24, 74:15, 82:11, 91:19, 94:14, 112:2, 113:6, 114:4, 129:19, 140:22, 197:16, 218:16, 247:2
**glitches** [1] - 85:3
**go-to** [1] - 224:2
**goals** [5] - 131:21, 133:12, 137:16, 227:7, 228:11
**godmother** [1] - 47:12
**godson** [4] - 158:12, 158:13, 199:7, 199:10
**Gonzalez** [38] - 10:7, 10:17, 11:23, 18:20, 19:25, 20:9, 20:12, 21:3, 27:24, 148:12,

149:3, 149:21, 152:4, 152:19, 153:8, 153:17, 154:9, 158:21, 159:5, 160:20, 166:18, 167:4, 177:9, 180:21, 203:19, 209:1, 209:2, 210:13, 210:18, 210:20, 210:22, 212:6, 212:7, 212:9, 229:22, 230:2
**Gonzalez'** [1] - 207:7
**Gonzalez's** [7] - 15:20, 149:23, 152:6, 160:24, 167:7, 182:12, 207:11
**Gonzalez/West** [2] - 185:8, 237:19
**good-hearted** [1] - 230:14
**goodness** [1] - 230:25
**governing** [1] - 130:4
**Government** [5] - 24:13, 25:21, 30:14, 198:17, 207:23
**GOVERNMENT** [4] - 1:13, 2:2, 2:6, 2:14
**government** [120] - 3:6, 22:10, 22:11, 22:14, 25:2, 26:8, 26:17, 29:14, 81:3, 82:6, 83:9, 86:2, 89:18, 91:1, 91:9, 91:14, 91:24, 92:4, 92:15, 92:22, 93:2, 93:14, 94:10, 95:3, 95:9, 95:15, 96:17, 99:8, 99:19, 103:1, 103:12, 103:21, 105:5, 105:7, 107:17, 107:18, 108:10, 109:23, 110:7, 110:11, 110:19, 110:25, 111:4, 111:9, 111:24, 116:15, 116:22, 117:12, 117:17, 117:19, 118:1, 118:15, 118:21, 119:9, 120:12, 121:25, 122:8, 123:24, 124:4, 124:15, 127:23, 128:7, 128:20, 128:22, 130:24, 131:3, 132:22, 133:1, 134:11, 134:12, 134:13, 136:6, 136:7, 136:8, 137:2, 137:6,

137:25, 138:3, 139:4, 139:6, 140:24, 140:25, 141:1, 141:4, 141:7, 161:2, 161:20, 170:4, 170:5, 187:6, 189:10, 189:16, 189:24, 190:9, 190:11, 192:11, 193:20, 194:12, 194:16, 195:15, 195:23, 197:4, 198:19, 202:23, 212:5, 212:13, 212:15, 213:7, 217:8, 230:9, 231:19, 231:22, 232:10, 235:12, 239:6, 240:20
**Government's** [5] - 19:22, 65:24, 71:19, 73:2, 178:12
**GOVERNMENT'S** [1] - 2:15
**government's** [26] - 23:25, 83:3, 89:9, 89:23, 90:6, 90:16, 90:19, 94:22, 96:4, 98:19, 104:17, 106:7, 111:14, 111:22, 115:8, 115:13, 122:19, 124:18, 124:20, 141:15, 141:16, 146:9, 202:23, 224:19, 232:13, 236:17
**governmental** [5] - 116:8, 116:13, 116:19, 117:9, 117:11
**grabbing** [1] - 203:15
**gradual** [1] - 34:16
**grand** [35] - 4:18, 4:25, 5:6, 5:10, 5:16, 5:19, 26:3, 26:4, 29:13, 29:15, 29:22, 49:2, 49:15, 51:4, 51:9, 137:25, 138:1, 138:4, 145:14, 145:18, 151:20, 157:12, 185:5, 185:9, 185:13, 228:21, 229:1, 229:7, 229:8, 229:9, 242:12, 242:15, 242:24, 242:25, 243:1
**great** [2] - 187:21, 194:6
**greater** [2] - 70:22, 139:18
**Greece** [3] - 158:14,

## H

158:25, 159:14
**greedy** [1] - 215:14
**grew** [1] - 54:11
**groups** [1] - 8:17
**guard** [4] - 162:22, 195:25, 196:7, 196:18
**guess** [12] - 42:6, 49:21, 60:10, 60:12, 62:2, 64:9, 68:22, 105:16, 119:25, 121:10, 202:13, 217:14
**guessing** [2] - 103:5, 103:6
**guidance** [2] - 14:8, 178:6
**guide** [2] - 112:22, 142:1
**guided** [1] - 5:20
**guilt** [11] - 124:10, 124:15, 124:19, 124:21, 128:11, 141:19, 146:8, 146:10, 186:1, 188:5, 190:10
**guilty** [48] - 95:20, 95:21, 96:3, 96:19, 97:20, 98:7, 98:11, 100:2, 123:25, 124:17, 125:3, 128:10, 131:5, 131:18, 132:8, 133:10, 134:23, 136:16, 137:14, 138:6, 140:1, 140:3, 140:4, 140:6, 188:5, 190:5, 192:18, 194:17, 198:2, 198:3, 198:4, 198:6, 210:20, 215:3, 226:2, 226:23, 229:14, 229:19, 231:20, 240:23, 240:24, 243:12, 243:13, 244:2
**guy** [28] - 8:22, 158:5, 159:25, 172:3, 176:24, 183:12, 195:19, 195:24, 196:8, 196:10, 196:11, 198:13, 204:3, 205:10, 206:4, 209:11, 211:20, 211:23, 219:22, 220:12, 224:2, 224:22, 225:13, 234:20
**guys** [4] - 37:2, 37:18, 45:21, 192:22
**gyms** [1] - 12:22

**half** [1] - 224:11
**hand** [6] - 32:11, 72:25, 73:24, 87:6, 151:7, 233:15
**handle** [5] - 51:24, 52:15, 57:3, 160:5, 219:4
**handled** [2] - 6:13, 57:8
**handling** [3] - 7:16, 7:17, 210:25
**hands** [4] - 40:6, 66:25, 155:8, 155:9
**hang** [5] - 35:3, 37:4, 164:19, 180:2
**hanging** [2] - 34:14, 35:1
**hangs** [1] - 158:24
**happy** [2] - 29:25, 186:21
**hard** [4] - 215:4, 219:19, 220:12, 221:6, 240:14
**hard-working** [2] - 220:12, 240:14
**hardship** [1] - 231:5
**hate** [1] - 226:5
**Hawk** [19] - 39:23, 40:12, 40:18, 59:18, 59:21, 60:1, 60:9, 60:18, 61:2, 63:12, 64:11, 65:17, 65:23, 67:3, 67:11, 75:17, 171:22, 177:20, 239:15
**head** [14] - 148:14, 151:5, 153:6, 153:19, 155:8, 156:6, 162:1, 162:23, 165:20, 168:5, 171:9, 171:24, 181:5, 191:15
**headings** [1] - 91:19
**health** [2] - 184:3, 191:2
**Health** [1] - 32:22
**healthcare** [1] - 10:23
**hear** [14] - 38:11, 83:6, 84:20, 107:23, 140:24, 141:4, 141:5, 146:22, 148:16, 174:17, 174:20, 180:9, 186:19, 247:15
**heard** [32] - 104:22, 116:7, 116:12, 116:18, 117:9, 139:3, 141:23, 147:14, 149:4, 149:5, 149:15,

150:13, 151:6, 162:7, 165:2, 174:10, 188:18, 201:13, 207:12, 208:23, 218:17, 218:19, 220:6, 220:14, 221:13, 221:20, 222:11, 223:15, 223:19, 231:14, 239:22
**heart** [4] - 131:1, 132:24, 137:4, 209:4
**heartburn** [2] - 103:20, 109:23
**hearted** [1] - 230:14
**heavily** [1] - 77:6
**heavy** [4] - 61:6, 124:18, 146:7, 190:9
**heck** [1] - 172:25
**held** [2] - 13:17, 98:8
**hell** [1] - 200:24
**hello** [1] - 38:18
**help** [10] - 112:20, 142:1, 153:24, 154:17, 157:1, 198:17, 202:13, 230:19, 230:20, 230:21
**helped** [1] - 206:22
**helpful** [2] - 128:13, 188:1
**helping** [1] - 151:15
**helps** [1] - 183:16
**Henry** [9] - 2:8, 31:5, 32:9, 32:12, 32:21, 219:2, 223:12, 231:15, 239:14
**hereby** [1] - 249:3
**herself** [1] - 212:5
**hesitate** [2] - 140:13, 192:7
**hesitation** [7] - 14:23, 125:2, 190:18, 190:19, 190:22, 191:7, 192:5
**HHS** [36] - 13:4, 14:21, 21:12, 32:25, 35:15, 39:1, 46:7, 48:12, 48:20, 49:6, 50:17, 50:19, 50:21, 51:16, 57:19, 58:11, 59:14, 70:4, 74:16, 77:22, 147:18, 149:5, 149:6, 149:18, 153:7, 154:7, 157:5, 161:15, 171:14, 171:19, 208:11, 210:12, 216:21, 219:19, 219:20, 239:18
**HHS-OIG** [24] - 13:4,

32:5, 35:15, 39:1, 48:12, 49:6, 51:16, 70:4, 74:16, 77:22, 147:18, 149:5, 149:6, 149:18, 153:7, 154:7, 157:5, 161:15, 171:14, 171:19, 208:11, 210:12, 219:19, 219:20
**hi** [2] - 38:22, 68:19
**Hi** [1] - 144:21
**Hialeah** [10] - 49:23, 49:25, 50:14, 67:16, 77:15, 147:22, 152:6, 206:24, 225:14, 238:22
**hide** [1] - 160:7
**hiding** [2] - 153:1, 153:2
**high** [8] - 189:17, 189:19, 190:15, 192:10, 202:8, 218:12, 227:13, 229:18
**highest** [1] - 189:11
**highlighting** [2] - 93:24, 169:14
**highlights** [1] - 93:14
**himself** [26] - 6:20, 8:22, 50:24, 52:15, 147:25, 149:4, 159:24, 165:12, 174:23, 176:10, 177:10, 181:17, 184:5, 202:9, 202:11, 218:8, 221:5, 222:8, 223:14, 226:7, 231:2, 239:3, 241:17, 242:17
**hinder** [8] - 25:10, 107:11, 132:4, 132:13, 134:20, 135:3, 143:5, 144:3
**history** [1] - 156:22
**hit** [2] - 122:14, 221:6
**hold** [6] - 23:7, 102:12, 105:21, 157:6, 204:5, 231:19
**holding** [1] - 73:14
**home** [31] - 27:23, 28:13, 35:6, 35:8, 57:6, 58:21, 59:7, 62:17, 63:10, 63:18, 64:4, 65:22, 66:13, 68:15, 68:21, 70:13, 76:19, 77:3, 77:8, 119:12, 147:3, 162:9, 167:3, 167:5, 167:10, 167:11, 172:9, 176:3, 178:1, 245:17

**honest** [2] - 140:15, 208:5
**Honor** [109] - 3:7, 3:12, 9:8, 17:13, 20:17, 22:7, 22:11, 22:23, 23:6, 26:18, 28:4, 28:20, 29:14, 29:23, 30:12, 30:20, 30:23, 31:3, 31:15, 37:22, 44:6, 48:9, 66:18, 71:9, 71:11, 80:24, 81:5, 81:9, 82:12, 83:25, 85:12, 85:16, 85:21, 85:25, 86:3, 86:22, 87:2, 87:5, 87:17, 88:7, 88:10, 88:13, 88:18, 88:21, 89:20, 89:24, 90:12, 90:21, 91:4, 91:10, 91:15, 92:2, 92:7, 92:12, 92:16, 92:18, 93:9, 94:11, 94:22, 95:4, 95:6, 95:12, 96:7, 96:12, 98:20, 99:11, 103:5, 104:19, 105:4, 105:11, 105:19, 106:9, 106:10, 106:20, 106:24, 108:8, 108:15, 109:3, 109:23, 110:5, 110:8, 110:13, 110:16, 110:22, 111:1, 111:12, 116:16, 117:4, 117:13, 117:21, 118:18, 118:23, 119:10, 119:16, 120:15, 120:22, 121:4, 122:1, 141:8, 181:3, 182:1, 187:7, 187:12, 231:12, 231:23, 232:6, 232:11, 246:21, 246:22
**HONORABLE** [1] - 1:10
**hooked** [3] - 204:11, 204:15, 204:18
**hope** [2] - 166:16, 231:19
**hopes** [3] - 128:4, 179:11, 197:2
**horrible** [1] - 56:13
**hospital** [2] - 191:12, 223:9
**Hospital** [1] - 203:12
**hot** [1] - 169:21
**hour** [3] - 121:10, 121:12, 147:4
**hours** [10] - 42:25,

43:7, 43:15, 56:24, 61:2, 61:20, 82:12, 155:14, 172:10, 179:22

**house** [57] - 16:24, 28:12, 35:25, 36:11, 36:19, 36:20, 36:21, 36:23, 37:7, 38:4, 43:24, 45:20, 47:14, 56:25, 57:7, 66:6, 66:7, 71:25, 72:3, 72:5, 72:8, 72:12, 72:16, 72:25, 73:1, 73:11, 73:14, 74:7, 74:10, 151:8, 158:16, 162:12, 162:13, 163:8, 164:24, 172:13, 172:19, 173:3, 173:7, 173:10, 176:2, 178:3, 178:5, 178:6, 178:10, 182:24, 199:9, 202:25, 208:25, 211:21, 217:1, 236:10
**houses** [1] - 148:21
**huge** [1] - 238:25
**Human** [1] - 32:22
**hurricane** [1] - 230:18
**hurt** [1] - 53:15
**husband** [5] - 45:23, 54:21, 54:25, 212:7, 212:16

**I**

**IA** [1] - 64:25
**ice** [1] - 204:21
**idea** [14] - 36:14, 40:23, 40:24, 41:11, 97:9, 145:17, 181:14, 232:25, 233:1, 233:2, 239:13, 240:14, 242:11
**identified** [4] - 11:22, 150:15, 150:19, 170:12
**identify** [1] - 20:5
**identifying** [1] - 69:8
**identities** [3] - 131:13, 133:4, 137:9
**identity** [5] - 16:15, 17:4, 171:5, 222:17, 225:6
**ignorant** [1] - 51:12
**ignoring** [1] - 115:11
**II** [1] - 129:23
**ill** [1] - 245:8
**illegal** [15] - 150:1, 174:1, 181:16,

182:12, 207:2, 207:7, 207:10, 209:19, 211:25, 212:1, 213:3, 213:9, 213:16, 233:14, 234:2
**illogical** [1] - 235:4
**image** [1] - 237:15
**immediately** [9] - 157:4, 160:25, 163:15, 166:3, 166:4, 166:25, 172:2, 179:14, 202:25
**impact** [2] - 15:18, 243:5
**impaired** [1] - 127:21
**impartially** [1] - 124:24
**impeachment** [1] - 92:8
**impede** [5] - 136:14, 136:20, 137:22, 145:11, 242:3
**importance** [1] - 146:13
**important** [55] - 58:1, 95:22, 125:2, 126:6, 127:1, 127:15, 146:2, 147:23, 155:13, 167:4, 183:20, 188:1, 189:3, 190:6, 190:19, 190:25, 191:2, 191:3, 191:5, 191:6, 191:9, 191:22, 191:24, 192:5, 192:13, 193:19, 194:20, 194:21, 197:14, 199:3, 199:18, 201:6, 201:19, 207:3, 207:16, 208:4, 209:20, 210:1, 213:21, 214:17, 214:18, 214:24, 215:2, 218:20, 219:14, 225:19, 225:22, 226:5, 226:11, 226:21, 227:8, 227:10, 228:18
**importantly** [2] - 228:1, 228:2
**impress** [3] - 126:12, 196:6, 197:23
**impression** [3] - 134:5, 135:25, 154:16
**impressions** [1] - 139:19
**improper** [3] - 70:2, 137:21, 242:2
**impropriety** [1] - 71:6
**inaccurately** [1] -

127:12
**incentive** [1] - 195:13
**incident** [1] - 64:25
**include** [10] - 11:17, 95:19, 99:13, 100:6, 100:25, 133:23, 135:17, 145:18, 151:22, 157:6
**included** [3] - 63:20, 93:18, 96:21
**includes** [2] - 125:6, 152:3
**including** [12] - 11:16, 11:18, 12:4, 51:22, 70:10, 108:2, 115:2, 119:16, 161:4, 161:16, 165:25, 232:8
**income** [3] - 148:5, 152:10, 218:6
**inconsistent** [1] - 92:9
**incorporate** [1] - 89:10
**increase** [1] - 34:7
**increased** [1] - 55:10
**incredible** [1] - 202:4
**incredibly** [1] - 169:21
**incumbent** [1] - 71:1
**indeed** [1] - 213:7
**indefinitely** [1] - 17:9
**independent** [1] - 139:15
**indicate** [1] - 101:3
**indication** [1] - 44:15
**indict** [1] - 5:16
**indicted** [1] - 5:1
**indictment** [25] - 10:6, 10:16, 12:7, 23:5, 124:9, 128:19, 129:11, 129:17, 129:19, 130:12, 130:25, 132:23, 137:3, 139:20, 139:24, 151:21, 151:23, 153:8, 154:24, 155:4, 157:6, 223:2, 236:23, 244:2, 244:24
**indirect** [1] - 146:24
**individual** [25] - 11:22, 38:4, 38:7, 38:17, 61:22, 69:18, 70:13, 71:2, 77:16, 112:20, 189:7, 196:17, 197:9, 197:13, 197:23, 197:24, 201:9, 203:23, 214:2,

214:12, 214:14, 215:8, 218:7, 222:11, 223:15
**individuals** [7] - 11:13, 12:2, 46:9, 69:4, 171:1, 171:2, 209:21
**inexplicable** [1] - 218:12
**infected** [1] - 35:16
**inferences** [2] - 109:14, 110:1
**influence** [6] - 16:14, 136:14, 136:20, 145:11, 160:5, 160:7
**influenced** [2] - 124:3, 139:16
**influencing** [1] - 71:6
**inform** [1] - 165:8, 180:21, 233:14, 233:19
**informant** [25] - 16:15, 17:3, 17:12, 17:21, 143:11, 144:13, 157:20, 158:2, 158:5, 158:6, 159:10, 159:21, 159:25, 222:12, 222:16, 222:18, 222:20, 222:23, 223:22, 224:13, 224:24, 225:6, 225:7, 235:6, 235:7
**informant's** [1] - 222:21
**informants** [2] - 17:7, 180:18
**information** [45] - 7:22, 7:25, 8:2, 8:8, 12:10, 15:24, 16:3, 16:6, 16:12, 25:11, 49:9, 64:15, 68:24, 69:8, 93:20, 132:6, 132:15, 134:2, 134:22, 135:4, 135:7, 135:9, 135:22, 143:7, 144:3, 144:6, 144:8, 150:1, 152:3, 154:22, 156:1, 156:2, 157:3, 183:15, 183:17, 183:24, 184:18, 201:14, 207:6, 207:15, 207:20, 212:22, 224:12, 241:5, 241:21
**informed** [2] - 21:4, 28:9
**informing** [1] - 225:3
**informs** [1] - 165:7
**ingredient** [1] -

215:13
**initial** [3] - 10:6, 11:2, 141:2
**initiative** [1] - 173:3
**innocence** [2] - 91:7, 124:11
**innocent** [2] - 124:11, 127:13
**insane** [1] - 215:19
**inside** [8] - 4:4, 40:20, 41:3, 72:8, 147:4, 183:15, 219:17, 220:3
**insinuate** [1] - 176:13
**insofar** [2] - 188:13, 207:19
**instances** [1] - 199:23
**instead** [2] - 94:21, 123:16
**instituted** [1] - 138:2
**instruct** [4] - 86:14, 99:23, 106:12, 123:19
**instructed** [10] - 39:3, 49:8, 69:17, 86:6, 115:5, 115:16, 119:16, 146:12, 147:1, 147:9
**instructing** [2] - 176:3, 235:6
**instruction** [87] - 90:24, 91:6, 91:7, 91:13, 91:14, 91:21, 92:3, 92:8, 92:14, 92:19, 93:1, 93:6, 93:10, 94:1, 94:14, 94:18, 95:7, 95:13, 95:19, 95:24, 96:17, 96:22, 96:23, 97:10, 97:15, 98:14, 99:13, 99:19, 100:18, 101:9, 101:14, 101:16, 101:18, 101:19, 101:20, 102:8, 102:19, 102:20, 103:3, 104:15, 106:19, 108:6, 108:7, 108:19, 108:22, 109:5, 109:7, 109:8, 110:4, 110:6, 110:11, 110:18, 111:3, 111:8, 111:18, 111:23, 112:2, 112:9, 113:7, 113:18, 114:7, 114:20, 114:22, 115:7, 115:14, 115:18, 118:2, 120:1, 121:17, 122:12, 123:6, 123:8, 140:22,

189:21, 190:16, 193:5, 195:14, 195:17, 196:22, 196:25, 197:17, 218:16, 218:20, 219:13

**instructions** [63] - 81:25, 82:19, 82:22, 82:24, 83:2, 83:13, 83:16, 83:21, 86:12, 90:7, 90:8, 90:10, 90:19, 90:25, 91:19, 95:8, 97:3, 97:16, 100:25, 101:25, 102:1, 102:25, 104:5, 106:14, 109:15, 111:14, 111:15, 112:1, 119:25, 120:22, 120:25, 121:16, 121:24, 122:5, 122:18, 122:24, 123:2, 123:5, 123:10, 123:14, 123:21, 124:7, 124:8, 125:11, 130:11, 140:21, 141:23, 144:17, 145:25, 175:25, 188:21, 188:25, 189:20, 193:19, 194:10, 194:18, 195:2, 197:15, 226:10, 233:25, 240:16, 244:21, 246:20

**INSTRUCTIONS** [2] - 2:13, 2:15

**instructor** [1] - 51:20

**instructs** [2] - 5:23, 146:7

**insufficiency** [4] - 25:9, 89:8, 89:11, 89:14

**insufficient** [13] - 23:8, 24:1, 24:7, 24:12, 24:19, 24:23, 25:7, 25:14, 25:17, 25:20, 25:23, 26:6, 26:13

**intend** [1] - 109:17

**intended** [5] - 97:23, 98:1, 100:17, 101:2, 106:8

**intending** [1] - 98:5

**intensified** [2] - 55:6, 55:9

**intent** [64] - 23:22, 25:7, 25:10, 96:10, 97:14, 97:18, 98:17, 99:13, 99:23, 100:21, 101:5, 101:14, 107:8,

107:10, 112:18, 112:19, 112:20, 112:23, 113:1, 113:15, 115:12, 129:3, 129:6, 129:22, 131:6, 130:18, 131:9, 132:4, 132:13, 134:7, 134:20, 135:3, 136:2, 137:22, 141:22, 142:5, 143:5, 144:2, 144:24, 145:3, 185:16, 193:11, 193:15, 193:18, 193:24, 194:14, 215:1, 215:3, 225:23, 226:7, 227:19, 227:22, 228:3, 228:6, 228:15, 228:16, 234:2, 234:3, 241:6, 242:3

**intention** [4] - 98:22, 133:17, 135:12, 227:17

**intentional** [1] - 127:14

**intentionally** [10] - 24:1, 106:2, 129:1, 134:2, 134:4, 135:22, 135:24, 138:14, 138:22, 194:8

**interact** [2] - 5:11, 39:11

**interacted** [2] - 68:8, 113:2

**interacting** [1] - 44:24

**interaction** [2] - 38:16, 78:11

**interest** [7] - 126:16, 140:19, 166:12, 197:25, 198:1, 227:7, 228:11

**interested** [3] - 34:13, 64:14, 237:3

**interesting** [3] - 158:1, 201:19, 208:19

**interests** [3] - 131:21, 133:12, 137:16

**interfere** [1] - 16:23

**interjects** [1] - 173:14

**internal** [1] - 53:25

**Internal** [2] - 64:12, 64:15

**internally** [1] - 219:4

**interpretation** [2] - 125:14, 224:5

**interrupted** [1] - 62:3

**interview** [20] - 14:1,

31:10, 31:17, 36:2, 58:4, 64:10, 64:12, 156:19, 157:3, 166:23, 167:16, 168:11, 170:10, 170:18, 170:22, 171:15, 198:24, 198:25, 220:18, 221:3

**interviewed** [12] - 15:2, 31:10, 46:21, 46:24, 53:21, 144:14, 169:13, 170:13, 172:22, 173:2, 183:2, 223:17

**interviewing** [5] - 14:22, 58:24, 165:24, 169:18, 237:9

**interviews** [22] - 11:7, 13:13, 13:14, 14:16, 14:18, 14:20, 15:11, 15:23, 21:19, 21:23, 35:20, 50:25, 53:9, 53:17, 53:19, 54:7, 57:25, 166:22, 168:8, 168:12, 208:14, 221:2

**intimate** [1] - 148:20

**intimated** [1] - 75:6

**intimidates** [1] - 150:10

**intimidating** [1] - 182:13

**intoxicated** [6] - 42:9, 42:12, 43:24, 44:4, 63:6, 176:13

**introduced** [2] - 68:3, 246:3

**introduces** [1] - 170:8

**introduction** [1] - 95:7

**investigate** [4] - 33:4, 70:18, 150:9, 161:10

**investigated** [8] - 16:22, 49:15, 142:10, 142:11, 152:20, 152:23, 158:21, 199:16

**investigating** [4] - 13:15, 50:9, 70:22, 161:16

**investigation** [81] - 10:6, 10:12, 10:22, 10:23, 10:24, 11:1, 11:5, 11:7, 11:12, 12:14, 15:14, 15:19, 20:10, 27:6, 27:9, 29:7, 30:7, 31:11, 51:1, 53:8, 58:4, 71:7,

93:21, 134:15, 136:10, 145:17, 149:2, 149:9, 149:17, 150:12, 150:22, 151:4, 152:18, 153:17, 154:3, 156:10, 156:25, 157:7, 157:15, 159:5, 160:20, 161:18, 163:2, 164:5, 165:20, 166:19, 167:9, 171:8, 175:25, 182:15, 183:17, 185:8, 210:8, 210:18, 210:21, 210:25, 211:1, 211:2, 211:3, 211:4, 211:5, 211:6, 211:8, 211:15, 217:15, 217:16, 223:3, 224:6, 228:24, 228:25, 229:22, 230:2, 230:6, 236:21, 237:2, 237:4, 239:17, 242:16

**investigations** [7] - 14:2, 14:7, 49:16, 49:17, 51:9, 183:23, 240:11

**investigative** [11] - 7:23, 11:2, 15:22, 17:22, 48:17, 48:24, 49:14, 51:7, 69:19, 70:6, 160:17

**investigative-related** [1] - 69:19

**investigator** [2] - 7:24, 74:16

**investigator/paralegal** [1] - 3:14

**involve** [1] - 226:7

**involved** [25] - 11:14, 13:19, 21:6, 49:16, 50:4, 69:5, 70:5, 70:10, 70:16, 70:19, 71:2, 78:11, 211:18, 211:22, 211:24, 212:3, 215:24, 216:2, 217:6, 226:1, 226:3, 226:4, 226:7, 235:13

**involvement** [1] - 21:11

**involves** [2] - 107:5, 107:7

**involving** [2] - 48:23, 127:8

**Irene** [2] - 54:15, 54:17

**IRIS** [7] - 7:11, 18:1, 18:23, 19:5, 19:9, 19:16, 160:15

**IRS** [5] - 48:14,

48:15, 48:16, 48:17, 216:20

**island** [5] - 230:18, 231:2, 231:3, 231:4

**isolation** [1] - 170:11

**issue** [20] - 25:3, 29:13, 36:22, 88:9, 99:6, 101:10, 105:2, 112:11, 113:3, 113:24, 115:6, 125:10, 144:12, 182:8, 192:6, 193:13, 193:15, 218:17, 236:20, 245:9

**issued** [2] - 16:7, 102:25

**issues** [6] - 9:19, 77:21, 99:17, 194:23, 225:8, 229:16

**IT** [2] - 18:11, 18:14

**it-even** [1] - 124:5

**items** [3] - 35:18, 160:23, 246:3

**itself** [6] - 19:20, 20:5, 24:12, 131:2, 132:25, 137:5

## J

**Jackson** [1] - 203:11

**jail** [1] - 180:16

**January** [5] - 10:16, 33:1, 154:7, 154:24, 162:23

**Jennifer** [1] - 53:24

**Jesus** [2] - 2:3, 4:10

**job** [10] - 35:12, 59:15, 69:5, 152:9, 188:17, 188:20, 192:20, 203:10, 221:25

**jobs** [4] - 13:11, 13:14, 187:24, 191:3

**join** [9] - 27:4, 68:17, 99:3, 142:22, 143:14, 182:9, 183:13, 226:13, 226:14

**joined** [37] - 23:9, 23:21, 24:2, 24:7, 24:8, 24:14, 25:23, 25:24, 26:7, 27:6, 27:9, 27:12, 27:14, 27:18, 27:21, 27:25, 28:3, 28:19, 28:21, 99:9, 131:11, 131:16, 132:17, 133:8, 136:22, 137:12, 145:21, 149:22, 182:16, 182:19, 182:21, 183:9,

219:18, 226:12, 226:23, 226:24
**joining** [1] - 147:21
**joins** [1] - 138:14
**joint** [1] - 61:10
**Jorge** [50] - 11:22, 12:1, 12:4, 21:5, 38:8, 38:9, 38:11, 38:17, 38:20, 67:15, 67:24, 68:3, 68:11, 68:14, 68:17, 77:14, 142:8, 142:14, 143:10, 143:20, 144:18, 144:21, 145:24, 147:15, 147:16, 148:4, 148:15, 148:22, 149:10, 149:16, 149:24, 150:8, 151:6, 160:21, 161:6, 161:22, 162:8, 164:14, 164:16, 173:13, 179:5, 180:9, 184:4, 195:18, 195:21, 196:12, 232:16, 238:4, 238:7, 241:10
**Jose** [1] - 3:12
**JOSE** [2] - 1:17, 1:17
**judge** [13] - 140:4, 188:9, 188:12, 188:15, 189:7, 191:4, 194:24, 195:11, 236:12, 236:13, 236:14, 236:15
**Judge** [31] - 19:22, 48:5, 48:7, 78:13, 78:16, 78:20, 79:2, 80:21, 81:16, 82:5, 82:21, 90:14, 96:1, 96:15, 97:4, 100:11, 101:12, 101:24, 102:10, 102:13, 103:9, 103:14, 103:21, 104:7, 111:17, 114:22, 116:10, 117:15, 146:25, 188:12, 248:4
**JUDGE** [1] - 1:11
**judged** [1] - 195:9
**judges** [9] - 140:19, 188:4, 188:11, 188:17, 192:11, 194:20, 194:23, 197:14
**Judges'** [2] - 81:8, 81:11
**judges-judges** [1] - 140:19
**judging** [1] - 196:16
**JUDGMENT** [1] - 2:6

**judgment** [4] - 23:8, 25:1, 89:16, 243:12
**July** [54] - 13:25, 28:5, 29:2, 29:4, 29:8, 29:19, 30:3, 30:5, 39:16, 39:17, 48:1, 48:2, 53:21, 59:18, 60:20, 64:8, 64:10, 74:16, 143:12, 144:11, 144:14, 144:16, 150:24, 159:17, 168:5, 168:7, 168:14, 168:15, 170:10, 171:9, 171:17, 171:24, 172:24, 176:13, 180:22, 181:5, 181:18, 183:3, 184:24, 185:1, 220:15, 220:22, 222:25, 223:7, 229:4, 233:4, 233:9, 233:16, 241:2, 241:3, 242:6, 242:17
**June** [23] - 13:25, 14:16, 27:22, 28:24, 165:20, 165:24, 166:10, 166:17, 168:9, 169:12, 170:13, 170:15, 170:24, 172:22, 182:25, 208:2, 208:10, 209:7, 210:6, 210:8, 210:10, 213:6
**juries** [1] - 189:14
**juror** [2] - 4:1, 245:14
**JUROR** [3] - 4:2, 9:10, 187:19
**jurors** [13] - 3:17, 5:12, 5:19, 79:19, 139:17, 140:11, 146:16, 186:15, 189:6, 189:15, 207:18, 238:2, 244:18
**JURY** [2] - 1:10, 2:13
**jury** [97] - 3:23, 4:18, 5:1, 5:6, 5:7, 5:10, 5:16, 5:23, 22:17, 22:20, 24:17, 24:23, 25:3, 25:8, 25:20, 26:3, 26:4, 26:13, 29:13, 29:15, 29:22, 32:1, 32:3, 33:2, 49:2, 49:15, 51:4, 51:9, 79:13, 81:18, 81:25, 82:2, 83:13, 84:15, 86:10, 86:19, 88:16, 90:4, 90:25, 93:10, 93:19, 94:14, 95:20, 95:22, 96:18, 99:23,

99:24, 100:1, 100:7, 106:12, 112:25, 114:12, 115:5, 115:14, 115:16, 122:20, 122:21, 123:15, 123:18, 123:21, 137:25, 138:1, 138:4, 141:9, 145:14, 145:18, 151:21, 185:5, 185:9, 185:13, 187:1, 187:13, 187:14, 187:18, 189:3, 189:20, 190:4, 228:21, 229:2, 229:7, 229:8, 229:9, 232:3, 232:9, 242:12, 242:15, 242:25, 243:1, 243:17, 243:25, 244:10, 245:7, 245:10, 246:17, 247:15
**jury's** [1] - 114:13
**justice** [9] - 48:24, 109:8, 120:4, 130:7, 145:5, 145:7, 192:14, 228:8, 232:18
**Justice** [1] - 194:6
**justified** [1] - 112:13
**justify** [1] - 112:2

## K

**keep** [15] - 45:16, 59:17, 71:5, 96:13, 105:14, 127:9, 149:10, 150:10, 172:8, 189:5, 191:19, 197:14, 204:1, 236:6
**keeping** [2] - 39:13, 156:3
**kept** [9] - 23:12, 74:24, 75:1, 198:21, 199:21, 202:11, 202:25, 203:1, 205:17
**key** [2] - 241:5, 241:21
**Keys** [1] - 181:6
**kicked** [1] - 166:20
**kicks** [1] - 194:8
**kids** [5] - 36:18, 36:20, 36:21, 204:25, 205:1
**kill** [7] - 180:22, 180:24, 233:5, 233:6, 236:2
**kind** [31] - 32:19, 34:7, 37:1, 40:23, 41:1, 44:15, 45:10, 80:14, 103:15, 104:1,

113:11, 122:12, 122:14, 128:7, 130:21, 131:1, 132:19, 132:24, 136:24, 137:4, 168:7, 178:14, 193:6, 196:23, 197:5, 202:6, 202:17, 205:14, 214:11, 216:22, 218:12
**kinds** [1] - 212:22
**Klugh** [1] - 113:19
**knife** [2] - 52:8, 52:10
**knock** [1] - 200:22
**knowing** [7] - 28:24, 131:12, 133:3, 137:8, 139:2, 162:10, 195:23
**knowingly** [54] - 23:21, 24:2, 24:7, 24:8, 24:14, 24:20, 25:3, 25:4, 25:23, 27:7, 28:21, 70:9, 93:7, 94:2, 97:22, 99:21, 100:3, 100:16, 100:20, 100:21, 101:2, 104:11, 104:21, 107:2, 128:25, 129:21, 129:24, 130:3, 130:6, 130:15, 130:17, 130:18, 132:3, 132:11, 134:1, 134:6, 134:18, 134:25, 135:1, 135:21, 136:1, 136:14, 137:21, 143:3, 143:24, 143:25, 193:21, 240:22, 240:25, 241:4, 241:13, 242:2
**knowledge** [7] - 44:7, 46:17, 51:15, 125:20, 128:13, 161:5, 169:14
**knowledgeable** [1] - 13:22
**known** [11] - 21:5, 45:12, 45:17, 46:6, 46:7, 133:19, 135:14, 233:20, 234:12, 234:15, 236:18
**knows** [59] - 27:17, 84:1, 100:7, 153:2, 158:20, 161:25, 162:14, 164:17, 164:18, 167:6, 167:7, 167:8, 170:3, 170:4, 170:5, 174:19, 174:25, 175:1, 176:10, 177:7, 178:4,

182:15, 183:7, 183:8, 184:5, 184:16, 185:12, 194:7, 194:15, 198:7, 198:18, 213:6, 213:8, 223:3, 224:1, 224:2, 225:5, 225:13, 233:13, 233:14, 233:18, 234:25, 235:8, 235:24, 237:13, 237:24, 241:14, 241:15, 241:24, 242:17, 242:25, 243:2

## L

**lack** [3] - 93:22, 133:24, 135:18
**ladies** [40] - 9:9, 22:13, 32:5, 33:2, 78:23, 79:3, 84:17, 86:4, 122:23, 141:9, 142:6, 145:13, 146:5, 146:11, 147:12, 151:2, 152:8, 154:23, 155:13, 155:24, 156:15, 159:3, 162:15, 171:6, 178:22, 181:25, 182:23, 183:19, 183:21, 185:17, 186:4, 187:17, 232:12, 233:3, 236:13, 239:9, 240:10, 243:6, 243:16, 245:15
**lady** [2] - 174:9, 204:19
**language** [22] - 94:16, 94:24, 97:2, 102:8, 102:14, 102:21, 102:22, 102:24, 103:3, 103:10, 103:11, 103:16, 108:4, 108:12, 109:10, 109:15, 109:19, 113:17, 122:8, 122:12, 188:23, 228:9
**Lao** [13] - 208:20, 209:22, 209:25, 212:4, 212:5, 212:10, 212:12, 212:13, 212:17, 212:23, 213:1, 213:18
**Lao's** [3] - 212:6, 212:8, 212:15
**lapse** [1] - 127:13
**laptop** [2] - 19:1, 246:24

**large** [1] - 17:25
**last** [20] - 8:14, 8:15, 94:6, 97:5, 100:25, 104:4, 107:15, 107:23, 112:8, 114:22, 119:4, 119:18, 122:9, 123:5, 141:15, 161:11, 162:17, 166:15, 238:16, 247:4
**lastly** [10] - 25:22, 114:22, 144:25, 161:14, 171:4, 185:1, 228:8, 242:1, 242:11, 243:3
**late** [3] - 88:16, 227:11, 243:7
**latest** [1] - 90:20
**laundering** [1] - 235:14
**law** [85] - 5:23, 13:5, 24:16, 24:17, 25:11, 25:16, 25:18, 48:19, 51:23, 86:6, 86:12, 98:24, 113:4, 113:12, 122:24, 123:2, 123:19, 124:5, 124:6, 124:8, 124:10, 125:11, 129:4, 129:5, 129:6, 129:8, 130:4, 132:5, 132:14, 133:18, 134:10, 134:14, 134:21, 135:4, 135:7, 135:13, 136:5, 136:9, 143:6, 144:4, 144:6, 159:12, 179:4, 179:6, 188:12, 188:13, 188:18, 188:19, 188:21, 189:1, 189:12, 190:16, 192:12, 193:8, 193:11, 193:25, 194:1, 194:3, 194:14, 194:15, 194:16, 194:19, 194:20, 194:21, 195:7, 195:10, 196:16, 197:9, 215:1, 215:2, 215:20, 219:9, 222:19, 222:22, 224:14, 224:17, 226:16, 226:17, 227:19, 227:20, 227:21, 228:17, 238:12
**law-and** [1] - 124:6
**lawful** [5] - 128:2, 133:21, 135:16
**Lawless** [53] - 12:6, 14:15, 26:24, 27:23,

29:3, 29:5, 29:8, 30:10, 142:9, 144:18, 144:20, 145:1, 149:15, 150:14, 151:21, 152:1, 156:18, 157:2, 166:21, 169:5, 169:7, 170:14, 177:1, 177:13, 177:17, 178:20, 179:11, 179:12, 179:16, 179:24, 180:8, 181:10, 183:6, 184:8, 184:11, 184:14, 184:17, 184:25, 185:7, 208:12, 208:21, 229:5, 229:6, 238:15, 240:7, 241:3, 241:9, 241:17, 241:22, 241:23, 241:24, 242:15
**Lawless's** [1] - 183:1
**laws** [1] - 189:9
**lawyer** [5] - 5:15, 7:12, 88:14, 113:20, 238:24
**lawyers** [2] - 125:8, 140:22
**lay** [1] - 99:4
**laying** [1] - 93:13
**lays** [2] - 166:11, 174:8
**lead** [4] - 81:12, 210:13, 228:24
**leader** [1] - 143:18
**leading** [7] - 14:3, 15:15, 37:22, 42:1, 178:24, 205:24, 206:2
**leads** [1] - 181:18
**learn** [6] - 6:17, 6:19, 38:7, 178:4, 230:14, 230:15
**learned** [11] - 53:5, 68:14, 179:25, 200:12, 200:14, 200:18, 217:14, 217:16, 229:23, 230:2, 230:11
**learning** [3] - 173:19, 182:11, 184:12
**learns** [5] - 157:24, 161:14, 171:13, 173:1, 173:16
**lease** [1] - 152:5
**least** [13] - 29:9, 36:15, 43:15, 46:7, 82:12, 98:6, 131:17, 133:8, 137:13, 138:4, 145:1, 147:19, 241:19
**leave** [12] - 17:25,

18:18, 68:19, 119:11, 164:23, 166:8, 180:3, 186:9, 231:17, 236:8, 246:13, 247:24
**leaves** [1] - 180:9
**leaving** [6] - 43:12, 47:14, 65:23, 163:7, 247:25, 248:1
**led** [1] - 42:11
**left** [5] - 87:20, 121:11, 166:14, 187:6, 238:11
**legal** [3] - 126:1, 133:19, 135:14
**legitimate** [2] - 148:5, 156:12
**legitimately** [1] - 220:20
**lending** [1] - 241:10
**length** [1] - 17:21
**lengthy** [2] - 31:18, 61:24
**lens** [1] - 185:24
**lent** [5] - 173:13, 174:14, 177:4, 177:5, 179:18
**LEO** [1] - 166:12
**LEO-related** [1] - 166:12
**less** [4] - 37:18, 37:19, 40:11, 98:9
**lessen** [1] - 198:12
**lesser** [2] - 128:1, 198:5
**letter** [1] - 152:2
**letters** [1] - 216:21
**level** [5] - 147:24, 189:16, 190:3, 190:14, 190:21
**liar** [2] - 176:20, 184:10
**lie** [35] - 28:14, 28:18, 29:6, 144:18, 144:23, 166:2, 176:4, 176:19, 177:7, 177:8, 177:15, 178:20, 179:16, 179:21, 181:6, 183:5, 183:18, 184:8, 184:24, 195:13, 212:2, 213:4, 213:17, 240:7, 240:8, 240:12, 242:8, 243:4
**lies** [8] - 29:9, 144:12, 145:2, 179:22, 181:11, 184:15, 238:19, 241:19
**life** [12] - 146:15, 190:25, 191:9, 191:23, 201:18,

204:23, 205:2, 205:24, 206:2, 222:21, 222:24, 225:20
**lifestyles** [1] - 148:2
**light** [4] - 21:14, 25:21, 30:14, 86:22, 119:14, 207:19
**likelihood** [2] - 135:6, 144:5
**likely** [2] - 17:11, 138:5
**likewise** [3] - 24:18, 57:8, 70:4
**limit** [1] - 13:13
**line** [4] - 194:4, 194:9, 222:21, 244:3
**lines** [2] - 95:18, 191:8
**lingo** [1] - 174:24
**linked** [1] - 11:23
**liquor** [8] - 41:7, 41:12, 43:18, 57:3, 57:8, 61:6
**list** [6] - 98:16, 166:22, 167:15, 167:20, 168:10, 247:5
**Listen** [6] - 164:16, 168:22, 169:3, 175:5, 175:22, 238:23
**listen** [25] - 7:13, 29:19, 98:21, 158:11, 165:7, 172:7, 173:8, 173:17, 174:3, 174:8, 174:12, 175:2, 175:8, 175:11, 175:17, 176:1, 177:10, 178:14, 179:17, 185:10, 211:20, 223:24, 225:11, 234:20, 237:9
**listened** [1] - 146:18
**listening** [1] - 174:3
**literally** [1] - 172:9
**live** [5] - 31:22, 148:2, 165:10, 170:22, 178:15
**lived** [4] - 38:5, 146:15, 195:24, 196:8
**lives** [5] - 187:23, 188:7, 191:2, 191:6, 191:22
**living** [2] - 38:4, 148:6, 163:4, 164:7, 165:21, 168:5, 171:2, 178:3, 178:5, 203:24, 211:20, 236:9
**load** [1] - 247:8
**loaded** [1] - 247:2
**loads** [1] - 162:3

**loath** [1] - 166:13
**located** [1] - 39:24
**lockdown** [1] - 57:22
**log** [2] - 21:17, 39:8
**logic** [2] - 149:12, 167:12
**logs** [1] - 160:15
**look** [24] - 10:22, 19:25, 28:10, 80:11, 150:2, 185:23, 185:24, 193:17, 194:2, 197:23, 216:16, 217:10, 220:2, 220:6, 225:10, 226:9, 229:3, 232:12, 236:22, 238:3, 238:15, 240:2, 243:8, 243:11
**looked** [3] - 82:25, 175:6, 197:19
**looking** [18] - 80:13, 90:14, 106:16, 106:17, 113:13, 157:25, 159:7, 160:17, 160:19, 161:6, 168:2, 168:21, 181:15, 182:19, 208:14, 211:14, 216:18, 217:5
**lookout** [1] - 158:6
**looks** [5] - 66:6, 67:1, 74:3, 83:9, 103:15
**Lorenzo** [36] - 12:4, 26:22, 27:19, 92:13, 142:9, 147:15, 148:15, 149:1, 149:22, 151:14, 152:3, 159:18, 164:13, 164:15, 164:23, 165:5, 180:17, 180:24, 195:19, 195:20, 196:8, 199:23, 201:2, 202:21, 203:1, 203:8, 204:5, 208:8, 229:25, 232:15, 233:6, 234:13, 236:1, 236:5
**Lorenzo's** [2] - 182:5, 200:7
**lose** [2] - 199:13, 222:24
**lost** [2] - 115:22, 193:6
**Louis** [3] - 245:2, 245:3, 245:6
**love** [2] - 148:18
**loved** [3] - 191:13, 191:18, 191:20
**loves** [1] - 158:13

**Lucia** [7] - 149:2, 165:25, 169:19, 172:12, 172:20, 206:21, 206:22
**Luna** [13] - 2:8, 31:5, 31:23, 32:9, 32:12, 32:21, 48:12, 53:4, 149:4, 219:2, 223:12, 231:15, 239:15
**lunch** [4] - 39:19, 67:18, 82:2, 82:3
**Lunch** [1] - 84:8
**lunchtime** [1] - 248:6
**lying** [5] - 28:24, 183:6, 183:22, 198:20, 243:4

# M

**machine** [1] - 191:19
**mail** [22] - 27:22, 27:25, 153:22, 153:23, 154:7, 155:9, 166:20, 166:23, 167:15, 168:7, 168:9, 168:13, 170:13, 170:14, 170:23, 183:1, 208:10, 208:13, 208:17, 208:22
**mails** [2] - 242:14, 242:15
**main** [2] - 142:21, 185:4
**maintain** [2] - 17:20, 59:10
**man** [24] - 15:1, 67:23, 151:7, 164:25, 170:16, 200:8, 200:19, 205:8, 206:14, 207:15, 208:24, 212:10, 213:22, 213:25, 216:4, 221:21, 221:24, 224:9, 225:24, 231:1, 231:18, 233:15, 234:21
**man's** [3] - 217:1, 217:4, 225:20
**management** [1] - 19:9
**manipulate** [4] - 199:18, 199:19, 199:20, 214:3
**manipulated** [4] - 199:24, 203:17, 203:24, 205:10
**manipulating** [6] - 199:4, 199:6, 199:12,

199:22, 210:3, 213:22
**manipulation** [1] - 208:7
**manipulator** [11] - 195:21, 195:25, 196:12, 196:14, 198:18, 203:5, 203:21, 204:17, 206:6, 207:13, 210:2
**manner** [3] - 25:16, 133:22, 135:17
**mantra** [1] - 198:22
**manual** [1] - 7:6
**map** [1] - 105:6
**March** [11] - 11:3, 12:10, 12:18, 14:22, 19:4, 21:10, 55:14, 156:6, 156:7, 156:18, 156:20
**Maria** [1] - 230:18
**marital** [1] - 54:20
**mark** [4] - 81:16, 105:7, 121:10, 121:12
**married** [1] - 54:14
**marshal** [2] - 244:15
**Marta** [3] - 156:1, 169:20, 172:16
**martial** [1] - 52:12
**mask** [2] - 39:15, 59:12
**masks** [4] - 13:10, 35:17, 59:20
**massive** [1] - 175:13
**material** [15] - 24:20, 82:13, 104:13, 104:14, 104:23, 106:2, 106:8, 107:1, 108:16, 108:22, 109:1, 135:24, 188:22
**materiality** [4] - 105:1, 105:3, 106:13, 107:9
**materially** [5] - 104:18, 104:21, 106:11, 107:2, 107:5
**matter** [15] - 25:8, 46:20, 51:20, 60:6, 89:1, 107:15, 114:17, 126:9, 128:15, 188:8, 210:7, 211:7, 219:9, 221:2, 249:5
**matters** [7] - 7:3, 10:22, 51:3, 115:4, 125:15, 193:17
**maximum** [1] - 221:16
**MCLAUGHLIN** [95] - 2:14, 2:15, 3:7, 3:21, 26:18, 27:3, 28:17, 30:4, 30:6, 30:20,

30:23, 31:15, 72:17, 72:20, 72:23, 73:15, 80:24, 81:5, 81:9, 82:11, 83:25, 84:13, 85:12, 85:21, 86:3, 86:22, 89:19, 89:22, 90:12, 90:21, 91:10, 91:12, 91:15, 91:25, 92:5, 92:12, 92:16, 92:23, 93:3, 94:11, 95:4, 95:10, 95:16, 96:6, 98:20, 103:4, 103:15, 103:20, 103:24, 104:7, 104:19, 104:25, 105:11, 105:14, 106:7, 106:20, 106:24, 107:20, 108:8, 108:15, 109:21, 110:8, 110:15, 110:20, 111:5, 111:10, 111:24, 115:23, 116:4, 116:16, 116:18, 117:4, 117:13, 117:21, 117:23, 118:7, 118:15, 118:22, 119:8, 120:13, 120:21, 121:4, 121:10, 121:13, 122:1, 122:3, 141:8, 173:10, 180:6, 187:7, 231:23, 232:6, 232:11, 246:21, 247:1
**McLaughlin** [8] - 1:13, 3:8, 71:12, 72:16, 79:2, 79:18, 80:3, 219:15
**mean** [35] - 6:17, 8:5, 10:3, 44:15, 52:20, 53:16, 56:6, 56:9, 59:14, 82:25, 83:1, 83:23, 100:5, 100:15, 101:7, 113:25, 114:10, 114:13, 122:15, 126:4, 127:9, 128:16, 174:25, 192:18, 193:22, 197:20, 198:15, 203:20, 204:14, 206:16, 214:6, 215:23, 216:21, 228:14
**meaning** [7] - 62:23, 193:8, 209:18, 211:25, 213:3, 213:16, 226:25
**means** [22] - 38:14, 99:13, 99:14, 104:11, 107:2, 122:11,

128:25, 129:2, 133:16, 133:17, 133:25, 134:10, 135:11, 135:12, 135:20, 136:5, 137:24, 175:1, 193:23, 222:20, 228:20, 228:21
**meant** [4] - 28:16, 83:4, 203:22, 226:14
**meantime** [1] - 43:9
**measure** [2] - 190:24, 192:21
**measures** [1] - 35:15
**measuring** [2] - 192:24, 192:25
**Medical** [26] - 10:7, 10:17, 11:12, 11:23, 11:25, 12:8, 12:13, 27:6, 142:10, 142:11, 142:15, 148:12, 149:3, 149:9, 149:23, 150:4, 150:25, 152:6, 152:18, 154:8, 182:14, 185:8, 233:12, 234:25, 236:22, 237:19
**medical** [4] - 79:21, 84:25, 209:4, 209:5
**Medicare** [3] - 10:23, 11:17, 33:5
**medication** [1] - 11:21
**medicine** [1] - 213:18
**meet** [13] - 33:12, 34:17, 35:2, 59:7, 67:15, 68:1, 148:4, 172:19, 177:14, 178:1, 178:6, 178:7, 189:16
**meeting** [15] - 40:3, 40:6, 40:8, 59:6, 81:8, 81:11, 82:1, 153:7, 153:16, 155:9, 155:10, 164:10, 201:14, 237:1
**meetings** [1] - 27:11
**meets** [4] - 147:16, 148:25, 149:1
**member** [11] - 50:9, 67:3, 67:13, 70:25, 130:22, 130:23, 132:20, 132:21, 136:25, 137:1, 147:21
**members** [20] - 21:11, 62:14, 63:12, 63:15, 64:12, 123:15, 123:18, 130:25, 131:1, 132:23,

132:24, 137:3, 137:4, 184:18, 187:22, 190:4, 206:23, 221:7, 223:9, 243:17
**membership** [5] - 41:15, 63:14, 63:15, 63:20, 67:7
**memo** [11] - 11:2, 11:5, 11:8, 11:10, 17:23, 19:25, 20:5, 20:7, 20:9
**memorandum** [1] - 17:22
**Memorial** [1] - 203:12
**memories** [1] - 139:19
**memory** [5] - 65:11, 126:18, 127:13, 127:21, 139:13
**mentality** [4] - 166:12, 232:14, 232:16, 232:17
**mention** [1] - 117:2
**mentioned** [19] - 31:7, 35:10, 36:10, 46:1, 47:23, 47:24, 63:12, 68:23, 83:11, 99:18, 102:1, 160:2, 173:25, 206:19, 207:14, 207:24, 219:15, 220:8, 229:9
**mentions** [4] - 99:25, 106:1, 113:12, 229:8
**mentored** [2] - 220:10, 220:11
**Mercedes** [19] - 28:7, 28:8, 163:14, 166:1, 171:25, 173:2, 173:7, 173:16, 173:25, 174:9, 174:17, 175:3, 176:20, 177:22, 178:9, 183:4, 184:10
**Mercedes's** [1] - 176:2
**merely** [8] - 19:18, 119:5, 131:20, 133:11, 134:4, 137:15, 139:1, 228:10
**mess** [1] - 169:12
**message** [3] - 166:11, 180:3, 244:14
**met** [12] - 29:23, 33:15, 37:1, 39:18, 77:14, 146:6, 200:5, 202:22, 205:13, 209:10, 227:15
**methamphetamine** [1] - 204:21
**MIAMI** [1] - 1:2

**Miami** [9] - 1:4, 1:15, 1:23, 1:24, 142:18, 152:20, 244:7, 249:10, 249:10
**Miami-Dade** [1] - 152:20
**Michelle** [1] - 245:2
**microphone** [4] - 27:1, 32:14, 87:10, 89:21
**middle** [1] - 223:7
**midnight** [2] - 176:16, 179:8
**might** [8] - 16:6, 18:19, 128:13, 161:16, 166:8, 184:6, 185:20, 185:21
**Milka** [15] - 208:19, 209:22, 209:24, 212:4, 212:5, 212:6, 212:8, 212:10, 212:11, 212:13, 212:15, 212:17, 212:23, 213:1
**mind** [21] - 16:21, 20:19, 106:25, 114:17, 127:9, 133:24, 135:19, 140:14, 166:11, 171:18, 185:16, 189:5, 197:14, 201:11, 202:5, 203:15, 211:15, 215:5, 223:6, 229:19
**mindful** [3] - 30:16, 30:17, 111:24
**minds** [3] - 164:21, 201:9, 202:1
**mindset** [1] - 228:17
**mine** [4] - 83:25, 103:4, 103:25, 174:3
**minor** [5] - 33:6, 58:20, 131:15, 133:6, 137:11
**minute** [12] - 31:16, 159:2, 159:13, 160:3, 160:14, 161:22, 208:20, 217:8, 220:23, 231:23
**minutes** [29] - 31:16, 31:19, 74:14, 79:11, 80:18, 81:9, 82:13, 85:8, 86:17, 120:19, 120:22, 120:25, 121:4, 121:6, 121:8, 121:15, 154:1, 154:10, 168:16, 186:24, 187:3, 187:4, 187:6, 196:6, 224:15, 232:1, 247:11, 247:19
**mislead** [5] - 107:8, 134:7, 136:2, 241:6, 241:8
**misleading** [29] - 24:19, 25:5, 25:18, 104:8, 104:10, 104:20, 105:9, 105:17, 106:1, 106:18, 107:2, 107:11, 108:12, 132:3, 132:12, 133:24, 133:25, 134:4, 134:19, 135:1, 135:18, 135:20, 135:24, 143:4, 143:25, 183:21, 240:22, 240:25, 241:4
**missing** [5] - 3:24, 4:1, 98:14, 100:23, 132:6
**misstated** [1] - 127:12
**misstatement** [1] - 127:15
**mistake** [6] - 107:20, 127:9, 129:1, 175:8, 175:10, 194:3
**mistaken** [1] - 114:6
**mistakes** [1] - 192:17
**mode** [1] - 222:15
**modification** [1] - 93:12
**modified** [1] - 93:11
**modify** [2] - 94:4, 117:17
**moment** [6] - 26:14, 54:22, 65:13, 130:5, 225:21, 238:14
**moments** [1] - 162:21
**Monday** [3] - 53:10, 181:9
**money** [34] - 23:13, 151:13, 162:4, 163:17, 163:20, 163:21, 164:16, 164:20, 169:11, 177:11, 182:24, 202:14, 202:15, 202:19, 203:22, 204:1, 215:12, 215:15, 215:18, 215:22, 215:25, 216:10, 217:5, 217:6, 217:7, 217:19, 225:25, 226:1, 226:6, 235:20, 235:24, 235:25
**monitors** [1] - 19:21
**month** [15] - 63:13, 67:4, 148:6, 152:11, 163:19, 163:23, 165:16, 216:3, 216:5, 217:11, 217:18, 231:3, 235:22, 237:22
**months** [15] - 12:20, 57:22, 166:15, 198:8, 198:11, 198:13, 198:16, 203:4, 205:5, 210:11, 211:13, 217:1, 234:18
**morning** [19] - 3:7, 3:12, 3:16, 3:18, 4:13, 4:14, 4:16, 8:15, 9:9, 9:10, 32:17, 32:18, 179:8, 186:18, 245:20, 245:23, 248:6
**mosquitoes** [1] - 231:5
**most** [22] - 5:3, 12:23, 21:22, 30:14, 35:21, 62:13, 83:14, 100:8, 125:2, 139:11, 183:14, 183:20, 190:19, 190:24, 191:1, 191:5, 191:9, 191:22, 192:12, 202:18, 204:21
**mostly** [5] - 55:2, 82:24, 172:3, 172:4, 172:5
**mother** [2] - 205:1, 212:8
**motion** [2] - 30:25, 90:1
**MOTION** [1] - 2:6
**motions** [9] - 22:22, 23:1, 23:2, 81:25, 83:7, 86:20, 88:23, 89:6
**motivates** [1] - 215:25
**motive** [1] - 216:1
**mounds** [1] - 235:14
**mouth** [3] - 146:23, 150:10, 236:6
**move** [10] - 23:7, 25:1, 85:17, 86:10, 94:18, 106:11, 149:20, 162:9, 178:20, 182:24
**moved** [1] - 177:10
**movement** [1] - 162:11
**moves** [1] - 162:14
**MR** [285] - 2:4, 2:4, 2:9, 2:10, 2:10, 2:14, 2:14, 2:15, 3:7, 3:12, 3:21, 4:12, 9:6, 9:8, 9:12, 14:3, 14:5, 15:5, 15:7, 15:9, 15:15, 15:17, 17:13, 17:15, 17:18, 19:21, 19:23, 20:7, 20:8, 20:17, 20:19, 20:22, 22:7, 22:11, 22:23, 23:1, 26:16, 26:18, 27:3, 28:17, 30:4, 30:6, 30:12, 30:20, 30:23, 31:3, 31:15, 31:23, 31:25, 32:8, 32:16, 37:22, 37:25, 42:1, 42:4, 44:6, 44:9, 48:5, 48:7, 48:9, 48:11, 60:4, 60:5, 65:4, 65:5, 65:6, 65:25, 66:18, 66:20, 66:24, 71:9, 71:11, 71:14, 71:17, 71:20, 72:14, 72:17, 72:19, 72:20, 72:22, 72:23, 72:24, 73:3, 73:13, 73:15, 73:17, 73:21, 74:12, 74:13, 78:3, 78:5, 78:13, 78:16, 78:20, 79:1, 79:7, 79:17, 80:2, 80:10, 80:16, 80:24, 81:5, 81:9, 81:15, 82:5, 82:11, 82:15, 82:21, 83:4, 83:12, 83:23, 83:25, 84:12, 84:13, 85:12, 85:16, 85:21, 85:25, 86:3, 86:22, 87:2, 87:5, 88:24, 89:5, 89:19, 89:22, 90:12, 90:14, 90:21, 91:2, 91:4, 91:10, 91:12, 91:15, 91:17, 91:25, 92:2, 92:5, 92:7, 92:12, 92:16, 92:18, 92:23, 92:25, 93:3, 93:5, 93:9, 94:7, 94:11, 95:4, 95:6, 95:10, 95:12, 95:16, 95:17, 96:1, 96:6, 96:15, 97:4, 97:11, 98:18, 98:20, 99:18, 100:11, 101:11, 101:17, 101:23, 102:10, 102:13, 102:16, 102:22, 103:4, 103:9, 103:15, 103:18, 103:20, 103:21, 103:24, 104:7, 104:10, 104:16, 104:19, 104:23, 104:25, 105:10, 105:11, 105:14, 105:19, 105:22, 106:4, 106:7, 106:20, 106:24, 107:15, 107:20, 107:21, 107:25, 108:8, 108:15, 108:17, 108:20, 108:23, 109:6, 109:9, 109:21, 110:5, 110:8, 110:10, 110:13, 110:15, 110:20, 110:22, 111:1, 111:5, 111:7, 111:10, 111:12, 111:17, 111:21, 111:24, 112:17, 113:19, 114:2, 114:12, 114:21, 115:2, 115:9, 115:23, 116:3, 116:4, 116:10, 116:16, 116:18, 116:25, 117:4, 117:5, 117:13, 117:15, 117:21, 117:23, 118:1, 118:5, 118:7, 118:9, 118:15, 118:18, 118:22, 119:1, 119:8, 119:11, 119:25, 120:3, 120:6, 120:9, 120:13, 120:15, 120:21, 121:4, 121:7, 121:10, 121:13, 121:15, 122:1, 122:3, 122:6, 141:8, 173:10, 180:6, 187:2, 187:7, 187:12, 187:17, 187:20, 224:16, 231:12, 231:14, 231:23, 232:6, 232:11, 246:21, 246:22, 247:1, 247:18, 248:4, 248:8
**multiple** [7] - 16:4, 41:18, 64:3, 110:23, 129:10, 129:12, 149:16
**municipality** [1] - 39:24
**must** [45] - 30:14, 53:6, 98:11, 123:20, 123:24, 124:1, 124:2, 124:5, 124:6, 124:7, 124:15, 124:16, 125:5, 126:3, 126:4, 127:12, 127:17, 128:16, 128:17, 129:5, 134:8, 136:3, 138:3, 138:25, 139:13, 139:14, 139:15, 139:21, 140:2, 140:6, 140:7, 140:9, 140:11,

189:24, 190:11, 192:21, 193:20, 194:12, 194:17, 194:20, 194:21, 197:15, 206:16, 226:22, 244:11

## N

**N95** [1] - 13:10
**name** [22] - 18:7, 18:12, 32:19, 32:21, 33:13, 39:22, 144:21, 158:22, 160:2, 161:11, 171:4, 173:15, 174:1, 175:16, 180:9, 193:7, 222:17, 224:13, 224:23, 230:4, 244:8
**named** [4] - 130:25, 132:23, 137:3, 161:6
**names** [6] - 131:13, 133:4, 137:9, 170:23, 181:2, 183:1
**Nanny** [2] - 206:22, 206:23
**narcotics** [4] - 50:10, 99:7, 112:3, 235:12
**narrow** [1] - 102:7
**narrows** [1] - 168:13
**naturally** [1] - 127:11
**nature** [11] - 7:4, 37:23, 53:15, 112:10, 148:16, 151:17, 153:1, 158:9, 158:18, 196:15, 198:15
**NCIC** [7] - 68:24, 69:2, 69:3, 69:7, 69:21, 77:25, 182:20
**NCIS** [1] - 49:8
**near** [1] - 153:13
**nearly** [1] - 233:25
**necessarily** [5] - 8:2, 49:15, 49:25, 126:9, 194:3
**necessary** [5] - 107:13, 116:9, 119:4, 119:10, 123:25
**necessity** [2] - 20:15, 51:6
**need** [45] - 7:19, 8:11, 19:18, 20:20, 20:24, 22:14, 70:22, 79:9, 82:15, 82:23, 83:18, 83:21, 88:11, 89:23, 118:7, 121:3, 129:7, 149:9, 153:24, 169:3, 175:14, 187:3, 188:25, 189:1, 189:5, 191:16, 197:10,

197:22, 208:24, 208:25, 210:24, 214:20, 214:21, 214:22, 216:8, 216:9, 219:24, 225:2, 228:15, 245:5, 247:4, 247:7, 247:11, 248:5
**needed** [4] - 38:25, 43:18, 160:1, 199:19
**needs** [5] - 20:20, 96:9, 115:5, 213:25, 222:23
**negates** [1] - 89:25
**neighbor** [1] - 149:6
**neighbors** [2] - 69:21, 172:17
**never** [19] - 4:25, 17:4, 23:13, 52:13, 53:12, 57:11, 57:13, 79:18, 106:25, 140:2, 140:8, 174:17, 174:19, 202:22, 204:3, 204:4, 233:3, 233:9
**nevertheless** [1] - 48:19
**new** [1] - 169:10
**newbie** [1] - 217:13
**news** [1] - 150:21
**next** [19] - 26:25, 27:3, 28:11, 57:22, 59:24, 78:19, 78:23, 86:5, 95:1, 101:19, 108:6, 109:7, 117:16, 118:13, 118:19, 152:5, 173:6, 173:21, 218:16
**night** [8] - 57:6, 97:5, 112:9, 114:22, 122:9, 176:15, 179:9, 180:12
**nine** [4] - 46:5, 203:11, 211:13
**ninety** [1] - 121:4
**NO** [2] - 1:2, 2:19
**nobody** [2] - 174:3, 198:14
**none** [6] - 111:2, 112:9, 199:3, 212:10, 224:21, 246:22
**nonetheless** [2] - 160:7, 171:15
**nonsense** [7] - 202:18, 218:5, 225:5, 233:3, 233:4, 239:14, 240:15
**noon** [2] - 81:12, 168:17
**normal** [12] - 14:9, 44:14, 57:15, 196:24,

203:11, 204:9, 204:10, 222:6, 223:17, 223:18
**normally** [9] - 14:19, 56:7, 99:22, 100:11, 101:7, 101:8, 128:2, 215:24
**North** [2] - 1:23, 249:10
**Northeast** [1] - 1:15
**note** [11] - 31:8, 79:3, 81:22, 84:10, 91:18, 96:24, 110:18, 121:23, 130:8, 187:9, 232:7
**note-taking** [1] - 110:18
**noted** [2] - 112:6, 122:16
**notes** [8] - 101:4, 108:23, 123:11, 139:10, 139:13, 139:14, 139:16, 139:18
**nothing** [26] - 57:2, 62:10, 98:3, 144:21, 157:8, 160:7, 169:4, 171:20, 174:19, 176:21, 180:1, 180:6, 180:10, 181:17, 184:9, 199:8, 201:4, 209:14, 209:15, 211:16, 222:5, 226:19, 231:4, 231:6, 240:3, 241:11
**notice** [3] - 42:9, 42:11, 44:24
**noticed** [2] - 169:18, 209:24
**notify** [2] - 39:2, 71:1
**notifying** [1] - 154:8
**notion** [1] - 161:17
**November** [2] - 142:14, 148:13, 150:6, 162:1, 182:6
**nowhere** [2] - 153:13, 170:9
**number** [17] - 12:2, 97:10, 97:12, 101:20, 106:14, 109:17, 119:15, 126:8, 129:18, 185:14, 195:21, 197:19, 208:17, 218:17, 242:22, 243:22, 243:25
**Number** [7] - 104:11, 104:24, 110:24, 111:3, 111:19, 208:19
**numbers** [3] - 91:19,

93:17, 247:14
**numerous** [1] - 232:15

## O

**o'clock** [11] - 60:6, 60:8, 60:13, 60:15, 82:3, 82:7, 155:2, 155:11, 176:15, 179:23, 247:22
**oath** [2] - 32:11, 200:2
**object** [26] - 24:3, 37:22, 81:3, 91:5, 93:12, 94:8, 101:4, 102:15, 104:8, 109:12, 109:18, 118:9, 118:21, 122:15, 131:8, 142:4
**objection** [86] - 14:3, 15:5, 15:15, 17:13, 20:17, 42:1, 44:6, 66:18, 78:3, 85:20, 85:21, 87:1, 90:25, 91:2, 91:8, 91:10, 91:12, 91:15, 91:17, 91:24, 91:25, 92:4, 92:5, 92:14, 92:16, 92:22, 92:23, 92:25, 93:2, 93:3, 93:5, 93:8, 94:5, 94:23, 95:1, 95:3, 95:4, 95:9, 95:10, 95:12, 95:15, 95:16, 101:11, 101:15, 101:17, 101:21, 103:22, 105:17, 105:19, 108:1, 108:7, 108:9, 108:16, 109:2, 109:6, 109:9, 109:10, 110:4, 110:7, 110:8, 110:10, 110:12, 110:13, 110:18, 110:20, 110:25, 111:1, 111:4, 111:5, 111:7, 111:9, 111:10, 111:12, 117:13, 117:15, 118:14, 118:15, 118:16, 118:17, 118:25, 119:1, 119:9, 120:12, 120:13, 122:9, 122:16
**objections** [16] - 82:25, 83:9, 83:13, 83:16, 83:17, 89:7, 89:10, 89:11, 90:7, 93:13, 101:16, 102:8, 108:18, 122:6, 246:20
**obligation** [2] - 188:16, 190:3

**obligations** [1] - 187:24
**observation** [1] - 101:8
**observe** [3] - 71:25, 73:8, 126:20
**obstruct** [20] - 29:6, 109:8, 112:19, 112:20, 112:23, 113:1, 120:4, 130:7, 136:14, 136:20, 137:23, 145:5, 145:7, 145:11, 175:25, 228:8, 238:13, 240:9, 240:11, 242:4
**obstruction** [3] - 112:5, 185:1, 237:23
**obvious** [2] - 164:11, 164:22
**obviously** [4] - 79:21, 191:2, 220:20, 247:16
**occasion** [8] - 9:21, 34:2, 56:20, 61:15, 99:10, 131:17, 133:9, 137:13
**occasion-that** [3] - 131:17, 133:9, 137:13
**occasions** [4] - 37:14, 44:17, 61:8, 218:18
**occupied** [1] - 68:14
**occurred** [3] - 127:20, 128:21, 209:10
**October** [9] - 150:6, 152:1, 160:10, 160:13, 210:9, 210:10, 210:17, 211:8, 228:23
**OF** [3] - 1:1, 1:4, 2:6
**offense** [24] - 23:24, 25:25, 26:5, 26:10, 95:7, 96:25, 98:21, 128:10, 129:11, 130:2, 130:9, 132:16, 133:20, 134:15, 135:10, 135:15, 136:10, 138:2, 143:8, 144:9, 189:25, 192:9, 218:4, 228:19
**offense-the** [1] - 130:9
**offenses** [8] - 50:5, 50:10, 102:2, 119:25, 130:5, 130:10, 143:21, 190:1
**OFFICE** [1] - 1:14
**office** [23] - 13:16, 14:14, 18:23, 33:23,

38:25, 39:1, 39:5, 39:7, 39:8, 39:10, 55:12, 70:23, 149:5, 149:9, 149:18, 149:19, 149:23, 152:18, 155:18, 162:3, 224:10, 247:1, 247:17

**officer** [18] - 25:11, 49:23, 49:25, 51:13, 132:6, 132:14, 134:10, 134:11, 134:21, 135:5, 135:8, 136:5, 136:6, 143:6, 144:4, 144:7, 206:24, 219:9

**OFFICER** [9] - 4:3, 22:19, 79:10, 79:12, 82:8, 86:18, 121:20, 122:20, 186:25

**offices** [1] - 152:6

**Official** [1] - 249:9

**official** [14] - 1:22, 17:24, 18:13, 26:2, 26:3, 26:9, 136:15, 136:20, 137:23, 137:24, 145:11, 145:13, 228:18, 228:20

**offsite** [1] - 168:15

**often** [4] - 21:22, 36:12, 61:17, 68:17

**OIG** [24] - 13:4, 32:25, 35:15, 39:1, 48:12, 49:6, 51:16, 70:4, 74:16, 77:22, 147:18, 149:5, 149:6, 149:18, 153:7, 154:7, 157:5, 161:15, 171:14, 171:19, 208:11, 210:12, 219:19, 219:20

**old** [9] - 15:1, 32:23, 46:4, 164:25, 200:19, 208:24, 221:8, 221:21

**Omar** [1] - 172:5

**omission** [1] - 107:7

**omits** [2] - 161:11, 161:12

**omitted** [1] - 151:23

**omitting** [4] - 134:2, 135:22, 241:5, 241:21

**once** [15] - 11:8, 17:3, 19:12, 36:15, 39:7, 93:23, 119:13, 119:15, 120:21, 198:24, 204:2, 204:23, 228:1, 245:10, 247:14

**one** [137] - 6:1, 6:6,

6:17, 6:19, 7:9, 7:12, 7:16, 8:10, 9:21, 21:21, 22:1, 23:11, 25:24, 28:24, 31:8, 45:7, 47:17, 47:20, 62:14, 74:19, 82:3, 82:7, 84:7, 84:21, 89:2, 90:24, 93:8, 94:16, 94:19, 97:22, 99:10, 101:12, 101:23, 102:18, 103:10, 103:22, 104:3, 104:20, 105:14, 105:19, 105:21, 107:5, 107:6, 108:23, 109:22, 109:23, 111:18, 113:12, 113:20, 116:6, 119:16, 122:13, 126:12, 129:14, 131:7, 131:17, 131:23, 132:10, 133:8, 133:14, 134:1, 134:25, 135:21, 136:18, 137:13, 137:19, 140:11, 141:13, 143:24, 145:9, 145:14, 145:16, 146:5, 146:21, 149:16, 152:14, 155:11, 162:17, 166:15, 171:3, 172:17, 174:7, 180:20, 188:9, 189:5, 191:1, 191:9, 191:14, 191:18, 191:20, 191:21, 192:12, 194:23, 195:5, 197:20, 197:22, 199:10, 202:20, 204:8, 204:21, 206:12, 206:15, 206:19, 206:21, 207:1, 207:3, 207:22, 208:19, 209:21, 209:24, 210:13, 211:13, 214:10, 217:2, 221:14, 221:24, 222:4, 223:20, 230:5, 230:13, 230:21, 230:25, 232:19, 232:21, 233:17, 233:18, 241:20, 243:17, 243:25, 244:19, 244:25, 247:4

**one-on-one** [1] - 21:21

**one-sided** [1] - 6:1

**ones** [4] - 5:4, 11:20,

83:5, 90:14

**ongoing** [11] - 10:5, 11:1, 11:8, 12:13, 14:6, 15:13, 15:19, 161:4, 166:19, 169:17, 242:16

**online** [4] - 35:14, 35:23, 36:6, 40:7

**open** [10] - 59:8, 60:19, 65:24, 71:19, 73:2, 76:6, 76:10, 79:8, 85:13, 208:5

**opened** [1] - 72:13

**opening** [7] - 74:24, 75:1, 141:12, 141:17, 145:25, 193:10, 227:18

**openly** [1] - 149:17

**opens** [1] - 105:2

**operate** [1] - 148:2

**operating** [2] - 7:6, 90:18, 114:9

**operation** [2] - 168:14, 171:15

**operational** [1] - 224:11

**opinion** [6] - 47:4, 125:10, 128:14, 128:17, 128:18, 140:14

**opinions** [1] - 116:9

**opportunity** [5] - 6:2, 126:19, 139:12, 188:3, 198:12

**opposed** [1] - 6:1

**opposing** [1] - 141:9

**options** [1] - 244:2

**orchestrated** [1] - 28:23

**Order** [1] - 3:1

**order** [14] - 7:11, 16:7, 18:23, 19:5, 41:7, 69:4, 71:7, 100:2, 128:6, 158:15, 173:5, 186:21, 197:4, 199:19

**ordered** [3] - 41:9, 41:12

**ordinarily** [2] - 138:9, 138:10

**organized** [2] - 59:22, 187:3

**original** [2] - 123:12, 244:20

**otherwise** [4] - 133:21, 135:16, 136:19, 145:11

**outcome** [2] - 126:16, 197:25

**outright** [1] - 198:20

**outset** [1] - 193:16

**outside** [17] - 4:3, 4:5, 34:14, 41:3, 41:4, 59:7, 59:19, 70:5, 75:18, 76:2, 76:3, 147:5, 179:3, 179:4, 179:6, 217:1

**overall** [2] - 16:15, 37:22

**overlap** [2] - 29:12, 145:6

**overlaps** [1] - 185:2

**overnight** [1] - 196:13

**overreact** [1] - 16:19

**overrule** [1] - 101:15

**overruled** [6] - 15:8, 17:17, 20:21, 37:24, 66:22, 78:4

**oversight** [1] - 97:6

**overwhelmingly** [1] - 141:18

**own** [24] - 21:20, 70:13, 70:21, 83:2, 108:23, 122:25, 125:2, 125:13, 125:14, 128:5, 140:13, 141:24, 162:9, 190:19, 190:25, 197:3, 202:2, 208:6, 213:14, 231:7, 234:1, 242:18

**owned** [2] - 203:24, 204:2, 214:15

**Oxy** [16] - 99:2, 150:25, 153:20, 162:3, 162:12, 163:5, 165:6, 165:18, 165:22, 168:3, 168:6, 173:11, 175:3, 177:12, 182:3, 182:6

**Oxycodone** [49] - 21:6, 23:12, 23:20, 23:23, 24:3, 26:20, 28:7, 96:11, 97:19, 99:22, 100:3, 100:20, 100:21, 101:5, 129:23, 130:15, 130:16, 130:18, 130:19, 131:9, 131:10, 141:22, 142:4, 142:5, 142:13, 152:9, 152:11, 153:3, 157:11, 164:8, 164:18, 172:1, 174:1, 174:11, 204:11, 204:18, 206:20, 207:11, 211:17, 211:18, 211:22, 212:3, 215:10,

216:11, 225:24, 226:3, 233:2

## P

**P.A** [1] - 1:17

**p.m** [22] - 1:6, 40:13, 60:1, 60:19, 60:24, 63:9, 76:9, 76:10, 84:15, 86:19, 122:21, 153:9, 159:17, 169:23, 173:1, 179:7, 187:1, 187:14, 232:3, 232:9, 246:18, 248:10

**package** [2] - 189:21, 195:4

**padre** [5] - 38:12, 38:14, 68:4, 77:17

**page** [25] - 54:3, 64:17, 65:4, 65:5, 74:19, 96:2, 96:23, 102:4, 102:9, 102:14, 102:17, 102:19, 104:5, 106:20, 107:16, 109:1, 109:10, 109:11, 109:12, 109:13, 208:1, 234:4, 244:5

**PAGE** [2] - 2:2, 2:7

**Pages** [1] - 1:8

**paid** [1] - 202:14

**pains** [1] - 21:12

**paired** [1] - 100:12

**Palero** [1] - 217:21

**Palmetto** [1] - 63:10

**pandemic** [14] - 13:20, 13:22, 16:19, 34:20, 35:10, 35:12, 36:3, 37:5, 38:25, 45:19, 46:13, 56:6, 56:11, 223:8

**paragraph** [6] - 94:6, 95:1, 104:4, 107:15, 197:1

**paragraphs** [1] - 94:25

**paranoid** [1] - 184:6

**parcel** [1] - 66:25

**parked** [1] - 73:6

**part** [34] - 10:20, 10:24, 12:23, 13:25, 35:21, 38:20, 38:21, 52:1, 58:15, 75:4, 93:14, 94:9, 97:6, 98:14, 100:25, 104:20, 105:25, 107:23, 126:8, 131:15, 133:6, 137:11, 150:21, 166:13, 189:20,

190:13, 195:16,
200:15, 209:12,
214:9, 230:1, 235:18,
240:5, 240:8
  **partially** [1] - 171:13
  **participant** [1] -
139:1
  **participants** [1] -
110:2
  **participate** [1] -
14:18
  **participated** [3] -
15:4, 15:11, 138:22
  **participating** [3] -
15:22, 155:21, 187:21
  **participation** [2] -
14:21, 28:24
  **particular** [13] - 24:6,
24:8, 26:10, 31:11,
67:5, 79:20, 83:22,
93:7, 95:18, 112:21,
126:9, 126:14, 228:19
  **particularly** [13] -
9:1, 24:15, 49:6,
61:24, 94:2, 189:6,
195:12, 195:19,
198:14, 208:15,
215:19, 222:24, 225:7
  **parties** [5] - 84:24,
85:5, 90:6, 96:24,
244:22
  **partner** [3] - 130:23,
132:21, 137:1
  **partners** [1] - 220:16
  **partnership** [3] -
130:22, 132:20,
136:25
  **party** [3] - 60:18,
134:8, 136:3
  **pass** [1] - 192:1
  **passage** [1] - 68:11
  **passed** [7] - 13:21,
47:12, 47:13, 47:20,
63:9, 221:7, 223:9
  **passing** [2] - 62:14,
122:24
  **patience** [1] - 32:5
  **patient** [14] - 11:18,
11:19, 149:23,
150:15, 150:16,
150:19, 150:23,
157:22, 166:19,
172:9, 203:19,
206:12, 212:7, 234:24
  **patient's** [1] - 172:8
  **patients** [31] - 11:15,
13:17, 14:24, 142:15,
148:12, 150:25,
151:9, 151:15,
151:16, 164:9,

165:24, 166:2, 166:5,
166:8, 169:13,
169:17, 169:19,
170:9, 170:12, 199:5,
199:7, 199:13,
199:14, 199:19,
199:20, 204:7,
206:10, 207:1
  **PATRICIA** [2] - 1:21,
249:8
  **pattern** [8] - 93:10,
94:9, 97:15, 102:1,
102:25, 103:1, 103:2,
109:17
  **patterns** [1] - 113:14
  **pause** [3] - 10:21,
79:9, 209:4
  **paused** [1] - 10:25
  **pay** [2] - 163:12,
181:1
  **paycheck** [1] - 150:5
  **paying** [3] - 43:4,
151:16, 202:19
  **payments** [1] -
151:11
  **PDMP** [6] - 148:11,
149:20, 157:10,
163:13, 173:11, 182:5
  **peace** [1] - 102:12
  **peddling** [3] - 203:9,
205:15
  **Pedro** [15] - 27:17,
143:11, 149:1,
157:19, 158:1,
158:11, 161:13,
162:17, 163:25,
165:25, 234:17,
234:23, 237:8
  **penalize** [2] - 193:11,
227:19
  **pending** [5] - 7:14,
7:19, 69:14, 83:18,
138:1
  **people** [97] - 5:11,
8:23, 8:25, 9:1, 12:22,
24:2, 35:2, 35:24,
42:14, 42:15, 42:20,
44:14, 50:4, 51:22,
52:24, 58:14, 59:22,
67:4, 67:20, 68:25,
70:5, 75:14, 75:20,
76:1, 98:25, 127:11,
130:24, 131:7,
131:20, 132:10,
132:22, 133:11,
136:18, 137:2,
137:15, 142:2, 143:2,
145:9, 150:16,
152:23, 154:17,
166:22, 167:15,

168:2, 168:12,
168:19, 170:13,
170:17, 170:21,
171:15, 172:22,
182:2, 183:2, 183:23,
184:12, 194:24,
195:11, 199:22,
200:16, 202:2, 202:3,
202:12, 202:13,
202:14, 202:15,
202:18, 202:20,
208:18, 209:14,
209:15, 209:18,
209:19, 211:19,
211:24, 213:15,
215:14, 215:24,
215:25, 216:25,
217:22, 223:8, 223:9,
223:16, 224:2, 227:6,
228:11, 230:7,
230:22, 230:25,
233:5, 235:16,
236:12, 239:24, 242:8
  **people's** [1] - 202:1
  **percent** [1] - 14:10
  **percentage** [1] -
224:11
  **perception** [1] -
113:8
  **Perez** [11] - 28:7,
28:8, 163:14, 166:1,
173:2, 173:25,
176:20, 177:22,
178:9, 183:5, 184:10
  **Perez's** [2] - 171:25,
173:7
  **perfect** [1] - 192:17
  **performed** [1] -
138:7
  **perhaps** [2] - 59:6,
139:11
  **period** [4] - 13:7,
63:5, 132:7, 153:14
  **permissible** [4] -
113:24, 113:25,
114:9, 114:11
  **permission** [3] -
39:7, 90:22, 225:2
  **permits** [2] - 162:12,
194:14
  **permitted** [3] - 21:7,
70:4, 139:10
  **person** [73] - 16:5,
18:6, 20:20, 25:4,
25:5, 25:16, 29:2,
30:9, 30:10, 45:15,
52:14, 58:2, 58:9,
61:18, 78:7, 125:19,
128:11, 128:13,
129:5, 129:7, 131:12,

131:22, 132:4,
132:13, 133:3,
133:13, 133:17,
133:18, 134:8,
134:11, 134:20,
135:1, 135:2, 135:12,
135:13, 136:3, 136:6,
137:8, 137:17,
137:20, 138:10,
138:11, 138:13,
138:14, 138:16,
138:17, 138:21,
141:13, 143:5,
143:25, 144:1,
152:14, 183:22,
191:18, 191:19,
192:1, 196:24,
198:14, 201:19,
203:11, 204:9, 205:9,
210:5, 210:24, 211:4,
212:21, 230:14,
239:11, 241:1, 241:3,
242:1
  **person's** [1] - 22:1
  **personal** [6] - 6:23,
69:7, 126:16, 155:17,
161:21, 197:25
  **personalities** [1] -
9:4
  **personally** [2] - 70:9,
138:7
  **persons** [4] - 15:19,
130:20, 132:18,
136:23
  **perspective** [1] -
159:5
  **persuade** [14] -
25:15, 102:4, 102:16,
108:11, 133:16,
133:17, 133:23,
135:11, 135:12,
135:17, 227:16,
228:5, 240:20, 240:25
  **persuaded** [4] - 25:4,
77:11, 134:25, 143:25
  **persuading** [2] -
108:5, 228:2
  **persuasion** [4] -
132:3, 132:12,
134:19, 143:4
  **pharmacies** [2] -
151:10, 164:10
  **pharmacy** [4] -
151:16, 163:9,
172:10, 204:8
  **Phase** [1] - 12:13
  **phases** [2] - 14:10,
14:11
  **phone** [78] - 13:14,
27:10, 27:24, 35:14,

42:14, 42:23, 43:5,
61:15, 61:18, 61:21,
61:23, 62:4, 144:19,
144:25, 148:8,
148:16, 148:22,
148:23, 148:24,
151:8, 152:15, 153:9,
153:18, 153:22,
154:2, 154:5, 154:6,
154:11, 155:16,
155:17, 156:16,
156:20, 156:22,
158:24, 159:24,
160:14, 160:15,
160:25, 161:2,
161:20, 161:21,
162:4, 162:12, 163:6,
163:16, 164:23,
167:14, 167:20,
168:24, 168:25,
169:5, 169:6, 169:22,
170:15, 172:12,
172:15, 173:1, 174:3,
178:9, 178:13,
178:20, 181:10,
183:6, 184:25,
185:10, 185:14,
208:23, 209:9,
209:13, 237:17,
238:18, 242:21,
247:13
  **phones** [5] - 148:2,
152:12, 157:13,
157:14, 174:7
  **phony** [4] - 179:12,
183:22, 220:21,
220:24
  **photograph** [1] -
105:6
  **phrase** [1] - 198:22
  **physical** [3] - 51:16,
246:4
  **physically** [1] - 52:15
  **pick** [5] - 151:9,
159:24, 168:23,
169:21, 176:2
  **picking** [3] - 80:15,
163:8, 164:9
  **picks** [4] - 144:19,
156:20, 160:25,
163:16
  **picture** [1] - 169:7
  **pictures** [2] - 206:18,
212:15
  **piece** [1] - 45:16
  **Pierre** [3] - 245:2,
245:3, 245:6
  **pills** [44] - 28:10,
28:12, 28:13, 150:17,
164:10, 168:23,

**play** [27] - 31:9, 31:11, 31:19, 31:21, 71:12, 71:17, 78:20, 79:1, 79:3, 79:7, 80:11, 81:13, 82:3, 85:9, 152:7, 152:16, 153:5, 153:19, 155:6, 156:6, 160:10, 162:2, 162:24, 170:7, 237:16, 243:9, 243:10

**played** [18] - 2:11, 65:24, 71:16, 71:19, 73:2, 78:25, 79:8, 79:18, 85:6, 85:13, 131:14, 133:6, 137:10, 165:2, 168:18, 169:1, 180:13, 201:8

**player** [1] - 154:17

**playing** [2] - 72:23, 80:7

**plays** [1] - 214:23

**plea** [7] - 92:20, 127:23, 127:25, 128:2, 195:6, 195:15, 196:17

**plead** [3] - 198:2, 198:4, 210:20

**pleaded** [1] - 128:10

**pleading** [1] - 198:3

**plug** [3] - 191:25, 192:1, 192:3

**pocket** [2] - 162:6, 203:22

**point** [35] - 24:11, 24:24, 25:20, 26:13, 30:21, 34:14, 34:24, 73:11, 86:1, 89:10, 89:15, 99:25, 100:1, 119:12, 119:16, 126:9, 166:18, 169:21, 171:18, 172:21, 174:16, 175:10, 176:25, 180:17, 192:6, 193:13, 195:3, 204:10, 211:20, 212:25, 214:13, 227:4, 236:12, 242:21, 245:17

**pointed** [1] - 228:5

**poisonous** [1] - 207:21

**pole** [3] - 65:21, 216:25, 217:1

**Police** [5] - 49:23, 50:14, 147:22, 152:20, 238:22

**police** [5] - 27:20, 49:25, 51:13, 92:20,

**pins** [1] - 200:24

**Pistolita** [3] - 173:4, 173:20, 181:21

**pizza** [1] - 186:21

**place** [22] - 39:21, 40:8, 40:19, 40:23, 40:24, 41:14, 43:9, 45:8, 47:2, 75:17, 75:23, 94:19, 145:15, 151:14, 181:6, 200:18, 204:6, 211:13, 223:1, 223:2, 244:7

**places** [2] - 35:11, 171:3

**plain** [3] - 153:21, 175:21, 242:10

**Plaintiff** [1] - 1:5

**plan** [41] - 25:24, 31:3, 98:2, 99:3, 120:24, 130:25, 131:2, 131:4, 131:8, 131:11, 131:13, 131:15, 131:16, 131:17, 132:11, 132:17, 132:23, 132:25, 133:2, 133:4, 133:6, 133:8, 136:19, 136:21, 137:3, 137:5, 137:7, 137:9, 137:11, 137:12, 137:13, 142:3, 143:3, 143:14, 145:10, 145:21, 157:5, 180:13, 181:6, 240:9

**plan-and** [3] - 131:16, 133:8, 137:12

**planned** [1] - 31:7

**planning** [3] - 42:17, 43:3, 170:10

**plans** [1] - 10:19

172:3, 173:4, 173:12, 173:18, 173:20, 174:12, 176:2, 176:18, 177:4, 177:5, 177:14, 177:23, 178:10, 179:19, 179:25, 180:11, 181:21, 183:4, 183:12, 199:15, 199:17, 203:9, 203:25, 204:1, 204:14, 205:15, 212:6, 212:7, 212:8, 212:14, 212:16, 212:21, 240:3, 241:10

**pinch** [1] - 238:22

**pinging** [1] - 156:1

**Pinkerton** [1] - 110:11

206:24

**policies** [19] - 115:12, 116:19, 116:23, 116:25, 117:6, 117:9, 117:20, 118:24, 119:3, 119:20, 119:22, 139:4, 139:7, 139:9, 218:17, 218:18, 218:21, 218:25, 219:7

**policy** [2] - 112:10, 219:5

**ponder** [1] - 216:8

**poor** [1] - 204:23

**populated** [1] - 19:14

**portion** [3] - 107:9, 134:3, 135:23

**position** [15] - 23:25, 24:22, 25:6, 25:19, 25:22, 26:11, 94:22, 96:4, 98:19, 104:17, 111:22, 115:8, 117:24, 205:11, 218:12

**positive** [1] - 14:24

**possess** [19] - 23:22, 24:3, 96:10, 97:14, 97:17, 99:5, 99:22, 100:21, 101:5, 129:22, 130:16, 130:18, 131:9, 141:22, 142:4, 201:9, 202:1, 202:5, 225:23

**possessed** [9] - 97:22, 97:24, 98:12, 98:22, 99:7, 100:16, 101:2, 205:10, 207:10

**possessing** [1] - 98:5

**possession** [3] - 98:2, 99:14, 101:14

**possibility** [3] - 9:4, 18:4, 128:1

**possible** [15] - 6:12, 18:18, 19:4, 65:20, 83:8, 132:15, 135:10, 138:6, 143:7, 144:9, 146:9, 158:14, 159:9, 190:10, 244:16

**possibly** [3] - 6:20, 171:1, 223:16

**postarrest** [1] - 160:24

**potential** [5] - 11:13, 12:3, 14:1, 21:19, 170:12

**potentially** [1] - 234:13

**power** [4] - 147:10, 188:4, 188:6, 188:15

**PowerPoint** [3] - 84:1, 84:3, 84:5

**powers** [1] - 217:24

**Pozo** [31] - 148:25, 149:25, 150:3, 150:10, 151:5, 151:7, 151:9, 159:19, 180:18, 180:20, 182:12, 204:3, 204:5, 207:5, 207:6, 207:9, 207:10, 233:6, 233:7, 233:9, 233:12, 233:15, 233:18, 233:19, 234:5, 234:6, 234:11, 234:12, 236:20

**Pozo's** [2] - 151:14, 204:6

**PPE** [1] - 235:20

**practical** [1] - 51:16

**practiced** [1] - 49:11

**precaution** [1] - 13:9

**prefer** [1] - 82:12

**pregnant** [1] - 31:8

**prejudice** [1] - 124:3

**preliminary** [1] - 84:19

**preoccupied** [1] - 62:16

**prepare** [2] - 86:8, 244:22

**prepared** [5] - 11:3, 17:23, 120:17, 123:3, 243:20

**prescription** [4] - 163:14, 172:1, 172:8, 173:11

**prescriptions** [1] - 11:20

**presence** [7] - 61:17, 81:18, 81:22, 84:10, 121:23, 187:9, 232:7

**present** [16] - 3:13, 23:16, 23:19, 30:18, 45:5, 47:5, 51:3, 67:21, 79:23, 84:25, 131:19, 133:10, 137:14, 138:23, 227:5, 228:10

**presentation** [1] - 6:1

**presented** [8] - 5:22, 15:24, 24:12, 26:8, 100:13, 124:2, 212:5, 212:13

**preserve** [2] - 108:1, 109:2

**press** [1] - 16:14

**presumably** [1] - 83:6

**presumes** [2] - 87:14, 124:10

**presuming** [1] - 109:2

**presumption** [1] - 91:7

**pretend** [1] - 200:13

**pretrial** [2] - 23:2, 89:6

**pretty** [4] - 8:21, 34:25, 103:25, 214:7

**prevalent** [1] - 58:18

**prevent** [11] - 21:12, 25:10, 107:11, 132:5, 132:13, 134:20, 135:4, 143:5, 144:3, 184:11, 184:17

**prevented** [2] - 14:21, 15:22

**prevention** [2] - 134:14, 136:9

**prevents** [1] - 7:20

**previous** [2] - 48:19, 51:23

**previously** [4] - 68:23, 78:24, 89:13, 122:7

**priest** [1] - 218:12

**priests** [1] - 202:8

**print** [1] - 244:8

**printed** [2] - 83:8, 120:17

**printout** [1] - 19:24

**priority** [1] - 139:14

**prism** [1] - 232:14

**prison** [3] - 198:14, 205:4, 221:16

**problem** [17] - 56:5, 56:15, 56:17, 81:6, 98:20, 107:21, 115:9, 116:23, 118:4, 119:14, 175:14, 178:2, 178:16, 178:17, 200:22, 201:1, 238:25

**problematic** [1] - 214:20

**problems** [1] - 202:14

**procedure** [8] - 7:6, 22:3, 22:4, 140:24, 209:4, 209:5, 218:25, 219:5

**procedures** [17] - 116:20, 116:24, 117:1, 117:7, 117:10, 117:20, 118:24, 119:3, 119:20, 119:22, 139:4, 139:7, 139:9, 218:17,

218:19, 218:22, 219:7
**proceed** [11] - 4:8, 30:15, 30:25, 31:24, 32:7, 88:1, 90:4, 90:5, 122:19, 123:4, 141:7
**proceeding** [23] - 26:2, 26:3, 26:5, 26:9, 29:14, 29:15, 136:15, 136:20, 137:23, 137:24, 138:1, 138:4, 145:12, 145:13, 145:14, 185:5, 185:9, 228:19, 228:20, 228:21, 242:12, 243:1
**proceedings** [3] - 49:2, 248:10, 249:4
**proceeds** [2] - 162:16, 163:12
**process** [2] - 19:6, 87:3
**produce** [2] - 25:2, 124:12
**productive** [1] - 219:22
**proficient** [2] - 51:18, 52:10
**profits** [1] - 23:12
**program** [1] - 33:5
**prohibited** [1] - 70:8
**projection** [1] - 239:2
**promise** [1] - 84:4
**promised** [1] - 141:16
**promptly** [2] - 172:1, 244:16
**prone** [3] - 52:25, 53:1, 75:7
**prong** [6] - 105:25, 106:1, 183:20, 240:20, 240:23, 241:7
**prongs** [3] - 105:5, 105:9, 105:12
**proof** [27] - 23:25, 124:18, 124:20, 124:25, 125:22, 125:24, 131:21, 133:12, 137:16, 138:21, 138:23, 146:4, 146:7, 146:9, 189:16, 190:9, 190:15, 190:16, 190:17, 190:21, 228:12, 229:12
**proper** [3] - 49:8, 94:1, 128:3
**properly** [2] - 68:24, 77:25
**proposal** [1] - 104:25
**proposed** [31] - 83:2,

83:16, 83:17, 90:7, 90:8, 90:15, 90:16, 90:19, 90:24, 91:19, 92:8, 92:19, 93:1, 93:6, 94:18, 96:16, 97:2, 101:19, 102:19, 104:5, 105:5, 108:7, 109:8, 110:6, 111:3, 111:8, 111:14, 111:18, 112:1, 213:8
**prosecution** [2] - 134:15, 136:10
**prosecutor** [12] - 5:11, 5:20, 5:22, 5:23, 31:4, 206:18, 207:14, 207:24, 215:12, 219:15, 220:22, 222:3
**prosecutors** [1] - 9:20
**protect** [8] - 35:15, 35:18, 71:7, 159:11, 175:23, 222:22, 222:23, 238:12
**protecting** [2] - 239:3
**protection** [5] - 163:24, 182:17, 185:24, 206:10, 237:23
**protocol** [1] - 77:22
**protocols** [2] - 49:5, 50:21
**proud** [3] - 189:9, 189:14, 192:14
**prove** [32] - 24:1, 24:23, 26:1, 29:14, 99:8, 107:18, 124:11, 124:15, 124:19, 125:25, 128:21, 128:22, 130:24, 131:3, 132:22, 133:1, 137:2, 137:6, 138:1, 138:3, 138:6, 145:14, 145:15, 146:8, 185:4, 189:10, 189:24, 190:10, 193:20, 194:12, 235:13, 235:14
**proved** [19] - 26:20, 29:1, 29:11, 29:17, 97:21, 109:14, 110:1, 123:24, 125:3, 129:14, 131:6, 132:9, 134:24, 136:17, 141:19, 148:10, 182:3, 185:17, 186:1
**proven** [7] - 142:6, 142:23, 146:10, 190:3, 190:23, 191:6, 192:7

**proves** [1] - 194:16
**provide** [9] - 16:6, 87:25, 112:15, 128:3, 149:25, 173:4, 183:24, 245:25, 246:2
**provided** [5] - 35:17, 78:25, 135:7, 144:6, 246:4
**provides** [3] - 128:1, 178:5, 183:15
**providing** [6] - 34:12, 163:24, 182:17, 183:1, 184:17, 185:24
**proving** [1] - 234:14
**public** [5] - 16:24, 157:7, 157:18, 163:2, 178:7
**puddles** [3] - 147:5, 147:6, 147:8
**Puerto** [2] - 230:17
**pull** [17] - 19:10, 20:7, 27:1, 29:20, 29:21, 32:14, 87:10, 171:14, 171:19, 185:11, 185:12, 191:25, 192:1, 192:3, 242:22, 242:23, 246:6
**pulled** [1] - 167:19
**pulling** [1] - 66:5
**pullover** [1] - 174:21
**pullovers** [5] - 174:9, 174:11, 174:20, 174:21, 174:23
**pulls** [1] - 171:19
**punched** [3] - 53:7, 53:11, 54:8
**punishment** [3] - 78:8, 140:2, 140:4
**purchase** [2] - 11:14, 63:16
**purchasing** [1] - 11:15
**purported** [4] - 28:25, 30:7, 170:21, 171:5
**purpose** [27] - 24:16, 69:3, 129:4, 131:11, 131:16, 131:23, 132:17, 133:7, 133:14, 136:21, 137:12, 137:19, 137:21, 143:14, 145:20, 156:16, 159:3, 161:23, 161:24, 170:1, 183:8, 193:25, 194:15, 226:16, 242:2, 242:7
**purposefully** [1] - 226:17

**purposely** [3] - 129:3, 193:24, 194:13
**purposes** [3] - 130:22, 132:20, 136:25
**purse** [3] - 74:4, 74:5, 74:6
**push** [3] - 16:2, 56:12, 170:19
**put** [23] - 45:7, 84:5, 88:24, 89:24, 94:16, 94:21, 97:8, 104:12, 113:21, 119:24, 120:1, 120:8, 122:13, 151:24, 157:6, 187:23, 200:19, 200:22, 201:5, 205:11, 216:25, 229:12, 239:7
**putting** [1] - 99:11

**Q**

**quarantine** [1] - 56:13
**quarantined** [1] - 13:18
**questioned** [8] - 4:17, 6:5, 47:1, 74:14, 76:22, 77:2, 77:15, 221:14
**questioning** [2] - 154:16, 176:12
**questions** [18] - 4:15, 8:14, 9:16, 10:9, 17:5, 22:7, 29:25, 37:23, 71:9, 74:17, 74:19, 75:8, 88:9, 126:11, 126:21, 166:17, 167:16, 176:7
**quick** [4] - 10:4, 52:19, 52:20, 52:23
**quickly** [5] - 54:17, 83:8, 146:3, 147:17, 158:12
**quiet** [1] - 45:16
**Quinon** [6] - 3:12, 29:13, 87:24, 88:23, 121:14, 122:4
**QUINON** [164] - 1:17, 1:17, 2:4, 2:9, 2:10, 2:14, 3:12, 4:12, 9:6, 14:3, 15:5, 15:7, 15:15, 17:13, 17:15, 20:17, 20:19, 22:23, 23:1, 26:16, 30:12, 31:3, 31:23, 31:25, 32:8, 32:16, 37:25, 42:4, 44:9, 48:5, 48:7, 65:4, 66:18, 66:20,

71:11, 71:14, 71:17, 71:20, 72:14, 72:19, 72:22, 72:24, 73:3, 73:13, 73:17, 73:21, 74:12, 74:13, 78:5, 78:13, 78:16, 78:20, 79:1, 79:7, 79:17, 80:2, 80:10, 80:16, 81:15, 82:5, 82:15, 82:21, 83:4, 83:12, 83:23, 84:12, 85:16, 85:25, 87:2, 87:5, 88:24, 89:5, 90:14, 91:2, 91:4, 91:17, 92:2, 92:7, 92:18, 92:25, 93:5, 93:9, 94:7, 95:6, 95:12, 95:17, 96:1, 96:15, 97:4, 97:11, 98:18, 99:18, 100:11, 101:11, 101:17, 101:23, 102:10, 102:13, 102:16, 102:22, 103:9, 103:18, 103:21, 104:10, 104:16, 104:23, 105:10, 105:19, 105:22, 106:4, 107:15, 107:21, 107:25, 108:17, 108:20, 108:23, 109:6, 109:9, 110:5, 110:10, 110:13, 110:22, 111:1, 111:7, 111:12, 111:17, 111:21, 112:17, 113:19, 114:2, 114:12, 114:21, 115:2, 115:9, 116:3, 116:10, 116:25, 117:5, 117:15, 118:1, 118:5, 118:9, 118:18, 119:1, 119:11, 119:25, 120:3, 120:6, 120:9, 120:15, 121:7, 121:15, 122:6, 187:2, 187:12, 187:17, 187:20, 224:16, 231:12, 231:14, 246:22, 247:18, 248:4, 248:8
**quite** [3] - 200:14, 204:23, 219:8
**quote** [3] - 105:11, 159:16, 179:18
**quotes** [1] - 158:18

**R**

**rain** [1] - 147:7

rained [1] - 147:7
raise [2] - 32:11, 87:6
raised [3] - 14:23, 29:13, 232:25
rare [1] - 21:22
rather [3] - 10:24, 59:6, 119:11
rational [1] - 62:23
Raton [2] - 142:16, 151:1
reach [3] - 95:23, 125:16, 140:12
reached [2] - 245:7, 245:10
react [1] - 53:20
reacts [1] - 44:19
read [19] - 19:11, 82:19, 99:15, 104:21, 107:1, 112:11, 116:18, 117:8, 119:2, 121:16, 122:18, 123:5, 123:10, 185:20, 190:13, 226:14, 228:4, 241:18, 246:20
reading [1] - 108:23
reads [3] - 115:14, 115:23, 244:5
ready [16] - 3:20, 31:24, 32:7, 73:18, 79:6, 84:11, 84:17, 85:11, 107:25, 120:20, 120:23, 141:7, 187:11, 187:13, 232:6, 246:12
real [7] - 124:22, 140:18, 167:2, 170:4, 173:4, 200:15, 239:10
reality [1] - 223:6
realize [1] - 104:16
realized [1] - 97:5
really [27] - 3:18, 38:20, 43:4, 80:16, 80:18, 89:11, 93:24, 94:14, 105:12, 112:6, 115:4, 116:10, 119:13, 121:3, 151:24, 158:4, 166:11, 201:8, 203:17, 203:23, 203:24, 210:5, 215:25, 216:9, 220:8, 238:15, 240:17
reappear [1] - 119:15
reason [41] - 7:24, 18:16, 39:6, 47:11, 79:20, 93:17, 97:7, 124:23, 126:14, 128:5, 151:2, 154:2,

154:11, 155:3, 156:12, 156:23, 160:16, 160:18, 160:19, 160:20, 161:12, 184:11, 184:16, 195:13, 196:9, 197:3, 197:12, 215:9, 215:10, 215:11, 216:1, 226:16, 226:20, 231:8, 235:8, 235:10, 236:24, 237:3, 239:16, 239:19, 243:11
reasonable [37] - 91:13, 97:21, 114:3, 124:1, 124:16, 124:20, 124:22, 124:25, 125:4, 128:22, 129:15, 131:6, 132:9, 134:24, 135:6, 136:17, 138:25, 141:19, 144:5, 146:1, 146:10, 146:11, 185:18, 189:11, 189:22, 190:1, 190:7, 190:12, 190:17, 190:23, 192:7, 193:1, 194:17, 226:22, 229:12, 236:18, 243:13
reasonably [3] - 29:15, 29:18, 128:23
reasoning [5] - 125:16, 146:14, 146:17, 146:19, 239:10
reasons [4] - 93:13, 181:2, 235:16, 235:17
REBUTTAL [1] - 2:15
rebuttal [2] - 121:11, 141:2
receipt [1] - 177:19
receive [4] - 152:2, 225:25, 244:24
received [2] - 30:19, 36:4
RECEIVED [1] - 2:19
receiving [1] - 35:24
recently [1] - 62:14
recess [9] - 79:16, 81:20, 84:8, 86:8, 121:19, 121:21, 187:8, 231:25, 248:9
recognize [2] - 66:1, 66:3
recognizing [1] - 148:1
recollection [2] - 125:14, 139:15

recommend [2] - 106:12, 115:10
recommends [2] - 105:7, 212:17
reconvene [1] - 186:18
record [11] - 18:1, 18:12, 38:14, 69:12, 81:21, 84:9, 88:25, 121:22, 230:1, 232:7
recorded [3] - 79:4, 184:25, 208:23
Recording [1] - 2:11
recording [7] - 31:21, 81:16, 85:15, 85:17, 220:6, 220:7, 223:19
records [18] - 29:20, 29:21, 69:18, 148:11, 149:20, 150:4, 153:12, 153:22, 162:9, 163:13, 173:11, 182:5, 185:11, 185:13, 217:10, 242:22, 242:23
recruited [1] - 148:12
recruiter [4] - 150:15, 150:16, 150:19, 234:25
recruiters [2] - 157:23, 166:19
recruiting [1] - 183:12
recuse [3] - 6:20, 6:24, 71:4
red [2] - 148:24, 175:16
redirect [3] - 9:7, 66:23, 71:10
REDIRECT [4] - 2:4, 2:10, 9:11, 71:13
reduction [4] - 198:2, 198:4, 229:20, 230:12
redundant [1] - 119:19
reexamine [1] - 140:13
refer [3] - 19:22, 38:11, 129:19
reference [4] - 19:25, 20:3, 117:18, 161:13
referred [1] - 38:9
referring [3] - 20:9, 65:4, 158:12
refers [1] - 181:11
reflect [1] - 18:15
reflected [6] - 11:2,

17:24, 18:2, 18:12, 197:15, 239:4
reflects [2] - 60:19, 60:23
refuses [3] - 170:20, 170:25, 171:4
regard [1] - 115:17
regarding [21] - 88:9, 101:16, 101:21, 111:22, 112:10, 116:8, 116:13, 116:14, 116:19, 116:21, 117:9, 117:10, 139:3, 139:4, 141:23, 142:13, 148:10, 166:19, 167:4, 168:8, 246:23
Rego [4] - 166:1, 168:19, 169:20, 172:16
regular [8] - 74:6, 148:8, 148:23, 152:10, 152:12, 157:14, 168:24, 174:23
regularly [1] - 148:21
regulation [1] - 117:3
regulations [9] - 115:1, 115:3, 115:20, 115:25, 116:9, 116:14, 116:25, 117:3, 119:6
rehab [1] - 205:7
Rehan [7] - 186:22, 245:4, 245:10, 246:1, 246:9, 246:12, 247:14
reignited [1] - 185:8
reigniting [1] - 167:8
reiterates [1] - 177:22
related [5] - 69:19, 93:21, 135:9, 144:8, 166:12
relates [2] - 30:2, 69:5
relating [3] - 132:15, 139:21, 143:7
relation [3] - 133:19, 135:14, 174:1
relationship [30] - 6:8, 6:18, 21:5, 34:21, 37:20, 44:22, 46:13, 54:11, 54:18, 68:5, 77:19, 112:22, 148:9, 148:16, 151:12, 153:1, 156:8, 157:22, 158:9, 158:19, 161:4, 164:19, 178:15, 183:7, 184:15, 203:3,

204:25, 205:1, 206:5, 206:7
relative [4] - 191:10, 191:13, 191:17, 191:25
relax [2] - 86:16, 199:7
relaxed [1] - 13:22
relayed [1] - 224:12
relays [2] - 166:4, 166:9
relevance [2] - 78:3, 114:25
reliable [1] - 201:14
reliance [1] - 113:15
religion [20] - 200:1, 200:10, 200:11, 200:15, 201:13, 201:15, 201:20, 202:6, 202:8, 202:10, 203:1, 210:5, 214:4, 214:5, 214:23, 218:11, 218:13, 218:14, 228:13
religious [3] - 112:21, 206:4, 210:4
religiously [1] - 46:14
rely [5] - 105:5, 125:1, 128:18, 190:18, 194:18
relying [2] - 240:21, 240:22
remain [2] - 90:22, 90:23
remarkable [1] - 176:6
remedied [1] - 83:14
remedy [1] - 63:6
remember [29] - 4:21, 39:21, 39:24, 40:9, 42:6, 43:14, 43:15, 57:12, 58:16, 60:12, 63:4, 64:24, 65:3, 65:15, 65:18, 76:21, 77:4, 127:11, 140:18, 155:14, 173:6, 179:3, 185:13, 192:20, 193:9, 194:11, 203:6, 207:21, 226:11
remembered [1] - 65:13
remembers [1] - 127:10
remotely [2] - 18:22, 18:25
removed [1] - 110:17
Rene [1] - 12:6
renew [2] - 23:1,

89:5

**rent** [6] - 162:16, 163:12, 163:17, 163:18, 163:20, 235:21

**renting** [1] - 38:4

**repair** [1] - 62:18

**repeat** [3] - 89:14, 226:5, 227:11

**repeated** [1] - 94:17

**repeatedly** [8] - 28:18, 29:4, 94:21, 169:19, 174:10, 180:13, 183:6, 238:19

**repeating** [1] - 94:21

**rephrase** [1] - 42:2

**reply** [1] - 30:11

**report** [23] - 17:24, 18:8, 18:17, 18:20, 19:8, 19:10, 19:12, 19:18, 19:19, 20:13, 20:20, 21:3, 70:17, 70:18, 70:23, 156:10, 156:17, 156:22, 160:23, 166:3, 245:22, 246:14, 246:15

**REPORTED** [1] - 1:20

**REPORTER** [1] - 173:9

**Reporter** [2] - 1:22, 249:9

**reporting** [1] - 222:7

**reports** [9] - 17:25, 18:22, 18:25, 19:5, 19:6, 27:13, 69:1, 166:4, 179:14

**representing** [1] - 7:13

**request** [3] - 14:15, 108:25, 109:4

**requested** [2] - 16:4, 111:15

**requesting** [2] - 110:12, 117:19

**requests** [1] - 156:22

**require** [5] - 18:11, 58:24, 107:9, 113:14, 189:16

**required** [6] - 25:7, 25:16, 107:17, 137:25, 193:14, 215:1

**requirement** [1] - 107:10

**requirements** [1] - 39:13

**requires** [4] - 25:18, 138:21, 189:1, 189:10

**resells** [1] - 150:18

**residence** [5] - 163:5, 163:6, 164:9, 167:12, 178:11

**residences** [2] - 61:9, 171:2

**resistance** [2] - 14:17, 14:19

**resolved** [1] - 83:18

**resources** [1] - 217:3

**respect** [6] - 11:12, 16:24, 50:25, 77:16, 77:19, 229:11

**respective** [1] - 157:4

**respond** [7] - 26:17, 53:2, 75:11, 75:14, 164:4, 235:2, 244:15

**responded** [1] - 76:17

**response** [3] - 89:17, 150:8, 173:3

**responsible** [4] - 98:8, 138:15, 138:17, 138:20

**rest** [6] - 31:13, 85:25, 118:2, 118:6, 180:12, 186:19

**restaurant** [4] - 61:21, 67:5, 67:16, 77:14

**restaurant's** [1] - 39:22

**restaurants** [1] - 12:22

**rested** [4] - 22:14, 86:5, 87:11, 88:15

**resting** [1] - 87:14

**restroom** [3] - 79:10, 120:23, 231:24

**rests** [1] - 22:12

**RESTS** [2] - 2:6, 2:12

**result** [4] - 133:20, 133:21, 135:15, 135:16

**resume** [6] - 3:20, 14:9, 82:7, 84:18, 245:24, 247:23

**resuscitating** [1] - 191:19

**retain** [1] - 17:8

**retired** [1] - 166:14

**retook** [1] - 4:10

**return** [8] - 10:15, 14:10, 173:21, 190:4, 231:20, 244:12, 245:20, 247:15

**returned** [1] - 154:24

**returning** [1] - 17:22

**reveal** [3] - 158:9, 158:18, 239:20

**reveals** [1] - 158:20

**revelation** [1] - 222:17

**revered** [1] - 192:13

**review** [8] - 17:25, 18:3, 18:25, 19:5, 20:25, 21:1, 120:22, 121:24

**reviewed** [5] - 18:4, 18:19, 18:20, 122:7, 153:11

**reviewing** [1] - 17:23

**rhyme** [1] - 226:20

**Richard** [1] - 113:19

**Rico** [2] - 230:17

**ridiculous** [3] - 144:15, 145:18, 242:13

**right-hand** [2] - 151:7, 233:15

**righteous** [1] - 238:11

**ring** [1] - 41:25

**rise** [7] - 22:19, 79:12, 82:8, 86:18, 121:20, 122:20, 186:25

**road** [4] - 93:23, 166:13, 189:2, 238:11

**rodeo** [1] - 147:25

**Rodolfo** [1] - 10:7

**Rolando** [19] - 11:3, 142:11, 161:1, 161:25, 210:11, 210:16, 210:17, 210:21, 210:23, 211:5, 224:19, 224:21, 224:25, 228:23, 230:15, 230:16, 230:19, 230:24, 231:9

**role** [2] - 201:8, 214:23

**roll** [1] - 211:10

**rookie** [1] - 51:11

**room** [8] - 5:17, 22:17, 38:23, 86:10, 123:21, 141:24, 243:17, 244:10

**roughly** [5] - 33:15, 42:5, 43:12, 150:6, 150:7

**round** [1] - 151:24

**Round** [1] - 157:5

**routine** [1] - 13:25

**RPR** [2] - 1:21, 249:8

**Ruben** [2] - 156:19, 157:3

**Ruiz** [2] - 149:2, 165:25

**rule** [2] - 65:19, 129:8

**Rule** [1] - 89:9

**rules** [10] - 13:22, 114:25, 115:20, 115:24, 116:8, 116:13, 119:6, 123:19, 128:3, 189:2

**ruling** [1] - 109:3

**rulings** [1] - 188:13

**run** [4] - 68:25, 69:4, 69:18, 69:21

**running** [2] - 225:16, 227:11

**runs** [1] - 193:3

**rush** [1] - 82:14

---

**S**

**S17** [1] - 113:13

**sacred** [1] - 192:13

**sacrifice** [1] - 187:21

**sad** [5] - 47:9, 47:11, 62:13, 76:23

**safe** [1] - 35:2

**safety** [2] - 21:25, 184:4

**saint** [4] - 201:22, 201:23, 202:10, 217:22

**saints** [2] - 202:12, 217:25

**sale** [4] - 11:14, 23:14, 23:20, 216:11

**sales** [1] - 211:22

**Samantha** [39] - 35:3, 35:4, 36:23, 37:2, 37:6, 37:18, 38:5, 39:18, 40:15, 41:20, 42:16, 42:23, 43:1, 54:18, 54:24, 55:4, 55:20, 60:8, 61:1, 61:9, 62:17, 63:14, 63:16, 63:21, 64:7, 65:8, 65:16, 65:22, 66:7, 66:10, 66:12, 66:16, 68:17, 73:8, 76:15, 76:19, 77:6, 77:11, 239:15

**Samantha's** [4] - 66:4, 66:25, 71:23, 235:20

**sample** [1] - 105:6

**Santeria** [12] - 46:15, 200:1, 200:4, 200:10, 200:13, 200:20, 200:21, 201:7, 201:17, 201:22, 204:9, 217:21

**sat** [4] - 41:4, 59:19,

75:18, 206:16

**satisfy** [1] - 26:9

**Saturday** [1] - 155:15

**savvy** [1] - 50:3

**saw** [22] - 11:5, 44:10, 52:13, 57:11, 57:13, 68:20, 122:14, 157:17, 158:23, 165:23, 166:1, 169:4, 174:8, 181:8, 201:2, 201:20, 206:18, 212:4, 214:6, 224:7, 224:10, 228:9

**scared** [2] - 158:25, 164:21

**scenario** [1] - 235:4

**scene** [5] - 131:19, 133:10, 137:15, 138:24, 228:10

**Schedule** [1] - 129:23

**schedule** [1] - 156:19

**scheduled** [1] - 173:6

**scheduling** [1] - 22:15

**scheme** [7] - 107:7, 110:3, 134:6, 136:1, 170:8, 241:6, 241:8

**scientific** [1] - 128:12

**scope** [4] - 44:6, 113:24, 114:4, 114:9

**scoured** [1] - 217:4

**screaming** [1] - 236:5

**screen** [1] - 85:10

**screens** [1] - 182:1

**seal** [1] - 154:25

**Sean** [2] - 3:7, 3:10

**SEAN** [1] - 1:13

**search** [6] - 27:11, 106:22, 154:8, 154:20, 182:22, 236:25

**searching** [1] - 160:16

**seasoned** [1] - 50:16

**seat** [2] - 32:10, 32:13

**seated** [17] - 3:2, 3:25, 22:21, 32:4, 41:1, 79:14, 84:16, 86:20, 87:9, 90:22, 90:23, 122:22, 187:9, 187:15, 232:4, 232:10, 246:19

**second** [28] - 22:24, 23:4, 48:5, 58:8,

73:18, 78:14, 83:15, 83:16, 83:17, 91:6, 99:20, 100:18, 102:14, 106:1, 107:6, 108:23, 109:12, 115:18, 115:23, 117:17, 142:25, 143:13, 145:20, 151:24, 159:14, 198:25, 234:4, 244:5

**secondly** [1] - 211:16

**seconds** [1] - 72:19

**secret** [2] - 140:8, 149:10

**secretary** [1] - 230:4

**Section** [5] - 97:16, 100:19, 130:13, 130:14, 134:17

**Sections** [2] - 132:1, 136:12

**SECURITY** [9] - 4:3, 22:19, 79:10, 79:12, 82:8, 86:18, 121:20, 122:20, 186:25

**security** [8] - 148:6, 152:10, 163:22, 217:9, 217:11, 217:19, 235:23

**see** [87] - 3:14, 18:14, 20:1, 20:3, 20:5, 27:15, 60:4, 64:22, 65:2, 65:21, 66:10, 66:16, 66:25, 68:11, 71:21, 71:25, 72:1, 72:3, 72:24, 72:25, 73:6, 73:9, 73:11, 73:22, 80:8, 80:13, 84:7, 85:10, 86:16, 96:16, 102:10, 103:1, 106:22, 111:21, 112:1, 112:12, 128:19, 144:19, 147:3, 147:7, 150:5, 153:22, 154:13, 155:24, 157:10, 158:11, 158:18, 160:5, 160:13, 161:19, 162:8, 163:10, 164:11, 165:4, 167:3, 167:5, 167:10, 169:1, 171:24, 172:18, 173:21, 173:23, 174:10, 174:16, 175:9, 177:2, 179:19, 179:24, 185:14, 190:8, 192:10, 192:23, 195:16, 196:12, 196:20,

196:23, 202:19, 202:20, 209:11, 217:5, 217:10, 223:24, 225:12, 228:1, 232:14, 242:14

**seeing** [1] - 19:7

**seek** [1] - 140:19

**seem** [1] - 126:18

**sees** [3] - 45:15, 152:23, 178:4

**segregated** [1] - 59:23

**segregation** [1] - 21:16

**select** [1] - 245:18

**selected** [1] - 147:1

**selective** [2] - 8:23, 8:24

**sell** [12] - 11:20, 28:11, 159:19, 172:3, 172:4, 172:10, 177:5, 177:14, 199:17, 204:1, 234:8, 240:3

**selling** [8] - 183:11, 199:15, 212:6, 212:8, 212:21, 226:19, 234:11, 235:21

**sells** [1] - 172:2

**send** [1] - 22:17

**sends** [3] - 208:13, 208:17, 208:21

**sense** [12] - 112:22, 124:23, 125:16, 146:14, 146:17, 146:19, 149:13, 167:12, 172:20, 236:22, 239:10, 243:12

**sent** [4] - 14:15, 114:23, 170:13, 170:14

**sentence** [29] - 99:20, 100:19, 101:3, 109:12, 109:20, 109:24, 109:25, 113:22, 115:19, 115:23, 116:7, 116:12, 117:8, 117:12, 117:16, 117:17, 118:3, 118:7, 118:8, 118:13, 118:19, 118:21, 119:4, 119:18, 128:1, 198:5, 198:8, 198:9, 198:11

**sentenced** [2] - 210:19, 210:20

**sentences** [1] - 116:6

**separate** [6] - 71:5,

129:17, 130:17, 139:20, 145:2, 171:2

**separated** [3] - 55:17, 55:18, 55:19

**separately** [1] - 139:22

**September** [6] - 143:10, 157:8, 157:17, 234:19, 237:8, 242:6

**serious** [4] - 9:24, 221:17, 236:10

**serve** [1] - 189:3

**service** [1] - 245:13

**services** [1] - 206:4

**Services** [1] - 32:22

**serving** [3] - 76:2, 134:13, 136:8

**set** [2] - 208:2, 232:5

**sets** [1] - 96:17

**setting** [2] - 80:19, 168:7

**settle** [1] - 185:19

**settled** [1] - 122:10

**seven** [3] - 232:2, 234:18, 245:16

**seventh** [1] - 102:3

**Seventh** [6] - 102:23, 103:5, 103:8, 103:11, 103:13, 103:25

**several** [1] - 57:22

**shall** [2] - 42:8, 248:8

**shape** [1] - 191:14

**share** [2] - 50:12, 66:8

**shared** [11] - 8:9, 61:4, 61:8, 131:8, 132:11, 136:19, 142:3, 143:3, 145:10, 209:12, 230:16

**sharing** [1] - 27:13

**ships** [1] - 13:17

**short** [4] - 22:16, 79:15, 141:5, 186:5

**shortcut** [1] - 225:15

**shortly** [6] - 22:18, 53:21, 55:19, 65:22, 66:10, 232:2

**show** [14] - 24:7, 24:13, 24:15, 24:19, 25:7, 25:14, 26:6, 39:1, 60:16, 71:15, 80:4, 149:21, 180:11, 181:20

**showed** [12] - 76:10, 153:6, 167:20, 169:4, 169:6, 170:15, 174:13, 207:22, 207:25, 209:13, 230:24, 243:10

**showing** [5] - 27:24, 80:6, 167:14, 167:15

**shown** [3] - 23:10, 23:18, 66:20

**shows** [4] - 60:22, 153:15, 185:16, 210:2

**shut** [12] - 12:18, 12:21, 13:5, 30:7, 150:10, 161:15, 170:1, 171:8, 183:23, 236:6, 239:17, 240:9

**sic** [6] - 64:10, 83:17, 91:14, 159:2, 161:22, 202:15

**sick** [3] - 185:20, 185:21, 231:7

**sic}** [1] - 215:25

**side** [6] - 16:24, 90:10, 121:8, 152:5, 161:15, 222:1

**sided** [1] - 6:1

**sides** [2] - 86:5, 88:15

**sign** [4] - 39:8, 196:20, 244:8, 244:11

**signed** [1] - 244:6

**significance** [1] - 127:14

**significant** [1] - 58:4

**similar** [2] - 101:21, 112:9

**simple** [9] - 127:9, 153:21, 163:21, 175:21, 184:20, 185:25, 212:25, 232:24, 242:10

**simply** [7] - 131:19, 133:10, 137:14, 138:23, 140:16, 223:5, 228:9

**single** [16] - 110:23, 124:7, 141:19, 152:24, 186:1, 206:12, 206:19, 206:25, 207:1, 219:20, 221:14, 238:13, 239:8, 241:20, 242:5

**sister** [2] - 191:11, 191:21

**sit** [7] - 75:25, 80:13, 172:8, 187:23, 188:7, 189:6, 191:4

**sites** [1] - 192:23

**sitting** [2] - 41:5, 59:21

**situation** [6] - 5:10, 5:19, 42:22, 53:3, 191:21, 223:13

**situations** [1] -

100:13

**six** [14] - 42:7, 63:22, 64:6, 64:8, 65:1, 65:8, 75:24, 76:1, 129:17, 141:20, 153:8, 155:1, 186:11, 198:8

**skilled** [1] - 52:14

**skills** [1] - 51:16

**skips** [1] - 171:11

**sky** [1] - 147:3

**Slattery** [2] - 3:10, 153:11

**slippery** [1] - 93:24

**slips** [2] - 158:8, 160:8

**slope** [1] - 93:25

**slow** [2] - 43:22, 43:25

**slowed** [1] - 169:13

**small** [2] - 33:23, 149:5

**smart** [1] - 203:5

**snitch** [1] - 233:17

**snitched** [1] - 175:6

**snitches** [1] - 180:18

**social** [13] - 6:8, 34:3, 59:10, 61:8, 61:15, 148:6, 152:10, 163:22, 217:9, 217:11, 217:18, 235:23

**socially** [1] - 37:21

**sold** [4] - 163:16, 173:13, 234:6

**sole** [2] - 143:18, 218:6

**some-years** [1] - 203:10

**someone** [13] - 3:24, 10:3, 17:20, 98:2, 150:16, 159:6, 161:6, 177:3, 179:18, 235:5, 238:25, 241:10, 245:8

**sometime** [1] - 193:6

**sometimes** [12] - 8:24, 8:25, 38:13, 52:6, 54:24, 58:1, 58:23, 123:1, 172:4, 188:20, 191:12, 191:15

**somewhat** [1] - 112:9

**somewhere** [3] - 35:19, 37:3, 186:9

**son** [5] - 148:18, 158:13, 191:12, 191:20, 206:22

**soon** [6] - 33:16, 56:11, 79:1, 120:20, 161:19, 180:2

**SOP** [1] - 7:20
**sorry** [24] - 17:14, 26:14, 26:15, 27:1, 27:3, 28:18, 30:23, 79:9, 81:17, 89:22, 105:22, 107:23, 115:22, 116:4, 138:9, 173:9, 180:4, 181:4, 194:19, 208:9, 210:10, 213:6, 217:22, 221:11
**sort** [8] - 7:15, 16:11, 39:6, 42:18, 45:7, 56:12, 59:23, 115:3
**sorts** [1] - 48:23
**Sotolongo** [3] - 12:7, 156:19, 157:3
**sounds** [1] - 214:7
**source** [17] - 15:1, 16:4, 16:5, 16:8, 17:11, 152:10, 201:14, 207:15, 207:20, 217:19, 221:21, 230:7, 239:10, 239:20, 239:23, 239:24
**sources** [2] - 17:8, 225:14
**South** [1] - 232:18
**south** [1] - 53:10
**Southern** [1] - 243:21
**SOUTHERN** [1] - 1:1
**Spalding** [2] - 53:24, 65:7
**Spanish** [3] - 68:4, 208:15, 208:16
**Spanish-speaking** [1] - 208:15
**speaking** [6] - 11:19, 42:23, 62:7, 88:14, 159:23, 208:15
**speaks** [4] - 208:16, 209:6, 214:10
**Special** [30] - 3:10, 26:23, 29:3, 30:10, 142:9, 142:10, 144:18, 144:25, 149:4, 149:5, 149:15, 149:16, 150:14, 151:21, 152:1, 153:11, 153:23, 156:11, 156:18, 157:2, 161:1, 161:20, 166:20, 177:1, 177:13, 177:16, 179:11, 181:9, 181:10
**special** [5] - 20:15, 21:7, 21:13, 128:13, 149:8

**specialized** [1] - 128:12
**specific** [14] - 103:10, 123:25, 129:8, 130:11, 137:22, 139:24, 140:1, 175:24, 180:14, 184:21, 184:22, 228:15, 228:16, 242:3
**specifically** [5] - 11:11, 29:18, 94:13, 144:17, 164:12
**specifies** [1] - 129:10
**specify** [1] - 98:12
**specimen** [1] - 105:6
**spectator** [1] - 139:2
**speculative** [2] - 15:7, 17:15
**spend** [5] - 37:2, 56:24, 57:6, 190:7
**spent** [8] - 55:6, 55:9, 55:19, 57:2, 61:1, 200:11, 205:25, 231:2
**spirits** [2] - 202:16, 214:7
**spoken** [2] - 88:19, 141:3
**squad** [5] - 27:11, 153:7, 153:16, 163:2, 236:25
**square** [1] - 161:18
**stab** [1] - 236:2
**staff** [1] - 114:23
**stage** [4] - 30:15, 90:2, 198:21, 198:22
**stake** [4] - 119:13, 191:23, 191:24, 229:18
**stand** [5] - 4:9, 4:10, 200:3, 202:21, 239:18
**standard** [19] - 7:6, 22:3, 22:4, 82:25, 90:2, 91:4, 93:9, 94:3, 94:24, 96:22, 109:19, 113:13, 189:7, 189:8, 189:16, 189:19, 192:21, 192:25, 197:15
**standards** [15] - 115:11, 115:20, 115:25, 116:14, 116:21, 117:10, 119:7, 139:5
**standing** [13] - 115:15, 115:25, 116:1, 116:3, 116:4, 117:23, 118:4,

118:10, 119:20, 122:8, 122:11, 139:7, 218:22
**start** [14] - 33:10, 80:22, 81:7, 85:7, 96:2, 111:25, 148:9, 155:19, 165:24, 166:21, 187:20, 189:18, 193:2, 232:25
**started** [16] - 33:1, 33:16, 33:17, 34:13, 34:15, 35:13, 40:9, 42:15, 43:23, 55:14, 121:1, 142:14, 193:9, 199:25, 200:5
**starting** [6] - 3:5, 105:16, 155:21, 160:14, 171:25, 245:22
**starts** [17] - 44:14, 81:11, 143:10, 147:23, 149:3, 160:6, 160:8, 160:16, 162:22, 164:15, 168:18, 169:9, 173:23, 175:5, 175:24, 182:16, 190:11
**state** [17] - 3:5, 18:11, 114:17, 128:14, 133:24, 135:18, 152:7, 152:16, 153:5, 153:19, 155:6, 156:6, 160:10, 162:1, 162:24, 166:11, 185:16
**statement** [43] - 24:21, 30:22, 64:23, 74:15, 78:24, 79:5, 84:20, 84:22, 85:5, 85:7, 104:12, 104:13, 104:21, 104:23, 104:24, 106:5, 106:8, 106:11, 107:3, 107:6, 107:12, 118:11, 118:17, 127:8, 128:6, 134:1, 134:3, 134:5, 135:21, 135:23, 135:25, 141:12, 141:17, 170:11, 193:10, 197:3, 227:19, 241:5, 241:13, 241:16
**STATEMENT** [3] - 2:14, 2:14, 2:15
**statements** [5] - 92:9, 113:23, 160:24, 180:15, 241:21
**States** [26] - 1:22,

3:4, 3:8, 25:11, 94:12, 99:21, 100:19, 130:13, 130:14, 132:1, 132:6, 132:14, 134:10, 134:17, 134:22, 135:5, 135:8, 136:5, 136:12, 143:7, 144:4, 144:7, 243:21, 243:23, 244:6, 249:9
**STATES** [5] - 1:1, 1:4, 1:11, 1:14, 1:14
**status** [4] - 17:8, 17:21, 27:9, 156:25
**statute** [5] - 105:1, 105:12, 106:24, 107:9, 129:10
**statutes** [4] - 115:20, 115:24, 117:18, 119:6
**stay** [1] - 86:10
**stealing** [1] - 204:14
**steeped** [1] - 51:12
**STENOGRAPHICA LLY** [1] - 1:20
**step** [4] - 22:8, 78:17, 237:7, 245:11
**stepped** [1] - 3:14
**stick** [1] - 200:24
**still** [30] - 4:9, 13:19, 17:12, 41:2, 55:16, 57:21, 57:23, 57:24, 59:16, 72:23, 90:3, 107:10, 113:9, 114:6, 150:13, 152:7, 158:17, 162:2, 162:19, 162:24, 163:24, 164:7, 165:11, 165:21, 165:22, 168:5, 168:6, 177:18, 183:5, 211:14
**stone** [1] - 168:8
**stooge** [2] - 203:17, 214:1
**stop** [12] - 43:18, 72:14, 72:15, 72:20, 72:24, 73:14, 73:15, 73:18, 73:19, 196:20, 196:22, 196:23
**stopped** [1] - 73:20
**stops** [1] - 150:6
**stories** [1] - 242:9
**story** [13] - 148:14, 179:13, 181:22, 181:24, 184:5, 184:23, 185:15, 185:22, 185:25, 186:1, 238:19, 239:16, 241:10
**straight** [1] - 103:18
**straightforward** [2] - 120:11, 185:25

**strange** [1] - 223:21
**Street** [1] - 1:15
**street** [10] - 15:1, 50:1, 50:3, 57:24, 170:17, 183:11, 196:19, 224:2, 225:13
**streets** [1] - 58:18
**stricken** [1] - 105:8
**strike** [5] - 94:24, 119:8, 119:18, 128:6, 197:4
**Strike** [17] - 29:16, 145:17, 147:19, 149:18, 150:15, 151:20, 152:2, 153:7, 161:9, 176:9, 177:16, 184:12, 184:19, 185:6, 208:12, 237:1
**striking** [1] - 174:15
**stuck** [1] - 231:15
**stuff** [8] - 35:13, 42:21, 196:1, 196:5, 200:12, 214:11, 221:17
**stumbles** [1] - 194:8
**stumbling** [1] - 63:3
**stupidity** [1] - 235:17
**style** [1] - 243:22
**subject** [1] - 168:25
**subjective** [1] - 115:12
**subjects** [1] - 10:19
**submit** [21] - 19:8, 102:17, 151:3, 153:15, 154:2, 154:10, 154:15, 155:3, 156:15, 156:23, 159:2, 161:23, 171:6, 185:5, 195:20, 201:13, 204:16, 214:13, 227:14, 229:14, 236:13
**submitted** [12] - 21:17, 96:11, 96:12, 99:19, 101:25, 102:18, 103:22, 111:18, 112:8, 114:22, 122:9, 150:2
**subpoena** [4] - 29:22, 185:13, 242:25, 243:1
**subsequent** [1] - 96:21
**substance** [17] - 23:7, 23:12, 97:15, 97:18, 97:19, 97:22, 97:23, 97:24, 98:2, 98:6, 98:8, 98:12, 100:16, 100:17,

32

101:2, 129:23
**substances** [4] -
11:14, 11:15, 95:13,
96:5
**substantive** [12] -
25:13, 96:25, 97:7,
98:21, 100:9, 100:12,
108:21, 130:2, 130:4,
130:9, 143:21, 227:23
**subvert** [2] - 137:22,
242:3
**succeeded** [3] -
131:4, 133:2, 137:7
**successful** [2] -
171:10, 171:14
**succumbs** [1] -
203:16
**Sucett** [1] - 230:4
**suddenly** [6] - 150:5,
153:23, 159:6, 167:2,
172:24, 233:8
**suffering** [1] -
223:10
**sufficient** [7] - 30:15,
30:25, 90:3, 129:15,
131:17, 133:9, 137:13
**sufficiently** [1] - 26:9
**suggest** [4] - 93:19,
113:14, 126:10, 191:7
**suggested** [3] - 17:2,
117:17, 122:8
**suggesting** [1] -
176:7
**suggestion** [5] -
95:17, 95:18, 104:10,
104:12, 104:20
**Suite** [1] - 1:18
**sum** [2] - 24:22,
25:19
**summaries** [3] -
157:10, 185:23,
243:10
**summarizes** [1] -
165:12
**summary** [4] -
148:10, 149:21,
153:7, 158:24
**Sunday** [4] - 26:21,
142:6, 155:16, 182:4
**superiors** [1] - 16:13
**supernatural** [1] -
217:23
**supervise** [2] -
134:14, 136:9
**supervised** [2] -
9:18, 9:21
**supervisor** [15] -
6:10, 9:25, 16:7,
19:10, 19:15, 39:4,
71:1, 169:22, 221:20,

222:7, 223:17,
224:21, 224:23, 238:7
**supervisors** [6] -
39:3, 153:2, 153:4,
157:4, 240:13, 242:10
**support** [1] - 33:5
**supposed** [5] - 14:9,
75:24, 77:8, 81:12,
168:22
**supposedly** [1] -
17:3
**Supreme** [1] - 194:6
**supreme** [1] - 188:11
**surfaced** [1] - 21:10
**surprised** [2] -
224:3, 225:12
**surprisingly** [1] -
170:19
**surveillance** [2] -
169:17, 216:24
**suspected** [1] - 69:4
**suspicion** [1] - 225:4
**suspicious** [1] -
223:5
**sustain** [1] - 94:23
**sustained** [4] - 14:4,
15:16, 42:2, 44:8
**SUV** [1] - 168:20
**sweet** [1] - 215:13
**switches** [2] -
161:21, 178:8
**sworn** [3] - 32:12,
87:7, 87:8
**sympathy** [1] - 124:3
**system** [12] - 7:11,
19:9, 19:16, 19:19,
48:25, 68:25, 160:16,
188:15, 189:9,
192:14, 232:18
**systems** [1] - 232:17

---

# T

**table** [8] - 3:9, 40:20,
40:22, 41:5, 41:6,
67:23, 146:16, 216:19
**tables** [2] - 59:24,
75:23
**tablets** [1] - 247:2
**tactics** [1] - 33:24
**talks** [8] - 42:13,
44:13, 101:13, 165:5,
176:4, 181:14,
181:15, 238:25
**tamper** [9] - 24:9,
24:14, 25:12, 29:6,
144:24, 145:3, 176:1,
176:18, 239:5
**tampering** [24] -
24:5, 24:25, 25:13,

96:16, 96:18, 96:20,
96:21, 96:22, 101:20,
102:2, 102:5, 108:6,
108:21, 112:5,
129:25, 130:4, 145:7,
145:22, 183:20,
185:3, 227:10,
227:16, 240:5, 240:18
**tape** [16] - 31:9,
31:11, 31:12, 31:16,
31:20, 78:21, 79:18,
80:11, 82:4, 83:6,
158:9, 192:25, 209:2,
220:10, 220:14,
223:24
**tapes** [7] - 146:18,
192:24, 196:2, 196:5,
199:4, 214:19, 229:1
**tapping** [1] - 174:7
**target** [7] - 53:7,
58:4, 59:7, 149:11,
168:12, 237:5
**targets** [7] - 11:12,
11:13, 12:3, 14:1,
21:20, 50:25, 149:17
**task** [2] - 58:15,
58:17
**taste** [1] - 201:21
**tax** [3] - 112:7,
113:12, 218:4
**teach** [3] - 33:23,
33:25, 51:22
**team** [2] - 33:7,
154:17
**technical** [1] -
128:12
**technological** [1] -
85:3
**teeing** [1] - 79:2
**telephone** [2] - 36:8,
58:5, 58:21, 217:1
**temper** [2] - 9:19,
10:2
**temperament** [1] -
9:15
**ten** [14] - 17:11,
31:16, 33:9, 61:21,
61:25, 80:17, 85:8,
95:1, 120:22, 208:18,
221:8, 247:11, 247:22
**ten-minute** [1] -
31:16
**tend** [2] - 125:25,
127:11
**term** [4] - 106:19,
106:22, 106:23,
137:24
**terms** [16] - 28:23,
29:11, 41:24, 83:25,
99:17, 105:3, 105:4,

112:12, 174:20,
175:25, 178:6,
188:23, 208:7,
214:23, 235:11,
240:16
**terrified** [1] - 200:19
**test** [1] - 192:16
**testified** [38] - 4:17,
4:22, 23:10, 114:16,
114:18, 126:20,
127:1, 148:15, 149:8,
149:24, 150:8,
150:14, 150:24,
151:14, 152:1,
152:12, 153:11,
156:11, 158:3,
159:24, 161:1,
163:15, 163:18,
164:14, 168:22,
169:24, 174:23,
177:8, 177:9, 200:1,
201:2, 202:7, 210:12,
223:12, 224:22,
229:24, 229:25
**testifies** [1] - 208:12
**testify** [23] - 84:25,
86:23, 86:24, 87:19,
87:20, 88:2, 88:6,
88:12, 88:16, 88:20,
89:3, 91:8, 124:13,
127:19, 149:4, 149:6,
151:7, 195:11,
219:21, 230:16,
239:22
**testifying** [6] - 87:15,
88:21, 126:8, 128:8,
197:6, 207:19
**testimony** [50] - 6:6,
23:15, 26:21, 26:22,
26:23, 30:18, 79:5,
79:23, 84:20, 92:20,
116:8, 116:13,
116:19, 117:9, 125:7,
125:19, 126:6,
126:23, 127:4,
127:17, 127:25,
128:8, 128:9, 128:17,
139:3, 139:19,
141:16, 142:8, 142:9,
142:10, 147:15,
162:8, 182:4, 182:5,
194:25, 195:5, 197:6,
197:7, 197:11,
198:20, 200:7,
218:19, 220:23,
232:13, 232:15,
232:16, 236:20
**THE** [259] - 1:10,
1:13, 1:17, 2:2, 2:7,
3:2, 3:11, 3:16, 3:22,

3:24, 4:7, 9:7, 14:4,
15:6, 15:8, 15:16,
17:14, 17:17, 20:18,
20:21, 22:8, 22:10,
22:13, 22:21, 22:25,
26:14, 26:17, 27:1,
28:15, 30:2, 30:5,
30:11, 30:13, 30:22,
30:24, 31:14, 31:21,
31:24, 32:1, 32:4,
32:10, 32:13, 37:24,
42:2, 44:8, 48:6, 48:8,
66:19, 66:22, 71:10,
78:4, 78:15, 78:17,
78:19, 78:23, 79:3,
79:9, 79:11, 79:14,
80:1, 80:9, 80:15,
80:23, 81:1, 81:7,
81:11, 81:19, 81:21,
82:6, 82:9, 82:18,
82:23, 83:6, 83:19,
84:4, 84:9, 84:14,
84:16, 85:15, 85:20,
85:22, 85:24, 86:2,
86:4, 86:20, 87:1,
87:4, 87:6, 87:9,
87:13, 87:14, 87:17,
87:18, 87:23, 87:24,
88:4, 88:5, 88:7, 88:8,
88:10, 88:11, 88:13,
88:14, 88:18, 88:19,
88:21, 88:22, 89:4,
89:17, 89:21, 90:1,
90:13, 90:18, 90:23,
91:3, 91:6, 91:11,
91:13, 91:16, 91:18,
92:1, 92:3, 92:6, 92:8,
92:14, 92:17, 92:19,
92:24, 93:1, 93:4,
93:6, 94:5, 94:10,
94:23, 95:5, 95:7,
95:11, 95:13, 95:24,
96:4, 96:14, 96:24,
97:10, 97:13, 98:19,
100:8, 100:15,
101:13, 101:19,
102:7, 102:11,
102:14, 102:21,
103:1, 103:7, 103:23,
104:4, 104:8, 104:15,
104:17, 104:22,
105:13, 105:16,
105:21, 105:23,
106:17, 106:21,
106:25, 107:23,
108:4, 108:11,
108:16, 108:18,
108:21, 109:4, 109:7,
109:19, 109:25,
110:6, 110:9, 110:11,
110:17, 110:21,

110:23, 111:2, 111:6,
111:8, 111:11,
111:13, 111:20,
111:22, 112:15,
113:10, 113:22,
114:8, 114:19,
114:25, 115:8,
115:22, 116:2, 116:6,
116:11, 116:17,
116:23, 117:2, 117:6,
117:14, 117:16,
117:22, 117:24,
118:3, 118:10,
118:16, 118:19,
118:25, 119:2,
119:18, 120:1, 120:4,
120:8, 120:10,
120:14, 120:16,
120:24, 121:6, 121:8,
121:12, 121:14,
121:16, 121:22,
122:2, 122:4, 122:16,
122:22, 173:9, 180:4,
186:4, 187:4, 187:9,
187:13, 187:15,
224:15, 231:11,
231:13, 231:22,
231:25, 232:4, 232:7,
232:10, 243:16,
245:15, 246:19,
246:23, 247:12,
247:20, 247:23,
248:1, 248:5, 248:9
**themselves** [4] -
6:24, 8:18, 21:20,
147:8
**theory** [4] - 24:10,
112:14, 112:18,
115:13
**thereabouts** [1] -
41:25
**thereby** [4] - 134:3,
134:5, 135:23, 135:25
**therefore** [2] -
112:23, 119:4
**thinking** [3] - 17:1,
81:23, 224:6
**thinks** [4] - 171:9,
171:10, 171:19, 234:1
**third** [9] - 94:6,
100:17, 100:24,
102:2, 103:1, 103:13,
107:7, 134:8, 136:3
**Third** [7] - 102:23,
103:2, 103:4, 103:7,
103:11, 103:16,
103:18
**thorough** [1] -
141:17
**thousand** [2] -

152:11, 181:1
**threat** [9] - 165:14,
233:15, 233:18,
234:13, 234:24, 236:1
**threaten** [3] - 164:25,
236:10
**threatening** [7] -
27:19, 27:20, 164:15,
180:25, 182:13,
236:4, 236:6
**threatens** [1] - 150:9
**threats** [1] - 236:9
**three** [38] - 10:17,
41:6, 55:2, 55:9,
61:10, 61:25, 65:11,
93:17, 97:23, 98:16,
102:19, 104:5, 105:8,
105:10, 105:17,
105:23, 108:13,
134:6, 135:6, 136:1,
141:12, 141:15,
143:17, 144:5,
144:10, 145:4, 156:4,
165:2, 179:8, 213:19,
216:21, 219:20,
219:21, 220:8,
230:24, 241:7, 242:23
**threshold** [3] -
97:25, 98:6, 98:9
**threw** [1] - 175:9
**throes** [1] - 180:22
**throughout** [2] -
162:11, 180:12
**throw** [5] - 175:22,
177:22, 198:22,
215:21, 240:2
**thundering** [1] -
147:4
**thwarted** [1] - 15:13
**tied** [1] - 191:19
**tight** [2] - 151:6,
228:13
**tighter** [1] - 206:5
**timeline** [1] - 147:11
**timing** [1] - 236:23
**tip** [1] - 219:17
**tipped** [4] - 229:21,
230:9, 233:3, 236:21
**tipping** [8] - 27:5,
27:22, 151:4, 156:2,
182:14, 182:16,
183:16, 230:5
**tips** [1] - 150:11
**Title** [7] - 99:20,
100:19, 130:13,
132:1, 134:17, 136:12
**today** [8] - 64:6,
115:2, 149:4, 158:15,
169:24, 175:3, 186:7
**together** [21] - 37:6,

54:23, 55:6, 55:9,
55:22, 56:19, 56:24,
56:25, 57:3, 61:14,
62:1, 63:5, 101:8,
113:21, 163:4, 164:7,
165:10, 165:21,
168:6, 178:21, 203:7
**tomorrow** [9] -
173:17, 175:9,
245:16, 245:20,
245:23, 245:25,
246:1, 246:15, 247:22
**tonight** [4] - 186:13,
186:20, 245:24,
246:12
**took** [8] - 40:19,
47:2, 170:14, 200:8,
204:22, 205:12,
205:14, 231:7
**tool** [4] - 183:14,
199:20, 203:17
**tools** [1] - 201:25
**top** [2] - 106:25,
109:13
**total** [2] - 81:10,
162:11
**totality** [1] - 30:24
**tough** [1] - 191:21
**toward** [10] - 9:19,
25:5, 132:4, 132:12,
134:19, 135:2, 143:4,
144:1, 183:21, 241:1
**towards** [1] - 151:20
**tracks** [1] - 162:20
**tradition** [1] - 189:15
**traffic** [2] - 18:5,
215:17
**trafficker** [6] - 152:9,
153:20, 162:24,
165:18, 165:22,
215:10
**traffickers** [1] - 148:1
**trafficking** [29] -
26:20, 28:2, 70:11,
99:2, 142:12, 142:19,
150:25, 152:11,
153:3, 157:11, 162:3,
162:12, 162:16,
163:5, 163:12, 164:8,
164:18, 165:6, 168:3,
168:6, 169:15, 175:3,
177:12, 182:3, 182:6,
207:10, 211:16,
211:22, 233:2
**trained** [6] - 49:5,
52:12, 53:2, 68:23,
68:25, 217:12
**training** [6] - 34:12,
48:21, 48:22, 52:13,
128:13, 214:8

**trainings** [1] - 34:12
**transcript** [30] -
31:12, 78:21, 80:4,
80:6, 80:8, 80:12,
80:14, 80:22, 81:17,
85:5, 85:10, 85:18,
174:11, 174:16,
185:20, 207:23,
207:24, 208:1,
220:13, 223:24,
225:11, 233:22,
234:4, 234:16,
235:19, 241:18,
242:20, 243:8
**transcription** [1] -
249:4
**transcripts** [3] -
157:18, 172:18, 246:7
**trash** [1] - 176:19
**travel** [1] - 173:3
**traveling** [1] - 114:14
**treated** [1] - 77:16
**treatment** [2] -
128:5, 197:2
**tree** [1] - 207:21
**tremendous** [5] -
188:4, 188:6, 188:15,
188:16, 230:24
**TRIAL** [1] - 1:10
**Trial** [1] - 80:4
**trial** [30] - 5:7, 23:3,
23:17, 81:24, 82:14,
84:18, 85:4, 88:20,
89:7, 115:6, 116:7,
116:12, 117:8,
118:20, 118:23,
119:3, 119:16,
119:21, 124:2,
125:12, 127:5, 139:3,
139:8, 139:10,
139:23, 187:21,
198:6, 218:24,
244:25, 245:7
**trick** [5] - 107:7,
134:6, 136:1, 241:6,
241:8
**tried** [8] - 13:13,
35:23, 100:5, 145:9,
154:16, 188:24,
233:19, 240:19
**tries** [1] - 99:12,
154:10, 155:1, 169:23
**trouble** [7] - 28:9,
111:25, 156:3,
156:25, 167:9,
175:15, 222:1
**truck** [1] - 169:10
**true** [11] - 4:25, 6:25,
16:16, 64:20, 126:4,
151:19, 161:3,

173:17, 181:12,
205:15, 206:3, 206:5,
213:17, 214:18,
214:19, 215:23,
217:17, 218:6, 219:18
**Trujillo** [6] - 11:25,
152:3, 172:2, 172:4,
172:6, 212:20
**truly** [1] - 216:8
**trust** [2] - 214:4,
214:14
**trusted** [1] - 37:20
**truth** [1] - 126:13,
126:15, 127:10,
140:20, 175:12,
184:12, 188:14,
197:24, 223:7,
241:24, 241:25
**truthful** [3] - 128:8,
184:17, 197:6
**try** [8] - 16:2, 35:25,
131:7, 132:10,
136:18, 140:12,
142:3, 143:2
**trying** [10] - 56:12,
81:23, 106:18,
154:25, 165:15,
170:1, 176:12,
181:20, 231:15,
233:17
**tune** [1] - 42:18
**turn** [5] - 16:11,
19:21, 164:2, 172:10,
238:22
**turns** [2] - 172:2,
172:15
**twice** [3] - 36:15,
46:25, 169:20
**twist** [1] - 220:2
**two** [58] - 24:2, 46:3,
47:16, 47:24, 47:25,
55:6, 60:7, 67:20,
79:17, 82:12, 94:15,
94:25, 96:8, 98:1,
98:25, 99:12, 100:16,
101:1, 101:3, 102:1,
102:24, 102:25,
104:2, 105:14,
113:13, 116:11,
118:12, 130:20,
131:7, 131:10,
132:10, 132:16,
132:18, 134:2, 135:3,
135:22, 136:18,
136:21, 136:23,
142:2, 143:2, 144:2,
145:9, 146:20, 159:1,
159:13, 161:22,
165:2, 179:8, 179:22,
181:2, 182:2, 185:6,

197:20, 204:14,
232:17, 233:5, 240:24
**type** [14] - 34:12,
40:3, 45:14, 50:5,
53:17, 78:7, 112:13,
146:12, 188:22,
204:22, 209:3, 209:4,
218:3
**types** [4] - 8:16,
146:20, 146:24, 148:2
**typical** [2] - 36:13,
61:10
**typically** [4] - 6:9,
67:4, 96:24, 97:8

## U

**U.S** [1] - 194:6
**U.S.C** [1] - 97:16
**Uber** [3] - 28:3, 57:6,
168:1
**ultimate** [1] - 88:1
**Umbach** [1] - 94:12
**unaccompanied** [2]
- 33:6, 58:19
**unanimous** [2] -
140:7, 244:3
**unanimous-in** [1] -
140:7
**unanimously** [3] -
98:11, 129:16, 243:25
**unassailable** [1] -
233:25
**unchanged** [1] -
160:11
**under** [23] - 27:6,
89:9, 105:17, 109:17,
114:14, 118:11,
134:14, 136:9,
138:12, 150:12,
150:22, 154:24,
175:9, 175:22,
177:23, 182:14,
183:17, 200:1, 211:3,
229:22, 230:2, 230:5,
240:2
**unduly** [1] - 139:16
**unfairly** [1] - 71:6
**unfortunately** [2] -
204:19, 220:7
**unimportant** [1] -
127:16
**unit** [2] - 62:16,
157:19
**united** [1] - 1:22
**UNITED** [5] - 1:1,
1:4, 1:11, 1:14, 1:14
**United** [25] - 3:3, 3:8,
25:11, 94:12, 99:20,
100:19, 130:13,

130:14, 132:1, 132:6,
132:14, 134:10,
134:17, 134:21,
135:5, 135:8, 136:5,
136:12, 143:6, 144:4,
144:7, 243:21,
243:23, 244:6, 249:9
**unknown** [2] - 61:18,
104:2
**unlawful** [30] - 24:3,
130:21, 131:2, 131:8,
131:10, 131:13,
131:16, 132:11,
132:17, 132:19,
132:25, 133:4, 133:7,
133:20, 133:22,
135:15, 135:17,
136:19, 136:21,
136:24, 137:5, 137:9,
137:12, 142:3, 143:3,
143:14, 145:10,
145:20
**unless** [10] - 35:25,
58:13, 192:2, 192:4,
194:16, 215:17,
215:22, 237:1, 242:10
**unnecessary** [2] -
81:23, 96:7
**unplug** [2] - 191:17,
191:20
**unusual** [6] - 17:20,
62:5, 62:10, 62:21,
80:18, 80:19
**up** [79] - 6:9, 10:6,
14:6, 19:11, 20:7,
23:17, 28:13, 39:1,
66:5, 67:23, 78:9,
79:2, 80:15, 105:2,
106:16, 112:7,
121:16, 140:15,
144:19, 151:1, 151:9,
156:20, 158:8,
158:24, 159:24,
160:8, 160:21,
160:25, 163:8,
163:16, 164:9,
165:16, 165:18,
166:20, 168:23,
169:21, 174:13,
175:8, 175:15, 176:2,
176:4, 176:5, 176:18,
177:23, 178:11,
180:3, 181:2, 181:20,
181:21, 182:7, 183:4,
184:5, 185:15,
186:17, 187:22,
191:19, 191:22,
202:11, 205:4,
220:21, 222:22,
229:7, 229:17,

230:13, 231:15,
231:17, 232:1, 233:7,
233:9, 233:18, 234:5,
236:3, 237:23,
238:12, 238:13,
239:1, 242:9, 246:6
**update** [1] - 11:9
**updated** [2] - 90:19,
100:25
**updates** [1] - 160:17
**upset** [2] - 47:12,
47:15
**upstanding** [1] -
238:11
**urge** [2] - 225:9,
243:8
**useful** [2] - 214:1,
214:2
**uses** [4] - 108:8,
158:22, 174:20,
201:25
**utilized** [1] - 157:21
**utter** [1] - 171:7

## V

**vacation** [1] - 57:21,
231:7
**vague** [1] - 122:12
**Valencia** [1] - 1:18
**valid** [1] - 16:5
**valuable** [1] - 183:14
**value** [2] - 15:25,
98:3
**valued** [1] - 51:16
**varied** [1] - 36:16
**varies** [1] - 33:8
**variety** [1] - 235:16
**various** [1] - 50:4
**verbatim** [1] - 105:11
**verdict** [16] - 98:13,
111:8, 120:10,
121:17, 140:6, 140:9,
190:4, 231:20,
243:20, 243:24,
244:3, 244:9, 244:10,
244:21, 245:8, 245:11
**versed** [1] - 51:3
**version** [4] - 83:13,
83:15, 84:6, 90:20
**versus** [3] - 3:4,
94:12, 243:23
**vest** [1] - 205:18
**Victor** [1] - 220:7
**Victoria** [8] - 2:11,
79:8, 220:9, 220:14,
220:15, 220:25,
223:19, 224:7
**video** [7] - 66:1,
66:20, 71:15, 85:9,

150:20, 167:10, 181:8
**view** [2] - 172:21,
232:13
**viewing** [1] - 19:19
**views** [1] - 160:23
**violate** [5] - 100:3,
226:16, 226:17,
227:20, 228:17
**violating** [12] -
115:11, 118:23,
119:3, 119:22, 129:9,
131:25, 133:19,
134:17, 135:14,
136:11, 139:9, 194:3
**violation** [12] - 96:5,
113:13, 115:19,
115:24, 117:20,
119:19, 130:13,
139:6, 218:4, 218:20,
218:21, 218:24
**violations** [3] -
112:10, 118:20
**violence** [3] - 52:25,
53:1, 75:7
**violent** [2] - 50:5,
53:15
**virtue** [1] - 49:14
**virus** [1] - 35:16
**visit** [3] - 35:6, 35:8,
66:7
**visiting** [1] - 148:21
**voice** [2] - 45:18,
52:22
**voicemail** [3] -
164:23, 180:9, 236:8
**volume** [1] - 17:25
**Volume** [2] - 1:7,
248:11
**voluntarily** [4] -
129:1, 129:3, 193:24,
194:13
**volunteer** [1] -
154:18
**volunteered** [2] -
219:16, 220:5
**volunteering** [6] -
154:19, 154:20,
154:23, 219:23,
219:25, 220:4
**voted** [1] - 244:19
**vs** [1] - 1:6

## W

**wait** [3] - 177:5,
186:14, 217:8
**waited** [2] - 40:17,
76:15
**waiting** [3] - 3:17,
158:13, 205:8

**walk** [4] - 145:2,
145:8, 147:12, 192:23
**walking** [1] - 73:11
**walls** [1] - 233:8
**wants** [20] - 7:12,
29:10, 80:25, 99:12,
106:10, 119:8,
154:20, 165:5,
169:10, 178:1,
180:22, 180:23,
198:19, 211:17,
211:21, 222:17,
233:5, 233:6, 233:13
**warm** [1] - 68:5
**warn** [1] - 154:11
**warns** [1] - 185:14
**warrant** [5] - 27:11,
154:8, 156:24, 236:25
**warranted** [1] - 107:5
**warrants** [4] - 69:14,
154:20, 182:22
**water** [3] - 43:23,
63:7, 147:5
**Waterloo** [1] -
238:16
**waters** [2] - 102:5,
104:2
**ways** [4] - 77:23,
129:10, 129:12,
240:24
**wear** [2] - 39:15,
59:12
**wearing** [1] - 59:20
**wedding** [4] - 42:17,
42:18, 42:20, 43:3
**week** [9] - 36:13,
36:15, 157:12,
166:16, 237:22, 238:9
**weeks** [9] - 47:16,
47:24, 47:25, 48:2,
141:12, 141:15,
143:17, 153:8, 203:4
**weigh** [1] - 16:13
**weight** [7] - 97:24,
98:11, 100:18,
100:23, 126:1,
139:19, 194:25
**welcome** [3] - 84:17,
122:23, 123:11
**well-versed** [1] -
51:3
**West** [24] - 10:6,
10:17, 11:12, 11:23,
11:25, 12:7, 12:13,
27:6, 142:10, 142:11,
142:15, 148:12,
149:3, 149:9, 149:23,
150:4, 150:25, 152:6,
152:18, 154:8,
182:14, 233:12,

234:25, 236:22
**whatsoever** [1] - 160:20
**whiskey** [2] - 56:19, 61:6
**whole** [14] - 45:9, 114:16, 124:7, 126:7, 151:19, 156:15, 169:11, 169:25, 221:8, 232:25, 238:19, 239:13, 240:14, 242:11
**wife** [3] - 35:4, 54:14, 171:21
**willful** [2] - 28:23, 139:1
**willfully** [46] - 24:8, 25:23, 27:4, 27:7, 27:12, 27:14, 27:18, 27:21, 27:25, 28:3, 28:19, 28:21, 93:7, 94:3, 99:3, 99:9, 129:2, 129:7, 129:22, 129:25, 130:7, 131:11, 131:16, 132:17, 133:8, 136:22, 137:12, 138:18, 142:22, 143:14, 145:21, 182:9, 183:9, 193:8, 193:21, 193:22, 193:23, 194:12, 226:12, 226:14, 226:15, 226:21, 226:23, 226:24, 227:10, 227:13
**willing** [4] - 125:1, 190:18, 221:2, 221:3
**window** [3] - 215:5, 215:7, 215:21
**wine** [24] - 40:21, 41:15, 41:17, 41:18, 42:8, 56:22, 61:7, 61:8, 61:12, 63:13, 63:16, 63:18, 63:22, 64:3, 64:8, 64:18, 65:8, 65:16, 66:8, 67:2, 67:4, 74:20, 74:24, 239:15
**wine-of-the-month** [2] - 63:13, 67:4
**wire** [2] - 106:13, 233:7
**wiretap** [29] - 26:21, 27:16, 28:1, 29:4, 29:18, 142:7, 144:16, 146:18, 146:22, 159:15, 163:2, 163:11, 164:5, 164:11, 165:21,

165:23, 166:2, 166:9, 168:18, 168:25, 171:25, 172:18, 174:11, 232:15, 233:25, 236:15, 236:16, 240:2, 242:18
**wisdom** [3] - 195:7, 195:10, 197:10
**wise** [1] - 70:8
**wish** [3] - 186:11, 244:13, 245:21
**withdraw** [1] - 110:15
**witness** [83] - 4:10, 6:23, 21:25, 24:5, 24:14, 24:25, 25:12, 25:13, 31:2, 31:5, 31:6, 31:22, 32:12, 58:4, 58:9, 59:6, 78:19, 78:24, 79:5, 79:21, 84:23, 84:25, 93:1, 96:16, 96:18, 96:20, 96:22, 101:20, 102:2, 102:4, 108:6, 108:21, 112:4, 114:10, 114:16, 114:17, 126:5, 126:7, 126:10, 126:12, 126:14, 126:16, 126:18, 126:19, 126:21, 127:1, 127:3, 127:4, 127:6, 127:7, 127:10, 127:12, 127:19, 127:20, 127:21, 128:2, 128:4, 128:7, 128:10, 129:25, 130:3, 145:7, 145:22, 159:21, 183:20, 185:2, 195:23, 196:23, 196:24, 196:25, 197:2, 197:5, 202:24, 204:4, 219:3, 224:19, 227:10, 227:16, 233:24, 239:8, 240:5, 240:17
**Witness** [2] - 22:9, 78:18
**witness's** [6] - 44:7, 79:4, 126:23, 127:17, 128:16, 128:17
**witnessed** [1] - 23:19
**witnesses** [20] - 3:14, 14:1, 21:19, 24:9, 50:25, 58:25, 84:21, 92:3, 92:9, 117:2, 125:7, 126:8, 127:24, 128:9, 159:9, 195:8, 195:17, 197:7,

197:11, 197:18
**WITNESSES** [2] - 2:2, 2:7
**woman** [4] - 148:6, 200:9, 202:22, 230:3
**woman's** [1] - 74:4
**wonder** [1] - 188:7
**word** [24] - 20:6, 22:1, 76:22, 104:13, 104:15, 104:18, 106:3, 106:21, 107:1, 108:2, 117:2, 128:25, 129:2, 129:13, 193:7, 193:19, 193:23, 207:14, 224:3, 226:10, 226:11, 226:21, 226:25
**Word** [1] - 114:23
**words** [27] - 4:25, 39:13, 75:7, 80:6, 80:11, 93:23, 95:20, 104:13, 113:7, 114:3, 114:14, 115:10, 116:11, 118:12, 123:16, 130:21, 132:19, 136:24, 138:25, 140:7, 146:22, 194:14, 195:9, 209:17, 215:12, 234:1, 242:19
**work-wise** [1] - 70:8
**worker** [1] - 219:19
**workers** [1] - 184:4
**works** [6] - 4:18, 67:7, 98:24, 170:4, 178:4, 237:12
**world** [3] - 172:13, 214:15, 233:16
**worried** [24] - 152:13, 157:14, 158:1, 158:25, 160:4, 162:5, 162:19, 164:13, 165:4, 167:25, 168:19, 168:21, 168:24, 169:16, 171:22, 173:24, 173:25, 175:4, 178:14, 221:1, 237:4, 242:21
**worry** [8] - 174:6, 178:16, 185:15, 199:9, 206:10, 221:25, 237:5, 238:24
**worse** [2] - 204:20
**worst** [1] - 204:21
**worth** [1] - 80:18
**wrap** [3] - 229:17, 230:13, 232:1
**wrapped** [1] - 200:10
**write** [4] - 19:8,

116:7, 244:14, 247:14
**writes** [1] - 103:1
**writing** [1] - 244:16
**written** [3] - 93:12, 193:7, 247:13
**wrongful** [2] - 133:17, 135:12

---

# Y

**Yandre** [5] - 11:25, 172:2, 172:4, 172:5, 212:20
**yard** [1] - 147:5
**year** [9] - 11:9, 33:10, 159:18, 159:22, 234:8, 234:12, 238:9
**years** [31] - 4:23, 4:24, 17:11, 34:6, 34:18, 65:11, 65:12, 147:20, 148:7, 166:14, 176:9, 183:16, 189:15, 195:24, 196:9, 198:8, 200:9, 203:4, 203:10, 203:14, 205:12, 205:14, 206:5, 206:8, 215:20, 221:8, 221:15, 225:14, 233:20, 238:3, 238:6
**yell** [1] - 73:15
**yesterday** [7] - 4:17, 6:5, 9:13, 10:5, 10:11, 11:5, 169:25
**you-have** [1] - 139:11
**you-perhaps** [1] - 139:11
**young** [2] - 170:3, 204:19
**younger** [3] - 148:7, 200:9, 203:10
**yourself** [22] - 43:17, 51:23, 54:20, 55:24, 56:15, 57:16, 69:3, 101:22, 115:5, 126:11, 126:25, 128:18, 139:16, 140:10, 191:5, 200:22, 214:13, 216:20, 216:21, 242:8, 243:4
**yourselves** [1] - 246:6

---

# Z

**zero** [3] - 216:6, 217:7